## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Tarek Elkholy       )
12440A Liberty Bridge Road   )
Fairfax, VA 22033      )
            )
Atef Tawfik Hanna      )
11100 Doubleday Lane     )
Manassas VA 20109      )
            )
Iman Gariballa       )
6918 Victoria Dr. Unit C    )
Alexandria, VA 22310     )
            )
Muhammad Bashir      )
3502 Holly Road       )
Annandale, VA 22003     )
            )
Abdalla Zamrawy      )
3701 George Mason Drive    )
Apt. # 2602 N        )
Falls Church, VA 22041     )
            )
    Plaintiffs,     )
  v.          )  Civil Action No.:_____
            )
THE ROYAL EMBASSY OF THE KINGDOM OF )
SAUDI ARABIA       )
 601 New Hampshire Ave. N.W.   )
Washington, D.C. 20037     )
            )
  and         )
            )
THE KINGDOM OF SAUDI ARABIA   )
            )
    Defendants.     )
            )

## COMPLAINT

Plaintiffs, Tarek Elkholy (hereinafter "Elkholy"), Atef Tawfik Hanna (hereinafter

"Hanna"), Iman Gariballa (hereinafter "Gariballa"), Muhammad Bashir (hereinafter "Bashir"),

and Abdalla Zamrawy (hereinafter "Zamrawy"), by and through undersigned counsel, Sylvia J. Rolinski, Esq. and the Rolinski Law Group, LLC, hereby files this action against The Royal Embassy of the Kingdom of Saudi Arabia (hereinafter "the Embassy") and the Kingdom of Saudi Arabia (hereinafter "the Kingdom") and hereby alleges as follows:

## NATURE OF THE CASE

1. This suit is brought against the Embassy and the Kingdom challenging their unlawful employment actions, breach of employment contracts and for their violation of federal law, including the Age Discrimination in Employment Act of 1967 (hereinafter "ADEA"), as amended, 29 U.S.C. § 621 *et seq*., Americans with Disabilities Act (hereinafter "ADA"), as amended, 42 U.S.C. § 12101 *et. seq*., and for their violation of the District of Columbia Human Rights Act ("hereinafter DCHRA"), as amended, D.C. Code § 2-1401 et. seq. Plaintiffs, in their respective claims, seek relief pursuant to the ADEA, including, but not limited to, 29 U.S.C. § 626(b-c), the ADA 42 U.S.C. § 12112(a), and the DCHRA, including, but not limited to, D.C. Code § 2-1402.11, for harms caused to Plaintiffs by Defendants' unlawful discrimination on the basis of age and/or disability related termination, when certain Plaintiffs were terminated for exceeding 60 years of age or their disability. Plaintiffs request as relief: reinstatement, or in the alternative, front pay (and future pecuniary losses); back pay and back benefits; unpaid overtime compensation; liquidated damages; compensatory damages; punitive damages; attorney fees; and such other relief as the Court deems just and appropriate, in order to fully remedy Defendants' unlawful acts;

## PARTIES

2.  Plaintiff, Tarek Elkholy, is a resident of Virginia, and was so at all times relevant to this Complaint. He currently resides at 12440A Liberty Bridge Road, Fairfax, VA 22033; Plaintiff Elkholy was employed for more than 26 years by the Embassy of the Kingdom of Saudi Arabia in Washington, D.C. as the Accounting Clerk. He is currently 62 years old;

3.  Plaintiff, Atef Hanna, is a resident of Virginia, and was so at all times relevant to this Complaint. He currently resides at 11100 Doubleday Lane, Manassas, VA 20109. Plaintiff Hanna was employed for more than 15 years at the Embassy of the Kingdom of Saudi Arabia in Washington, D.C..  Initially he was employed commencing January 1, 2006, as the receptionist/phone operator at the Kingdom Ambassador to the U.S. residence in Washington D.C. for one year.  In 2007, he commenced employment as a Consulate Processing Agent in the consular section of the Embassy of the Kingdom of Saudi Arabia and was employed there for approximately 14 years. He is currently 63 years old;

4.  Plaintiff, Iman Gariballa, is a resident of Virginia, and was so at all times relevant to this Complaint.  She currently resides at 6918 Victoria Dr. Unit C, Alexandria, VA 22310.  Plaintiff was employed for 21 years by the Embassy of the Kingdom of Saudi Arabia in Washington, D.C as the Accounting/Personnel Manager.  She currently is 62 years old;

5.  Plaintiff, Muhammad Bashir, is a resident of Virginia, and was so at all times relevant to this Complaint. He currently resides at 3502 Holly Road, Annandale, VA 22003. Plaintiff Muhammad was employed for almost 21 years by the Embassy of the Kingdom Saudi Arabia as a driver at the Office of the Military Attaché. He is currently 78 years old;

6. Plaintiff, Abdalla Zamrawy, is a resident of Virginia, and was so at all times relevant to this Complaint. He currently resides at 3701 George Mason Drive, Apartment # 2602 N, Falls Church, VA 22041. He is currently 76 years old;

7. Defendant, the Royal Embassy of the Kingdom of Saudi Arabia, is an office, instrumentality, arm, agency or representative of the Kingdom of Saudi Arabia in the United States and the District of Columbia. The Embassy has substantial contact with the United States and with the District of Columbia, and the Embassy engages in and conducts commercial activity in the United States and the District of Columbia. The Embassy's address is 601 New Hampshire Avenue N.W., Washington, D.C. 20037;

8. Defendant The Kingdom of Saudi Arabia is a foreign state which has substantial contact with the United States and the District of Columbia. Defendant The Kingdom of Saudi Arabia engages in and conducts commercial activity in the United States and the District of Columbia;

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this Complaint because it presents questions of federal law pursuant to 28 U.S.C. § 1331;

10. Specifically, this Court has jurisdiction over this Complaint pursuant to the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621 *et seq*. and Americans with Disabilities Act (hereinafter "ADA"), as amended, 42 U.S.C. § 12101 *et seq*.;

11. This Court may exercise its supplemental jurisdiction under 28 U.S.C. § 1367 for the claims arising from the District of Columbia Human Rights Act, as amended, D.C. Code § 2-1401 *et seq*.;

12. This Court has jurisdiction over the Embassy of the Kingdom of Saudi Arabia based on the commercial activity exception to the Foreign Sovereign Immunities Act (hereinafter "FSIA"), 28 U.S.C. § 1605(a)(2). See generally, 28 U.S.C. §§ 1602-1611, *see also Youssef v. Embassy of U.A.E., et al.,* 17-cv-2638 (KBJ) (D.D.C. Aug. 23, 2021). Further, this Court has subject matter jurisdiction over this matter for all Plaintiffs were not employed as a civil servant employees of Defendant the Embassy of the Kingdom of Saudi Arabia, all Plaintiffs were not employed as government civil servant employees of Defendant The Kingdom of Saudi Arabia, and all Plaintiffs' actions were neither governmental, nor diplomatic or political in nature. Plaintiffs were hired as third country local employees in the United States;

13. This Court is the proper venue pursuant to 28 U.S.C. § 1391(f) and 29 U.S.C. § 626(c). Plaintiffs' place of work was located in Washington, D.C., and all evidence and relevant supervisor(s) were located in Washington, D.C. Defendant The Embassy is located in Washington, D.C.. Defendants' discriminatory acts complained of took place in Washington, D.C.;

14. Plaintiffs' Americans with Disabilities Act claims pursuant to 42 U.S.C. §12112(a) are timely pursuant to 28 U.S.C. § 1658;

15. Plaintiffs' age discrimination claims are timely pursuant to 29 U.S.C. § 626(d), which allows Plaintiffs to file a civil action in this Court 60 days or more after filing a discrimination charge in the EEOC;

16. Plaintiff Elkholy received termination letter on March 24, 2021 with an effective termination date on June 1, 2021, and he was terminated on June 1, 2021. He timely filed a Charge of Discrimination with the EEOC on April 14, 2021. The EEOC took no action

on the matter and issued a Notice of Right to Sue to Plaintiff on November 14, 2022; and he timely brings this civil action against Defendants within 90 days of their receipt of this Notice;

17. Plaintiff Hanna received termination letter on March 24, 2021, with an effective termination date on June 1, 2021, and he was terminated by the Embassy on June 1, 2021. He timely filed a Charge of Discrimination with the EEOC on May 10, 2021. The EEOC took no action on the matter. Plaintiff Hanna requested a Right to Sue Notice from the EEOC. The EEOC has yet to respond;

18. Plaintiff Gariballa was discriminated against due to her disability and her employment terminated with the Embassy in February 2018, and she filed a Charge of Human Rights Discrimination with the D.C. Commission on Human Rights ("DCHRC"). The DCHRC took no action on the matter and issued a response on March 16, 2020; and she timely brings this civil action against Defendants. Additionally, Plaintiff Gariballa timely brings her claims under the ADA due to her visual disability;

19. Plaintiff Bashir was terminated by the Embassy on August 1, 2017, and he filed a Charge of Human Rights Discrimination with the D.C. Commission on Human Rights. The DCHRC took no action on the matter and issued a response on April 3, 2020; and he timely brings this civil action against Defendants;

20. Plaintiff Zamrawy was terminated by the Embassy on June 1, 2019, and he filed a Charge of Human Rights Discrimination with the D.C. Commission on Human Rights. The DCHRC took no action on the matter and issued a response on January 31, 2020; and he timely brings this civil action against Defendants;

## GENERAL FACTS APPLICABLE TO ALL PARTIES

21. Upon information and belief, Defendants engaged in a age discrimination;

22. Upon information and belief, Defendants engaged in discrimination based on employees disability and failed to make accommodations for said disability which were within the control and ability for Defendants to accommodate the disabilities;

23. Upon information and belief, Defendants failed to provide health insurance; adequate contribution for health insurance and adequate contribution to U.S. social security employer payment contributions;

24. Upon information and belief, Defendants breached their employment contracts with Plaintiffs by failing to provide agreed upon and standard end-of- service compensation as promised;

25. Upon information and belief, Defendants have engaged in decades long discrimination practices to the detriment of Plaintiffs;

26. Upon information and belief, Defendants have enabled and allowed, despite complaints, a hostile work environment and discrimination based on national origin, age, and ethnicity;

27. Defendants routinely have local employees work past the age of 65 and not compel their retirement, but Embassy managers asserted as to Plaintiffs, except Gariballa, that said Plaintiffs would be terminated because of exceeding 65 years of age and engaged in a course of conduct which is arbitrary and disparate toward Plaintiffs.  In contrast with the treatment of other Embassy employees, Plaintiffs termination by Defendants was in violation of federal law and D.C. law as noted above;

28. Plaintiffs suffered damages as a result of the unlawful termination by Defendants. For instance, Plaintiffs have been without income since their termination and Plaintiffs had

no plans to retire. All efforts to gain employment have been thwarted by the willful manner in which Plaintiffs were terminated, specifically set forth below as to each Plaintiff. Plaintiffs' termination from the Embassy has resulted in Plaintiffs being precluded from obtaining employment at other embassies, i.e., in field of expertise, as termination from the Embassy effectively blacklists them on the job market. As a consequence of Defendants' actions, Plaintiff's reputation has been severely damaged by Defendant's unlawful termination and they have suffered emotional distress. Plaintiffs' severance payment and benefits were also negatively impacted by Defendants' unlawful conduct and premature termination in breach of Plaintiffs' respective employment contracts and Defendants promises to Plaintiffs, policies and practices for end-of-service compensation;

## FACTS RELATED TO PLAINTIFF ELKHOLY

29. Plaintiff Elkholy, is a dual United States-Egyptian citizen, and is a 62-year-old man with a specialty in accounting and a Master of Science in Accounting from Strayer University, Commonwealth of Virginia;

30. Elkholy was employed at the Embassy for more than 26 years as an accountant. He commenced employment at the Embassy on October 6, 1994, as an Accounting Clerk. In May 2008, his title was updated to clerk and he ultimately became the number two person with expanded accounting related responsibility in the Department of Finance at the Embassy;

31. He successfully served six Kingdom Ambassadors to the U.S. in Washington, D.C. on behalf of the Defendants, including Her Excellency Reema Bint Bandar Al Saud,

Ambassador to the United States for the Kingdom, when he was terminated on June 1, 2021;

32. In his 26 years of employment with Defendants as an Accountant Elkholy received numerous letters from Embassy officials commending his loyalty and the high quality of his work;

33. Elkholy's job duties as the Accounting Clerk included, but were not limited to, the following: preparing annual Embassy budgets and reports; compliance with external annual audits; supervising and monitoring the work of the accounting team; evaluating accounting team performance and training; payroll management; verifying local employee timesheets; bank account reconciliation and general ledger accounts; and paying local United States vendors' invoices. As the Accounting Clerk reviewing the Embassy's transactions in the United States, Elkholy oversaw Defendants' commercial activity in the United States, monitoring commercial transactions in the United States. At no time did he engage in diplomatic, governmental or political work;

34. On October 6, 1994, when Elkholy was first hired by the Embassy as an Accounting Clerk, the Embassy and Elkholy executed an employment contract. See Ex 1 Elkholy Employment Contract. This employment contract was titled "Employment Contract For Employees of Saudi Embassies and Consular Office Overseas". Elkholy during all times of his employment was a "Local Employee". Elkholy, as an American/Egyptian citizen of non-Saudi origin, was hired as a local employee to fill a local staffing need and was not a civil servant of Defendants at any time during his employment;

35. On February 27, 1998, Elkholy's contract was changed but the position remained the same - Accounting Clerk. As a local employee and not a civil servant, Elkholy was not entitled to

civil service benefits or to any other benefits, rights, or remedies provided by the laws of Defendants Embassy or the Kingdom of Saudi Arabia;

36. On April 28, 2004, a letter was sent by local employees of non-Saudi origin, aka local employees, including Elkholy, to His Royal Highness Bandar bin Sultan Al Saud, Ambassador of the Kingdom of Saudi Arabia to the U.S., requesting an increase in salary, health insurance and U.S. social security employer contributions. No outcome resulted from this letter;

37. On September 30, 2004, a follow-up letter was sent by local employee of non-Saudi origin, aka local employees, including Elkholy, to His Royal Highness Bandar bin Sultan Al Saud, Ambassador of the Kingdom of Saudi Arabia to the U.S. No outcome resulted from this letter;

38. On October 6, 2004, a copy of the letter sent to His Royal Highness Bandar bin Sultan Al Saud, Ambassador of the Kingdom of Saudi Arabia to the U.S. was sent to His Royal Highness Saud bin Faisal Al Saud, Foreign Minister of the Kingdom of Saudi Arabia;

39. On February 16, 2006, a letter was sent to His Royal Highness Turki bin Faisal Al Saud, Ambassador of the Kingdom of Saudi Arabia to the U.S., which included unresolved issues such as: local employees of non-Saudi origin, aka local employees, did not receive a pay increase for more than 9 years; local employees of non-Saudi origin, aka local employees, did not have health insurance or U.S. social security contributions from the Defendants. Further, it also mentioned that the Embassy was hiring local employees of Saudi origin without considering experience and qualifications, and providing greater compensation to those local employees of Saudi origin than the compensation made to more experienced and better qualified local employees of non-Saudi origin, aka local employees;

40. On May 28, 2006, Elkholy's employment contract was changed. Elkholy's gross salary was noted by Defendants as follows: $2,577.30 for basic salary, $193.30 for social security, and $644.33 for health insurance, for a total of $3,414.93;

41. Because the amounts arbitrarily designated by Defendants for social security and health insurance were part of Elkholy's monthly gross paycheck, he was required to pay U.S. income tax on both amounts. This reduced the available dollar amount of actual in pocket post taxes compensation and rendered the amount insufficient to procure health insurance for himself and his family. Also, for over nine years there had been no health insurance contribution or social security contribution or cost of living increase;

42. On May 7, 2008, Elkholy's title was changed from Account Clerk to Clerk. The memorandum from the Ministry of Foreign Affairs No. 62646/60/95, dated May 28, 2008, noted the title change would take effect on May 7, 2008;

43. On July 5, 2008, the Embassy created a two-tiered pay scale system: one for local employees of non-Saudi origin, aka local employees, and another for local employees of Saudi origin. In effect Defendants created a caste system. Each pay scale had 15 grades. The pay scale for local employees of Saudi origin provided compensation in amounts far greater than the scale for the local employees of non-Saudi origin, aka local employees, by as much as $1,500 per pay period for the same position. Further, Defendants put most of the local employees of non-Saudi origin, and Plaintiffs, including Elkholy, on the lowest/last 3 pay scales so that they would not receive a pay increase, and Defendants put local employees of Saudi origin on the highest/first grade of the scale so they would receive a pay increase over the next 15 years. When Elkholy complained about this, the Embassy opened the scale for non-Saudi origin local employees, but local employees of Saudi origin were on a higher

scale of 20 grades instead of 15. This pay scale did not take into consideration the years of experience, skills, and qualifications of local employees. This tier system allowed Defendants to continue to discriminate against Plaintiffs, including Elkholy, based on national origins and ethnicity;

44. On June 1, 2009, Elkholy's salary was increased to $3,670.40. An increase in base salary was supposed to occur annually after 2008, however, the increases occurred only twice, once in 2009 and once in 2015;

45. Upon information and belief, on January 1, 2013, Defendants introduced a new contract for all new local employees because the old version did not comply with Saudi labor laws and American labor laws. The new version of the contract had a severance pay with no cap. Elkholy asked for his contract to be updated to the new version, to which the Embassy declined and informed him that there is no need because his severance pay would have no cap;

46. Defendants failed to make any U.S. social security tax payments to the state or the IRS on behalf of the local employees of non-Saudi origin. Rather, defendants merely designated the arbitrary amount of $193.30 as a social security designation of Elkholoy's gross salary;

47. Defendants failed to establish any health insurance plan, purchase any health insurance plan or provide adequate funds to local employees to purchase health insurance. Instead, the Defendants merely set forth an arbitrary amount of $644.33 out of the base salary as a designation for Elkholoy's health insurance. However, upon information and belief, no plan in the U.S. could be purchased for that amount for an individual or a family during all times relevant hereto. Therefore, the local employees, including all Plaintiffs, continued to exist without health insurance and without any U.S. social security contribution. As to the lack

of health insurance, the U.S. Department of State has sought to compel the Defendants to create or contribute enough funds to local employees to support a health insurance plan, but to no avail;

48. On November 1, 2015, Elkholy's salary was increased to $3,815.77, a mere $24.00 per year since 2009 as compared with an annual increase of 5% annually afforded local employees of Saudi origin;

49. On February 29, 2016, a letter was sent from local employees of non-Saudi origin, including Plaintiff Elkholy, to His Royal Highness Abdullah bin Faisal Al Saud, Ambassador of the Kingdom of Saudi Arabia to the U.S. (10/2015 - 04/2017), requesting health insurance, actual U.S. social security tax contribution, and an increase in salary for local employees of non-Saudi origin due to inflation. This increase after a 10 year period of time did not adequately provide for the local employees of non-Saudi origin. The cost for local employees of non-Saudi origin to buy their own health insurance for themselves and their family far exceeded the 2006 $644.33 amount that was "designated" by Defendants in and a part of Plaintffs', including Elkholy's, gross salary. The Embassy provided a health insurance plan with full medical coverage for local employees of Saudi origin and their families at no cost to them. Local employees of non-Saudi origin requested multiple times to get coverage under the same plan but the request was denied.

50. On March 3, 2016, a letter was sent from local employees of non-Saudi origin asking for the housing allowance to His Royal Highness Abdullah bin Faisal Al Saud, Ambassador of the Kingdom of Saudi Arabia to the U.S.;

51. On November 9, 2017, a letter was sent to His Royal Highness Khalid bin Salman Al Saud, then Ambassador of the Kingdom of Saudi Arabia to the U.S., now the Kingdom's Minister

of Defense, from local employees of non-Saudi origin, requesting a salary increase, removal of the cap on severance pay, U.S. social security tax, and health insurance;

52. On June 4, 2018, a diplomatic note from the U.S. Department of State to the Embassy was sent to Defendants requesting that health insurance be provided for all employees, including local employees of non-Saudi origin;

53. In May 2019, Elkholy reported financial abuse to the Embassy by his superiors for which he was subsequently penalized and whistleblower retaliation was a contributing factor in his subsequent termination based on national origin and age as well;

54. On May 8, 2019, Marzouk Al-Otaibi, head of administration and personnel of the Saudi Embassy from 2018 to 2022, (hereinafter "Marzouk") sent his car to the mechanic that Elkholy employed to maintain Embassy vehicles. The mechanic informed Elkholy that Marzouk took his car after fixing it without paying and instructed the mechanic to send the invoice to Elkholy for payment from Embassy funds. Elkholy told the mechanic that it was a personal car, and Elkholy was only authorized to make payments on repairs related to Embassy vehicles. After two weeks, Marzouk left the repair invoice in Elkholy's office. Elkholy took the invoice to his supervisor, Ibrahim Haneen, Head of Finance Department of the Embassy, to explain the situation. Marzouk finally paid the mechanic from his personal credit card and provided Elkholy with a copy of the payment receipt. He threw the receipt payment at Elkholy aggressively. Marzouk, in conjunction with Defendants, sought Elkholy's termination and in fact replaced him with a younger Saudi graduate student, Faisal Al-Fouqueeh, accounting clerk, employed from 2021 to the present;

55. On May 29, 2019, again the U.S. Department of State sent a diplomatic note to the Embassy demanding that health insurance be provided for all employees, including local employees of non-Saudi origin;

56. On November 22, 2019, an email was sent to Her Royal Highness Reema bint Bandar Al Saud, Ambassador of the Kingdom of Saudi Arabia to the U.S. (02/2019 - Present), requesting a meeting with two local employees of non-Saudi origin, including Elkholy, to discuss the discrimination and disparity in pay, benefits and treatment. There was no answer;

57. On January 8, 2020, a follow-up email was sent, to which there was no answer;

58. On January 14, 2020, local employees of non-Saudi origin received notice that they were prohibited from bringing their cell phone to the workplace. Nonetheless, Saudi nationals as well as local employees of Saudi origin could still bring their cell phones to the workplace;

59. On April 3, 2020, a final notice from the U.S. Department of State was sent to the Embassy, requesting health insurance for all employees, including local employees of non-Saudi origin. The U.S. Department of State provided December 31, 2020 as the deadline to the Embassy to effectuate such coverage for all employees, regardless of nationality. The Embassy ignored the diplomatic notes from the U.S. Department of State regarding this matter. No local employees of non-Saudi origin received the health insurance benefit;

60. On October 13, 2020, a letter was sent to His Royal Highness Faisal bin Farhan Al Saud, Foreign Minister of the Kingdom of Saudi Arabia serving from October 2019 to the present, requesting salary increases, change in severance pay to have no cap, change of employment contracts to the new version, U.S. social security contribution, and health insurance for all employees. The basis of the request rested on the disparity of benefits and pay between the

local employees of Saudi origin and local employees of non-Saudi origin. The letter was delivered to Samer Alkharashi, Deputy Chief of Mission of the Saudi Embassy employed from February 2019 to 2022, to send it to His Royal Highness Faisal bin Farhan Al Saud. However, instead Samer Alkharashi sent the letter to Marzouk, who did not forward it to the Foreign Minister;

61. On October 20, 2020, Marzouk called Elkholy to his office and closed the door. He yelled at Elkholy for sending a letter to the Deputy Chief of Mission. He accused Elkholy of overstepping him, even though Elkholy was instructed to do so by his own boss after Elkholy shared his concerns. Marzouk said that he had already reached the age of 60, and should have been let go because of his advanced age. Further, he said: "You Egyptians are demagogues. You will never be equal to the Saudis";

62. On November 13, 2020, a new COVID-19 work schedule was circulated for local employees of non-Saudi origin in the Embassy Finance Department, which required local employees of non-Saudi origin to work more hours than their Saudi colleagues. It included the further restriction that local employees could only be exempt from work if a local employee had contracted COVID. This exception did not apply to employees of Saudi origin;

63. On December 15, 2020, Marzouk asked Elkholy to train Faisal Al-Fouqueeh as an accounting clerk (est 2021 - Present). Marzouk claimed that Faisal was an accounting U.S. graduate student, and that he needed to learn everything associated with Elkholy's work. Elkholy trained Faisal for over two months. After Faisal was trained Elkholy was terminated. Elkholy later learned that Faisal replaced him;

64. On January 6, 2021, Marzouk directed Elkholy to handle his personal business during work hours. This included paying Marzouk's personal bills, repairing his car, renting his house, and more;

65. On January 10, 2021, Elkholy complained to his superiors about a Saudi colleague, Abdulaziz Fitaihi, accounting clerk employed from 2019 to the present, because Fitaihi did not want to complete his assignment and rudely instructed Elkholy to finish it for him. When Elkholy objected, Fitaihi informed Elkholy that he was a Saudi, and that Elkholy should not protest for there would be repercussions for such whistleblower actions. Marzouk was aware of this incident, and stated that he sided with Fitaihi because he was a Saudi national;

66. On February 21, 2021, Elkholy was a witness to high-level fraud at the Embassy which he reported to Defendants. Hisham AbdelMalak bin Saif, Saudi citizen department clerk of the Saudi Embassy, employed from 2017 to the present, used the Embassy's Fedex account for his personal business. This was an accepted practice that allowed the Embassy's employees to benefit from the FedEx business discount as long as the employee reimbursed the Embassy by giving the cash to Elkholy would added it back into the budget. However, Hisham did not give the cash to Elkholy and instead gave it to Elkholy's manager, Ibrahim Haneen, Head of the Finance Department of the Saudi Embassy (est. 2018-2022). When Elkholy requested the money from his manager, Haneen, so to return the amount to the budget, Haneen told him to forget about it. This incident involved over $1000;

67. After this incident, within a month, on March 24, 2021, Elkholy received a termination letter from his manager, Ibrahim Haneen, Head of the Finance Department of the Saudi Embassy (est. 2018-2022) signed by Samir Bin Ibrahim Alkharashi, Deputy Chief Of Mission of the

Embassy. Elkholy's termination of employment was effective on June 1, 2021, based on the contrived reason of "for the public good";

68. On April 14, 2021, Elkholy submitted a charge of discrimination to the EEOC for retaliation, national origin, and age;

69. On April 28, 2021, Elkholy signed an agreement to mediate through the EEOC;

70. On June 7, 2021, Elkholy made a formal demand on the Defendants for payment for end-of-service, health insurance, and social security not paid over his 26 years of employment;

71. On November 14, 2022, Elkholy received a closure notice from the EEOC and a notice of right to sue letter;

72. On November 15, 2022, Elkholy learned that without his consent or authorization, Fahad Nazer, the Embassy's spokesman, was copied on Elkholy's EEOC right to sue notice by the EEOC. Fahad is not on the Defendants' legal team and in an apparent conflict of interest, Fahad's wife, Christine Saah Nazer, is an EEOC senior public affairs employee;

73. On November 30, 2022, Elkholy mailed and emailed a Section 83 Request for Charge File to the EEOC;

74. Elkholy has received no end-of-service compensation in breach of his contract with Defendants;

75. The Deputy Chief of Mission's termination letter dated March 24, 2021, praised Elkholy and expressed their appreciation for his dedication, sincerity, and trust for over 26 years of service;

76. Defendants' action to terminate Elkholy due to his age and national origin was a willful action. Defendants knew or showed reckless disregard for the fact that age and national origin discrimination is prohibited by U.S. laws, which protect local employees who work

at the Embassy, like Elkholy, as opposed to Kingdom civil service employees, who have no such protection;

77. Defendants committed an intentional unlawful act (termination due to Elkholy's age and national origin) and exhibited reckless or callous indifference to the rights of Elkholy;

78. Elkholy's damages due to Defendants' unlawful conduct and actions include, *inter alia*, loss of income and benefits; loss of employment opportunities; loss of earning capacity, future benefits, and future severance payment; future pecuniary and nonpecuniary losses; discharge from employment; damage to Plaintiff's reputation and career; emotional pain and suffering; embarrassment, humiliation, and indignity; inconvenience, mental anguish, and loss of enjoyment of life; and withholding his rightfully due wages and deprivation of entitlements;

## FACTS RELATED TO ATEF HANNA

79. Plaintiff Hanna, is a dual American and Egyptian citizen, and is 63 years old with a specialty in Science and Education, with a Bachelor of Science from University of Zagazig, Egypt;

80. Hanna was employed at the Embassy for more than 15 years. He initially was employed as a phone operator at the Embassy Ambassador's residence in Washington, D.C in 2006. In January 2007, he was employed by the Consular section in the Embassy as a Consulate Processing Agent. Hanna remained in this position for 14 years until he was terminated on June 1, 2021;

80. He successfully served five Ambassadors in Washington, D.C. on behalf of the Defendants, including Her Excellency Reema Bint Bandar Al Saud, Ambassador to the United States when he was terminated on June 1, 2021;

81. In his 14 years as a Consulate Processing Agent, Hanna received multiple recognitions for exemplary service from the Consuls, including Consul Fahad Al-Rewis, Consul Naser Al-Gaeed, Consul Khalid Al-Arak, and Consul Bandar Al-Hazany based on his dedicated valuable work. Hanna was verbally commended for his work ethic, loyalty and quality of work during the service of each of the Consuls;

82. His responsibilities expanded and changed over the years as he was serving the consulate's needs in multiple aspects. Hanna was responsible for incoming and outgoing Consulate mail, and provided clerical services to individuals seeking employment in the Kingdom, business affairs, and visa forms to Saudi Arabia. Hanna's other responsibilities included data entry to assist the Consul and the Deputy Consul in the processing of applications.

83. On January 1, 2006, when Hanna was first hired by the Embassy as a phone operator, the Embassy and Hanna executed an employment contract. Hanna during all times of his employment was a non civil servant "Local Employee". Hanna at no time engaged in diplomatic, governmental, or political work;

84. On January 1, 2006, Hanna's base salary was $1,500. See Ex 2 Hanna Employment Contract;

85. On May 28, 2006, Hanna's employment contract changed, and his base salary increased to $1,650, with $193.30 going for social security, and $644.33 for health insurance, for a total of $2,487.63.

86. In June 2014, Hanna's base salary increased to $3,400.93.

87. On July 5, 2008, the Embassy created a two-tiered pay scale system: one for local employees of non-Saudi origin, aka local employees, and another for local employees of Saudi origin. In effect Defendants created a caste system. Each pay scale had 15 grades.

The pay scale for local employees of Saudi origin provided compensation in amounts far greater than the scale for the local employees of non-Saudi origin, aka local employees, by as much as $1,500 per pay period for the same position. Further, Defendants put most of the local employees of non-Saudi origin, and Plaintiffs, including Hanna, on the lowest/last 3 pay scales so that they would not receive a pay increase, and Defendants put local employees of Saudi origin on the highest/first grade of the scale so they would receive a pay increase over the next 15 years. When Hanna complained about this, the Embassy opened the scale for local employees of non-Saudi origin but local employees of Saudi origin were on a higher scale of 20 grades instead of 15. This pay scale did not take into consideration the years of experience, skills, and qualifications of local employees. This tier system allowed Defendants to continue to discriminate against Plaintiffs, including Hanna, based on national origins and ethnicity;

88. On multiple occasions, a letter was sent by local employees of non-Saudi origin, including Hanna, to His Royal Highness Abdullah bin Faisal, Ambassador of the Kingdom of Saudi Arabia to the U.S. No outcome came from this letter on the last 3 grade scales so that they would not get a pay increase, and they put local employees of Saudi origin on the first grade of the scale so they would get a pay increase over the next 15 years. When Hanna complained about this, the Embassy opened the scale for local employees of non-Saudi origin but local employees of Saudi origin were on a higher compensation scale of 20 grades instead of 15;

89. Upon information and belief, on January 1, 2013, Defendants introduced a new contract for all new local employees because the old version did not comply with Saudi labor laws and American labor laws. The new version of the contract had a severance pay with no cap.

Hanna asked for his contract to be updated to the new version, to which the Embassy declined and informed him that there is no need because his severance pay would have no cap;

90. On November 1, 2015, Hanna's final salary increased to $3,815.00 and remained at that rate until his termination in June 2021;

91. On February 29, 2016, a letter was sent from local employees of non-Saudi origin, including Plaintiff Hanna, to His Royal Highness Abdullah bin Faisal Al Saud, Ambassador of the Kingdom of Saudi Arabia to the U.S. (10/2015 - 04/2017), requesting health insurance, U.S. social security tax contribution, and an increase in salary for local employees of non-Saudi origin due to inflation. Since the last increase in 2006, the cost for local employees of non-Saudi origin to buy their own health insurance for self and family far exceeded the $644.33 that was arbitrarily designated by Defendants for Hanna in 2006. The Embassy provided a health insurance plan with full medical coverage for Saudi origin local employees and their families at no cost to them. Local employees of non-Saudi origin requested multiple times to get coverage under the same plan, but the request was denied;

92. On March 3, 2016, a letter was sent to His Royal Highness Abdullah bin Faisal from the local employees of non-Saudi origin at the Embassy requesting a housing allowance;

93. On March 3, 2016, a letter was sent from the Embassy to the Personnel Department of Saudi Arabia Ministry of Foreign Affairs, which requested housing allowance for the local employees as well as health insurance, social security tax contribution, and an increase in salary for local employees of non-Saudi origin due to inflation;

94. On November 9, 2017, a letter was sent to His Royal Highness Khalid bin Salman Al Saud, Ambassador of the Kingdom of Saudi Arabia to the U.S. from local employees of non-

Saudi origin, requesting a salary increase, to remove the cap on severance pay, provide U.S. social security contributions, and health insurance for there was no action taken on the March 3, 2016, letter to the Foreign Ministry;

95. On June 4, 2018, a diplomatic note from the U.S. Department of State to the Embassy was sent requesting that health insurance be provided for all employees, including local employees of non-Saudi origin;

96. In 2019, Marzouk Al-Otaibi, head of administration and personnel of the Embassy, moved Hanna from the Consular section to the Embassy phone room to train two local employees of Saudi origin, since he was not of Saudi origin. Hanna was threatened multiple times by Defendants, including Marzouk, with termination due to his national origin, lack of a Saudi accent, despite his fluency in Arabic, and age;

97. On May 29, 2019, again the U.S. Department of State sent a diplomatic note to the Embassy asking for health insurance for all employees, including local employees of non-Saudi origin;

98. On November 22, 2019, an email was sent to Her Royal Highness Reema bint Bandar Al Saud, Ambassador of the Kingdom of Saudi Arabia to the United States (appointment date 02/2019 - Present), requesting a meeting with two local employees of non-Saudi origin to discuss the discrimination and disparity in pay, benefits and treatment. There was no answer;

99. On January 8, 2020, a follow-up email was sent, to which there was no answer;

100. On January 14, 2020, local employees of non-Saudi origin received notice that they were prohibited from bringing their cell phone to the workplace. Local employees of Saudi origin could still bring their cell phones to the workplace;

101.     On April 3, 2020, a final notice from the U.S. Department of State was sent to the Embassy, requesting health insurance for all employees, including local employees of non-Saudi origin. The U.S. Department of State provided a deadline to the Embassy to cover all employees, regardless of nationality, by December 31, 2020. The Embassy ignored the diplomatic notes from the U.S. Department of State regarding this matter. No local employees received the health insurance benefit;

102.     On October 13, 2020, a letter was sent to His Royal Highness Faisal bin Farhan Al Saud, Foreign Minister of the Kingdom of Saudi Arabia (10/2019 - Present), requesting salary increases, a change in severance pay to have no cap, to change the contract to the new version, U.S. social security contributions, and health insurance. The basis of the request rested on the disparity of benefits and pay between the Saudi origin local employees and the local employees of non-Saudi origin. The letter was delivered to Samer Alkharashi, Deputy Chief of Mission of the Saudi Embassy (est 02/2019 - present), who was to send it to His Royal Highness Faisal bin Farhan Al Saud. However, instead he sent the letter to Marzouk, who did not forward it;

103.     In 2020, a discussion was held with Marzouk wherein the local employees of non-Saudi origin, including Plaintiffs, requested equal rights for local employees of non-Saudi origin consistent with local employees of Saudi origin. Marzouk's response was: "You Egyptians will never be equal to the Saudis";

104.     On November 13, 2020, a new work schedule (per COVID-19) was circulated for local employees of non-Saudi origin in the Consulate and Visa section, who were required to report to work every day of the week, while the Saudi employees were not required to show at all during the week. The only exception for local employees of non-Saudi origin

not reporting to work was COVID.  Hanna was asked to report to work despite his known medical history of coronary artery disease, diabetes and surgical history of coronary stents while he worked there. When Hanna informed management of his health concerns during the height of COVID, that he was a person of high risk, his request to stay/work from home was denied . Defendants easily could have accommodated Hanna's work at home request;

105.     Before Hanna received his termination letter, Hanna was asked by diplomat Ahmad Fahad to have Mr. Jomar, a cafeteria worker,  shadow Hanna as he performed his job. After Hanna was terminated, Hanna position was filled with a younger employee of Saudi origin, Ibrahim El-Manee;

106.     On March 24, 2021, Defendants tendered a termination letter to Hanna through his manager, Bandar Al-Hazany, Deputy Consul of the Saudi Embassy (est. 2018-2022), signed by Samir Bin Ibrahim Alkharashi, The Deputy Chief of Mission. His termination of employment was effective on June 1, 2021, based on the "public good" and not for cause;

107.     Hanna's employment contract provides for end-of-service compensation and related post-employment compensation.  Defendants have not paid Hanna.  Defendants have breached their contract.  At all times Hanna has conducted himself in an exemplary fashion and not contributed to Defendants breach of his contract;

108.     The Deputy Chief of Mission's termination letter dated March 24, 2021, praised Hanna and expressed their appreciation for his dedication, sincerity, and trust for over 15 years of service;

109.     On May 10, 2021, Hanna submitted a charge of discrimination to the EEOC for retaliation, national origin, and age.  The matter is now closed.  Hanna requested a "right to sue letter" from the EEOC.  The EEOC has yet to respond;

110.     Defendants' action to terminate Hanna due to his age and national origin was a willful action.  Defendants knew or showed reckless disregard for the fact that age and national origin discrimination is prohibited by U.S. laws, which protect local employees who work at the Embassy, like Hanna, as opposed to Kingdom civil service employees, who have no such protection;

111.     Defendants committed an intentional unlawful act (termination due to Hanna's age and national origin) and exhibited reckless or callous indifference to the rights of Hanna;

112.     Hanna's damages due to Defendants' unlawful conduct and actions include, *inter alia*, a loss of income and benefits; loss of employment opportunities; loss of earning capacity, future benefits, and future severance payment; future pecuniary and nonpecuniary losses; discharge from employment; damage to Plaintiff's reputation and career; emotional pain and suffering; embarrassment, humiliation, and indignity; inconvenience, mental anguish, and loss of enjoyment of life; and withholding his rightfully due wages and deprivation of entitlements;

## FACTS RELATED TO PLAINTIFF GARIBALLA

111.     Plaintiff, Iman Gariballa, is a dual United States and Sudanese citizen, 62-year-old woman with a bachelor's degree in Business Management with a specialty in accounting.  She is a member of a protected group by virtue of her medical disability (visual impairment);

112.     Gariballa was employed at the Embassy for 21 years.  Initially employed on January 6, 1997, as an Administrative Assistant in the Information Office with an annual net salary of $19,200. 30. See Ex 3 Salary employment confirmation letter;

113. Between 1997 and 2001, Gariballa was assigned to various administrative roles between the Information Office and the Administration Office;

114. Gariballa, a Sudanese citizen at the time her initial employment, was hired as a local employee to fill a local staffing need and was not a civil servant of the Kingdom of Saudi Arabia at any time during her employment and was not entitled to benefits afforded civil servants;

115. On or about April 2001, upon information and belief, Gariballa discovered a salary disparity whereby she was paid a lower salary and no additional compensation for health insurance unlike her local employees of non-Saudi origin peers working in the Embassy's Information Office. Gariballa requested of the new director of the Information Office, Adel Al-Jubeir, that her salary be adjusted to match her local employees of Saudi origin colleagues in addition to health insurance compensation. Adel Al-Jubeir honored her request for the salary change moving forward but Gariballa was never compensated retroactively for previous years of salary disparity and inequity. As to the health insurance request, this was not honored; the discrepancy endured;

116. In or about early 2002, the new Information Office Director, Nail Al-Jubeir, asked Gariballa to additionally take on the responsibility of Accounting and Personnel duties for the office. Upon information and belief, the Embassy placed her in this position due to her predecessor's, Abdullah Al-Akeel, deficiencies. Since Mr. Al-Akeel was a local employee of Saudi origin, he was allowed to keep his salary while Gariballa assumed his work responsibilities with no salary adjustment despite the increase in work. Gariballa assumed sole responsibility for this work and continued to perform the two jobs until she was forced to terminate her employment by the Embassy on January 31, 2018;

117.    For 17 years, Gariballa worked as the Accounting/Personnel Manager. The Embassy did not hire a replacement for the vacancy and for many years did not provide Gariballa with a promotion or salary adjustment commensurate with her new responsibilities. During this period, Gariballa received numerous accolades from Embassy officials commending her loyalty and the high quality of her work. See Ex 4 May 7, 2013 commendation letter from Nail Al-Jubeir;

118.    Gariballa's job duties as the Embassy's Information Accounting/Personnel Manager included, but were not limited to, the following: preparing annual office budgets and reports; verifying local employee timesheets; bank account reconciliation; and paying local United States vendors invoices.  As the Accounting/Personnel Manager reviewing the Information Office's transactions in the United States, Gariballa oversaw Defendants' commercial activity in the United States, monitoring commercial transactions in the United States.  At no time did she engage in diplomatic, governmental or political work;

119.    Gariballa's assigned responsibilities were very demanding and overwhelming during high accounting seasons and she repeatedly requested, and was refused, an assistant. Absent of any support, whenever Gariballa was out of the office, traveling, or on vacations, her workload would accumulate, and she was expected to make up time lost while on authorized leave in order to complete accumulated tasks on infeasible timelines;

120.    In April 2004, a letter was written by local employees of non-Saudi origin working at the Embassy and signed by multiple staff in the office to then-Ambassador His Royal Highness Bandar Bin Sultan requesting an increase in salary, health insurance and social security for local employees;

121.    In September 2004, a follow-up letter to the April 2004 letter was sent. There was no response to either the letter;

122.    In or about early 2007, Gariballa attempted to negotiate a salary increase. Defendants rejected this request. Shortly afterwards, a colleague, Abeer Alsobahi, who was a new hire and a local employee of Saudi origin, complained about her salary and was granted an increase. Upon information and belief, Embassy supervisors would approve an increase for a local employee of Saudi origin, like Plaintiffs, including Gariballa;

123.    In September 2007, Gariballa continued to advocate for a salary adjustment, and was provided a minimal adjustment, raising her salary to $3,950 monthly. See Ex 5 September 10, 2017 letter from Nail Al-Jubeir confirming salary;

124.    The Defendants did not provide employees with W2s, make any tax withholding payments, or provide any medical health insurance. After paying 30% of her income in U.S. taxes and making the mandatory U.S. social security contribution of 13.5-15% depending on the year of payment and regulations in place at the time of payment, Gariballa was unable to pay for mortgage, gas, food, and the actual cost of medical insurance;

125.    In March 2010, Gariballa started experiencing deteriorating vision issues and was ultimately diagnosis of macular degeneration;

126.    In June 2012, after dealing with continual vision issues in part caused by High Energy Visible Light from computers, Gariballa sought support from a low-vision specialist, who recommended conventional lenses and magnifying visual aids for her and her computer;

127.    In June 2012, this letter was provided to Gariballa's supervisor, Nail Al-Jubeir, along with a request for the provision of magnification tools and additional staffing aid to

mitigate eye strain. Due to the demanding nature of the job, local employees of Saudi origin and Saudi nationals were not interested in such positions, and thus, her request to hire additional support was denied by Defendants who also denied her requests for disability accommodations within their control to facilitate;

128.     In October 2012, Gariballa received a salary letter noting $5,014.25 as her new salary, which included $650 "in lieu of health insurance coverage". This stipend was considered gross income with no taxes withheld or W2 issued. See Ex 6 Al-Jubeir October 31, 2012 letter;

129.     In May 2013, Gariballa received a salary letter noting the same salary as 2012 with no increase per the parties agreement and practices of $5,014.25, which includes the same 2012 $650 "in lieu of health insurance coverage". This $650 stipend was considered gross income with no taxes withheld or W2 issued. See Ex 7 Al-Jubeir May 19, 2013 letter;

130.     In September 2016, a follow-up letter from her medical provider further explained to Defendants that Gariballa's condition was in gradual decline and her ability to see fine detail is affected.  Gariballa needed accommodations within the control of defendants who refused to make any accommodations to Gariballa;

131.     In or about early 2017, Gariballa kept complaining of eye strains and blurred vision as a result of her work demands and lack of accommodations. Gariballa's eyesight began deteriorating rapidly and she was forced to cut her personal expenses to see a retina specialist to support her with her condition due to lack of health insurance. Gariballa needed eye injections every 4 weeks due to fluid building up in her left eye. Since she had no  employer-provided  medical  insurance  and  inadequate  access  to  workplace

accommodations, she had to assume the burden of covering health expenses while also enduring a work environment that exacerbated her condition;

132.     In August 2017, correspondence between her medical providers established that providing more optical or electronic magnification did not improve her reading facility satisfactorily. The letter indicates that multiple interventions were, still not sufficient to sustain near detailed tasks for 8 to 10 hours a day. The medical accommodation advanced was using auditory conversion of all her reading material using optical character reading technology so that optical character reading technology would improve her accuracy, alleviate the stress on her visual system, and enable her to finish her work in a timelier fashion;

133.     In August 2017, Gariballa submitted this recommendation letter for disability accommodations to Asya Baakdah, who was overseeing the office at the time, who after looking at it, set it aside, and instructed Gariballa to prepare financial and HR reports to the new management team -- ignoring the request and directing Gariballa to complete her assigned work responsibilities.  Despite explaining her condition and providing doctors' notes and requesting accommodations, Gariballa was still expected to produce the requested reports/documents without any accommodations which were within Defendants control and ease to provide;

134.     Later that same day, Gariballa stayed late working on finishing the reports while in pain and experiencing blurry vision. The late hour and poor vision from long work hours made her commute home dangerous almost striking a pedestrian. Gariballa then requested a change to her work schedule to work from 6am to 2pm to avoid traveling to work at night;

135.     Gariballa's eye condition continued to get worse until it became more difficult for her to drive or see computer screens clearly. She explained her situation to Baakdah, and again asked for accommodations in order to finish her work responsibilities, and again Defendants declined her request. Upon information and belief, the office could not identify a local employee of Saudi origin willing to take the role and refused to hire anyone of a different nationality;

136.     Gariballa continued to have difficulty working, and yet the Embassy kept adding on to her workload without support or accommodations. Whenever Gariballa attempted to speak with a supervisor about accommodations or support, Defendants refused and still mandated delivery of requested work products;

137.     In September 2017, a letter indicated that Gariballa's monthly salary is $6,037.99 and that "the Embassy neither withholds taxes nor issues W-2." See Ex 8 Al-Jubeir September 27, 2017 letter;

138.     In November 2017, her medical team indicated that without accommodation Gariballa's vision would further deteriorate, especially with continued prolonged use of computers without adjustments for her disability;

139.     On December 13 2017, Gariballa received a letter from the Commonwealth of Virginia's Department for the Blind and Vision Impaired, which certified that Gariballa was "an individual with a documented disability". See Ex 9 December 13, 2017 disability letter;

140.     In December 2017, the new director of the Information Office, Saud Kabli, and Baakdah's refusal to provide accommodations for her disability, began a course of conduct designed by Defendants to push Gariballa out of her job and terminate her employment;

141.    In February 2018, Gariballa formally departed from her role at the Embassy;

142.    The Embassy and the Kingdom promised Gariballa additional post employment compensation if she accepted an initial payment. This promise was breached. There have been no further payments despite demand. The Embassy purposefully engaged in a course of conduct to dupe Gariballa and breach their contract with her for post-employment compensation;

143.    52. Compensation should have been minimally one-month salary for each year of service, $252,000 for health insurance, and $60,971.62 for Social Security, although there is no cap on end-of-service compensation;

144.    On October 23, 2018, the Embassy provided Gariballa with a partial severance payment of $25,385.60, indicating additional payments were forthcoming. After a 9-month period without income, Gariballa was struggling to pay bills and was at risk of losing her home. Upon information and belief, the Embassy used Gariballa's dire circumstances to pressure her to accept a partial payment under duress;

145.    Upon information and belief, the Embassy provided additional payments to other employees but refused to honor promises made to Gariballa for additional payments;

146.    On March 16, 2020, Gariballa received a response to a complaint filed with the D.C. Office of Human Rights;

147.    Defendants' action to terminate Gariballa due to her disability and national origin was a willful action. Defendants knew or showed reckless disregard for the fact that disability and national origin discrimination is prohibited by U.S. laws, which protect local employees who work at the Embassy, like Gariballa, as opposed to Kingdom civil service employees, who have no such protection;

148. Defendants committed an intentional unlawful act (termination due to Garbiballa's disability and national origin) and exhibited reckless or callous indifference to the rights of Gariballa;

149. Gariballa's damages due to Defendants' unlawful conduct and actions include, *inter alia*, a loss of income and benefits; loss of employment opportunities; loss of earning capacity, future benefits, and future severance payment; future pecuniary and nonpecuniary losses; discharge from employment; damage to Plaintiff's reputation and career; emotional pain and suffering; embarrassment, humiliation, and indignity; inconvenience, mental anguish, and loss of enjoyment of life; and withholding his rightfully due wages and deprivation of entitlements.

## FACTS RELATED TO MUHAMMAD BASHIR

148. Plaintiff, Muhammad Bashir, is a 78-year-old dual American-Pakistani citizen. He worked for the Armed Forces of the Royal Embassy of Saudi Arabia in Washington D.C. from November 04, 1997 until August 01, 2017. Total length of his employment with the Embassy was 20 years. He is a member of a protected group by virtue of his medical disability;

149. Bashir was initially employed as an Embassy driver and in 2012 transferred to an administrative role. See Ex 10 Bashir Employment Contract;

150. Bashir's duties involved picking up and delivering mail to and from the Armed Forces Office and the Embassy, the Saudi cultural office, and U.S. Department of State; picking up and dropping off official guests from local airports and transportation to hotels; and transporting guests during their local stay in the Washington, D.C. area;

151.     In January 2012, the Air Attaché Brig. Gen. Ahmed Nasir Al-Qahtani transferred Bashir to an administrative job in the training section of the Air Force in the Embassy office dealing with the American training centers, which trained Saudi students. Bashir submitted an application to raise his salary commensurate with that of his colleagues, local employees of Saudi origin. Instead of considering Bashir's application, Defendants, including Al-Qahtani, sought to terminate Bashir;

152.     As of January 2012, Bashir's administrative duties involved clerical work such as, keeping and maintaining records of Air Force airmen/officers coming to the U.S. for basic and advanced courses or any other special training courses at U.S. facilities, and assisting administratively Air Force training officers in connection with their training activities. Bashir worked in this office for many years and without any complaints as to his work. He always maintained discipline and did not violate any rules or regulations;

153.     Bashir at no time engaged in diplomatic, governmental, or political work;

154.     Defendants stated they would terminate him due to his age. He made a request for an adjustment of his salary to be equivalent to the pay of local employee of Saudi origin in the same position.  After this request, Defendants terminated him;

155.     In April 2014, he was diagnosed with Stage-V renal disease which resulted from his job-related stress causing development of hypertension, depression, and high blood pressure.  Bashir commenced dialysis in April 2016, which is a very painful and expensive treatment, three days a week, each treatment lasting four hours a day. Despite having dialysis Tuesday, Thursday, and Saturday mornings from 6.00 AM to 10 am, Bashir still reported to work every day.

156.	On August 1, 2017, during this difficult and painful time, instead of displaying understanding and accommodation, Defendants forced Bashir to end his employment. The Defendants, with undue pressure from Air Attaché Col. Fahad Al-Saqr, was forced out of his job on August 1, 2017.

157.	Defendants failed to make any accommodations for Bashir based on his disability and refused to allow local employees of non-Saudi origin, including Bashir, to use their leave in breach of their contract. For example, in Spring 2000, Bashir was detailed to work with Saudi guests. During this same time his mother was sick in Pakistan. Bashir requested, in fact, begged for use of his vacation time accrued to see his ailing mother before she died. Air Attaché Brigadier General Saleh Al-Jawini refused his request and his mother died while he was working with Saudi guests who were shopping in a Georgetown mall in Washington, D.C. Defendants and his superiors, including, Air Attaché Brigadier General Saleh Al-Jawini, denied Bashir leave to attend his mother's funeral;

158.	At the time of his termination, the retirement compensation Defendants offered him was $10,666.57. Bashir rejected that offer for it is inconsistent with the terms of his contract and the practice of a minimum of one month for each year worked model used by the Defendants for end-of-service compensation among other retirement incentives plus the no cap policy, contract and practice in place at the time as referenced above;

159.	Defendants have engaged in a course of discriminatory conduct which negatively impacted Bashir and caused him harm, distress, stress and to experience inequity. By way of example, in January 2020, Bashir learned that a local employee of Saudi origin and U.S. permanent resident, Saleh Obaid, who performed administrative tasks at the

Saudi Information Office, received his monthly pay checks for a period of five years after he was compelled to leave his employment due to a diabetic condition. Bashir has been discriminated against because he was a local employee of non- Saudi origin. Bashir adopts by reference the above averments set forth by Plaintiffs as to the decades long discriminatory conduct by Defendants based on national origin, age and disability;

160.	Defendants' action to terminate Bashir due to his age, disability and national origin was a willful action.  Defendants knew or showed reckless disregard for the fact that disability and national origin discrimination is prohibited by U.S. laws, which protect local employees who work at the Embassy, like Bashir, as opposed to Kingdom civil service employees, who have no such protection;

161.	Defendants committed an intentional unlawful act (termination due to Bashir's disability, age and national origin) and exhibited reckless or callous indifference to the rights of Bashir;

162.	Bashir's damages due to Defendants' unlawful conduct and actions include, *inter alia*, a loss of income and benefits; loss of employment opportunities; loss of earning capacity, future benefits, and future severance payment; future pecuniary and nonpecuniary losses; discharge from employment; damage to Plaintiff's reputation and career; emotional pain and suffering; embarrassment, humiliation, and indignity; inconvenience, mental anguish, and loss of enjoyment of life; and withholding his rightfully due wages and deprivation of entitlements.

### FACTS RELATED TO ABDALLA ALI ZAMRAWY

162.	Plaintiff Zamrawy, is a dual American-Egyptian citizen, and is a 76-year-old man. He is a member of a protected group by virtue of his medical disability;

163. Zamrawy on January 1, 1986, initially worked as a private driver for His Royal Highness Mohammed bin Faisal bin Turki Al Saud, Director of Islamic Affairs for the Embassy, with an initial monthly salary of $1,000;

164. In April 1986, Zamrawy began work as a private driver for His Royal Highness Khalid bin Faisal bin Turki and his mother, Her Royal Highness Lulwa bint Abdulaziz, and his wife, Her Royal Highness Iman Al-Tuwaijri;

165. Zamrawy became employed by the Defendants on July 1, 1992, as a driver for the Embassy with a monthly salary of $1,200. Zamrawy remained employed by the Embassy for 27 years. During his employ he received praise for the high quality of his work;

166. On December 14, 1993, Zamrawy's employment contract was modified with Zamrawy's gross salary by Defendants as follows: $1,600.00 for basic salary, no social security, and no health insurance contribution;

167. On April 28, 1998, Zamrawy's contract was renewed with an increase in salary to $1,760 per month for basic salary, no social security, and no health insurance contribution. See Ex 11 Zamrawy Employment Contract

168. On May 28, 2006, Zamrawy's salary increased as follows: $2,288 for base salary, $171.60 designated for U.S. social security, and $572 designated for health insurance, for a total of $3,889.60 monthly gross salary, upon which Zamrawy paid U.S. income tax;

169. The Defendants failed to make any U.S. social security tax payments to the state or the IRS on behalf of the local employees of non-Saudi origin. Rather, defendants merely designated the arbitrary amount of $171.60 as a social security designation of the gross salary;

170.     The Defendants failed to establish any health insurance plan, purchase any health insurance plan or provide adequate funds to local employees to purchase health insurance. Instead, the Defendants merely set forth an arbitrary amount of $572.00 out of the base salary as a designation for health insurance. However, upon information and belief, no plan in the U.S. could be purchased for that amount for an individual or a family during all times relevant hereto. Therefore, the local employees, including all Plaintiffs, continued to exist without health insurance and without any U.S. social security contribution. As to the lack of health insurance, the U.S. Department of State has sought to compel the Defendants to create or contribute enough funds to local employees to support a health insurance plan, but to no avail.

171.     Upon information and belief, on January 1, 2013, Defendants introduced a new contract for all new local employees because the old version did not comply with Saudi labor laws and American labor laws. The new version of the contract had a severance pay provision with no cap. Zamrawy asked for his contract to be updated to the new version, to which the Embassy declined and informed him that there is no need because his severance pay would have no cap;

172.     While working at the Embassy, Zamrawy worked with VIP visitors and received professional accolades from them;

173.     Marzouk Al-Otaibi was hired by the Embassy in 2018. Upon Marzouk's arrival he asked Zamrawy to work as a personal driver for his family. Zamrawy consented even though the family was not Embassy employees, however, Zamrawy stated that he could not drive the children to school for it was more than an hour away. By this time, Zamrawy's doctor advised him not to drive distances longer than an hour. After this

incident, Marzouk expressed displeasure with Zamrawy and said you "must obey my orders as long as you're working in the Embassy";

174.    In August 2015, Zamrawy began working with Emad Abu Al-Khuyour, the Finance Manager of the Embassy to drive him from the Embassy to his home. At some point thereafter, Emad Abu Al-Khuyour requested that Zamrawy drive Emad's daughter to Richmond, Virginia, from Arlington, Virginia. This request was outside of his Embassy duties. Zamrawy refused due to back pain and the length of the trip exceeding medical restrictions of one hour driving of which the Embassy was apprised. Defendants further stated that he would be terminated due to his age;

175.    Zamrawy at no time engaged in diplomatic, governmental, or political work;

176.    Zamrawy was subject to a hostile work environment in disregard of his disability and subject to Defendants lack of accommodation due to his disability. For example, in 2018, Zamrawy was praying at the Embassy's mosque using a chair to pray due to back condition resulting in back pain. Marzouk removed the chair while Zamrawy was praying, and when Zamrawy tried to sit down he fell to the floor, experiencing severe back pain. Marzouk told Zamrawy not to call an ambulance. After two days, Zamrawy continued to experience severe back pain for which he then sought medical attention and which resulted in Zamrawy undergoing more than 18 sessions of physical therapy;

177.    In his 27 years of employment Zamrawy received numerous letters from Embassy officials and Ambassadors commending his loyalty and the high quality of his work. Her Royal Highness Reema, Ambassador to the U.S. refused to make any accommodations given Zamrawy's disability and he was terminated;

178.    On June 1, 2019, Zamrawy received a termination letter with an end-of-service compensation of $10,666.66 and 2 month vacation payout of $8000 totaling $18,666.66. Zamrawy rejected the end-of-service compensation for it breached the terms of his contract and was inconsistent with Defendants policy and practice. For example, colleagues who departed their employ with Defendants three years earlier were paid a minimum of month's salary for each service year, plus other end-of-service compensation, most of whom received more than $100,000;

179.    Defendants breach their contract with Zamrawy and failed to compensate him the amount due for end-of-service compensation and related end-of-service compensation benefits;

180.    On February 13, 2020, Zamrawy protested in front of the Saudi Embassy. Samir Al Kharashi (Deputy Chief of Mission) called Zamrawy to offer an extra $10,000 over the $18,000 offered severance pay for a total of $28,000. Zamrawy refused this offer as previous colleagues similarly situated received over $100,000 packages as severance pay, and Zamrawy was continuing to be discriminated against based on national origin, age and disability;

181.    On October 13, 2020, Zamrawy protested in front of the Four Seasons Hotel in Washington D.C., as Foreign Minister His Royal Highness Faisal bin Farhan was visiting the United States and staying at the hotel. Zamrawy went with colleagues, including Plaintiff Gariballa, to ask for Defendants to honor their employment contracts and provide adequate end-or-service and severance package pay to local employees of non-Saudi origin. An employee of His Royal Highness Faisal's office asked them why they were

protesting. Zamrawy and Gariballa requested to meet with His Royal Highness Faisal which was not honored;

182.     Saudi Embassy security office took pictures of Zamrawy while protesting in front of both the Saudi Embassy and the Four Seasons Hotel. Upon information and belief, these photos were sent to Defendant the Kingdom. The security office advised Zamrawy not to travel to Saudi Arabia as Zamrawy was put on a blacklist;

183.     Zamrawy has been discriminated against because he was a local employee of non-Saudi origin. Zamrawy adopts by reference the above averments set forth by Plaintiffs as to the decades long discriminatory conduct by Defendants based on national origin, age and disability;

184.     On January 31, 2020, Zamrawy received a response to a complaint filed with the D.C. Office of Human Rights;

185.     Defendants' action to terminate Zamrawy due to his age, disability and national origin was a willful action.  Defendants knew or showed reckless disregard for the fact that disability and national origin discrimination is prohibited by U.S. laws, which protect local employees who work at the Embassy, like Zamrawy, as opposed to Kingdom civil service employees, who have no such protection;

186.     Defendants committed an intentional unlawful act (termination due to Zamrawy's disability, age and national origin) and exhibited reckless or callous indifference to the rights of Zamrawy;

187.     Zamrawy's damages due to Defendants' unlawful conduct and actions include, *inter alia*, a loss of income and benefits; loss of employment opportunities; loss of earning capacity, future benefits, and future severance payment; future pecuniary and nonpecuniary

losses; discharge from employment; damage to Plaintiff's reputation and career; emotional pain and suffering; embarrassment, humiliation, and indignity; inconvenience, mental anguish, and loss of enjoyment of life; and withholding his rightfully due wages and deprivation of entitlements.

## CAUSES OF ACTION

## COUNT I
## DISCRIMINATION BASED ON AGE
## IN VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT,
## 29 U.S.C. § 621 *et seq.*

31.     Plaintiffs adopt and incorporate herein by reference, as if specifically set forth herein, the averments of paragraphs 1 through 185 of this Complaint;

32.     Based upon the facts described in the preceding paragraphs, Defendants unlawfully discriminated against Plaintiffs Elkholy, Hanna, Bashir and Zamrawy, on the basis of their age in violation of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621 *et seq*;

33.     Plaintiffs Elkholy, Hanna, Bashir and Zamrawy suffered from the discriminatory practices and policies of Defendants as averred above;

34.     Defendants' violation of the ADEA was willful;

35.     As a direct and proximate result of Defendants' discriminatory conduct, practices, and/or policies, Plaintiffs Elkholy, Hanna, Bashir and Zamrawy has suffered damages, including, but not limited to, loss of income and benefits; loss of employment opportunities; loss of earning capacity, future benefits, and future severance payment; future pecuniary and nonpecuniary losses; discharge from employment; damage to Plaintiffs Elkholy, Hanna, Bashir and Zamrawy reputation and career; emotional pain and suffering; embarrassment, humiliation, and indignity;

inconvenience, mental anguish, and loss of enjoyment of life; and withholding of his rightfully due wages and deprivation of entitlements;

## COUNT II
## DISCRIMINATION BASED ON AGE
## IN VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT,
## D.C. Code § 2-1401 *et seq.*

36.     Plaintiffs adopt and incorporate herein by reference, as if specifically set forth herein, the averments of paragraphs 1 through 35 of this Complaint;

37.     Based upon the facts described in the preceding paragraphs, Defendants unlawfully discriminated against Plaintiffs Elkholy, Hanna, Bashir and Zamrawy on the basis of his age in violation of the District of Columbia Human Rights Act, as amended, D.C. Code § 2-1401 *et seq*;

38.     Plaintiffs Elkholy, Hanna, Bashir and Zamrawy suffered from the discriminatory practices and policies of Defendants as averred above;

39.     Defendants' violated the DCHRA willfully; and

40.     As a direct and proximate result of Defendants' discriminatory conduct, practices, and/or policies, Plaintiffs Elkholy, Hanna, Bashir and Zamrawy has suffered damages, including, but not limited to, loss of income and benefits; loss of employment opportunities; loss of earning capacity, future benefits, and future severance payment; future pecuniary and nonpecuniary losses; discharge from employment; damage to Plaintiffs Elkholy, Hanna, Bashir and Zamrawy reputation and career; emotional pain and suffering; embarrassment, humiliation, and indignity; inconvenience, mental anguish, and loss of enjoyment of life; and withholding of his rightfully due wages and deprivation of entitlements.

## COUNT III
## DISCRIMINATION BASED ON DISABILITY
## IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT,
## 42 U.S.C. § 12101 et. seq.

36.     Plaintiffs Iman Gariballa, Bashir and Zamrawy, adopt and incorporatesherein by reference, as if specifically set forth herein, the averments of paragraphs 1 through 35 of this Complaint;

37.     Based upon the facts described in the preceding paragraphs, Defendants unlawfully discriminated against Plaintiffs Iman Gariballa, Bashir and Zamrawy on the basis of their respective disabilities in violation of the Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq*.;

38.     Plaintiffs Iman Gariballa, Bashir and Zamrawy suffered from the discriminatory practices and policies of Defendants as averred above;

39.     Defendants' violated the Americans With Disabilities Act willfully; and

40.     As a direct and proximate result of Defendants' discriminatory conduct, practices, and/or policies, Plaintiffs Iman Gariballa, Bashir and Zamrawy has suffered damages, including, but not limited to, loss of income and benefits; loss of employment opportunities; loss of earning capacity, future benefits, and future severance payment; future pecuniary and nonpecuniary losses; discharge from employment; damage to Plaintiffs Iman Gariballa, Bashir and Zamrawy reputation and career; emotional pain and suffering; embarrassment, humiliation, and indignity; inconvenience, mental anguish, and loss of enjoyment of life; and withholding of his rightfully due wages and deprivation of entitlements;

## COUNT IV
## Breach of Contract

35.     Plaintiff s adopt and incorporate herein by reference, as if specifically set forth herein, the averments of paragraphs 1 through 35 of this Complaint;

37.     Based upon the facts described in the paragraphs above, Plaintiffs, respectively, and Defendants entered into a long-term multi-decade local employee contract for employment at the Embassy of the Kingdom in Washington, D.C.;

37.     Defendants breached their contract with each of the Plaintiffs, respectively ,when Defendants failed to make end-of-service, and severance related payments, to the Plaintiffs, respectively, pursuant to their contract and pursuant to Defendants practices and policies in place at the relevant times;

37.     Plaintiffs did not contribute in any way to Defendants breach or otherwise breach their respective contracts with Defendants; and

37.     Defendants' breaches are a direct and proximate cause of Plaintiffs respective damages.

## RELIEF REQUESTED

41.     Plaintiffs request any and all relief for breach of contract and as provided by the discrimination laws of the United States and the District of Columbia, including, but not limited to, the following:

a.      Reinstatement, or in the alternative, front pay and future pecuniary losses under the ADEA and/or DCHRA;

b.      Plaintiffs seek back pay and back benefits under the ADEA and DCHRA;

c.      Plaintiffs seek maximum liquidated damages under the ADEA and/or ADA;

d.      Plaintiffs seek compensatory damages under the DCHRA for, *inter alia,* Plaintiffs' loss of income and benefits; loss of employment opportunities; loss of earning capacity, future benefits, and future severance payment; future pecuniary and nonpecuniary losses; discharge from employment; damage to Plaintiffs' reputation and career; emotional pain and suffering;

embarrassment, humiliation, and indignity; inconvenience, mental anguish, and loss of enjoyment of life; withholding of his rightfully due wages and deprivation of entitlements; and other pecuniary and nonpecuniary losses in an amount to be determined at trial;

e.      Plaintiffs seek punitive damages under the DCHRA;

f.      Plaintiffs seek reinstatement, or in the alternative, front pay and future pecuniary losses based on their contracts;

g.      Plaintiffs seek compensatory damages for Defendants breach of its contract with the respective Plaintiffs, and other pecuniary and nonpecuniary losses in an amount to be determined at trial;

h.      Plaintiffs seek reasonable attorney fees at prevailing market rates, costs, and expenses of this action; and

i.      Such other relief as the Court deems just and appropriate.

Respectfully Submitted,

PLAINTIFFS,
Tarek Elkholy
Atef Tawfik Hanna
Iman Gariballa
Muhammad Bashir and
Abdalla Zamrawy

By Counsel:

_/s/ Sylvia J. Rolinski_____
SYLVIA J. ROLINSKI, ESQ.
D.C. Bar No.430573
Rolinski Law Group, LLC
14915 River Road
Potomac, MD 20854
Office:  +1-301-987-0202, ext. 1
Fax:  +1-301-263-7100
SJR@Rolinski.com

Attorney for Plaintiffs,
Tarek Elkholy
Atef Tawfik Hanna
Iman Gariballa
Muhammad Bashir and
Abdalla Zamrawy

February 3, 2023