**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Tarek Elkholy, *et al.,* | ) |
| | ) |
| **Plaintiffs,** | ) |
| v. | )   **Civil Action No.:23-306** |
| | ) |
| **THE ROYAL EMBASSY OF THE KINGDOM OF** | ) |
| **SAUDI ARABIA,** *et al.,* | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

## <u>DECLARATION OF JAFAR JAFARI</u>

I, Jafar Jafari, am over the age of majority and suffer no mental infirmity:

1. I reside in Maryland;

2. I have been designated an expert in Middle East affairs and in particular issues relation to the Foreign Sovereign Immunity Ace, its exceptions, sovereign immunity and, inter alia, the Kingdom of Saudi Arbia's employment practices, institutions and political environment;

3. I have worked in Saudi Arabia for approximately 2 years, 1997-1998, as an internet engineer to upgrade new service providers' installations. This meant extensive interaction with Saudi personnel, and others as well;

4. I am credentialed with the U.S. State Department Foreign Press Center, in Washington, DC: in my capacity as a news producer with a satellite-based television network, based in Beirut, Lebanon;

5. I also serve as an accredited translation representative of clients seeking citizenship before the U.S. Citizenship and Immigration Services;

6. I submit this Declaration in the above matter in support of Plaintiffs Opposition to the Defendants The Royal Embassy of the Kingdom of Saudi Arabia and The Kingdom of Saudi Arabia's Motion to Dismiss Plaintiffs Complaint and Motion to Strike Plaintiffs' Punitive Damages Demand pursuant to Federal Rules of Civil Procedure 12(b)(1) and *forum non conveniens*;

7. The Embassy operates under a policy of routine discrimination towards older employees terminating employees well before their retirement age;

8.  As is standard practice for Saudi Arabia and its Embassy in Washington, D.C., all Plaintiffs executed renewable one-year contracts for administrative work as local third country nationals of non-Saudi citizenship.  The contracts did not include any Saudi civil service benefits, or any other benefits, rights, or remedies provided by the laws to the Saudi civil servants or Saudi nationals;

9.  It is not possible for these Plaintiffs to adjudicate their claims as averred in the Complaint in Saudi Arabia for political, security, and institutional reasons;

10. Saudi Arabia as a country and the tribunals set forth in the Plaintiffs employment agreement for resolution of matters is unavailable to them for the reasons set forth herein and as widely reported in the news and U.S. Department of State country reports attached;

11. Saudi Arabia is an unsafe place to travel, especially for these Plaintiffs.  There are well reported instances when similarly situated person have been detained at the board and expelled without gaining entry to the country.  Also, even upon entry, as noted herein and in the attached articles and reports, many people of non-Saudi nationality with claims against the Kingdom have been incarcerated on fabricated charges, without access to the courts, or merely held;

12. Saudi Arabi suffers from significant human rights issues included credible reports of: unlawful or arbitrary killings, including extrajudicial killings; enforced disappearances; torture and cruel, inhuman, or degrading treatment or punishment by government agents; harsh and life-threatening prison conditions; arbitrary arrest and detention; political prisoners or detainees; transnational repression against individuals in another country; serious problems with the independence of the judiciary; arbitrary or unlawful interference with privacy; punishment of family members for alleged offenses by a relative; amongst other documented human rights issues;

13. It is also well documents and Saudi Arbia suffers from deep criticism for its judicial system there is neither transparent nor independent, and that the system discriminates against foreign parties, non-Saudi nationals especially, and follows deficient substantive and procedural rules;

14. For example, proceedings before the Board of Grievance precludes a party advancing a claim from being represented by counsel, it exclusively only allows *pro se* representation;

15. The Saudi legal system, including the Board of Grievance, lacks a comprehensive legal apparatus to protect witnesses or individuals reporting offenses, their relatives, and other close individuals;

16. The Civil Service Bureau is reserved for Saudi civil servants;

17. In terms of protection of whistleblowers or claimants, such provisions do not exist in Saudi Arabia, thus allowing retaliation against whistleblowers. See Corrupt Practices in

Saudi Arabia: An Analysis of the Legal Provisions and the Influence of Social Factors attached;

18. Amnesty International's report on Human Rights in Saudi Arabia – 2023, specifically lays out the inability to have redress before any tribunal in Saudi Arabia and the threat to ones safety when seeking such relief in country;

19. Saudi Arabia is not willing to vindicate third country nationals claim and even if they do, it is rewarded for incarceration shortly thereafter. See attached articles;

20. Saudi Arabia is void of regulations prohibiting discrimination based on religion, political opinion, national origin or citizenship, sexual orientation or gender identity, language, age or HIV-positive status;

21. The antidiscrimination law only applies to citizens and does not protect the rights of expatriates or third country nationals;

22. Not mere inconveniences but there is a remarkably high likelihood it could cost the Plaintiffs their lives; which has happened to countless others while pursuing claims in the Kingdom-See attached articles relating to Omar and Sarah Al-Jabri;-Saudi authorities brought charges against these siblings a month after their father sued Crown Prince Mohammed bin Salman in U.S. District Court;

23. Saudi Arabia does not manifest the same high standard of social justice as the United States judiciary for its arbitrary and capricious in its administration of justice;

24. Plaintiffs maintain reasonable concern that their legal action may result in the lack of a fair trial or retaliation targeted at them or their family;

25. Plainly stated though Saudi Arabia asserts a framework for conflict resolution, this is not available to the Plaintiffs for the reasons stated above as well as it is simply not safe for them to travel to and in Saudi Arabia; and

26. All exhibits are incorporated herein by reference.


THE REMAINDER OF THIS PAGE IS DELIBERATELY LEFT BLANK

I, Jafar Jafari, declare under penalty of perjury this 16th day of August, 2024, that the information provided herein is accurate to the best of my personal knowledge.

_____

Jafar Jafari

Maurer School of Law: Indiana University

# Digital Repository @ Maurer Law

Maurer Theses and Dissertations                                   Student Scholarship

2017

# Corrupt Practices in Saudi Arabia: An Analysis of the Legal Provisions and the Influence of Social Factors

Abdulmajeed Alshalan
*Indiana University Maurer School of Law*, ashalan33@gmail.com

Follow this and additional works at: https://www.repository.law.indiana.edu/etd

 Part of the Comparative and Foreign Law Commons, and the Organizations Law Commons

## Recommended Citation

Alshalan, Abdulmajeed, "Corrupt Practices in Saudi Arabia: An Analysis of the Legal Provisions and the Influence of Social Factors" (2017). *Maurer Theses and Dissertations*. 45.
https://www.repository.law.indiana.edu/etd/45

This Dissertation is brought to you for free and open access by the Student Scholarship at Digital Repository @ Maurer Law. It has been accepted for inclusion in Maurer Theses and Dissertations by an authorized administrator of Digital Repository @ Maurer Law. For more information, please contact kdcogswe@indiana.edu.



**Corrupt Practices in Saudi Arabia: An Analysis of the Legal Provisions and the Influence of Social Factors**

**Abdulmajeed Alshalan**

Submitted to the faculty of Indiana University Maurer School of
Law in partial fulfillment of the requirements
for the degree: Doctor of Juridical Science (S.J.D).
June 2017

"O you who have believed, be persistently standing firm in justice, witnesses for Allah, even if it be against yourselves or parents and relatives. Whether one is rich or poor, Allah is more worthy of both." Surat An-Nisa 4:135.

Accepted by the faculty, Indiana University, Maurer School of Law, in partial fulfillment of the requirements for the degree of Doctor of Juridical Science.

Doctoral Committee:

_____

Joseph L. Hoffmann
Harry Pratter Professor of Law and Director
for Strategic Projects.

_____

Donald H. Gjerdingen
Professor of Law.

_____

Dr. Jim Sherman
Professor Emeritus.

Date of Dissertation Defense: June 7, 2017

DEDICATION

To My Father, Abdulrahman, for being a role model of honesty and dignity and for teaching me to believe in hard work.

To My Mother, Haya, for being a role model as a strong fighter and for encouraging me to keep going further and further.

To My Lovely Wife, Lamia, for giving me an example of the meaning of sacrifice, and for taking my hand and picking me up whenever I fall down.

ACKNOWLEDGMENTS

In the first place, I am grateful to Allah Almighty for the grace to proceed and accomplish meaningful things in my life and academic career.

Second, I would like to express my utmost gratitude to my Committee Chair, Prof. Joseph L. Hoffmann, for his unstinting and generous support, advice, and patience during my LL.M. and S.J.D. journey. I could receive no greater academic reward than to work under his supervision. My gratitude is also extended to my dissertation committee members, Dr. Jim Sherman and Prof. Donald H. Gjerdingen, for their freely shared insights and understanding.

I also want to express my sincere gratitude and appreciation to my family at the Graduate Legal Studies Office— Dean Lesley Davis, Prof. Gabrielle L. Goodwin, Ms. Lara Gose, and Ms. May Rhea—for their generous and continuous encouragement and advice on both the personal and the professional level.

Lastly, and most importantly, my genuine and deep appreciation and gratitude to my loving mother for the infinite support she has shown me throughout every single moment of my life, and to my father, who always expressed such a gentle and positive attitude and who would have been proud to see my achievement. Without their sacrifices, this dissertation could not have come into existence. I also appreciate the consideration and understanding of my siblings, who were always ready to encourage me to proceed, regardless of the circumstances. My very special gratitude and appreciation goes to my loving wife, Lamia, for her tireless support and encouragement, and above all for her many sacrifices on my behalf.

ABSTRACT

In 2015, the National Anti-Corruption Commission (*Nazaha*) conducted a survey to assess corruption in Saudi Arabia. From this survey, two main findings deserve to be highlighted. First, the survey reveals that the practice of *wasta* was the most prevalent corrupt practice in Saudi society, constituting about 62 percent of such practices. This finding shows that it is essential to examine such a practice not only as a legal issue, but also as a social issue. Accordingly, the first part of this dissertation is devoted to providing a legal and social analysis of the practice of *wasta*. Another significant finding of the *Nazaha* survey is that around 81 percent of respondents attributed the prevalence of corruption in Saudi Arabia to the complexity of procedures and the outdated nature of the laws. In light of this finding, the latter part of this dissertation undertakes an evaluation of the Anti-Bribery Law, which is one of the main legal instruments to fight corruption, and other legal provisions that intersect with it in order to highlight issues which may hinder the application of the Anti-Bribery Law and which consequently constitute legal factors that promote corruption.

# Table of Contents

Dedication ............................................................................................................... iv

Acknowledgments ................................................................................................... v

Abstract .................................................................................................................. vi

Introduction ............................................................................................................ 1

**Chapter One: Corruption in General** .............................................................. 6

**Introduction** ......................................................................................................... 6

   **A. Definition and Related Issues** ..................................................................... 6

   **B. Classification of Corruption** ...................................................................... 11

      1.   Political Corruption v. Bureaucratic Corruption .......................... 11

      2.   Private Corruption v. Collective Corruption ................................ 13

      3.   Redistributive Corruption v. Extractive Corruption ................... 13

   **C. Forms of Corrupt Practices** ...................................................................... 14

      1.   Bribery ........................................................................................ 15

      2.   Embezzlement and Fraud ........................................................... 15

      3.   Extortion .................................................................................... 16

      4.   Abuse of Power .......................................................................... 16

   **D. Causes and Consequences of Corruption** ................................................. 17

      1.   Political Explanation .................................................................. 18

      2.   Cultural Explanation .................................................................. 22

      3.   Economic Explanations ............................................................. 26

      4.   Legal Explanations .................................................................... 30

   **E. Problems in Fighting Corruption** ............................................................. 34

**Conclusion** ........................................................................................................ 38

**Chapter Two: Background: Islamic Criminal Law** ...................................... 39

**Introduction** ....................................................................................................... 39

   **A. The Sources of Islamic Law** ..................................................................... 40

      1.   Primary Sources ......................................................................... 41

      2.   Secondary Sources ..................................................................... 46

   **B. Islamic Criminal Legislation** ................................................................... 49

      1.   The Classification of Crimes in Islamic Criminal Legislation ... 50

      2.   The Legal Consequences of Classification ................................ 55

      3.   Characteristic Features of Islamic Criminal Justice System ...... 57

**As a consequence of this religious character,** .............................................. 58

   **C. Corruption in Islamic Law** ....................................................................... 60

      1.   Bribery ........................................................................................ 61

      2.   Nepotism and Intercession (*shafa'ah*) ...................................... 63

   **D. Islamic Mechanisms of Combating Corruption** ...................................... 66

      1.   The Internal Mechanisms ........................................................... 66

      2.   The External Mechanisms .......................................................... 67

**Conclusion** ........................................................................................................ 68

**Chapter Three: Background: Saudi Arabian Law** ....................................... 70

**Introduction** ....................................................................................................... 70

**A. The Saudi Criminal Justice System** ...........................................................**70**
   1.   The Criminal Judicial System ...............................................73
   2.   Jurisdiction ..............................................................................75
   3.   Criminal Procedures ..............................................................76
**B. The Historical Development of Laws** ...........................................................**77**
**C. The Saudi Legal System in the Twenty-First Century** ............................**83**
**D. Corruption in Saudi Arabia** ..........................................................................**86**

**Conclusion** ...................................................................................................... **89**

**Chapter Four: Corruption and Saudi Arabian Society** ........................ **90**

**Introduction** .................................................................................................. **90**
**A. Societies and Corruption** ..............................................................................**90**
**B. Saudi Society in Context** ...............................................................................**98**
   1.   History .....................................................................................98
   2.   Culture ..................................................................................102
   3.   Social Stratification .............................................................107
**C. The Application of Social Psychology to Saudi Arabian Society** ............**115**
   1.   Ibn Khaldun's Analysis .......................................................115
   2.   Power and Corruption .........................................................117
   3.   Corruption and the Role of Intergroup Bias and the Culture of Collectivism .................127

**Conclusion** .................................................................................................... **138**

**Chapter Five: *Wasta* in Saudi Arabia** ................................................... **140**

**Introduction** ................................................................................................ **140**
**A. Wasta and Similar Concepts** .......................................................................**140**
**B. The Background and Evolution of Wasta in Saudi Arabia** .....................**149**
**C. Is Wasta an Act of Corruption? When and How? Legal or Moral?** .....................**160**

**Conclusion** .................................................................................................... **174**

**Chapter Six: The Saudi Anti-Bribery Law** ............................................ **175**

**Introduction** ................................................................................................ **175**
**A. The Saudi Anti-Corruption Legal Framework** ........................................**175**
**B. General Legal Analysis** ...............................................................................**179**
   1.   Bribery Offense in Anti-Bribery Law .................................186
   2.   Punishments ..........................................................................190
   3.   The Effective Regret Defense .............................................191
   4.   Rewards .................................................................................192
**C. Classifications of the Crimes** ......................................................................**193**
   1.   The Offering of Bribery .......................................................193
   2.   Knowingly Enjoying a Benefit Resulting from Bribery .................195
   3.   Gratuity .................................................................................197
   4.   The Offer and the Acceptance of *Wasta* ............................199
   5.   Trade in Influence ................................................................200
   6.   The Use of Force and the Threatening of a Public Official .................202
   7.   Following up on a case being processed outside the public official's authority:  being an "expediter" .................203

**Conclusion** .................................................................................................... **205**

**Chapter Seven: Evaluation of the Framework of Anti-Bribery Law** ............................ **206**

**Introduction** ................................................................................................ **206**
   **A. The Liability of Legal Persons** ..........................................................206
   **B. The Wasta Provision** ..........................................................................210
   **C. Immunity** ............................................................................................216
   **D. Penalties and Rewards** ......................................................................219
   **E. Protection of Whistleblowers and Witnesses** ...................................223
   **F. The Jurisdiction of the Anti-Bribery Law** ........................................227

**Conclusion** ................................................................................................ **232**

**Chapter Eight: Fighting Corruption a Different Way** ................................ **234**

**Introduction** ................................................................................................ **234**
   **A. Nudges** ..............................................................................................234
   **B. Simplification of the Procedures and the Implementation of E-Government** ...................240
   **C. The Reform of Anti-Bribery Jurisdiction** ........................................246
      1.   General View of the Jurisdiction of Anti-Bribery Law ..............246
      2.   Bribery of Foreign Public Officials ..........................................247
      3.   Private-to-Private Bribery ........................................................251
   **D. The Role of Criminal Law in Preventing Corruption** ......................256

**Conclusion** ................................................................................................ **263**

**Conclusion** ................................................................................................ **265**

INTRODUCTION

As the largest global supplier of oil, Saudi Arabia saw almost continuous economic expansion in the last half of the twentieth century, an expansion which has continued in the twenty-first. Since King Abdullah ascended the throne in 2005, Saudi Arabia has made significant economic improvement. In that same year, it joined the World Trade Organization, which has attracted a number of international and foreign investors to expand their business in the Kingdom. Even before that, in 2001, the Saudi government began establishing a number of industrial cities (*modon*) around the country. It can be said that Saudi Arabia has a new economic strategy for the twenty-first century aimed at expanding and liberalizing the economy.

This seemed successful until 2009, when a flood struck Jeddah City and many other cities in Makkah Province, leaving some 500 dead and thousands missing. Afterward, it was revealed that the casualties, as well as the major financial losses, were due to unethical practices in the awarding and execution of construction contracts. A similar but even worse disaster occurred in 2011. These two incidents brought the issue of corruption to the fore.

This has led the Saudi government to establish the National Anti-Corruption Commission (*Nazaha*), which, along with other authorized governmental bodies, is charged with investigating the source of the corruption and with preventing such corruption in the future. Though the Commission and other authorities have had their achievements, this did not prevent the disastrous flooding that hit Riyadh, the capital, in 2013. This series of events indicates that there are still more difficulties and challenges facing the *Nazaha* and other authorized governmental bodies that prevent them from getting to the heart of the issue.

Although there are articles and books that have addressed the issue of corruption in Saudi Arabia, most of these works do not consider the issue more holistically. Instead, they tend to

view corruption as the result of government practices, rather than examining the legal and cultural system that allows such corruption to arise. Cultural and legal structures lie at the root of this issue, and only by addressing these can the problem of corruption be reduced significantly.

Accordingly, this dissertation sheds light on *wasta* as a socially promoted corrupt practice, in addition to examining the Saudi Anti-Bribery Law and related aspects within the Saudi legal framework as legal issues. It seeks to argue that combating corruption may not be so much an issue of enforcing anti-corruption laws as an issue of discovering the social and legal factors that hinder the enforcement of the legal provisions in the first place—although this cannot be understood as implying that enforcement issues are of no account.

In terms of the social factors that contribute to corruption, it needs to be said that Saudi society does not promote bribery; it does, however, promote the practice of favoritism based on tribal and familial relationships, or what is known broadly as *wasta*. *Wasta* constitutes a sufficient reason for the increase of corruption. Generally, *wasta* can be categorized as indigenous forms of informal influence processes which involve acts of favoritism, whether on the basis of family, tribe, or region. The practice of *wasta* is widespread, not only in Saudi society, but also in the Arab world at large, where individuals resort to the practice in order to obtain certain advantages. Although Islamic jurisprudence clearly distinguishes between permissible and forbidden forms of *shafa'ah* (intercession), *wasta* is frequently confused with the Islamic concept of *shafa'ah* (intercession).

To understand *wasta* as a practice, it is necessary to understand the social, cultural, and historical background within which this practice thrives. Social psychology plays a significant role in providing the basic explanation for why individuals promote and participate in practicing *wasta* instead of challenging and resisting it, despite their negative perception of the practice.

From a legal perspective, *wasta* exists most frequently in a grey area of the law, which poses a significant challenge for the existing legal provisions that aim to combat such practices.

The Saudi Anti-Bribery Law is one of the country's main anti-corruption regulations. The Law represents a significant advance in certain respects, in that it criminalizes a number of corrupt practices, establishes the criminal liability of legal persons, rewards whistleblowers, and gives the government partial jurisdiction over the private sector. Despite such advances, however, the Law contains within it certain provisions that may hinder its effectiveness. Other obstacles and disadvantages that arise from related provisions within the criminal justice system generally and within the anti-corruption framework in particular may also neutralize the benefit of such advances.

Since Saudi Arabia ratified the United Nation Convention against Corruption in 2013, the Saudi Anti-Bribery Law should be examined in light of the Convention's standards and provisions, in addition to comparing it with other legal systems and with international conventions and standards. Such an evaluation will highlight the disadvantages more vividly so that the Saudi government and future researchers may consider them. Since the Anti-Bribery Law does not exist by itself as a comprehensive legal instrument, the identification of its disadvantages requires the examination of related provisions and aspects within the criminal justice system generally and within the anti-corruption framework in particular.

**Research Roadmap**

This dissertation is divided into eight chapters. The first three chapters lay the basic foundation and explore the relevant background on corruption, Islamic criminal law, and the Saudi legal system, while the remaining chapters focus specifically on the issues of concern to this dissertation. The first chapter discusses the definition of corruption and related issues and

briefly surveys the classification of corruption, problems in fighting corruption, and the causes and consequences of corruption.

The second chapter provides background on Islamic criminal law as the source of the Saudi legal system. In the first section, the sources of Islamic law are explained. The second section explores the structure of the Islamic criminal law, including its classification of crimes and its main principles. The last section sheds light on the position of Islamic criminal law on certain corrupt practices.

The third chapter reviews the background of the Saudi legal system. This chapter focuses mainly on the Saudi criminal justice system by identifying briefly and generally the structure of the criminal justice system. It then surveys the historical development of the Saudi legal system in general and the criminal justice system in particular, as well as the obstacles it faced during that development. The chapter concludes by reviewing the current situation of corruption in Saudi Arabia

After the essential foundations for the dissertation are laid, the focus turns toward the specific issues to be examined. Chapter four makes a transition to the topic of corruption and Saudi Arabian society. The first section surveys the debate as to whether corruption is an individual phenomenon or a social phenomenon. Section two delves into Saudi Arabian society to supply readers with the essential background on Saudi history, culture, and social stratification. Finally, a brief review of the social psychological perspective is given in the last section.

Chapter five places the practice of *wasta* under the microscope. The first section describes the practice of *wasta* and compares it with a number of similar practices that involve informal influence. The chapter then tracks the evolution and development of *wasta* in Saudi

Arabia in light of the brief historical and cultural background provided in chapter four. The last section investigates how the public perceives *wasta* and the legal position of the practice.

The Anti-Bribery Law is the sole focus of chapter six. Before analyzing the Anti-Bribery Law, the first section reviews the Saudi anti-corruption legal system. The second section explores the definition of bribery as an offense under the Law, the elements of the offense, the scope of the Law's application, and the punishments, defenses, and rewards for reporting the offense under the Law. The third section further examines the corrupt practices included in the Law and their elements.

Based on chapter six, chapter seven examines the strength and weaknesses of the Anti-Bribery Law in regard to four aspects: the liability of legal persons; the *wasta* provision, immunity; penalties and rewards; the protection of whistleblower and witnesses; and the jurisdiction of the Anti-Bribery Law.

The dissertation concludes by offering potential legal, structural, and behavioral solutions to fight corrupt practices generally and the practice of *wasta* specifically. The first section proposes improving institutional structures by the implementation and development of e-government. The second section suggests using the approach of nudges in order to discourage corrupt practices generally and *wasta* specifically. The third section then considers the possibility of expanding the jurisdiction of the Anti-Bribery Law. Finally, the dissertation concludes by addressing the role of criminal law in fighting corruption.

CHAPTER ONE: CORRUPTION IN GENERAL

INTRODUCTION

Corruption concerns many individuals around the globe, whether in the so-called developing nations or in developed nations. Corruption, as a subject, gains its complexity from the fact that it is related to different disciplinary perspectives. This indicates that each factor has a role in corruption. Consequently, each discipline argues and provides an explanation of the causes and consequences that may overlap with other disciplinary perspectives.

In this chapter, a general examination of the issue of corruption will be provided. At the outset, the definition of corruption will be discussed. The discussion will be extended to cover the issues related to the definitions of corruption. This will lay a foundation for discussing the classification of corruption and the forms of corrupt practices. After that, this chapter will shift to examine the causes and consequences of corruption from the political, cultural, economic, and legal perspectives. This chapter will conclude by highlighting the main problems that arise in fighting corruption.

*A. Definition and Related Issues*

Corruption is not a new phenomenon, but rather one that has existed for thousands of years.[1] Since the 1990s it has received greater attention, but why was that not the case before? No definite answers can be provided. Instead, a number of possible reasons have been offered. Globalization, without doubt, has had a significant role in generating discussion about corruption

---

[1] For example, in the period of Prophet Mohammad, there were incidents where he had to stand against certain practices and acts that fall under the umbrella of corruption. *See generally* Vito Tanzi, *Corruption Around the World: Causes, Consequences, Scope, and Cures*, (Int'l Monetary Fund, Working Paper No. 98/63, 1998), *available at* https://www.imf.org/external/pubs/ft/wp/wp9863.pdf. Jacob van Klaveren, *Corruption as a Historical Phenomenon*, *in* POLITICAL CORRUPTION: CONCEPTS AND CONTEXTS 83, 83-94 (Arnold J. Heidenheimer & Michael Johnston eds., 3d ed. 2002) (providing a historical review of corruption).

and has given rise to a series of consequences. Not only has corruption become a universal phenomenon, it is also no longer a taboo topic. This, it is certain, was a result of the growth of a democratic environment that has facilitated the media's advancement to a sufficient stage of development. The media began to shift from traditional means to more advanced means that have almost zero restrictions, which then eliminated the obstacles created by lack of information and boundaries. Globalization and the idea of universality have encouraged the rise of nongovernmental organizations whose missions focus wholly or partly on fighting corruption.[2]

Politically, corruption is often utilized as a political agenda. Allegations and charges are now more obvious than they were before. The attention to seeking out and discussing corruption can also be attributed to the end of the Cold War, since there has been no more need to cover up corruption in attempts to gain allies. In fact, the United States and European countries have played significant efforts in fighting corruption. Economically, countries have suffered and are still suffering from corrupt practices. Again, due to globalization, the effects of corruption are not limited within the borders of the nation where it occurs.[3]

When it comes to discussing corruption, a disagreement can be seen as regards the definition. Corruption can be defined from different points of view. Consequently, quite broad definitions exist, eliminating the idea of one single definition. The reason for the existence of diverse definitions can be attributed generally to the idea that corruption is perceived differently by different societies.

International organizations have adopted a number of definitions, and this is also true when it to comes to different scholars. Transparency International (TI) defines corruption as "the

---

[2] *See generally* Tanzi, *supra* note 1.
[3] *Id.*

abuse of entrusted power for private gain."[4] A similar definition to some extent is also adopted by the World Bank (WB), which defines corruption as "the abuse of public office for private gain."[5] The difference between these definitions is manifest in the idea of using the term "public office" in the WB definition. Thus, a number of criticisms are brought against the WB definition, arguing that such a definition is incomplete since it does not include the private sector.

Scholars have also gone further to define corruption starting from the very same point— that is, corruption implies that there is an ideal model or condition and there is perversion or deviation from it. Then they have seemed to suggest different propositions or concepts of what the ideal condition or model is. At the outset, definitions have ranged across the classifications found in Arnold. J. Heifenheimer's analysis of corruption, which divided the analysis into three main models: public-office-centered, public-interest-centered, and market-centered.[6]

The public-office-centered definition of corruption focuses mainly on the acts of public officials that can be considered to deviate from a legal norm in favor of private gain. The definition and concept of corruption in this category tends to be narrower than that of other categories, since it is linked to legal norms. The most cited definition representing this category is that of Nye, who defined corruption as "behavior which deviates from the formal duties of a public role because of private-regarding (personal, close family, private clique) pecuniary or status gains; or violates rules against the exercise of certain types of private regarding influence."[7]

---

[4] TRANSPARENCY INT'L, http://www.transparency.org/what-is-corruption (last visited Nov. 14, 2016).

[5] THE WORLD BANK GROUP, http://www1.worldbank.org/publicsector/anticorrupt/corruptn/cor02.htm#note1 (last visited Nov. 14, 2016).

[6] ARNOLD J. HEIDENHEIMER, POLITICAL CORRUPTION: READINGS IN COMPARATIVE ANALYSIS, at 4-6 (1970).

[7] Joseph S. Nye, *Corruption and Political Development: A Cost-Benefit Analysis*, 61 AM. POL. SCI. REV. 417, 419 (1967).

The critics of the public-office-centered definition argue that it is too narrow, since not all illegal acts by public officials are corrupt practices, and vice versa. The second criticism focuses on the fact that a number of countries do not provide explicit rules governing officials' conduct.[8]

The public-interest-centered definition emphasizes the harm to the public interest or the common good, i.e., corruption is an act that causes damage to the public interest. Rogow and Laswell, for instance, argue that practice of corruption is inconsistent with public order that elevates public interest over private interest. Other scholars, such as Friedrich[9] and Morris,[10] follow the same model in their concept of corruption. The public-interest-centered concept and definition, however, has attracted criticism on the basis of its non-specificity, i.e., it fails to specify whose interest has been violated. Moreover, a number of corrupt practices occur, in fact, in accordance with public interest, such as so-called honest graft.[11]

The market-centered definition of corruption has been influenced to some extent by the perspectives of economists. According to this model, thus, "[c]orruption is an extra-legal institution used by individuals or groups to gain influence over the actions of the bureaucracy. As such, the existence of corruption per se indicates only that these groups participate in the

---

[8] John A. Gardiner, *Defining Corruption*, *in* POLITICAL CORRUPTION: CONCEPTS AND CONTEXTS 25, 26 (Arnold J. Heidenheimer & Michael Johnston eds., 3d ed. 2002); *see also* Thomas D. Lancaster & Gabriella R. Montinola, *Toward a Methodology for the Comparative Study of Political Corruption*, 27 CRIME, L. & SOC. CHANGE. 185, 188 (1997) (*citing* C. Leys, *What is the Problem About Corruption?*, *in* POLITICAL CORRUPTION: READINGS IN COMPARATIVE ANALYSIS, 31, 31–37 (Arnold J. Heidenheimer ed. 1970)).

[9] Carl J. Friedrich, *Political Pathology*, 37 POL. Q. 70, 74 (1966) (Friedrich links a practice of corruption and the damage that occurs to the organization or the group in general.).

[10] *See* STEPHEN D. MORRIS, CORRUPTION & POLITICS IN CONTEMPORARY MEXICO 6-7 (1991) (Morris also noted that practice of corruption is not consistent with public interest, which he refers to as the "state's legitimizing ideology".).

[11] Lancaster & Montinola, *supra* note 8, at 188.

decision-making process to a greater extent than would otherwise be the case."[12] The market-centered concept of corruption mainly focuses on bureaucrats or "civil servants" who use their public office as a private business,[13] which then results in a shift from a mandatory pricing model to a semi-black-market model, where an individual is forced to pay higher than the mandated price in order to receive a certain benefit.[14] The main criticism of this concept is that it only focuses on the practices of bureaucrats, while it excludes the practices of others, such as elected officials.[15]

Attempting to eschew the difficulties related to defining corruption, a number of international and regional conventions[16] and domestic regulations opt not to provide a comprehensive definition of corruption; instead, these conventions and regulations list certain acts and practices of corruption and define them separately. This method was motivated by the fact that attempts to define corruption, as noted in the U.N. Anti-Corruption Toolkit, "invariably encounter legal, criminological and, in many countries, political problems."[17] Consequently, corruption generally as a term refers to a wide collection of acts and practices including bribery,

---

[12] Nathaniel H. Leff, *Economic Development Through Bureaucratic Corruption*, 8 AM. BEHAVE. SCI. 8, 8 (1964).

[13] ARNOLD J. HEIDENHEIMER & MICHAEL JOHNSTON, POLITICAL CORRUPTION: CONCEPTS AND CONTEXTS, at 8 (3d ed. 2002).

[14] Robert O. Tilman, *Emergence of Black-Market Bureaucracy: Administration, Development, and Corruption in the New States*, 28 PUB. ADMIN. REV. 437, 440-42 (1968).

[15] Lancaster & Montinola, *supra* note 8, at 190.

[16] This includes the United Nations Convention against Corruption, the Organization for Economic Co-operation and Development (OECD) Anti-Bribery Convention, the Inter-American Convention against Corruption, the African Union Convention on Preventing and Combating Corruption, the League of Arab States Anti-Corruption Convention, the Council of Europe's Civil and Criminal Law Conventions on Corruption, and the European Union's Convention Against Corruption Involving Officials.

[17] U.N. OFFICE ON DRUGS AND CRIME, THE GLOBAL PROGRAM AGAINST CORRUPTION; U.N. ANTI-CORRUPTION TOOLKIT 10 (3d ed. 2004).

trade of influence, embezzlement, favoritism, abuse of power, extortion, fraud, and money laundering.

From a legal perspective, defining corruption is a difficult task due to the potential restrictions it may impose on individuals and the consequences of criminalization. To define a crime too generally or using too broad a concept would jeopardize the freedom of individuals and the stability of societies. Therefore, to be on the safe side, each corrupt act can be defined separately in a way that describes both the act (actus reus) and the intention (mens rea), followed by other elements, such as punishments and jurisdiction.

B. *Classification of Corruption*

Corruption is generally classified based on various features, and such classification mainly depends on the perspective from which the analysis is undertaken. Economists classify corruption based on its economic consequences or its sources; thus, for example, they have classified corruption based on the frequency of incidence, how rare or widespread it is, or based on how organized the corruption is, i.e., whether it is well organized or chaotic.[18] The political scientists follow the same pattern and focus on governmental structures and institutions, leading to a classification of corruption as centralized or decentralized, and the same path is followed by legal scholars and sociologists. Their form of classification aims no lower, but rather gains its significance from the fact that it defines accurately the root causes of corruption, and, accordingly, prescribes the appropriate measures to combat corruption and offers solutions.

1.  Political Corruption v. Bureaucratic Corruption

It is not always possible to set forth a definition of corruption that clearly draws a line between political corruption and bureaucratic corruption. This can be attributed to the

---

[18] *See, e.g.*, U Myint, *Corruption: Causes, Consequences and Cures*, 7 ASIA PAC. DEV. J. 33, 40-42 (2000).

generalization that usually takes place in defining any concept. Political corruption, also known as grand corruption,[19] refers to corrupt practices committed by higher level officials or decision-makers. Falling into this category are politicians and public representatives who deviate from their main mission of making rules and enforcing them on behalf of the people, to protect them, and do so in order to enhance their own power and wealth. While the previous type of corruption focuses on the misconduct of higher level officials, bureaucratic corruption, also referred to as petty corruption, focuses on the corrupt practices committed by lower level officials, i.e., the administrative staff.[20]

This classification relies heavily on a clear separation, which practically speaking, does not exist in most political systems, between high level or political officials and lower level or administrative officials; without such a distinction, it will remain a vague system of classification. This, however, does not deprive this classification of its own analytical and practical merits, since the consequences of political corruption are not only more serious than those of petty corruption, they also have a clear impact on the political system in general. In the real world, political corruption exceeds the bounds of mere deviation or violation of legal rules or codes to encompass the utilization of laws and rules to serve personal interests, which can be considered a deviation from the principles and values of legal rationality.[21]

---

[19] *Id*. at 40 (it can also be referred to as high-level corruption).
[20] *Id*. at 40-41; *see also* JENS C. ANDVIG ET AL., CORRUPTION: A REVIEW OF CONTEMPORARY RESEARCH 10-12 (2001).
[21] Inge Amundsen, *Political Corruption: An Introduction to the Issues* 3-4 (CHR. MICHELSEN INST, Working Paper. 7, 1999) (political corruption though it occurs in both authoritarian and democratic regimes, can be characterized as a norm in the former and as incidental in the latter); *see also* SUSAN ROSE-ACKERMAN, CORRUPTION AND GOVERNMENT: CAUSES, CONSEQUENCES, AND REFORM 113-26 (1999).

2.   Private Corruption v. Collective Corruption

Another type of classification depends on who would benefit from the corrupt act. In the private corruption category, the benefit emerging from the corrupt act would be limited to the perpetrator and his family or friends, meaning that the circle of beneficiaries is still within private and individual limits.[22] Once the circle of beneficiaries extends beyond that, the corruption can be regarded as collective corruption. The benefits emerging from collective corruption are divided among the group members.[23] The group can be a certain class, organization, party, or even a gang that can utilize the resources in their advantages. Here, corruption may shift to being a form of organized crime.

The latter form is what most corrupt acts tend to be aimed at hiding. As a result, when a corrupt act starts as a conspiracy between two or more individuals, it grows quickly to a larger group being involved. This gradual development and spread of corruption from private "individual" corruption to collective "aggregated" corruption may lead to greater social acceptance of corruption. The ultimate dangerous and frustrating result is the belief among the people that corruption is inevitable and expected.[24]

3.   Redistributive Corruption v. Extractive Corruption

This classification aims at identifying the relationship between the state and society, as the two main players in corruption problem, and the direction in which the resources flow, i.e., from the top downward, which is extractive corruption, or from the bottom upward, which is redistributive corruption. Since the relationship between the society and the state in cases of

---

[22] Amundsen, *supra* note 21, at 4.
[23] *Id.* at 5.
[24] *Id.*

corruption is usually not balanced, one party, either the state or the society, will benefit the most from corruption.[25]

In redistributive corruption, the state is in the weaker position in the relationship, allowing a number of individuals or social or economic groups to gain more benefit from the corruption than the state. This results from these groups and individuals being powerful and organized, which enables them to challenge the state and distribute state resources based not on fairness but rather on how powerful the groups or individuals are. Appropriately, in this type of corruption, a powerful ethnicity, region, or tribe will benefit the most as a group from the corruption. The mafia is the quintessential example of this type of corruption. Ultimately, the state and the poor will be affected the most.[26]

Extractive corruption, on the other hand, is a type of corruption in which the society is in the weaker position in the relationship. Accordingly, the state will benefit more from corrupt practices. Though they are passive players, the ruling elite benefit more from corruption by extracting the resources from the society through using the state system and instruments to their advantage. This category of corruption can be seen in authoritarian and neo-patrimonial states, where the resources and the power are concentrated in the hands of the rulers.[27]

*C. Forms of Corrupt Practices*

Having identified a number of classifications of corruption, it will be helpful to list the most significant forms of corrupt practices recognized in anti-corruption regulation and conventions in order to identify more specifically what corruption is from a criminal law perspective.

---

[25] *Id.*
[26] *Id.* at 6-7.
[27] *Id.* at 7-10.

1.  Bribery

Bribery is "the corrupt payment, receipt, or solicitation of a private favor for official action."[28] This definition appears similarly in both domestic laws and international conventions.[29] The benefit from bribery is not limited to monetary benefits and need not be paid directly to the bribed individual but rather can be anything that benefits the bribee directly or indirectly. The criminalization of bribery can apply to the private sector and the public sector alike. It can also be limited to public officials, in which case the definition of public officials would be extended broadly to include individuals or corporate groups with a relationship to public functions.  There are many terms equivalent to bribery, such as kickback, gratuity, commercial arrangement, sweetener, baksheesh, pay-off, and speed money or grease money.

2.  Embezzlement and Fraud

Embezzlement is "the fraudulent taking of personal property with which one has been entrusted."[30] Though it is considered generally a form of property crime, embezzlement can be considered a form of corruption when applying broader definitions of corruption, since the act affects the public interest and is committed by a public official.  Fraud is the use of false or deceptive information to "induce another to act to his or her detriment."[31] For instance, fraud can be committed by an official who conveys false information about the distribution of supplies or the number of beneficiaries.

---

[28] BRIBERY, Black's Law Dictionary (10th ed. 2014).
[29] *See, e.g.*, United Nations Convention Against Corruption art 8, 43 I.L.M. 37 (2004). [hereinafter UNCAC]; *see, e.g.*, Organization for Economic Development Convention on Combating Bribery of Foreign Public Officials in International Business Transactions art 1, Nov. 21, 1997, 37 I.L.M. 1 [hereinafter OECD Convention].
[30] EMBEZZLEMENT, Black's Law Dictionary (10th ed. 2014).
[31] FRAUD, Black's Law Dictionary (10th ed. 2014).

3.  Extortion

Extortion is "the offense committed by a public official who illegally obtains property under the color of office."[32] The main element in the crime of extortion is the use of coercion, which also affects, in addition to the public interest, the victim of the crime itself. The difference between bribery and extortion is critical, since the individual who paid the benefit will be criminally liable if the offense is bribery, but not if it is extortion.[33] Between bribery and extortion, however, there is not a clear, bright line.

> If one other than the officer corruptly takes the initiative and offers what he knows is not an authorized fee, it is bribery and not extortion. On the other hand, if the officer corruptly makes an unlawful demand which is paid by one who does not realize it is not the fee authorized for the service rendered, it is extortion and not bribery. In theory it would seem possible for an officer to extort a bribe under such circumstances that he would be guilty of either offense whereas the outraged citizen would be excused.[34]

4.  Abuse of Power[35]

Abuse of power is a general and broad category that includes acts such as abuse of discretionary powers and favoritism. Abuse of power refers to acts involving the use of power to gain a personal benefit. Abuse of power is associated in most cases with bureaucracies where there is a broad discretionary power and little supervision or accountability. Favoritism, as a form of abuse of power, involves a high level of bias in the distribution of resources to family, friends, or members of a group. Nepotism, as a specific form of favoritism, is defined as the "bestowal of

---

[32] EXTORTION, Black's Law Dictionary (10th ed. 2014).
[33] *See generally* U.N. OFFICE ON DRUGS AND CRIME, *supra* note 17, at 14-15.
[34] ROLLIN M. PERKINS & RONALD N. BOYCE, CRIMINAL LAW 538 (3D ED. 1982).
[35] U.N. OFFICE ON DRUGS AND CRIME, *supra* note 17, at 15.

official favors on one's relatives."[36] Other examples of favoritism are the acts of clientelism, patronage, and cronyism.

### D. Causes and Consequences of Corruption

When it comes to corruption, almost every aspect of it seems difficult to pin down, starting with the definition of it. The same difficulties apply to the causes and consequences of corruption, which seem to have a dynamic relationship. This dynamic relationship shifts some elements from the side of causes to the side of consequences, and vice versa. The overlap between the two sides not only arises because some factors that can be found in one place do not necessarily exist in another, but also because some factors can be observed on one side in one place and on the other side in another place.

Despite these difficulties, research has consistently advanced so that it can at least determine the chain of corruption in a series. As a result, from each of the perspectives on corruption, whether economic, political, legal, or social, scholars and researchers have identified a number of causes and consequences. When it comes to the causes of corruption, however, most of the research pivots around Klitgaard's corruption equation. The equation is as follows:

Corruption = Economic Rent + Discretionary Power – Accountability.[37]

This equation indicates that the co-existence of three elements is required: economic rent accompanying discretionary power and a low probability of accountability and penalization.

I am proposing that corruption is similar to a seesaw or teeter-totter where there are four factors on each side, depending on the following cultural, economic, political, and legal factors on the side of the causes. On the consequences side, the same factors are organized backward, i.e., the legal, political, economic, and cultural consequences. In the case of unbalanced weight

---

[36] NEPOTISM, Black's Law Dictionary (10th ed. 2014).
[37] ROBERT E. KLITGAARD, CONTROLLING CORRUPTION 75 (1988).

resulting in a collapse of the consequences, the most damage will be seen in the cultural and economic aspects, since each consequence will affect both of those aspects, either directly or indirectly. In a sense, the legal and political aspects are merely means to create corruption, while the motivations and the explanations remain to be found in the cultural and economic aspects.

1.  Political Explanation

The democratic system, adopted in most of the wealthy states, does not necessarily succeed in reducing corruption. This is due to two main reasons: first, the term "democracy" is an overarching rubric and includes several forms. Second, a government system that works efficiently and effectively in one state may not work in the same way in another. History provides a number of examples of corruption that have occurred in democratic states—consider Chicago, for example. This is a clear indication that democratic systems do not succeed in fighting corruption without efficient tools.[38]

Nevertheless, studies show that democracy gradually helps to lower the level of corruption, as can be seen in a study testing the impact of grounded democracy in states with a democratic tradition since 1950.[39] The study found a significant impact of democracy on corruption, which was derived from being exposed to democracy over time, rather than the current level of democracy.[40] Other studies have found that corruption in authoritarian systems is slightly lower than in medium-democratic systems.[41]

---

[38] ROSE-ACKERMAN, *supra* note 21, at 113.

[39] Daniel Treisman, *The causes of corruption: a cross-national study*, 76 J. PUB. ECON. 399, 433-35 (2000).

[40] *Id.*

[41] Johann G. Lambsdorff, *Causes and Consequences of Corruption: What Do We Know from a Cross-Section of Countries*, *in* INTERNATIONAL HANDBOOK ON THE ECONOMICS OF CORRUPTION 11 (Susan Rose-Ackerman ed., 2006) (*citing* Philip Manow, *Politische Korruption und Politischer Wettbewerb: Probleme der Quantitativen Analyse [Political Corruption and Political*

The form of democracy also plays a significant role in determining the level of corruption in a democracy. Empirical studies indicate that democratic systems with more powerful presidents are more corrupt than the parliamentary system, in the absence of U.S.-style checks and balances, as is the case in the majority of presidential systems. A study that compared parliamentary systems with presidential systems provided evidence that the former were associated with lower levels of corruption. [42] This can be attributed to an imbalanced distribution of powers; that is, in presidential systems where presidents have semi-complete power over the resources, they can be more easily utilized for the presidents' personal profits. Presidents also tend to extend their power to gain both legislative and non-legislative powers, taking advantage of the absence of checks and balances.[43]

Describing the relationship between decentralization and corruption increases the complexity and challenges of giving an adequate account of corruption. Studies are divided between the advantages and disadvantages of decentralization, though a number of studies have found no significant impacts of either on corruption.[44] This division in the results is due to how decentralization is measured.[45] Decentralization and centralization are important, but they are not

---

*Competition: Problems of Quantitative Analysis], in* DIMENSIONEN POLITISCHER KORRUPTION [Dimensions of Political Corruption] 249, 249-66 (Ulrich von Alemann ed., 2005)).

[42] John Gerring & Strom C. Thacker, *Political Institutions and Corruption: The Role of Unitarism and Parliamentarism*, 34 BRIT. J. POL. SCI. 295, 325-28 (2004) (the study also compared unitarism with a federal system and found that unitarism tended to be associated with less corruption. The ranking was as follows: 1. Federal and presidential systems are high corruption. 2. Unitary presidential and federal parliamentary systems are intermediate corruption. 3. Unitary parliamentary systems are low corruption).

[43] Jana Kunicová & Susan Rose-Ackerman, *Electoral Rules and Constitutional Structures as Constraints on Corruption*, 35 BRIT. J. POL. SCI. 573, 586 (2005) (the authors also support the results of the previously mentioned study. They also expand the study to examine plurality voting in contrast to proportional representation and found that the latter is associated with more corruption in the case of presidential systems).

[44] Lambsdorff, *supra* note 41, at 16.

[45] *Id*. at 17.

the right basis on which to fight corruption, as there are other factors, mainly cultural, that are likely confuse the issue.[46]

Finally, strong competition serves as dual function: it not only provides societies with the option to change leaders who did not meet their expectations,[47] it also decreases the likelihood of corrupt practices in the political domain, since such acts hurt the reputation of candidates.[48] In general, an ideal democratic system would reduce corruption, since it limits politicians' greed by the device of elections and safeguards liberties and free speech, which ultimately enhance the transparency and openness of governments.[49] More specifically, democratic systems control the level of corruption indirectly by imposing essentially two types of limitations on political power: the first is the very structure of democratic government, which creates "veto points and independent sources of political, administrative and judicial power"; the second type provides citizens freedom of speech and assembly, a channel through which they can complain and have their voice heard.[50]

When corruption is rife, it erodes the legitimacy of governments.[51] The belief that government is placing democratic values at the top of its agenda is undermined by corruption, which leads the citizens to form an alternative belief that their "government is for sale to the

---

[46] *Id.*

[47] *Id*. at 10.

[48] ROSE-ACKERMAN, *supra* note 21, at 127.

[49] *Id*. at 113.

[50] *See generally id*. at 143-74; *see also* Daniel Treisman, *What Have We Learned About the Causes of Corruption from Ten Years of Cross-National Empirical Research?*, 10 ANNU. REV. POL. SCI. 211, 228-36 (2007).

[51] *See* Mitchell A. Seligson, *The Impact of Corruption on Regime Legitimacy: A Comparative Study of Four Latin American Countries*, 64 J. POL. 408, 424 (2002) ("In every case, higher corruption is significantly (<.001) associated with lower support for the legitimacy of the political system").

highest bidder."[52] Once democratic rulers are accused of corruption, this provides a justification for military takeover. In authoritarian governments, conversely, corruption is used to maintain power. The placement of wealthy and powerful individuals inside the circle of corruption and benefit maintains support for the regime and eliminates the chances of exposure.[53]

Moving a step back, corruption reduces the services provided by the government. This is mainly because the evaluation of what should be provided is not based on efficiency or quality. The shift from the basis of efficiency and quality to that of personal profit coupled with the existence of a corrupt relationship between corrupt producers and the bureaucracy prevents producers offering products or projects with adequate quality and efficiency from the start.[54]

Consequently, corruption affects decisions regarding budget expenditures.[55] This may explain the tendency of corrupt governments to have more military projects than those dealing with, for example, education. The tendency toward "hard" public investments will be higher than that toward "soft" investments such as health and education services; resources are likely to be reallocated out of the borders of the country rather than inside it.[56] The effects of corruption, then, include lowering public revenue and increasing spending, which lead to fiscal deficits.[57] This is not to mention the processes of the appointment and promotion of officials, which come to be based on nepotism or bribery, rather than on candidates' merits.[58] Such acts contribute significantly to the inefficiency of bureaucracy and of the public sector in general.

---

[52] Susan Rose-Ackerman, *The Political Economy of Corruption, in* CORRUPTION AND THE GLOBAL ECONOMY 45 (KIMBERLY A. ELLIOTT, ED. 1997).
[53] *Id.*
[54] Arvind K. Jain, *Corruption: A Review*, 15 J. ECON. SURV. 71, 93 (2001).
[55] Myint, *supra* note 18, at 49.
[56] Amundsen, *supra* note 21, at 20.
[57] Tanzi, *supra* note 1, at 582.
[58] Lambsdorff, *supra* note 41, at 31.

2.   Cultural Explanation

The fact that the corruption is contextual in its nature suggests that cultural factors influence the level of corruption in states, both directly and indirectly. The causal relationship can be often described as unidirectional, i.e., the culture affects the level of corruption, rather than vice versa, due to the stability of cultural variables over long periods of time.[59] The influence of culture on the level of corruption can be seen in the previously mentioned studies which emphasize that mere exposure to democracy for a significant period of time lowers the level of corruption.

In the 1950s, Edward Banfield examined the association between strong family bonds and the high levels of corruption found in Sicily and southern Italy; he found that corruption was linked to powerful familial values that included an intense feeling of obligation.[60] A higher loyalty to the family was related to a higher level of corruption, since familial interests and broader social or official interests were in competition with each other.[61] This description explains primarily nepotistic practices and the influence of culture, especially when accompanied with high levels of kinship or familial loyalty.[62]

Robert Merton also explained the relationship between cultural goals and institutional norms, indicating that cultures establish the goals of cultures and societies and then pave certain roads and means to reach them. He noted that there was unequal access, for a variety of reasons, including race, religion, capital, and so on, to the opportunity structure, leading those who were

---

[59] *Id*. at 17.
[60] EDWARD BANFIELD, THE MORAL BASIS OF A BACKWARD SOCIETY (1958).
[61] Lambsdorff, *supra* note 41, at 19.
[62] *See* Seymour M. Lipset & Gabriel S. Lenz, *Corruption, Culture, and Markets*, *in* CULTURE MATTERS: HOW VALUES SHAPE HUMAN PROGRESS 112, 120 (Lawrence E. Harrison & Samuel P. Huntingto eds., 2000) (Lenz and Lipset found a positive correlation between the level of familism and the level corruption).

excluded or had small chance of access not to follow the rules and to find another means of access.[63] The implication of this observation is that cultures set a number of economic goals, but also create limited access to chances of achieving these goals, which ultimately increases the level of corruption.[64]

There is a negative correlation between the level of trust and the level of corruption. A high level of trust builds better cooperation among bureaucrats themselves and between bureaucrats and citizens, which is ultimately a helpful factor in fighting corruption. Uslaner argued that trust has a stronger impact on corruption than corruption has on trust.[65]

Another relevant study is one conducted by Husted that sought to measure different variables related to cultural values. Husted relied on surveys that were made by Hoftede in 1997 to investigate the relationship between Hoftede's cultural dimensions[66] and corruption.[67] The

---

[63] *Id*. at 116-17 (*citing* ROBERT K. MERTON, SOCIAL THEORY AND SOCIAL STRUCTURE 186-193 (1957)).

[64] *Id*. at 117.

[65] Eric M. Uslaner, *Trust and Corruption*, *in* THE NEW INSTITUTIONAL ECONOMICS OF CORRUPTION 76, 76-7 (Johann G. Lambsdorff, et al. eds., 2005).

[66] GEERT HOFSTEDE ET AL., CULTURES AND ORGANIZATIONS: SOFTWARE OF THE MIND: INTERCULTURAL COOPERATION AND ITS IMPORTANCE FOR SURVIVAL 61, 92, 191, 140, 239, 281 (3d ed. 2010). (The six dimensions are as follows:

1. The power distance index (PDI): "the extent to which the less powerful members of institutions and organizations (like the family) within a country expect and accept that power is distributed unequally."

2. Individualism vs. collectivism (IDV): "Individualism pertains to societies in which the ties between individuals are loose: everyone is expected to look after himself or herself and his or her immediate family. Collectivism as its opposite pertains to societies in which people from birth onwards are integrated into strong, cohesive in-groups, which throughout people's lifetime continue to protect them in exchange for unquestioning loyalty."

3. Uncertainty avoidance index (UAI): "extent to which the members of culture feel threatened ambiguous or unknown situation."

4. Masculinity vs. femininity (MAS): "A society is called masculine when emotional gender roles are clearly distinct: men are supposed to be assertive, tough, and focused on material success, whereas women are supposed to be more modest, tender, and concerned with quality of life. A society is called feminine when emotional gender roles overlap:

study found a positive correlation between the level of corruption and power distance and between the level of corruption and the level of masculinity, as well as a positive correlation between uncertainty avoidance and the level of corruption. The variables related to individualism, as Husted noted, were not significant.[68] Harry Triandis et al., however, found a positive correlation between cultural collectivism and the level of deception, which included the tendency to bribe.[69]

Hufsted saw "traditionalism" as related to other cultural variables: "Societies that cultivate secular-rational attitudes towards authority (that is, where impersonal values are more important as opposed to particularistic or family values) are perceived to be less corrupt, unlike those where traditional religious values dominate."[70] A later study sought to create a scale using traditional values vs. secular-rational values as one dimension and survival values vs. self-expression values

---

> both men and women are supposed to be modest, tender, and concerned with the quality of life."
> 5. Long-term orientation vs. short-term orientation (LTO): "Long Term Orientation stands for the fostering of virtues oriented towards future rewards, in particular perseverance and thrift. It's opposite pole, short Term Orientation, stands for the fostering of virtues related to the past and present, in particular, respect for tradition, preservation of 'face' and fulfilling social obligations."
> 6. Indulgence versus restraint (IND): "Indulgence stands for a tendency to allow relatively free gratification of basic and natural human desires related to enjoying life and having fun. Its opposite pole, restraint, reflects a conviction that such gratification needs to be curbed and regulated by strict social norms.").

[67] *See, e.g.*, James H. Davis & John A. Ruhe, *Perceptions of Country Corruption: Antecedents and Outcomes*, 43 J. Bus. Ethics 275, 275 (2003) ("This study examines the relationship between Hofstede's cultural dimensions and how country corruption is perceived. Power distance, individualism and masculinity were found to explain a significant portion of the variance in perceived corruption.").

[68] *See generally* Bryan W. Husted, *Wealth, Culture, and Corruption*, 30 J. Int'l Bus. Stud. 339-59 (1999). *But see* Monica V. Achim, *Cultural Dimension of Corruption: A Cross-Country Survey*, 22 Int'l Advances in Econ. Res. 333, 333-45 (2016) (found that individualism-collectivism dimension, in addition to power distance and long- versus short-term orientation dimensions have an influence on corruption.).

[69] *See generally* Harry C. Triandis et al., *Culture and Deception in Business Negotiations: A Multilevel Analysis*, 1 Int'l. J. Cross Cultural Mgmt. 73-90 (2001).

[70] Lambsdorff, *supra* note 41, at 19.

as the second dimension.[71] It found that "a strong 'survival' orientation contributes twice as much as a strong 'traditional' orientation to higher levels of corruption."[72]

The consequences of corruption for cultures are huge, since such consequences, whether they are legal, political, or economic, directly or indirectly affect cultures and societies. The inability of governments to impose regulatory laws, as a legal consequence, has further cultural and societal impacts. Corruption leads to more violations of building codes, environmental regulations, and health standards, which can result in severe social harm. Around the world, we hear about such incidents resulting in a huge number of casualties.

Income inequality, as an economic impact, not only creates a vacuum in which powerful groups allocate resources for their private benefit, it also extends its impacts to further inequalities in education, health, and land distribution.[73] Education and health are affected not only by income equality, but also by misallocation of expenditures.[74]

Moreover, corruption affects income distribution by concentrating the wealth among few individuals out of the whole population.[75] Consequently, the burden becomes heavier for the poor, since they become unable to pay bribes in order to obtain basic necessities in life. Correlated with

---

[71] Ronald Inglehart & Christian Welzel, *Changing Mass Priorities: The Link Between Modernization and Democracy*, 8 PERSPECTIVES ON POL. 551, 554 (2010) (see the cultural map 2005-2007 and the explanation of the dimensions).

[72] Johann G. Lambsdorff, *supra* note 41, at 20 (*citing* Wayne Sandholtz & Rein Taagepera, *Corruption, Culture, and Communism*, 15 INT'L REV. SOC. 109-31 (2005)) (Lambsdorff also criticizes the finding of that study since the authors did not explain on what basis the dimensions were determined, and they did not control for some standard variables, such as GDP per capita).

[73] *See, e.g.*, You, Jong-sung & Sanjeev Khagram, *A Comparative Study of Inequality and Corruption*, 70 AM. SOC. REV. 136, 139 (2005).

[74] Kwabena Gyimah-Brempong, *Corruption, Economic Growth, and Income Inequality in Africa*, 3 ECON. & POL. 183, 188 (2002) ("increased corruption is associated with decreases in the share of government expenditures devoted to education and health care").

[75] *See generally* Sanjeev Gupta et al., *Does Corruption Affect Income Inequality and Poverty?*, 3 ECON. GOVERNANCE. 23, 23-45 (2002); *see also* Hongyi Li et al., *Corruption, Income Distribution, and Growth*, 12 ECON. & POL. 155, 155-82 (2000).

that is a change in the pattern of consumption where the wealthy class becomes obsessed with keeping up to date with the new fashions and modern lifestyle, creating what can be called an unproductive and superficial society.[76]

At the personal level, in societies with high levels of corruption, talents and resources are misallocated and eventually lost.[77] This explains why individuals in such societies are more attracted to occupations providing extra revenue—an occupation where one can receive bribes, or where one holds high rank in order to create a wide network of connections, rather than an occupation where an individual can be more productive and contribute directly to the society's success.[78]  The scarcity of talented individuals, scientists, and entrepreneurs is also impacted by the lack of incentives, since the society's evaluation is not based on merits.

3.   Economic Explanations

As a central argument, a number of researchers propose that the absence of economic competition and the expansion of a monopoly of profit fuel a higher level of corruption. Competition between suppliers diminishes the monopoly which ultimately reduces the irrational prices. The existence of competition reduces the motivation of politicians and public officials to seek bribes, since they have little to "sell" in exchange for bribery. The opposite, however, can

---

[76] Myint, *supra* note 18, at 47.

[77] Toke S. Aidt, *Corruption, Institutions, and Economic Development*, 25 OXFORD REV. ECON. POL'Y. 271, 275 (2009) ("As highlighted by a large literature on rent seeking, the jobs of those government officials are contestable. As a consequence, *real* resources, sometimes of a value equal to the total bribe revenues, are wasted in contesting these jobs and, in the process, entrepreneurial talent is misallocated").

[78] PAOLO MAURO, WHY WORRY ABOUT CORRUPTION? 6 (1997) ("Where rent seeking proves more lucrative than productive work, talent will be misallocated. Financial incentives may lure the more talented and better educated to engage in rent seeking rather than in productive work …").

also be seen: less or limited competition creates more opportunity and high rents for politicians and public officials to exchange for bribery or other corrupt practices.[79]

A downside of competition can be a decrease of quality: that is, competition may lead private firms to reduce the quality of supplies or projects by, for example, paying off projects inspectors or auditors to ignore violations of quality standards.[80] Nevertheless, a negative correlation between corruption and competition is supported by numerous studies.[81] For instance, a study examining data from a market dominance index[82] and an anti-trust laws index[83] shows that high levels of corruption are more likely to be seen in countries that provide domestic firms with higher rents.[84] This can happen where domestic firms are protected by nature or policy from foreign firms' competition or where there is an absence of effective anti-trust laws.[85]

In line with competition, there is an inverse relationship between openness toward more international investment and corruption. Accordingly, it is not surprising that the growth of globalization restricts to a great extent the expansion of corruption.[86] In support of that, Sandholtz and Gray noted that the level of corruption is lower if a nation is a member of international organizations and institutions such as the United Nations, the International Monetary Fund, or the

---

[79] Lambsdorff, *supra* note 41, at 8; *see also* Jakob Svensson, *Eight Questions About Corruption*, 19 J. ECON. PERSPECTIVES 19, 33-34 (2005).

[80] Lambsdorff, *supra* note 41, at 8.

[81] Martin Paldam, *The Cross-Country Pattern of Corruption: Economics, Culture and the Seesaw Dynamics*, 18 EUR. J. POL. ECON. 215, 215-40 (2002); *See, e.g.*, Arthur A. Goldsmith, *Slapping the Grasping Hand: Correlates of Political Corruption in Emerging Markets*, 58 AM. J. ECON. & SOC. 865, 865-83 (1999).

[82] Alberto Ades & Rafael D. Tella, *Rents, Competition, and Corruption*, 89 AM. ECON. REV. 982, 986 (1999) ("an index of Market Dominance, that measures 'the extent to which dominance by a limited number of enterprises is detrimental to new business development.'").

[83] *Id* ("an Antitrust Laws index, that measures 'the effectiveness of anti-trust laws in checking noncompetitive practices.'").

[84] *See generally id*. at 982-93.

[85] *Id*. at 992.

[86] Wayne Sandholtz & Mark M. Gray, *International Integration and National Corruption*, 57 INT'L. ORG. 761, 761-800 (2003).

World Trade Organization. The study also reported that the longer the time a nation had been a member of such organizations, the lower the level of corruption in the country.[87] In a similar vein, another study found that the longer period of time a country had been exposed to imports and open to trade, the lower the level of corruption.[88]

Finally, economic development is negatively associated with the level of perceived corruption, i.e., the higher the level of economic development, the lower the perceived corruption level. The direction of causation, however, is debatable. While some argues that good institutions foster economic development, others suppose the opposite.[89] The debate extends to the wage level and its effects on the level of corruption. The relationship between wages and corruption remains ambiguous. Earlier researchers encouraged high wages as an instrument to fight corruption.[90] More recent research has concluded that increasing wages reduce bribery, but "only under some circumstances".[91] On the other hand, other studies show that high wages pose no significant roles in reducing corruption.[92] Other economic factors such as inflation have been proposed as indirect reasons for corruption. Since it lowers the ability to monitor public spending, inflation increases the level of corruption.[93]

---

[87] *Id. See also* Treisman, *supra* note 50, at 236.

[88] *See generally* Shang-Jin Wei, *Natural Openness and Good Government* (National Bureau of Economic, Working Paper No. 7765, 2000); *See also* Treisman, *supra* note 39, at 435.

[89] Treisman, *supra* note 50, at 223-28.

[90] Svensson, *supra* note 79, at 32-33.

[91] *Id* ("This strategy requires a well-functioning enforcement apparatus; the bribe being offered (or demanded) must not be a function of the official's wage; and the cost of paying higher wages must not be too high. In many poor developing countries where corruption is institutionalized, these requirements appear unlikely to hold.").

[92] Treisman, *supra* note 50, at 239.

[93] *Id*. at 238 (*citing* Miguel Braun & Rafael D. Tella, *Inflation, Inflation Variability, and Corruption*, 16 ECON. & POL. 77, 77–100 (2004)). *But see* Fahim A. Al-Marhubi, *Corruption and Inflation*, 66 ECON. LETTERS. 199, 199-202 (2000) (argues that inflation is a consequence of corruption).

The consequences of corruption on the economy are diverse and ultimately lead to inhibiting economic growth. To begin with, studies provide evidence for the negative impact of corruption on both domestic and foreign investments. In order to initiate a new business or investment, bribes or other similar corrupt practices are required, not to mention the continuous corrupt practices needed to keep the business running.[94] Due to the lower commitment of corrupt governments to trustworthy policies, both domestic and foreign investments are likely to suffer from corruption.[95] If a country is affected by corruption, this discourages investors from expanding or even initiating investment in that country.

Though there are studies indicating the benefits of corruption for economic growth,[96] the more recent studies provide evidence for the adverse impacts of corruption. A great number of these studies demonstrate the negative impacts of corruption on foreign direct investment, rather than on domestic investment.[97] Mauro argued that corruption reduces the level of private investments, which negatively effects the economic growth in general, noting that if Bangladesh had a bureaucracy as efficient and honest as that of Uruguay, "its investment rate would rise by almost five percentage points, and its yearly GDP growth rate would rise by over half a percentage point."[98]

---

[94] Myint, *supra* note 18, at 47.

[95] Lambsdorff, *supra* note 41, at 27.

[96] *See, e.g.*, Leff, *supra* note 12, at 8-14 (1964); *see generally* SAMUEL P. HUNTINGTON, POLITICAL ORDER IN CHANGING SOCIETIES (1968).

[97] *See generally* Lambsdorff, *supra* note 41, at 27-29; *see also* Mohsin Habib & Leon Zurawicki, *Corruption and Foreign Direct Investment*, 33 J. INT'L BUS. STUD. 291, 291-307 (2002).

[98] Paolo Mauro, *Corruption and Growth*, 110 Q. J. ECON. 681, 683 (1995); *see also* Shang-Jin Wei, *How Taxing Is Corruption on International Investors?*, 82 REV. ECON. & STAT. 1, 1-11 (2000).

Different types of corruption can also have different effects on the level of investments. Investment may be deterred more by petty corruption than by grand corruption.[99] Foreign investors ultimately tend to invest in joint projects; joint projects between domestic investors and foreign investors are preferred because the domestic investors are likely to be better acquainted with the corrupt practices that are common in the host country.[100]

Corruption affects the tax revenues of governments mainly because private gain is reducing the commitment to tax collection, which eventually lowers government revenues. A study suggests that "[a] 1 point increase in the corruption index is associated with 1.5 percentage point decline in total revenue-GDP ratio, [and a] 2.7 percent decline in tax-GDP ratio".[101] In line with that, the underground economy[102] tends to be larger where the level of corruption is high. The increase in the underground economy affects the validity and the accuracy of the value and volume of a country's economy.[103]

4.  Legal Explanations

States perform their roles by relying on and utilizing a set of laws and regulations. The existence of these laws and regulations contributes to the power distribution in a state; that is, the more authorization given to officials, the more power they have. In states with higher levels of corruption, these officials extract more benefits through the power they have. The situation can be aggravated in cases where the regulations and procedures are not transparent or not publically

---

[99] Lambsdorff, *supra* note 41, at 31 (*citing* JOHANN LAMBSDORFF, BETWEEN TWO EVILS— INVESTORS PREFER GRAND CORRUPTION! (2005)).

[100] Lambsdorff, *supra* note 41, at 30.

[101] Vito Tanzi & Hamid R. Davoodi, *Corruption, Growth, and Public Finances*, *in* THE POLITICAL ECONOMY OF CORRUPTION 89, 104 (Arvind K. Jain ed., 2001).

[102] Underground economy may take a form of two; the first form includes the illegal activities such as drugs, smuggling, and money laundry. The second form involves legal and unrecorded activities.

[103] Myint, *supra* note 18, at 46.

available.[104] Corruption can be aided by ineffective substantive laws or by insufficient implementation of the provisions.

In general, the absence of transparent and clear laws and procedures creates an atmosphere for corruption to thrive.[105] Thus, for instance, when trade tariffs are diverse, the probability of corrupt acts is high.[106] The number of substantive laws can create more rents and profits for public officials and eventually leads to corruption. Studies show that higher barriers to market entry and higher levels of state intervention lead to higher levels of corruption.[107]

It is not only criminal law or anti-corruption laws[108] that create space for corruption; other types of law such as tax law,[109] anti-trust laws,[110] and procurement laws[111] do so as well. These laws encourage corruption when they give officials more discretionary power, have more loopholes, and contain vague provisions. The other kind of laws relevant to corruption is regulatory law, which mainly regulates public officials. This category creates a space for corruption to thrive when it avoids drawing a clear line between what is legal and what is illegal.

The implementation of legal provisions relies heavily on two essential bodies. The judicial body, on the one hand, can influence, negatively or positively, directly or indirectly, the level of corruption in a country. Independence of the judicial branch by itself does not always provide a safeguard against corruption. Instead, the legal procedure and the accessibility of the judicial

---

[104] Tanzi, *supra* note 1, at 566-67.
[105] *Id*. at 575-76; *see also* Lambsdorff, *supra* note 41, at 7.
[106] *Id*. at 8 (*citing* Roberta Gatti, *Corruption and Trade Tariffs, or a Case for Uniform Tariffs*, (World Bank, Working Paper No. 2216, 1999)).
[107] Lambsdorff, *supra* note 41, at 7.
[108] Further details will be provided in upcoming chapters.
[109] Tanzi, *supra* note 1, at 567.
[110] See the previous study in the economic explanations.
[111] ROSE-ACKERMAN, *supra* note 21, at 59.

system can critically affect the level of corruption.[112] Yes, it is essential to have an independent judicial body to protect individuals from arbitrary decisions and abusive powers, but if citizens lack the ability to access the judicial system or if there is a high threshold to enter it, the power of judicial independence is gradually diminished.[113] The indirect restrictions involve, inter alia, delayed procedures and vague litigation procedures.[114] This drives individuals and firms to seek for alternatives.

The other important body on the implementation side is the investigative and prosecutorial body. The exact same character of being independent that is essential to the judicial branch is also required here to achieve the goal of reducing corruption. The success of the anti-corruption commissions was generated by their independence.[115] They were also armed with an adequate power to enforce laws and investigate cases.[116] It is not only independence that leads to a successful commission: power, tools, and resources are also factors enhancing the ability of these

---

[112] *See, e.g.*, Richard Damania et al., *The Persistence of Corruption and Regulatory Compliance Failures: Theory and Evidence*, 121 PUB CHOICE. 363, 365 (2004) ("more inefficient judicial systems are found to be positively correlated with corruption.").

[113] *See generally* Simeon Djankov et al., *Courts*, 118 Q. J. ECON. 453, 453-517 (2003) (They "find that such formalism is systematically greater in civil than in common law countries, and is associated with higher expected duration of judicial proceedings, less consistency, less honesty, less fairness in judicial decisions, and more corruption."); *see, e.g.*, Maria Dakolias, *A Strategy for Judicial Reform: The Experience in Latin America*, 36 VA. J. INT'L L. 167, 169-70 (1995) ("Such a judiciary requires predictability in the outcomes of cases, accessibility to the courts by the population regardless of income level, reasonable times to disposition and adequate court provided remedies."); *see also* Maria Dakolias & Kim Thachuk, *Attacking Corruption in the Judiciary: A Critical Process in Judicial Reform*, 18 WIS. INT'L L.J. 353, 365 (2000).

[114] KLITGAARD, *supra* note 37, at 4 (consider, for example, the Filipinos innocent tax payers experience when they were extorted by the tax examiners, yet they were "unwilling to complain through a costly process of litigation.").

[115] *See, e.g.*, Jon S. T. Quah, *Controlling Corruption in City-States: A Comparative Study of Hong Kong and Singapore*, 22 CRIME L. & SOC. CHANGE 391, 391-414 (1994) (shows the importance of the independency of anti-corruption commissions in Hong Kong and Singapore).

[116] Tanzi, *supra* note 1, at 575.

commissions to combat corruption. Recently, such investigations have begun using wiretaps, for example to provide more details and evidence in cases.[117]

Generally, identifying whether a law is beneficial or not can help in directing efforts to fight corruption. Two issues, however, remain problematic. The first is the causal direction—that is, whether bad laws are consequences or causes of corruption. For instance, privileging domestic firms in public procurements can cause corruption, but when domestic firms provide a way for strong private interests to seize public funds, bad laws can merely be a consequence of corruption.[118] Secondly, it is not always obvious whether a certain law is beneficial or not. Laws may, on the one hand, create an opportunity for corruption, but may also, on the other hand, promote public health and safety. Thus, something that has a negative impact in terms of corruption may have a positive impact in some other sphere.[119]

The impact of corruption in the legal realm is manifest mainly in the enforcement of laws and regulation, on the one hand, and in the lawmaking process, on the other. Corruption minimizes the capacity of governments to impose the essential regulations through which they can monitor and control the failures of markets. This leads to unsatisfactory performance of governments' necessary duties in supervising financial markets, hospitals, schools, and so forth. Even when governments intervene, their interventions are blemished by corrupt motivations and

---

[117] *See, e.g.*, William K. Rashbaum & Benjamin Weiser, *Wiretaps Offer New Details in Corruption Case Against State Senator Skelos and His Son*, N.Y. TIMES (Oct. 25, 2015), http://www.nytimes.com/2015/10/24/nyregion/wiretaps-offer-new-details-in-corruption-case-against-state-senator-skelos-and-his-son.html?_r=0.
*Wiretaps in Guatemala corruption scheme name supreme court justice*, FOX NEWS (May. 10, 2015) http://www.foxnews.com/world/2015/05/10/wiretaps-in-guatemala-corruption-scheme-name-supreme-court-justice/; *see e.g.*, French court approves use of Sarkozy wiretaps in corruption case, FRANCE 24 (May. 7, 2015) http://www.france24.com/en/20150507-france-court-approves-use-sarkozy-wiretaps-corruption-case.
[118] Lambsdorff, *supra* note 41, at 6.
[119] *Id.*

often lead to more monopolies and more failures.[120] Moreover, the enforcements of contracts and protection of property rights, as a fundamental duty of governments, is eroded by corruption.[121]

More importantly, when corruption is dominant, it erases, completely or partly, legal restrictions and regulations. It will not be surprising if laws are violated with no regard to the protection of people and the environment which such laws sought to create. In many countries, for instance, violations of building standards result in a large number of casualties.[122] This is mainly because it is difficult to inculcate respect for the law in a system that is rife with corruption, since such systems breed cynicism instead.[123]

Corruption also affects the quality of certain types of regulations. It has been noted that countries where corruption is prevalent have less effective or protective laws. The example of such laws par excellence is environmental law, where a number of studies indicate that the quality of environmental regulation is affected negatively by high levels of corruption.[124] An extension of this can be seen in the low levels of compliance with international measures and regulations.[125]

### E.  Problems in Fighting Corruption

Before going further in outlining the problems of fighting corruption, it has seemed worthwhile to identify the nature of corruption. Corruption is contextual, since what is considered

---

[120] Tanzi, *supra* note 1, at 585.

[121] *Id.*

[122] Myint, *supra* note 18, at 50.

[123] Thomas Carothers, *The Rule of Law Revival*, 77 FOREIGN AFF. 95, 96 (1998) (This is also related to the legitimacy of governments.).

[124] Heinz Welsch, *Corruption, Growth, and the Environment: A Cross-Country Analysis*, 9 ENV'T & DEV. ECON. 663, 684 (2004); *see also* Per G. Fredrikssona & Jakob Svensson, *Political Instability, Corruption and Policy Formation: The Case of Environmental Policy*, 87 J. OF PUB. ECON. 1383, 1383 (2003) ("Political instability has a negative effect on the stringency of environmental regulations if the level of corruption is low, but a positive effect when the degree of corruption is high.").

[125] Damania et al., *supra* note 112, at 365.

an act of corruption in a certain nation is not necessarily so in another.[126] A variety of factors, such as ideology, culture, politics, and context, delineate the meaning of corruption.[127] This leads to the point that corruption is essentially a matter of perception and depends on how individuals or societies perceive a given behavior. Consequently, corrupt behavior can be classified as white, gray, or black.[128] This implies that corruption is seen as a deviation from a moral, cultural, or legal norm.[129] Eventually, since individuals, by default, avoid the shame that results from deviating from a norm, corruption will be committed secretly and stay hidden.

Furthermore, corruption is associated with power.[130] Consequently, a bribe is paid to an individual who is in a position of power or has control over the desired benefit, and an individual must be a position of power to abuse it. Such an association between corruption and power means corruption is not a unique phenomenon that only exists in the public-sector only, but can also exist in the private-sector.[131]

Therefore, problems in fighting corruption raise some challenges and in some cases flaws. Since corruption is contextual, it will be difficult to combat it once a society perceives such practices as a normal way life. The situation worsens when a society is blind to identifying

---

[126] *See, e.g.*, Donald Bowser, *Corruption; Trust and the Danger to Democratization in the Former Soviet Union*, *in* THE TRANSITION: ESSAYS IN THE POST COMMUNISM 6, 6 (David W. Lovell ed., 2001) ("The use of 'clans' or social networks/blat, that typifies post-Soviet clientism, nepotism and cronyism, is often not viewed in a negative light.").

[127] *See, e.g.*, Eric C. Chan & Yun-han Chu, *Corruption and Trust: Exceptionalism in Asian Democracies?*, 68 J. POL. 259, 262 (2006) ("one contextual account for differential corruption is that political cultures vary in different countries. The idea is intuitive: what is considered unethical and corrupt in one culture maybe regarded as a routine transaction in another.").

[128] HEIDENHEIMER & JOHNSTON, *supra* note 13, at 139-40; *see also* Arnold J. Heidenheimer, *Perspective on the Perception of Corruption*, *in* POLITICAL CORRUPTION: CONCEPTS AND CONTEXTS 141, 152 (Arnold J. Heidenheimer & Michael Johnston eds., 3d ed. 2002). Yadong Luo, *An Organizational Perspective of Corruption,* 1 MGMT. & ORG. REV. 119, 122-24 (2005).

[129] Luo, *supra* note 128, at 123.

[130] *Id.*

[131] Zafar Iqbal, and Mervyn K. Lewis, *Governance and Corruption: Can Islamic Societies and the West Learn From Each Other?*, 19 AM. J. ISLAMIC SOC. SCI. 1, 2 (2002).

corruption.[132] The justification in such a case is already provided: corrupt individuals, regardless of their own lack of integrity, tend to believe that corruption existed before they came to power and that they did not invent it; thus, all they are doing is following the same path as those who came before them.[133] Consequently, any penalties have lost their deterrence, since most of the time such penalties will not be associated with the loss of any social capital.[134]

Another problem stems from a partial view of corruption. In a number of countries, and even in the international arena, fighting corruption focuses significantly on corruption in governments. This is justifiable, based on the high expectations citizens may have of their governments, but such an assumption could be misleading, since corruption can occur in every sector of society, including the private sector and non-profit and non-governmental organizations.[135] Gerald Caiden notes that in a given culture, people who study, socialize, and live together are not likely to be significantly different in their conduct, and thus, public ethics are not likely to differ significantly from private ethics either.[136]

Finally, following on the contention that corruption is associated with power, we can see that a significant obstacle manifests itself as power in opposition to fighting corruption. This occurs through two main ways: first, through a lack of government willingness to fight corruption that occurs through refusing to ratify and implement anti-corruption measures.[137] Political

---

[132] Gerald E. Caiden, *Cautionary Tale: Ten Major Flaws in Combating Corruption*, 10 Sw. J. L & Trade Am. 269, 291 (2003).

[133] *Id*. at 290.

[134] Tanzi, *supra* note 1, at 574.

[135] Caiden, *supra* note 132, at 276-78. (In non-profit and non-government organizations corruption occurs under the excuse of the funding and charities.).

[136] *Id*. at 278.

[137] *See also* Jon ST. Quah, *Curbing Asian Corruption: An Impossible Dream?*, 105 Current Hist. 176, 178 (2006) ("Megawati Sukarnoputri, who became president in 2001, seemed initially interested in fighting corruption. But she demonstrated a lack of political will by

willingness is not only needed to promote anti-corruption measures, but also to support efforts and individuals fighting corruption.[138] In fact, a number of politicians and officials gain more power merely by allying with corrupt cliques.[139]

The second way in which power seeks to restrain anti-corruption movements is by sabotaging them. This can happen when politicians and others who benefit from the existence of corruption will be negatively affected by the abandonment of corruption. As for others, so long as they are spoiled by corrupt benefits in one way or another, they lack an incentive to abandon corrupt practices, which creates a sufficient motivation to nullify any efforts to fight corruption.[140] This can be seen where there is a strong will from governments to fight corruption, yet the measures taken against corruption are weak and ineffective. In this case, there may be an investigatory body, but it is enfeebled and lacks the power needed to act.[141]

Practically, there is a significant obstacle posed by national security. Many of countries' defense projects involve a huge amount of corruption that goes unchecked and unprosecuted. In such cases, the investigation is dismissed under the justification of national security. In the same spirit, human rights standards can be an issue in fighting corruption. For instance, if a country with a poor human rights record sends another country a request for extradition on the grounds

---

delaying the establishment of an anticorruption commission, declining for more than two years to sign the authorizing legislation.").

[138] Anwar Shah & Mark Schacter, *Combating Corruption: Look Before You Leap*, 41 FIN. & DEV. 40, 41 (2004).

[139] Caiden, *supra* note 132, at 284-287; *see also* Quah, *supra* note 137, at 179. (Showing a comparative between Asian countries.); *see, e.g.*, Richard Damania et al., *Trade Liberalization, Corruption, and Environmental Policy Formation: Theory and Evidence*, 46 J. ENVTL. ECON. & MGMT. 490, 496 (2003) ("The level of corruption in the model is reflected by the government's willingness to allow lobby groups to influence the process of environmental policy formation.").

[140] Caiden, *supra* note 132, at 287.

[141] *Id.*

that the accused has committed acts of corruption, should the other country approve such a request or not?[142]

CONCLUSION

From what has been said so far, it can be seen that corruption has attracted many explanations from several perspectives. Not all disciplines have been equally involved in examining this topic, however, as some of them have given it much more study than others. The analysis of corruption in particular circumstances may require a more in-depth analysis, since each nation and culture may possess factors distinguishing it from others. Underestimating these differentiating factors may jeopardize not only the analysis but also the purposed solutions and measures to fight corruption.

This chapter has sought to survey the issue of corruption from various perspectives. Initially, it highlighted the issues related to defining corruption. Distinctions between the forms of corruption were offered in order to provide an adequate understanding of the issue of corruption and how it should be combated. Further, this chapter explored the general causes and consequences of corruption in different dimensions with an aim of connecting the dots together that make up a picture of corruption. In light of that picture, the problems encountered in fighting corruption were identified.

---

[142] *See, e.g.*, Michael Forsythe & Mark Mazzetti, *China Seeks Businessman Said to Have Fled to U.S., Further Straining Ties*, N.Y. TIMES (Aug. 3, 2015), http://www.nytimes.com/2015/08/04/world/asia/china-seeks-ling-wancheng-businessman-said-to-have-fled-to-us.html?emc=eta1&_r=1.

CHAPTER TWO: BACKGROUND: ISLAMIC CRIMINAL LAW

INTRODUCTION

In the pre-Islamic era in Arabia, criminal law was associated with or based on the idea of retaliation. Due to the importance of the tribal system, the emphasis was on collective responsibility; thus, not only would offenders be punished, but also their tribes. Motivated by revenge and the desire to maintain or repair tribal dignity, the Arabs of that era tended to apply severe, and in many cases, unjust punishments. So, for instance, in a case of the punishment for murder, a man must be punished, rather than a woman; a male slave did not represent a sufficient revenge, and in the case of a tribe that was considered superior to the offending tribe, two or more men had to be killed as punishment, rather than one. These examples show the aggressiveness and the seeming irrationality of the system, which, however, is not strange when the Arabs' collective social structure is taken into consideration.[143]

In 610 C.E.,[144] the Arabs were introduced to a new era. In this year, the Prophet Mohammad received the first Quranic verse (*ayah*). The divine revelation continued for twenty-three years,[145] ending in 632 C.E. with the completion of the Holy Quran, which consists of more than 6,200 verses[146] (*āyāt*, sing. *ayah*) divided into 114 chapters (*suwar*, sing. *surah*). The chapters were also divided according to where they were received. The first category, those received in Mecca, or the Meccan chapters (610–622 C.E.), includes 86 chapters. The general theme of the Meccan chapters is the belief in Allah and the afterlife. The second category, those received in Medina, or the Medinan chapters (622–632 C.E.), includes 28 chapters, which are

---

[143] Matthew R. Lippman, *Islamic Criminal Law and Procedure: Religious Fundamentalism v. Modern Law*, 12 BC INT'L & COMP. L. REV. 29, 29-30 (1989).

[144] FAZLUR R. SHAIKH, CHRONOLOGY OF PROPHETIC EVENTS 50 (2001).

[145] *Id.*

[146] M. Cherif Bassiouni & Gamal M. Badr, *The Shari'ah: Sources, Interpretation, and Rule-Making*, 1 UCLA J. ISLAMIC & NEAR EL. 135, 149 (2001).

devoted to the organization of Muslims' social life and their relationships with each other and with non-Muslims as well.[147]

## A. The Sources of Islamic Law

The study of the Islamic law resources generally is called *usul al-fiqh*. It is important to mention that there are four Sunni schools of interpretation, or *Madhāhib* (sing. *Madh'hab*), the Maliki, the Hanafi, the Shafiʿi, and the Hanbali.[148] The schools agree on the primary resources but they disagree about the ranking of the secondary resources.[149] Moreover, the disagreement does not relate to the essentials of Islam, such as faith in God and the Five Pillars of Islam (profession of faith, prayer, fasting, alms, and pilgrimage).[150] Thus, the disagreement led the schools to adopt in some cases different legal positions or notions.[151] More importantly, the emergence of different notions among the four schools can be seen as the result of the different situations, geographical areas, and traditions in which they arose.[152]

To illustrate, Imam Abu Hanīfah (80–150 A.H., or 699–767 C.E.), did his teaching in Kufa.[153] Imam Malik (97–179 A.H., or 717–795 C.E.) established his school in Medina, where the Prophet Mohammad had been, which led him to consider the Medinan people's traditions as a

---

[147] Bassiouni & Badr, *supra* note 146, at 148-45.

[148] NOEL J. COULSON, A HISTORY OF ISLAMIC LAW 86-87 (1964). Note that the Shia Schools are irrelevant to the subject, so they are not included in this paper.

[149] MUHAMMAD ABU ZAHRA, TĀRĪKH AL-MADHĀHIB AL-ISLĀMIYYA [The History of Islamic Schools] 11 (1976).

[150] *Id. See* MUHAMMAD ABU ZAHRA, USHUL AL-FIQH [Islamic Jurisprudence] 270-73 (1957) (For example, while Hanafi school was the leader in considering Istihsan, as a secondary source, which refers to reversing the ruling on the matter counterparts to another rule to achieve the best goal, Shafi school are not considering it as a source.).

[151] ABU ZAHRA, *supra* note 149, at 11; *see also* COULSON, *supra* note 148, at 12.

[152] ABU ZAHRA, *supra* note 149, at 12-18.

[153] *Id.* at 333-365. Majid Khadduri, *Nature and Sources of Islamic Law*, 22 GEO. WASH. L. REV. 3, 12-3 (1953).

secondary resource.[154] Imam Al-Shāfiʿī (150–204 A.H., or 767–819 C.E.), unlike the previously

mentioned imams, was not known for taking up residence in a particular place. He started his

journey as a student of Imam Malik in Medina, and then was in Iraq as a scholar of Imam Abu-

Hanifa. He did his teaching in Mecca, Baghdad, and Yemen, and finally ended his journey in

Egypt.[155] Similarly, Imam Ahmad ibn Ḥanbal (164–241 A.H., or 780–855 C.E.) was a student of

the illustrious Hanafi scholar and judge, Abu Yusuf. He also met and studied under the

supervision of Imam Al-Shāfiʿī in Mecca. His well-known saying, "With the inkwell to the

cemetery,"[156] illustrates his frequent travels seeking more knowledge. Among the places to which

he traveled are Baghdad, Kufa, Basra, Hejaz, and Sana.[157]

1.   Primary Sources

a.   The Qur'an

In Islam, the Qur'an is the Holy Book, and it contains 114 chapters, or *suwar*, and 6,342

verses.[158] Since it contains codes regulating religious and social matters, the Qur'an is not a text

that is fully devoted to legal issues, which explains why the Qur'an only has approximately 500

verses that can be considered as legal provisions. Not surprisingly, 30 of the 500 verses relate to

criminal law.[159] The 500 verses contain injunctions that may take the form of a command (*amr*) or

a prohibition (*nahi*).[160]

---

[154] ABU ZAHRA, *supra* note 149, at 399-400; *see generally* ABU ZAHRA, *supra* note 149, at 333-65; *see also* Khadduri, *supra* note 153, at 13-14.

[155] Bassiouni & Badr, *supra* note 146, at 161; *see generally* ABU ZAHRA, *supra* note 149, at 407-21.

[156] ABU ZAHRA, *supra* note 149, at 459.

[157] *Id*. at 451-62.

[158] Taymour Kamel, *The Principle of Legality and Its Application in Islamic Criminal Justice, in* THE ISLAMIC JUSTICE SYSTEM 149, 152 (M. Cherif Bassiouni ed., 1982).

[159] Bassiouni & Badr, *supra* note 146, at 149.

[160] Kamel, *supra* note 158, at 152. Bernard K. Freamon, *Slavery, Freedom, and the Doctrine of Consensus in Islamic Jurisprudence*, 11 HARV. HUM. RTS. J. 1, 15-16 (1998) ("Legal scholars

The Qur'an in its formulation is considered to be general, allowing it to govern issues that might exist in the near or distant future, either explicitly or implicitly.[161] Thus, a full understanding of the Qur'an is difficult without relying on its commentaries (*tafsir*), which include both the text's historical and its linguistic aspects.[162] This character is what explains the rules of scholars to whom religious and judicial rulings are attributed.[163]

In Islamic law, the Qur'an and the Sunnah are considered as the primary and the supreme resources which no other rules should violate. As with many constitutions, the Qur'an provides general rules and leaves the details to be worked out later. For instance, the Qur'an orders Muslims to pay alms (*Zakah*), but does not specify what constitutes a quorum (*Nisab*) of the money above which the *Zakah* is mandatory.[164] Conversely, in other cases, the Qur'an provides detailed rules, such as for the rule of inheritance. Consequently, in the Qur'an, there is a clear reference to the Sunnah ("Whatever the Messenger gives you, take; whatever he forbids you, give over. And fear God; surely God is terrible in retribution").[165]

---

have developed a system of *Qur'anic* interpretation that actually assigns at least five values (*alahkim al khamsah*) to the *Qur'an's* regulation of human behavior. At one end of this yardstick are those forms of behavior that are *wjib* (obligatory) and at the other end are those behaviors that are strictly *harem* (forbidden). Between these two poles are values classifying all other behavior as *mandub* (commendable), *halal* (permissible), or *makruh* (reprehensible).").

[161] Irshad Abdal-Haqq, *Islamic Law: An Overview of Its Origin and Elements*, 7 J. ISLAMIC L. & CULTURE. 27, 45-46 (2002).

[162] *See generally id.* at 51-53 (elaborates the role of *tafsir*).

[163] Kamel, *supra* note 158, at 152.

[164] Abdullah S. Alarefi, *Overview of Islamic Law*, 9 INTER'L. CRIM. L. REV. 707, 711 (2009).

[165] Surat Al-Hashr 59:7; *see also* Freamon, *supra* note 160, at 19 ("The *Sunnah* is extremely important because, through it, the Prophet Muhammad (peace be upon him) interpreted, clarified, explained, and complemented many of the principles revealed in the Qur'an.").

b. Sunnah

The Sunnah, as the second primary resource, is defined as any act, saying (*hadith*), or confirmation of another's practice by the Prophet Muhammad.[166] As a result, a Sunnah may take one of three forms.[167] The first is an uttered Sunnah in which the Prophet spoke and addressed a certain issue. The second is a reported act performed by the Prophet. The third form is when the Prophet did not act or speak, but gave a confirmation of a certain act or statement. The Sunnah can play two main roles; the first is to be a supplement to the Qur'an, i.e., to be explanatory to the general provisions of the Qur'an.[168] The second is to be a primary resource by providing a rule that is not given in the Qur'an.[169] It is significant to mention that the Sunnah cannot violate the Qur'an, and that other sources should be in concurrence with the Qur'an and the Sunnah.[170]

From what has been said so far, it can be seen that the Sunnah can be considered as an additional instrument that developed many of the Qur'anic principles. Thus, in addition to relying on the Qur'an's commentaries, scholars consider the Sunnah to be a significant source for reaching a comprehensive understanding of the Qur'an in order to develop a particular doctrine.[171] Consequently, the Sunnah is considered as a first-tier source and has the same legal authority as the Qur'an.

---

[166] ABU ZAHRA, *supra* note 150, at 105 (A confirmation by the Prophet Muhammad of what a person has done or said agreeing that is acceptable.); *see also* Abdal-Haqq, *supra* note 161, at 47. ("Muhammad's tacit approval of actions performed in his presence, i.e. his silence on a matter was interpreted as consent."); *see* Abdulaziz S. Al-Rodiman, The Application of Shari'ah and International Human Rights Law in Saudi Arabia 7 (April, 2013) (unpublished Ph.D. Dissertation, Brunel University) (on file with author) ("The Sunnah refers to the Prophet's actual life, actions, sayings, judgements or attitudes, whereas the Hadith relates mostly to what he said in expressive opinion on a subject.").

[167] Alarefi, *supra* note 164, at 707-12.

[168] *Id*. at 712-3.

[169] *Id*.

[170] Abdal-Haqq, *supra* note 161, at 48-49.

[171] Kamel, *supra* note 158, at 154.

By the time of the Prophet Muhammad's death in 632 C.E., there were more issues that were not referred to or addressed directly by the Qur'an or the Sunnah. Subsequently, supplemental sources of law were developed to deal with issues about which the Qur'an and the Sunnah had no direct rules.[172] Thus, it was necessary to develop further supplemental sources, an undertaking carried out by the four Sunni schools of interpretation. The schools, however, ranked and applied the supplemental sources differently, which ultimately led to having an "intellectual framework within which the Shari'a maintained some rigid continuity, while at the same time preserving elasticity for change."[173]

c.  *Ijma* (Consensus)

Consensus (*ijma*) is recognized as the third source of Islamic law. *Ijma* occurs when the jurists of any era, not limited to a certain era, reach a consensus over an issue confronting them.[174] *Ijma* is derived from the affirmation of the community and unity of Muslims as an essential characteristic. This emphasis on the significance of the community and the legitimacy of consensus as a source of Islamic law is derived from various Qur'anic and Sunnah texts. In the Qur'an, for instance, a verse reads, "And hold you fast to God's bond, together, and do not scatter,"[175] and another verse says, "But whoso makes a breach with the Messenger after the guidance has become clear to him and follows a way other than the believers', him We shall turn over to what he has turned to and We shall roast him in Gehenna — an evil homecoming."[176] In

---

[172] Bassiouni & Badr, *supra* note 146, at 139-40.

[173] *Id*. at 140.

[174] C.G. WEERAMANTRY, ISLAMIC JURISPRUDENCE: AN INTERNATIONAL PERSPECTIVE 39 (1988) ("General consensus among Islamic scholars of a particular age in relation to the legal rule correctly applicable to the situation.").

[175] Surat Ali-'Imran 3:103.

[176] Surat An-Nisa 4:115.

the Sunnah, there is a *hadith* of the Prophet Muhammad saying, "My community will never agree on an error."[177]

The question then becomes, whose opinions are considered in seeking consensus? Qualified jurists and scholars, known as *mujtahidin* (sing. *mujtahid*), are individuals who are identified by their ability and capability to form judgments relying on other Islamic sources (*usul al-fiqh*) following the process of *ijtihad*.[178] Consensus (*ijma*) may take one of two forms: the first is an active consensus, which occurs when the *mujtahidin* in a certain era reach and express the same judgment regarding the same issue. The second is a passive consensus, which occurs when some *mujtahidin* express a judgment while the others remain silent and express no objections.[179]

d.   *Qiyas* (Analogical reasoning)

The fourth source of Islamic law is analogical reasoning (*qiyas*), which has a wider application than consensus due to the fact that consensus is hard to reach in the contemporary era. The difficulties of reaching *ijma* can also be attributed to the differences in the attributes of each of the sources, since *ijma* is a group task, whereas *qiyas* is an individual task.[180] As a result, opinions and judgments based on analogical reasoning are abundant.[181]

---

[177] Kamel, *supra* note 158, at 155.

[178] Bassiouni & Badr, *supra* note 146, at 153. Wael B. Hallaq, *Considerations on the Function and Character of Sunnī Legal Theory*, 104 J. AM. ORIENTAL SOC'Y. 679, 680-81 (1984) ("Whether in the final analysis an opinion was to be accepted as authoritative or to be rejected as weak was the primary function of the instrument of consensus (*ijma*). Consensus had the final say not only on the validity or invalidity of a juristic opinion but also on what of the Qur'an and Sunna is or is not to be accepted as a basis for that opinion. The consensus of the community, represented by its scholars, sanctioned law; on whatever the community agrees, the decision of consensus must be right.").

[179] Bassiouni & Badr, *supra* note 146, at 153 (All four schools consider the active consensus as a source of law, while only two of them consider the passive consensus to be so.).

[180] Kamel, *supra* note 158, at 157.

[181] MUSTAFA AL-ZARQA, AL-MADKHAL AL-FIQHI AL-'AM [General Introduction to Jurisprudence] 80 (2nd ed. 2004).

*Qiyas* can be defined as deriving a judgment on an unresolved issue from an existing judgment because they share the same *raison d'être*, known as *illa* in Arabic.  To render a judgment relying on *qiyas*, there must be an existing judgment or rule that is similar in its reasoning that can be applied to the new situation which has no rule or judgment. For the application of *qiyas*, the identification of the *raison d'être* of the existing rule is the first and fundamental step. This is different from the rationality expected of all legal rules, which is similar to *hikma* (wisdom),[182] because *illa* is more specific.

The prohibition of narcotic drugs, for example, was based on *qiyas*. To render a judgment on prohibiting narcotic drugs, a new situation with no rules, jurists relied on analogy by extending the prohibition on drinking alcohol, an existing rule in the Qur'an, because both kinds of prohibited substances have the same *illa*, that is, they are both intoxicating.[183] Though the Hanifi School refrained from using *qiyas*, the Shafiʿi School applied it to determine punishments in Islamic law.[184]

2.  Secondary Sources

In order to keep up with new issues as they arose over time, earlier scholars, mainly the founders of the four schools, developed a number of secondary resources to solve issues not covered by the primary sources.[185] This sprang from the idea that Shari'a applies at all time and in

---

[182] ABU ZAHRA, *supra* note 150, at 249- 53.

[183] Bassiouni & Badr, *supra* note 146, at 156.

[184] ABU ZAHRA, *supra* note 150, at 259-61.

[185] Wael B. Hallaq, *Was the Gate of Ijtihad Closed?*, 16 INT'L. J. MIDDLE E. STUD. 3, 4 (1984) ("The Quran and the Sunna of the Prophet do not, as a rule, specify the law as it might be stated in specialized law manuals, but only contain some rulings (*ahkam*; pl. of *hukm*) and indications (*dalalat* or *amiart*) that lead to the causes (*'ilal*; pl. of *illa*) of these rulings.").

all places. This chapter will shed light only on those sources that are related to the issues relevant to this dissertation.[186]

a.   Custom (*urf*)

Custom, or *urf*, refers to the common practices of individuals in societies or communities. All of the Islamic schools consider custom as a secondary source of the rules of law.[187] The authority of custom has been established in the Qur'an and the Sunnah.[188] In practice, Islam did not reject the rules of the pre-Islamic Arabs, but rather adopted a number of rules that were compatible with the values and mission of Islam. Accordingly, custom is divided into valid customs, compatible with general Islamic rulings, and invalid customs, which are incompatible with Islamic rulings derived from the Islamic primary sources. Valid custom is further categorized into two categories: the first is a specific custom that is a practice of certain group of people, a certain business, or a certain region. The second is a general custom which is the practice of the people in all the regions or among many cultures.[189] As a good example of the latter, taking an oath is upheld by the Islamic rules of law when giving evidence,[190] and exactly what sum constitutes the crime of theft is defined by custom.[191]

---

[186] Bassiouni & Badr, *supra* note 146, at 141 (The secondary sources include, inter alia, the following:
1.   *Masalih mursala* (consideration of the public good);
2.   *Istihsan* (reasoning based on the best outcome, or equity);
3.   *Urf* (custom and usage, subdivided between general and special);
4.   The practices of the first four "Wise Caliphs" (a form of authoritative precedent);
5.   Treaties and pacts, and;
6.   The jurisprudence of judges.).
[187] *Id*. at 157.
[188] Surat Al-Haj 22:78; *see also* ABU ZAHRA, *supra* note 150, at 273.
[189] ABU ZAHRA, *supra* note 150, at 274.
[190] ABDULKARIM ZAIDAN, AL-WAJIZ FI USUL AL-FIQH [The Brief of Islamic Jurisprudence] 216 (1998).
[191] 3 MUHAMMAD I. AL-SHAFI'I, AL-UMM [The Mother] 153 (1990).

b.   The common good (*masalih mursala*)

The common good (*masalih mursala*) can be defined as any common interest that has not been recognized by itself or has not been categorized in the primary sources.[192] Islamic jurists identified five essential values that should be protected: personal faith, personal life, personal intellect, personal progeny, and personal wealth. Consequently, any rule that further endorses and protects these values and that is compatible with the Qur'an and the Sunnah is considered a valid rule.[193] The presumption behind these five values is that they not only serve the individual's interest, they also serve the community's interest.[194] Having that in mind, the common good, as a source of Islamic law, can be considered an essential source that has enabled Islamic law to advance and face social and economic changes.[195]

c.   *Ijtihad* (Individual Reasoning)

To reach a ruling on a certain issue, scholars follow the process of *ijtihad*, which is "literally striving, the individual search for a ruling from God's law to govern a human action in conditions where the divine law is not definitively revealed."[196] A dialogue between the Prophet Muhammad and Mu'adh, when he was appointed as a judge and sent to Yemen, illustrates the process of the rule-making in Islamic law.

The *hadith* is essentially as follows:

The Prophet: "How wilt thou decide when a question arises?"

Mu'adh: "According to the Book of Allah [the Qur'an]."

The Prophet: "And if thou findest naught therein?"

---

[192] AL-ZARQA, *supra* note 181, at 100.
[193] Bassiouni & Badr, *supra* note 146, at 158.
[194] *Id.*
[195] *Id.* at 159.
[196] *See* FRANK E. VOGEL, ISLAMIC LAW AND LEGAL SYSTEM: STUDIES OF SAUDI ARABIA 372 (2000).

Mu'adh: "According to the sunnah of the Messenger of Allah."

The Prophet: "And if thou findest naught therein?"

Mu'adh: "Then I shall apply my own reasoning [meaning *ijtihad*]."[197]

Rule-making (*ijtihad*) is now governed by what has been known as *usul al-fiqh*, which has been described briefly in the discussion above.

### B. Islamic Criminal Legislation

At the outset, crimes in Islamic criminal legislation can be divided into two main categories: determined and discretionary. The determined crimes include the crimes and punishments found in the Qur'an and the Sunnah. The determined crimes encompass the crimes of *hudud*, retribution (*quesas*), and compensation (*diyya*). The *hudud* crimes include exclusively seven crimes. Crimes of retribution (*quesas*) and compensation (*diyya*) acquired their names due to the fact that the punishment for these crimes includes either retributive punishment (*quesas*)—i.e., a penalty equal to the victim's injury—or monetary punishment (*diyya*). It is important also to mention that retribution is not applied if the victim or the victims' heirs waive their right to compensation or retribution, or where other reasons make the application of retribution in-executable or impossible.[198]

---

[197] Bassiouni & Badr, *supra* note 146, at 141 ("Ijtihad originated in Islam's Ist century as part of the doctrine of *ray* (opinion) and evolved through *qiyas* (reasoning by analogy). The doctrine of [ray] was at first based on authoritative texts and thus came under the doctrinal approach of ilm. It was Shafi'i who established the conceptual and doctrinal approach that was later followed by other scholars who expanded upon it").

[198] Muhammad S. Al-Awwa, *The Basis of Islamic Penal Legislation*, *in* THE ISLAMIC JUSTICE SYSTEM 127, 127 (M. Cherif Bassiouni ed., 1982).

The discretionary (*ta'azir*)[199] crimes are the second category of crimes in Islamic criminal legislation. This category of crimes arose to protect individuals and societies from crimes that fall outside the *hudud*, *quesas*, and *diyya* framework. Having the category of *ta'azir* crimes is a method through which Islamic criminal law is able to cope with rapid social changes and challenges and to protect the five values that have been mentioned previously (personal faith, personal life, personal intellect, personal progeny, and personal wealth).

1.   The Classification of Crimes in Islamic Criminal Legislation

Generally, what crimes have in common is the fact that they are all prohibited acts or omissions and are punishable; they differ, however, depending on the angle from which they are analyzed. The classification of crimes in Islamic criminal jurisprudence is based on the penal aspect, i.e., on the severity of the punishment.

a.   The *Hudud* Crimes

"There are the limits ordained by God; so do not transgress the limits ordained by God." "Those are God's bounds; do not transgress them. Whosoever transgresses the bounds of God — those are the evildoers."[200] *Hudud* literally means "limit" and the term refers to a certain group of crimes punishable by a *hadd*, a fixed punishment specified in the Qur'an; each of these crimes is an offense committed against the rights of God or the rights of individuals.[201] In this category of crimes, the Qur'an criminalized the acts and their corresponding punishments, leaving the definition of other details and the elements of each of these crimes to the Sunnah. The seven

---

[199] *See generally* Ghaouti Benmelha, *Ta'azir Crimes, in* THE ISLAMIC JUSTICE SYSTEM 211, 211-55 (M. Cherif Bassiouni ed., 1982) (*Ta'azir* can be defined broadly as corrective and discretionary punishment.).

[200] Surat Al-Baqarah 2:229.

[201] 1 ABDULQADIR AWDAH, AL-TASHRI' AL-JINĀI' AL-ISLĀMI [Islamic Criminal Law] 78-79 (3d ed. 1963) (*citing* ALI IBN MUHAMMAD AL-MAWARDI, AL-AHKAM ALSULTANIYYA WA AL-WILAYAT AL-DINIYAH [Ordinance of Government] 221 (Mustafa Al-Babi Al-Halabi 2d ed. 1966)).

*hudud* crimes[202] are theft,[203] illicit sexual relations,[204] sexual defamation,[205] drinking intoxicants,[206] apostasy,[207] rebellion against the legitimate authority, and brigandage.[208]

    *Hudud* crimes are distinguished by their punishments because of the physical pain they involve. These severe punishments are not aimed at threatening Muslims, but instead at preventing the crimes by fighting their root causes and the milieu that enhances the growth of these crimes.[209] *Hudud* punishments are subject to strict scrutiny and require strict evidence, making their application and enforcement neither automatic nor arbitrary.[210] A good example of the *hudud* punishments' effectiveness can be seen in the 1980s and 1990s,[211] when Saudi Arabia and other Islamic countries had a lower rate of crime, mainly of *hudud* crimes, than did other countries.[212]

---

[202] AWDAH, *supra* note 201, at 79; *see generally* Silvia Tellenbach, *Islamic Criminal Law*, *in* THE OXFORD HANDBOOK OF CRIMINAL LAW 248, 251-53 (Markus D. Dubber and Tatjana Hörnle eds., 2014).

[203] *See* Surat Al-Ma'idah 5:38.

[204] *See* Surat An-Nur 24:2.

[205] *See* Surat An-Nur 24:4.

[206] *See* Surat Al-Ma'idah 5:90-9.

[207] *See* Surat Al-Ma'idah 5:35.

[208] *See* Surat Al-Ma'idah 5:33.

[209] Aly A. Mansour, *Hudud Crimes*, *in* THE ISLAMIC JUSTICE SYSTEM 195, 195 (M. Cherif Bassiouni ed., 1982).

[210] *See generally id.* at 197-200.

[211] *See generally* FREDA ADLER, NATIONS NOT OBSESSED WITH CRIME (1983). Sam S. Souryal, *The Role of Shariah Law in Deterring Criminality in Saudi-Arabia*, 12 INT'L J. COMP. & APPLIED CRIM. JUST. 1, 1-25 (1988). Seyed H. Serajzadeh, *Islam and Crime: The Moral Community of Muslims*, 4 J. ARABIC & ISLAMIC STUD. 111, 111-31 (2001) (Citing on p. 113 crimes rates from the Second U.N. Survey of Crime Trends (United Nations 1992)); *See also* Mansour, *supra* note 209, at 201.

[212] Tellenbach, *supra* note 202, at 257 ("Punishments provided for in the Quran cannot be abolished but we can observe that they are seldom applied. Crucifixion, the punishment provided for highway robbery if the victim is killed and his property taken away, is reportedly applied in rare cases in Saudi Arabia …").

b.  *Quesas* and *Diyya* Crimes

These crimes are defined as crimes punishable by retaliation (*quesas*, i.e., the lex talionis principle)[213] or by monetary compensation (*diyya*). This category covers mainly the homicide offences and battery offences, under each of which there are further classifications on the basis of intent (*mens rea*).[214] The punishment, thus, varies depending on the intent of the offender. Consequently, intentional crime is punishable by the *quesas* or *diyya*, while the unintentional is subject to *diyya*. These crimes and their punishments are also established and defined by the Qur'an[215] and the Sunnah.[216]

Since these offenses are considered crimes committed against a right of an individual, satisfaction or monetary compensation to the victim or to his or her family is required.[217] In addition to these punishments, there are other penalties that might result from a conviction, such as exile or being prevented from receiving an inheritance.[218] Crimes in this category, similar to

---

[213] M. Cherif Bassiouni, *Quesas Crimes, in* THE ISLAMIC JUSTICE SYSTEM 203, 203 (M. Cherif Bassiouni ed., 1982) (*Quesas* in Arabic means equality and theoretically refers to the idea of equalizing the harm in order to redress the misconduct. This is not, however, an exact meaning, as "retaliation" is used by a number of Western authors, implying more the meaning of revenge).

[214] Tellenbach, *supra* note 202, at 259 ("there is a system of three groups of crimes: intentional crimes, semi-intentional crimes, and crimes committed by mistake … Semi-intentional homicide comprises cases in which the act as such is intentional but the result is not… Homicide committed by mistake denotes both an accidental and negligent way of causing the death of a person.").

[215] *See* Surat Al-Baqarah, 2:178; *see also* Surat Al-Ma'idah 5:45.

[216] BULUGH AL-MARAM, BOOK OF CRIMES (KITAB AL-JENAYAT), BOOK 9, HADITH 1216 (The Prophet said "If the relative of one of you is killed after my speech, his family has one of two choices: 'Either they take his Diyah or kill the killer.'"); *see also* Nawal H. Ammar & Robert R. Weaver, *Crime, Punishment, and Justice Among Muslim Inmates*, 2 AFF. J. CRIM. JUST. STUD. 64, 75-78 (2006).

[217] Bassiouni, *supra* note 213, at 204.

[218] *Id.*

those in the previous category, are also subject to sophisticated elements governing the

application of the punishments[219]

Within the atmosphere of heightened emotions that might surround such situations, Islam

encourages reconciliation between the parties, i.e., encourages the victim or his or her family to

accept *diyya,* rather than insisting on *quesas*. Pardon and forgiveness is supported by numerous

Qur'anic and Sunnah texts. The Qur'an says, "And the recompense of evil is evil the like of it; but

whoso pardons and puts things right, his wage falls upon God; surely He loves not the

evildoers."[220]  It was also narrated that Anas bin Mālik said, "I never saw the Messenger of Allah

when any case involving retaliation was referred to him, but he enjoined pardoning."[221]

c.   *Ta'azir* Crimes

The literal meaning of *ta'azir* is discipline, rehabilitation, or correction. Legally, Al-

Mawardi defined *ta'azir* as punishments inflicted for prohibited acts which are not punishable by

*hudud*.[222] Clearly, *hudud* and *quesas* crimes and punishments are not categories that cover all the

crimes that could be committed. Consequently, there are several crimes that are left to the

discretion of judges, jurists, and governors. This category encompasses any act jeopardizing the

public good or considered damaging to the social order at any time. As a result, corrupt acts,

sexual harassment, or human trafficking are without doubt condemned and held to be crimes by

---

[219] *See generally id.* at 204-08.

[220] Surat Ash-Shuraa 42:40.

[221] SUNAN ABI DAWUD. BOOK OF TYPES OF BLOOD-WIT (KITAB AL-DIYAT), BOOK 40, HADITH 4482.

[222] ALI IBN MUHAMMAD AL-MAWARDI, AL-AHKAM ALSULTANIYYA WA AL-WILAYAT AL-DINIYAH [Ordinance of Government] 236 (Mustafa Al-Babi Al-Halabi 2d ed. 1966). Tellenbach, *supra* note 202, at 262 ("Ta'zir is typically applied to two groups of crimes. The first group is made up of crimes for which *hadd* punishment exists but in the case at issue one or more of its requirements are not fulfilled, for instance the value of the stolen object was insufficient. The second group deals with conduct that is forbidden in the Quran but for which no punishment is provided as well as for conduct that contradicts general principles of Islam.").

any person at any time or place, since they bring harm, if not to the whole society, then certainly to individuals.[223]

Appropriately, *ta'azir* crimes may be divided into three essential categories. The first category covers those offences related to the *hudud* or *quesas* and *diyya* crimes, such as attempts to commit a crime of *hudud*, like attempted robbery. The second category involves offences punishable by *hudud*, but where one or more elements of a *hudud* crime is missing, such as a theft committed against a relative of the offender. The last category covers all other criminal acts that fall outside the *hudud* framework.[224]

Since this category is discretionary, judges evaluate harmful acts and apply the punishments they see fit. Accordingly, judges take into consideration the culpability, subjectively, of the offender, and objectively, of the nature of the offense.[225] This discretion, however, is limited by the general principles of the framework of Islamic criminal law.[226] In addition to that, the punishments are subject to certain restrictions that ensure the protection of communities and their welfare. First, a committed act must cause an actual harm, or at least threaten the public good.[227] Second, the punishment must be justified and reasonable.[228] Third, the reasoning behind the punishment must provide flexible rules that can be adapted to others' situations.[229]

This category provides Islamic criminal law with great flexibility, enabling communities to deal with changes that may occur at any time. This category of law requires the continuous

---

[223] Kamel, *supra* note 158, at 167; *see also* Ammar & Weaver, *supra* note 242, at 73-74.
[224] Bassiouni, *supra* note 213, at 213-14.
[225] Kamel, *supra* note 158, at 167.
[226] *Id*. at 167-68.
[227] Bassiouni, *supra* note 213, at 214.
[228] *Id*.
[229] *Id*.

reform and development of jurisprudence to gain the full benefit of it. It can backfire, however, when jurists and judges do not keep up with new events.[230]

## 2.  The Legal Consequences of Classification

### a.  Forgiveness and Amnesty

Since their commission is considered an offense against the rights of God, neither forgiveness nor amnesty may be granted in *hudud* crimes. Consequently, forgiveness or amnesty has no legal effect on either the crime or the punishment.[231] In *quesas* and *diyya* crimes, on the other hand, forgiveness, as previously noted, is encouraged but not mandatory, meaning that forgiveness may occur in this category if the victim agrees to accept monetary compensation instead of demanding punishment for the offender. The victim also has the right to issue a full forgiveness, i.e., one that does not even ask for monetary compensation. It must be noted that the right of forgiveness is limited to the victim and his or her relatives, under some circumstances. Therefore, judges or other officials who are considered delegates of the sovereign, and even the sovereign him- or herself, do not have the right to forgive such crimes, as forgiveness or reparations for these crimes are considered to be the rights of individuals.[232]

In *ta'azir* crimes, forgiveness can be issued by a judge or a delegate of the sovereign. This is limited, however, if the victim has a right to retaliation or reparations, or if immediate harm occurred to an individual. By the same analogy, the victim has also the same right to forgive, but only within the scope of his or her rights; that is, a victim has no right to forgive if the crime damages the public order.[233]

---

[230] Kamel, *supra* note 158, at 167.
[231] Awdah, *supra* note 201, at 81.
[232] Kamel, *supra* note 158, at 167.
[232] Awdah, *supra* note 201, at 81.
[233] Kamel, *supra* note 158, at 167; *see also* Awdah, *supra* note 201, at 81-82.

b.   Judicial Discretion as to Punishments

As mentioned before, if an offender is convicted of a *hudud* offense, the judge has no discretion either to minimize or to maximize the fixed punishment. The judge's authority is limited in this category to examining the elements of the crime and, accordingly, either to issue a conviction or not.[234] In the *quesas* category, the judge's discretion is also restricted to imposing punishment once the offender is convicted. However, if the victim has fully forgiven the offender, the judge may have some discretion to impose a *ta'azir* punishment when the punishment is considered to serve the public good.[235]

The judge's discretion manifests itself more obviously in *ta'azir* punishments, but not beyond the principles of Islamic criminal law and the restrictions previously mentioned.[236] Mitigating circumstances, consequently, are more to be considered in imposing punishments in *ta'azir* crimes than in other categories of crimes.[237]

c.   Rules of Evidence

The basis for proving guilt in the *hudud* crimes is exceptionally restricted, meaning that such crimes cannot be proven by other means than by the testimony of a specified number of witnesses, which varies depending on the offence; thus, for example, to prove the offence of illicit sexual relations, four witnesses must testify, while for slander and defamation, two witnesses are sufficient to prove the offender's guilt.[238] In *quesas* crimes, the same means of proof applies, and such crimes cannot be proven by other means — two witnesses or confession are required to meet

---

[234] AWDAH, *supra* note 201, at 82.
[235] *Id.*
[236] *Id.*
[237] *Id.* at 83.
[238] *Id.* at 83-84.

the legal requirements.[239] In *ta'azir* crimes, on the other hand, the rules of evidence are more flexible.[240]

The Hanafi, the Shafi'i, and the Hanbali schools of jurisprudence restrict the evidence (*bayyina*) to testimonies, confessions, oaths, and written documents. They rely on the following Qur'anic verse: "And be not loth to write it down, whether it be small or great, with its term; that is more equitable in God's sight, more upright for testimony, and likelier that you will not be in doubt. Unless it be merchandise present that you give and take between you…."[241] The Maliki School adopted the more liberal view and included more than 17 types of evidence, while the jurist Ibn Al-Qiem[242] recognized 26 types of evidence.[243]

3. Characteristic Features of Islamic Criminal Justice System

a. The Religious Character of Islamic Criminal Legislation

Since most of its regulations are derived either directly (as with *hudud*, *quesas*, and *diyya*) or indirectly (based on Muslim jurists' reasoning and discretion, or *ijthad*) from provisions of the Qur'an or Sunnah, which have been characterized as divine resources, these regulations have a religious character. Consequently, the definition of Islamic Shari'a is "the collection of legal provisions (*ahkam*) divinely revealed to the Prophet."[244]  Thus Alshafi noted that "[f]or everything that affects the life of a Muslim, there is prescribed in the Qur'an a guide to lead him on the right way."[245]

---

[239] *Id*. at 83.
[240] *Id*.
[241] Surat Al-Baqarah 2:282.
[242] AHMAD M. AL-HUSARI, ILM AL-QADA: ADILAT AL-ITHBAT [Jurisprudence of Judiciary] 16 (1977).
[243] *Id*.
[244] Al-Awwa, *supra* note 198, at 128.
[245] *Id*. at 130.

As a consequence of this religious character, [246]

1. conformity to these provisions is considered an act of faith in God;

2. violation of these provisions is punishable in this life and in the hereafter;

3. obedience to these provisions results from the previous two consequences;

4. enforcement of these provisions is a part of the state's obligations according to the principles of Islamic government; and

5. a change of the ruler does not change the law.[247]

b.   Protection of Morality

In a number of Qur'anic and Sunnah texts, the emphasis on morality and moral values can be clearly observed. The reasoning behind the prohibition of drinking alcohol, for instance, is based on morality: "Satan only desires to precipitate enmity and hatred between you in regard to wine and arrow-shuffling, and to bar you from the remembrance of God, and from prayer. Will you then desist?"[248] Another example is the *hadith* in which the Prophet says, "I was sent to perfect good character."[249]

Due to the religious character of Islamic law, the conflict between Islamic criminal legislation and moral values is minimized. Furthermore, the issue of the intervention of criminal law to protect morality does not arise due to the integrated relationship between moral principles and Islamic criminal legislation.[250]

---

[246] *Id*. at 130-31.

[247] AWDAH, *supra* note 201, at 73.

[248] Surat Al-Ma'idah 5:91.

[249] MUWATTA MALIK, BOOK OF GOOD CHARACTER (KITAB HUSN ALKHULQ), BOOK 47, HADITH 8.

[250] WAEL B. HALLAQ, AN INTRODUCTION TO ISLAMIC LAW 20 (2009) ("Thus, all acts are regarded as *shar'i* (i.e., subject to the regulation of the Shariʿa *and therefore pronounced as law – "law"* being a moral-legal commandment" …).

One of the consequences of the religious character previously mentioned, i.e., punishment in this life and in the hereafter, also gives an indication of this character. This link between the present life and the hereafter increases the link between the criminal justice system and moral values. In short, one of the reasons or sources of respect for and conformity to Islamic criminal provisions is Islamic principles of morality.

c.   Equality before the Law and the "Equal Application of the Law"

Again, this principle is manifested clearly in Qur'anic and Sunnah texts. A Qur'anic verse reads, "O mankind, we have created you male and female, and appointed you races and tribes, that you may know one another. Surely the noblest among you in the sight of God is the most godfearing of you. God is All-knowing, All-aware."[251] The significance of this principle was emphasized by the Prophet when he stated that "[w]hat destroyed the nations before you, was that when a noble person committed theft, they used to leave him (without punishment), but if a weak person among then committed theft, they would inflict the legal punishment on him."[252] He then stated, as a role model, that even if Fatimah, his daughter, was the offender, the specified punishment (the *hadd*) would be carried out. Further, several Qur'anic verses clearly command believers to avoid discrimination on any basis, whether of race, religion, kinship, or state of hostility.[253]

This strong emphasis was a result of the discrimination that had previously existed in the Arab world specifically and in the surrounding nations generally. As has been stated earlier in this chapter, among the pre-Islamic Arabs, the application of punishments was extremely discriminatory, which was a result of the fact that the Arab nation was constructed of highly tribal

---

[251] Surat Al-Hujurat 49:13.
[252] BULUGH AL-MARAM, BOOK OF HUDUD (KITAB AL-HUDUD), BOOK 10, HADITH 1270.
[253] *See* Surat An-Nahl 16:90; *see also* Surat Al-Ma'idah 5:8.

competitors for wealth, resources, prestige, and power. The ultimate result, unsurprisingly, was wars between tribes that lasted for decades. As a direct response, the Prophet abolished discriminatory customs.[254]

## C. Corruption in Islamic Law

*Fasad*, often used as an equivalent to the word corruption, in Arabic literature refers to any conduct or article that contradicts goodness or the good.[255] The definition covers a wide range of conduct that jeopardizes the society, economy, morality, or politics.[256] Thus *fasad* translates to, inter alia, mischief, abuse, rottenness, putrefaction, depravity, wickedness, viciousness, iniquity, and dishonesty.[257]

Accordingly, the Islamic perspective on corruption is quite broad and is not limited to a certain act, nor to a certain category of office, so long as the phenomenon referred to affects the principles of justice.[258] This broad perspective results in there being a number of definitions and even more categories of crimes that can be considered corrupt practices. It must also be taken into consideration that these crimes fall under the umbrella of *ta'azir* crimes, since neither they nor their punishments were identified in the Qur'an.[259] What follows from considering corrupt

---

[254] Al-Awwa, *supra* note 198, at 140.

[255] 3 Ibn Manzour, Lesan Al-'Arab [The Arab Tongue] 335-336 (Dar Rased 1883).

[256] Iqbal & Lewis, *supra* note 131, at 8 (*citing* Surat Hud 11:85; Surat Al-Qasas28:4, 77, 83; Surat Al-'Ankabut 29:28-30; Surat Ar-Rum 30:41; Surat Al-Fajr 89:12.).

[257] *Id*.

[258] Siti F. AbdulJabbar, *Corruption: Delving into the Muddy Water through the Lens of Islam*, 20 J. Fin. Crime. 139, 141 (2013).

[259] Muḥammad S. Al-Awwa, Fi Usul Al-Niẓam Al-Jinai Al-Islami : Dirasah Muqaranah [The Basic of Islamic Penal Legislation: Comparative Study] 344 (2006).

practices to be *ta'azir* crimes is that these practices can be proven by a variety of types of evidence, rather than the prosecution being limited to specific types of evidence.[260]

1.  Bribery

As a Qur'anic verse states, "O my people, fill up the measure and the balance justly, and do not diminish the goods of the people, and do not mischief in the land, working corruption."[261] The Qur'an prohibits individuals from giving bribes[262] to rulers, judges, and decision makers in order to obtain a favorable ruling.[263] In the Sunnah, there is an explicit prohibition of bribery, as narrated by Abdullah ibn Amr ibn al-'As: "The Messenger of Allah cursed the one who bribes and the one who takes bribe."[264] It has been reported on the authority of Abu Humaid as-Sa'idi, who said the following:

> The Messenger of Allah appointed a man in charge of Sadaqat (similar to tax) to be received from another tribe. When he came back, the Messenger of Allah asked him to render his account. He said: This wealth is for you (i.e. for the public treasury) and this is a gift (presented to me). The Messenger of Allah said: You should have remained in the house of your father and your mother, until your gift came to you if you spoke the truth; then he addressed us. He praised God and extolled Him, and afterwards said: I appoint a man from you to a responsible post sharing with the authority that God has entrusted to me, and he comes to me saying: This wealth is for you (i.e. for the public treasury) and

---

[260] ABDULLAH AL-TARIKE, JAREMAT AL-RASHWA FI AL- SHARI'A AL-ISLAMIAH M'A DERAST NEZAM MUKAFHT AL-RASHWA FI AL-MAMLKH AL-ARABIA AL-SAUDIA [Bribery Crimes in Shari'a: A Comparative Study with Saudi Anti-Bribery Law] 109-12 (1980).

[261] Surat Hud 11:85.

[262] *See* Iqbal & Lewis, *supra* note 131, at 8. (The Qur'an did not use the exact term bribery, but a number of Muslim commentators have defined it as bribery.).

[263] Surat Al- Baqarah 2:188.

[264] SUNAN ABI DAWUD 4482. BOOK OF THE OFFICE OF THE JUDGE (KITAB AL-AQDIYAH), BOOK 24, HADITH 3573.

this is a gift presented to me. Why did he not remain in the house of his father and his mother and his gift came to him, if he was truthful? By God, any one of you will not take anything from (the public funds) without any justification, but will meet his Lord carrying it on himself on the Day of judgment. I will recognise any one of you meeting Allah and carrying a growling camel, or a cow bellowing or a goat bleating.[265]

Jurists, accordingly, have provided a number of definitions of bribery, but the most comprehensive definition is, as Ibn Abidin defined it, that bribery is what is given to a ruler, judge, or others to obtain a favorable ruling or to gain a needed benefit.[266] This definition is quite broad, since it does not specify what is given nor to whom it is given. In light of the analysis of bribery in Islam, jurists and scholars have categorized bribery, and, accordingly, the ruling for each type.

The bribery may differ depending on the purpose for giving it. It might be paid in order to invalidate someone's rights or to validate a falsehood, such as obtaining a ruling or judgment that favors the briber. The bribery may also be paid in order to obtain a public position. Both of these cases are considered bribery, and punishment should be applied both to the briber and to the bribee.

What is controversial among the jurists is the case where the bribery is paid by an individual to obtain or secure his or her right or to reverse an injustice. The dissent considers this situation as no different from the previous situation, i.e., as a crime of bribery, since this disagrees with the general rules of Islamic jurisprudence.[267] The majority of scholars, however, including

---

[265] SAHIH MUSLIM, THE BOOK ON GOVERNMENT (KITAB AL-IMARA), BOOK 20, HADITH 4473.

[266] 5 MUHAMMAD A. IBN ABIDIN, HAHIYAT RADD AL-MUHTAR 'ALA AL-DURR AL-MUKHTAR [The Answer to the Baffled over the Exquisite Pearl] 362 (1885).

[267] See Surat Al- Ma'idah 5:2 ("Help one another to piety and godfearing; do not help each other to sin and enmity.").

the Hanafi, Maliki, Shafiʿi, and Hanbli schools of jurisprudence, hold that the briber is permitted and not guilty, but the bribee is still forbidden from accepting the bribe, and if he does so, he is guilty of bribery.[268] The majority based their authority on a Quranic verse that reads, "God does not burden any soul beyond its ability,"[269] and a *hadith* narrated by Ibn 'Abbas that the Prophet said, "Allah has forgiven my nation for mistakes and forgetfulness, and what they are forced to do."[270]

A critical issue related to bribery is whether a particular gift is considered a bribe or not. Generally, gifts are permitted and encouraged between individuals. However, rulers are not allowed to accept gifts. The same ruling applies to judges in the following situations:

1. A gift from a party to a dispute.

2. A gift from an individual who did not give gifts to the judge before that person was elevated to the judiciary; in other words, a gift that was given solely because of the judge's position.

3. An unusual gift from an individual who used to give gifts to the judge before he became a judge.

The rules about gifts to judges also apply to public officials in general.[271] A principle in regard to gifts that can be derived from the previous analysis is that if the gift is given because of the official's position, it is a bribe.

2.  Nepotism and Intercession (*shafa'ah*)

The term *shafa'ah*, or intercession, corresponds to the concept of nepotism, known today as *wasta*. It can be defined as intercession on behalf of another individual in order to gain a

---

[268] AL-TARIKE, *supra* note 260, at 55-56.
[269] Surat Al-Baqarah 2:286.
[270] AL-TARIKE, *supra* note 260, at 56.
[271] *Id*. at 70-76.

benefit or prevent harm.[272] Based on legality, Shari'a divides intercession into two categories:

permissible intercession and forbidden intercession. Between these two categories, a fine line is

drawn. A Qur'anic verse says, "Help one another to righteousness and piety; do not help each

other to sin and transgression."[273]

Accordingly, permissible intercession can be defined as intercession to uphold and gain a

benefit that is considered an individual's right. In contrast, intercession that results in others'

losing their rights, in transgressing public good and order, or in upholding falsehood or deception

falls under the category of forbidden intercession.[274] In contemporary times, intercession is also

forbidden when it used to violate a regulatory statute, for instance, traffic violations, fees, and so

forth.[275] For forbidden intercession, the intent is self-centered, since permissible intercession must

spring from a pure intent to help; otherwise, it will be forbidden. So, for example, if intercession

is done with the intent to get a non-monetary[276] benefit, i.e., to obtain a service or intercession in

return, or if it is motivated by any illegal reason, it falls into the category of forbidden

intercession.[277]

A number of Qur'anic and Sunnah texts forbid the former category. In addition to the

previously cited verses, in the Qur'an, a verse says, "Whoso intercedes with a good intercession

shall receive a share of it; whosoever intercedes with a bad intercession, he shall receive the like

---

[272] MAHMOUD M. MA'ABREH, AL-FASAD AL-EDARI WA ELA'JH FE AL-FIQH AL-ISLAMI DRASAH MQARANH BE AL-QANON AL-ORDANI [The Administrative Corruption and Its Solution in the Islamic Jurisprudence: A Comparative Study of Jordanian Administrative Law] 184 (2011).

[273] Surat Al-Ma'idah 5:2.

[274] MA'ABREH, *supra* note 272, at 184.

[275] ZEED S. AL-GANAM, AHKAM SHAFA'AH FE AL-FIQH AL-ISLAMI [Intercession in Islamic Jurisprudence] 33-34 (2011).

[276] *Id*. at 58 (If it is a monetary benefit, then it will be bribery. Even if the intercession is permissible, Hanafi, Maliki, Shafi, Hanbil, and Ibn Tayymeh ruled to forbid the receiving of money for intercession.).

[277] MA'ABREH, *supra* note 272, at 184.

of it…."[278] Commentators indicate that "shall receive a share of it" implies that this kind of intercession is forbidden and is rewarded with punishment in this life and in the hereafter.[279]

In the Sunnah, the previously mentioned *hadith* (footnote 253) is another example where the Prophet, as the highest authority, refused the intercession of Osama[280] when he was interceding with him not to execute punishment on a thief, and condemned Osama's deed. It has also been narrated on the authority of Abu Dharr, one of the Prophet's companions, who said,

> I said to the Prophet: Messenger of Allah, will you not appoint me to a public office? He stroked my shoulder with his hand and said: Abu Dharr, thou art weak and authority is a trust, and on the Day of judgment it is a cause of humiliation and repentance except for one who fulfills its obligations and (properly) discharges the duties attendant thereon.[281]

The previously mentioned Qur'anic and Sunnah verses are in agreement with the principle of equality and in general with justice as a fundamental principle of Shari'a, since the forbidden type of intercession ultimately generates inequality of opportunity and rights. It also works against honesty and trustworthiness, which eventually results in corruption.[282]

Principles that can be derived from this understanding are as follows:

1. Intercession that would work against the public good and order is forbidden.

2. Intercession that would impair equality and justice for all citizens is forbidden.

And further, as a strategy to combat corruption, do not appoint someone who asked to be appointed because he will follow that pattern in appointing others.

---

[278] Surat An-Nisa 4:85.

[279] MA'ABREH, *supra* note 272, at 185.

[280] Osama was one of the Prophet's companions and was adopted by him; *see* footnote 253.

[281] SAHIH MUSLIM, THE BOOK ON GOVERNMENT (KITAB AL-IMARA), BOOK 20, HADITH 4491. MA'ABREH, *supra* note 272, at 185 (Jurists also argue that an individual should not be appointed as a judge if he asked to be appointed.).

[282] *Id*. at 187.

*D. Islamic Mechanisms of Combating Corruption*

It can be said that Islam has dual mechanisms, both internal and external, for fighting corruption. The internal mechanisms aim at establishing self-control or self-government. In order to achieve that, what is required is adherence to the Islamic principles and commands derived from the Qur'an and the Sunnah. The external mechanisms rely on the broad criminalization of abuse of power and crimes of dishonesty by categorizing them under the broad category of *ta'azir*.

1.  The Internal Mechanisms

As noted previously, Islamic law is characterized as religious law, which implies that responsibility for such law exists both in this life and in the hereafter. This implies that in making risk assessments, Muslims must take into consideration not only the risks of being caught in this life, but also the consequences of their deeds in the hereafter. This, however, does not exist without roots. Moral education is required to establish and enhance the internal mechanisms.

Conduct, and especially moral conduct, is an external reflection of social values. In a similar vein, to fight corruption, social values must form the frontline of defense by condemning corrupt acts on moral grounds. A moral education is exactly what has been established and followed in Islamic criminal legislation, not only as regards corruption, but also in relation to other criminal acts.[283]

Although compliance with divine commands and standards is, on the face of it, done to please God, it also serves another purpose solely aimed at human beings. This is what is referred to as *huquq al-íbad*, or individuals' rights and duties toward each other.[284] This category

---

[283] Iqbal & Lewis, *supra* note 131, at 11.

[284] LAWRENCE ROSEN, THE JUSTICE OF ISLAM: COMPARATIVE PERSPECTIVES ON ISLAMIC LAW AND SOCIETY 157 (2000) (*Haqq*, the singular of *huquq*, is a "richly nuanced concept [that] is

establishes several morally based standards to organize and govern individuals and communities, and eventually nations. This path aims at achieving a peaceful and just co-existence of individuals.[285] To sum up the significance of the internal aspect of individuals' behavior, consider the concept of justice in Islam. A Qur'anic conception of justice implies that justice emanates from the interior of individuals (*bāṭin*), rather than from the exterior (*zāhir*). Thus, true justice requires the proper intention behind it.[286]

2.   The External Mechanisms

Since the corruption-fighting mechanisms at the internal or personal level can fall short, and can even be expected to do so, for a variety of reasons, Islam has recognized the need for external mechanisms that fight corruption also. The external mechanisms are manifested in a series of laws and incentives. The *ta'azir* category of crime, as noted above, was developed in order to provide adequate flexibility to define contemporary crimes based on how they endanger the five essential values mentioned previously. This was enhanced by the precaution of criminalizing a series of acts in furtherance of fighting the root causes of corruption, or the crimes that might lead to corrupt practices in the future.

As a mechanism for fighting the root causes of corrupt practices, Islamic criminal legislation creates no scope under which the legalization of corruption will be allowed. This zero tolerance stance toward corruption appears lucidly in the rejection of the so-called "grease that

---

commonly translated as 'right' or 'duty' but its implications are far more diverse and subtle than those translations alone convey. Basically, *haqq* is the distribution of rights and duties, the interconnected set of obligations and associations by which man and God, and man and man, are linked to one another.").

[285] Iqbal & Lewis, *supra* note 131, at 12; *see generally* Mevliyar Er, *Corruption from the Islamic Perspective: Some Recommendations for the MENA Region*, 1 INT'L J. ISLAMIC & MIDDLE E. FIN. & MGMT. 31, 31-51 (2008).

[286] ROSEN, *supra* note 284, at 156.

oils the economic wheels" or any form of unjustified facilitation of business endeavors.[287] Such a mechanism can also be seen in the principle that rulers should refuse to appoint individuals to positions in the judiciary who are actively seeking such a position and are relying on their connections with high public officials, and the tight restrictions on, if not the complete prohibition of, officials' acceptance of gifts.[288]

At the administrative level, not only is the separation of powers promoted, but also a restricted framework of legislation is implemented. The legislative process, as has been explained, is well established by defining and rooting it in transcendent rules and principles. This characteristic feature makes Islamic legislation something that it is difficult for the state to monopolize for political purposes. Instead, the Islamic legal framework opens the door to knowledgeable and sophisticated jurists and scholars who are not necessarily affiliated with the state.[289]

CONCLUSION

The Qur'anic and Sunnah provisions that have been cited clearly condemn and reject corruption. Moreover, corruption clearly negates the main characteristic features and principles established and articulated by Shari'a. Most notably, corruption contradicts the protection of morality since corruption is essentially an act of dishonesty which is inconsistent with moral principles. Furthermore, corruption jeopardizes the equal application of the law, an aspect to which Islamic jurisprudence has responded with firm disapproval, as has been noted.

---

[287] Iqbal & Lewis, *supra* note 131, at 15.
[288] See above on the sources of Islamic law.
[289] Iqbal & Lewis, *supra* note 131, at 14 (A good example of a jurist who refused to be under the control of the state is Imam Ahmad ibn Hanbl, who refused to be appointed as a judge or governor by the Abbasid Caliphate.).

Islamic law and principles have to be distinguished from the practice of individuals within Muslim nations. Though it does not designate or assign a penalty, Islamic law pronounces its firm rejection of several corrupt practices. Thus, those practices remain subject to the *ta'azir* crimes and penalties since they violate the principles and commands of Shari'a. These can be considered, as previously noted, the external mechanisms for fighting corruption. In fighting corruption, however, Islam also relies on the internal mechanisms, which derive their effectiveness from the religious character of Islamic criminal law.

CHAPTER THREE: BACKGROUND: SAUDI ARABIAN LAW

INTRODUCTION

This chapter seeks to explore and provide a foundation to the Saudi criminal justice system; it gives an overview of the criminal judicial system, jurisdiction, and criminal procedures. It also offers a brief introduction to the development of the Saudi legal system and identifies the challenges facing it. Following that, the general problem of corruption in Saudi Arabia is highlighted.

A. *The Saudi Criminal Justice System*

Essentially, Saudi criminal law is derived from mainly from three resources: Islamic law, statutory law, and royal decrees and orders. Saudi Arabia confirms its adherence to Islamic law through articles 1,[290] 7,[291] and 48[292] of the Basic Law of Governance. Consequently, Saudi Arabia remains reliant on Islamic criminal jurisprudence when identifying the substantive and general rules of criminal law and refrains from adopting a criminal penal code.[293] Since the Saudi criminal justice system adopts Islamic criminal jurisprudence,[294] crimes are classified in accordance with the traditional classification of Islamic criminal jurisprudence as follows:

---

[290] The Basic Law of Governance, Royal Order No. A/90 of 1412H (corresponding to 1992), art. 1 (SA) ("The Kingdom of Saudi Arabia is a fully sovereign Arab Islamic State. Its religion shall be Islam and its constitution shall be the Book of God and the Sunnah (Traditions) of His Messenger, may God's blessings and peace be upon him (PBUH).").

[291] *Id*. art. 7 ("Governance in the Kingdom of Saudi Arabia derives its authority from the Book of God Most High and the Sunnah of his Messenger, both of which govern this Law and all the laws of the State.").

[292] *Id*. art. 48 ("The courts shall apply to cases before them the provisions of Islamic Shari'a, as indicated by the Qur'an and the Sunnah, and whatever laws not in conflict with the Qur'an and the Sunnah which the authorities may promulgate.").

[293] MUHAMMAD ABDELHALEEM, ET AL., CRIMINAL JUSTICE IN ISLAM: JUDICIAL PROCEDURE IN THE SHARI'AH, at 12 (2003) ("Some countries, such as Saudi Arabia, do apply Shari'a, but do not have consolidated criminal codes that lend themselves to being studied easily.").

[294] *See, e.g.*, ERIKA FAIRCHILD, COMPARATIVE CRIMINAL JUSTICE SYSTEMS 58 (1993).

1. The *hudud* crimes include the seven crimes of theft, illicit sexual relations, sexual defamation, drinking intoxicants, apostasy, rebellion against the legitimate authority, and brigandage.

2. *Quesas* and *diyya* crimes cover the crimes of homicide and battery.

3. *Ta'azir* crimes encompass all other types of crimes.

In general, as discussed in the preceding chapter, there are four schools of Islamic jurisprudence, each of which places an emphasis on certain aspects of law in a way that distinguishes it from the others. This can be an emphasis on traditions, logic, or textual interpretation.[295] In each Muslim country, there tends to be a strong reliance on one of the schools more than the others. The situation in Saudi Arabia, however, needs further explanation.

The Hanbali School is recommended, but not mandatory, for the Saudi courts to follow—a fact that runs contrary to the argument of some scholars that the Saudi courts are mandated to apply the Hanbali School.[296] The Royal Order issued by King Abdulaziz in 1346H/1928 indicates that there is no required school of jurisprudence, so long as the reasoning of the holding is in accordance with the general principles of Shari'a.[297] The Royal Order also recommended a number of works authored by Hanbali scholars and jurists as guidance, rather than as a mandatory requirement.[298]

---

[295] *Id*. at 41.
[296] *Id*.
[297] THE SUPREME JUDICIAL COUNCIL OF SAUDI ARABIA, https://www.scj.gov.sa/about. (Nov. 15, 2016).
[298] *Id*. (The recommended works are as follows:
(1) Sharh al-lqna (Explanation of al-Iqna Manual);
(2) Sharh Muntaha al-Iradat (Explanation of Muntaha al-Iradat Manual).
(3) Zad al-Mustaqni fi Ikhtisar al-Muqni (A Summary of al-Muqni, and al-Iqna) by Sharf al-Din Abu al-Naja al-Hajjawi (968H/1560);
(4) Dalil al-Talib li Nayl al-matalib (A Summary of Muntaha al-Iradat), by Mar'i ibn Yusuf al-Karmi;
(5) Mughnī (The Enricher), by Muwaffaq al-Dīn Ibn Qudāmah; and
(6) Ash-Sharḥ ul-Kabīr (Grand Explanation) by Muwaffaq al-Dīn Ibn Qudāmah.)

Thus, Saudi judges handle cases by relying on direct reference to Qur'anic and Sunnah texts, rather than by "making close analogies to Hanbali *fiqh* rules."[299] The situation in Saudi Arabia, as described by Shaykh Al-Lahaydan, is this: "Saudi *qadis* [judges] are Hanbalīls, though they do not commit themselves in every one of their cases to the school of the Imam Ahmad."[300] Instead, judges "are required to be Hanbalis in their *fiqh*, but only as a starting point, for the sake of unification of the system."[301] Dr. Hamad al-Faryan, former Deputy Minister of Justice for Administrative and Financial Affairs, noted that practitioners in the Saudi legal system have told him that "Saudi judges do occasionally apply rules from other schools when they believe such rules are suited to the case before them."[302]

Additionally, statutory laws, influenced by the civil law system (mainly by the legal systems of France and Egypt), have emerged since the late fifties.[303] The statutory laws are generally issued by royal decrees through the Council of Ministers as the legislative branch.[304] Accordingly, *ta'azir* crimes are partially but not completely codified in Saudi Arabia. The criminalization of certain acts and practices is done in one of two ways. The first is by setting forth a complete criminal act, such as the Anti-Bribery Law, the Anti-Money Laundering Law, the Law of Combating Narcotics and Psychotropic Substances, and so forth. The other way this

---

[299] VOGEL, *supra* note 196, at 122.

[300] *Id*. at 125.

[301] *Id*. at 126 (citing Dr. Hamad al-Faryan interview.).

[302] *Id*.

[303] Maren Hanson, *The Influence of French Law on the Legal Development of Saudi Arabia*, 2 ARAB L. Q. 272, 272-91 (1987).

[304] (Note that Royal Orders, unlike Royal Decrees, are that group of regulations that have been issued by the king without going through the Council of Ministers. The laws enacted by Royal Decree include the Basic Law of Governance, the Shura Council Law, the Council of Ministers Law, and the Regional Law.) *see, e.g.*, Abdulrahman AlMasnad, Unclaimed Money in Saudi Banks 11 (March, 2013) (unpublished S.J.D. Dissertation, Indiana University) (on file with author).

occurs is through the criminalization of some acts within other laws. This can be seen, for

instance, in the Commercial Court Law[305] and the Saudi Arabian Citizenship System.[306]

The adoption of statutory laws derives its legitimacy from the doctrine of the common

good (*al-maslahah al-mursalah*) as a source of Islamic laws, so long as provisions are in

accordance with the divine law.[307] Being in accord with and in conformity to the principles of

Shari'a as a stipulation for the legitimacy of the codified law, which can be seen in a number of

provisions in different laws.  For instance, Article 67 of the Basic Law of Governance states that

"[t]he regulatory authority shall have the jurisdiction of formulating laws and rules conducive to

the realization of the well-being or warding off harm to State affairs in accordance with the

principles of the Islamic Shari'a."[308]

1.   The Criminal Judicial System

According to the most recent Law of the Judiciary,[309] Saudi Arabia has a three-tier court

system consisting of First-Degree Courts, Courts of Appeals, and the High Court.[310] The structure

---

[305] Commercial Court Law, Royal Decree No. 32 of 1350H (corresponding to 1930), art. 143 (SA).

[306] Law of Saudi Arabian Citizenship System, Royal Decree No. M/54 of 1425H (corresponding to 2004), art. 26 (SA).

[307] Frank E. Vogel, *The Public and Private in Saudi Arabia: Restrictions on the Powers of Committees for Ordering the Good and Forbidding Evil*, 70 SOC. RES. 749, 571 (2003) ("In the formulation given to *siyasa* by the *ulama*, a ruler to take any legal action as long as it meets two conditions: 1) serves the general or public interest [*al-maslahah al-mursalah*]; 2) gives no offense to a fundamental principle or rule of the Sharia.").

[308] The Basic Law of Governance, *supra* note 290, art. 67; *see also* Law on Procedures before Shari'a Courts, Royal Decree No. M/2 of 1435H (corresponding to 2013), art.1 (SA); *see also* Law of Criminal Procedures, Royal Decree No. M/2 of 1435H (corresponding to 2013), art. 1 (SA) ("Courts shall apply to cases before them provisions of Shari'a laws, in accordance with the Qur'an and Sunnah of the Prophet (peace be upon him), and laws promulgated by the State that do not conflict with the Qur'an and Sunnah, and their proceedings shall comply with the provisions of this Law.").

[309] Law of the Judiciary, Royal Decree No. M/78 of 1428H (corresponding to 2007) (SA) (The Executive mechanism for developing the judicial system was set forth in the same Royal Decree, part 6 of section I, as follows:

of the first two tiers is based on specialized courts where the matter of the case determines the specialized court in which it is tried. The number of judges hearing a case depends also on the matter of a case.[311]

In the first-degree courts, the criminal courts have jurisdiction over criminal cases. The criminal courts consist of three specialized panels: the *hudud* and *qisas* cases panel, the *ta'azir* cases panel, and the juvenile cases panel.[312] Generally, cases in these panels are heard by a three-judge panel with exception of some offences which the Supreme Judicial Council has specified should be tried by one judge.[313] In districts where there are no specialized criminal courts, general courts establish a criminal cases panel that has a jurisdiction over the criminal cases.[314]

For criminal cases, the courts of appeals are structured in the same way as the first-degree courts, with minor differences. The courts of appeals do not consist of a number of panels, as the first-degree courts do; instead, the criminal circuits have jurisdiction over all criminal cases, including those that were decided by the general courts.[315] The general rule is that three judges rule on a case, but there are five judges in cases dealing with homicide, amputation, stoning, or *qisas* cases.[316] The role of the High Court is critical, since any ruling on homicide, amputation, stoning, or *qisas* cases must be affirmed by that Court.[317]

---

§ 6. Relocate the Criminal Circuits in the Board of Grievance to The Criminal Courts.
§ 7. Transfer all the criminal cases to the criminal courts.
§ 8. Transfer all the proceeding criminal cases in the Board of Grievance to The Criminal Courts.).
[310] *Id*. art. 9.
[311] *Id*. art. 15, 20, & 21.
[312] *Id*. art.  20.
[313] *Id*.
[314] *Id*. art. 23.
[315] *Id*. art. 16.
[316] *Id*. art. 15.
[317] Law of Criminal Procedures, *supra* note 308, art. 10.

2.  Jurisdiction

In identifying the Saudi jurisdiction, it is important to give an overview of the concept in ancient Islamic jurisprudence. The four schools of jurisprudence are divided over the issue of jurisdiction. The majority, including the Maliki, Shafi'i, and Hanbali Schools, hold that Islamic laws apply to any individual who has committed a crime inside a Muslim country, yet the laws apply only to a Muslim or a *dhimmi*[318] who commits a crime outside a Muslim country, similar to the principle of nationality.[319] The Hanafi School, however, restricts the jurisdiction to crimes committed within a Muslim country's boundaries and committed only by a Muslim or *dhimmi*.[320]

According to the Saudi Criminal Procedures Law, jurisdiction is determined by the place where the crime was completely or partially[321] committed, or the residence of the accused.[322] In the case of a conflict of jurisdiction, the High Court identifies which court has jurisdiction over the case.[323] In codified laws, generally Saudi jurisdiction is based on the principle of territoriality,[324] which links the jurisdiction with the place where the crime was committed, unless otherwise specified. This is can be confirmed by inference from Article 3 of the Law of Terrorism Crimes and Financing, which states that, "[n]otwithstanding the principle of territoriality, the provisions of this Law shall apply to any person, Saudi or non-Saudi, who commits, aids, attempts, instigates, participates or conspires to commit—outside the Kingdom—a crime

---

[318] JUAN E. CAMPO, ENCYCLOPEDIA OF ISLAM 194 -195. (2009) ("Dhimmis are non-Muslims who live within Islamdom and have a regulated and protected status.").
[319] AWDAH, *supra* note 201, at 287.
[320] *Id*. at 280-1.
[321] Law of Criminal Procedures, *supra* note 308, art. 131.
[322] *Id*. art. 130.
[323] *Id*. art. 134.
[324] Rollin M. Perkins, *Territorial Principle in Criminal Law*, 22 HASTINGS L.J. 1155, 1155 (1971).

provided for in this Law…."[325] Other laws specify the jurisdiction over and the application of the provisions to certain group of individuals, which can be seen in the Anti-Bribery Law, as will be illustrated in Chapter Six.

3. Criminal Procedures

Criminal procedure is regulated by the Criminal Procedures Law[326] and its executive regulation.[327] The provisions of the Law can be divided into two main categories: investigative procedures and trial procedures. In the investigative procedures, the law first identifies the investigative bodies. Instead of identifying their jurisdictions precisely, the Law refers to other laws or orders laying out their jurisdictions.[328] Additionally, the Law regulates the collection and seizure of evidence,[329] flagrante delicto,[330] arrest procedures,[331] searches of individuals and homes,[332] seizure of mail and surveillance,[333] and the investigative process.[334]

---

[325] Law of Terrorism Crimes and Financing, Royal Decree No. M/16 of 1435H (corresponding to 2013), art. 3 (SA); *see also* Combating Narcotic Drugs and Psychotropic Substances Act, Royal Decree No. M/39 of 1426H (corresponding to 2005), art. 4 (SA).

[326] Law of Criminal Procedures, *supra* note 308.

[327] Executive Regulation of Law of Criminal Procedures, Royal Decree No.142 of 1436H (corresponding to 2015) (SA).

[328] Law of Criminal Procedures, *supra* note 308, art. 26 ("The authority of investigation the crimes are conducted by:

1. Bureau of Investigation and Prosecution.
2. Directors of police and their assistants in the various provinces, counties, and districts.
3. Public security officers, secret service officers, passport officers, intelligence officers, civil defense officers, prison directors and officers, border guard officers, special security forces officers, national guard officers and military officers, each in accordance with their specified duties with respect to crimes committed within their respective jurisdictions.
4. Heads of counties and chiefs of districts.
5. Captains of Saudi ships and airplanes, with respect to crimes committed on board.
6. Heads of centers of the Bureau for the Promotion of Virtue and Prevention of Vice, with respect to matters falling within their jurisdiction.
7. Employees and other individuals who have powers of criminal investigation pursuant to special regulations.
8. Entities, commissions and other persons who have been assigned to conduct an investigation pursuant to the regulations.").

[329] *Id.* § 3, pt. 1.

In the trial procedures, the Law identifies the courts' jurisdictions[335] (as noted above), trial procedures,[336] and the appeals process.[337] In trials, the Bureau of Investigation and Prosecution has jurisdiction over prosecuting criminal cases, in addition to the authority to investigate criminal cases.[338] It must be noted, however, that the Law on Procedures before Shari'a Courts applies in any case where "there are no provisions provided herein, and in matters that are not inconsistent with the nature of penal actions."[339] The case par excellence is that the provisions regulating the law of evidence in the Law on Procedures before Shari'a Courts will be applied in criminal cases, since the Law of Criminal Procedures does not regulate them as the former law does.

### B.  The Historical Development of Laws

Saudi Arabia has witnessed some significant legal changes, especially in the past decade. Nevertheless, the Saudi legal system is still in need of reform.[340] In essence, the Saudi legal system is based on the interaction between three factors: Islamic law, modern law, and the Saudi

---

[330] *Id*. § 3, pt. 2.
[331] *Id*. § 3, pt. 3.
[332] *Id*. § 3, pt. 4.
[333] *Id*. § 3, pt. 5.
[334] *Id*. § 4 (Regulates the authority of investigators, assignment of experts, crime scene inspection, disposal of seized items, questioning the witnesses, interrogation process, summons, detention warrants, and temporary release.).
[335] *Id*. § 5.
[336] *Id*. § 6.
[337] *Id*. § 7.
[338] *Id*. §15.
[339] *Id*. art. 218.
[340] Antoinette Vlieger, Domestic Workers in Saudi Arabia and the Emirates: A Socio-Legal Study on Conflicts 227 (2012).

tribal structure.[341] Identifying the history of each element can help in identifying the main obstacles the Saudi legal system faces.

Saudi Arabia, and more specifically King Abdulaziz, opted to follow Islamic law and based the legal system's identity on that since its establishment in 1926. To have a comprehensive understanding of the reason why, it is necessary to step back and take a broader view. An early Saudi Sheikh, Mohammed ibn Sa'ud (1710–1765), had established an alliance with Muhammad ibn Abdul Wahhab (1703–1791).[342] When the latter observed a deviation from the pure Islamic faith, the former offered support for him to achieve his goal of returning to the pure faith.[343] Thus, when King Abdulaziz came to power, he adopts the same path of restoring pure Islam as the foundation of the new Saudi State in order to unify and unite scattered people from diverse areas and tribes. Since then, Islam as a religion continues to be the foundation of the country[344] and has formed the country's identity and its legal and political system.[345]

Further, Saudi Arabia holds a position of particular eminence within the Muslim world, since the Holy Cities, Mecca and Medina, are located within its boundaries. The fact that the birthplace of Islam constitutes a distinctive status of Saudi Arabia is another reason why Islamic law ought to be the basis of the country's legal system.[346] Consequently, Muslims around the

---

[341] Hossein Esmaeili, *On a Slow Boat towards the Rule of Law: The Nature of Law in the Saudi Arabia Legal System*, 26 ARIZ. J. INT'L & COMP. L. 1, 6 (2009).

[342] PETER W. WILSON, SAUDI ARABIA: THE COMING STORM 16 (1994) (Provides essential information about Muhammad ibn Abdul Wahhab.).

[343] FOUAD FARSY, MODERNITY AND TRADITION: THE SAUDI EQUATION 20-22 (1990).

[344] FAIRCHILD, *supra* note 294, at 58.

[345] Ziad A. Al-Sudairy, *The Constitutional Appeal of Shari'a in a Modernizing Saudi State*, 2 MIDDLE E. L. & GOVERNANCE. 1, 6 (2010).

[346] Esmaeili, *supra* note 341, at 7; *see also* Al-Sudairy, *supra* note 345, at 5.

world consider Saudi Arabia the center of Islam and that the Shari'a should govern every aspect in this area, and the government bears the responsibility to protect and uphold it.[347]

Being the birthplace of Islam has also a significant impact manifested in the role of tribal laws and customs in the Saudi legal system. As explained in Chapter 2, Arab traditions and customs have had an influence on Islamic law.[348] In Saudi Arabia, unlike in other Muslim countries, Arab customs overlap with Islamic law.[349] This is mainly because in other Muslim countries, such as Turkey, Iran, or Asian countries, the traditions and customs to some extent may not be consistent with Islamic principles.[350]

The role of tribal customs appears in the process of settling cases, or mediation. A case par excellence is the homicide cases, where the tribes engage in the process of settlement in order to persuade the victims or their heirs to accept monetary compensation instead of *qisas*.[351] Furthermore, the role of tribal customs has caused some difficulties in the application of some

---

[347] Esmaeili, *supra* note 341, at 8-9. *See also* Mark Jones, *Islamic law in Saudi Arabia: a responsive view*, 16 INT'L. J. COMP. & APPLIED CRIM. JUS. 43, 45-46 (1992).

[348] Esmaeili, *supra* note 341, at 16 (In addition to custom as a source of Islamic law, there are three main channels through which pre-Islamic Arab customs became part of Islamic legal system.
1. There are practices and rules that existed before Islam and were upheld in Islam.
2. There are practices and rules that were neither upheld nor overruled.
3. There are practices and rules that exist though they were banned by Islam.).

[349] *Id*. at 8-9. *See also* VOGEL, *supra* note 196, at xviii ("Looking only at the legal system neglects essential study of that system's social underpinnings, even the influences of customary or tribal laws.").

[350] *Id*.

[351] *Id*. at 22 (The negotiation process witness the heavy involvement of middlemen who might be people with high stature in the community in order to receive a commission for their involvement, which is against Islamic principles.); *see, e.g.*, *Diyya auction; who is paying more*, ALRIYADH NEWSPAPER, Jan. 22, 2013, http://www.alriyadh.com/803684

laws, on the one hand, and created fertile ground for certain crimes to thrive on the other. This can be seen most obviously in crimes of domestic violence.[352]

Nevertheless, Saudi Arabia has opposed tribal rules and customs[353] and has reduced their impact to some extent. This is mainly because the movement of Muhammad ibn Abdul Wahhab at its core aimed at diminishing those traditions that violated the Shari'a.[354] Moreover, civilization and the movement into cities has also weakened those customs.[355] In line with the increase in civilization, a number of laws were promulgated against those customs.[356]

Modernity and civilization lead to the third element of Saudi legal system history, namely, modern laws and a modern legal system. Modern laws and a modern legal system have clearly been developing, as will be described in the next section, since the beginning of the twenty-first century. However, the ongoing issue in Saudi Arabia is whether the authorities, the state, or rulers can codify the Shari'a rules and adopt a codified legal system.[357]

The dilemma here is essentially between the role of the authorities and the role of judges. Judges' autonomy springs from the autonomy of Shari'a from all human beings through the practice of *ijitihad*,[358] whereas the authorities gain their power from *siyāsa shar'iyya*,[359] the power

---

[352] *See*, *e.g.*, *Ministry of Interior States that Traditions and Customs Impede the Application of Law of Protection from Abuse*, ALRIYADH NEWSPAPER, Dec. 28, 2014, http://www.alriyadh.com/1007693; *see also* Sahar Alhabdan, Domestic Violence in Saudi Arabia 11 (October, 2013) (unpublished S.J.D. Dissertation, Indiana University) (on file with author) ("It must be stressed, though, that economic-social abuse is often a result of tribal legacies, tradition, and culture of the family rather than actual Islamic teachings.").

[353] VOGEL, *supra* note 196, at 157. (explaining the impact of settlement).

[354] *Id*. at xvi; *see also* Esmaeili, *supra* note 341, at 22.

[355] *Id*.

[356] *See*, *e.g.*, Law of Protection from Abuse, Royal Decree No. M/52 of 1434H (corresponding to 2013) (SA).

[357] Esmaeili, *supra* note 341, at 30.

[358] VOGEL, *supra* note 196, at 372 (*Ijitihad* literally means "striving, the individual search for a ruling from God's law to govern a human action in conditions where the divine law is not definitively revealed.").

and rule of governance given to the authorities through the common good, *masalih mursala*, as a non-textual source. Between these two poles, the *ulamā*[360] and the judges on one side and the authorities and rulers on the other, the issue arose.[361]

As a firm response to the movement toward codification, the Board of Senior Ulamā issued a fatwa[362] rejecting the idea of codification.[363] Furthermore, due to Shari'a judges' reluctance to apply the state's legislation, which comes in the form of codes, and their insistence on applying the traditional form of Islamic law, the jurisdiction of Shari'a courts over a number of cases were relocated to several administrative boards, specialized committees, and commissions.[364]

This issue has existed since the establishment of Saudi Arabia, but it became more acute after the discovery of oil, when Saudi Arabia was about to step into the arena of international trade. Saudi Arabia is not the only country facing this issue,[365] yet it must also reckon with the

---

[359] IBN QAYYIM AL JAWZY, AL TURUQ AL HUKMIYYAH FI AL SIASAH AL SHAREIAH [The Rules in Religious Policies] 16 (1961) (*siyāsa shar´iyya* is defined as "necessary measures taken for the well-being of people and to distance them from corruption even if there is no authority for such measures in the Islamic sources."); *see also id.* at 329 (illustrating the *siyāsa shar´iyya*, explaining that "in public matters it acknowledges, though often tacitly, broad discretion in the ruler, but seeks even then to place doctrinal limits on his affairs. Its doctrine for doing this, the *siyāsa shar´iyya*, attempts to constrain ruler action by dictating for it positive and negative requirements: positively, it declares that *siyasa* stems from public or general utility; negatively, it requires that it not conflict with shari'a.").

[360] *Id.* (the *ulamā* refers to scholars of the religious sciences and Islamic jurisprudence.)

[361] *See generally* Ayoub M. Al-Jarbou, *The Role of Traditionalists and Modernists in the Development of the Saudi Legal System*, 21 ARAB L. Q. 191, 191-229 (2007).

[362] A fatwa is an advisory opinion by a qualified scholar on a point of Islamic law.

[363] 3 SENIOR SCHOLARS RESEARCH [LAJNAT AL-BUHUTH], FATWA NO.8. [TADWIN AL-RAJIH] 231-239 (2001). http://www.alifta.net/Fatawa/FatawaChapters.aspx?languagename=ar&View=Page&PageID=297&PageNo=1&BookID=1. *See also* VOGEL, *supra* note 196, at 339.

[364] Al-Sudairy, *supra* note 345, at 8.

[365] *See, e.g.*, FAZLUR RAHMAN, ISLAM AND MODERNITY: TRANSFORMATION OF AN INTELLECTUAL TRADITION. (1984) (Providing more examples about the experience of a number of Muslim countries.).

additional factor of being the birthplace of Islam, which has made the area unconditionally controlled by Shari'a since then.[366] Looking back at history, we can see that the Ottoman Empire went through an almost similar experience.[367] The Ottomans adopted a hybrid system which had Islamic law and state legislation, mainly similar to the Western system, and established a dual legal system of secular courts and Shari'a courts.[368] However, the Hijaz area in which the Holy Cities are located was governed by Shari'a and Shari'a courts.[369]

The debate over codification is not a new issue in Saudi Arabia[370] and in fact the debate has been going on since 1926, when the Hijaz was conquered.[371] The continuous debate seems to indicate a sort of agreement between the two parties specifically on three points: firstly, the status quo in Saudi Arabia is neither adequate nor stable. Secondly, the smooth and effective interaction between policymaking and Shari'a and between laws and courts requires a legal system that creates and enhances more internal harmony. Finally, all of that should lead in one direction, avoiding the creation of "the sort of ideologically dual (secular/religious) legal system" that exists in many neighboring countries.[372]

---

[366] Al-Sudairy, *supra* note 345, at 5.
[367] *See generally* VOGEL, *supra* note 196, at 309-62
[368] Al-Sudairy, *supra* note 345, at 4.
[369] *Id*.
[370] *See generally* Haitham Osta, Modernization, Codification and the Judicial Analysis: Exploring Predictability in Law in Sharī'a Courts in Saudi Arabia (Feb, 2015) (unpublished Ph.D. Dissertation, University of Washington School of Law) (on file with author).
[371] Gayle E. Hanlon, *International Business Negotiations in Saudi Arabia*, *in* ABA GUIDE TO INTERNATIONAL BUSINESS NEGOTIATIONS: A COMPARISON OF CROSS- CULTURAL ISSUES AND SUCCESSFUL APPROACHES 891 (James R. Silkenat et al. eds., 3d ed. 2009).
[372] VOGEL, *supra* note 196, at 310.



Figure 1. Saudi Legal Dilemma

## C.  The Saudi Legal System in the Twenty-First Century

The Saudi legal system has been subject to significant legal amendments in an effort aimed at modernizing the legal system. At the outset of the twenty-first century, the Law on Procedures before Shari'a Courts was promulgated.[373] A year later the Criminal Procedures Law[374] was issued to bring together a number of scattered procedures issued in various laws and ministerial circulars under one law.[375]

In 2007, the Law of the Judiciary was amended to change the landscape of the litigation system and trial law and to unify the court system.[376] The Law, as previously noted, establishes

---

[373] Law on Procedures before Shari'a Courts, *supra* note 308.

[374] Law of Criminal Procedures, *supra* note 308.

[375] ABD AL-FATAḤ KHIḌR,  AL-SIMAT AL-MAWDU'IYAH WA AL-IJRA'IYAH LE NIZAM AL-JINA'I BI-AL-MAMLAKAH AL-ARABIYAH AL-SAUDIA [The Substantive and Procedural Features of the Criminal Justice System of Saudi Arabia] 60-64 (2007) (illustrates the old provisions governing the criminal procedures.).

[376] Al-Sudairy, *supra* note 345, at 2.

criminal courts for the first time in order to unify the jurisdiction over criminal matters.[377] In addition to the specialized courts, the judicial system was transformed to a three-tier court system. Subsequently, judicial powers were assigned to the newly established Supreme Court instead of to the Supreme Judicial Council.[378] Courts of appeals were also introduced to create a "fully fledged court of appeals" system, in place of the Shari'a Review Court (*mahkamat al-tamyiz*).[379] Moreover, the Law of the Board of Grievances was also replaced in creating the three-tier court system.[380]

In 2013, upon the establishment of the new judicial system, the procedures were again revisited. This time all the procedures were replaced with new laws, including the Criminal Procedures Law,[381] the Law on Procedures before Shari'a Courts,[382] and the Law on Procedures before the Board of Grievances.[383] This group of procedural laws were promulgated to include provisions regulating the appeals process in accordance with the new judicial system.

Substantively, though the penal code seems far from being adopted, criminal laws and provisions have developed. In the past decade alone, most of the criminal laws have been introduced or revised. Nevertheless, there are number of fragments and drawbacks due to the lack

---

[377] Under the previous system, the jurisdiction over criminal cases was divided among several administrative boards, specialized committees, and commissions, in addition to the Shari'a courts and the Board of Grievances.

[378] Law of the Judiciary, *supra* note 309, art. 11; *see also* Al-Sudairy, *supra* note 345, at 12.

[379] *Id*. *See also* Abdullah F. Ansary, *A Brief Overview of the Saudi Arabian Legal System*, HAUSER GLOBAL LAW SCHOOL PROGRAM NEW YORK UNIVERSITY SCHOOL OF LAW (Nov. 15, 2016, 8:19 PM), http://www.nyulaw.global.org; *see generally* Abdulaziz K. Al-Hamoudi, Criminal Defense in Saudi Arabia: An Empirical Study of the Practice of Criminal Defense in Saudi Arabia 43-4 (2014) (unpublished Ph.D. Dissertation, University of Washington) (on file with author).

[380] Law of Board of Grievances, Royal Decree No. M/78 of 1428H (corresponding to 2007) (SA).

[381] Law of Criminal Procedures, *supra* note 308.

[382] Law on Procedures before Shari'a Courts, *supra* note 308.

[383] *Id*.

of criminal provisions related to certain criminal acts. Another related issue is the absence of a sentencing guide.[384]

At the international and regional level, Royal Order 7/b/12661 was issued urging all governmental agencies to revise and amend laws that are necessary for Saudi Arabia to sign international treaties.[385] Near the end of 2005, Saudi Arabia joined the World Trade Organization (WTO).[386] At the regional level, Saudi Arabia and the Gulf Cooperation Council Countries have started adopting unified laws;[387] such laws aim at strengthening the foundation of GCC markets. If this cooperation is developed and extended further, this may result in the adoption of a unified penal code.

To summarize, the development of the Saudi legal system shows that the formal system of government law retains legitimacy and effectiveness. Despite the challenges posed by the other poles, formal laws have their own influence on individuals and their behaviors and acts, which

---

[384] Fahad Al-Majed, *Al-Tfawt fe Al-Hkam Al-Qadaieh* [Disparities in judicial decisions], *in* AL-NIZAM AL-ADLI FI AL-SAUDIAH [Justice System in Saudi Arabia] 283-296 (Mansour A. Al-Haidari & Mohammad Al-Besher eds., 2015).

[385] Royal Order No. 7/B/12661 17/03/1424H (corresponding to May. 18, 2003) (SA); *see also* Hussain Agil & Bruno Zeller, *Foreign Investments in Saudi Arabia*, 15 INT'L TRADE & BUS. L. REV. 60, 61 (2012) ("As many as 55 investment related laws 'and their implementing rules' have since been enacted.8 Which as an example include the Commercial Law, the Capital Market Law, Foreign Investment Law, and Companies Law, banking Control Law, Cooperative Insurance Companies Control Law, and Anti-Money Laundering Law among others.").

[386] *See generally* U.S. DEPARTMENT OF STATE, SAUDI ARABIA INVESTMENT CLIMATE STATEMENT (2014) (A number of reforms were taken subsequent to accession to the WTO); *see Saudi Arabia to Begin Major Overhaul of Its Judiciary*, IHS MARKET, Mar. 10, 2007, https://www.ihs.com/country-industry-forecasting.html?ID=106597596 (noting that the judicial reform was enacted in accordance with WTO specifications). *But see* Steffen Hertog, *Two-Level Negotiations in a Fragmented System: Saudi Arabia's WTO Accession*, 16 REV. INT'L. POL. ECON. 650, 668 (2008) (The author is skeptical about the WTO's legal impact, stating that "some domestic reform measures seem to have been pushed through under the WTO label although they are not strictly linked to the WTO's technical requirements, including reform of the Saudi court system.").

[387] *See, e.g.*, Trademark Law of the GCC States, Royal Decree No. M/51 of 1435H (corresponding to 2014) (SA).

can be observed through the obedience to formal regulations and laws in recent times. The

demands for reforms in many aspects of the legal system also bear witness to the significance of

formal laws and regulations.

### D. Corruption in Saudi Arabia

Corruption in Saudi Arabia can be found at the highest levels of the government, which,

however, does not imply that there is no corruption at the middle and lower levels.[388] Over the last

three decades, there has been a gradual increase in the level of corruption at the lower levels,

boosted by an increase in the cost of living alongside "stagnating wages."[389] Accordingly, the

corruption level may differ from one institution to another.[390] On the other hand, the judicial

branch remains relatively clean compared to other countries and to other branches of government

in Saudi Arabia.[391] Judicial corruption mainly manifests itself in cases involving land registration

and disputes.[392]

---

[388] BERTELSMANN STIFTUNG, BTI 2016-SAUDI ARABIA COUNTRY REPORT 29 (2016).

[389] *Id.* Ghassan H. Alshmrani, Athr Alraqabah Almaliah fi Alhyah Alwataniah le Mukafahat Alfasad be Almamlakah Alarabia Alsaudia Lelhad min Amliat Alfasad, [The Impact of Saudi National Anti-Corruption Commission in Limiting Financial Corruption] 31 (November, 2013) (unpublished MBA Thesis, Arab East College) (on file with author). (63% of Saudis believe that financial corruption has become more prevalent in the present time); *see also* "Nazaha" Fighting Corruption in Saudi Arabia, LEX ARABIAE (Oct. 12, 2016, 8:19 PM), http://lexarabiae.meyer-reumann.com/nazaha-fighting-corruption-in-saudi-arabia/; *see also Saudi Arabia's Efforts in Protecting the Integrity and Fighting Corruption*, ALRIYADH NEWSPAPER, Nov. 1, 2010, http://www.alriyadh.com/573272 (Compare the number of the cases investigated by the General Directorate of Criminal Investigations and Research Public Security between 2005 and 2009.).

[390] BERTELSMANN STIFTUNG, *supra* note 388, at 29. (For example, the Central Bank (SAMA), the Royal Commission for the Industrial Cities of Jubail and Yanbu, and Aramco remain relatively cleaner than other government institutions.); *see generally Countries at the Crossroads 2012: Saudi Arabia*, FREEDOM HOUSE, https://freedomhouse.org/report/countries-crossroads/2012/saudi-arabia. (last visited Nov. 15, 2016).

[391] *Saudi Arabian Judicial System*, BUSINESS ANTI-CORRUPTION PORTAL, http://www.business-anti-corruption.com/country-profiles/middle-east-north-africa/saudi-arabia/judicial-system.aspx. (last visited Nov. 15, 2016).

[392] BERTELSMANN STIFTUNG, *supra* note 388.

The United States came close to investigating and prosecuting a number of corruption cases that occurred in Saudi Arabia through the Foreign Corrupt Practices Act (FCPA).[393] For instance, through the FCPA, the U.S. Department of Justice discovered a bribe of $500,000 a year that was paid for five years to a Saudi official in exchange for rewarding HealthSouth a contract for operating a hospital.[394] Regrettably, a number of other cases that are cited as being among the largest settlements in the history of the FCPA took place partly or completely in Saudi Arabia.[395]

This can be attributed partly to a lack of disclosure coupled with the absence of transparency, which indicates the absence of public accountability. Through the history of Saudi Arabia, it is rare to hear of an official being tried on corruption charges.[396] Thus, the "naming and shaming" strategy of calling attention to corruption does not often take place in Saudi Arabia.[397] Further, the dismissal of public servants is considered a challenge to the officials' superiors and a

---

[393] *See, e.g., SEC sanctions two former defense contractor employees for FCPA violations*, U.S. SECURITIES AND EXCHANGE COMMISSION (Nov. 17, 2014), http://www.sec.gov/News/PressRelease/Detail/PressRelease/1370543472839#.VGpwPWPgfIA. *SEC charges Pfizer with FCPA violations*, U.S. SECURITIES AND EXCHANGE COMMISSION (Aug. 7, 2012), http://www.sec.gov/News/PressRelease/Detail/PressRelease/1365171483696. *See also SEC v. Pride International, Inc.*, Civil Action No. 4:10-cv-4335 (S.D. Texas, Nov. 4, 2010), http://www.sec.gov/litigation/litreleases/2010/lr21726.htm.

[394] *See Former HealthSouth Officers Indicted in Connection with Bribery Involving Saudi Hospital*, U.S. DEPARTMENT OF JUSTICE (July 1, 2004), http://www.justice.gov/archive/opa/pr/2004/July/04_crm_463.htm

[395] *Alstom Pleads Guilty and Agrees to Pay $772 Million Criminal Penalty to Resolve Foreign Bribery Charges*, U.S. DEPARTMENT OF JUSTICE, (Dec. 22, 2014), http://www.justice.gov/opa/pr/alstom-pleads-guilty-and-agrees-pay-772-million-criminal-penalty-resolve-foreign-bribery. *See also BAE Systems PLC Pleads Guilty and Ordered to Pay $400 Million Criminal Fine*, U.S. DEPARTMENT OF JUSTICE. (Mar. 1, 2010), http://www.justice.gov/opa/pr/bae-systems-plc-pleads-guilty-and-ordered-pay-400-million-criminal-fine

[396] U.S. DEPARTMENT OF STATE, SAUDI ARABIA INVESTMENT CLIMATE STATEMENT 17 (2015).

[397] *Naming and shaming corrupt officials*, THE SAUDI GAZETTE, Feb. 20, 2014, http://www.sauress.com/en/saudigazette/196391

restriction on their discretion.[398] All of these issues derive their support from the patronage culture.[399]

Thus, the backbone of the patronage culture is favoritism, including, inter alia, the practice of nepotism and cronyism, more broadly referred to as *wasta*, which has a dual function. It functions by itself in many cases as a practice of corruption where it takes the form of influence-peddling. In addition to this function, it can open a path for other corrupt practices to occur. This can occur through the collaboration of middlemen and their role in facilitating bribery, for instance, which depends in the first place on reciprocity and trust between the parties.

In 2015, the National Anti-Corruption Commission (*Nazaha*) conducted a survey to assess corruption in Saudi Arabia.[400] The survey revealed that the practice of *wasta* was the most prevalent corrupt practice constituting about 62 percent of the corrupt practices in the country. On the other hand, around 81 percent of the corruption in Saudi Arabia was attributed to the complexity of procedures and to outdated laws.[401] Consequently, what can be derived from this survey is that *wasta* forms a challenge to the Saudi legal system, as will be explained in Chapter Five. Secondly, the legal instruments available have proved to be inadequate to fight corruption.

---

[398] BERTELSMANN STIFTUNG, *supra* note 388, at 28.

[399] *Business Corruption in Saudi Arabia*, GAN BUSINESS ANTI-CORRUPTION PORTAL. (Nov. 15, 2016), http://www.business-anti-corruption.com/country-profiles/middle-east-north-africa/saudi-arabia/show-all.aspx

[400] *According to a Recent Study: Wasta Is the Most Prevalent Corrupt Practice*, NATIONAL ANTI-CORRUPTION COMMISSION (Feb. 1, 2017, 10:04 AM), http://www.nazaha.gov.sa/Media/News/Pages/news953.aspx

[401] *See also* RIYADH ECONOMIC FORUM, ALFSAD ALEDARY WA ALMALI: ALWAQA' WA ALATHAR WA SUBL ALHADD MENH [Administrative and Financial Corruption: Reality, Consequences, and Combating it] 52 (2013) (This study also support the same finding. In this study, 1302 Participants were asked to rate how much they believe that there is a need to a legal reform on a Likert scale of 1 to 5, with 1 corresponding to "strongly disagree" and 5 corresponding to "strongly agree". The median was 4.5, which indicates that the majority of participants strongly agreed with the need for legal reform to combat corruption.).

CONCLUSION

The present chapter has offered a brief review of the Saudi criminal justice system that has surveyed the criminal judicial system itself and the issues of jurisdiction, and criminal procedures. This chapter has also examined the development of the laws and regulations in Saudi Arabia and the challenges associated with such development. The chapter concluded by examining briefly the problem of corruption in Saudi Arabia.

CHAPTER FOUR: CORRUPTION AND SAUDI ARABIAN SOCIETY

INTRODUCTION

The previous chapter explores the Saudi criminal justice system in general and corruption

in Saudi Arabia and the anti-corruption legal framework in particular. Since society plays a

significant role in corruption in Saudi Arabia, it is essential to give an overview of Saudi history,

culture, and society. At the outset, this chapter will examine the relationship between society and

corruption. After briefly reviewing corruption in Saudi Arabia, it will then proceed to provide

essential background about Saudi history, culture, and society. Finally, it concludes by

examining corruption through the lens of sociology and social psychology by outlining the

argument of Ibn Khaldun, representing a sociological analysis of cultures similar to Saudi

Arabia, and by examining the influence of power and intergroup biases on corrupt behaviors and

acts.

### A. Societies and Corruption

The question attracting scholars in the early discourse on corruption was, why do certain

societies or countries seem to be more inclined to be corrupt than others? In an effort to provide

an answer to this question, scholars have set forth two main analyses.[402] The first analysis was

culturally based, arguing that corruption is a result of social norms which value loyalty and gift-

giving over the rule of law. This analysis also has two main streams; the first expresses the views

of the moralists, most notably Banfield[403] and Wraith and Simkins,[404] who considered those

norms and corrupt behaviors to be both politically immoral and economically harmful. The

---

[402] See Gabriella R. Montinola & Robert W. Jackman, *Sources of Corruption: A Cross-Country Study*, 32 BRIT. J. POL. SCC'Y. 147, 148 (2002).
[403] See generally BANFIELD, *supra* note 60.
[404] See generally RONALD E. WRAITH & EDGAR SIMPKINS, CORRUPTION IN DEVELOPING COUNTRIES (1964).

second stream, represented by Wertheim[405] and other scholars, merely seeks to shed light on the differences in norms and the results of such differences.

The second stream, led by the revisionists, argued that corruption is merely a result of political and administrative norms that are different from those adopted in the West.[406] Those norms, in their view, satisfy political, economic, and administrative demands. Influenced by the revisionist school, some have argued in favor corruption, since it enhances the efficiency of bureaucrats, helps in avoiding the problems of capital formation, and provides administrative flexibility.[407] Others, despite adopting the same view—that corruption is a result of the process of modernization—remain skeptical about its positive consequences or its necessity.[408]

During the 1960s, revisionists and moralists engaged in a lengthy and unresolved debate. As the discourse on corruption has advanced, a new approach has emerged that bases its analysis on public choice.[409] This approach focuses on many economic and political variables and attempts

---

[405] Willem F. Wertheim, *Sociological Aspects of Corruption in Southeast Asia*, *in* POLITICAL CORRUPTION: READINGS IN COMPARATIVE ANALYSIS 195, 195–211 (Arnold J. Heidenheimer ed., 1970).

[406] Montinola & Jackman, *supra* note 402, at 148 ("corruption stimulated by events in the new states … attributed the phenomenon to a country's particular stage of development.").

[407] *See* Leff, *supra* note 12, at 11; *see also* SAMUEL P. HUNTINGTON, POLITICAL ORDER IN CHANGING SOCIETIES 69 (1968) ("In terms of economic growth, the only thing worse than a society with a rigid, overcentralized, dishonest bureaucracy is one with a rigid, overcentralized, honest bureaucracy."); *see also* MYRON WEINER, THE POLITICS OF SCARCITY; PUBLIC PRESSURE AND POLITICAL RESPONSE IN INDIA 253 (1962) (describing the advantage of corruption in India, arguing that "[m]any economic activities would be paralyzed were it not for the flexibility which *bakshish* contributes to the complex, rigid, administrative system").

[408] *See, e.g.*, JAMES C. SCOTT, COMPARATIVE POLITICAL CORRUPTION (1972).

[409] Peter J. Hill, *Public Choice: A Review*, 34 FAITH & ECON. 1, 1 (1999) ("Public Choice is best defined as the application of the rational choice model to non-market decision-making. In a more general sense, it has meant the application of economics to political science. … The Public Choice Society was established in 1965 by Gordon Tullock and James Buchanan. Founded upon the economic model of rational choice, it had the explicit goal of facilitating exchange of work and ideas at the intersection of economics, political science, and sociology."); *see, e.g.*, James M. Buchanan, *Social Choice, Democracy, and Free Markets*, 62 J. Pol. Econ. 114, 114-23 (1954);

to find a causal nexus between these variables and corruption.[410] However, the answer to the previous question remains unresolved and open to debate.

Thus, scholarly approaches differ in answering the question of why some societies have more corruption than others, and consequently what they attribute corruption to and how they analyze it differ. While some scholars build their analysis on the organizational and societal level, others tend to center their analysis on the individual—that is, some scholars attribute corruption primarily to societies rather than to the individual, other scholars do the reverse. In attempting to find an answer, we should take into consideration some of the concepts from different approaches and analyses.

The popular explanation adopted by sociologists of the different levels of corruption between the countries emphasizes the different norms adopted by different countries which result in different perceptions of the same acts. However, it cannot be assumed that non-Western countries are not concerned with corruption.[411] In fact, in many of the developing countries, respondents to public opinion polls consider corruption to be one of the top problems in their country. In China, for example, people condemn *guanxi* (personal and political connections) on the one hand, while on the other they still "admire the ingenuity of individual exploits among their acquaintances in its use."[412] Moreover, as one scholar has noted, "A major problem with

---

*see, e.g.*, Gordon Tullock, *The Welfare Costs of Tariffs, Monopolies and Theft*, 5 W. ECON. J. 224, 224-32 (1967).

[410] *See, e.g.*, Chapter 1 of this dissertation (the studies explaining the causes and consequences of corruption). Montinola & Jackman, *supra* note 402, at 149 (arguing that at their core, public choice explanations of corruption attribute the phenomenon to a lack of competition in either or both the economic and political arenas).

[411] Pranab Bardhan, *Corruption and Development: A Review of Issues*, 35 J. ECON. LITERATURE 1320, 1330 (1997).

[412] *Id.* at 1331.

norm-based explanations is that they can very easily be near-tautological ('a country has more corruption because its norms are more favorable to corruption')."[413]

With that being said, numerous scholars argue that the difference between the public perception in different cultures of certain acts as being corrupt or not is the reason for the different levels of corruption—that is, what is considered a bribe in the West may be considered a gift in other cultures.[414] To complicate the issue, however, a number of studies suggest that there is a firm moral disapproval of corruption even in the most corrupt countries. For instance, a study conducted by the Afrobarometer in the African context asked respondents to evaluate three different potential acts by government officials, and whether they would consider these acts to be "wrong but understandable" or "wrong and punishable.""[415] The vast majority of the African respondents considered the acts in all three scenarios "wrong and punishable."[416]

---

[413] *Id.*

[414] Anna Person et al., *Why Anticorruption Reforms Fail: Systemic Corruption as a Collective Action Problem*, 26 GOVERNANCE 449, 455-56 (2013); *see generally* Arnold J. Heidenheimer, *Perspectives on the Perception of Corruption*, *in* POLITICAL CORRUPTION: CONCEPTS AND CONTEXTS 141, 141-54 (Arnold J. Heidenheimer and Michael Johnston eds., 2002) (distinguishing between the different forms of corruption and explaining the public acceptance of such practices); *see, e.g.*, Jean-Pierre O. de Sardan, *A Moral Economy of Corruption in Africa*, 37 J. MOD. AFR. STUD. 25, 25–52 (1999) (arguing that corruption in Africa "socially embedded in 'logics' of negotiation, gift-giving, solidarity, predatory authority and redistributive accumulation."); *see generally* Italo Pardo, *Who is Corrupt? Anthropological Reflections on the Moral, the Criminal, and the Borderline*, 23 HUM. AFF. 124, 124-47 (2013) (Compare between the Brits and the Italian perception of what is considered as a corrupt act.). Mark Levin & Georgy Satarov, *Corruption and Institutions in Russia*, 16 EUR. J. POL. ECON. 113, 113–32 (2000).

[415] The three scenarios were if a public official:
  1. "decides to locate a development project in an area where his friends and supporters lived."
  2. "gives a job to someone from his family who does not have adequate qualifications."
  3. "demands for a favor or an additional payment for some service that is part of his job."

[416] Carolyn Logan et al., *Citizens and the State in Africa* (Afrobarometer Network, Working Paper No. 61, 2006). WILLIAM L. MILLER ET AL., A CULTURE OF CORRUPTION? COPING WITH GOVERNMENT IN POST-COMMUNIST EUROPE (2001) (Provides a number of empirical studies examining inter alia the perception of individuals in Czech Republic, Slovakia, Bulgaria, and

Yet despite this firm disapproval, individuals in corrupt countries not only choose not to punish corrupt acts, but also continue to perpetuate them. Individuals in such settings are not necessarily corrupt, but they are corruptible[417]—that is, in a given setting, individuals engage in corrupt acts even though they morally disapprove of them and comprehend the negative social consequences of them, since they know that these are the rules of the game by which they can gain more benefit. In the short term, not being corrupt is not only costly, but also will not change the rules of the game, and this ultimately drives individuals to continue to engage in corrupt behaviors.[418]

The most relevant form of corruption that may help in providing a comprehensible view of the situation is the concept of systemic corruption introduced by Caiden and Caiden. In their words, "Systemic corruption occurs whenever the administrative system itself transposes the expected purposes of the organization, forces participants to follow what otherwise would be termed unacceptable ways, and actually punishes those who resist."[419] Consequently, corruption is structural and systemic rather than incidental. Caiden and Caiden argued that the revisionists tend to consider corruption in individual terms, even though the revisionists identify corruption as a social phenomenon.

---

Ukraine about corrupt practices.); *see also* STEN WIDMALM, DECENTRALIZATION, CORRUPTION AND SOCIAL CAPITAL: FROM INDIA TO THE WEST 166-173 (2008) (Based on a survey conducted in India, Sten found that corruption is not accepted by the majority of the respondents).

[417] William L. Miller, *Corruption and Corruptibility*, 34 WORLD. DEV. 371, 371 (2006).

[418] *See* Bo Rothstein, *Anti-Corruption: The Indirect 'Big Bang' Approach*, 18 REV. INT'L. POL. ECON. 228, 231 (2011) ("In general, agents at the bottom of a corrupt system … have no incentive to refrain from corrupt practices because even if they as individuals start behaving honestly, nothing will change.").

[419] Gerald E. Caiden & Naomi J. Caiden, *Administrative Corruption*, 37 PUB. ADMIN. REV. 301, 306 (1977); *see generally* SOMA PILLAY, DEVELOPMENT CORRUPTION IN SOUTH AFRICA: GOVERNANCE MATTERS 24-27 (2014) (distinguishing generally between systemic corruption and individual corruption).

Systemic corruption exists not only in poor countries, but also in any country which is an organizational society[420]—those societies that value organizational loyalty more than the public interest. It is worth noting that systemic corruption is known to exist and to thrive in certain kinds of transactions rather than others.[421] The example par excellence is military and defense contracts, which become riddled, if not controlled, by systemic corruption.

Systemic corruption gains its complexity from the characteristics it has, the consequences it creates, and the difficulties involved in fighting against it. Systemic corruption has some characteristics that distinguish it from individual or incidental corruption. First, organizations usually claim adherence to an external code of ethics which in fact differs from the de facto internal practices. These internal practices play significant roles not only in hiding the infringements of the external code, but also in hiding the rewards the organization gives for such infringements.[422] Thus, it is not surprising to find strong protections for the violators accompanied by punishments for the non-violators for "foregoing the rewards of violation and offending violators."[423]

Second, in systemic corruption the exposing of such infringements is diminished significantly. On the one hand, the whistle-blowers, unless they enjoy some protection from being the victims of future revenge, are forced into silence.[424] On the other, institutions and officials

---

[420] Caiden & Caiden, *supra* note 419, at 308.

[421] *Id*. at 306.

[422] *Id*. at 307. *See also* DONATELLA D. PORTA & ALBERTO VANNUCCI, THE HIDDEN ORDER OF CORRUPTION: AN INSTITUTIONAL APPROACH 50 (2012) (emphasizing the role of the informal rules in the systemic corruption).

[423] *Id*.

[424] *Id*. at 306.

charged with monitoring, investigating, and uncovering corruption rarely take action. Even if they do act, they will consider the incident of corruption as an exceptional act that rarely occurs.[425]

Owing to these characteristics, systemic corruption poses a number of risks to a society that are greater than those posed by incidental corruption. Since it prevents the reflections of social developments from being integrated into institutions, systemic corruption enforces restricted access and closed policies on the one hand, and enhances class, economic, and even social divisions on the other.[426] This situation leads to the suppression of opposition, which eventually results in limited reforms and changes in administration and policy.[427]

The preceding explanation lays a foundation for introducing the collective reputation theory, its interpretation, and its relevance to corruption. As Tirole sensibly argued,

> When belonging to a group is an unalterable trait, poor collective [behavior] in the past may make current good [behavior] a low-yield individual investment and thus generate poor collective [behavior] in the future. Even more fascinating is the history-dependence of collective reputations. In our view, stereotypes are long-lasting because new members of a group at least partially inherit the collective reputation of their elders.[428]

That is to say, younger generations inherit the reputation of being corrupt from the older generations and continue to use corrupt alternatives because they lack incentives to be honest, and this eventually results in the persistence of corruption in a given group, culture, or society.[429]

---

[425] *Id.*

[426] *Id.* at 307; *See, e.g.*, Donatella D. Porta, *Political Parties and Corruption: Ten Hypotheses on Five Vicious Circles*, 42 CRIME L. SOC. CHANGE 35, 41 (2004) (supporting this point by citing the Italian experience).

[427] *Id.*

[428] Jean Tirole, *A Theory of Collective Reputations (With Applications to the Persistence of Corruption and to Firm Quality)*, 63 REV. ECON. STUD. 1, 18 (1996).

[429] Bardhan, *supra* note 411, at 1334.

There is a fine line between a corrupt society and corrupt individuals. Yes, there are corrupt norms that exist in some countries, yet the public are not satisfied with them nor do they morally believe in them. The use of corrupt alternatives and behaviors existing in a particular society does not render a judgement that the society is corrupt when most people in that society disapprove of corrupt alternatives and behaviors.[430] What can be said instead is that there is a corrupt atmosphere forcing individuals to use corrupt alternatives and behaviors. The disapproval does not make the individuals who constitute a society corrupt; the fact that they have no option but corruption has forced to be corrupt. In fact, when applying the collective reputation theory, one may discover the opposite result—that is, there are certain cultures, societies, or countries that may benefit from the collective reputation of not being corrupt while they are still having a number of corrupt behaviors.[431]

This discussion is not merely a theoretical analysis but is beneficial in terms of practice. It not only points to the root cause of corruption, it also provides an essential step toward solving and curbing corruption. Most of the strategies that successfully identify the root cause of the problem have failed to provide adequate solutions, since a number of these strategies tend to import already prepackaged remedies. The reliance on over-the-counter remedies and solutions does not obviate the need for more precise and sometimes customized cures.

---

[430] BO ROTHSTEIN, SOCIAL TRAPS AND THE PROBLEM OF TRUST 7 (2005) ("The reason they continue to act treacherously or opportunistically is not necessarily that they (or their culture) suffer from some kind of moral defect, but rather that there is no point in being the only honest player in a rotten game at which everyone else cheats (or is perceived to be a cheater).").

[431] This may be applicable to the corruption perception indices, which include Transparency International's CPI and the World Bank's Control of Corruption index (WB), since they rely mainly on the perception of corruption, which may be biased or influenced by "the collective reputation." *See, e.g.*, Dilyan Donchev & Gergely Ujhelyi, *What Do Corruption Indices Measure?*, 26 ECON. & POL. 309, 309-31(2014).

*B. Saudi Society in Context*

1.  History

      The roots of what we now know as Saudi Arabia go back to 1744 and the establishment of the Emirate of Dir'iyyah, which became known as the first Saudi state.[432] The first Saudi state was the result of an alliance established between the earlier Saudi Sheikh, Mohammed ibn Sa'ud (1710–1765), and Muhammad ibn Abdul Wahhab (1703–1791), which aimed at restoring a pure orthodox Islam in the Arabian Peninsula and fighting to abolish heretical practices (*Bida'*).[433] This politico-religious alliance led to a strong movement that captured an enormous area of the Arabian Peninsula.[434]

      However, the Saudi state did not last very long, as the Ottoman Empire responded to the expansion of the Emirate and its seizure of Ottoman territory by launching a military campaign to recover their lost territory. At the domestic level, the Saudi state faced the challenge of the Banu Khalid, a tribe that had controlled the eastern region of the Arabian Peninsula since their rebellion against the Ottoman Empire in 1670.[435]  The Saudi state was also confronted by the Sharifian family in Hejaz.[436]

---

[432] WAYNE H. BOWEN, THE HISTORY OF SAUDI ARABIA 69 (2008).

[433] MADAWI ALRASHEED, THE HISTORY OF SAUDI ARABIA 15 (2010).

[434] BOWEN, *supra* note 432, at 73 (This included parts of what is now known as the United Arab Emirates, Qatar, and Oman. By 1810, the Saudi state was in control of nearly the entire Arabian Peninsula).

[435] ALRASHEED, *supra* note 433, at 34 (In 1795, the Banu Khalid were defeated and their threat was eliminated); *see also* HALA M. FATTAH, THE POLITICS OF REGIONAL TRADE IN IRAQ, ARABIA, AND THE GULF, 1745-1900 95 (1997).

[436] *See* ALRASHEED, *supra* note 433, at 13 (describing how the Ottoman Empire ruled the Hejaz Region in cooperation with Sharifian family beginning in 1517 and continued to rule the area for the next four centuries. The Sharifian family were defeated and the Saudi State was able to extend its control over Ta'if in 1802, over Mecca in 1803, and over Medina in 1804)

The Emirate of Najd, the second Saudi state, emerged in 1824, shortly after the fall of the first state, and moved the capital to Riyadh.[437] This occurred when Turki bin Abdullah bin Muhammad successfully reconquered Riyadh from Egyptian forces.[438] In 1891, the Battle of Mulayda brought an end to the second Saudi state.[439] A number of factors contributed significantly to the collapse of the second Saudi state, inter alia, internal conflicts in the house of Al-Saud[440] coupled with the emergence of the Rashidi Emirate in Ha'il in northern Najd (1836–1921) as a powerful rival.

At the beginning of the twentieth century, Abdul-Aziz ibn Saud launched on the path to restore the rule of his forefathers. In 1902, Abdul-Aziz led a small group from Kuwait, where his family had settled after they fled in 1893,[441] to Riyadh, the capital of his ancestors.[442] At that time, the Rashidi Emirate had expanded its territory to include, in addition to Ha'il in northern Najd, Qassim, the center of the Arabian Peninsula, and Riyadh.[443] When he successfully reconquered Riyadh in 1902, Ibn Saud was able to consolidate other parts of Najd.[444]

Between 1902 and 1906, there were series of battles over the Qassim between Ibn Saud and the Rashidi Emirate, which had already lost a significant part of their territory in southern Najd; these eventually ended with Ibn Saud conquering Qassim.[445] However, Ibn Saud's conquest was not fully stable. Faisal Al-Dawish, supported by other leaders of the Mutair tribe,

---

[437] BOWEN, *supra* note 432, at 77.
[438] AFSHIN SHAHI, THE POLITICS OF TRUTH MANAGEMENT IN SAUDI ARABIA 50 (2013).
[439] MUHAMMAD SUWAED, HISTORICAL DICTIONARY OF THE BEDOUINS 19 (2015).
[440] BOWEN, *supra* note 432, at 77, 79 (For instance, Turki ibn Abdullah, the founder of the second Saudi state, was assassinated by his nephew Mishari in 1843. There was also a civil war between the sons of Faysal ibn Turki over the throne.).
[441] ALEXEI VASSILIEV, THE HISTORY OF SAUDI ARABIA 204 (1998).
[442] *Id*. at 212.
[443] SUWAED, *supra* note 439, at 19.
[444] *Id* (Including Washm, Arid, Kharj, and Sudayr, in a short time)
[445] ALRASHEED, *supra* note 433, at 38.

formed a secret alliance with Abdullah Aba Al-Khail and split from Ibn Saud. In 1907, Ibn Saud

defeated the Mutair in a battle near Al-Majmaa, a town in Najd, and Faisal eventually submitted

but retained his status as a leader of the Mutair.[446] At that time, Abdullah Aba Al-Khail still had

an alliance with part of the Mutair tribe and the people of Buraida, a town in Qassim, and joined

Sultan ibn Hamud, a ruler of the Rashidi Emirate. In 1907, the battle of Tarafiya occurred and

Ibn Saud again emerged successful, but he was not able to return to Buraida until 1908, when his

support in Buraida grew and enabled him to enter the town.[447].

In 1913, the first *hijra* (settlement) was founded as a response to the emergence of the

*Ikhwan* (Brethren) movement. The first settlement was Al-Artawiya, where the Mutair tribe was

settled. Although the shift from a nomadic lifestyle to farming was a difficult step for the

Bedouin, it took only a decade to establish sixty more settlements.[448] These settlements were a

milestone in the consolidation of the Arabian Peninsula, as they provided stability and

powerbases for the army of Ibn Saud. The purpose of these settlements was not completely

fulfilled, since individuals who joined the settlements were supposed to abandon the habits and

duties derived from tribal traditions; instead, settlements continued to be inhabited based on

tribal affiliation.[449]

In 1913, after the stabilization of Najd, Al-Hasa also fell under the sovereignty of Ibn

Saud.[450] Again, Ibn Saud confronted another tribal rebellion. This tribe was the Ajman, and they

were rebellious and refused to fully submit to Ibn Saud. This rebellion started when, during the

---

[446] VASSILIEV, *supra* note 441, at 222.
[447] *Id*. at 222-23.
[448] *Id*. at 228.
[449] *See id*. at 228 ("*Umm al-Qura* gave a breakdown of the Ikhwan according to tribe in 1929: Anaza 7; Shammar, 16; Harb, 22; Mutair, 12; Ataiba, 15; Subai, 3; Suhul, 3; Qahtan, 8; Dawasir, 4; Bani Khalid, 2; Ajman, 14; Awazim, 2; BaniHajir, 4; Al Murra, 4; Hitaim, 3; and Zafir, 1.").
[450] FOUAD AL-FARSY, SAUDI ARABIA: A CASE STUDY IN DEVELOPMENT 41 (1986).

battle of Jarrab (1915), Ibn Saud experienced disloyalty from the Ajman, and ended in the battle of Kanzan, in which the Ajman were defeated, although only with difficulty.[451] The defeat of Ibn Saud's long-time rival, the Rashidi Emirate, came in 1921.[452] This was followed shortly by the consolidation of Asir. In 1925, Hejaz submitted to Ibn Saud, which ended the rule of the Sharifian family.[453]

Throughout the history of Saudi Arabia, tribal culture and Islam have exercised a strong influence. The role of Islam can be observed in the fact that, without wealth or a confederation between the tribes in Najd, there was little if any means of expanding the sovereignty, but adopting a religious message enabled Mohammad ibn Saud and his successors to achieve a confederation.[454] This cannot be overemphasized when the role of tribes is considered.

The role of tribes in the history of the Saudi state was of central importance. First and foremost, the center of Arabia, Najd, was not controlled by the Ottomans and was ruled by the *amirs* (leaders) of each tribe, who maintained their autonomy and independence. [455] This was mainly due to the mobility of the tribes, which was part of their very nature, coupled with the tradition of autonomy.[456] Furthermore, when comparing the Saudi states to their rivals, the Rashidi Emirate and the Sharifian family, the role of tribes becomes more obvious. The Rashidi Emirate was perceived as dominated solely by the Shammar tribe, which imposed difficulties on

---

[451] VASSILIEV, *supra* note 441, at 239.

[452] *Id*. at 254-56

[453] *See generally id*. at 260-84 (On September 18, 1932, after the consolidation of the new regions of the Arabian Peninsula, Ibn Saud issued a decree changing the name of the state to the Kingdom of Saudi Arabia).

[454] ALRASHEED, *supra* note 433, at 17.

[455] *Id*. at 13.

[456] *Id*. at 18.

the Emirate's control over other tribes; this was not the case for either the Saudi states or the Sharifian family.[457]

The Sharifian family, descendants of the prestigious Hashemite tribe, which has a direct lineage from the Prophet Muhammad by way of his daughter Fatimah, relied on their lineage to impose their sovereignty.[458] In Hejaz, nonetheless, there was a sharp division between the rural and the urban population,[459] coupled with the absence of an "overarching tribal leadership capable of claiming authority over the whole confederation."[460] That is to say, the Hejazi tribes were separated into different entities, each of which was led by a prominent *shaykh* (leader), resulting in an implicit agreement that no one would claim leadership or authority beyond his territory.[461]

2.  Culture

The geographic insularity of Arabian Peninsula led to a lengthy period of isolation, resulting in a high level of ethnocentricity in Saudi culture. The small exception is the Hejaz region, which was exposed to the pilgrims from all over the world visiting Mecca and Medina.[462] In addition to being birthplace of Islam, the Arabian Peninsula is the cradle of the Arabs, whose cultural identity was based in the tribe and the extended family as much as in linguistic or political bonds, if not more so.[463]

---

[457] *Id*. at 36 ("The revival of Saudi rule early in the twentieth century and the evolution of their third emirate into a fully fledged state are attributed to the fact that they had no clear or obvious association with a tribal confederation.").

[458] *Id*. at 32.

[459] *Id*. at 30 (Hogarth noted that "the Hejazi Bedouins are of exceptionally predatory character, low morale, and disunited organization.").

[460] *Id*. at 29.

[461] *Id*.

[462] DAVID E. LONG, CULTURE AND CUSTOMS OF SAUDI ARABIA 26 (2005).

[463] *Id*.

For Arabs, accordingly, bloodline, rather than wealth or success, is what shapes and establishes personal status. Thus, the Saudis maintain their pride in their Arabian ancestry and deem themselves to be the center of their own universe.[464] Further, the Saudis have preserved "a proud, closed, and extended family-oriented society that is secure in its own worth and destiny" because their area has never been colonized, which also diminishes the "feeling of cultural inferiority."[465] More specifically, the family is the cornerstone of the Saudi social structure, playing a significant role in maintaining the lineage, reinforcing the social cohesiveness, and enhancing the structural integrity of the nation.[466]

A number of the Saudi social customs derive their roots from the code of personal and collective honor (*sharaf*).[467] As a good example, hospitality for the Saudis is considered a matter of honor; this determines their roles as hosts, in addition to the "mutual security consideration," that is, the welfare of the guest.[468] As a form of personal honor, sincerity and loyalty (*ikhlas*) is one of chief elements of Saudi social norms.[469] The personal-oriented pattern in Saudi society boosts the significance of *ikhlas*, since it is fundamental to these close relationships. *Ikhlas* can blind the eyes of Saudis to an individual's slips.[470] As a result, personal trust and a close personal

---

[464] *Id.*

[465] *Id.* at 26, 37.

[466] SANDRA MACKEY, THE SAUDIS: INSIDE THE DESERT KINGDOM 115 (1987); *see also* Yazeed Almahraj, *Public Relations and Culture in Saudi Arabia*, 7 in PROCEEDINGS OF THE EIGHTH SAUDI STUDENTS CONFERENCE IN THE UK (Neil Alford & Jean Fréchet eds., 2016).

[467] *See* KAREN E. HOUSE, ON SAUDI ARABIA: ITS PEOPLE, PAST, RELIGION, FAULT LINES—AND FUTURE 67 (2012) ("Honor, for Arabs who seek leadership in any sphere, is akin to favorable public opinion polls in a democracy. Loss of respect equates to loss of honor.").

[468] LONG, *supra* note 462, at 64; *see also* MACKEY, *supra* note 466, at 116 ("To extend hospitality increases a man's standing among his peers and reflects favorably on his family, bolstering its standing in the community. The function of hospitality is to add to the reputation of the giver, not necessarily to benefit the recipient. To increase his status, a Saudi will bear crippling expense in the name of hospitality.").

[469] LONG, *supra* note 462, at 64.

[470] *Id.*

relationship are considered to be a *conditio sine qua non* for successful relationships and social transactions of any kind.[471]

As a form of honor, preserving "face" is one of the most compelling characteristics of Saudi society. The essentiality of preserving face can be seen in how it explains the ultimate goal of several behaviors. A number of these behaviors generally aim at protecting the image of Saudis.[472] Thus, Saudi employers, for instance, tend to prefer exaggerated flattery rather than honest criticism, which can be considered an insult.[473]

Shame (*ayb*) is a concept which is inversely related to honor. As with many Arab societies, Saudi society is driven by shame;[474] that is to say, individuals are concerned about shame and their behaviors are shaped accordingly.[475] Honor, as a matter of supreme importance, concerns the individual and group reputation, which must be maintained. Consequently, individuals, their families, and even the groups to which they belong are considered to be shamed

---

[471] *Id*. at 25; *see* GEERT H. HOFSTEDE ET AL., CULTURES AND ORGANIZATIONS: SOFTWARE OF THE MIND: INTERCULTURAL COOPERATION AND ITS IMPORTANCE FOR SURVIVAL 90 (2010) ("The Swedes and the Saudis … have different concepts of the role of personal relationships in business. … [F]or the Saudis [business] is done with a person [not a company] whom one has learned to know and trust.").

[472] MACKEY, *supra* note 466, at 117.

[473] *Id*. at 119 ("For there is a strong cultural inclination for a Saudi to place the blame for his mistakes and failures on others. Transferring responsibility to others makes it easier to justify a potentially embarrassing situation.").

[474] 1 SEBASTIAN MAISEL & JOHN A. SHOUP, EDS., SAUDI ARABIA AND THE GULF ARAB STATES TODAY: AN ENCYCLOPEDIA OF LIFE IN THE ARAB STATES 206, 412 (2009).

[475] MACKEY, *supra* note 466, at 117 ("A Saudi obeys social requirements not so much because he has a deep-seated belief in them but because to gain self-respect he must conform outwardly to the ethics of society. A Saudi's behavior is controlled not by the interior forces of right and wrong but by who is going to see it. This oppressive fear of shame accounts for the difference between the Saudis' puritan behavior within the kingdom and their often outrageous behavior abroad").

when their honor is tarnished.[476] The scope of behavior that is consider shameful in a given area can be broader or narrower than the number of permissible behaviors in Islam[477]

Saudi social behavior, thus, is constructed in stylized patterns whose existence has not been affected by modern Western social norms, but Saudi interpersonal behavior is contextual as well, which adds to the difficulties of understanding these patterns.[478] Saudis practice Western social patterns while at the same time they maintain their own behavioral patterns between themselves, i.e., the Saudi stylized patterns between fellow Saudis.[479]

To gain a more comprehensive view of Saudi culture, one needs to take a step back. In the heyday when the rapid development and expansion of the Saudi government was coupled with the oil boom, there were huge demands for Saudi human resources. Those individuals who seized the opportunity at that time have now become family elders. The family elders now hold the responsibility of maintaining the welfare of their family members by using their influence in either business or public affairs.[480] This chain of events has created an overlapping network between senior business figures and high officials, on the one hand, and the younger entrepreneurs and bureaucrats predominating in both the public and the private sector, on the other.[481] "The dominant feature of overlapping interpersonal networks was the centrality of extended family loyalties in symbiotic public-private sector alliances."[482]

---

[476] *See generally* Adel Almutairi & Alexandra L. McCarthy, *A Multicultural Nursing Workforce and Cultural Perspectives in Saudi Arabia: An Overview*, 1 THE HEALTH 71, 71-74 (2012). *See also* MACKEY, *supra* note 466, at 118 ("To complicate his burden, honor is not individual; it is the collective property of the family.").

[477] MAISEL & SHOUP, *supra* note 474, at 206.

[478] LONG, *supra* note 462, at 63.

[479] *Id.* HOUSE, *supra* note 467, at 32 ("This need for conformity forces Saudis to wear multiple faces and change them multiple times each day.").

[480] LONG, *supra* note 462, at 38.

[481] *Id.*

[482] *Id.*

At an early period in Saudi Arabia, mainly the pre-modern era, the extended family

system "served a positive purpose by distributing government contracts among the various family

business concerns."[483] With the economic and governmental expansion and development, the

situation has changed. The system has become inadequate because, while there has been some

development in the standards and procedures of accountability and transparency, the senior

executives and bureaucrats remain the elders of their extended families, which leads to standards

and procedures being maintained essentially the same as they were in the past.[484]

The extended family delineates a difference between Saudi society and Western societies.

While Western societies have become more youth-oriented and the importance of the extended

family has diminished, Saudi society still maintains the extended family: great respect is paid to

age and seniority, and the younger members remain in a place of lower status until they attain a

certain age.[485] These young people, who are the majority of the population as a result of the

population boom, can be categorized as something of an underclass.[486]

The dichotomy between the Saudi business culture and Western business culture can be

attributed to their sources. While the concept of law governs business relationships and

transactions in the West, the concept of honor plays the same role in the Saudi context.

Consequently, in Western culture, business decisions and transactions are made in the light of

legal principles, and viewed through this lens, the informal and personalized norms the Saudis

adopt in carrying out transactions are immoral and illegal. On the other hand, from the Saudi

point of view, the code of honor controls both interpersonal relationships and business

---

[483] *Id*. at 39.
[484] *Id*.
[485] *Id*. at 37-38.
[486] *Id*. at 43.

transactions. From that point of view, transactions are judged to be immoral, no matter whether they are legal or illegal, if they are considered to be dishonorable.[487]

3.   Social Stratification

Although Saudi Arabia is often considered ethnically and religiously homogeneous, each region has its own unique cultural and historical aspects that existed before the consolidation of Saudi Arabia.[488] Within Saudi Arabia, although it is administratively divided into thirteen regions, culturally there are at least six regions: Najd, Hejaz, Asir, the Eastern region, the Northern Area, and Najran.[489] Moreover, each tribe has developed its own customs and traditions.

a.   Regional Differences

What follows is an overview of the regional history of the Arabian Peninsula. As explained above, the Peninsula can be broadly divided into the different regions. Within one region, there is a further stratification based on where one's hometown is. As in many places around the world, regionalism in Saudi Arabia is shaped by how far a region and its population is from a center of power. In present-day Saudi Arabia, however, regionalism is considered to be somewhat taboo.[490]

Loyalty to one's own region and denigration of other regions operated reciprocally. At its zenith, the situation between Najd and Hejaz represented regionalism in a clear way. The Hejazis, or inhabitants of Hejaz, saw themselves as more civilized than the Najdis, the inhabitants of Najd.

---

[487] *Id.* at 32.
[488] *Id.* at 5.
[489] *Id.*
[490] Simon Henderson, *Saudi Arabia in Books*, 14 Middle E. Q. 57, 62 (2007).

Conversely, the Hejazis "viewed the [Najdis] as ignorant and uncultured."[491] The Najdis, on other hand, saw themselves as "ethnically purer" than the Hejazis.[492]

Even today, the people of different regions of Saudi Arabia remain relatively divided and distinctive. When people from different regions immigrate to the big cities, there is a subtle tendency among them to develop their relationships with people from their own region, rather than others, indicating the existence of regionalism in the country.[493] However, this cannot be considered a tendency promoted by the government, at least officially. A number of decisions taken by the government indicate a dissatisfaction with regionalism.[494]

The existence of regionalism has led to a dangerous form of discrimination. Regionalism has created a form of favoritism in many areas. The most obvious example can be seen in the process of hiring or promoting of individuals, and this can also be extended to the appointment of officials to high positions.[495] As an extension of creating unequal opportunity, regionalism affects the distribution of services based on regions, which means that some regions enjoy more services than do others.[496]

---

[491] WILSON, *supra* note 342, at 18.

[492] *Id*.

[493] HOUSE, *supra* note 467, at 187.

[494] Mark Thompson, *Assessing the Impact of Saudi Arabia's National Dialogue: The Controversial Case of the Cultural Discourse*, 1 J. ARABIAN STUD. 163, 163-81 (2011) (A national dialogue was held to discuss the issue of tribalism and regionalism and their Impact on national unity.). *Saudi Prince Banned from Media over Racist Slur: Ban Imposed by King Salman in Line with Pledge to Treat all Saudis Equally*, GULF NEWS, Apr. 27, 2015, http://gulfnews.com/news/gulf/saudi-arabia/saudi-prince-banned-from-media-over-racist-slur-1.1499509

[495] Talal Al-Gashgri, *Odious Regionalism*, AL-MADINA NEWSPAPER, Aug. 8, 2015, http://www.al-madina.com/node/623453

[496] *See Media Coverage of National Dialogue,* OKAZ NEWSPAPER, Dec. 29, 2010, http://www.okaz.com.sa/new/Issues/20101229/Con20101229391508.htm (Hashim Aljahdli, assistant editor at the Okaz Newspaper, stated that "we are witnessing an unfair distribution of development projects, even the residential loans vary from one region to another, the paving of roads also varies from region to region, universities and others.").

b.  Tribal Differences

Tribes (*qab'il*, sing. *qabila*) in Saudi Arabia play a major role in shaping the culture of the country.[497] The significance of the tribes manifests in the role of the tribes as the "source of the Saudi value system," which includes "[p]olitical decentralization, minimal administration, kin-related political behavior, social solidarity, and economic cooperation,"[498] and also as a fertile ground for bias and discrimination. The Saudi nation has been influenced and shaped by their traditions and heritage, both the bad and the good. Saudis have inherited, along with chivalry, courage, and generosity, tribalism (*asabiyya qabaliyya*), which could decimate all their other benign cultural inheritances.[499]

Arab genealogists rely on a structure of descent extending back to "Adam" in order to define the *qabila*, or tribe.[500] The structure is based on a segmentary lineage, or a unit model consisting of, from top down, the tribe (*qabila*), and then ever smaller units, such as the clan, the extended family, and so on down to an individual's father.[501] This model can be seen in Figure 2. To put it simply, the ego is a part of the family at the smallest and closest segment in which the siblings stand next to each other. At the next level, the previous segment becomes part of a larger

---

[497] Ondrej Beranek, *Divided We Survive: A Landscape of Fragmentation in Saudi Arabia*, BRANDEIS U. CROWN CENTER FOR MIDDLE EAST STUD., Jan. 2009, at 5 ("It is blood and tribal solidarity (*asabiyya qabaliyya*) that has been for centuries the key to control over the country.").

[498] Deborah Sue Akers, The Tribal Concept in Urban Saudi Arabia 173 (2001) (unpublished Ph.D. dissertation, Ohio State University) (on file with author) (*quoting* Joseph Kostiner, *Transformation Dualities: Tribe and State Formation in Saudi Arabia, in* TRIBES AND STATE FORMATION IN THE MIDDLE EAST 227 (Philip S. Khoury & Joseph Kostiner eds., 1990)).

[499] *Tribalism ... back to the worst forms of ignorance!!*, AL-JAZIRAH NEWSPAPER, March. 26, 2010, http://www.al-jazirah.com/2010/20100326/is7.htm

[500] Akers, *supra* note 498, at 155-57 (That is to say, for example, one counts the descent of an individual from his father, then *al-faisala al-ashera, al-fakhid, al-batan, al-amara*, and finally *al-qabila* (the tribe). "These segmentary units (*al-amara, al-batan, al-fakhid,* and *al-faisala*) are, however, divisions within an abstract model, useful for demonstrating the nature of genealogical divisions, but not necessarily corresponding to actually existing social groups.").

[501] *Id.* at 157.

segment consisting of the closest cousins and their families. The segments become larger and larger at every level.[502]



| Segment Number | Lineage Divisions | Descent Groups (Arabic Terms) |
|---|---|---|
| I | Arab People | *Sha'b al-'Arabiya* |
| II | Dominant Group | *Qabila* |
| III | Maximal Lineage | *'Amara* |
| IV | Major Lineage | *Batan* |
| V | Minor Lineage | *Fakhid* |
| IV | Minimal Lineage | *Fasa'il* |

Figure 2. Segmentary Lineage Folk Model[503]

It is not unusual to find a copy of the family tree either placed on display or kept for reference in Saudi houses.[504] Such a family tree visually displays to a boy "the precise way in

---

[502] *See generally* Frederik Barth, *Descent and marriage reconsidered*, *in* THE CHARACTER OF KINSHIP 3-19 (Jack Goody ed., 1973). ROBERTA E. LENKEIT, E-STUDY GUIDE FOR: INTRODUCING CULTURAL ANTHROPOLOGY (2012) (This can be explained by the traditional saying "Me and my brothers against my cousins, me and my cousins against the outsiders.").

[503] Akers, *supra* note 498, at 158.

which he is related to his patrilineal kin and he can see the ancestors after whom he has been named: his great grandfather, his grandfather, and his father."[505] In the modern urban context, people are often not completely conversant with their segmentary lineage, unlike their personal ancestries, but they know their *al-qabila*, as the highest segment; *al-fakhid*, the middle segment; and definitely their families, the bottom segment.[506]

The social divisions caused by tribalism exist in different forms, but the most significant forms are between tribesman and non-tribesman (*qabila* and non-*qabila*) or between tribesmen from different tribes. The former (*qabila* member and non-*qabila* member) division has replaced the traditional division of "Arab society into nomadic (bedouin) and sedentary (hadar) populations."[507] The basis of this division is, to put it simply, the pure lineage, which leads the *qabila* members to deem themselves of superior status.[508] In contrast, the division between tribesmen from different tribes results from loyalty to one's tribe as well as taking pride in one's tribe.[509]

c.   Religious Differences

Saudi Arabia is an Islamic country, as stated in First Article of the Basic Law of Governance.[510] The majority of the population are Sunnis, whereas the Shiite population makes

---

[504] Akers, *supra* note 498, at 224.

[505] *Id*. at 225.

[506] *Id*. at 159.

[507] *Id*. at 232.

[508] Sebastian Maisel, *The new rise of tribalism in Saudi Arabia*, 18 NOMADIC PEOPLES 100, 105 (2014).

[509] *Id*. at 106-12 (Provides the forms of expressing tribalism including, inter alia, televised tribalism, online tribalism, and the beauty of camels competition (*mazayin al-abl*).); *see also* Beranek, *supra* note 497.

[510] The Basic Law of Governance, *supra* note 290, art. 1 ("The Kingdom of Saudi Arabia is a fully sovereign Arab Islamic State. Its religion shall be Islam and its constitution shall be the Book of God and the Sunnah (Traditions) of His Messenger, may God's blessings and peace be upon him (PBUH). Its language shall be Arabic and its capital shall be the city of Riyadh.").

up 5 to 10 percent of the whole population.[511] Sufism is a minority that also exists in the Hejaz region.[512] Within the Sunnis a division exists between the four schools of Islamic jurisprudence (*madhāhib*): the Maliki, the Hanafi, the Shafiʿi, and the Hanbali.[513] It is worth noting that there is no article of the Basic Law of Governance that defines the school of jurisprudence (*madhʾhab*) or the religious sect of the country.[514]

Regional differences add more complexity to this aspect of the culture. The overlap between the religious differences and regional differences can be seen more clearly in the fact that the religious differences exist in certain regions.[515] Sufism, for instance, exists mainly in the Hejaz, and the Shiite population live in the eastern region and tend to inhabit certain cities.[516] On the other hand, *madhāhib* differences seem to be regional, but are not as distinctive and obvious as the sectarian differences.[517]

With the rapidly increasing mobilization of the population, it has become more ambiguous whether these religious distinctions have begun to lose their importance or not;[518] that is to say,

---

[511] PASCAL MÉNORET, THE SAUDI ENIGMA: A HISTORY 36 (Patrick Camiller trans., 2005) (2003).

[512] *Id*; *see generally* MAI YAMANI, CRADLE OF ISLAM: THE HIJAZ AND THE QUEST FOR AN ARABIAN IDENTITY (2004).

[513] MÉNORET, *supra* note 511, at 36.

[514] *Id*. *But see, e.g.*, The Family Law No. 22 of 2006, art. 3 (Qatar) (Article 3 indicates that "Unless provided by this Law, or otherwise decided by the Court, the prevailing view in the Hanbali School shall be followed.").

[515] TOBY MATTHIESEN, THE OTHER SAUDIS: SHIISM, DISSENT, AND SECTARIANISM 4 (2015) (Note that "there is also a small Twelver Shia community in Medina called *nakhawila*. Unlike the Shia in the Eastern Province, the *nakhawila* are partly tribally organised and are members of key Hijazi tribes.").

[516] *Id*. at 2 (The same applies to the Ismaili community. "The southern region of Najran near the border with Yemen is home to a substantial *Ismaili* community. The Ismailis are mainly from the powerful *Yam* tribe and many of them carry the last name [*A*]*l-Yami*." It must be noted that "[s]ignicant numbers of *Ismailis* moved to the Eastern Province in the twentieth century.").

[517] *Id*. at 1 ("Saudi Arabia is often portrayed as a largely Hanbali- and Wahhabi-dominated country, but a variety of Islamic traditions and all four schools of Sunni religious law can be found across the country.").

[518] MÉNORET, *supra* note 511, at 37.

the regional or tribal differences may overcome or undermine the religious differences.

Furthermore, the *madhãhib* differences have also begun to lose their significance, which can be

seen in the appointment to the Council of Senior Scholars (*Majlis Hay'at Kibar Al-Ūlama*) of

members who adopt schools of jurisprudence other than the Hanbli.[519]

d.   Nationality Differences

Saudi Arabia is a country that has one of the largest numbers of foreign workers, with

more than six million foreign workers living in it.[520] Like its neighboring countries, Saudi Arabia

has employed a huge number of foreign laborers due to a lack of local laborers.[521] Thus, the

foreign workforce plays a crucial role in the Saudi economy. Nevertheless, Saudi Arabia has

managed to keep the number of foreigners in the workforce lower than in many of the other Gulf

Cooperation Council (GCC) Countries.[522]

---

[519] *Id*. at 37 ("Finally, and most important, the opening of Najd Islam itself to Egyptian influences … has helped quite considerably to narrow the gap between Shafeite and Hanbalite."). *See, e.g.*, Huda Alsaleh, *The Diversity of Islamic Schools in the Council of Senior Scholars is an Advantage*, ASHARQ AL-AWSAT NEWSPAPER, March. 17, 2009, http://archive.aawsat.com/details.asp?section=17&article=511267&issueno=11067#.VklFO4RU Cf7 (For example, Yaʿakob Albahssien is a Hanafi Scholar and Qiys Almubark is a Maliki scholar.).

[520] *The World Fact Book: Saudi Arabia*, U.S. CENT. INTELLIGENCE AGENCY, https://www.cia.gov/library/publications/the-world-factbook/geos/sa.html (Immigrants make up more than 30 percent of the total population.).

[521] Andrzej Kapiszewski, *Arab Versus Asian Migrant Workers in the GCC Countries*, *in* SOUTH ASIAN MIGRATION TO GULF COUNTRIES: HISTORY, POLICIES, DEVELOPMENT 46, 47-48 (Prakash C. Jain & Ginu Z. Oommen eds., 2016); *see* Alexander W. Wiseman et al., *Challenges to Creating an Arabian Gulf knowledge economy*, *in* EDUCATION FOR A KNOWLEDGE SOCIETY IN ARABIAN GULF COUNTRIES 1, 14 (Alexander W. Wiseman et al. eds., 2014) (This is in additional to the cultural aspect; as a former British ambassador noted, "In the Kingdom, there is a disdain for any work which is not noble. Most people shy away from work which they consider ignoble; Englishmen, for example, are reluctant to be waiters or dustmen. But the Saudi classification of jobs is extraordinarily strict. Not only do they reject all manual and menial work; they are also reluctant to undertake anything which is tedious or humdrum. Plumbing is manual and road sweeping is menial; for these tasks they employ foreigners.").

[522] Kapiszewski, *supra* note 521, at 47-48.

The great number of foreigners and the need for their labor do not seem to have eased Saudi xenophobia. As in many other cultures, the relationship between Saudis and their foreign workers cannot be characterized as warm, and this can be attributed to religious, cultural, and language differences,[523] but above all to Saudi Arabia's long period of isolation, as noted above.[524] This isolation has created a highly secretive society in which individuals trust their families and tribes rather than outsiders.[525]

Moreover, economic aspects also play a significant role in shaping the strained relationship between Saudis and foreign workers. The imposition of the expatriate income tax in 1988, for example, led to the resignation of a number of foreigners.[526] This was perceived by Saudis as foreign workers' refusal to contribute to or sacrifice for the common good of the country. From their perspective, the Saudis argue that foreigners have access to a number of free and subsidized services, which has created an unjust situation.[527] In general, the dislike can be described as mutual, and even worse, the foreigners themselves dislike each other.[528] "The Saudis and their Western [and other foreigners] work force coexisted in a state of tension that was not the

---

[523] WILSON, *supra* note 342, at 31.

[524] *See generally* MACKEY, *supra* note 466, at 30 ("This self-perception has little to do with the Saudis' immense wealth but rather extends back through the centuries when the vast majority of Saudis lived within the confines of family and tribe, experienced nothing of the outside world.").

[525] *Id*. at 4.

[526] WILSON, *supra* note 342, at 31. *See Taxing expats under spotlight*, ARAB NEWS March. 31, 2012, http://www.arabnews.com/node/409782 . *Imposing taxes on expats is hot topic again – Saudi Arabia*, SAUDI LIFE STYLE NEWS, Apr. 5, 2012, http://saudilifestyle.com/2012/04/imposing-taxes-on-expats-is-hot-topic-again-saudi-arabia/ (Note that the imposition of expatriate income tax was suspended four days after the imposition of the law. In recent years, the law has once again been under deliberation by the Shura Council.).

[527] *See, e.g.*, *Here's Why Germany Is Welcoming Migrants with Open Arms*, FORTUNE NEWS, Sept. 8, 2015, http://fortune.com/2015/09/08/germany-migrant-crisis/ (arguing that the foreigners are considered as a drain on state resources; the same argument has been going in a number of European countries).

[528] WILSON, *supra* note 342, at 32.

result of ill will on the part of either, but rather resulted from a combination of Saudi insecurities and Western insensitivities."[529]

### C. The Application of Social Psychology to Saudi Arabian Society

1.  Ibn Khaldun's Analysis

In the *Muqaddimah* (the "Introduction"), Abdul Rahman Ibn Khaldun (1332–1406), an Islamic historian who lived in North Africa, provided a theoretical framework that sought to illustrate relevant group dynamics. The importance of this work is that it explains the character of tribal psychology within a general analysis that begins with the establishment of a state, continues through its growth and prosperity, and ends finally with its breakdown.

Ibn Khaldun initially argued that Bedouins and sedentary people are both natural groups. Yet the lifestyles these different groups adopt result in differences of conditions among them.[530] As a result, people form social organizations in order to cooperate in making their living, starting with the essential necessities of life.[531] In time, people eventually improve their conditions, increase their wealth, and reach a state of more comfort than before, and even one that is more comfortable than what they essentially need, which results in a shift in the cooperation toward secondary needs rather than primary needs.[532] This leads Ibn Khaldun to conclude that sedentary peoples emerged after the Bedouins, which means that the desert was the basis and the source of civilization.[533]

---

[529] MACKEY, *supra* note 466, at 24.

[530] 1 ABDUL RAHMAN IBN KHALDUN, AL-MUQADDIMAH: AN INTRODUCTION TO HISTORY 91 (Franz Rosenthal & Nessim J. Dawood trans., 1969).

[531] *Id.*

[532] *Id.* ("They use more food and clothes, and take pride in them. They build large houses, and lay out towns and cities for protection. This is followed by an increase in comfort and ease…").

[533] *Id.* at 93.

Ibn Khaldun then asserts that the existence of an effective and distinguished leader is a precondition for the success of any group.[534] Such a leader can either rule through commands or with the support of a group feeling that induces others to obey him.[535] The second method, the support of the group, leads to *asabiyya*—a term for which it is hard to find a translation that

> reflect[s] the real significance and dynamism of *asabiyya* as meant by Ibn Khaldun. This has led some writers to use the Arabic term as it is, while others tended to use synonyms such as the "sense of solidarity", "group feeling", "group loyalty", and "esprit de corps". This may reflect in different circumstances various connotations like faithfulness to the group, will for defense, internal unity, common will for power, or the group itself.[536]

For Ibn Khaldun, *asabiyya* is a cornerstone of the dynamic human quality which "produces the ability to defend oneself, to offer opposition, to protect oneself, and to press one's claims," as without *asabiyya*, no one could do any of these things.[537] Aware of Islam's condemnation of and firm opposition to *asabiyya*,[538] Ibn Khaldun, in order to preserve his theoretical approach, sought to find a meeting place between Islamic principles and *asabiyya*.[539]

Ibn Khaldun emphasized that there is a strong causal relationship between *Badawa* (primitive culture) and *asabiyya* because people in a primitive culture rely on *asabiyya* to survive the rough life of the desert.[540] In his view, the strength of the tribal unity depends on purity of

---

[534] *Id.* at 47.

[535] *Id.*

[536] *See* MUḤAMMAD M. RABIʿ, THE POLITICAL THEORY OF IBN KHALDŪN 49 (1967) (Due to these difficulties in translation, this dissertation retains the Arabic term *asabiyya*.).

[537] IBN KHALDUN, *supra* note 530, at 111.

[538] RABIʿ, *supra* note 536, at 49 (noting that "as a pre-Islamic word, [*asabiyya*] was used to indicate a kind of making common cause with one's agnates, which might lead to blind support of one's group without regard for the justice of its cause," which is inconsistent with the egalitarian character of Islam).

[539] *Id.*

[540] IBN KHALDUN, *supra* note 530, at 97.

lineage and common descent.[541] Thus, pure Bedouins maintained an untainted and pure lineage when they isolated themselves by living in the desert.[542] Furthermore, *asabiyya* can be of different types, such as *wala* (clientship) or *hilf* (alliance),[543] yet *silat al-rahim* (blood ties) are supreme above the other kinds since they are something natural among almost all human beings. Such ties motivate affection for one's blood relatives and a desire that no harm come to them.[544]

2.   Power and Corruption

Human beings are considered to be hierarchical animals, a facet of human behavior which can be observed and noticed clearly across cultures, even though cultures vary greatly in their level of hierarchy.[545] Within the hierarchical relationship, the restrictions of autonomy and obedience are imposed on both powerful and less powerful individuals.[546] Though less powerful individuals are subject to more restrictions and must demonstrate more obedience, powerful individuals must follow the strictures of their role in the society and fulfill its demands and obligations also if they wish to remain in power.[547]

Thus, power plays a significant role in many aspects of human life. More particularly, a discussion of corruption and dishonesty highlights the role of power captured by Lord Acton's well-known saying that "power tends to corrupt, and absolute power corrupts absolutely." This

---

[541] *Id.* at 99.
[542] *Id.*
[543] *Id.* at 100-01.
[544] *Id.* at 98.
[545] Dacher Keltner & Jonathan Haidt, *Approaching Awe, a Moral, Spiritual, and Aesthetic Emotion*, 17 COGNITION & EMOTION 297, 307 (2003).
[546] Jennifer R. Overbeck & Bernadette Park, *When Power Does Not Corrupt: Superior Individuation Processes Among Powerful Perceivers*, 81 J. PERS. & SOC. PSYCHOL 549, 550 (2001).
[547] *Id.* at 550.

quote not only summarizes the conclusion of scholarly studies and research, but also highlights the layperson's understanding of power and hierarchy.[548]

Generally, the findings of a number of studies on power have shown that power is associated with unethical behavior and decision making.[549] Specifically, empirical studies indicate "that powerful individuals and members of powerful groups differ from powerless individuals and members of powerless groups with regard to (a) how they perceive and judge others, (b) how they are evaluated as targets, and (c) how they behave."[550]

In term of judgement, powerful individuals and groups are more likely than powerless individuals and groups to negatively evaluate the out-group, and consequently they show more in-group bias, leading the dominant group members to exercise more discrimination against subordinate out-group members than vice versa.[551]  A number of studies provide support for this view. Guimond et al., in examining the relationship between social positions, social dominance orientation (SDO),[552] and prejudice, found that when an individual is assigned a powerful position, this increases her social dominance orientation, causing her ultimately to show more prejudice against lower status groups.[553] Social power has also been positively associated with

---

[548] Steven L. Blader & Andy J. Yap, *Power, Dishonesty, and Justice*, *in* CHEATING, CORRUPTION, AND CONCEALMENT: THE ROOTS OF DISHONESTY 208, 208 (Jan-Willem van Prooijen & Paul A. M. van Lange eds., 2016).

[549] *Id*. at 33-41.

[550] Markus Brauer & Richard Y. Bourhis, *Social Power*, 36 EUR. J. SOC. PSYCHOL. 601, 601 (2006).

[551] *Id*. at 607.

[552] JIM SIDANIUS & FELICIA PRATTO, SOCIAL DOMINANCE: AN INTERGROUP THEORY OF SOCIAL HIERARCHY AND OPPRESSION 61 (1999) ("SDO is defined as a very general individual differences orientation expressing the value that people place on non-egalitarian and hierarchically structured relationships among social groups. It expresses general support for the domination of certain socially constructed groups over other socially constructed groups, regardless of the manner in which these groups are defined.").

[553] Serge Guimond et al., *Does social dominance generate prejudice? Integrating individual and*

reliance on stereotype,[554] leading to a favoring of powerful in-group members when distributing rewards.[555] This can be attributed to the likelihood that "high power individuals indeed apply the out-group homogeneity bias to a greater extent than individuals belonging to a group with little power."[556] Those in power, thus, "may be motivated to neglect or oppress their subordinates in order to maintain the status quo … [and] to legitimate their privileged position."[557]

Power also affects the way that powerful individuals and groups are perceived and evaluated. While powerful individuals and groups tend to evaluate other individuals and groups negatively, as noted, they are evaluated positively, as people attribute more positive characteristics and less negative characteristics to powerful individuals and groups than they do to powerless individuals and groups.[558] Though the reason behind this is unclear, system justification theorists suggest that individuals tend to attribute positive characteristics to powerful groups in order to defend and rationalize the social system.[559] As a target, powerful individuals and groups, then, are subject to less stereotyping.

---

[554] *Contextual Determinants of Intergroup Cognitions*, 84 J. PERS. & SOC. PSYCHOL. 697, 697–721 (2003); *see also* Brauer & Bourhis, *supra* note 550, at 607.

[554] *See* Susan T. Fiske, *Controlling Other People: The Impact of Power on Stereotyping*, 48 AM. PSYCHOL. 621, 621-628 (1993).

[555] Overbeck & Park, *supra* note 546, at 576 (*citing* Serena Chen et al., *Relationship Orientation as a Moderator of the Effects of Social Power*, 80 J. PERS. & SOC. PSYCHOL, 173-187 (2001). And Itesh Sachdev & Richard Y. Bourhis, *Power and Status Differentials in Minority and Majority Group Relations*, 21 EUR. J. SOC. PSYCHOL. 1-24 (1991)).

[556] Brauer & Bourhis, *supra* note 550, at 608.

[557] Susan T. Fiske & Jennifer Berdahl, *Social Power*, *in* SOCIAL PSYCHOLOGY: HANDBOOK OF BASIC PRINCIPLES 678, 685 (Arie W. Kruglanski & E. Tory Higgins eds., 2007).

[558] Brauer & Bourhis, *supra* note 636, at 609.

[559] John T. Jost et al., *A Decade of System Justification Theory: Accumulated Evidence of Conscious and Unconscious Bolstering of the Status Quo*, 25 POL. PSYCHOL. 881, 881–919 (2004). Brauer & Bourhis, *supra* note 550, at 609. *See also* Fiske & Berdahl, *supra* note 557, at 586 ("Low-status groups favor high-status groups and attribute intelligence and responsibility to them, and they do this especially when explanations (even meaningless) are provided for the power difference.").

Lastly, power affects the way individuals act. The approach inhibition theory of power, which deals with power's influence on behavior, distinguishes between the behavior of high power and low power individuals.[560] According to this theory, power triggers "approach-related processes" for two main reasons.[561] Firstly, power is associated with resources—material, financial, and social resources—by which powerful individuals are surrounded.[562] Secondly, power is associated with the awareness that an individual can act on her dispositions with less social restrictions.[563] "Acting within reward-rich environments and being unconstrained by others' evaluations or the consequences of one's actions, people with elevated power should be disposed to elevated levels of approach-related affect, cognition, and behavior." Conversely, lack of power is correlated with inhibition, which means that low power individuals have a limited access to resources and are more attentive to the evaluation and restrictions of others and society, making them more vulnerable to threats and punishments.[564]

According to the approach inhibition theory, powerful individuals are more sensitive to material and social rewards, consider others as means to satisfy their goals and targets, adopt a systematic way of processing information, act on their dispositions with less consideration of social restrictions, and transgress those restrictions.[565] Conversely, less powerful individuals are more attentive to punishments and threats, perceive themselves as a means to others' goals and ends, adopt a controlled and complex way of processing information, act and behave in accordance with social norms, and adopt an inhibited manner.[566]

---

[560] Dacher Keltner et al., *Power, Approach, and Inhibition*, 110 PSYCHOL. REV. 265, 265 (2003).
[561] *Id*. at 268.
[562] *Id*. at 268-69.
[563] *Id*. at 269.
[564] *Id*.
[565] *See generally id*. at 265-84.
[566] *See generally id*.

In light of this, the activation of the behavioral approach system can offer a link between power and corruption. Powerful individuals' sensitivity to and focus on rewards rather than punishments, coupled with the elimination of restrictions that can be imposed on their behavior, lead them to seek after their self-interested ends, disregarding limitations that would inhibit the pursuit of self-interest.[567] The result of this is "increased risk-seeking and unethical behavior among the powerful, … both of which indicate an enhanced propensity for dishonesty and corruption."[568]

Further, the focus on self-interest and ends may affect the perception of justice and consequently "how justice criteria are prioritized."[569] Knowing that powerful individuals tend to emphasize ends rather than means may lead to a greater focus on distributive justice and the elimination of the significance of procedural justice. Within the different criteria of distributive justice, equity is mostly adopted in pursuing productivity goals.[570] Consequently, the powerful may tend to adopt the equity form of distributive justice rather than equality or need, even when others believe the latter forms are appropriate.[571] Consider the situation where the powerful adopt equity criteria, believing those criteria to be just, to assign employee benefits or other resources. In such a case, less powerful individuals are likely to suspect that allocating these resources via equity occurs due to corrupt acts that seek to benefit those favored by the powerful.[572]

On the other hand, power may decrease the resistance of less powerful individuals to corrupt practices. Due to the behavioral inhibition system, less powerful individuals are more likely to be attentive to punishments and threats and to perceive themselves as a means to others'

---

[567] Blader & Yap, *supra* note 548, at 213.
[568] *Id.*
[569] *Id.* at 219.
[570] *Id.*
[571] *Id.*
[572] *Id.*

goals and ends, leading them to adopt a conforming approach.[573] This also may explain the frequent and undeterred attempts of powerful individuals to influence less powerful individuals' behaviors and acts.[574] The reduced resistance may also be attributed to less powerful individuals' positive perception of the powerful enhanced by the system justification mechanism which the former may adopt.

We have focused on the individual level, but what is the relationship between power and corrupt behaviors at the organizational level and the ideological level generally? Among the power theories, it seems that the Social Dominance Theory (SDT) can offer an explanation for that.[575] It also provides an explanation for favoritism behaviors between groups and individuals. The theory aims at identifying the processes of social psychology that establish and maintain group-based social hierarchy.[576] It distinguishes between the dominant groups, controlling a disproportionately large amount of valued resources, and subordinated groups, possessing a "disproportionately large share of negative social values."[577]

---

[573] Cameron Anderson & Jennifer L. Berdahl, *The Experience of Power: Examining the Effects of Power on Approach and Inhibition Tendencies*, 83 J. PERS. & SOC. PSYCHOL. 1362, 1364 (2002) ("Classic research on obedience to authority (Milgram, 1963) and social conformity (Asch, 1955) also showed that people in a presumably low power position keep their opinions to themselves.").

[574] David Kipnis, *Does Power Corrupt?*, 24 J. PERS. & SOC. PSYCHOL. 33, 33-41 (1972). Fiske & Berdahl, *supra* note 557, at 686 ("powerholders are more able to influence subordinates to confirm their expectancies about them because subordinates are motivated to have an agreeable interaction.").

[575] Brauer & Bourhis, *supra* note 550, at 605-06 ("an increasing number of researchers think that social dominance orientation may be more adequately understood in terms of ideological beliefs than in terms of a stable personality trait.").

[576] *Id*. at 605 ("Social Dominance Theory was developed by Sidanius and Pratto over the last decade … [suggesting] that group-based hierarchy fostering inequality is a universal and recurrent characteristic of human social organizations."). SIDANIUS & PRATTO, *supra* note 552, at 32.

[577] *Id* (Negative social values include "such things as low power and social status, high-risk and low-status occupations, relatively poor health care, poor food, modest or miserable homes, and severe negative sanctions (e.g., prison and death sentences).").

In essence, SDT proposes that the human tendency toward group-based hierarchy contributes to group conflicts and oppression.[578] Legitimizing myths[579] influence such tendencies toward group-based hierarchy and may take the form of hierarchy-enhancing myths, i.e., promoting group-based inequality, or hierarchy-attenuating myths, i.e., promoting group-based equality. To an extent, what influences an individual's endorsement of either form of legitimizing myths is her psychological orientation toward group-based social hierarchy (i.e., her Social Dominance Orientation (SDO)).[580] Accordingly, individuals higher in SDO are likely to adopt the belief that societies are fundamentally stratified and that those at the top of the stratification deserve to be in the dominant position, whereas those at the bottom of the hierarchy deserve to be in the subordinate position.[581] Conversely, individuals lower in SDO are likely to adopt egalitarian ideologies and endorse group-based equality.[582]

Thus, SDT suggests that a greater endorsement of SDO is derived from high status and dominant members attached to their own group, rather than low status and subordinate groups.[583] This seems to be in line with other studies suggesting that powerful individuals and groups desire

---

[578] *Id*. at 38.

[579] *Id*. at 45 ("legitimizing myths consist of attitudes, values, beliefs, stereotypes, and ideologies that provide moral and intellectual justification for the social practices that distribute social value within the social system").

[580] *Id*. at 39 ("We call the generalized orientation toward group-based social hierarchy *social dominance orientation*.").

[581] Ana Guinote & Alice Cai, *Power and the Social Self*, *in* THE SOCIAL DEVELOPMENTAL CONSTRUCTION OF VIOLENCE AND INTERGROUP CONFLICT 3, 13 (Jorge Vala et al. eds., 2016) (*citing* Ryan M., Quist & Miriam G. Resendez, *Social Dominance Threat: Examining Social Dominance Theory's Explanation of Prejudice as Legitimizing Myths*, 24 BASIC & APPLIED SOC. PSYCHOL. 287, 287-293 (2002) ("One consequence of these hierarchy-enhancing attitudes is the belief that low-power individuals deserve their disadvantaged positions because they lack effort or ability.").

[582] Brauer & Bourhis, *supra* note 550, at 605.

[583] *Id*.

to defend and maintain their power and the status quo.[584] To justify and maintain power and the status quo, powerful individuals and groups may rely on information confirming stereotype-based expectations, such as the incompetence or laziness of outgroups and individuals.[585]

As noted above, a number of studies have linked SDO to prejudice and discriminatory behaviors. For instance, SDO has been identified as a factor that increases prejudice against disadvantaged and minority groups, in addition to increasing "the tendency to allocate fewer economic resources to ethnic outgroups compared to ethnic ingroups, even if doing so can lower the absolute profit of the ingroup."[586] To explain more clearly, dominant groups may exercise favoritism toward their in-groups, yet subordinate groups may exercise out-group favoritism toward the dominant groups rather than toward their own in-groups.[587] In this situation, thus, subordinate groups' members shift from being an object of discrimination to being active participants in the process.[588]

Since individuals with high SDO are less aware of losses and harms associated with their behaviors and feel entitled to exercise power to obtain resources and positive social value for their groups or themselves, they are less likely to recognize that their behaviors or acts involve a misuse of power in order to gain personal or organizational benefits.[589] They are more prone to

---

[584] Fiske, *supra* note 554, at 621–28.
[585] Susan T., Fiske & Eric Dépret, *Control, Interdependence and Power: Understanding Social Cognition in its Social Context*, 7 EUR. REV. SOC. PSYCHOL. 31, 31-61 (1996). Guinote & Cai, *supra* note 581 at 14.
[586] Guinote & Cai, *supra* note 581, at 14.
[587] Valerie Rosenblatt, *Hierarchies, Power Inequalities, and Organizational Corruption*, 111 J BUS ETHICS, 237, 240 (2012). John C. Turner & Henri Tajfel, *The Social Identity Theory of Intergroup Behavior*, *in* PSYCHOLOGY OF INTERGROUP RELATIONS 7, 7-24 (William G. Austin & Stephen Worchel eds., 1986).
[588] Rosenblatt, *supra* note 587, at 240.
[589] Valerie A. Rosenblatt, How Does Power Corrupt? The Way Individual and Institutional Support of Social Hierarchies Influences Unethical Behavior, 19 (Aug. 2012) (unpublished Ph.D dissertation University of Hawai'i) (on file with author).

use moral disengagement to frame their actions and attitudes as less harmful and to diminish their own sense of guilt or responsibility.[590] On the other hand, motivated to show loyalty to be in a dominant position benefiting from positive social values associated with the position, the members of subordinate groups are more likely to engage in corrupt practices rather than challenging them.[591]

At the organizational and ideological level, studies have found a positive association between the level of corruption and the endorsement of hierarchy and power inequality.[592] That is, a high level of corruption is found in cultures that tend to endorse hierarchy and power inequality (SDO). Moreover, the more vertical that hierarchical social structures are, the more prone they are to corruption.[593] In order to provide an explanation for the previous relationship, the gap between the factor (hierarchy) and the result (corruption) has to be filled.

Building on the previous discussion, it has been shown that 1) high SDO individuals endorse group-based hierarchy 2) through legitimizing myths. The role of the latter is critical and central in the process by mediating the relationship between the tendency of individuals to endorse group-based hierarchy and their awareness of corrupt behaviors at the organizational level.[594]

At the organizational level, the establishment and enforcement of norms, structures, and bureaucracy that "promote informational ambiguity and maximize organizational focus on

---

[590] *Id*. at 37.
[591] *Id*. at 21.
[592] *See, e.g.*, Husted, *supra* note 68, at 339–59.
[593] *See, e.g.*, Triandis et al., *supra* note 69, at 73-90; *see also* Ararat L. Osipian, *Corrupt Organizational Hierarchies in the Former Soviet Bloc*, 17 TRANSITION STUD. REV. 822, 822-36 (2010).
[594] *See generally* Rosenblatt, *supra* note 587.

dominance and advancement" reduces individuals' awareness of corrupt practices around them.[595] The support of schemas and scripts encourage a focus on efficiently accomplishing tasks rather than thinking about what end result is achieved through such efficient activities.[596] Moreover, hierarchical structure can reduce awareness of organizational corruption by facilitating the diffusion and normalization of practices and values that promote "inequality, dominance, favoritism, and the misuse of power or positions."[597]

To illustrate the role of legitimatizing myths, we may consider the practice of *guanxi* discussed above. One of the norms promoted by *guanxi* is gift-giving, a practice that aims at exhibiting honor, respect, and gratitude.[598] Such a practice creates and establishes a cultural norm and script that may lead eventually to organizational corruption or nepotism.[599] In a similar vein, *wasta* involves cultural scripts and norms on which individuals rely to overcome bureaucracy and routines. However, following these scripts and norms, individuals may easily and without full awareness come close to committing bribery, abuse of power, or even influence peddling. On the other hand, informational ambiguity facilitates the practice of *wasta* or other corrupt practices by creating an ambiguous situation in which a person may argue easily that no harm or violation of rules has taken place. Even if that happens, i.e., even when there is knowledge of a violation of

---

[595] *Id.* at 243.

[596] *Id* (*quoting* Donald Palmer, *Extending the Process Model of Collective Corruption*, 28 RES. IN ORG. BEHAV. 107, 115 (2008)).

[597] *Id.* at 243-44 ("Following the footsteps of high status, successful firms such as Citibank and Sally Mae, many financial companies were providing kickbacks, participating in revenue-sharing contracts, and presenting lavish gifts to university officials in at least 60 universities in exchange for being placed on the preferred loan provider lists that would guarantee dominant positioning and greater financial returns compared to the financial firms not on the preferred lists").

[598] *Id.* at 245.

[599] Yadong Luo, *Guanxi: Principles, Philosophies, and Implications*, 16 HUMAN SYSTEMS MGMT. 43, 47 (1997) (Foreign investors and companies "are often in danger of overemphasizing the gift-giving and wining-and-dining components of a guanxi relationship, thereby coming dangerously close to crass bribery").

rules or harm, an individual may resort to moral disengagement[600] as a type of legitimizing myth

or rationalization allowing her to restructure such an act so that it appears harmless or to place the

responsibility on others and consequently eliminate the sense of guilt.[601]

3.   Corruption and the Role of Intergroup Bias and the Culture of Collectivism

Bias, as a term, covers a scope of intergroup orientations encompassing "beliefs about the

traits and characteristics of groups, or individuals by virtue of their group membership, as well as

unfair evaluative, affective, or behavioral responses to groups and their members."[602] Generally,

these types of bias can be linked to stereotypes (overgeneralized beliefs), discrimination (biased

behaviors), and prejudice (biased attitudes).[603] Broadly, bias can be defined as "an unfair

evaluative, emotional, cognitive, or behavioral response toward another group in ways that

---

[600] Albert Bandura, *Selective Moral Disengagement in the Exercise of Moral Agency*, 31 J. MORAL EDUC. 101, 101 (2002) ("The moral disengagement may center on the cognitive restructuring of inhumane conduct into a benign or worthy one by moral justification, sanitising language and exonerative social comparison; disavowal of personal agency in the harm one causes by diffusion or displacement of responsibility; disregarding or minimising the injurious effects of one's actions; and attribution of blame to, and dehumanisation of, those who are victimised.").

[601] *See* Rosenblatt, *supra* note 587, at 245 ("SDO showed the strongest link with 'dehumanizing' and 'blaming the victim' rationalizations. According to Bandura (1986), dehumanization, which involves turning people into objects (e.g., instead of attracting voters, some politicians collect votes), and blaming the victim, which is used to attribute blame to those who are being mistreated, tend to surface in organizational and cultural contexts characterized by greater endorsement of hierarchies, dominance, and bureaucratization because these contexts support inequalities, estrangement, and division of people into ingroups and outgroups."). Rosenblatt, *supra* note 589, at 40. ("Building on social dominance theory, socially dominant individuals are argued to be more prone to moral disengagement which allows them to minimize accountability for immoral actions, avoid self-sanctions, and make one's actions appear acceptable, justifiable, and not damaging.").

[602] 2 John F. Dovidio & Samuel L. Gaertner, *Intergroup Bias*, *in* HANDBOOK OF SOCIAL PSYCHOLOGY 1084, 1084 (Susan T. Fiske et al. eds., 5th ed. 2010).

[603] *Id* ("Stereotypes are generally considered to represent a set of shared beliefs about a group, prejudice is typically conceived as an attitude, and discrimination is a type of behavior.").

devalue or disadvantage the other group and its members either directly or indirectly by valuing or privileging members of one's own group."[604]

A large number of studies show that the perception of in-groups differs from the perception of out-groups in several aspects. The most highlighted difference appears in the "tendency to evaluate the in-groups more favorably than out-groups."[605] This phenomenon, which may take different forms, is what is referred to as in-group bias. One of the forms that in-group bias may take is the evaluation of the efforts of in-groups "as superior to the efforts of out-groups.[606] Another form is the tendency to treat the members of in-groups more favorably than the members of out-groups.[607]

Essentially, human beings are social animals, which implies that group living is a significant aspect of their lives. Since the activities of human beings are by and large rooted in interdependence, group living constitutes a survival strategy. Through the cooperation between the members of groups, group systems provide significant survival benefits over other systems that lack "reciprocally positive social relations."[608] However, trust is a fundamental element in deciding whether to share resources with nonrelatives to benefit from them, since "the ultimate benefit for the provider depends on others' willingness to reciprocate."[609]

To accomplish this, group boundaries and social categories establish the foundation for achieving the advantages of cooperative interdependence. Thus, in-group membership can be considered as a form of conditional cooperation that eliminates the risk of non-reciprocation by

---

[604] *Id.*
[605] Brian Lickel et al., *Varieties of Groups and the Perception of Group Entitativity*, 78 J. PERS. SOC. PSYCHOL. 223, 226 (2000).
[606] *Id.*
[607] *Id.*
[608] Dovidio & Gaertner, *supra* note 602, at 1088.
[609] *Id.*

restricting the cooperation to in-group members.[610] In light of this, in-groups "can be defined as bounded communities of mutual trust and obligation that delimit mutual interdependence and cooperation."[611] Group boundaries, whether they are based on culture, race, or other bases, ultimately serve the purpose of distinguishing who is "in" and who is "out."[612]

Categorization has profound consequences that manifest in behavioral orientations toward other individuals and groups. As to behavioral outcomes and social relations, cooperation and trust is extended to in-group members rather than out-group members.[613] Further, positive forms of social behavior are more likely to be displayed between in-group members.[614] When deciding whether to share scarce resources with in-group members, individuals are more likely to exercise personal restraint over scarce resources which they share with in-group members and tend to be more generous in their reward distribution to in-group members rather than to out-group members.[615] Additionally, "empathy for a person in need of assistance is more strongly predictive of helping behavior when that target is an in-group member than an out-group member."[616] Thus, individuals tend to provide more help to in-group members rather than to out-group members.[617]

Though it plays a fundamental role in intergroup bias, social categorization is not the sole cause of it. Different researchers on intergroup bias have provided different explanations. Competition has been highlighted as a main cause of intergroup conflict and has been adopted by

---

[610] *Id.*

[611] *Id.*

[612] *Id.*

[613] *Id.* at 1091 (*citing* Samuel L. Gaertner & John F. Dovidio, Reducing intergroup bias: The Common Ingroup Identity Model (2000)).

[614] *Id.*

[615] *Id. See also* Roderick M. Kramer & Marilynn B. Brewer, *Effects of Group Identity on Resource Use in a Simulated Commons Dilemma*, 46 J. Pers. Soc. Psychol. 1044, 1044-57 (1984).

[616] *Id.*

[617] *Id.*

a number of theories. Realistic group conflict theory proposes that the perception of competition over scarce resources generates attempts to limit the access of out-groups to such resources.[618] Sherif posited that win-lose competition between groups produces positive outcomes for the in-group and negative outcomes for out-groups.[619] What must be noted is that this theory emphasizes the perception of competition rather than actual and explicit competition.[620]

Furthermore, a number of studies point to the feeling of interdependence on the in-group as a cause of intergroup bias. The behavioral interaction model, for instance, proposes that dependence on in-group members by itself is sufficient to stimulate intergroup biases, and thus the more dependence, the more intergroup bias.[621] In a similar vein, Gaertner and Insko showed that individuals are more likely to discriminate in favor of their in-group members when there is an outcome dependency.[622]

The instrumental model of group conflict, built on the framework of realistic group conflict theory, proposes that resource stress coupled with the awareness of potential competition from outgroups generates a perception of other groups competing for resources.[623] The perception of competition takes the form of zero-sum beliefs—beliefs that when the other groups obtain

---

[618]  Michael A. Hogg, *Intergroup Relations*, *in* HANDBOOK OF SOCIAL PSYCHOLOGY 533, 538 (John DeLamater & Amanda Ward eds., 2d ed. 2013).

[619] *Id* (*citing* MUZAFER SHERIF ET AL., INTERGROUP CONFLICT AND COOPERATION: THE ROBBERS CAVE EXPERIMENT (1961)).

[620] Victoria M. Esses et al., *Intergroup Competition and Attitudes Toward Immigrants and Immigration: An Instrumental Model of Group Conflict*, 54 J. SOC. ISSUES 699, 701(1998).

[621] Dovidio & Gaertner, *supra* note 602, at 1092 (*citing* 2 Jacob M. Rabbie & Hein F. M. Lodewijkx, *A Behavioral Interaction Model: Toward an Integrative Theoretical Framework for Studying Intra- and Intergroup Dynamics*, *in* UNDERSTANDING GROUP BEHAVIOR: SMALL GROUP PROCESSES AND INTERPERSONAL RELATIONS 255, 255-94 (Erich H. Witte & James H. Davis eds., 1996)).

[622] Lowell Gaertner & Chester A. Insko, *Intergroup Discrimination in the Minimal Group Paradigm: Categorization, Reciprocation, or Fear?*, 79 J. PERS. & SOC. PSYCHOL. 77, 84 (2000).

[623] Esses et al., *supra* note 620, at 702 ("the term resource stress [refers] to any perception that, within a society, access to resources may be limited for certain groups").

more resources, this decreases the resources available for an individual's own group. Such perceived competition then produces strategic attempts to remove the source of competition.[624] Those attempts may take the form of discrimination, outgroup derogation, or avoidance of other groups.[625] A number of factors play a significant role in determining the degree of perceived resource stress, including, inter alia, the scarcity of resources and the desire for the unequal distribution of resources.[626]

Other studies opt to emphasize the role of collective identity. Influenced by such perspectives, social identity theory (hereinafter SIT) examines the effect of collective identity on intergroup relations.  Essentially, SIT posits that individuals possess a strong desire to maintain or enhance the personal and the social identity that is entwined with in-group membership. The members of an in-group distinguish themselves positively from members of out-groups.[627] Such an "evaluation of one's own group is determined with reference to specific other groups through social comparisons in terms of value-laden attributes and characteristics."[628] The distinction of social groups then creates what is known as the "we" v. "they" concept, which leads ultimately to favoring members of the in-group to satisfy social identity and the need for positive self-esteem.[629]

---

[624] Esses et al., *supra* note 620, at 702.

[625] Dovidio & Gaertner, *supra* note 602, at 1092.

[626] Esses et al., *supra* note 620, at 702 ("scarcity of resources, whether real or only perceived, will increase the chances that groups will perceive that access to resources is limited.").

[627] Henry Tajfel & John C. Turner, *An Integrative Theory of Intergroup Conflict*, *in* THE SOCIAL PSYCHOLOGY OF INTERGROUP RELATIONS 33, 40-1 (William G. Austin & Stephen Worchel eds., 1979); *see also* Meni Koslowsky et al., *Moderators of Social Power Use for In-Group/Out-Group Targets: An Experimental Paradigm*, 38 J. APPLIED SOC. PSYCHOL. 3036, 3093 (2008).

[628] *Id*. at 40.

[629] *See generally id*; *see also* Miles Hewstone et al., *Intergroup Bias*, 53 ANN. REV. PSYCHOL. 575, 580 (2002).

It follows that conformity to in-group norms can aggravate bias. The decision of individuals to distribute rewards and resources is influenced by in-group norms.  Jetten et al. found that the norms of the in-groups influenced members' behaviors, making them favor their own group more and show more discrimination to those outside of the group.[630] That is, if in-group members discriminate against others, other in-group members will conform as well, so that they fit the in-group norms. The research also showed that these norms can change discrimination strategies.[631] The members of groups tend to conform to what the other members are doing, even as regards discrimination.[632] The study also discusses how in-group norms change in-group biases and actions.[633] These norms moderate biases from the group, so the other members will follow the ideals of the rest of the group.[634]

Thus, the allocation of resources and rewards constitutes the intersection between intergroup bias and corruption. Fundamentally, corruption refers to an abuse of power for private benefit where the object of the abuse of power is the allocation of resources and rewards. Intergroup bias involves the allocation of resources favorably for in-group members, suggesting that favoring in-group members constitutes utilitarian behavior which maximizes the resources and rewards of the in-group. On the other hand, intergroup bias influences the perception of corrupt practices and those who commit such practices.

There are certain factors that play a significant role in intergroup bias which deserve to be highlighted because of their relevance both to Saudi society and to corruption. Status is considered one of the moderators determining the level of intergroup bias. Generally, high-status

---

[630] Jolanda Jetten et al., *Intergroup Norms and Intergroup Discrimination: Distinctive Self-Categorization and Social Identity Effects*, 71 J. PERS. SOC. PSYCHOL. 1222, 1222-33 (1996).
[631] *Id.*
[632] *Id.*
[633] *Id.*
[634] *Id.*

groups are more likely to exhibit bias toward low-status groups.[635] Nevertheless, if such status is perceived as illegitimate, low-status groups tend to show more bias than high-status groups.[636] In the same vein, power determines the level of bias. When power is associated with high status, members of such groups tend to be more discriminatory, even if they are members of a numerical minority.[637]

In light of this, it can be argued that members of powerful and high-status groups tend to favor their in-groups in their allocation of resources and rewards. Thus, status and power can fuel corruption, as will be explained in the next section, by the favorably allocating resources to members of the in-group. This can be seen in the real world where certain groups of people dominate the top tiers of hierarchies and perform the job of gatekeepers in order defend the existing social structure that benefits them.

The other factor that influences the level of intergroup bias is represented in the perception of threats.  "Threat can be perceived in terms of the in-group's social identity, its goals and values, its position in the hierarchy, even its existence."[638] A threat can be tangible, as in the case of competing over limited resources, or it can be symbolic, as in the case of protecting the values or traditions of the in-group.[639] Essentially, realistic group conflict theory posits that conflict of interest between different groups is the basis of discrimination and prejudice.[640] One of the premises of this theory is that "the greater the intergroup threat and conflict, the more hostility is

---

[635] *See, e.g.*, Brian Mullen et al., *Ingroup Bias as a Function of Salience, Relevance, and Status: An Integration*, 22 EUR. J. SOC. PSYCHOL. 103, 103-22 (1992).

[636] B. Ann Bettencourt et al., *Status Differences and In-Group Bias: A Meta-Analytic Examination of the Effects of Status Stability, Status Legitimacy, and Group Permeability*, 127 PSYCHOL. BULLETIN 520, 520-42 (2001).

[637] Sachdev & Bourhis, *supra* note 555, at 1-24.

[638] Hewstone et al., *supra* note 629, at 586.

[639] *Id.*

[640] Esses et al., *supra* note 620, at 701 (*citing* DONALD T. CAMPBELL & ROBERT A. LEVINE, ETHNOCENTRISM: THEORIES OF CONFLICT, ETHNIC ATTITUDES, AND GROUP BEHAVIOR (1972)).

expressed toward the source of the threat."[641] In accordance with SIT, it was also found that in-group bias is exhibited more when a threat to the distinctiveness of the group is perceived.[642]

Groups in Saudi Arabia, therefore, may exercise and show more in-group bias to protect their identity, as seen in scenarios involving tribalism or regionalism. The competition over scarce resources and behavior showing in-group bias can be seen explicitly between Saudis and foreigners, though it may also exist between different groups. As an example of the effect of feeling threatened, consider the racist attitudes exhibited by the skilled blue-collar workers in the United States and Britain who are "most vulnerable to competition from other (e.g., immigrant) groups and thus feel most threatened and fraternalistically most deprived."[643] Another example of the role of a sense of threat is manifested in hate crimes and xenophobia against other groups, mainly minorities. When a high influx of immigrant minorities is associated with an unsteady economic situation, the perception of threat and the incidence of violence are escalated, and this can be exacerbated by far-right political leaders.[644]

In line with the interdependence of the in-group, reciprocity represents an influential factor in intergroup bias. The hypothesis of in-group reciprocity proposes that in-group favoritism

---

[641] *Id.*

[642] Jolanda Jetten et al., *Distinctiveness Threat and Prototypicality: Combined Effects on Intergroup Discrimination and Collective Self-Esteem*, 27 EUR. J. SOC. PSYCHOL. 635, 635-657 (1997).

[643] Hogg, *supra* note 618, at 550 (*citing* Reeve D. Vanneman & Thomas F. Pettigrew, *Race and Relative Deprivation in the Urban United States*, 13 RACE 461, 461-86 (1972)).

[644] Hewstone et al., *supra* note 629, at 586; *see also* Lincoln Quillian, *Prejudice as a Response to Perceived Group Threat: Population Composition and Anti-Immigrant and Racial Prejudice in Europe*, 60 AM. SOC. REV. 586, 586-611 (1995); *see also* Donald P. Green et al., *From Lynching to Gay Bashing: The Elusive Connection between Economic Conditions and Hate Crime*, 75 J. PERS. SOC. PSYCHOL. 82, 82-92 (1998) (referring to the role of political leaders in "fomenting public resentment toward minority groups in times of economic contraction"); *see also* Thomas F. Pettigrew, *Reactions toward the New Minorities of Western Europe*, 24 ANNU. REV. SOC. 77, 77-103 (1998) (demonstrating the role of far-right parties in a number of Western European countries).

in reward allocation in the minimal group paradigm constitutes utilitarian behavior aiming at increasing economic self-interest.[645] Specifically, "category members follow a norm of reciprocity and exchange favorable allocations with [in-group] members."[646] Accordingly, Yamagishi et al. found that "subjects in MGEs [minimal group effects] do not practice [in-group] favoritism in reward allocation unless they expect similar favorable treatment from [in-group] members."[647]

Building on the distinction between "restricted exchange" and "generalized exchange",[648] Yamagishi et al. noted that when a favor is provided to a member of in-group, reciprocation of such a favor is expected from any member of the in-group, and not directly and particularly from the same member for whom the favor was performed.[649] Thus, the reciprocation of such favors is diffuse; it is not restricted to mutual exchange between particular dyads ("restricted exchange"), but rather takes the form of multilateral and indirect exchange ("generalized exchange").[650] Reciprocation aiming at enhancing the economic self-interest is also an essential factor in corruption, both in interpersonal corrupt practices and in practices involving the abuse of power. As will be explained in Chapter 5, individuals are "aware of the fact that certain behavior (e.g., corrupt cooperation) in the present might lead to positive outcomes in the future (e.g., reciprocal payback)."[651]

---

[645] Gaertner & Insko, *supra* note 622, at 78.
[646] *Id.*
[647] Toshia Yamagishi et al., *Bounded Generalized Reciprocity: Ingroup Boasting and Ingroup Favoritism*, 16 ADVANCES IN GROUP PROCESSES 161, 186 (1999).
[648] Toshio Yamagishi et al., *In-group Bias and Culture of Collectivism*, 1 ASIAN J. SOC. PSYCHOL. 315, 321 (1998) (*citing* PETER EKEH, SOCIAL EXCHANGE THEORY: THE TWO TRADITIONS (1974)) ("In a restricted exchange, resources (in this case favors) are directly exchanged between two actors. In a generalized exchange, on the other hand, resources one gives to a person are returned from someone else, not from the original recipient.").
[649] Yamagishi et al., *supra* note 647, at 187.
[650] *Id.*
[651] Nils C. Köbis et al., *Prospection in Individual and Interpersonal Corruption Dilemmas*, 20 REV. GEN. PSYCHOL. 71, 79 (2016).

For those committing corrupt practices, norms, as explained above, influence the perception of such actions. Following the "black sheep effect," in-group members whose attributes (i.e. behaviors, attitudes, etc.) are inconsistent with in-group norms are judged more negatively than normative in-group members and even more negatively than are members of out-groups.[652] Such derogation of non-normative members of the in-group can be seen as "a cognitive-motivational strategy to purge from the group those [in-group] members who negatively contribute to social identity."[653] However, if the leader of the group behaves in a socially undesirable way, the situation may differ. De Moura and Abrams found that "transgressors were judged less punitively if they were [in-group] leaders than [in-group] members, outgroup members, or outgroup leaders."[654]

Having discussed the nature and origins of intergroup bias, we turn to the roles and the forms it takes in different cultures. Cultures can be divided into two main categories: individualist and collectivist cultures. In individualist cultures, "attitudes, beliefs, definitions, norms, values, and other elements of subjective cultures … are centered on the individual."[655] The situation is different in the collectivist cultures, where these elements "are centered on the ingroup."[656] Four

---

[652] Jose M. Marques & Dario Páez, *The 'Black Sheep Effect': Social Categorisation, Rejection of Ingroup Deviates, and Perception of Group Variability*, 5 Eur. Rev. Soc. Psychol. 37, 37–68 (1994).

[653] *Id*. at 38.

[654] Georgina R. de Moura & Dominic Abrams, *Bribery, Blackmail, and the Double Standard for Leader Transgressions*, 17 Group Dynamics: Theory, Research, & Practice. 43, 43-52 (2013).

[655] Triandis et al., *supra* note 69, at 74.

[656] *Id*.

main attributes distinguish the two cultures: "(a) how individuals perceive themselves, (b) how they relate to others, (c) the goals they follow, and (d) what concerns drive their behavior."[657]

In collectivist cultures, individuals tend to identify themselves "as interdependent with an ingroup" (which can be a family, tribe, region, etc.); social relationships are characterized as communal rather than individual; communal or group goals are prioritized over individual goals; and norms, duties, and obligations strongly guide and predict social behaviors.[658] Thus, "the major gap for collectivists occurs between [in-group] and [out-group], [i.e. we and they]; the major gap for individualists occurs between self and others, [i.e. I and others]."[659]

Thus, "obedience, conformity, acquiescence and loyalty" are essential elements of collectivist cultures, and these play a significant role in the thriving of corruption and the decline of whistle-blowing roles.[660] Further, individuals in collectivist cultures tend to violate the rules, especially if they come in conflict with the traditionally established norms.[661] Notably, individuals in collectivist cultures consider loyalty to the group as an ethical standard which leads them to be "more likely to seek consensus and [they] might be more prone to nepotism because networks of friends and family tend to create loyal relationships that encourage [favoritism]."[662]

Nevertheless, collectivist cultures are not all the same; there is a further distinction among these cultures which also applies to the individualist cultures. Depending on whether the culture

---

[657] Ronald Fischer et al., *Individualism-Collectivism as Descriptive Norms Development of a Subjective Norm Approach to Culture Measurement*, 40 J. CROSS-CULTURAL PSYCHOL. 187, 188 (2009).
[658] Triandis et al., *supra* note 69, at 74.
[659] *Id.*
[660] Soma Pillay & Nirmala Dorasamy, *Linking Cultural Dimensions with the Nature of Corruption: An Institutional Theory Perspective*, 10 INT'L J. CROSS CULTURAL MGMT. 363, 372 (2010).
[661] *Id.*
[662] *Id.*

emphasizes hierarchy or equality, the culture can be described as vertical or horizontal.[663] If the culture's emphasis is on hierarchy, it can be described as vertical, whether it is individualist or collectivist, whereas if the culture's emphasis is on equality, this society is then characterized as horizontal, whether it is individualist or collectivist.

In the vertical collectivist cultures, which include Saudi Arabia, members are not perceived as equal; rather, some members are considered more important than others. Consequently, obedience to the authorities and sacrifices for the group are valued, or even required.[664] On the other hand, horizontal collectivist cultures place the emphasis on equality, where members of the group are perceived as equal.[665]

Both vertical and horizontal collectivist cultures tend to maintain group harmony, but this tendency is more emphasized and obvious in the vertical collectivist cultures. This implies that individuals will be guided by the norms of their groups and act in accordance with "what is expected of them."[666] Though both vertical and horizontal collectivist cultures share a similar character, in vertical collectivist cultures, the tendency toward nepotism, favoritism, and deception is higher than in horizontal collectivist cultures.[667]

CONCLUSION

This chapter began by exploring the nexus between societies and corruption. This nexus necessitated providing the reader with some background on Saudi history, culture, and society, in addition to brief review of corruption in Saudi Arabia. The chapter ended by exploring Ibn

---

[663] Triandis et al., *supra* note 69, at 75.
[664] *Id.*
[665] *Id.*
[666] *Id.*
[667] *Id.* at 75-76 ("[C]orruption refers to a cultural level and deception to an individual level of the phenomenon. However, when individuals use deception frequently, that may result in more corruption, since most corrupt behavior require deception").

Khaldun's discussion of *asabiyya* as a sociological analysis relevant to corruption and Saudi culture. From the social psychological perspective, this chapter has sought to highlight the impact of power and intergroup bias on corrupt behaviors and acts. This chapter has aimed to lay a sufficient foundation for the following chapter, which addresses the practice of *wasta*.

CHAPTER FIVE: *WASTA* IN SAUDI ARABIA

INTRODUCTION

To this point, it has been shown that corrupt practices may not only take different forms, they are also contextual. Consequently, cultures and regions may vary in their perceptions of those practices, for what is good in the East may not be perceived the same way in the West. In fact, within the same area such different perspectives may exist. This applies to the practice of *wasta*, a practice has been recognized by the *Nazaha* as the most prevalent corrupt practice in Saudi Arabia.

*Wasta* generally refers to an act of favoritism on any basis, whether that of race, region, religion, tribe, or family. In this chapter, *wasta* will be defined and a comprehensive explanation will be provided. This chapter will also shed light on the background and evaluation of *wasta* in Saudi Arabia. Since the practice of *wasta* can be categorized as a form of informal influence processes that exist in a number of countries around the world, *wasta* will be distinguished from other similar practices. Finally, *wasta* will be examined from a legal and a moral perspective.

A.  *Wasta and Similar Concepts*

*Wasta* is an Arabic word that is often loosely translated as "nepotism," but in fact the meaning of the word is somewhat wider than that. *Wasta*, in contemporary Arab societies, is generally an act of favoritism. Yet such a characterization may not be accurate since *wasta*, as will be explained, requires mutual interdependence and reciprocity in most cases, i.e., an expectation of *quid pro quo*, which may be immediate or may remain in the future -- features which favoritism may lack.[668]

---

[668] Naresh Khatri et al., *A Two-Stage Model of Cronyism in Organizations: A Cultural View of Governance, in* CORRUPTION AND GOVERNANCE IN ASIA 61, 63 (John B. Kidd & Frank-Jürgen Richter eds., 2003).

*Wasta*, or *wasata* in general, in Arabic means essentially "the middle" and is related to the verb *yatawassat*, which means a compromise between the needs of two conflicting parties in order to reach a middle ground.[669] A distinction is made in classical Arabic between *wasata*, which refers to the act itself, and *wasta* or *wasit*, which refers to the person carrying out the act; despite this distinction, *wasta* is commonly used in contemporary spoken Arabic to refer to both the act and the person carrying it out.[670]

Defining *wasta* creates some difficulties, and probably Justice Stewart's famous phrase, "I know it when I see it," is applicable to *wasta*. *Wasta* can be defined as "the intervention of a patron in favor of a client in an attempt to obtain privileges or resources through a third party."[671] Others suggest that *wasta* is an implicit social contract between members of a group, mainly tribal groups, which imposes certain kinds of obligation upon the group members to provide favorable treatment.[672]

The role of *wasta* creates another distinction. *Wasta* may serve the purpose of mediation or intercession. *Wasta* as mediation involves a family intervention to solve a conflict between one of a family's members and a member of another family. Mediation also can be conducted by a third party. The reliance on mediation, a trait intrinsic to Arab societies, can explain the hesitance of individuals to rely on government officials to resolve their issues. Judges, influenced by this trait, still frequently urge and prefer mediation rather than issuing a judgment.[673] Historically,

---

[669] ROBERT CUNNINGHAM & YASIN K. SARAYRAH, WASTA: THE HIDDEN FORCE IN MIDDLE EASTERN SOCIETY 1 (1993).

[670] *Id.*

[671] Ahmed A. Mohamed & Mohamad S. Mohamad, *The Effect of Wasta on Perceived Competence and Morality in Egypt*, 18 CROSS CULTURAL MGMT. INT'L. J. 412, 412 (2011); *see also* CUNNINGHAM & SARAYRAH, *supra* note 669 (adopting a similar definition of *wasta*).

[672] Andy Barnett et al., *Regulation, Trust, and Cronyism in Middle Eastern Societies: The Simple Economics of "Wasta"*, 44 J. SOCIO-ECONOMICS. 41, 41 (2013).

[673] CUNNINGHAM & SARAYRAH, *supra* note 669, at 8.

even the central authorities, which have included the Ottoman Empire and various occupiers, refrained from imposing full control over the tribes and opted to give them more independence in the area of settling disputes.[674]

The other role played by *wasta* is one of intercession, in which individuals utilize *wasta* to gain advantages and seek benefits from the government. With the rapid development and increase of the size of government, *wasta* as a form of intercession has become more notable. In this role, *wasta* departs from the impartiality and neutrality that can be found in its role as mediation, where a person serves the benefits of both parties. In contrast, in *wasta* as intercession, a person is acting as a patron of, rather than as a mediator for, a client aiming at securing a benefit or advantage from a third party.

In contemporary Arab societies, *wasta* rests on family loyalty as the foundation of its existence, and thrives, since family performs the traditional role of intervening to solve difficulties or to obtain a benefit of any kind.[675] Though blood relationships (i.e., the family unit)[676] remain the cornerstone of loyalty within which *wasta* plays a twofold role—to show loyalty and to enhance family ties and relationships—other loyalties based on membership in various groups, whether ethnic, religious, regional, or even political, may facilitate the use of *wasta*. Thus, *wasta* may not be only an act of nepotism, but may also extend to include others such as close friends, and may eventually become cronyism.[677]

---

[674] *Id* ("Villages were taxed but it was impossible to tax the nomads of the hinterland. On the contrary, the various occupiers paid tribute to the tribal shaykhs to discourage tribal raiding of cultivated areas and areas along trade routes." The same applies to the tribes in the Arabian Peninsula, where tributes were paid to Sherifan family.).

[675] *Id*. at 2.

[676] As explained in chapter four, the family unit is segmentary and can include the units of *al-qabila*. *al-amara*, *al-batan*, *al-fakhid*, *al-ashera,* or *al-faisala*; *see* Figure 2 in chapter four.

[677] CUNNINGHAM & SARAYRAH, *supra* note 676, at 2. *See generally* Mohamed & Mohamad, *supra* note 671, at 414. It is worth noting that *wasta* maintains a specific character distinguishing

*Wasta* may also extend beyond such groups to serve the stranger who is willing to pay for such a service.[678] In such a case, a *wasta* or *wasit* receives a sum of money to utilize his influence or connections to secure benefits for another. An "expediter" (*mueaqqib*), for example, can be contacted by a total stranger who offers a sum of money to receive certain government services, a passport, or any of several different kinds of licenses. However, this is not always the case; in some circumstances, a *wasta* or *wasit* becomes a middleman in bribery transactions. Since Arab culture is heavily regulated by personal relationships and personal loyalty, the role of the middleman in a legal or illegal transaction is fundamental.

At this point, the use of *wasta* may fall into one of three categories. First, *wasta* is sought to obtain an advantage for a family member or for a member of one's tribe. Second, *wasta* is sought to gain benefits for a friend outside the family or tribal unit. Third, *wasta* is sought by a stranger with whom there is no kinship or friendship. The first two categories are relevant to the issue under discussion, while the third category must be distinguished in some ways from the previous two scenarios. In the first scenario, the *wasit* will fall into one of the first two categories, which makes it partly relevant to the issue, unlike the third scenario, which does not fall completely within the category of *wasta* due to the financial incentives involved.

As explained in Chapter 2, *shafa'ah* is the term used in Islamic jurisprudence to refer to *wasta*. However, the approved and legal form of *shafa'ah* or *wasta* is contrary to the contemporary form of *wasta*. The permissible *shafa'ah* was fundamentally aimed at supporting solidarity for the whole society (*takaful al Ijtima'i*), which is not the same as the contemporary form of *wasta*. Aspects of Islam work to promote social solidarity: a "strong emphasis on social

---

it from cronyism. While cronyistic obligations do not pass through different generations, obligations in a *wasta* situation are inherited. *See* Naresh Khatri et al., *Cronyism: A Cross-Cultural Analysis*, 37 J. INT'L BUS. STUD. 61, 63 (2006).

[678] Mohamed & Mohamad, *supra* note 671, at 414.

cohesion, charity, social justice, collective responsibility for the welfare of society, the legitimate claims of the weak upon community, and the duty to help the poor and strangers at all times and regardless of economic and social circumstances."[679] Though *wasta* helps to enhance social solidarity, it does so between a smaller group of individuals and with a clear emphasis on economic and social circumstances.[680]

Having explained briefly the concept and the practice of *wasta*, we should note that similar practices and concepts have existed in different societies around the globe. *Guanxi* is a similar concept in China, as is *jeitinho* in Brazil, and *sv'ázi* thrives in Russia, while "pulling strings" is still recognized in Britain. These concepts and practices definitely share some similar characteristics, though they exist in different societies and cultures.

*Guanxi* literally means connections, relations, or relationships. Generally, *guanxi* is "an indigenous Chinese construct" that is defined as "an informal, particularistic personal connection between two individuals who are bound by an implicit psychological contract to follow the social norms of *guanxi* such as maintaining a long-term relationship, mutual commitment, loyalty, and obligation."[681] A distinction must be made between the existence of *guanxi* and the practice of *guanxi* in the context of Chinese society. While the existence of *guanxi* depends on personal

---

[679] Hamed El-Said & Jane Harrigan, "*You Reap What You Plant": Social Networks in the Arab World—The Hashemite Kingdom of Jordan*, 37 WORLD DEV. 1235, 1238 (2009).

[680] *See Fatwa No. 33017886 issued in 22/11/1422 H (Oct. 8, 2012). Distinguishing Between Permissible Shafa'ah and Wasta*, NATIONAL ANTI-CORRUPTION COMMISSION (Nov. 20, 2016, 7:32 PM), http://www.nazaha.gov.sa/Media/News/Pages/news193.aspx (According to the Council of Senior Scholars, it is important not to confuse permissible *shafa'ah* with the contemporary form of *wasta*. While the former aims at helping people to obtain their deserved legal rights and to eliminate injustice, the latter does not achieve these ends, as it may impose injustice or deprive deserving individuals of their rights, which eventually jeopardizes and harms the public good.).

[681] Xiao-Ping Chen & Chao C. Chen, *On the Intricacies of the Chinese Guanxi: A Process Model of Guanxi Development*, 21 ASIA PAC. J. MGMT. 305, 306 (2004).

relationships and human sentiments, the practice of *guanxi* involves the utilization of these relationships to make exchanges or generally to obtain advantages.[682]

The existence of *guanxi* requires a relatively low threshold, which is a familiarity between two individuals resulting from past interactions. However, special *guanxi* requires personal relationships which involve sentiment and obligation.[683] Rather than demographic or personal similarities, *guanxi* is based on specific social institutions, kinships, or regions, or sharing the same alma mater or work unit.[684] Accordingly, and similar to Arabs, Chinese people categorize others within three categories, moving from the closest ties to the most distant: family, familiar people, and strangers.[685]

*Guanxi* and *wasta* both depend heavily on the trust between parties, which derives from long-standing relationships. In both Arab and Chinese cultures, the family is fundamental. Such an importance imposes on the individual the obligation to maintain the honor of the family and to be loyal to its members.[686] Both cultures place an emphasis on reciprocal obligations, leading to the reciprocal relationships that are essential for *guanxi* and *wasta* to exist and thrive.[687]

The dichotomy may be observed in how each society considers and perceives these practices. The Chinese are able to distinguish good *guanxi* from bad *guanxi* or other corrupt practices. Consequently, they primarily perceive and consider *guanxi* to be a positive aspect of

---

[682] Chao C. Chen et al., *Guanxi Practices and Trust in Management: A Procedural Justice Perspective*, 15 ORG. SCI. 200, 201 (2004).
[683] *Id.*
[684] *Id*; *see also* Chen & Chen, *supra* note 681, at 311.
[685] Chen et al., *supra* note 682, at 201.
[686] Kate Hutchings & David Weir, *Understanding Networking in China and the Arab World: Lessons for International Managers*, 30 J. EUR. INDUSTRIAL TRAINING 272, 280 (2006).
[687] *Id.*

interpersonal relationships.[688] In contrast, the Arab societies still view *wasta* suspiciously. Despite the classifications of *shafa'ah* in Islamic jurisprudence, which fundamentally shapes Arab societies, *wasta* is still widely practiced even though individuals in these societies tend to associate *wasta* with corruption and to perceive *wasta* negatively.[689]

Another similar practice existing in Brazil is called *jeitinho*, which literally means a "little way out"; the term "refers to creative ingenuity in rapidly achieving short-term solutions to problems."[690] The application of *jeitinho*, then, can be a way to avoid bureaucratic boundaries and rules or to avoid any potential difficulty with higher-level officials within a strictly hierarchical system.[691]

Barbosa placed *jeitinho* in the middle of a spectrum between two extremes, with a favor-like action at the positive end of the spectrum and corruption at the negative end.[692] Accordingly, he distinguished between *dar um jeitinho* (to find a way out), which aims at achieving a goal and solving a problem, regardless of whether the way is legal or illegal, and *jeitinho brasileiro* (the Brazilian way out), in which creativity is employed to deal with daily circumstances and

---

[688] Yuan Li et al., *Social Capital Networking in China and the Traditional Values of Guanxi*, *in* THE POLITICAL ECONOMY OF WASTA: USE AND ABUSE OF SOCIAL CAPITAL NETWORKING 173, 180 (Mohamed A. Ramady ed., 2016).

[689] Hutchings & Weir, *supra* note 686, at 281 (*citing* Francesca Sawalha, *Study Says 'Wasta' Difficult to Stamp out when Advocates Remain in Power*, JORDAN TIMES, Apr. 1, 2002) ("In a pioneering opinion poll carried out by the Arab Archives Institute in 2001, 87 per cent of respondents stressed the need to eradicate wasta, viewing it as divisive and symptomatic of corruption, even though more than 90 per cent also responded that they believed they would be using it at some point in their lives.").

[690] Peter B. Smith et al., *Are Indigenous Approaches to Achieving Influence in Business Organizations Distinctive? A Comparative Study of Guanxi, Wasta, Jeitinho, Svyazi and Pulling Strings*, 23 INT'L J. HUMAN RES. MGMT. 333, 336 (2012).

[691] *Id*.

[692] *Id*; *see generally* Maria C. Ferreira et al., *Unraveling the Mystery of Brazilian Jeitinho: A Cultural Exploration of Social Norms*, 38 PERSONALITY & SOC. PSYCHOL. BULLETIN 331, 331-44 (2012).

situations.[693] In this sense, the first form is perceived to be close to corruption, while the second is perceived more as a part of Brazilian social life.[694]

In this regard, *jeitinho* and *wasta* are double-edged swords that may be used to create social justice which privileges the individual human and natural rights instead of legal and institutional rights.[695] Thus, both are appeals to emotion, rather than to reason, employing behavioral tactics like excuses and justifications which are "based on a personal situation that differentiates the person asking for the *jeitinho* from others in society."[696] However, what distinguishes *jeitinho* from both *guanxi* and *wasta* is that a long-standing relationship is required between the parties in the latter two, but not necessarily in the former.[697]

Generally, the previously mentioned concepts are recognized as indigenous forms of informal influence processes. These processes involve a reliance on informal linkages to achieve and gain certain advantages and benefits.[698] The differences appear mainly in the "emphasis on the intensity, duration, and hierarchical nature of the relationship between the parties."[699]  To illustrate, *guanxi* and *wasta* occur within a hierarchical system and context and require long-standing emotional commitments, which is not necessary in the case of *jeitinho*.[700] Thus, a number of studies consider these practices to be forms of informal influence processes that are

---

[693] *Id* (*citing* LÍVIA BARBOSA, O JEITINHO BRASILEIRO: A ARTE DE SER MAIS IGUAL DO QUE OS OUTROS [The Brazilian Jeitinho: The Art of Being More Equal than the Others] (2006)).

[694] Cláudio V. Torres et al., *Brazilian Jeitinho v. Chinese Guanxi: Investigating Their Informal Influence on International Business*, 16 RAM. REVISTA DE ADMINISTRAÇÃO MACKENZIE, 77, 80-81 (2015).

[695] *Id*. at 81.

[696] *Id.*

[697] *Id*, at 83. Smith et al., *supra* note 690, at 337.

[698] Peter B. Smith et al., *How Distinctive are Indigenous Ways of Achieving Influence? A Comparative Study of Guanxi, Wasta, Jeitinho, and "Pulling Strings"*, 43 J. CROSS-CULTURAL PSYCHOL. 135, 138 (2012).

[699] *Id.*

[700] *Id.*

societally related rather than societally bound, which suggests that the variation between countries is a matter of quantity, rather than of the distinctive qualities of certain processes[701]—meaning that there are certain factors which make these processes more salient in one country than another.

Finally, based on various grounds, *wasta* can be distinguished from the mentoring and networking systems adopted in Western nations. In the Western notion, the mentor is traditionally a senior manager within the entity itself, whereas *wasta* is not limited within the borders of the entity involved: in fact, it is notable that *wasta* is obtained from outside the entity.[702] The other major difference lies in what is provided by *wasta* in contrast to what is provided by the mentoring system. For Westerners, a mentor is expected to help individuals navigate through the system, which can be a form of coaching, counseling, or advising, whereas *wasta* is more along the lines of intervening on behalf of an individual to guarantee that person certain advantages or benefits.[703]

Furthermore, networking does not involve reciprocal obligations, as is the case with *wasta*, since the qualifications and merits of the individual are the basis of networking, but not always of *wasta*.[704] Most notable is the individualistic characteristics of networking in the Western context vs. the collectivistic characteristics of *wasta* in the Arab context. From the Western perspective, networking has an individualistic character and exists primarily between individuals. In contrast, *wasta* has a collectivistic character in which the family or groups are

---

[701] Smith et al., *supra* note 690, at 345; *see generally* Torres et al., *supra* note 694.
[702] Hayfaa Tlaiss & Saleema Kauser, *The Importance of Wasta in the Career Success of Middle Eastern Managers*, 35 J. Eur. Industrial Training 467, 475 (2011).
[703] *Id*. at 475-76.
[704] *Id*. at 477 ("in the Arab culture a company may be obligated to employ you even if you are the weaker candidate. This suggests that agents in a *wasta* are confined by mutual obligations that need to be returned because interpersonal bonds are governed in part by reciprocity.").

involved; that is, the element of dependence is more salient in the case of *wasta* than in the case of networking.[705]

### B. The Background and Evolution of Wasta in Saudi Arabia

The history of the evolution of *wasta* seems to be similar in the various Arab societies, but there is no exact time period at which *wasta* was initiated.[706] Nevertheless, old publications, such as Ibn Khaldūn's *Intruduction to History*, in which he noted the significance *asabiyya* and the connections between members of a group in order to obtain a benefit or profit, inform us that the practice of *wasta* or similar acts of favoritism existed and can be traced to at least the fourteenth century. Thus, it can be said that *wasta* is a long-standing practice that evolved and spread throughout Arab societies, among which was Saudi Arabia.

The goal of *wasta* is historically related to the two forms of *wasta*, the old form and the contemporary form. The old form of *wasta*, which existed before the formation of the new nations, was used to reach a solution to conflicts raised between tribes, as mentioned above; that is, *wasta* was a tool through which the peace, solidarity, unity, and integrity of the tribe itself and of the society in general was achieved and maintained. Thus, *wasta* was a form of social insurance in in the past, mainly before the emergence of the new states in the second half of the twentieth century. This is in line with Ibn Khaldūn's analysis when he noted that *asabiyya* is a necessity to overcome the rough life of the desert and its risks.[707] In the Arabian Peninsula, which was populated largely by nomadic tribes, people lived in isolation and when raids occurred

---

[705] *Id*. at 479.

[706] Barnett et al., *supra* note 672, at 42 ("The wasta network, on the other hand includes influential protagonists such as senior managers, family members, acquaintances and important figures in social, political and economic spheres from inside and outside the organization.").

[707] IBN KHALDUN, *supra* note 530, at 97.

between different tribes there were limited channels through which to solve such conflicts.[708]
Hence, the most effective avenue was *wasta*, through which tribes could live in peace and survive
the harsh environment in which they lived.

When the nation-states were formed and governments developed, a new form of *wasta*
emerged. *Wasta* shifted to be more of a means of intercession. The emphasis consequently shifted
toward the interests of the individuals constituting the tribe, rather than on enhancing tribal
status.[709] The shift from the collective benefit to a relatively individual benefit was due to
modernity and and has been boosted by globalization, which imposed more competition and more
services provided by the state, resulting ultimately in more stress on Arab societies.[710]

Despite this shift, the welfare of the tribe and family remains a motivating factor, even if
only implicitly and subtly: *wasta* is used to obtain and serve individuals' interests, but this
ultimately enhances the status of the tribe itself.[711] This results from the fact that *wasta* was
initially used to promote a person to a position of high rank, which not only provided that
individual with benefit, but also increased the resources that the tribe had at its disposal and
enhanced their status among other tribes due to their having more people in higher positions.
Those now in higher positions are expected to do the same for their group members, and the
vicious circle goes on.

This shift in the nature of *wasta* from mediation to intercession created another shift in
the mechanism of *wasta* itself. The new mechanism diminished and altered the role of middlemen
in two main ways.  First, individuals who had powerful acquaintances could go beyond the
middlemen and reach their goals directly. Second, the role of middlemen has become more

---

[708] Barnett et al., *supra* note 672, at 44.
[709] *Id*. at 42.
[710] *Id*.
[711] *Id*.

personal, since the middlemen now tend to enhance their own status, fame, and even their wealth.[712] Thus, the new mechanism allows for a more extensive practice of *wasta* and less family or tribal coordination in the prioritizing of the goals of *wasta*.

Basically, the differences between the old form of *wasta* and the contemporary form of *wasta* can be narrowed down to two specific areas. First, the process of directing *wasta*, in the old form, was a top-down one, as the leaders of the tribe or group obtained benefits on behalf of their tribe or group, whereas the process in its contemporary form tends to operate from the bottom up, where individuals seek to gain advantages for themselves initially which will benefit the group ultimately.[713] Second, the role of middlemen, which once provided the elders and leaders of the tribe or the group with authority and high status, receded when the contemporary form of *wasta* evolved.[714] Consequently, *wasta* has become a tool for seeking advantages rather than peace, and the *wasit*, the person who is performing *wasta*, has become a dispenser of benefits instead of being a problem-solver.

It must be emphasized that the nature of tribal society is central to the development and evolution of *wasta*. In Saudi Arabia, as discussed in Chapter 4, the role of the family and the tribe is crucial in shaping the society and interpersonal relationships. The history of Saudi Arabia's consolidation is replete with events and incidents that illustrate the significance of the tribes. Since the first Saudi state, the role of the tribe has been pivotal.[715] The Banu Khalid, for instance,

---

[712] Mohamed & Mohamad, *supra* note 671, at 54.

[713] Barnett et al., *supra* note 672, at 43.

[714] *Id.*

[715] *See, e.g.*, Kamel Mellahi, *Human Resource Management in Saudi Arabia*, in MANAGING HUMAN RESOURCES IN THE MIDDLE-EAST 97, 106 (Pawan Budhwar & Kamel Mellahi eds., 2006) ("Historically, prior to the birth of the Kingdom of Saudi Arabia, the region was governed by independent tribes. Saudi Arabia was born out of the unification of different tribes and large families. Against the backlog of a strong need for maintaining a tribal identity within a national

was a tribe that created difficulties for the Ottoman Empire and for the Saudi state as well. The Sharifian family and the Rashidi family were also obvious examples of tribes that had a significant role.[716] Further, some elite and powerful tribes or figures were supported financially and exempted from the taxes, either by the Ottoman Empire or by the British, to provide safety for trade routes and to prevent tribal raids.[717]

During the consolidation period, the concept of tribal solidarity, the belief in tribes and families as the fundamental unit of organization and identity, and the emphasis on the leading role of tribal leaders were elements of the consolidation process. Historically, as discussed in Chapter 4, settlements were inhabited on the basis of tribal affiliation. Thus, settlements were mainly inhabited by the members of the same tribe.

In the twenty-first century Saudi Arabia, affiliation with the tribe and the support for its members can be seen most clearly in the elections of municipal councils. Tribalism has revived in the process of the municipal elections and has played a significant role in the results of these elections.[718] Although it is illegal to run as a candidate based on tribalism, informal tribal

---

state, on the one hand, and the need to control an embryonic state and save it from potential conflicts between competing tribes, on the other.").

[716] *See* chapter four for more examples and explanation.

[717] *See* ALRASHEED, *supra* note 433, at 31 ("While Ottoman military and administrative presence was pronounced in the cities, it was virtually non-existent outside them. The duty to control the territories and population in the regions between the major urban centers was delegated to the *Sharif*. Prominent *Sharifs* were rewarded for demonstrating exceptional ability to restrain the tribal confederations, especially during the annual pilgrimage season. The amir of Mecca received regular subsidies and his urban constituency was exempt from Ottoman taxes.").

[718] Caroline Montagu, *Civil Society in Saudi Arabia: The Power and Challenges of Association*, 15 (Chatham House Research Paper 2015) ("Most tribes, like the *al-Qahtani* or *al-Utaibi* or the *Anizah*, are in military or public service, such as in the National Guard. The 2005 municipal elections were an interesting moment for the tribes, as their leaders encouraged members to vote not for the tribal candidate but for the most qualified individual.").

alliances have been formed not only to win elections, but also to exclude non-tribal candidates from an election.[719]

The role of tribal leaders was strong during the consolidation of Saudi Arabia, as can be seen, for instance, in the role of Faisal Al-Dawish and Sultan ibn Bijad as leaders of the *Ikhwan* movement.[720] More recently, the political role and influence of tribal leaders has been weakened with the emergence of the new technocrats and elites.[721] This has not, however, undermined the relationship between the government and some of these leaders, mainly those of the leading tribes.[722] In fact, the degree to which tribal or customary law serves as an obstacle to the development of the legal system shows how effective the role of the tribes is. The leaders or elites of tribes may act as arbitrators to settle internal or inter-tribal disputes. In their arbitration, they rely on customary law, which is based on the idea that reconciliation should provide the victim with compensation.[723]

---

[719] Sebastian Maisel, *The Resurgent Tribal Agenda in Saudi Arabia*, 7 (The Arab Gulf States Institute, working paper No. 5, 2015) ("It is however illegal to run on a tribal (or political party) platform. Thus, in order to circumvent this restriction, tribal candidates have formed informal alliances to make sure non-tribal candidates were kept outside."); *see also* Maha Alwabl, The municipal elections and tribal alliances, ALWATAN NEWSPAPER, Sept. 17, 2015, http://alwatan.com.sa/m/Article_Detail.aspx?ID=27919.

[720] *See generally* ALRASHEED, *supra* note 433, at 38.

[721] *See generally* STIG STENSLIE, REGIME STABILITY IN SAUDI ARABIA: THE CHALLENGE OF SUCCESSION 54, 64-67 (2012).

[722] *Id*. at 54 ("The *Najdi* tribal families, traditionally the leading ones, are frequently attendants at the courts of the king or senior princes…. The princes sometimes also visit tribal chiefs.").

[723] *See* Sebastian Maisel, *Tribes and the Saudi legal system: an assessment of coexistence*, MIDDLE EAST INSTITUTE, Oct. 1, 2009, http://www.mei.edu/content/tribes-and-saudi-legal-system-assessment-coexistence (The role of the tribal elites as mediators is still active to some extent, and can take place when the elites of tribes intervene in the process of settlements after homicide cases, for instance.).

With that being said, the seed of *wasta* was initially planted in the system early in the consolidation of Saudi Arabia.[724] As emphasized repeatedly after the consolidation, the backbone of the tribal system is honor, which by its nature is tightly linked with loyalty;[725] that is, to be honored, an individual must be loyal to those around him, to friends and acquaintances, but more importantly, to members of his family and tribe. This creates a closed structure, based on family, tribe, or blood ties generally, which is a fertile ground for *wasta* to flourish in. Such a closed structure assures members within it "that their efforts are pooled for the benefit of all and that recipients are thus predisposed to act favorably in return, a 'tit-for-tat' for the group."[726]

Thus, it is not always the case that those performing *wasta* personally know the individual who sought their services; instead, they may provide *wasta* as a favor to their acquaintances in order to maintain their trust.[727] Since trust and performing favors are highly regarded, those performing *wasta* are semi-obligated to make the necessary efforts to provide the advantages sought by the requestor in order to maintain that trust.[728] On the other end, the person who is performing *wasta* may not personally know, and need not know, the individual who has the authority to provide the advantages or the benefits sought. Hence, if the *wasta* does not personally know the individual who has the power to provide the advantages or the benefits, he will rely on

---

[724] Aseel Al-Ramahi, *Wasta in Jordan: A Distinct Feature of (and Benefit for) Middle Eastern Society*, 22 ARAB L. Q. 35, 39 (2008) (Note that though this paper addresses the situation in Jordan, there is a clear analogy between Jordan and Saudi Arabia in this area, with some minor differences.).

[725] *See, e.g.*, Annika Kropf & Tanya C. Newbury-Smith, *Wasta as a Form of Social Capital? An Institutional Perspective*, in THE POLITICAL ECONOMY OF WASTA: USE AND ABUSE OF SOCIAL CAPITAL NETWORKING 15 (Mohamed A. Ramady ed., 2016) ("The concepts of loyalty and honor appear to us to be the main quantifiers that can be used to link family networks and purely professional networks.").

[726] *Id.*

[727] Tlaiss & Kauser, *supra* note 702, at 477.

[728] *Id.*

his own network circle and acquaintances to make contact with that individual and achieve his goal.[729]

In essence, then, *wasta* requires and involves implicitly reciprocal and cooperative obligations presupposing the existence of a loyalty which has expanded *wasta* relationships to cover other ethnic, religious, or regional groups.[730] Even the political structure itself has been influenced by this concept of loyalty, which can be seen in the government's assignment of educated tribal elites and their close relatives to major positions in the government in order to gain their loyalty.[731] All in all, these networks and relationships eventually lead an individual to be dependent on rather than independent from others. The welfare and fate of a member of a group depends heavily on the actions of other members and the network in general.[732]

In practice, *wasta* depends mainly on the group an individual is considered to be a member of, that is, the individual's family, tribe, village, region, or nationality. Thus, people tend more often to identify themselves with their tribal or regional affiliation.[733] Individuals from the same group largely rely on each other by practicing *wasta* in order to gain certain advantages. In this sense, individuals are defined by their family, tribe, or region, rather than by their own achievements and qualities. Thus, "who you are" significantly influences the relationships

---

[729] *Id.*

[730] Al-Ramahi, *supra* note 724, at 44; *see, e.g.*, Mellahi, *supra* note 715, at 115 ("[*Wasta*] is a result of the tribal-based collectivist culture, where an individual's loyalty to the tribe, family and friends is valued over and above that to the organization.").

[731] Abdalla F. Hayajenh et al., *Research Note: Assessing the Effect of Nepotism on Human Resource Managers*, 15 INT'L. J. MANPOWER, 60, 62 (1994).

[732] *Id.* at 62 ("These tribal and extended-family ties constitute the basic institutions which shape the individual's social values, norms and [behavior]. These values and norms encourage nepotism in Arab societies, encouraging individuals to fulfil their responsibilities towards their family.").

[733] Al-Ramahi, *supra* note 724, at 44.

between individuals and *wasta*.[734] The relationships between individuals require a certain familiarity between them which the answer to "who you are" provides; that is, people sharing the same family, tribe, or region form a relationship more quickly and easily. This quick formation of relationships assumes implicitly the existence of the loyalty which enables *wasta* to be practiced and favors to be exchanged more fluently.[735]

Within an organizational context, a *wasta* can be anyone with sufficient power to influence the behavior of others.[736] The sources of such power do not always derive from a formal position, but can also derive from a socio-economic position which has a high level of respect from others in the society.[737] Thus, people tend to build good relationships with those who are powerful and influential in a society, since they naturally "like to be associated with those in power."[738] Accordingly, activities individuals perform to build and establish interpersonal connections with influential and powerful people, whether in the political, the economic, or the social sphere, explain the networking aspect of *wasta*.[739] The aim of these relationships with powerful and influential people is not merely to provide for one's immediate needs, but to prepare for whatever exigencies may arise in the future.[740]

In Saudi Arabia, *wasta* is a deep-rooted practice in the society. *Wasta* can be used to obtain a license or permit or a favorable legal ruling. The hierarchical system of power is parallel with the similar hierarchical system of resources—that is, not everyone has the same access to the

---

[734] Saleh Al-Harbi et al., *Culture, Wasta and Perceptions of Performance Appraisal in Saudi Arabia*, 28 INT'L JOURNAL OF HUMAN RES. MGMT. (forthcoming 2017).
[735] *See, e.g.*, Al-Ramahi, *supra* note 724, at 36 ("[*Wasta*] is also a personal exchange system between members of society that is entrenched in the tribal structure of the country.").
[736] Tlaiss & Kauser, *supra* note 702, at 476.
[737] *Id.*
[738] *Id.* at 476-77.
[739] *Id.*
[740] *Id.*

same resources; thus, the scarcer the resource that is sought, the stronger the *wasta* represented by a powerful individual who has a higher rank in the hierarchal system. In this sense, though the use of *wasta* is essentially to overcome a barrier, *wasta* itself can be a barrier in some cases. To illustrate, resources or services can be restricted to those who have a strong *wasta*, despite their merits or eligibility. It also worth noting that the frequency and intensity of using *wasta* varies from one institution to another and also from one object sought to another.

In ordinary life, *wasta* can be sought in order to avoid burdensome bureaucratic procedures, in recruitment or promoting, or to obtain certain services.[741] In Saudi Arabia, as in many Arab nations, *wasta* seems to be an effective means of dealing with weak institutions. Thus, "the family network functions as a 'state within a state'."[742] Nowadays, the existence and practice of *wasta* cannot be denied, despite the debate about whether it is beneficial or not. It is unfortunate that people use *wasta* to get things that they are entitled to by law, and that without *wasta* a person may not be able to get them.[743] In these situations, *wasta* itself acts as a barrier.

The most notable situation in which *wasta* is used and practiced is in recruitment or promoting scenarios.[744] The family-based nature of Saudi society means that "the prestige and wealth of families … determine the level of power and influence, i.e. *wasta*, not only to position

---

[741] Samih Farsoun, *Family Structure and Society in Modern Lebanon*, *in* PEOPLES AND CULTURES OF THE MIDDLE EAST 257, 270 (Louise Sweet ed., 1970) (The general use of *wasta* may be captured in Farsoun's description of Lebanon where he notes that "[o]ne needs *wasta* in order not to be cheated in the market place, in locating and acquiring a job, in resolving conflict and legal litigation, in writing court decisions, in speeding governmental action and establishing and maintaining political influence, [or] bureaucratic procedures.").

[742] Kropf & Newbury-Smith, *supra* note 725, at 19.

[743] *Id*. at 18 ("Often overlooked in regard to *wasta* is the fact that it is not simply employed to secure privileges or speed-up matters, particularly bureaucratic; it is often used to get things *at all*, such as those [one is] entitled to by law.").

[744] *See, e.g.*, SHELLY ANDERSON, FALLING OFF THE EDGE OF THE WORLD 118 (2013) ("the better the connection [*wasta*], the better the job.").

their members in desired jobs but to influence their career advancement as well."[745] Regional

background is another factor in the use of *wasta* in the recruitment or promoting process.[746]

Generally, *wasta* eliminates the merits and qualifications requirements in either recruitment or

promoting. A number of incidents have clearly demonstrated the existence and the thriving of

*wasta* practices in employment procedures.[747]

      Further, individuals use *wasta* to obtain certain services provided mainly by the

government, most notably education and health services. Though most health services in Saudi

Arabia are provided by the government for free, access to these services is not necessarily equal.

Thus, individuals may use *wasta* in scheduling an appointment or even in some cases to be

admitted to see a doctor.[748] Education, mainly higher education, is also an area where *wasta* plays

---

[745] Fatin Al-Hussain & Abdulkareem Al-Marzooq, *Saudi Men and Women Work Participation: The Use of Wasta to Overcome Sociocultural Barriers*, *in* THE POLITICAL ECONOMY OF WASTA: USE AND ABUSE OF SOCIAL CAPITAL NETWORKING 95, 101 (Mohamed A. Ramady ed., 2016).

[746] Al-Harbi et al., *supra* note 734, at 11 (As one of the interviewees noted, "If the employee says to the manager I'm from Hail or Quassim, that will invite sympathy from the manager to give the employee a high grade." Another interviewee noted, "The name of the family is important. The ordinary person who does not have a family name that has strong power, it's difficult for him to get a good position even if his performance exceeds expectations.").

[747] *See* Badria Al-Bishr, *I hate Saudi wasta!*, SAUDI GAZETTE, May. 9, 2014, https://uk.news.yahoo.com/hate-saudi-wasta-000000682.html ("The young man's father-in-law called him and asked him to go to a certain government agency to pick up the approval letter regarding his wife's appointment to a position in the agency. The official in charge handed him the appointment letter and told him not to tell anyone about this job and how it had been given to his wife. He said: Nobody knows about these positions. So keep the secret."); *see also* Mellahi, *supra* note 715, at 115 ("employees with strong tribal or family connections are often placed in a more advantageous position when it comes to promotion. This is especially true in large and public sector organizations.").

[748] Al-Bishr, *supra* note 747 (For example, this story was narrated by a writer in one of the newspapers: "My relative said there was a long line of people waiting to see the doctor and some of them must have been waiting for hours. However, it took him and his wife only a few minutes to see the doctor and have him examine their three children. The doctor requested an X-ray for the children. Usually, it takes a few months to have an X-ray done at a government hospital because you have to wait your turn. But they did not need to do that.").

a significant role, though the introduction of an electronic application process has reduced the practice of *wasta* to some extent.[749]

Lastly, lengthy and cumbersome bureaucratic procedures have forced Saudis to use *wasta*. In this grey area, *wasta* is used to overcome costly and difficult bureaucratic red tape. The dark side to this, however, is that *wasta* is used by those who might not succeed if decisions were based on individual merit.[750] This can occur in obtaining a permit or license of any kind, all the way up to winning a government contract.[751] The introduction of e-government in some governmental agencies, such as the Ministry of the Interior, has successfully reduced the number of interventions and uses of *wasta*, yet some of the e-government processes remain as slow as, if not even slower than, they were before.[752]

In general, this can be attributed to the absence of clear rules, which aggravates citizens' unfamiliarity with the legal system.[753] The lack of clarity is associated with the wide discretionary powers that are vested in the hands of officials, who tend to extensively, and in some cases inconsistently, issue regulations and procedures.[754] This situation seems to be consistent with the

---

[749] Al-Hussain & Al-Marzooq, *supra* note 745, at 111 ("Some Saudis have been impacted negatively by their connection to influential people such as father, uncle, husband, or in-laws. They, like their connections, are very successful as they have got the benefit of good education in reputable schools, fluency in more than one language, and international experience."); *see also Female students demonstrated against lack of fairness in the admissions process, Saudi female students storm Mecca's Umm Al Qura university campus*, AL-ARABIYA NEWS, July. 26, 2011, http://english.alarabiya.net/articles/2011/07/26/159336.html.

[750] Barnett et al., *supra* note 672, at 41.

[751] MOHAMED A. RAMADY, THE SAUDI ARABIAN ECONOMY POLICIES, ACHIEVEMENTS, AND CHALLENGES 208 (2010) ("Others argue that the system can sometimes lack transparency, with government tenders linked to [favors] and whom you know or *wasta*, especially for large government tenders.").

[752] Kropf & Newbury-Smith, *supra* note 725, at 19.

[753] VLIEGER, *supra* note 340, at 222 ("It is thus not surprising that Emirati and Saudi citizens demand clarity on rules in their dealings with more powerful parties such as the government, but they refrain from doing so in their dealings with less powerful parties such as migrant workers.")

[754] *See, e.g.*, Pillay & Dorasamy, *supra* note 660, at 363-78.

characteristics of high uncertainty avoidance societies, in which individuals to some extent become preoccupied with need for rules and regulation; the extensive promulgation of regulations and rules leads to the existence of inconsistent, or even dysfunctional, rules.[755]  Eventually, this situation leaves a wide open door for *wasta* to be practiced and to thrive.

### C.  Is Wasta an Act of Corruption? When and How? Legal or Moral?

*Wasta* can be perceived either as a form of corruption or as a form of networking. At either end of the spectrum, *wasta* can be viewed differently. On the one hand, *wasta* can be viewed as a useful means of resolving disputes. On the other hand, *wasta* may involve the use of power in order to secure certain advantages, which can be perceived as corruption.[756] Distinguishing between these dimensions of *wasta* is not an easy task. From one perspective, *wasta* is viewed as a means of reducing and overcoming red tape, and therefore as legitimate, while from another perspective, mainly that of those who do not have *wasta*, it is viewed as a mere act of corruption.[757] Clearly, *wasta* is an ambiguous practice. It can serve to enhance fairness and help the disadvantaged, but it also inappropriately benefits family members or those who are financially powerful. In reality, today *wasta* seems to be a negative term that most often refers to corruption.[758]

In its origins, *wasta* had a more positive function; today, however, it is a pervasive problem.[759] Manifestly, *wasta* has some of the consequences that corrupt practices do. Although,

---

[755] HOFSTEDE ET AL., *supra* note 66, at 209.

[756] Al-Ramahi, *supra* note 724, at 38.

[757] *Id*. at 53.

[758] *Id*. at 54.

[759] Charles D. Adwan, *Corruption terminology in the Arabic language*, MIDDLE EAST AND NORTH AFRICA GOVERNANCE NEWS AND NOTES, 11–12 (2008). http://siteresources.worldbank.org/INTMNAREGTOPGOVERNANCE/Resources/Charlespiece onTerminology.pdf

as in the case of corruption, some research argues that *wasta* is beneficial,[760] yet it is definitely more beneficial for those who have access to it or those who are influential and powerful.[761] As noted above in regard to the consequences of corruption, *wasta* negatively affects economic competition and the development of nations where it is widely practiced. Since it depends more on connections than on merits and qualifications, *wasta* provides entities with unqualified resources, which eventually affects the productivity and performance of these entities, as well as destroying fair competition.[762] In a similar vein, *wasta* decreases individuals' incentives to develop their skills or merits, since they become more dependent on *wasta* than on their skills or capabilities.[763]

　　　　Socially, *wasta*, similar to corruption, leads to social inequality. To have a strong *wasta*, one must already have connections, and thus "*wasta* may create a reinforcing cycle where the powerful receive the resources while the weak becomes weaker."[764] Broadly speaking, *wasta* provides undue advantages and benefits to certain individuals or groups rather than others, and does not do so based on merit, and thus, rather than reinforcing social equality, *wasta* corrodes it. Though this may be clearly seen in scenarios of recruitment or promotion, it can also be seen, even if less clearly, in other domains, including the provision of services and rule of law applications.

---

[760] Tlaiss & Kauser, *supra* note 702, at 469 ("[*W*]asta can strengthen social ties and networks and deepens social cohesion, reinforce social relations and strengthen ties within kinship groups."); *see also* Fawaz B. ALHussan et al., *The Benefit of Wasta Network: The Arab Middle East region* (Kolding, Denmark 31st IMP Conference 2015).

[761] Tlaiss & Kauser *supra* note 702, at 473 (quoting a junior public sector manager in Syria who said, "I think wasta is not good because there is little fairness. It is only good for the person who has wasta [. . .] the majority of people are disadvantaged because they have no wasta [. . .] or even access to a wasta [. . ] wasta benefits only the few and influential.").

[762] Robert B. Cunningham & Yasin K. Sarayrah, *Taming "Wasta" to Achieve Development*, 16 Arab Stud. Q. 29, 36-37(1994).

[763] Tlaiss & Kauser *supra* note 702, at 479.

[764] Mohamed & Mohamad, *supra* note 671, at 412-13.

Similar to what has been noted above about the consequences of corruption, *wasta* has a negative legal impact. Effectively, *wasta* negatively affects equality before law and the equal enforcement of the law, which eventually leads to having less effective laws.[765] At a trivial level, for instance, many violators of traffic laws who are subject to imprisonment according to the law will be released simply because they have *wasta*.[766] This phenomenon is not limited to such cases; other cases can be subject to the influence of *wasta*, though they vary in intensity and frequency.

In general, *wasta* is a form of favoritism that involves discrimination in favor of an individual's tribe or group. Though it provides benefits and advantages to those using and practicing it, *wasta* comes with a cost that increases and decreases with the size of discriminated-against groups. In his analysis, Bucker provided a comprehensible explanation. He distinguished between the situation in the United States and that in South Africa, where the size of the discriminated-against groups differed; that is, the majority in the United States are whites, whereas whites are a minority in the context of South Africa. In essence, if the discriminated-against group is small, the cost of such discrimination is relatively small in comparison to a situation where the size of the discriminated-against group is large, in which the cost will be large as well.[767]

Applying the previous analysis to the practice of *wasta*, it can be argued that if the use of *wasta*, as a form of discrimination, is carried out by the majority group to favor its members rather than the minority group, the cost is relatively small since the minority, rather than the

---

[765] *See, e.g.*, VLIEGER, *supra* note 340, at 216 ("In both countries—but especially in Saudi Arabia—many interviewees complained about the fact that the elite seem to be above the law entirely.").

[766] *Id*. at 222 ("One explained that his son was arrested when he was in a neighborhood where a car had been broken into: 'There was no evidence at all, but nevertheless they refused to let him go. So I called my boss and he called a prince, and then he was released.'").

[767] *See generally* GARY S. BECKER, THE ECONOMICS OF DISCRIMINATION (2010).

majority, will bear the cost.[768] The reverse situation is one that imposes more cost on both sides—

the majority who is discriminated against, and the minority who practice discrimination, or *wasta*,

as well. In the Saudi context, the latter situation seems to be more applicable, since the minority

are carrying out discrimination, whereas the size of the group being discriminated against is not

small.[769] For example, if the members of one regional group are practicing *wasta*, then the size of

this group is small, since the size of this group is one region out of thirteen. The same can be said

in the case of tribal groups when there is one tribe against many, and so on. However, if several,

or most, regional groups or tribes are practicing *wasta*, then the cost to the society becomes very

high.

After considering generally the main consequences of *wasta*, it is important to consider

how individuals perceive it morally. Among the Arab nations, for instance, 90 percent of

Jordanians surveyed said they would continue using *wasta* in the future, even while 87 percent

expressed a desire to see *wasta* eliminated.[770] This suggests that individuals perceive *wasta*

negatively despite the de facto widespread practice of *wasta*, even by those who perceive it

negatively. Another study, targeting people's perception of the competency and morality of those

who obtained their employment via *wasta*, showed that those who were appointed by *wasta* were

perceived as less moral and less competent.[771] Interestingly, however, respondents of lower

socioeconomic status perceived those who used *wasta* more positively than did respondents of a

more affluent status.[772] Ironically, another study showed that students who had completed an

---

[768] Barnett et al., *supra* note 672, at 44.
[769] *Id*.
[770] SA'EDA KILANI & BASEM SAKIJHA, WASTA: THE DECLARED SECRET 17 (2002).
[771] Mohamed & Mohamad, *supra* note 671, at 412.
[772] *Id*. at 421.

ethics class tended to use *wasta* in the future, which suggests that such classes are ineffective in promoting the change of such a resistant practice.[773]

In the Saudi context, a similar pattern exists where individuals of lower socioeconomic status perceive those using *wasta* in recruitment and promotion relatively less negatively. The difference can be seen in how men and women perceived those who were promoted due to *wasta*. In this context, 77 percent of men perceived an individual promoted through *wasta* as less competent, while only 46 percent of women did.[774] From the morality perspective, 54 percent of men perceived anyone promoted because of *wasta* as less moral, while only 33 percent of women did.[775]

More broadly, the same survey revealed a pattern of perceptions similar to those of other Arabs, where respondents perceived *wasta* as an unfair practice and corruption but still believed it was a tool to overcome barriers. Though both women and men agreed, by 67 percent and 66 percent, respectively, that *wasta* was a means to overcoming barriers, there was a difference in how they perceived *wasta* generally:[776] among women, 57 percent believed that *wasta* was a form of corruption that introduced low morality into the organization, and 61 percent perceived it as an unfair practice.[777] Among men, 80 percent considered *wasta* as a form of corruption and 76 percent considered it an unfair practice.[778]

To illustrate the role of socioeconomic status in perceiving *wasta*, a comparison between the generations may be significant. Though Saudi men hold a negative view of *wasta* regardless

---

[773] Gary D. Gold & George S. Naufal, *Wasta: The Other Invisible Hand: A Case Study of University Students in the Gulf*, 2 J. ARABIAN STUD. 59, 68 (2012).
[774] Al-Hussain & Al-Marzooq *supra* note 745, at 103.
[775] *Id.*
[776] *Id.*
[777] *Id.*
[778] *Id.*

of their generation, a difference in views can be noted between the younger and older generation

of women. While only 44 percent of the older generation of women perceived *wasta* as an unfair

practice, this rose to 65 percent among the younger generation.[779] The same pattern is apparent in

terms of viewing *wasta* as a corrupt practice, where 48 percent of the older generation of women

did so, whereas among the younger generation, 61 percent did so.[780] A significant difference

between the perceptions of the younger and the older generation of women was found in regard to

the belief that those who were promoted through *wasta* were less competent. While 27 percent of

the older generation perceived them as less competent, 52 percent of the younger generation did

so.[781]

This seems to be in line with the findings, mentioned above, that people of lower

socioeconomic status tend to view *wasta* more positively. Accordingly, the difference between

the view of *wasta* among the younger and the older generation of Saudi women can be attributed

to the change in their socioeconomic status. In Saudi Arabia, the socioeconomic status of women

has changed significantly during the last decade, which can be seen in the dramatic increase in the

percentage of Saudi women participating in the private sector, whereas Saudi men's

socioeconomic status was not subject to the same shift.[782]

Regardless of whether they perceive *wasta* negatively or positively, individuals seem to be

continuing to use *wasta* in their life. It is also important to emphasize that the contemporary form

of *wasta* is clearly inconsistent with Islamic teachings and jurisprudence. As explained in Chapter

---

[779] *Id*. at 110.

[780] *Id*.

[781] *Id*.

[782] Abdulrahman Almsbahi, *According to the Saudi Ministry of Labor, The Percentage of Saudi Women Participating in the Private Sector has Drastically Increased by Around 670 Percent Between 2011 and 2015*, OKAZ NEWSPAPER, Oct. 20, 2015, http://www.okaz.com.sa/new/Issues/20151020/Con20151020803405.htm

2, Shari'a has a firm position against *wasta*, which is similar, to some extent, to the prohibited

forms of *shafa'ah*. For instance, the emphasis on hiring based on qualifications and merit can be

found in several Qur'anic and Sunnah texts.[783]

The broader psychological explanation for the dissonant behavior of condemning *wasta*

while continuing to use it is provided by self-justification theory. The inconsistent attitude

towards *wasta* and its widespread practice is simply a form of what is known as cognitive

dissonance, where people hold two incompatible beliefs at the same time.[784] Since people "are

motivated not so much to *be* right as to believe [they] are right (and wise, and decent, and good),

they tend to reduce such dissonance."[785] This dissonance reduction, though irrational, is mainly

aimed at protecting the ego and providing a positive image of the self.[786] Thus, individuals

committed to a certain attitude develop a strong desire for self-justification, leading them to resist

any attempt to change such an attitude.[787] What cognitive dissonance theory provides, then, is an

illustration of the efforts people undertake to live with troublesome situations: if the situation is

unpleasant and at the same time negative, people seek to cognitively minimize the

unpleasantness.[788]

In addition to self-justification, individuals develop system-justification, in which they

engage in motivated psychological processes "to imbue the status quo with legitimacy and to see

---

[783] *See* Ahmed A. Mohamed & Hadia Hamdy, *The Stigma of Wasta: The Effect of Wasta on Perceived Competence and Morality* 2 (German University in Cairo, Working Paper No. 5, 2008) ("In the Quran, Muslims are instructed that 'the best that you can hire employee is one who is competent and trustworthy' (Quran, 28, 26). Prophet Mohamed is also reported to have said 'He who is in a leadership position and appoints knowingly a person who is not qualified to manage, than he violates the command of God and His messenger'.").

[784] ELLIOT ARONSON & JOSHUA ARONSON, THE SOCIAL ANIMAL 184 (10TH EDITION 2003).

[785] *Id*. at 186.

[786] *Id*. at 192.

[787] *Id*. at 206.

[788] *Id*. at 232.

it as good, fair, natural, desirable, and even inevitable."[789] System dependence and a sense of inevitability play significant roles in developing and motivating system-justification processes.[790] Similar to self-justification, individuals within the system attempt to defend the legitimacy of the system in order to reduce their cognitive dissonance.

This may be particularly applicable to *wasta* practices, and more generally to systemic corruption. Since individuals are dependent on the system and *wasta* practices, they tend to defend not only the use of, but also the legitimacy of such practices. This suggests that the more dependent the individuals are, the more likely they are to defend and justify the practices, which can partly explain the differing views among those of low and high socioeconomic status.[791]

Individuals may be also motivated by the system's seeming inevitability, which, as with self-justification, leads them to make the best of an inevitable situation. In reality, it is difficult to abandon most social systems or norms, since that would involve significant loss.[792] Thus, ironically, although "rational people should judge systems from which they cannot escape most harshly, system-justification theory instead predicts that, all else being equal, people will show more system defense within inescapable systems."[793]

Cultural differences exist in the dissonance reduction processes. For instance, dissonance-reducing behavior in less individualistic societies may exist in a more communal form.[794] North American researchers have shown that people who agree to tell a lie for a small monetary reward

---

[789] Jost et al., *supra* note 559, at 887.

[790] *See* Aaron C. Kay & Justin Friesen, *On Social Stability and Social Change: Understanding When System Justification Does and Does Not Occur*, 20 CURRENT DIRECTIONS IN PSYCHOL. SCI. 360, 360 (2011).

[791] *Id*; *see, e.g.*, Mohamed & Mohamad, *supra* note 671, at 412 ("Applying this to *wasta*, it could be that individuals from lower socioeconomic groups had more positive attitudes towards *wasta* users because doing so makes them feel consistent.").

[792] *See* Kay & Friesen, *supra* note 790, at 362.

[793] *Id*.

[794] ARONSON & ARONSON, *supra* note 784, at 249.

tend to resolve the cognitive dissonance this creates by believing the lie; however, in the Japanese context, which is considered a communal culture, individuals who only watched a friend who participated in the experiment telling a lie to someone else experienced cognitive dissonance and resolved it by believing the lie their friend had told. This suggests that the experience of certain widespread practices by individuals in a communal culture may strongly encourage them to reduce their cognitive dissonance by in some way justifying or excusing those practices.[795]

Shifting focus from the issue of morality and *wasta*, it is appropriate to consider *wasta* from a legal perspective. In this regard, *wasta* practices overlap with a number of criminal corrupt acts. Viewed more narrowly*, wasta* may involve nepotism or cronyism, where an official uses his authority to advantage a relative, friend, or acquaintance. More broadly, *wasta* may include the abuse of power, which involves, inter alia, trade in influence practices. Thus, the legal characterization and practice of *wasta* may involve a grey area, where *wasta* may fall outside the scope of legal provisions.

Before approaching more complex issues, we should highlight the Saudi legal provisions related and applicable to *wasta*. First, Article 4 of the Saudi Anti-Bribery Law states that "any public official who has violated any of the functions of his duty by committing or abstaining from any functions of his duties, as a result of a request, recommendation, or mediation, is deemed to be tantamount to having received a bribe; he shall be punished with imprisonment for a period not exceeding three years or a fine not exceeding 100,000 Riyals [equivalent to $26,664], or both."[796]

---

[795] *Id*. at 250 (*citing* Haruki Sakai, *A Multiplicative Power-Function Model of Cognitive Dissonance: Toward an Integrated Theory of Cognition, Emotion, and Behavior After Leon Festinger*, *in* COGNITIVE DISSONANCE: PROGRESS ON A PIVOTAL THEORY IN SOCIAL PSYCHOLOGY 267-94 (Judson Mills, Eddie Harmon-Jones eds., 1999)). Mohamed & Mohamad, *supra* note 671, at 416 (In addition, "[i]t is possible that dissonance is reduced when individuals observe that many members of society also use *wasta*.").

[796] Anti-Bribery Law, Royal Decree No. M/36 of 1412H (corresponding to 1992), art. 4 (SA).

The phrase "by committing or abstaining from any functions of his duties" can be understood in two different ways based on one of two different judgements that can be reached. Applying the law broadly, it can be read literally, as saying that, whether whatever action the official took fell under his duty or not, he violates the provision only by doing so "as a result of a request, recommendation, or mediation." To put it another way, when a public official acts because of *wasta*, this act is a violation of Article 4, whether he acts within his authority or not. Reading the law more narrowly, the violation occurs when the act of a public official is not within his duty or authority.[797] This latter is what seems to have been adopted in Saudi courts.[798]

Accordingly, the actus reus in this crime is the act that violates the duty of the public official or the mere abstaining from performing the duty. Unlike bribery, the mere acceptance of the request, recommendation, or mediation (*wasta*) does not hold the actor criminally liable. Thus, the act or abstaining must be taken to be held criminally liable.[799] Further, the causation between the actus reus and the acceptance of the request, recommendation, or mediation (*wasta*) must be proven. This crime also requires a mens rea, which is a general intent to accept the request, recommendation, or mediation (*wasta*). Thus, if the public official believes that he is acting in accordance with his duty and authority, the mens rea is absent.[800] This may occur, for instance, in the case that a public official believed that he was carrying out an order of a supervisor.[801]

---

[797] Awad A. Al-Enzi, Not Real Bribery (Bad Intercession) (May. 5, 2014) (unpublished master's thesis, Naif Arab University for Security Sciences) (on file with author).

[798] ABD AL-FATAH KHIDR, BRIBERY AND FORGERY CRIMES IN SAUDI LAW [Jarā'im Al-tazwīr Wa-al-rashwah Fī Anẓimat Al-mamlakah Al-'arabīyah Al-su'ūdīyah] 382 (2007) (The published cases suggest that the Board of Grievances adopts the narrow explanation which requires the violation of duty and authority to be held criminally liable under Article 4.); *see Judicial Published Cases*, BOARD OF GRIEVANCES (Nov. 21, 2016), http://www.bog.gov.sa/ScientificContent/JudicialBlogs/Pages/default.aspx

[799] KHIDR, *supra* note 798, at 381-3.

[800] *Id*.

[801] *Id*. at 384-5.

The second related provision is Article 5 of the same law, which states that "any public official shall be deemed to have received a bribe if he has solicited for himself or for others, or accepted, or received a promise or gift for exercising real or alleged influence, in order to obtain from any public authority any act, matter, decision, obligation (contract), license, supply agreement, or to obtain a job, services, or any other kind of benefit or advantage; he shall be punished with the penalty provided in Article 1 hereof."[802]

This article requires three elements: (1) a public official who has real or alleged influence and who (2) demands or accepts a promise or benefit of any kind (3) to use this influence to obtain any advantages from any public authority.[803] The intention required for this act is a general intent. Accordingly, the mens rea element is met once the actor demands or accepts what has been offered, knowing that this was in exchange for using the influence, which then does not require carrying out the promise.[804]

Though there are some similarities between *wasta* and trade in influence, they might differ depending on whether the legal provisions can be applied or not. As explained above, it is not always the case that the source of such influence is occupying a certain office or formal position, i.e., being a public official.[805] Further, trade in influence and *wasta* might be distinguishable, since the return in trade in influence can be visible and semi-immediate, which is not the case in *wasta*. As noted previously, *wasta* might be prospective, rather than immediate.

---

[802] Anti-Bribery Law, *supra* note 796 (The penalty in Article 1 is imprisonment for a period not exceeding ten years or a fine not exceeding one million Riyal or both.).
[803] *See generally* KHIDR, *supra* note 798, at 442-51.
[804] *Id*. at 452.
[805] *See* Law No. 58 of 1937, art. 106 (Criminal Code of 1937, reformed in 1952), *Al-Jaridah Al-Rasmiyya* (Egypt). Act No. 16 of 1960, art. 119 (Kuwaiti Penal Code of 1960), *Official Gazette* (Kuwait) (Other countries thus do not require that the actor to be a public official, which extends the application of such provisions to anyone who has economic or social influence.).

Lastly, a distinction must be made between trade in influence, criminalized by Article 5, and abuse of power. The abuse of power is criminalized in Article 2 (A) of Royal Decree No. 43, which states that

> any public official who commits, and any individual, whether a public official or not, who aids and abets in the commission of one of the following offenses shall be punished by imprisonment for a term not exceeding ten years or a fine not exceeding twenty thousand Riyals [equivalent to $5,333] ….

### A.  Abuse of power for private interest[806]

From an analysis of most of the cases published by the Board of Grievances,[807] it seems that the scope of this particular provision and Royal Decree No. 43 in general are similar to the scope of U.S. Color of Law violations.[808] Furthermore, the promulgation of the previous provision, and including it with the Anti-Bribery Law offenses, suggests and supports such conclusion and finding.[809] This does not, however, eliminate the possibility of applying this provision to *wasta*.[810] This provision offers some advantages in fighting *wasta*, yet it causes some difficulties in proving such a violation.

On the positive side, the scope of this provision does not require the legal character of public official in the aider and abettor, allowing the prosecution of those whose source of power is

---

[806] Royal Decree No. 43, 29/11/1377H (Corresponding to June. 17, 1958), art. 2. (SA).

[807] BOARD OF GRIEVANCES, *supra* note 798.

[808] 18 U.S. Code § 242 (2000). COLOR OF LAW, Black's Law Dictionary (10th ed. 2014) (Color of law is defined as "[t]he appearance or semblance, without the substance, of a legal right.  The term implies a misuse of power made possible because the wrongdoer is clothed with the authority of the state. State action is synonymous with color of [state] law in the context of federal civil-rights statutes or criminal law.").

[809] The Anti-Bribery Law was amended by Royal Decree No. M/36 in 1412H (corresponding to 1992), more than three decades after the promulgation of Royal Decree No. 43, which was issued in 1958.

[810] *See generally* SULIMAN M. AL-JORESH, ALFASAD ALEDARY [Administrative Corruption] (2003).

not the public office. Further, it sets private interest as the threshold to be charged under this provision. Thus, the scope of this provision is broader than Article 5 of the Anti-Bribery Law. On the negative side, the difficulty manifests in the proving and providing sufficient evidence for such a violation. Providing sufficient evidence for private interest and the abuse of power, especially if the decision was made within the scope of an official's authority, is not an easy task, let alone proving aiding and abetting.

Even with these provisions, there is a grey area that remains legally questionable. To give a comprehensive view, scenarios must be provided. Consider the situation where an official provides certain advantages falling under his broad discretion to one of his relatives or acquaintances, yet he does not provide such an advantage for others. In this case, what this official does is with no doubt legal, but it is not necessarily fair. Another scenario is one in which *wasta* is an additional factor—that is, among many individuals who are eligible for certain advantage, the chosen individual is one who has *wasta*. This situation thrives in recruitment and promotion scenarios, where *wasta* provides a fast track for one employee rather than another.

Since a person's family can be recognized by his family name, which usually indicates a person's tribe and the region of origin, more complicated scenarios exist. Consider an individual who applies for a certain position without using *wasta* during any of the procedures involved. Yet, when reviewing the files, an official responsible for such procedures recognizes that his family name was familiar or that the applicant belongs to the same region or tribe as the official does, which leads this official to act in favor of the applicant. To further complicate the situation, an official might do so not because the applicant belongs to the same region or tribe as the official but because the official knows that the father of the applicant holds a high position in another

entity. Consequently, the official exercises favoritism toward the applicant in order to develop a prospective relationship with his father.

Clearly, the fight against *wasta* is not an easy one since it involves economic, social, and political elites promoting a dual system that involves both informal social patterns and formal institutions.[811] Furthermore, the success or failure of an individual will be influenced by the strict hierarchies of power and interpersonal relations in particular circumstances.[812] Thus, "[n]o amount of external criticism can change the inner structure of a patronage system, for wherever patriarchal relations exist … patronage dominates."[813] In short, *wasta* is a cumulative and hydra-headed problem such that "distinguishing the many dimensions of [it] is problematic."[814]

To summarize, as with many corrupt practices and acts, *wasta* is highly contextual. Consequently, whether it is a negative or positive phenomenon may be determined on the basis of the individuals involved, their intentions, the qualifications, and the context. What must be taken into consideration is that opting out of the system of *wasta* is difficult, as the societies in which it is practiced are highly collectivistic and use high-context communication. Thus, one is expected to say "yes" to an individual asking for *wasta* in a face-to-face situation, but then not carry out the promise. One is also expected to use another escape clause, such as the evasive *bukrah* (tomorrow) or *in sha Allah* (if God wills) instead of saying "no." The judgment, therefore, whether it is a moral or a legal one, will vary significantly depending on the context.[815]

---

[811] Al-Ramahi, *supra* note 724, at 53.

[812] *Id.*

[813] *Id* (*quoting* HISHAM SHARABI, NEOPATRIARCHY: A THEORY OF DISTORTED CHANGE IN ARAB SOCIETY 47 (1988)).

[814] *Id.*

[815] Kropf & Newbury-Smith, *supra* note 725, at 20.

CONCLUSION

It is evident that *wasta* constitutes a significant problem in Saudi Arabia. From the Shari'a and Islamic law perspective, *wasta* is rejected on a number of bases. The current form of *wasta* clearly departs from the permissible *shafa'ah* and takes the opposite form, i.e. the forbidden *shafa'ah* which violates the principles of Shari'a. Further, Shari'a in its essence aims at protecting morality, which includes the promotion of the principles of honesty and justice that the practice of *wasta* contradicts. Such a practice is based on favoritism and discrimination, which essentially hinder the equal application of law.

The short reach and the scarcity of the provisions prohibiting the practices of favoritism and discrimination generally and the practice of *wasta* particularly aggravates the issue and facilitates its prevalence. This is coupled with a culture that also provides a fertile ground for *wasta* to be practiced frequently. Those factors and others highlighted in this chapter contribute to the difficulties of fighting *wasta*.

CHAPTER SIX: THE SAUDI ANTI-BRIBERY LAW

INTRODUCTION

Like a number of countries, Saudi Arabia enacted several regulations to fight corruption rather than adopting an inclusive anti-corruption law. Since the establishment of Saudi Arabia, a number of laws were enacted and amendments were issued in order to fight corrupt practices. The Anti-Bribery Law is considered to be the main legal instrument on which the government relies to fight bribery and related corrupt practices.

The Law defines the offense of bribery, in addition to other related corrupt practices, including inter alia trade-in-influence and the acceptance of *wasta*. It also regulates the defense and the rewards of whistleblowers. After exploring the Saudi anti-corruption legal framework, this chapter will be devoted to explaining in general the offenses included in the Law. It also underlines other aspects of the Law's provisions: the jurisdiction of the application of the Law, penalties, the rewards of whistleblowers, the role of effective regret, and other defenses.

*A.   The Saudi Anti-Corruption Legal Framework*

In the first instance, a National Strategy for Protecting Integrity and Combating Corruption was promulgated in an effort to strengthen the measures to fight corruption.[816] The Strategy in its Introduction embraces a wide view of corruption, stating that corruption "includes every act that threatens the public interest as well any abuse of the civil service in order to earn an individual advantage."[817] The broad view can be also seen in the targets and the means adopted by the Strategy.[818]

---

[816] Council of Ministers Decision No. 43, 1/2/1428H (corresponding to Feb. 19, 2007) (SA).

[817] *See National Strategy for Protecting Integrity and Combating Corruption*, NATIONAL ANTI-CORRUPTION COMMISSION (Nov. 15, 2016, 8:05 AM) http://www.nazaha.gov.sa/en/About/Pages/Strategy.aspx

[818] *Id.*

The Strategy's significant impact can be seen in two main results. First, Saudi Arabia has ratified the United Nations Convention Against Corruption, which was signed by Saudi Arabia three years before the promulgation of the Strategy.[819] The ratification should increase the measures a country adopts in fighting corruption. Second, the Strategy established specifically a National Commission for Combating Corruption and generally an apparatus to fight corruption.[820]

In the Saudi legal system, laws and decrees have been promulgated that aim at fighting a number of corrupt practices. Royal Decree No. 43[821] is the one of oldest legal documents criminalizing number of corrupt practices and acts. The Decree criminalizes the engagement of a public servant in commercial or business activities without permission, which is punishable by a fine of between 1000 Riyals and 10,000 Riyals (equivalent to $266 and $2,660).[822] Further, in Article 2 the Decree criminalizes a number of acts including, inter alia, abuse of power and authority, embezzlement, and the use of excessive power and coercion.[823] The acts and practices falling under Article 2 are punishable by a maximum of 10 years in prison, monetary penalties of a maximum of 20,000 Riyal (equivalent to $5,333), or both. Those practices were then included

---

[819] Saudi Arabia Signed on 9 Jan 2004, and ratified on 29 April, 2013; *see United Nations Convention against Corruption Signature and Ratification Status as of 12 December 2016*, UNITED NATION OFFICE ON DRUGS AND CRIMES (Nov. 15, 2016, 8:05 AM) https://www.unodc.org/unodc/en/treaties/CAC/signatories.html

[820] *See National Strategy for Protecting Integrity and Combating Corruption*, *supra* note 824 ("establishing a National Commission for Combating Corruption that takes over the following tasks:
A. Tracking the implementation of the strategy, monitoring its results, evaluating and auditing it, and setting its programs of action and its application's mechanisms.
B. Coordination of the efforts of both the public and the private sectors concerning planning, monitoring and evaluating the anti-corruption systems.
C. Receiving, analyzing and producing analysis sheet for the periodical reports and statistics of the relevant bodies.
D. Collecting, classifying, assessing, analyzing and exchanging the information, data and statistics with the relevant specialized agencies.").

[821] Royal Decree No. 43, *supra* note 806.

[822] *Id*. art. 1(A).

[823] *Id*. art. 2.

as being prohibited for civil servants and public officials in the Civil Service Law, but that law did not specify the penalties.[824]

The Employee Discipline Law focuses on the administrative, rather than the criminal, aspect of corrupt practices. Thus, the law does not include the prohibition of acts per se; rather, it includes any "financial and administrative violations."[825] Accordingly, the penalties in this law are administrative, and range from warning to dismissal.[826] The administrative character of this law can be derived from Article 25, which indicates that if the accusations are crimes, the investigation must be terminated and transferred to the authority holding jurisdiction over those matters.[827]

Public-Fund Management Act also criminalizes embezzlement, considering such custodians' positions as an aggravating circumstance,[828] though the maximum monetary penalty is 100,000 Riyal (equivalent to $26,664) and the prison time remains the same, a maximum of 10 years.[829] It is noteworthy that the Bill for a Law of Abuse of Public Trust has languished for

---

[824] Civil Service Law, Royal Decree No. M/49 of 1397H (corresponding to 1977) (SA) (Article 12 prohibits public servants from the following:
  1. Abuse of functions
  2. Active and passive bribery.
  3. Accepting gifts.
  4. The disclosure of secrets of offices.
Article 13 prohibits public servants from engaging directly or indirectly in outside commercial or business activities.); *see also* Officers Service Law, Royal Decree No. M/43 of 1393H (corresponding to 1973), art. 17 (SA) (Prohibiting the same acts in Article 12 of Civil Service Law.).
[825] Employee Discipline Law, Royal Decree No. M/7 of 1391H (corresponding to 1971), art. 3 (SA).
[826] *Id*. art. 32.
[827] *Id*. art. 25.
[828] Note that the reformed law issued by Royal Decree No. M/18 on 23/2/1436H (corresponding to Dec. 15, 2014) invalidated the previous law except for Article 9.
[829] Public-Fund Management Act, Royal Decree No. M/77 of 1395H (corresponding to 1975), art. 9 (SA).

almost a decade awaiting approval.[830] If approved, it will invalidate Royal Decree No. 43 and Article 9 of the Public-Fund Management Act.[831] Several other laws were also amended, such as the Anti-Forgery Law[832] and the Anti-Money Laundering Law.[833] Similarly, the Government Tenders and Procurement Law was amended to enhance transparency and competition in the bidding for government contracts.[834]

In addition to the previously mentioned laws, the Impeachment of Ministers Law criminalizes several acts and prohibits the ministers from being involved in a number of actions.[835] Article 5, in particular, criminalizes a number of corrupt acts.[836] In line with this law,

---

[830] *Majlis Al-Shura Approved Law of Abuse of Public Trust Bill*, AL-JAZIRAH NEWSPAPER, Apr. 4, 2005, http://www.al-jazirah.com/2005/20050404/hs1.htm.

[831] *Id.*

[832] Anti-Forgery Law, Royal Decree No. M/11 of 1435H (corresponding to 2013) (SA).

[833] Anti-Money Laundering Law, Royal Decree No. M/31 of 1433H (corresponding to 2012) (SA).

[834] Government Tenders and Procurement Law, Royal Decree No. M/58 of 1427H (corresponding to 2006), art. 75 (SA) (States that "A violation of any provision of this Law shall subject the violating employee to disciplinary measures in accordance with provisions of the Employee Disciplinary Law and other criminal provisions applicable to employees of government sectors and public institutions, without prejudice to the agency's right to file a criminal or civil suit against violators."); *see also G20 Anti-Corruption Working Group Progress Report 2013*, COMPILATION OF G20 RESPONSES ON PROCUREMENT (Feb. 15, 2017, 1:59 PM). http://www.g20.org/English/Documents/PastPresidency/201512/P020151228414820695527.pdf. Organisation for Economic Co-operation and Development [OECD], *Compendium of Good Practices for Integrity in Public Procurement*, GOV/PGC/ETH(2014)2/REV1 (Jan. 21, 2015). http://www.oecd.org/officialdocuments/publicdisplaydocumentpdf/?cote=GOV/PGC/ETH(2014)2/REV1&docLanguage=En.

[835] Impeachment of Ministers Law, Royal Decree No. 88 of 1380H (corresponding to 1961) (SA).

[836] *Id.* art. 5 (The acts criminalized in Article 5 are as follows:
  A. Behaviors and actions that would impact the increase or decrease in the price of goods, real estate, currency, or stock, to obtain personal benefit to him or to others.
  B. Acceptance of a benefit—of any kind—to himself or others, to perform official act or refrain from formal work.
  C. Influence peddling, whether the fraud is for the benefit or advantage of himself or of any other body or company, or organization.
  D. Deliberate violations of laws, regulations, and orders that result in financial loss of the state's rights, or the rights of individuals.

the Royal Decree No. M/16 establishes a committee within the Council of Ministers to audit the ministers' finances. The committee also has the authority to audit the finances of ministers' family members.[837] With that being provided, the Anti-Bribery Law remains one of the oldest anti-corruption laws promulgated and encompasses a number of crimes under its umbrella.[838] Thus, the remainder of this chapter will focus on providing a comprehensive survey of the Law.

### B. General Legal Analysis

Saudi Arabia is one of those countries that has neither an explicit definition of corruption nor an inclusive corruption law. Rather, as explained briefly above, there are a number of laws that define and criminalize a number of corrupt acts. Bribery, along with related offenses, is one of these crimes that is inclusively regulated, defined, and criminalized within one law (the Anti-Bribery Law). This law went through several stages and amendment to arrive at its current form.

As mentioned previously, bribery is a crime that is categorized among the *ta'zir* crimes which were prohibited by *shari'a*, yet no specific punishment was assigned to them. In the early 1930s, the crime was first criminalized by the *Nizam Alm'amoreen* (the Public Official Law), which only criminalized active bribery. The Public Official Law was amended in the 1940s to include more offenses in addition to active bribery, and aggravated the punishments.[839]

In the following decade, Saudi Arabia entered the era of bribery crimes by the promulgation of Royal Decree No. 43, which criminalized bribery, abuse of power, and

---

E.  The disclosure of cabinet decisions and deliberations relating to national security, the state's foreign affairs, financial and economic affairs, and the trial of ministers.

F.  Personal intervention in the affairs of the judiciary and other government bodies and departments.).

[837] Royal Decree No. M/16, 7/3/1382H (corresponding to Aug. 8, 1962) (SA).

[838] Anti-Bribery Law, *supra* note 796.

[839] OSAMA M. NOUR, JARIMAT ALRASHWA FI ALNIZAM ALSAUDI [Crime of Bribery in Saudi Law] 30-31 (1996).

gratuity.[840] In 1962, the first Anti-Bribery Law (the Old Law) was promulgated, overturning paragraphs (c) and (d) of Article 2 of Royal Decree No. 43.[841] The Old Law derives its significance from the fact that it established clearly who is subject to the law and the nature of the offenses. The offenses are not limited to bribery, but also include the extortion of a public official to make him perform or omit aspects of his duties.[842] Finally, the New Anti-Bribery Law amended the Old Law three decades later. The amendments did not affect the offenses but instead slightly amended who is subject to the law.[843]

In order to provide a comprehensive view of the Anti-Bribery Law, we must define who is subject to this law before discussing the offenses and the punishments. The Law's main focus is on public officials and public offices, yet it also includes other individuals who are not necessarily within that category. Thus, Article 8 of the Law defines the persons who are subject to the application of its provisions. Article 8 reads as follows:

For the application of this Law, the following are deemed to be public officials:

(1) Persons employed by the State or any of the public administrative authorities, regardless of whether the employment is permanent or temporary;

(2) An arbitrator or expert appointed by the Government or any entity having judicial specialization;

---

[840] Royal Decree No. 43, *supra* note 806, art. 2 ((c) criminalized both active and passive bribery while Article 2 (d) criminalized the acceptance of commissions which prevent implementation of the government's orders.).
[841] Anti-Bribery Law, *supra* note 796.
[842] NOUR, *supra* note 839, at 32.
[843] *Id.* at 33; *see also* Alexander S. Kritzalis, *Saudi Arabia*, 28 INT'L L. 449, 456 (1994) ("Under the Old [Anti-Bribery] Law fines ranged from SR 5,000 to SR 100,000, and imprisonment ranged from one to five years. Under the New [Anti-Bribery] Law fines generally may be imposed up to SR 1,000,000, and prison sentences may extend for as long as ten years for each offense.").

(3) Persons assigned by a Government authority or any other administrative authority to perform a specific assignment;

(4) Persons employed by a corporation or a sole corporation, which manages and runs, or maintains (services) a public facility or which is performing a public service; the same applies to persons employed by joint stock corporation or corporation in which the State has a holding, as well as corporations and sole corporations which carry out banking operations;

(5) Chairmen and members of board of directors of corporations provided for in (the preceding) paragraph 4 of this Article.[844]

As has been noted previously, the Law is mainly concerned with and centered on public officials and offices. Thus, paragraph (1) shows that the Law applies to public officials in any branch of the government or public servants who are employed or contracted by any public entity established by the government, whether they are a Saudi nationals or foreigners. This provision also applies on those who are temporarily appointed if they commit any offense within these legal statutes.

Paragraph (2) adds arbitrators or experts to those to whom the Law applies. However, the Law may not be enforced on them unless they have been appointed or assigned by a government entity or agency or by an entity performing a judicial task. In light of this paragraph, experts who are assigned by private party or individuals are not subject to the Law even if they are performing a task in front of a court or any other judicial body.[845] Consequently, the Law applies on experts who are assigned, for instance, by the Saudi Customs Commission to examine certain subjects.

---

[844] Anti-Bribery Law, *supra* note 796, art. 8.
[845] NOUR, *supra* note 839, at 42-43.

The main focus of this paragraph seems to be those who are appointed by an entity performing a judicial duty. Within the Saudi legal system, there are a number of semi-judicial committees, such as the Committee for the Adjudication of Banking Disputes, which reviews significant economic cases.[846] Members of these committees are generally appointed by a government entity to perform as arbitrators in the litigations that come before these committees. The members can be professors, judges, or other high-ranking officials in another government entity or agency. From the text of Article 8, it would appear that arbitrators assigned by parties other than the government are not subject to the Law.[847]

Paragraph (3) is also related to the center of this Law, which is public officials and public service. The paragraph includes only persons who are assigned by direct or delegated authority to perform official duties. Thus, a person to whom the Law applies must be assigned by a government entity holding legitimate authority over the assigned duty.[848] It is also worth distinguishing between the assignment of a person, which imposes an obligation to perform such a duty, and permission, which may take the form of a license.[849] To explain, consider a company that has a license to perform drivers' training and another that is assigned by the government to train and test within the Traffic Bureau; the latter is an entity to which the Law applies, but the former is not. Further, Courts have tended to adopt a narrow interpretation of a "specific assignment" to public service rather than any other kind of duty.[850]

---

[846] Rayan Alkhalawi, Legal Education Reform in Saudi Arabia: A Case Study of Taibah University 13 (unpublished LL.M. thesis, Indiana University) (May. 22, 2015) (on file with author) ("[T]here are more than 100 semi-judicial committees.").

[847] NOUR, *supra* note 839, at 42-43.

[848] *See generally* KHIDR, *supra* note 798, at 288-92.

[849] NOUR, *supra* note 839, at 46-47.

[850] AHMED L. MAREI, ALJARAYIM ALMASSAH BE NAZAHAT ALWAZIFAH WA ALTHTHIQAH ALEAMMAH [Offenses Against the Integrity of the Job and Public Trust] 97 (2007).

An extension of the application of the Law is introduced in paragraph (4), which covers a number of persons in the private sector. This application is conditional and limited rather than unrestricted. Paragraph (4) includes three main categories:

(a) Persons employed by a company or a sole corporation, which manages and runs, or maintains (services) a public facility or which is performing a public service …; (b) persons employed by joint stock companies or companies in which the State has a holding …; (c) [persons employed by] companies and sole corporations which carry out banking operations….[851]

The first category includes persons who are employed in a corporation involved in any form of operating, managing, or performing a public service. This includes inter alia companies operating or maintaining public facilities such as the Bin Laden Group, which operates The Holy Mosques in Mecca and Madinah, or providing public services such as those corporations contracted by the municipal authorities to perform sanitation or sewage operations. This also includes non-profit organizations if they are providing or performing public services.[852] For this category, the emphasis is again similar to the previous paragraphs—the focus is on public officials or services. This paragraph also extends to subcontractors with a main contractor that performs public services.[853]

The second category is what can be considered, at least partly, an exception from the main focus on public officials or services since it covers "persons employed by joint stock

---

[851] Anti-Bribery Law, *supra* note 796, art. 8(4).
[852] MAREI, *supra* note 850, at 100 (For instance, the King Khalid Foundation and the Prince Sultan Foundation are among the legal entities to which the Law applies since they are performing and providing public services.).
[853] *Id*. at 99 (indicating that there is unnecessary redundancy in this category since the mere inclusion of joint stock corporations covers those in which the government has a holding.).

companies or companies in which the State has a holding."[854] Unlike the persons in the previous categories and paragraphs, persons in this category are subject to the Law without the condition of performing public services or being assigned by a government authority.

Finally, the Law extends its application to persons who are employed by any corporation performing banking operations. Though Article 3 (1) of the Banking Control Law requires any banking business to be licensed to be "a Saudi joint-stock company,"[855] this paragraph seems to be intended to extend the application of the Anti-Bribery Law to companies that are exempt from Article 3 (1).[856] Similar to the persons covered in the previous category, the application of the Anti-Bribery Law is not conditioned by the same conditions in paragraph (2) and (3).

The last paragraph extends the application of the Law to chairmen and members of board of directors of corporations provided for in paragraph (4), since not all the members of the board directors are necessarily employees in the corporation. Thus, this provision extends the coverage of persons not only to executive members, but also to non-executive board members and independent board members. Further, the importance of this paragraph is derived from the fact that the Law of Companies prohibits the conjoining of the position of chairman of the board of directors and any executive position, including the chief executive officer, the managing director, or the general manager.[857]

---

[854] Anti-Bribery Law, *supra* note 796, art. 8(4).

[855] Banking Control Law, Royal Decree No. M/5 of 1386H (corresponding to 1966), art 3(1) (SA).

[856] MAREI, *supra* note 850, at 100.

[857] Law of Companies, Royal Decree No. M/3 of 1437H (corresponding to 2015) (SA) (Article 81 (1): "it shall not be permissible to combine the position of Chairman of the Board and any executive position of the company."); *see also* Corporate Governance Regulations Resolution No. 1/212/2006 of 2006, art. 12 (c)(d) (SA) (Article 12 (c) The majority of the members of the Board of Directors shall be non-executive members. Article 12 (d) It is prohibited to conjoin position of the Chairman of the Board of Directors with any other executive position in the company, such as the Chief Executive Officer (CEO) or the managing director or the general

This legal status must be available at the time of committing the crime and not at the time of investigating or prosecuting the crime.[858] Thus, if a person accepted a bribe while he was covered by any of the previous paragraphs, the Law is applied to that person even if he is not holding one of the legal statuses during the investigation or trial process. What must be also noted is that the legal status of the persons is not affected by the nationality of the person as long as the provisions of Article 8 are met.[859] However, the public official in another international or foreign entity is not deemed to be a Saudi public official even if he is a Saudi national, which restricts the application of the Law to him.[860]

Having identified the persons to whom the law applies, the statutes defining the offense of bribery shall be illustrated. Initially, the Law does not adopt the notion distinguishing between active and passive bribery. Rather, the Law mainly focuses on the action of public officials and their counterparts included in Article 8. The two initial articles of the Law, Articles 1 and 2, can be read similarly except that Article 1 criminalizes the active action performed in exchange for a bribe, while Article 2 criminalize the passive action represented in the abstention from performing a duty in exchange for a bribe.[861] Article 3, though it is related to these articles,

---

manager.). ("The Board of the Capital Market Authority issued resolution Number (1- 36 -2008) Dated 12/ 11 /1429H corresponding to 10/ 11 /2008G making paragraphs (c) and (d) of Article 12 of the Corporate Governance Regulations mandatory on all companies listed on the Exchange effective from year 2009.").

[858] MAREI, *supra* note 850, at 118.

[859] *Id.* at 118-19.

[860] *Id.*

[861] Anti-Bribery Law, *supra* note 796, art. 1 & 2 (Article 1 of the Saudi Anti-Bribery Law states that "[e]very public official shall be deemed as having received a bribe, if he has solicited for himself or a third party, or accepted or received a promise or gift *to perform any duties* of his function or claims that such act falls within the scope of his duties, even where the act is lawful, [and] shall be punished with imprisonment for a period not exceeding ten years or a fine not exceeding one million Riyals or both; the offense shall be deemed as having been committed, even if the official did not intend to carry out such act." Article 2 states that "[e]very public official shall be deemed as having received a bribe, if he has solicited for himself or a third party,

requires more illustration since it involves a different act, which is the violation of public official duties and also involves the crime of gratuity.[862]

1.   Bribery Offense in Anti-Bribery Law

In general, Articles 1 and 2 require proof that there is (1) a public official with actual or ostensible authority; who (2) solicited, received, or requested; (3) a thing of value or a promise of such thing for himself or a third party; (4) an official act; and (5) criminal intent.

First, for the Law to be applied to a person requires that a person within the scope of Article 8 have the authority or discretion to perform or abstain from the action for which he was bribed as long as the delegation of authority is legally valid.[863] It is not also required for the person to have complete or sole authority to perform or omit the action as long as the bribe was paid on such a basis.[864] Thus, if the person is a member of a committee where the decision-making process is held by vote, this person is subject to the Law as long as the bribe was paid only to gain a favorable opinion.

Nevertheless, courts have extended the application of the Law to persons who have indirect authority over the subject of the bribery where such a person is sufficiently able to influence the official act.[865] In a similar vein, the act of violating the lawful duties of the person

---

[862] or accepted or received a promise or gift to *abstain from carrying out  any function of his duties*, or pretend that such act falls within the scope of his duties, even where the abstention is lawful, [and] he shall be punished with penalty provided in Article I hereof; the offense shall be deemed to have been committed, even if the official did not intend to carry out such act.").

[862] Anti-Bribery Law, *supra* note 796, art. 3 (Article 3 states that "Every Public official shall be deemed to have received a bribe, if he has solicited for himself or a third party, or to accept or received a promise or gift for violating the function of his duties or for remunerating him for his actions even where the same happened without prior agreement; he shall be punished with the penalty provided [in] Article 1 hereof.").

[863] MAREI, *supra* note 850, at 121-22.

[864] *Id*. at 124.

[865] *Id*. at 125.

does not negate the requirement of authority. In this case, if a judge acquitted a guilty person, he acted in violation or abuse of his authority rather than outside of his authority.[866]

In addition to the actual authority, the Law is applied in the case of ostensible authority. The mere claim of authority directly or indirectly meets the threshold of this requirement.[867] However, there is a fine line between impersonating a public official and claiming authority as regards this Law. Thus, there must be a close nexus between the position that person holds and the position he claims to hold.[868] Further, this claim of authority must be in the form of an implicit or explicit active action deceiving a reasonable person to pay the bribe.[869] Though the Law does not indicate this, courts have tended to even include a person who mistakenly assumed the authority existed even if such authority was outside of the scope of an official's authority over the promised action.[870]

Second, the Law does not distinguish, as noted previously, between accepting and soliciting a bribe.[871] In this matter, the mere solicitation or request for a bribe by any active form, whether directly or indirectly, meets this requirement regardless of whether the briber agreed to pay or provide anything of value, so long as this act was committed by a public official and the

---

[866] *Id.* at 129-30.
[867] *Id.* at 132.
[868] *Id.* at 135.
[869] *Id.* at 136-37.
[870] NOUR, *supra* note 839, at 84 (*citing* Board of Grievances Order No. H/2/42. Case No. 314/1/Q in 1402H (corresponding to 1982)).
[871] *See* THE ORGANISATION FOR ECONOMIC CO-OPERATION AND DEVELOPMENT, CORRUPTION: A GLOSSARY OF INTERNATIONAL CRIMINAL STANDARDS, 22 (2007) (In general, "[b]ribery offenses against national public officials fall into two broad categories: (1) when an official 'requests' or 'solicits' a bribe, and (2) when an official 'receives' or 'accepts' a bribe.").

beneficiary of the act received and knew of such a demand.[872] In a similar vein, the acceptance of

an offer or promise, even if the benefit was not actually received, fulfills this requirement.[873]

The third element to be proven is a thing of value or a promise of any benefit. The nature

of the benefit is defined broadly in Article 12 as "every benefit or advantage which may be

obtained by the bribe, regardless of the form or description thereof, be it monetary or not."[874]

Hence, the source, whether legitimate or illegitimate and whether owned by the beneficiary or

not, of such benefit is immaterial in this situation.[875] With regard to this element, courts have

adopted a broad interpretation which includes invisible benefits, such as exemption from paying

rent, providing a service with no fees, or even an exchange of official acts between two

officials.[876] They also consider facilitating the process of providing loan as a benefit.[877] Finally,

it is inconsequential whether the benefit was for the person who asked for it or for a third party,

which could include inter alia spouses, sons, daughters, siblings, or parents.[878]

The fourth element is the official act, which is the return for the benefit provided by the

beneficiary (quid pro quo). This can be an active act within the official's authority, as indicated

in Article 1, where the official, for instance, asks for a benefit to facilitate the proceedings.[879]

---

[872] MAREI, *supra* note 850, at 143-45 (Thus, it is not possible for there to be "attempted bribery," since once the demand for or the solicitation of the bribe has taken place and the other party knows of it, bribery has been committed in the eyes of the Law.).

[873] *Id*. at 147-49 (Consequently, if the official regrets his act of receiving the benefit and returns it, such regret does not negate the committing of the crime; rather, it is considered as a mitigating circumstance.).

[874] Anti-Bribery Law, *supra* note 796, art. 12.

[875] MAREI, *supra* note 850, at 152

[876] *Id*. at 153 (*citing* Board of Grievances Order No. H/1/62. Case No. 384/1/Q in 1400H (corresponding to 1980)).

[877] *Id* (*citing* Board of Grievances Order No. H/1/86. Case No. 552/1/Q in 1400H (corresponding to 1980) ("A public official in a department of tenders received a loan from a company deemed to be a benefit.")).

[878] *Id*. at 156.

[879] Anti-Bribery Law, *supra* note 796, art. 1.

The official act may also take the form of abstaining from performing the official's duty, as noted in Article 2.[880] The last form of this element is introduced in Article 3, where the official act or abstention is considered a violation of the official's duties.[881] This form is distinguished from the previous two forms since in this form the benefit is offered for an official to carry out an illegitimate act.[882] This element is required at the initial stage; meaning that the beneficiary is offering a benefit or the official is asking for a benefit because of the official act. However, whether the official intended to act or abstain from the promised act is immaterial.[883] Thus, the completion of the promised act is not required to satisfy this element.[884]

Finally, those crimes are intentional crimes that require an intention to commit these crimes in order for one to be criminally liable. Articles 1, 2, and 3 of the Law make the public official's intent relevant. Thus, the intent element is satisfied by proving that the public official knew of his authority and the quid pro quo and intended to accept or solicit the bribe or the benefit.[885] What must be noted, however, is that it is immaterial whether the public official performed the intended act or not.[886] The issue raised is when the public official knew of the quid pro quo nature of the arrangement. That is, if the public official came to know about the quid pro quo nature awhile after he received the benefit and performed the official act, is he still

---

[880] Anti-Bribery Law, *supra* note 796, art. 2.

[881] Anti-Bribery Law, *supra* note 796, art. 3 ("Every Public official shall be deemed to have received a bribe, if he has solicited for himself or a third party, or accept[ed] or received a promise or gift for violating the function of his duties or for remunerating him for his actions even where the same happened without prior agreement; he shall be punished with the penalty provided [in] Article 1 hereof.").

[882] Marei, *supra* note 850, at 162.

[883] *Id.* at 165 (Similarly, Articles 1 and 2 state that the offense is committed "even if the official did not intend to perform such act.").

[884] *Id.*

[885] *See generally* Nour, *supra* note 839, at 119 (*citing* Board of Grievances Order No. H/1/68. in 1400H (corresponding to 1980) & Board of Grievances Order No. H/1/64. in 1400H (corresponding to 1980)).

[886] *See generally id.* at 116-24.

criminally liable? The majority of scholars argue that concomitance between the bribe and the intent is required.[887] Consequently, if an individual received a gift and he did not know the nature of the payment or the benefit at that time, i.e., that it was a bribe or gratuity, and he then performed or abstained from an act benefiting the person who provided the benefit, he then did not have an intent and he is not criminally liable for Articles 1 or 2.[888]

Having defined the elements of the crime of the bribery, it is important to identify the differences between Articles 1 and 2 on the one hand and Article 3 on the other. First, Articles 1 and 2 can be distinguished from Article 3 since in the former the public official may abstain or act within the legal authority designated to him; it is intent that constitutes the crime of bribery; in the latter, in contrast, the act or the abstaining by itself constitutes the improper performance of a duty.[889] The second difference is manifest in the fact that the second part of Article 3 targets the crime of gratuity, rather than bribery, as will be illustrated in the next point.[890]

2.  Punishments

The Law initially assigned certain punishments to each act. For the crimes indicated in Articles 1, 2, and 3, offenders are subject to imprisonment for a period not to exceed 10 years and/or fines not to exceed a million Saudi Riyal (equivalent to 270,000 USD).[891] In addition, Collateral Punishments are indicated in Articles 13 and 15. Where Article 15 orders the confiscation of the benefit, Article 13 orders the dismissal of the offender from public service

---

[887] *Id*. at 125-28.
[888] *Id*.
[889] Anti-Bribery Law, *supra* note 796, arts. 1, 2, & 3.
[890] *Id*. art. 3.
[891] *Id*. art. 1 (note that Articles 2 and 3 include references to Article 1 with regard to punishments).

and places a prohibition on the appointment of the offenders to any position indicated in Article 8 subsequent to the conviction.[892]

The dismissal can be reviewed by the Council of Ministers, which can revoke the dismissal after the period of five years, which makes a repeat offense possible. Thus, Article 18 imposes an aggravated punishment on repeat offenders that may not exceed twice the indicated punishments in the Law, i.e., for the crimes indicated in Articles 1, 2 or 3, 20 years' imprisonment and a fine of 2 million Saudi Riyals (equivalent to $540,000).[893] Further, the Law orders the Ministry of Interior to publish convictions under the Law.[894]

On the other hand, legal persons, a category which includes the corporate entities mentioned in Article 8, are subject to other punishments. Article 19 imposes a set of different penalties on the criminally liable entities under this Law, which requires proof of a nexus between the act and the benefit to such an entity.[895] In part, Article 19 increases the maximum monetary penalty to ten times the value of the bribe and/or imposes a ban on those entities from being in a future contract with government agencies and organizations.[896] In circumstances where the entity has an existing contract with a government agency, the ban is not final since the agencies with which the convicted entity has contracts must file recommendations as to whether to allow the entity to complete the contract or not.[897]

3. The Effective Regret Defense

The law grants the briber a defense if the briber or a middleman discloses the incident of bribery before being discovered, stating in Article 16 that "the briber or middleman shall be

---

[892] *Id*. art. 13 & 15.
[893] *Id*. art. 9.
[894] *Id*. art.  21. MAREI, *supra* note 850, at 184.
[895] MAREI, *supra* note 850, at 179.
[896] Anti-Bribery Law, *supra* note 796, art. 19.
[897] Anti-Bribery Law, *supra* note 796, art. 20; *see also* MAREI, *supra* note 850, at 208.

exonerated from both the penalties and collateral sanctions if he has reported the offense to the authorities prior to its discovery by the authorities."[898] Nevertheless, the payment or the benefit provided by the beneficiary is always subject to confiscation, as stated in Article 15 of the Law: "In all cases, the judgment shall order confiscation of any benefit provided in this transaction, where this is possible in practice."[899] The return of the benefit is banned by the Law, unless the benefit was provided in good faith.[900] This can be seen in cases where the payer was acting in accordance to the advice of a middleman where the payer is deceived as to the original purpose, i.e., bribery. On the other hand, the bribee does not benefit from this affirmative defense.[901]

4.  Rewards

The Law rewards a whistleblower monetary awards ranging from a minimum of 5,000 Riyals (equivalent to $1,340) to a maximum of half the confiscated benefit or payment.[902] According to the Law,

> Every informer providing information regarding an offense, which is provided herein,
> which information led to establishing the commission of the offense, shall, if he is not a
> briber, accessory or intermediary, be granted a reward of not less than 5,000 Riyals and
> not exceeding one half of the confiscated property; assessment of rewards at the
> discretion of the authority adjudging the case but the Ministry of Interior may pay a sum

---

[898] Anti-Bribery Law, *supra* note 796, art. 16 (This article overruled Article 229 (4) of the Law of Public Security issued by Royal Order No. 3594 dated in (29 Rabi' I, 1369H – 18 January, 1950) indicating that if the briber was under coercion to pay the bribe and disclose the incident within the period of three days, he shall be immune from the criminal liability and the sum paid shall be returned to him.).

[899] Anti-Bribery Law, *supra* note 796, art. 15.

[900] Marei, *supra* note 850, at 208 (This can occur in cases where the payer was acting on the advice of a middleman and the payer is deceived as to the original purpose, i.e., bribery.).

[901] *Id.*

[902] Anti-Bribery Law, *supra* note 796, art. 17.

higher than the sum which would be fixed in pursuance of this Article, subject to the approval of the Council of Ministers.[903]

## C. *Classifications of the Crimes*

In addition to the crime of bribery, the Law identifies certain acts as crimes punished under its provisions. These include the following:

1. The offering of bribery

2. Knowingly enjoying a benefit resulting from bribery

3. Gratuity

4. The offer and the acceptance of *wasta*

5. Trade in influence

6. The use of force and threatening of a public official

7. Following up on a case being processed outside a public official's authority: being an "expediter"

Each of these acts is defined by the Law and subject to different punishments, as will be articulated in this section.

## 1. The Offering of Bribery

In general, this offense occurs primarily when the briber offers a benefit and the public official declines to receive it. Without Article 9, there would have been a great gap resulting in legal unaccountability, since Articles 1, 2, and 3 require the involvement of the public official to legally exist. Thus, if an offer was declined, the briber could not be legally held liable, nor could an accomplice, since there would be no crime in the first place.[904] Article 9 states that "any person who has offered a bribe, which is not accepted, shall be punished with imprisonment for a

---

[903] *Id*. art. 17.
[904] MAREI, *supra* note 850, at 226.

period not exceeding ten years or a fine not exceeding one million Riyals [equivalent to $ 266,638] or both."[905]

This offense requires certain elements to be satisfied. The first and foremost element is that the offer must be made to a person that falls within the scope set forth in Article 8. That is, if an individual offers a bribe to another who is not within the scope of Article 8, e.g., an individual working in a limited liability company that has no contracts with the government, then this crime cannot be prosecuted under this provision.[906] In addition to the requirement of being within the scope of Article 8, this offense requires, as a bribery offense, that the person has actual or ostensible authority.[907]

The actus reus in this offense is the mere offering. The Article does not specify a certain type of offer or benefit which expands the scope of this element.[908] Thus, the offer includes the immediate giving of a benefit or a promise of future giving. The offer does not have to be an explicit and direct, but can be an implicit offer. Further, the Law adopts an open-ended timeframe for this offense, which means that even if the offer was made after the completion of the intended result, the offense would have been committed.[909]

In order to have a complete actus reus, the offer has to be made to a public official and must be rejected.[910] Consequently, if an individual intentionally withdraws her offer before the public official declines it, she cannot be liable under this provision. A disputed case manifests where the withdrawal is involuntary and where the offer was not delivered to the public official for some unintended reason. Some scholars argue that the offense has already occurred, since the

---

[905] Anti-Bribery Law, *supra* note 796, art. 9.
[906] MAREI, *supra* note 850, at 227.
[907] Id. at 228 (See the explanation of this requirement in the previous section.).
[908] Id. at 229.
[909] Id. at 230.
[910] *Id.*

public official's knowledge of the offer is not required.[911] Others consider that as an attempt, since it was not because the person who made the offer voluntarily withdrew it that the delivery was not made, and the offense is distinguished from the offenses in Articles 1, 2, and 3.[912]

In addition, this offense is an intentional offense requiring that the individual offering the bribe know the legal character of the individual to whom the offer is made, i.e., that the individual is a public official or someone else who falls within the scope of Article 8 on the one hand, and that she intended to solicit the public official to accomplish the intended result.[913] Nevertheless, coercion is considered to be an affirmative defense if it is proven.[914]

Finally, Article 9 imposes a penalty of a maximum of 10 years' imprisonment and/or a million Riyals (equivalent to $ 266,638).[915] This is in addition to the collateral penalties mentioned previously, which include dismissal from public office if the offender is holding one and the confiscation of the benefit that was intended to be delivered when possible.[916] Moreover, offenders are subject to the rule that deals with repeat offenders provided in Article 18.[917]

2.   Knowingly Enjoying a Benefit Resulting from Bribery

In circumstances where the briber and the bribee appoint a beneficiary outside of the bribery schema, this beneficiary can be prosecuted under the provision of Article 11 indicating that "Every person who has been appointed by the briber or the bribed to receive the bribe and

---

[911] MAḤMŪD N. ḤUSNI, SHARḤ QĀNŪN AL-'UQŪBĀT: AL-QISM AL-KHĀṢṢ [The Explanation of Criminal Law: Special Part] 64 (1988); *see also* KHIDR, *supra* note 798, at 402-04.

[912] MAREI, *supra* note 850, at 231.

[913] *Id*. at 232.

[914] *Id*. at 234.

[915] Anti-Bribery Law, *supra* note 796, art. 9.

[916] MAREI, *supra* note 850, at 235-36; *see also* Anti-Bribery Law, *supra* note 796, art. 13 & 15.

[917] *See* Anti-Bribery Law, *supra* note 796, art. 18. MAREI, *supra* note 850, at 236.

accepts knowing the reason therefor shall be punished with imprisonment for not more than two years or a fine not exceeding 50.000 Riyals [equivalent to $13,333], or both."[918]

Article 11 generally criminalizes the beneficiary who accepts the benefit knowing the reason for it. The Law distinguishes this offense from the role of complicity indicated in Article 10, since the beneficiary may not be involved in the offense, and may neither have aided nor abetted it, which makes the crime occur with or without her involvement.[919] Thus, the punishment and the liability of the actor in this case is not dependent on the principal actors in the crime of bribery, i.e., the briber and the bribee.[920] The offense must be also distinguished from the situation where benefits were provided to a public official in order to benefit another individual who is not the briber, since the objective of the punishment in this offense is the benefit provided *to* the public official, rather than the benefit provided *by* her.[921]

Unlike the other offenses in this Law, this offense does not require that the actor have certain legal character that falls within the scope of Article 8.[922] Further, the beneficiary can be any individual; there is no restriction in terms of the individual's relationship to actors in the bribery schema, although the reality requires a close relationship between the beneficiary and the bribee.[923] It is also worth noting that the beneficiary can appointed by the briber without a previous agreement with the bribee. Consequently, if the benefit was provided to the beneficiary by the briber and the beneficiary accepted the benefit knowing its purpose, she meets the

---

[918] Anti-Bribery Law, *supra* note 796, art. 11.
[919] MAREI, *supra* note 850, at 245.
[920] *Id.*
[921] KHIDR, *supra* note 798, at 430-31.
[922] MAREI, *supra* note 850, at 246.
[923] *Id.* at 246.

requirement of this offense regardless of whether the public official performs the briber's intended result.[924]

As previously noted, the Law defines the benefit broadly to include more than the monetary benefits.[925] Further, Article 11 expands its application to include the gratuity provided to the beneficiary, so long as she knew the reason for such a benefit.[926] Hence, as can clearly be seen, this offense pivots around the intention of the beneficiary. In order to hold an individual liable under this provision, the intention to keep a benefit despite knowing the illegitimate reason for such a benefit must be proven.[927]

Offenders convicted of this provision are subject to not more than two years' imprisonment and/or a fine of no more than 50,000 Riyals (equivalent to $13,335). This is not to mention the collateral penalties for repeat offenders, which include confiscation and dismissal from public office. Nevertheless, an individual can be prosecuted under Article 10 in addition to Article 11 if he meets the threshold and acts as middleman or encourages the bribee to agree to perform the briber's intended result.

## 3.  Gratuity

As has been mentioned earlier in this chapter, the Law criminalizes the offense of gratuity under Article (3), stating that "[e]very Public official shall be deemed to have received a bribe, if he has solicited for himself or a third party, or accept[ed] or received a promise or gift for violating the function of his duties or remunerating him for his actions even where the same

---

[924] *Id*. at 247.
[925] *See* Anti-Bribery Law, *supra* note 796, art. 12.
[926] Marei, *supra* note 850, at 247.
[927] Khidr, *supra* note 798, at 433-34.

happened without prior agreement; he shall be punished with the penalty provided [in] Article 1 hereof."[928]

Article 3 includes, as previously noted, the crime of bribery in which the act or abstention from acting of a public official is considered a violation of his duty and constitutes a gratuity offense. As with the crime of bribery, the jurisdiction of Article 3 only covers those who were indicated in Article 8. However, this offense can be distinguished slightly from the crime of bribery since bribery requires previous agreement between the briber and the bribee. A further distinction is manifest in the requirement that an official have actual authority in Article 3, while Articles 1 and 2 include ostensible authority also.[929]

In this offense, unlike other laws that only recognize the acceptance of a gratuity,[930] the Anti-Bribery Law does not distinguish between the solicitation, acceptance, or requesting of a reward or gratuity.[931] Moreover, this offense, similar to the other offenses that fall under this Law, is an intentional offense requiring proof that the public official accepts the reward knowing that it is because of an official act;[932] that is, there must be a nexus between the act and the reward, a quid pro quo. Thus, the Law imposes the same penalties imposed in Articles 1 and 2.[933]

In general, Article 3 aims at closing the loophole that exists in a scenario where there is no previous agreement between the briber and bribee and the rewarding of public official for the acts been performed, yet it also requires the proof of quid pro quo. In part, it extends the

---

[928] Anti-Bribery Law, *supra* note 796, art. 3.
[929] MAREI, *supra* note 850, at 252.
[930] *See, e.g.*, Law No. 58 of 1937, art. 105 (Criminal Code of 1937, reformed in 1952), *Al-Jaridah Al-Rasmiyya* (Egypt) (Stating that a penalty shall be imposed on "public official/civil servant who accepts a present or a donation from a person for whom he performs a work of his position duties or refrains from performing any duty thereof….").
[931] MAREI, *supra* note 850, at 255.
[932] *Id*. at 256.
[933] *See* Anti-Bribery Law, *supra* note 796, art. 3 ("he shall be punished with the penalty provided [in] Article 1 hereof.").

application of the Law to include those offenses not covered by Articles 1, 2, and 9, but also imposes a heavier burden.

4.  The Offer and the Acceptance of *Wasta*

In the previous chapter, a brief summary of this offense was provided, leaving other aspects to be legally illustrated. Article 4 requires certain elements, some of which are not any different from the other offenses covered under the Law, among which is the requirement of being within the scope of Article 8.[934] However, other elements deserve a further interpretation including (1) *wasta* or other similar forms of influence peddling, and (2) whether acceptance results in violation of an official's duty.

First, the core of *wasta* generally is the solicitation of others based on relationship with them in order to obtain a certain advantage as a favor.[935] Thus, such an act may take the form of mediation or a request so long as the basis of such an act is the exchange of favors. The difficulty arises in the situation where no *wasta* or similar forms of influence peddling have taken place, but rather the official was influenced by the mere favoritism that may result from social status, familial relationship, or other causes, with implicit suggestion of future quid pro quo. In such a case, the act would fall outside the purview of Article 4.[936] The second element is that the acceptance of *wasta* results in a violation of an official's duty. As noted in the previous chapter, to be held liable under Article 4, the act or the abstention has to be in violation of the official's

---

[934] Anti-Bribery Law, *supra* note 796, art. 4 (Article 4 states that "any public official, who violated any of the functions of his duty, by committing or abstaining from any functions of his duties, as a result of a request, recommendation or mediation is deemed to be tantamount to having received a bribe; he shall be punished with the imprisonment for a period not exceeding three years or a fine not exceeding 100,000 Riyals [around 26,000 USD] or both.").

[935] MAREI, *supra* note 850, at 260.

[936] *Id*.

duty.[937] Thus, a nexus between the violation and the *wasta* has to be proven in order to satisfy the atcus reus element.[938]

With the respect to the penalties, In addition to the collateral penalties, Article 4 imposes a penalty of imprisonment not to exceed three years and/or a fine not to exceed 100,000 Riyals (equivalent to $26,666).[939] However, unlike bribery, the conviction of the public official is required to convict the individual exercising *wasta* since the latter will be punished in accordance to Article 10, which establishes liability on the basis of complicity rules.[940] Thus, if the public official rejects the *wasta*, the individual who practiced it in the first place cannot be punished due to the fact that Article 4 does not separate the two acts, nor does the Law establish such a thing as a case of bribery where the offering of a bribe is punished by Article 9 and the solicitation, acceptance, or requesting of a benefit is punished by Articles 1, 2, and 3.

5.  Trade in Influence

As has been illustrated briefly in the previous chapter, in Article 5, the Anti-Bribery Law criminalizes trade of influence practices. Such an offense can be distinguished from bribery on certain grounds; first and foremost, this offense initially does not require a public official character in the individual who is using her real or supposed influence,[941] yet the Law requires such an element in this offense.  The second difference is that the core of bribery is the authority over the advantage provided, while the core of trading influence is the influence itself being

---

[937] *See generally* Al-Enzi, *supra* note 797.
[938] MAREI, *supra* note 850, at 261.
[939] Anti-Bribery Law, *supra* note 796, art. 4.
[940] MAREI, *supra* note 850, at 264.
[941] *See, e.g.*, UNCAC, *supra* note 29, art. 18.1 (a) ("The promise, offering or giving to a public official or any other person, directly or indirectly, of an undue advantage in order that the public official or the person abuse his or her real or apparent influence….").

used, which means that the individual using the influence may not have authority, but has the influence to secure an advantage.[942]

The Law requires, as noted, three elements in this offense. As with the most of the offenses in the Law, Article 5 applies only to those individuals within the scope of Article 8, those who have real or supposed influence. Thus, this restricts the meaning of influence in that the influence results from a public office or position.[943] The second element resembles the bribery element of the solicitation, acceptance, or requesting of a benefit of any kind.[944] Finally, the influence, to be prosecuted under Article 5, must be exercised over a public authority, which mainly includes the government and its agencies and organizations.[945] Consequently, if the influence was exercised over private organizations, corporations, or foreign entities, this does not fall within the scope of Article 5.

As mentioned in the previous chapter, this offense requires a general intent which is met merely by the solicitation, acceptance, or requesting of the benefit knowing that it occurs because of the exercise of real or supposed influence.[946] Since the Law did not extend the application of the Article 5 nor mitigate the burden of proof, it seems rational that it imposes the same punishments provided in Article 1. This is not to mention the collateral penalties and the confiscation of the benefit.

---

[942] *See generally* KHIDR, *supra* note 798, at 442-51.

[943] MAREI, *supra* note 850, at 269.

[944] Anti-Bribery Law, *supra* note 796, art. 5 (Article 5 reads, "any public official shall be deemed to have received a bribe if he has solicited for himself or for others, or accepted, or received a promise or gift for exercising real or alleged influence….").

[945] MAREI, *supra* note 850, at 271.

[946] KHIDR, *supra* note 798, at 452.

6.   The Use of Force and the Threatening of a Public Official

Among other offenses, Article 7 criminalizes the practice of extortion against a public official, stating that "[a]ny person who uses force, violence or threats against a public official in order to force him to act illegally, or to instigate him to refrain from doing any of the acts of which he has legal charge, shall be punished with the penalty provided for in Article 1 hereof."[947]

In this article, the character of the individual who is using force or threatening is immaterial; rather, what is important is the character of the individual against whom such practice is carried out. Thus, if any individual uses force or threatens another individual within the scope of Article 8, he shall be prosecuted under this provision.[948] It is worth noting that courts distinguish this act from the crime of resisting arrest, excluding such an act from the scope of this article.[949] This article requires that the force or threat aims at forcing the public official to violate the duty of his job.[950]

Having illustrated Articles 5 and 7, it seems that offense of extortion remains in a grey area. On one hand, Article 7 does not specify the act of extortion as an offense within its provision; instead, it specifies a "threat," which cannot carry out the same meaning of extortion. Article 5, on the other hand, requires the existence of the solicitation, receiving, or requesting of a benefit to abuse of power, which includes inter alia the exercise of extortion. Thus, if a public official or another practices extortion without the solicitation, receiving, or requesting of a benefit, this may exclude such an act from the application of Article 5. This leaves no option but

---

[947] Anti-Bribery Law, *supra* note 796, art. 7.
[948] KHIDR, *supra* note 798, at 460 (2007).
[949] *See* Board of Grievances case No. 6916/2/Q in 1431H – 2010 and case No. 229/6/Q in 1431H – (corresponding to 2010) (the court distinguished between the use of force and the threatening of a public official and the assault and battery against a police officer.).
[950] KHIDR, *supra* note 798, at 462.

to rely on Article 2 (A) of Royal Decree No. 43, as explained above in Chapter 5, in order to cover such a loophole.[951]

7.  Following up on a case being processed outside the public official's authority:   being an "expediter"

Article 6 states that

[e]very public official who solicits for himself or a third party,  or accepts or receives gift, on account of his position, to follow up a formality in a Government authority (service), if the other provisions set down herein do not apply with respect to him, shall be punished with imprisonment not exceeding two years or a fine not exceeding 50,000 Riyals [equivalent to $13,335] or both; the same penalty shall be imposed on such a person who has given, offered or promised to make a gift for the aforementioned purpose; the intermediary shall also be liable to the aforementioned penalty, in any of these cases.[952]

This mainly aims at extending the application of the Law to cover an area uncovered by Article 5, which deals with the trade of influence, since it is not always the case that the public official has a real or even a supposed influence to obtain a certain advantage, and consequently the provision of Article 5 does not apply to him.[953] For instance, an official may follow up on a case moving through the Department of Immigration and Homeland Security either to expedite a process or to obtain an undue advantage. In such a situation, this official does not have influence

[951] Royal Decree No. 43, *supra* note 806, art. 2(A) (Article 2(A) states that "any public official and any individual aids and abets, whether a public official or not, commits one the following offenses shall be punished by imprisonment for a term not exceeding ten years or a fine not exceeding twenty thousand Riyals [equivalent to $ 5,332]:
     "A. Abuse of power for private interest.").
[952] Anti-Bribery Law, *supra* note 796, art. 6.
[953] Marei, *supra* note 850, at 276.

over this Department, but rather he jeopardizes his fiduciary duty by creating a potential for a future exchange of benefits between himself and an official in the Department of Immigration and Homeland Security.

In this offense, like the majority of the offenses included in the Law, the requirement of a public official character is required, but it is not required to have an authority over the formality; otherwise the practice would be covered by Article 1, 2, or 3. It is also required that a governmental entity or multiple entities have authority over case the public official is following up on.[954] It does not also negate this element if the same entity in which the public official works has authority over the case, so long as he has no actual authority or ostensible authority over it.[955] However, Article 5 does not cover a situation where a corporation or other private entity has authority over the case being processed.

This offense shares the same elements of the bribery offense, including the actus reus, representing the solicitation, receiving, or requesting of a benefit of any kind. This offense is also considered an intentional offense which requires proving that the public official intentionally solicited, received, or requested a benefit knowing the purpose of it, i.e., that the purpose of the benefit was to follow up on a case being processed by in another government entity.[956]

Finally, the scope of this offense includes official who follow up on a case being processed by another government agency, the person who offered a benefit, and the intermediary in such offense.[957] Thus, those individuals, when convicted, are punished by "imprisonment not

---

[954] *Id*. at 277.
[955] *Id*.
[956] *Id*.
[957] This can be an additional emphasis since those individuals are already subject to the provisions of Article 10 of Anti-Bribery Law covering the rule of aiding and abetting in these offenses.

exceeding two years or a fine not exceeding 50,000 Riyals [equivalent to $13,335] or both."[958]
The other penalties noted above, including confiscation, dismissal, and the aggravating of
punishments when committed by repeat offenders, are also imposed.

CONCLUSION

This chapter has sought to provide an explanation of the Saudi anti-corruption legal
framework in general and of the Anti-Bribery Law in particular. The Law in general went
through different stages before it arrived at its current form, which can be considered as
developed as other regulations enacted before it. In addition to the offense of bribery, the Law in
general criminalizes a number of offenses. The Law restricts its application, however, to a
certain group of individuals. The Law also highlights effective regret as a defense and the
rewards of whistleblowers.

Though the Law represents an advance in a number of respects, it possesses certain
loopholes and weaknesses. The weaknesses cannot be attributed solely to the Law; instead there
are other related aspects within the general legal framework that may hinder the effectiveness of
the Law. The next chapter will explore these strengths and weaknesses in light of the explanation
provided in this chapter.

---

[958] Anti-Bribery Law, *supra* note 796, art. 5.

CHAPTER SEVEN: EVALUATION OF THE FRAMEWORK OF ANTI-BRIBERY LAW

INTRODUCTION

Because other regulations intersect with the Anti-Bribery Law, the evaluation of some aspects of the Law may require researching these provisions in order to provide a comprehensive evaluation. Thus, in this chapter, certain issues will be evaluated based on the Anti-Bribery Law and on other aspects of the Saudi legal framework. Such an evaluation will be conducted in light of general anti-corruption standards and other countries' legal apparatus to combat corruption.

This evaluation will shed light on the advantages of the Saudi legal system as well as its disadvantages, specifically in regard to six aspects. These aspects include the liability of legal persons, the *wasta* provision, immunity, penalties and rewards, the protection of whistleblowers and witnesses, and the jurisdiction of the Anti-Bribery Law. For each aspect, the examination will be based primarily on the provisions of the Anti-Bribery Law and secondarily on the provisions related to them.

*A. The Liability of Legal Persons*

The liability of legal persons for the offenses of corruption is enforced and included in number of international conventions against corruption.[959] Opponents of this notion remain skeptical about its rationality since it is not practical to impose a liability on corporation "as if it has a blameworthy state of mind."[960] Further, it is sufficient to impose civil liability, which makes criminal liability unnecessary.[961] Nevertheless, the advocates of this notion emphasize the

---

[959] *See, e.g.*, UNCAC, *supra* note 29, art. 26. OECD Convention, *supra* note 29, art. 2.
[960] THE ORGANISATION FOR ECONOMIC CO-OPERATION AND DEVELOPMENT, FIGHTING CORRUPTION IN EASTERN EUROPE AND CENTRAL ASIA: THE ISTANBUL ANTI-CORRUPTION ACTION PLAN PROGRESS AND CHALLENGES 55 (2008).
[961] Sara Sun Beale, *Response to the Critics of Corporate Criminal Liability*, 46 AM. CRIM. L. REV. 1481, 1486 (2009).

heavy impact of corporations on the economy, which makes them capable of inflicting serious harm.[962] Thus, the imposing of criminal liability is necessary to prevent such harm.

The Anti-Bribery Law made an advance in establishing the liability legal persons in Article 19 as follows:

> The authority having power to adjudge the offences of bribery must impose a fine not exceeding tenfold the value of the bribe, or banning from concluding contracts with ministries, Government services or public juristic persons, for providing purchases or execution of their projects and works, or both penalties; this penalty is imposable on any company or private firm national or foreign- whose manager or any personnel thereof has been found guilty of committing any offences provided for herein, if the said offence has been committed to serve the interest of such company or firm; the Council of Ministers may reconsider the banning penalty aforementioned after the lapse of at least five years from the date of passing judgement.[963]

Further, Articles 69[964] and 147[965] of the Criminal Procedures Law impose civil liability on legal persons, which does not eliminate the criminal liability established by the Law. In

---

[962] *Id*. at 1482 ("imposing criminal liability on corporations makes sense, because corporations are not, fundamentally, fictional entities. Rather, they are very real and enormously powerful actors whose conduct often causes very significant harm both to individuals and to society as a whole.").

[963] Anti-Bribery Law, *supra* note 796, art. 19.

[964] Law of Criminal Procedures, *supra* note 308, art. 69 (reading that "whoever suffers harm in consequence of a crime may file a claim in respect of his private right of action during the investigation of that action. The Investigator shall decide on the admissibility of such claim within three days from the date of filing. If the claim is rejected, an appeal may be lodged with the head of the relevant department within one week from the date of communication of the decision to the interested party. The decision issued by the head of the relevant department shall be final during the investigation stage.").

[965] *Id*. art. 147 ("A person harmed by a crime and his heirs shall, at any time during the proceedings of the case in issue, be entitled to submit a request to the trial court regarding his

addition to establishing the liability, the Law expands its application to foreign firms. That is, the Law does not distinguish between national and foreign entities in imposing criminal liability on legal persons.[966]

Though the Law includes and establishes the criminal liability of legal persons, a loophole still exists that may allow for the evasion of such liability. In the provision of Article 19, the phrase "*whose manager or any personnel thereof* has been found guilty of committing any offences provided for herein" (emphasis added)[967] may raise a serious issue. Such a phrase may restrict the application of the Law.[968] Depending on how the phrase is interpreted, this may mean that if an outside intermediary was utilized by the firm, this may negate the imposition of criminal liability on the firm.[969]

Nevertheless, provisions in the Law of Government Tenders and Procurement address this issue. Though it is discretionary, Article 53 provides that

> a government authority *may* withdraw the work from a contractor and rescind the contract or execute it at his expense without prejudice to the right of the government authority to claim compensation for damage sustained as a result, in any of the following cases:

---

private right of action regardless of the amount thereof, even though his action has been rejected during the investigation.").

[966] Anti-Bribery Law, *supra* note 796, art. 19.

[967] *Id.*

[968] Maíra Martini, *Liability of legal persons for corruption*, TRANSPARENCY INTERNATIONAL, 5 (2012).

[969] *See generally* Mark Livschitz, *Liability of Legal Persons for Corruption: A Swiss Perspective*, *in* CRIMINALISATION OF CORRUPTION: LIABILITY OF LEGAL PERSONS FOR CORRUPTION, CONFISCATION OF THE TOOLS AND PROCEEDS OF CORRUPTION, MUTUAL LEGAL ASSISTANCE IN CORRUPTION-RELATED CASES 7-19 (Expert Seminar for Eastern Europe and Central Asia, Almaty, Kazakhstan, 2007), available at: http://www.oecd.org/dataoecd/56/29/38873929.pdf (The Swiss provision on liability of legal persons was criticized on the same ground.).

(a) If it is proven that a contractor attempts by himself or *through others*, *directly or indirectly*, to bribe an employee of an authority subject to the provisions of this Law or has procured the contract by way of bribery.[970]

These provisions lead to the second point that deserves to be highlighted, which is the debarment. Generally, countries differ as to which debarment approach they have adopted—either the automatic debarment approach or the discretionary debarment approach.[971] Although the Law has taken a significant step in prohibiting the convicted entities from making future contracts with the government, future amendments may take into consideration that the ban from entering into any contract with the government's agencies and entities should be a collateral penalty, rather than an original penalty. The recent provision leaves the ban as a judicial discretionary penalty in Article 19 by leaving it to the judge's discretion to impose the monetary penalty and/or future ban from entering into contracts with the government's agencies or entities.[972] This also requires a further step to be taken in establishing a register of criminal convictions.[973]

The argument for adopting an automatic debarment approach is based on two lines of reasoning. First, the automatic debarment approach increases the cost of a corruption offense when an offender is performing a cost-benefit analysis.[974] Second, the default options are more

---

[970] Government Tenders and Procurement Law, *supra* note 834, art. 53(a).

[971] ELIZABETH ACORN, THE POWER OF PROCUREMENT IN THE FIGHT AGAINST FOREIGN BRIBERY (OECD INTEGRITY FORUM, PARIS, FRANCE 2016) (distinguishes between the automatic debarment approach and the "discretionary" debarment approach).

[972] Anti-Bribery Law, *supra* note 796, art. 19.

[973] Martini, *supra* note 968, at 5 ("While such a register is not yet common in other countries (of the countries [analyzed] here, only France keeps records of legal entities convicted), in the case of Switzerland, the absence of such a register makes it nearly impossible to apply the rules on repeat offending….").

[974] Emmanuelle Auriol & Tina Søreide, *An Economic Analysis of Debarment* (Norges Handelshøyskole, Discussion Paper No. 23/2015, 2015) (This is especially true in "markets with

likely to be adopted in the decision-making process.[975] That is, when the judge is faced with a

provision imposing automatic debarment, she is more likely to impose the debarment. With the

existing provision (i.e., a discretionary debarment approach), judges might find it more difficult

to opt-out. It is worth noting that this argument and the tendency to adopt the automatic

debarment approach is valid unless the government adopts a voluntary disclosure mechanism. In

that case, the automatic debarment approach may backfire and decrease the effectiveness of the

voluntary disclosure mechanism.[976]

B. *The Wasta Provision*

Credit must be given to the drafters of the Law for the inclusion of Article 4 in its

provisions, even though the Article is not comprehensive. In fact, the text of the Article seems to

reflect the legislators' attempt to avoid making the provisions overly broad. Nevertheless, the

failure to combat *wasta* may be attributed to the legal system in general rather than to the Law

itself. *Wasta* in its essence is an act of favoritism and discrimination, and to effectively combat it

requires a comprehensive legal apparatus. Thus, a single provision in one law cannot achieve the

intended result.

In the Arab world, similar provisions have been enacted in number of countries.[977] These

provisions share similarities with Article 4 of the Saudi Anti-Bribery Law. However, the

---

low competition it may deter corruption as long as firms value public procurement contracts in the future and there is a certain risk of being detected in corruption.").

[975] Eric J. Johnson & Daniel Goldstein, *Do Defaults Save Lives?*, 302 SCI. 1338, 1338-39 (2003); *see also* Shai Davidai et al., *The Meaning of Default Options for Potential Organ Donors*, 109 PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCES OF THE UNITED STATES OF AMERICA 15201, 15201-5 (2012).

[976] *See* Mathias Nell, *Contracts Obtained by Means of Bribery: Should They be Void or Valid?*, 27 EUR. J.L. ECON. 159, 159 (2009).

[977] *See, e.g.*, Penal Code No 111 of 1969, art. 330 (Iraq) ("Any public official or agent who unlawfully refrains from executing the duties of his office or willfully fails to fulfill his duties in response to a request or instruction or to mediation by another or for any unlawful reason is

Jordanian provision in this matter is slightly different from the Saudi provisions, stating in

Article 5 (i) that "[f]or the purposes of this Law, the following shall be deemed as corruption: (i)

The acceptance of nepotism and favoritism, which revokes a right or validates what is void."[978]

The standard in the Jordanian provision is the individual's right, rather than the public official's

duties. The standard shifts from public official's duty to the individual's right, which expands the

scope of the application of the provision in fighting *wasta*.[979]

More importantly, such a shift in the Jordanian provision leads to a significant inference.

The Saudi provision on *wasta*, similar to its Egyptian and Iraqi counterparts, weights the

integrity of the public office more than other concerns. Thus, such provisions are instituted

within the framework of the protection of public office, which explains why there is a

requirement that the public official violate his duty in order for these provisions to apply.[980]

Nonetheless, these advantages of the Jordanian provision have not immunized it from

criticism. Some scholars argue that the Jordanian Anti-Corruption Commission Law refrains

---

punishable by detention."); *see also* Law No. 58 of 1937, art. 105 *bis* (Criminal Code of 1937, reformed in 1952), *Al-Jaridah Al-Rasmiyya* (Egypt) ("Imprisonment, and paying a fine not less than two hundreds pounds, and not exceeding five hundreds pound, shall be the penalty inflicted on each public official/civil servant who performs or refrains from performing a work of his position duties, or default on the duties of his position as a result of an entreatment, recommendation, or mediation." Note that the Saudi and Iraqi provisions are more explicit in requiring the violation of public official's duty than the Egyptian provision.).

[978] Anti-Corruption Commission Law No. 62 of 2006, art. 5 (Jordan).

[979] Mish'al Al-Raggad & Fahed Al-Kasasbeh, *Jarimat Qabul Alwasitat Fi Alttashrie Al'urdunni Wa Ishkaliat Alttatbiq (Dirasah Muqarna)* [The crime of acceptance of nepotism in the Jordanian legislation and problematic application (comparative study)]*,* 43 DIRASAT: SHARI'A & L. SCI. 99, 99-112 (2006).

[980] Mish'al Al-Raggad, The crime of acceptance of nepotism in the Jordanian legislation and problematic application (comparative study) [jarimat qabul alwasitat fi alttashrie al'urdunni wa ishkaliat alttatbiq (dirasah muqarna)] 19 (2011) (Unpublished Master's Thesis, Amman Arab University) (on file with author).

from defining the rights it intends to protect.[981] Further, the phrase "revokes a right" invites some criticism, since only legal rules define what revokes a right and nepotism and favoritism (*wasta*) does not revoke a right; rather, *wasta* is an infringement of rights.[982]

Moreover, the previously mentioned provisions, including the Jordanian provision, share the same disadvantage that these provisions do not apply unless the *wasta* is accepted. Thus, if the *wasta* was rejected, such provisions cannot be applied.[983] This can be attributed to the focus of these provisions on the acts of public officials rather than on the acts of the individuals initiating the corrupt practice. Consequently, these laws refrain from criminalizing the act of offering or using *wasta* per se, if it is not accepted.[984]

In addition to the specific provision on *wasta*, the absence of certain provisions contributes to the difficulties of fighting *wasta*. One of the issues most closely related to *wasta* is conflict of interest. The Saudi legal system in a limited number of provisions prohibits certain practices that may involve a conflict of interest. Indirectly, the Civil Service Law prohibits public officials from engaging in commerce, which constitutes a preventive measure against the conflict of interest.[985] Such prohibition is affirmed by the Royal Decree No. 43 in Article 1, which states

---

[981] Al-Raggad & Al-Kasasbeh, *supra* note 979, at 99 (This argues that study's most important recommendations are for Jordanian legislators to correct the text of Article 5(i) by limiting the rights they seek to protect, by more accurately specifying the status of nepotism, by clarifying some unclear items, by using consistent terminology, and by abandoning the focus on determining a behavior's criminality based the act of acceptance, focusing instead on "an immediate response to the concept of nepotism.").

[982] Al-Raggad, *supra* note 980, at 28.

[983] MAREI, *supra* note 850, at 260-61.

[984] *Id.*

[985] *See* Civil Service Law, *supra* note 824, art. 13 (stating that "A public official must refrain from:
    (a) engaging directly or indirectly in commerce.
    (b) Participating in establishment of corporate of any kind or the acceptance of board member position within any corporate");

that "a fine [of] not less than one thousand Riyal, and not exceeding ten thousands Riyal, shall be inflicted on:

(a) public officials who are engaging in commerce.…"[986]

The other provision that directly targets the conflict of interest is in the Law of Procedure before Sharia Courts. Article 94 of that law prohibits a judge from hearing a case in the following circumstances:

(a) If he is the spouse, relative, or in-law up to the fourth degree of a litigant.

(b) If he, or his wife, has an existing dispute with a litigant in the case or with his wife.

(c) If he is an attorney-in-fact, guardian, trustee, or presumptive heir of a litigant or if he is the spouse of the guardian or trustee of a litigant or if he is a relative or an in-law up to the fourth degree of such guardian or trustee.

(d) If he, his wife, a relative, or an in-law in the ancestral line, or a person for whom he is trustee or guardian, has an interest in the existing case.

(e) If he had issued a fatwa [religious legal opinion], litigated for one of the litigants in the case, or written about it, even if it were before he joined the judiciary, or if he had earlier considered the case as a judge, expert, or arbitrator, or had been a witness in the case or had engaged in any investigative action therein.[987]

---

*see also* Officers Service Law, *supra* note 824 (prohibiting the same acts in Article 17); *see also* the Law of Bureau of Investigation and Public Prosecution Royal Decree No. M/56 of 1409H (corresponding to 1989), art. 7 (SA) ("A member of the Bureau may not combine his job with commercial activities or any other profession or work inconsistent with the independence of the Bureau's work and its dignity."). *See also* Law of the Judiciary, *supra* note 309, art. 51.
[986] Royal Decree No. 43, *supra* note 806.
[987] Law on Procedures before Shari'a Courts, *supra* note 308, art. 94 (Article 96 includes the circumstances under which the parties are permitted, but not obligated, to file a motion to disqualify the judge, stating that
   "[a] judge may be disqualified for any of the following reasons:
   (a) If either he or his wife has a case similar to the case before him.

However, this provision does not inflict a penalty; rather, as stated in Article 95,

> An action or decision by a judge in any of the foregoing circumstances set forth in Article 94 shall be null and void even if it were with the agreement of the litigants. If such nullification occurs with respect to a judgment upheld by the Appellate Court, a litigant may request said court to nullify the decision and assign another judge to reconsider the appeal.[988]

A clear-cut provision similar to 18 U.S. Code § 208 does not exist in the Saudi legal system.[989] The lack of a direct conflict of interest provision may decrease the public awareness of the illegitimacy of such practices, leading ultimately to a reduction of culpability.[990]

---

(b) If he, or his wife, has a dispute with a litigant or his wife after the lawsuit was filed and pending with the judge, unless that [latter] lawsuit was filed with the intention of disqualifying him from considering the case before him.

(c) If his divorcee with whom he has a child or one of his relatives or in-laws up to the fourth degree has a dispute before the judiciary with a litigant in the case, or with his wife, unless the case was brought with the intention of disqualifying him.

(d) If a litigant is his servant or the judge had habitually dined or lived with him, or if he had received a gift from him shortly before the lawsuit was filed or thereafter.

(e) If enmity or friendship exists between him and a litigant such that it is likely he would not be able to judge impartially.");

*see also* Law of Criminal Procedures, *supra* note 308, art 21 (This Article forbids the members of Bureau of Investigation and Public Prosecution from investigating or involving in the following cases:

(a) If he is a victim of the investigated crime, or is the spouse, relative, or in-law up to the fourth degree of a litigant.

(b) If enmity or friendship exists between him and a litigant such that it is likely he would not be able to judge impartially.

(c) If he had already involved in a case: as an expert, arbitrator, an agent, a witness, and so on.).

[988] Law on Procedures before Shari'a Courts, *supra* note 308, art 95.

[989] *Business Corruption in Saudi Arabia*, *supra* note 399.

[990] *See, e.g.*, MAMDOOH M. AL-RADADI, BANKS, SNAKES & LADDERS: ARAB BANKING & CORPORATE SUCCESS 196 (2011) ("I had a manager who had three relatives working under his supervision, I mean dude! Give me a break! Ever heard of conflict of interest?").

Consequently, the absence of such a provision in the Saudi legal system not only contributes to the difficulties of prosecuting *wasta*, but also provides fertile ground for *wasta* to thrive in.[991]

Additionally, rules directly targeting nepotism and discrimination are absent from the Saudi legal apparatus. The Shoura Council just recently deliberated a bill for an Anti-Discrimination Law.[992] This law, if issued, would be more comprehensive than the U.A.E.'s Anti-Discrimination Law,[993] which only prohibits discrimination for religious reasons.[994] The Saudi bill criminalizes the discrimination on nearly on any basis, including race, region, religion, or ideology.[995]

What can be more difficult to implement is provisions aiming at the prohibition of nepotism. Rules similar to 5 U.S.C. 3110 and 5 U.S.C. 2302 have not been instituted in the Saudi framework. In addition to the difficulties in the application of these rules, they may raise skepticism about the effectiveness and practicality of anti-nepotism provisions, since nepotism is part of the socio-cultural, economic, and political structure.[996] Despite such skepticism and difficulties, the issuance of these rules would raise public awareness about nepotism, which would eventually decrease the prevalence of nepotistic practices.

---

[991] *See* OECD JOINT LEARNING STUDY, IMPLEMENTING A CODE OF CONDUCT FOR THE PUBLIC SECTOR IN JORDAN, 20 (2010) (OECD report on Jordan recommends that "[t]he Government of Jordan may consider the following means to control *wasta*:
1. Adopt and enforce clear conflict-of-interest provisions").
[992] *Law to criminalize all discrimination*, ARAB NEWS, Aug. 22, 2016, http://www.arabnews.com/node/958811/saudi-arabia.
[993] Anti-Discrimination Law No. 2 of 2015 (U.A.E.).
[994] *See generally* U.A.E. Anti-Discrimination Law No. 2 of 2015, art. 4.
[995] *Law to criminalize all discrimination*, *supra* note 992 ("Article 12 of the law says that those who raise tribal slogans will be fined no less than SR 50,000 or will be jailed for at least six months, or both. Article 16 says that those who support the publication, recording, filming, taping, computer programs, applications or data in electronic format of any such material that ridicule religion, discriminates or foments hatred will face at least one year in jail and a fine of a minimum SR 50,000 and a maximum of SR 200,000.").
[996] *See generally* Hayajenh et al., *supra* note 731, at 60-67.

*C. Immunity*

In essence, countries grant immunity to a certain group of officials to serve a dual purpose: to safeguard their independence and to protect them from malicious prosecution.[997] Nevertheless, such immunity may constitute an obstacle to investigating or prosecuting corrupt practices committed by these officials. From the public perspective, immunity is one of those factors that increases corruption, leading the public to lose their confidence in the rule of law.[998]

Thus, immunity is a sensitive issue, especially when it is associated with corruption, requiring a balance between the need for immunity and the need for "effective investigation, prosecution and adjudication of corruption offences."[999] Accordingly, the UNCAC requires the parties of the convention to

> take such measures as may be necessary to establish or maintain, in accordance with its legal system and constitutional principles, an appropriate balance between any immunities or jurisdictional privileges accorded to its public officials for the performance of their functions and the possibility, when necessary, of effectively investigating, prosecuting and adjudicating offences established in accordance with this Convention.[1000]

To meet such a balance, countries should not adopt a notion of absolute immunity; instead the notion of immunity adopted should functional in nature, limiting the immunity to

---

[997] THE ORGANISATION FOR ECONOMIC CO-OPERATION AND DEVELOPMENT, *supra* note 871, at 51.

[998] *Id*; *see also* Tilman Hoppe, *Public corruption: limiting criminal immunity of legislative, executive and judicial officials in Europe*, 5 VIENNA J. ON INT'L CONST. L. 538, 538 (2011) ("63% of respondents to a survey by Gallup International see 'public official's immunity' as one of the 'main factors that have contributed to an increase in corruption', ranking it the 2nd most important factor").

[999] THE ORGANISATION FOR ECONOMIC CO-OPERATION AND DEVELOPMENT, *supra* note 871, at 51.

[1000] UNCAC, *supra* note 29, art. 30.2.

only those acts performed within the framework of official duties.[1001] The immunity should only cover the period when the official actually held office, rather than being open-ended.[1002] In addition, suspending the statute of limitations, if there is such, during the time officials enjoy immunity must be taken into consideration to ensure that prosecution is not barred by the statute of limitations.[1003]

This subject deserves some attention. At the outset, the Saudi legal system grants immunity to ministers, judges, and members of the Bureau of Investigation and Public Prosecution (BIP). The source of this immunity is derived from variety of provisions. The immunity of officials previously in office can be revoked via various procedures, depending on the position they held.

Judges enjoy immunity from prosecution based on Article 68, which states, "Except in the foregoing cases [flagrant delicto], the judge may not be arrested, be subject to investigation proceedings, or be prosecuted without the permission of the Supreme Judicial Council. Detention of judges and execution of punishments restraining their freedom shall be implemented in separate facility." A similar provision has been included in Article 19 of the Law of the Bureau of Investigation and Public Prosecution, but the permission to prosecute must be provided by the Bureau Administration Committee.[1004]

---

[1001] THE ORGANISATION FOR ECONOMIC CO-OPERATION AND DEVELOPMENT, *supra* note 871, at 51.

[1002] *Id.*

[1003] *Id.*

[1004] Law of Bureau of Investigation and Public Prosecution, *supra* note 992, art. 19 ("Except in the foregoing cases [flagrant delicto], Members of BIP may not be arrested, be subject to investigation proceedings, or be prosecuted without the permission of the Bureau Administration Committee. Detention of Members and execution of punishments restraining their freedom shall be implemented in separate facility.").

The immunity of ministers deserves more elaboration since there are two different sets of rules governing it. Generally, the Law of Criminal Procedures requires a prior revocation of immunity issued by the King to prosecute ministers and those who hold the rank of minister or have previously been appointed minister or held the rank of minister.[1005] With respect to certain corrupt practices, as noted above in Chapter 3, officials are subject to impeachment rather than public prosecution.[1006]

Drawing on this brief explanation, advantages and disadvantages of the Saudi anti-corruption measures can be noted. The Saudi legal system did not adopt a statute of limitations for the corrupt offenses which would allow the prosecution of officials after they leave office. Further, immunity can be revoked with the permission of the authorized authorities. Yet the procedures need to be more transparent to ensure effective procedures for revoking immunity.[1007] Further, immunity for ministers or those who hold the rank of ministers raises a twofold issue. On the one hand, immunity extends even after an official leaves office, which contradicts the

---

[1005] Law of Criminal Procedures, *supra* note 308, Para. 4 of preamble.

[1006] Impeachment of Ministers Law, *supra* note 842, art. 5. (criminalizes the following acts:
  A. Behaviors and actions that would impact the increase or decrease in the price of goods, real estate, currency, or stock, to obtain personal benefit to him or to others.
  B. Acceptance of a benefit — of any kind — to himself or others, to perform official act or refrain from formal work.
  C. Influence peddling, whether the fraud is for the benefit or advantage of himself or of any other body or company, or organization.
  D. Deliberate violations of laws, regulations and orders that result in financial loss of the state's rights, or the rights of individuals.
  E. The disclosure of cabinet decisions and deliberations relating to national security, state's foreign affairs, financial and economic affairs, and the trial of ministers.
  F. Personal intervention in the affairs of the judiciary and other government bodies and departments.).

[1007] THE ORGANISATION FOR ECONOMIC CO-OPERATION AND DEVELOPMENT, ANTI-CORRUPTION REFORMS IN EASTERN EUROPE AND CENTRAL ASIA: PROGRESS AND CHALLENGES, 2009-2013, FIGHTING CORRUPTION IN EASTERN EUROPE AND CENTRAL ASIA 75 (2013) ("A number of standards can be formulated with regard to immunity which should … provide for swift and effective procedures for lifting immunity, clear criteria for lifting of immunity which are the based on merits of the request to lift immunity.").

principle of limiting the duration of immunity.[1008] On the other hand, immunity extends to an unnecessarily large number of officials. Finally, it would be more effective to restrict the immunity so that it is clearly functional in nature, a concept which cannot be garnered from the broad language of the previous provision.[1009]

### D. Penalties and Rewards

Penalties play a significant role in preventing crimes, at least based on the classic analysis. Theoretically, the increase of penalties would reduce the number of corrupt practices, but also may increase the amount of bribes. In reality, however, the number of perpetrators who are punished for such practices is low, not to mention the gap between the penalties stated in the law and those actually imposed. It is also worth noting that the preventative roles of penalties decrease significantly if the penalty is not associated with a loss of social capital, which is the state of things where corruption is prevalent.[1010]

At the core of this issue is the anti-corruption provisions and laws. To succeed, such laws must adopt the "right mix of penalties, rewards, and undercover law enforcement."[1011] Anti-corruption laws achieve more by compromising between deterrent impact and rewarding "whistleblowers." The probability of detection and the imposed penalties, including those imposed by societies, influence the deterrence to engaging in criminal behavior.[1012] Thus, while

---

[1008] Law of Criminal Procedures, *supra* note 308, Para. 4 of preamble.

[1009] THE ORGANISATION FOR ECONOMIC CO-OPERATION AND DEVELOPMENT, *supra* note 871, at 52 ("[E]ven officials who were involved in car accidents because of speeding have escaped prosecution, even though driving is not part of their official duties.").

[1010] Tanzi, *supra* note 1, at 574 (*citing* Gary Becker, *Crime and punishment: An economic approach*, 76 J. POL. ECON. 169, 169-217 (1968)).

[1011] ROSE-ACKERMAN, *supra* note 21, at 68.

[1012] *Id*. at 55.

high fixed penalties lower the number of corrupt acts, they increase the sum of payoffs.[1013] That is, officials will demand a high payment to engage in bribery when the penalty is high.[1014]

Bases on a cost–benefit analysis, then, the probability of being apprehended and the penalties inflicted, which include those inflicted legally and socially, shape the deterrence of criminal behaviors.[1015] Another point that must be taken into account is that the benefits for the bribe payers and bribe recipients are not symmetric. Such an asymmetry can be seen, for instance, when a briber pays a $1,000 to a bribee to get a benefit of $2,000 from a contract.

In an assessment of the effectiveness of monetary penalties, OECD concluded that "23 countries' maximum fines were not high enough to offset the financial return on investments in which bribery is involved."[1016] The low monetary penalty has provoked a number of commentators, among them OECD Secretary General Angel Gurria, who stated that "[s]ometimes sanctions are so light that even if people have a 100 percent chance of getting caught they would still choose to pay the fine and get the benefit of the act of bribery."[1017]

Despite these considerations, conventions against corruption tend to avoid providing detailed guidance for sentencing in corruption offenses. The UNCAC, refraining from providing a minimum or a maximum for penalties, states that "each State Party shall take measures … to provide effective, proportionate and dissuasive civil, administrative or criminal penalties"[1018]

---

[1013] *Id*. at 54.
[1014] *Id*.
[1015] *Id*. at 52.
[1016] *Disparate Laws, Low Fines Mean Corporate Bribery Often Pays: OECD*, REUTERS, Jun. 9, 2016, http://www.reuters.com/article/us-oecd-corruption-idUSKCN0YV1BR. *See also* OECD, *Is foreign bribery an attractive investment in some countries?* in OECD BUSINESS AND FINANCE OUTLOOK 2016 207-22 (OECD ed., 2016).
[1017] *Id*.
[1018] UNCAC, *supra* note 29, art. 12 (1); *see also* OECD Convention, *supra* note 29, art. 3 Para. 1 (states that bribery of foreign officials "shall be punishable by effective, proportionate and dissuasive criminal penalties comparable to the penalties for corruption of domestic officials.").

Additional recommendations are provided by the UNCAS and the OECD, including the disqualification of convicted individuals from holding public offices,[1019] the recognition of "legal persons' criminal liability,"[1020] and confiscation of the benefit.[1021]

      Accordingly, countries around the globe vary in the penalties they inflict on corruption offenses. In terms of penalties, countries generally impose a fixed imprisonment penalty, yet they vary in the assignment of monetary penalties. A number of countries impose a fixed monetary penalty for bribery,[1022] while others take into consideration the value of bribe.[1023] Notably, some countries, including Saudi Arabia, have adopted a mix of the two systems, where they apply the former to individuals and the latter on legal persons.[1024] It is also worth noting that a number of countries, including United Kingdom, do not set a maximum limit for a monetary penalty.[1025]

      In the Saudi context, the Saudi legal system assigns asymmetric penalties depending on the offenses ranging from 2 to 10 years of imprisonment and a monetary penalty ranging from

---

[1019] UNCAC, *supra* note 29, art. 30 (7).

[1020] OECD Convention, *supra* note 29, art. 3 Para. 2; *see also* UNCAC, *supra* note 29, art. 26.

[1021] OECD Convention, *supra* note 29, art. 3 Para. 3; *see also* UNCAC, *supra* note 29, art. 31.

[1022] *See, e.g.*, CODE PÉNAL [C. PÉN.] art. 435-1, 435-2, 435-3 435-4 (Fr.) (Bribery is generally punished by "ten years' imprisonment and a fine of €150,000." Article 131-38 for legal persons "The maximum amount of a fine applicable to legal persons is five times that which is applicable to natural persons by the law sanctioning the offence."); *see also* OECD, *supra* note 1016, at 210 ("Some countries impose simple maximum thresholds for monetary fines. These vary greatly in size from about USD 580 000 in the country with the lowest threshold to over USD 10 million in the highest threshold.").

[1023] *See, e.g.*, Act No. 16 of 1960, art. 114 (Kuwaiti Penal Code of 1960), *Official Gazette* (Kuwait); Criminal Code No. 15 of 1976, art. 191 (Bahr.); Criminal Code No. 11 of 2004, art. 140 (Qatar); Criminal Code No. 3 of 1987, art. 238 (U.A.E.); 18 U.S. Code § 201 (West).

[1024] *Criminal Code Act 1995* (Cth) divs 141.1 (5)(6) (Austl.) (Australia adopts a mix of the two systems. See Division 141.1 (5) penalty for individuals is a fix amount of monetary penalty. Division 141.1 (6) also adopts a similar system for legal persons, allowing the judge to impose a fine of 100.000 penalty units, or a maximum that does not exceed threefold the value of the benefit.).

[1025] Gerry Ferguson, *Criminal Sentences and civil sanctions for corruption*, *in* GLOBAL CORRUPTION: LAW, THEORY AND PRACTICE 24 (2015); *see also* OECD, *supra* note 1016, at 210 (indicating that "eight countries do not set 'maximum' thresholds for fines.").

twenty thousand to a million Saudi Riyal. Additionally, the Anti-Bribery Law achieved certain

advances in imposing collateral penalties, which includes dismissal from public office,

confiscation, and promulgation of convictions.[1026] The Law also made an advance by

recognizing aggravated penalties for repeated offenders[1027] and the criminal liability of legal

persons, imposing a monetary penalty of tenfold the value of the bribe.[1028]

     Although the Saudi legal system has achieved a number of significant advances, certain

points deserve to be highlighted. The absence of sentencing guidelines and the penal code have

contributed to the issue of an inconsistency between penalties. With regard to bribery, while the

monetary penalty is assigned in the Anti-Bribery Law, the Impeachment of Ministers Law

refrains from imposing monetary fines.[1029] Even if a fixed monetary penalty were imposed,

which is the situation in the current Anti-Bribery Law, which imposes a penalty of a million

Saudi Riyal (equivalent to 270,000 USD), the Saudi legal system might be falling into the trap of

a low monetary penalty. Consequently, the shift from a fixed amount of monetary penalty to a

monetary penalty based on the value of the bribe would provide more consistency and be more

effective.

     Finally, since the success of any anti-corruption system partly depends on whistleblowers

and uncovering these offenses, a process which is always characterized by secrecy, rewards play

---

[1026] *See* Anti-Bribery Law, *supra* note 796, arts. 13, 15, & 21.

[1027] *Id*. art. 18.

[1028] *Id*. art. 19; *see*, *e.g.*, THE ORGANISATION FOR ECONOMIC CO-OPERATION AND DEVELOPMENT, *supra* note 960, at 58 (Note that there are number of countries that do not adopt the criminal liability of legal persons, including Armenia, Azerbaijan, Kazakhstan, Ukraine, Egypt and Kuwait.).

[1029] *See* Impeachment of Ministers Law, *supra* note 842, art. 5 (States that "a penalty of imprisonment between 3 – 10 years shall be inflicted on whoever commits one of the following offenses").

significant role in such a system. Similar to the laws in a number of countries,[1030] the Anti-Bribery Law grants relatively generous rewards to encourage whistleblowers to report crimes. The rewards range from 5,000 Saudi Riyal (equivalent to 1,333 USD) to the half of the value of the confiscated benefits.[1031]

### E.  Protection of Whistleblowers and Witnesses

In addition to penalties and rewards, the success of anti-corruption laws requires a mechanism to uncover corrupt practices. Since it is mainly characterized by hidden acts, to uncover these acts may require motivating whistleblowers to report. This can be done either by the reward mechanism, as noted, or by protection, or both. In addition to its significant role in detecting corrupt practices by providing unaccusable information facilitating the investigation, reporting may play a similar role in preventing corrupt practices by increasing mistrust between bribers and bribees.[1032] In social terms, reporting enhances trust in law enforcement and the rule of law on one hand, and a decreased perception of corrupt practices as normal practices on the other.[1033]

Confusion arises, mainly in countries where laws and rules regarding the protection of whistleblowers and witnesses are not common,[1034] between the protection of whistleblowers and

---

[1030] OECD, WHISTLEBLOWER PROTECTION: ENCOURAGING REPORTING 10 (2012) ("The [Korean] Anti-Corruption and Civil Rights Commission may provide whistleblowers with rewards of up to USD 2 million if their report has contributed directly to recovering or increasing revenues or reducing expenditures for public agencies." "The Dodd-Frank Act also authorizes the SEC to pay rewards to individuals who provide the Commission with original information that leads to successful SEC enforcement actions (and certain related actions). Rewards may range from 10 percent to 30 percent of the funds recovered.").

[1031] *See* Anti-Bribery Law, *supra* note 796, art. 17.

[1032] THE ORGANISATION FOR ECONOMIC CO-OPERATION AND DEVELOPMENT, *supra* note 960, at 71.

[1033] *Id.*

[1034] *Id* ("not a single country in the region [Eastern Europe and Central Asia] has effective legal provisions to protect whistleblowers in either the private or public sectors.").

the protection of witnesses and individuals cooperating with the investigatory authorities. The difference between these two groups lies mainly in the procedures they are involved in: whistleblowers are not normally part of a criminal procedure, either because the private company or government agency deals with the issue internally, or because law enforcement has adequate evidence and does not need the whistleblower's testimony. Witnesses, on the other hand, are directly involved in the criminal procedure.[1035] The source and the purpose of the protection differs accordingly. Since whistleblowers will not take part in criminal procedures in most cases, provisions are derived from administrative regulations, labor laws, or specific laws on the protection of whistleblowers aiming at protecting them against retaliation, mobbing, dismissal, etc., in the workplace.[1036] In contrast, the protection of witnesses and individuals cooperating with the authorities aims at protecting their physical integrity.[1037]

Based on this distinction, anti-bribery rules generally tend to focus on the protection of witnesses and individuals cooperating with the authorities due to the fact that these cases are criminal cases in nature. In this matter, the UNCAC provides that "[e]ach State Party shall consider providing for the possibility, in accordance with fundamental principles of its domestic law, of granting immunity from prosecution to a person who provides substantial cooperation in the investigation or prosecution of an offence established in accordance with this Convention."[1038]

---

[1035] *Id*. at 71-72.

[1036] *Id*. at 72 ("whistleblower protection rules for the private sector are provided in labour code (Slovak Republic, Sweden [France and Norway]) or in specific laws on protection of whistleblowers (Japan, United Kingdom, [New Zealand and Canada]). Whistleblower protection in the public sector is usually provided in administrative laws or regulations (Mexico).").

[1037] *Id*.

[1038] UNCAC, *supra* note 29, art. 37(3); *see also* Article 22 of Criminal Law Convention on Corruption, January, 27, 1999, Eur. T.S. No. 173 (Similarly states that "[e]ach Party shall adopt such measures as may be necessary to provide effective and appropriate protection for:

A distinction between the defense of effective regret and the immunity or leniency granted to individuals cooperating with the authorities deserves to be highlighted. Despite the great similarities between them, "[i]n most countries, the effective regret [defense] applies only when an offender reports the crime shortly after its commission, which is not required in the case of immunity."[1039] However, this requirement, i.e., reporting the offense shortly after the commission, is not always adopted by countries, since some countries allow more time so long as the offense was not uncovered by the authorities, and thus an offender may benefit from such a defense.[1040] Thus, countries take different positions on effective regret; while some countries provide such a defense, others do not.[1041]

Nevertheless, a concern about the "effective regret" defense arises in the case of the bribery of foreign officials. Generally, the effective regret defense benefits the briber who reports the bribery to avoid the criminal liability, which eventually also assists the authorities by providing essential information to prosecute corrupt officials.[1042] Such a purpose may not be

---

       a)  those who report the criminal offences established in accordance with Articles 2 to 14 or otherwise co-operate with the investigating or prosecuting authorities;

       b)  witnesses who give testimony concerning these offences….").

[1039] THE ORGANISATION FOR ECONOMIC CO-OPERATION AND DEVELOPMENT, *supra* note 871, at 53.

[1040] ASIAN DEVELOPMENT BANK & ORGANISATION FOR ECONOMIC CO-OPERATION AND DEVELOPMENT, THE CRIMINALISATION OF BRIBERY IN ASIA AND THE PACIFIC 35 (2011).

[1041] *Id.* at 251, 284, & 458 (Within the Japanese Penal Code, "domestic bribery offences do not contain some defenses to bribery that are commonly found in other jurisdictions. According to the Japanese authorities, there are no defenses of small facilitation payments, solicitation or 'effective regret'." A similar position has been taken by Korea and Singapore.); *see also* RODERICK MACAULEY, FIGHTING CORRUPTION: INCRIMINATIONS 54 (2011) ("[The effective regret defense] is not known at all in the more western European nations.").

[1042] OECD, FOREIGN BRIBERY OFFENCE AND ITS ENFORCEMENT IN EASTERN EUROPE AND CENTRAL ASIA 53 (2016).

achieved in bribery involving foreign officials since "there is no guarantee that the foreign

official who was given a bribe will be prosecuted if the bribe giver comes forward."[1043]

Within the Saudi legal system, the Anti-Bribery Law, as noted in the previous chapter,

adopts the effective regret defense for the briber and the middleman who cooperates with

authorities, but this does not extend to the recipient of bribe.[1044] Though the Law does not require

that the information provided to be fundamental in building and proving the case,[1045] scholars

have argued that such a requirement must be met.[1046] However, the Law allows for a delay in

reporting the offense so long as the offense is not uncovered or investigated by the authority.[1047]

In terms of witness protection, the Executive Regulation of Criminal Procedure Law allows the

investigator to conceal the identity of witnesses.[1048]

Nevertheless, the Saudi legal system lacks a comprehensive legal apparatus to protect

witnesses or individuals reporting offenses, their relatives, and other close individuals.

According to the U.N. Executive summary, "Saudi Arabia has not taken appropriate measures to

provide effective protection against potential retaliation or intimidation for persons who

cooperate with the justice authorities or for their relatives and other persons close to them."[1049]

Notably, anonymous reports are not always preferred nor protected, especially in regard to

corrupt offenses.[1050] In terms of protection of whistleblowers, such provisions do not exist in

---

[1043] *Id.*
[1044] Anti-Bribery Law, *supra* note 796, art. 16.
[1045] *Id.*
[1046] NOUR, *supra* note 839, at 153-54. MAREI, *supra* note 850, at 204.
[1047] Anti-Bribery Law, *supra* note 796, art. 16.
[1048] Executive Regulation of Law of Criminal Procedures, *supra* note 327, art. 69(3).
[1049] *See* U.N. Conference of the States Parties to the UNCAC, St. Petersburg, Russ., Nov. 3-4, 2015, Review of implementation of the UNCAC, CAC/COSP/IRG/I/4/1/Add.20 (Sept. 24, 2015).
[1050] *Saudi whistle-blowers slam sackings, lack of protection*, ARABNEWS, Sept. 16, 2013, http://www.arabianbusiness.com/saudi-whistle-blowers-slam-sackings-lack-of-protection-

Saudi Arabia, thus allowing retaliation against whistleblowers.[1051] In view of the absence of such provisions, the Ministry of Labor and Social Development and the Ministry of Commerce and Investment recently took steps to issue new regulations aiming at encouraging and protecting whistleblowers.[1052]

### F.  The Jurisdiction of the Anti-Bribery Law

Historically, anti-bribery provisions began by targeting the offenses within the framework of public offices due to the fact that public offices were controlling and responsible for significant resources, and those offenses would jeopardize the social and economic structure, leaving the bribery in the private sector to be governed by "civil (e.g. competition) or [labor] laws or general criminal law provisions."[1053]

With the emergence of mega corporations and enterprises, societies, and more importantly, economies, were restructured. These corporations and enterprises have gained the same significance and effects on societies and economies as governments once had. Soon, their business activities expanded from the local domain to become global, which then added more difficulties to combating bribery, since countries are restricted in their jurisdiction to certain geographical and personal scopes.  Thus, certain countries realized such an effect and acted to face corrupt offences occurring within that scope. Regrettably, however, a number of countries

---

518365.html#.V8TiumUi6f5 (Ministry of Labour spokesman Hattab Al Enezy indicates that "disclosure of informers' identities was essential to take legal action against corrupt officials."); *see also* SCHOOL OF INTERNATIONAL SERVICE AMERICAN UNIVERSITY, THE STATE OF WHISTLEBLOWER & JOURNALIST PROTECTIONS GLOBALLY: A CUSTOMARY LEGAL ANALYSIS OF REPRESENTATIVE CASE, 81 (2015) ("whistleblowers are put in even more potential danger, since the state will not allow anonymous reporting. The law states that the identity of the whistleblower is necessary in order to investigate the claims.").

[1051] *Saudi whistle-blowers slam sackings, lack of protection*, *supra* note 1050.

[1052] *Saudi Arabia: Protection for 'whistleblowers'*, ARABNEWS, May. 16, 2016, http://www.arabnews.com/news/protection-'whistleblowers'

[1053] THE ORGANISATION FOR ECONOMIC CO-OPERATION AND DEVELOPMENT, *supra* note 960, at 57.

did not extend the application of anti-bribery provisions to reach the private sector's corrupt practices.

In addition to the traditional form of bribery where a bribe is paid to a local official, countries have become subject to two additional forms of bribery. The first is bribery within the private sector, which may take the form of private to private bribery or individual to private bribery. The second form is bribery paid by a private sector company or private individuals to a foreign official. This is not, however, limited to bribery offenses, but may also extend to other offenses such as trade in influence or abuse of power.

Accordingly, a number of contemporary conventions against corrupt practices include the private sector (commercial bribery) and the bribery of foreign officials within their provisions. The UNCAC urges, rather than requires, its state parties to adopt "legislative and other measures as may be necessary to establish as criminal offences, when committed intentionally in the course of economic, financial or commercial activities."[1054] Further, conventions have advanced to cover bribes paid by private entities and individuals to foreign officials, expanding the jurisdiction of countries to prosecute those entities and individuals.[1055]

The U.S. took the initiative to fight the bribery of foreign officials as early as 1977 when it enacted the Foreign Corrupt Practices Act (FCPA).[1056] The FCPA prohibits individuals and entities within the FCPA's jurisdiction from committing "any acts in furtherance of bribery aimed at influencing the business decisions of foreign government officials or foreign political

---

[1054] UNCAC, *supra* note 29, art 21 (Note that Council of Europe Criminal Law Convention on Corruption in article 7 and 8 requires its state parties to "adopt such legislative and other measures as may be necessary to establish as criminal offences under its domestic law, when committed intentionally in the course of business activity.").

[1055] *See* UNCAC, *supra* note 29, art 16. Criminal Law Convention on Corruption, *supra* note 1038, arts 5 & 6. OECD Convention, *supra* note 29, art. 1.

[1056] The Act was amended in 1988 and 1998.

candidates or parties."[1057] The purpose of the FCPA clearly aims at protecting fair competition among American businesses and individuals carrying out international business activities.[1058] Since the domain of international business is shared and includes other international entities whose countries do not adopt similar acts restricting the bribery of foreign public officials, the American entities were disadvantaged when competing with other countries' entities.[1059]

Thus, the Americans took another step, but this time globally. Their efforts aimed at the adoption of harmonized provisions criminalizing the bribery of foreign officials.[1060] These efforts result in the implementation of such provisions in other conventions, as noted above.[1061] At the beginning of this century, such efforts culminated in the adoption of similar provisions targeting the bribery of foreign officials in more countries and placing the same restrictions on more international corporations.[1062]

Within the scope of private sector, bribery offenses became more common, leading national legislatures to react by improving and amending their criminal law, yet different countries have adopted different techniques.[1063] Countries such as Germany, Korea, the Netherlands, and Sweden, for instance, have adopted criminal provisions directly targeting

---

[1057] Joseph L. Hoffmann, *The U.S. Foreign Corrupt Practices Act*, 6 U. TOKYO J. L. & POL, 60, 61 (2009).

[1058] *Id*.

[1059] *Id*.

[1060] *Id*.

[1061] *See generally id*. at 61-62.

[1062] *See, e.g.*, The U.K. Anti-Bribery Act 2010 § 6 (Eng.); CODE PÉNAL [C. PÉN.] art. 435-3 & 435-4 (Fr.); *Criminal Code Act 1995* (Cth) div 70 (Austl.); Fusei kyōsō bōshi-hō [Unfair Competition Prevention Act], Act No.47 of 1993, art. 28 (Japan); Corruption of Foreign Public Officials Act (S.C. 1998, c. 34 (Can.).

[1063] GÜNTER HEINE ET AL., PRIVATE COMMERCIAL BRIBERY: A COMPARISON OF NATIONAL AND SUPRANATIONAL LEGAL STRUCTURES 8 (2003) ("Nevertheless, despite international and national tendencies towards combating commercial bribery by means of criminal law, some payments/benefits for facilitating the conduct of business are still tolerated.").

commercial bribery in their criminal codes.[1064] Others have opted to follow another technique by adopting criminal provisions in different special laws such as commercial laws or anti-trust provisions.[1065] Notably, some countries remain reliant on classical crimes such as "fraud management, misappropriation, fraudulent administration, or forgery of documents."[1066]

The Saudi Anti-Bribery Law defines specifically the scope of its application in Article 8. The law, as explained in the previous chapter, covers bribery in the private sector, as well as bribery of public officials. While the law covers persons employed in joint stock corporations and corporations carrying out banking operations with no conditions, a condition of performance of public service or managing, running, or maintaining a public facility is a condition to applying the provisions of the Law to persons employed in entities other than these kinds of corporations. That is, an entity other than a joint stock corporation, whether it is a holding company, a sole corporation, a limited liability corporation, or a non-profit organization, has to meet the previous requirement to be included within the scope of Article 8. Finally, all others can be prosecuted and punished under the *ta'azir* crimes.

To understand the jurisdiction of the Law, three scenarios must be provided. The first is one where the giver of a bribe is a Saudi corporation, of any kind, and the recipient is foreign official in a foreign embassy in Saudi Arabia or abroad. This is definitely outside the jurisdiction of the Anti-Bribery Law since the Law and "Saudi legislation does not criminalize bribery

---

[1064] *Id*. at 9.
[1065] *Id* (For instance, countries may include criminal provisions in "commercial codes (Korea - with overlapping provisions in the Penal Code, Japan, the Czech Republic, Switzerland), the Prevention of Corruption Act (England/Wales, 1906), the Labor Code (France).").
[1066] *Id* (This technique was followed by for instance, Spain, Poland, and Switzerland.).

committed by foreign public officials or officials of international public institutions, nor does it criminalize the solicitation or acceptance of a bribe by any such official."[1067]

The second scenario can be more complex and challenging to the Law specifically and to the legal system generally. Consider the situation where the giver of bribe is within the jurisdiction of the Law, yet the recipient is not. In such a scenario, none of the parties falls within the jurisdiction of the Law since the Law only criminalizes the solicitation or acceptance of a bribe if that is committed by persons within the jurisdiction of the Law.[1068] Aside from *ta'azir*, provisions criminalizing certain practices in different laws might be applied to such a situation. One such provision is found in the recently enacted Companies Law, which criminalizes the misuse of power or votes knowingly when such an act is against the interests of the company and seeks to directly or indirectly obtain personal advantages for oneself or other individuals or another company.[1069] The other provision is in the Competition Law; it is rather indirect and targets legal persons, stating that

> [p]ractices, agreements or contracts among current or potential competing firms … shall be prohibited, if the objective of such practices, agreements or contracts, or consequent impact thereof is the restriction of commerce or violation of competition among firms. A firm or firms enjoying a dominant position shall also be banned from carrying out any practice which restricts competition among firms.…[1070]

---

[1067] U.N. Conference of the States Parties to the UNCAC, *supra* note 1049, at 3. VLIEGER, *supra* note 340, at 198 (For instance, the bribing of foreign embassy personnel occurs more frequently in the context of domestic workers. In an answer provided to a questionnaire about what to do to demand a legal right, a domestic worker said, "The only place to go really is the embassy, but they also sometimes help the Saudis; maybe they take some money under the table, you know.").

[1068] Anti-Bribery Law, *supra* note 796, arts. 1, 2, & 3.

[1069] Law of Companies, *supra* note 857, art. 211(c).

[1070] Competition Law Royal Decree No. M/25 of 1425H (corresponding to 2004), arts. 4 & 12 (SA) (Article 12 imposes a penalty of five million Saudi Riyals (equivalent to $1.3 million)).

The final scenario can be more specific to the trade in influence offenses, but is intended to highlight the jurisdiction of the Law over former officials. Suppose a payment was provided to a former official to use his influence in an agency, organization, or other entity in which he has been holding a high rank. Such a situation would challenge the jurisdiction of the Law since the Law's jurisdiction is limited to current public officials or those who are deemed as such by Article 8. That is, if an individual does not hold a position that falls within the scope of Article 8 at the time he agrees to use his influence, he may not fall within the jurisdiction of the Law.[1071]

To sum up, offenses committed by certain individuals may fall outside the jurisdiction of the Anti-Bribery Law. This includes foreign public officials, former officials, and employees in the private sector other than joint stock corporations, corporations carrying out banking operations, or corporations performing public services or managing, running, or maintaining a public facility. It is also important to emphasize that the Law focuses on the recipient's soliciting or accepting a bribe; this means that if the recipient of the payment is not covered by the scope of Article 8, the jurisdiction of the law is limited, even if the giver of bribe falls within the scope of Article 8.

CONCLUSION

This chapter has examined six aspects of the Saudi Anti-Corruption Law. Those aspects were selected to focus on the most significant legal issues when discussing bribery or similar corrupt practices. These aspects include the liability of legal persons, the *wasta* provision, immunity, penalties and rewards, the protection of whistleblowers and witnesses, and the jurisdiction of the Anti-Bribery Law.

---

[1071] Anti-Bribery Law, *supra* note 796, art. 8.

As noted above, the Saudi legal system possesses a number of advantages that other countries lack. However, such advantages may not be fully functional since they are either incomplete or there are other provisions within the general legal framework that may hinder their effectiveness. Finally, this chapter sought to provide an examination and evaluation of the issues, rather than recommending solutions, which will be provided in the next chapter with respect to certain issues.

CHAPTER EIGHT: FIGHTING CORRUPTION A DIFFERENT WAY

INTRODUCTION

Having highlighted the main issues behind corruption in Saudi Arabia, this chapter aims

at providing legal and procedural suggestions that can directly or indirectly reduce the practice of

*wasta* and other corrupt practices. Since a number of corrupt practices are socially and legally

influenced, these suggestions bear such factors in mind in order to provide applicable solutions

to fight corruption in Saudi Arabia. It is also important to note that though a number of

weaknesses have been highlighted in the previous chapter, this chapter does not provide

additional recommendations on topics where they have been provided previously. The exception

is the jurisdiction of Anti-Bribery Law, which will be discussed in this chapter.

In addition to suggestions about reforming the jurisdiction of Anti-Bribery Law to cover

private-to-private bribery on the one hand and the bribery of foreign public officials on the other,

this chapter also urges the simplification of procedures by proposing a number of changes in the

existing e-government program. The development of such programs serves a dual purpose: that

of simplification and of adding anti-corruption mechanisms. In this chapter, a number of nudges

are recommended to fight *wasta* in particular and generally other corrupt practices. Finally, this

chapter explores the role of criminal law in fighting corruption.

*A.  Nudges*

Since *wasta* is deeply rooted in Saudi society, the solution may be to combat such

practices indirectly. Laws and regulations are more likely to fail and prove to be ineffective when

they are too far ahead of the culture in which they are enacted. In line with that, mechanism

combating *wasta* in the recent time should adopts a gradual and indirect approach to facilitate

and minimize the shock of introducing legal provisions that directly target such practices. Accordingly, gentle nudges may play a useful role.

Generally, policies may take different forms among which are a form of 'do and do not,' a form of economic incentives, and a form of nudges. A nudge is defined as "any aspect of the choice architecture that alters people's behavior in a predictable way without forbidding any options or significantly changing their economic incentives. To count as a mere nudge, the intervention must be easy and cheap to avoid."[1072] Recently, this approach has been utilized in various areas such as, for instance, environmental and health issues. The nudge approach is based on the idea of libertarian paternalism, which on the one hand seeks to "steer people's choice in directions that will benefit them" while maintaining or increasing their freedom of choice on the other.[1073] Further, a nudge can take various forms, among which are the simplification of rules and procedures, the use of social norms, an increase in ease and convenience, graphic warnings, reminders, eliciting implementation intentions, and informing individuals about the consequences of their past decisions.[1074]

Various nudge practices have been used or suggested as means of fighting corruption. One example is the use of architecture and design to fight corruption; one writer has suggested that offices should be designed to be transparent (i.e., glass offices) to promote more

---

[1072] RICHARD H. THALER & CASS R. SUNSTEIN, NUDGE: IMPROVING DECISIONS ABOUT HEALTH, WEALTH, AND HAPPINESS 6 (2009).
[1073] *Id*. at 5. Cass R. Sunstein & Richard H. Thaler, *Libertarian Paternalism Is Not an Oxymoron*, 70 U. CHI. L. REV. 1159, 1159 (2003).
[1074] Cass R. Sunstein, *Nudging: A Very Short Guide*, 37 J. CONSUMER POL'Y, 583, 583-88 (2014) (highlighting ten of the most important nudges some of which mentioned in the body and the remaining includes, default rules, disclosure, and precommitment strategies.).

transparency in the activities that go on within them.[1075] To illustrate the importance of architecture and design; another study sheds light on the development of the architecture and design of courthouses throughout history and how that development shapes people's notions of justice.[1076]

Yet another study supports the idea that simple and inexpensive initiatives (nudges) may reduce corrupt practices by officials. The study, which examined five laboratory experiments and another organizational survey study, found "that exposure to moral symbols displayed by the subordinates dissuades superiors from both engaging in unethical behaviors themselves and asking their subordinates to engage in unethical behavior."[1077] What these moral symbols do is to nudge individuals by reminding them to maintain their integrity and refrain from acting unethically. Another interpretation is that such symbols create a social norm of rejecting unethical behavior. Once such a social norm is perceived by superiors, then they are dissuaded from violating the norm by acting or asking others to act unethically.

In practice and reality, a brilliant initiative was undertaken by an Indian NGO named Fifth Pillar to fight petty corruption (bribery of lower level officials). They printed and distributed zero rupee notes to the citizens so that they could hand these valueless notes to officials who were demanding bribery.[1078] The goal was to show a rejection of the demand of

---

[1075] *See generally* Dieter Zinnbauer, *Architecting Transparency Back to the Roots—and Forward to the Future?* (Transparency Int'l, working paper, 2015), *available at* https://ssrn.com/abstract=2616655.

[1076] *See generally* Judith Resnik & Dennis E. Curtis, *Re-presenting Justice: Visual Narratives of judgment and the invention of democratic courts*, (Faculty Scholarship Series. Paper No. 3861, 2012), *available at* http://digitalcommons.law.yale.edu/fss_papers/3861.

[1077] *See generally* Sreedhari Desai & Maryam Kouchaki, *Moral Symbols: A Necklace of Garlic Against Unethical Requests,* ACAD. MGMT. J. (forthcoming 2017).

[1078] Dean Nelson, *India 'Issues' Zero Rupee Banknotes*, THE TELEGRAPH, Feb. 2, 2010, http://www.telegraph.co.uk/news/worldnews/asia/india/7137567/India-issues-zero-rupee-banknotes.html.

bribery and "to get people to show their disapproval of public service delivery dependent on bribes."[1079] The zero Rupee served as a nudge since it enhanced individuals' commitment to reject petty corruption and paying a bribe.

Scholar Dieter Zinnbauer has introduced a notion he calls "ambient accountability," which "can be broadly described as all efforts that seek to shape, use and engage systematically with the built environment and public places and the ways people experience and interact in them, in order to further transparency, accountability and integrity of public authorities and services."[1080] Since it eventually aims at "steer[ing] people's choice in directions that will benefit them,"[1081] the notion of ambient accountability can be considered as a nudge approach in a broad sense. Zinnbauer's examples of such initiatives include the idea of graphic warnings, informing individuals about their rights (reminders and disclosure), and enabling them to provide feedback (simplification and increases in ease and convenience).[1082]

Consequently, the initiatives introduced by Zinnbauer focus on informing individuals of their rights and allowing them to provide an evaluation at the very place where the service is provided, which then enhances accountability. One of the interesting ideas Zinnbauer presents is that of Twitter walls which provide immediate feedback from citizens about the service they have just received and the performance of officials and employees. These Twitter walls were placed in front of the place providing a service, allowing immediate feedback and accountability.

---

[1079] Fumiko Nagano, *Paying Zero for Public Services*, WORLD BANK BLOG, (Dec. 29, 2009), http://blogs.worldbank.org/publicsphere/paying-zero-public-services ("Corrupt officials seldom encounter resistance by ordinary people that they become scared when people have the courage to show their zero rupee notes, effectively making a strong statement condemning bribery.").

[1080] Dieter Zinnbauer, *Ambient Accountability: Fighting Corruption Where and When it Happens* 4 (Transparency Int'l, Working Paper No. 5.3, 2012).

[1081] THALER & SUNSTEIN, *supra* note 1072, at 5.

[1082] *See generally* Zinnbauer, *supra* note 1075.

In terms of nudges that have already been employed in Saudi Arabia, a number of initiatives have been seen on the ground, some of which are initiated by individuals and others by the government. In terms of those initiated by individuals, some officers and law enforcement personnel have started taking off their name tags to avoid pressure from others that would affect the performance of their duty. As explained above in Chapter 5, the name of the family can provide demographic information about the individual, and law enforcement personnel who have a name tag presenting their family or tribal name can invite pressure from others belonging to the same region, tribe, or family. Such pressure then inhibits law enforcement officials from performing their legal duties ethically and impartially. As an example of initiatives implemented by governmental agencies and organizations, detailed information about projects highlighting the timeline of the project, the contractors, and the cost of the project has been presented on signs at the place of the proposed projects. Such initiatives are aimed at promoting the transparency of government projects and contracts.

These initiatives and nudges can be also developed and enhanced to be more effective. Not wearing the name tag is a way to avoid the pressure and protect the impartiality of officers and personnel, yet it may not be the most appropriate practice from a legal point of view. What can be done instead is to provide personnel with the option of wearing a name tag that shows only their first name and an officer identification number. The practice can be also expanded to be applied to individuals in other governmental agencies and organizations whose duties involve dealing with the public. On the other hand, informational signs are great in terms of promoting transparency, yet they do not invite feedback. To improve the sufficiency and effectiveness of

these signs, the utilization of social media, mainly Twitter,[1083] and the creation of an active

channel to allow immediate feedback can yield more benefits from such an initiative and

promote accountability in addition to transparency.

With that being said, there are still other nudges that can be suggested to fight corruption

generally and *wasta* particularly. In terms of corruption in general, it has been argued that one of

the obstacles facing efforts to fight corruption is the "denial of victim" justification—that is,

"most corrupt activities are clandestine and go unreported because they lack an immediate

victim."[1084] To nudge the system, therefore, a solution that can be suggested is to visualize the

victims, which would help in bridging the gap. Thus, it can be suggested that the Saudi

government use a graphic warning showing the victims of corruption—for instance, a graphic

warning about the consequences of corruption in which victims of the Jeddah floods appear. This

step would serve a purpose in informing individuals about the consequences of their past

decisions. Such a nudge can be more effective than graphics that merely warn against accepting

or paying a bribe.

With respect to *wasta*, in addition to graphic warnings showing the victims of *wasta*,

other graphic warnings showing how other individuals negatively perceive individuals using

*wasta* can help in reducing the practice. For instance, data have been provided in Chapter 5

showing that individuals using *wasta* are perceived as less competent; or a visual image

representing the perception of *wasta* as a form of corruption and an unfair practice can be shown

to people to nudge them to refrain from engaging in the practice of *wasta*. Another nudge that

---

[1083] *See* Saudi Arabia profile – Media, BBC, Jan. 23, 2015, http://www.bbc.com/news/world-middle-east-14703480 ("With 2.4 million users, Saudi Arabia is home to more than 40% of all active Twitter users in the Arab region, says the Dubai School of Government (2014). Among the top Twitter users are clerics and members of the royal family.").
[1084] Michael Johnston, *Why Do So Many Anti-Corruption Efforts Fail?* 67 N.Y.U. ANN. SURV. AM. L. 467, 468 (2011).

can be suggested is to have a "whitelist" which rewards the agencies and organizations that reduce the practice of *wasta*, which can enhance the commitment to fighting *wasta*. To implement this nudge, another nudge may be suggested—push-button boxes linked to the National Authority for Combating Corruption (Nazaha) through which individuals can report the practice of *wasta* directly. An award then can be based on the number of reports, which can then enhance the commitment of both citizens and officials to refrain from engaging in the practice of *wasta*.

Finally, since Saudi society is a largely Muslim society, nudges should be utilized to increase individuals' self-awareness. These nudges should focus on and highlight the dissonance between Islamic principles (which, as has been shown in the second chapter, firmly reject corruption) and the existing corrupt practices. Consider, for instance, an experiment aimed at examining self-awareness of cheating as a dishonest behavior which proved that the number of people cheating decreased when participants merely signed an honor code.[1085] Such a procedure apparently increased the participants' self-awareness, which by itself controlled their dishonest behavior. Similar steps can be adopted simply by using a verse of the Qur'an or other phrases on official documents to increase the self-awareness of those who use them. Even more practically, official documents should contain a line that states, for instance, that this document has been processed in agreement with regulations signed by public officials.

*B. Simplification of the Procedures and the Implementation of E-Government*

In this section, the discussion will focus on approaches to fighting *wasta* primarily, although some of the points discussed will be applicable to other corrupt practices as well. To

---

[1085] Nina Mazar & Dan Ariely, *Dishonesty in Everyday Life and Its Policy Implications*, 25 J. PUB. POL'Y & MARKETING 117, 121 (2006); *see also* Nina Mazar et al., *The Dishonesty of Honest People: A Theory of Self-Concept Maintenance*, 45 J. MARKETING RES. 633, 636-37 (2008).

understand why *wasta* is difficult to dictate or reduce, one must examine the role of the institutional structures. As noted above in Chapter 5, *wasta* seems to provide an alternative to weak institutional structures. The same also applies to other indigenous forms of informal influence such as *guanxi*. As has been suggested in the Chinese context, "the absence of official rules permits *guanxi* relations to drive official decision-making."[1086]

Thus, weak institutional structures and official rules lower the level of professionalism.[1087] This can be seen in the weak role of codes of conduct in both the public and the private sector in Saudi Arabia. In 2013, however, Nazaha drafted a code of conduct in conjunction with the Ministry of Civil Service which aims at inter alia protecting public money and imposing mandatory financial disclosure for public officials.[1088] The Nazaha also drafted and adopted a code of conduct and urged the private sector to follow their lead.[1089]

The issues raised by the foregoing are twofold: first, a weak institutional structure leads to vague procedures. The second issue that stems from the weak institutional structure is undefined discretionary power. The unrestricted discretionary power by itself, as discussed in the first chapter, creates a fertile ground for corruption to thrive in.  Thus, those two factors when coupled together lead to the thriving of *wasta* and drive individuals to rely on *wasta* to advance

---

[1086] Pitman B. Potter, *Guanxi and the PRC Legal System: From Contradiction to Complementarity*, *in* SOCIAL CONNECTIONS IN CHINA: INSTITUTIONS, CULTURE, AND THE CHANGING NATURE OF GUANXI 179, 189 (Thomas Gold et al. eds., 2002). Jacob Harding, *Corruption or Guanxi? Differentiating Between the Legitimate, Unethical, and Corrupt Activities of Chinese Government Officials*, 31 UCLA PAC. BASIN L.J. 127, 144-45 (2014) (Jacob Harding also identifies weak institutional structures as a cause of corruption in China: "China's corruption problem is caused by flaws in the institutional structures for regulating corruption, China's method of anti-corruption enforcement, and China's burdensome bureaucracy. Thus, China will have the greatest success battling corruption by addressing these institutional problems.").

[1087] *See generally*, Potter, *supra* note 1086, at 189.

[1088] *Nazaha Urges the Private Sector to Adopt Code of Conduct*, ALEQTISADIAH NEWSPAPER, Feb. 18, 2014. http://www.aleqt.com/2014/02/18/article_826454.html.

[1089] *Id*.

their businesses, to say nothing of the thriving of corrupt practices in general. This suggests that the clarification and simplification of procedures on the one hand, and the defining of discretionary powers on the other, would limit the pervasive practice of *wasta*.[1090]

Related to these issues, a number of studies have suggested that the use of e-government reduces the level of corruption in general and of *wasta* specifically.[1091] When implemented effectively, e-government can curb corruption, at least partly, since it reduces discretionary power, which then closes the door to opportunities to act arbitrarily; from the other side, the fact that e-government secures and maintains detailed information about each transaction facilitates the investigation and the tracking of corrupt practices, which then increases the odds of their being detected.[1092] In general, "[b]y making rules simpler and more transparent, e-government emboldens citizens and businesses to question unreasonable procedures and their arbitrary application."[1093]

In Saudi Arabia, e-government has been already implemented by a number of governmental agencies. Early in 2003, the Saudi government issued a Royal Decree ordering the

---

[1090] *See, e.g.*, Irène Hors, *Fighting Corruption in Customs Administration: What Can We Learn From Recent Experiences?* 21 (OECD Research, Working Paper No. 175, 2001) (arguing that "[t]his radical simplification of tax structure greatly reduced abusive exercise of discretion by customs officers.").

[1091] *See, e.g.*, Thomas B. Andersen, *E-Government as an Anti-Corruption Strategy*, 21 INFO. ECON. & POL. 201, 209 (2009) ("[t]his paper documents that increases in the use of e-government have led to reductions in corruption over the decade 1996–2006 in non-OECD countries."); *see, e.g.*, Cassandra E. Di Rienzo et al., *Corruption and the Role of Information*, 38 J. INT'L BUS. STUD. 320, 320-32 (2007).

[1092] Subhash Bhatnagar, *E-government and Access to Information*, *in* GLOBAL CORRUPTION REPORT 2003: ACCESS TO INFORMATION 24, 30 (Transparency Int'l 2003).

[1093] *Id*; *see also* Subhajit Basu, *E-Government and Developing Countries: An Overview*, 18 INT'L REV. L. COMPUTERS & TECH. 109, 110 (2004) (arguing that "[t]he strategic objective of e-governance is to support and simplify governance for all parties; government, citizens and businesses.").

Ministry of Finance to establish an e-government program.[1094] In the same year, another Royal Decree was issued to assign the Ministry of Communication and Information Technology to be responsible for managing, planning, and developing of the communications and information technology sector.[1095] Later in that year, the Ministry of Communication and Information Technology was ordered to institute a plan to provide e-government services to individuals and was authorized to provide the necessary resources through government procurement.[1096] In 2005, the E-Government Program (YESSER) was established in a partnership between the Ministry of Communication and Information Technology and the Ministry of Finance.[1097]

      To succeed, or at least increase the benefits of this strategy, certain points have to be taken into consideration to enhance and support fighting corruption. When discussing the e-government initiatives, the experience of the Seoul e-government system for anti-corruption, known as OPEN (Online Procedures Enhancement for civil application), offers useful lessons. Inter alia, OPEN implemented prevention and enforcement strategies aimed at curbing corruption. The prevention strategy involved a reform of administrative procedures and practice "by clarifying the procedures and designing systems that 'simplify, standardize, and de-personalize the delivery of services.'"[1098] The enforcement strategy aims at achieving a high level of accountability and transparency.[1099] Further, the Seoul Metropolitan Government strengthened its enforcement strategy by inviting the Audit and Inspection Bureau to be part of the enforcement mechanism. The transparency aspect of the OPEN system can be seen in a

---

[1094] *See* Royal Decree No. 7/B/2427, 16/1/1424H (corresponding to Mar. 19, 2003) (SA).

[1095] *See* Royal Decree No. 133, 21/05/1424H (corresponding to July. 20, 2003) (SA).

[1096] *See* Royal Decree No. 7/B/33181, 10/07/1424H (corresponding to Sept. 7, 2003) (SA).

[1097] SAUDI E-GOVERNEMNT PROGRAM (YESSER), http://www.yesser.gov.sa/en/ProgramDefinition/Pages/Overview.aspx

[1098] Seongcheol Kim et al., *An Institutional Analysis of an E-Government System for Anti-Corruption: The Case of OPEN*, 26 GOV'T INFO. Q. 42, 47 (2009).

[1099] *Id.*

feature that provides an applicant with the ability to know the status of the transaction in real time, the official in charge, and the time frame in the transaction is to be handled.[1100] This feature enhances the accountability aspect since applicants can submit a complaint to the audit department—"they may even contact the Mayor through an e-mail or online bulletin board"— when any misconduct or delay is observed.[1101]

In addition, social media applications play an important role in fostering the process and utility of e-government systems, which is especially significant in those cultures that value face-to-face interactions.[1102] In general, social media can serve the dual purpose of accountability on one hand and of clarifying and simplifying administrative procedures on the other. A study based on the concept of psychological distance found that "forms of e-government conducive to the transmission of less detailed information (social media) may be more effective at improving relationships between citizens and their government than forms of e-government that are more commonly used to transmit detailed information (e-government websites)."[1103]

This suggests that Saudi Arabia can improve its e-government by considering these points. The involvement of an independent audit body, the Nazaha for instance, in addition to the audit departments of the agencies and organizations, will contribute significantly to accountability and eventually enhance the strategy of anti-corruption. Further, the adoption of a hybrid system through which the governmental websites provide concise information while social media channels provide more information through active interactions with individuals would maximize the utility of the e-government system.

---

[1100] *Id.*
[1101] *Id.*
[1102] Suha AlAwadhi & Anne Morris, *Factors Influencing the Adoption of E-Government Services*, 4 J. SOFTWARE, 584, 584-90 (2009).
[1103] Gregory A. Porumbescu, *Linking Public Sector Social Media and E-Government Website Use to Trust in Government*, 33 GOV'T INFO. Q. 291, 291-304 (2016).

Broadly speaking, the divisive effect of *wasta* specifically and of corruption generally can be eradicated by implementing fair procedures. Thus, "[p]rocedures and practices that all parties regard as 'fair' facilitate positive relations among group members and preserve the fabric of society even in the face of conflicts of interest that exist in any group whose members have different preferences and different beliefs concerning how the group should manage its affairs."[1104]

To summarize, the existence of e-government per se does not limit or reduce corrupt practices and behaviors. Instead, legal regulations are needed that define procedures and impose civil and criminal liability for violations. Such violations may take the form of the alteration of confidential or legal documents. The culpability is greater when the distance between the act and the result is close, which is not always the case with corrupt behaviors and acts. Thus, violations of the rules regulating e-government has the effect of decreasing the distance between the act and the result, and thus increase the perception of culpability. The existence of e-government should also aim at providing legitimate procedures that apply equally and fairly.

In essence, this solution can be characterized as an indirect approach to targeting *wasta* by incorporating nudges into the system. That is, instead of outlawing *wasta* directly, this approach minimizes the cultural clash and confrontation by shifting the focus to restricting the practice through reforming procedures. The reform of procedures then decreases the reliance on *wasta*, which eventually decreases the prevalence of the practice and intensity of the cultural confrontation.

---

[1104] Tracey L. Meares et al., *Why Do Criminals Obey the Law? The Influence of Legitimacy and Social Networks on Active Gun Offenders*, 102 J. Crim. L. & Criminology. 397, 403 (2012).

*C. The Reform of Anti-Bribery Jurisdiction*

The most recent waves of anti-corruption regulation have aimed at fighting the bribery of foreign officials and private-to-private bribery. Rules targeting the bribery of foreign public officials have been adopted by a growing number of countries as a result of American efforts, as noted in the previous chapter, to protect fair competition between corporations conducting business activities abroad.[1105] Above all, these provisions close the loopholes resulting from the limited jurisdictions of anti-bribery provisions, allowing corporations to escape from prosecution and criminal liability for their conduct abroad.

1. General View of the Jurisdiction of Anti-Bribery Law

Building on the all the illustrations offered in previous chapters and the social structure of Saudi Arabia, where the power and resources may not always be associated with public office, the only suggestion that can be made is to abandon the "protection of the integrity of public offices" notion and shift to a "protection of national integrity" notion. Such a task is definitely not an easy one since it requires a comprehensive reconsideration of the recent provisions enacted to combat corruption practices.

From a broader perspective, the problem of the Anti-Bribery Law's jurisdiction is not limited to the offenses of bribery. In fact, the other offenses namely, trade-in-influence, accepting of *wasta*, or the following up of a case being processed outside the public official's authority, may invite more difficulties and more easily evade the short reach of the provisions of the Law. These offenses share one characteristic in that they all require that an individual must have power and influence to be able to commit any of these offenses. Thus, since power may not always derive from one source, i.e., public office or position, which is especially true in the

---

[1105] Hoffmann, *supra* note 1057, at 61-62.

Saudi context, the individual committing the offense may not always be a public official or hold a public office at the time of committing such an offense.

Thus, in addition to failing to extend the jurisdiction of the Law to the private sector completely, the Law fails to include former public officials, as mentioned in the previous chapter, within its jurisdiction. The question is raised as to whether the inclusion of them would be sufficient. The accurate answer is that it would allow the prosecution of more cases and consequently eliminate, to some extent, the commission of such offenses.

The dilemma may be seen in whether to widen the jurisdiction of the Law and provide a broad jurisdiction to the application of the Law on the one hand, or to limit the jurisdiction of the Law and avoid creating catch-all provisions on the other. Thus, it seems that expanding the jurisdiction of the Law to apply to all the aforementioned offenses is not practical. From a practical prospective, the suggestion that can be offered to overcome such a dilemma is that instead of adopting a general jurisdiction of the Law applying to all of the offenses within the Law, the jurisdiction should be defined on the basis of the offense. For instance, the jurisdiction of the trade-in-influence offense should be defined distinguishably from the offense of following up on a case being processed outside a public official's authority. That is, the jurisdiction of the Law can be defined on an offense-by-offense basis, rather than creating one jurisdiction for all offenses, which is the current situation of the Law.

## 2. Bribery of Foreign Public Officials

In the Saudi legal system, the lack of provisions targeting the bribery of foreign public officials may not only negatively impact fair competition, but also the human rights of individuals. For instance, a number of foreign workers have accused their countries' embassies of receiving bribes from their Saudi employers in order to turn a blind eye to the violations of

contracts committed by the employers.[1106] In a larger context, recruitment companies and agencies, for instance, may engage in similar activities.[1107]

The bribery of foreign public officials also may be committed by other Saudi companies engaging in international business activities, especially considering the growing size and number of Saudi companies.[1108] As an example of the impact of the Saudi private sector, five out of the ten largest joint stock corporations in Arab world are Saudi corporations.[1109]

As with American corporations, such an initiative would definitely provoke many complaints from Saudi companies since these provisions may put them at a disadvantage when competing with other international corporations whose countries have not adopted similar provisions. Nevertheless, this does not eliminate the need for enacting provisions to combat the bribery of foreign public officials.

In order to enact comprehensive provisions combating the bribery of public officials, specific elements have to be taken into consideration; namely, the definition of a public official and the affirmative defense. Thus, to enact optimal provisions, both international and national experience needs to be utilized. At the international level, the UNCAC and the OECD provide a basic framework for the bribery of public officials while the FCPA and the U.K. Bribery Act of 2010 (hereafter the Bribery Act of 2010) offer examples of efforts at the national level.

---

[1106] VLIEGER, *supra* note 340, at 198.

[1107] *See, e.g.*, *id.*

[1108] *See, e.g.*, Forbes global 2000: Saudi Arabia's largest companies, ECONOMY WATCH, July. 7, 2013, http://www.economywatch.com/companies/forbes-list/saudi-arabia.html ("In total, there were 17 Saudi companies on the 2013 Forbes Global 2000 list. Collectively, the companies had a combined market value of $256.8 billion with $567.8 billion in assets; generating $122.5 billion in revenues and $20.1 billion in profits.").

[1109] *See, e.g.*, Top 100 companies in the Arab World 2016, FORBES MIDDLE EAST, (last visited Dec. 31, 2016). http://www.forbesmiddleeast.com/en/lists/read/2016/top-100-companies-in-the-arab-world-2016/listid/281; *see also* Top 100 companies in Arab world revealed, Gulf News, June. 1, 2016, http://gulfnews.com/business/economy/top-100-companies-in-arab-world-revealed-1.1838772.

At the outset, the provisions of the aforementioned laws seem to agree on the definition of a foreign public official, though they may differ structurally. Generally, these rules cover two distinct kinds of officials: public officials of international organization and foreign public officials. For instance, the OECD defines a foreign public official as "any person holding a legislative, administrative or judicial office of a foreign country, whether appointed or elected; any person exercising a public function for a foreign country, including for a public agency or public enterprise; and any official or agent of a public international [organization]."[1110] The U.K.'s recently enacted Bribery Act of 2010 goes a step further in defining a public international organization to include any organization "whose members are any of the following:

    (a) countries or territories,

    (b) governments of countries or territories,

    (c) other public international organisations,

    (d) a mixture of any of the above."[1111]

The difference between the provisions of the aforesaid laws and conventions lies in their position on the affirmative defense and how it is adopted. Neither the UNCAC nor the OECD included in their provisions an affirmative defense to the bribery of foreign public officials.[1112] On the national level, the FCPA highlighted mainly two affirmative defenses and one exception introduced by the 1988 amendment of the FCPA establishing the "local law defense" and the

---

[1110] OECD Convention, *supra* note 29, art. 1(4)(a). *See also* UNCAC, *supra* note 29, art. 2(b)(c). *See also* Section 30A(f )(1)(A) of the Exchange Act, 15 U.S.C. § 78dd-1(f )(1) (A); 15 U.S.C. §§ 78dd-2(h)(2)(A), 78dd-3(f )(2)(A). *See also* The U.K. Anti-Bribery Act 2010 § 6 (5) (Eng.). *See also Criminal Code Act 1995* (Cth) div 70.1 (Austl.).
[1111] The U.K. Anti-Bribery Act 2010 § 6 (6) (Eng.).
[1112] *See, e.g.*, OECD Convention, *supra* note 29, Annex I(A) ("Article 1 of the OECD Anti-Bribery Convention should be implemented in such a way that it does not provide a [defense] or exception where the foreign public official solicits a bribe.").

"reasonable and bona fide promotional expense defense," in addition to the exception for

"'facilitating or expediting payments made in furtherance of routine governmental action."[1113]

The Bribery Act of 2010 adopted another position by narrowing the defenses and the exceptions in its provisions and providing more discretionary power to the U.K. authorities. The Bribery Act of 2010 restricts the defense to those payments expressly permitted by local written law. Consequently, whether the payment is a facilitating payment or another type of payment, "section 6 explicitly provides that no violation occurs if the written law governing the official's conduct requires or permits him or her to be influenced by the offer, promise, or gift."[1114] Nevertheless, concerns have been raised about the criminalization of "the sorts of common payments [such as] payments for obtaining permits or licenses, processing government papers, or scheduling inspections."[1115] Practically, the Joint Committee on the Draft Bribery Bill has indicated that authorities would not use their discretionary powers to prosecute an offence involving "such small amounts of money."[1116] Further, the Bribery Act of 2010 does not indicate promotional expense as a defense, which creates an unclear situation raised mainly in cases of routine inexpensive hospitality.[1117] Again, this is largely left to the discretion of the authorities,

---

[1113] 15 U.S.C. § 78dd-1(b)-(c), 15 U.S.C. § 78dd-2(b)-(c), 78dd-3(b)-(c); *see generally* CRIMINAL DIVISION OF THE U.S. DEPARTMENT OF JUSTICE AND THE ENFORCEMENT DIVISION OF THE U.S. SECURITIES & EXCHANGE COMMISSION, A RESOURCE GUIDE TO THE U.S. FOREIGN CORRUPT PRACTICES ACT 3, 25 (2012).

[1114] Warin, F. Joseph et al., *The British are Coming: Britain Changes its Law on Foreign Bribery and Joins the International Fight Against Corruption*, 46 TEX. INT'L. L.J. 1, 21 (2010).

[1115] *Id*. at 20.

[1116] *Id*. at 20-21 ("In other words, U.K. authorities may at their discretion decline to prosecute certain facilitating payments that are technically illegal under the Bribery Act.").

[1117] *Id*. at 21 ("Accordingly, most business courtesy expenditures provided to foreign public officials constitute a prima facie offense under the Act."); *see* JOINT COMMITTEE ON THE DRAFT BRIBERY BILL, FIRST REPORT, 2008–09, H.L. 115-I/H.C. 430-I, available at http://www.publications.parliament.uk/pa/jt200809/jtselect/jtbribe/115/11502.htm.

who will be unlikely to prosecute an offense in such a case.[1118] Finally, the Bribery Act of 2010 provides a defense "for corporations who have adequate procedures, programs, and practices in place to monitor and prevent bribery by associated persons."[1119]

In light of the brief illustrations above, Saudi legislators may adopt a similar provision to that provided by the OECD convention in defining a foreign public official. In the context of the affirmative defense, Saudi legislators could benefit from the examples provided by the FCPA and the Bribery Act of 2010. However, the FCPA might be an optimal model, if they intend to adopt affirmative defense provisions, since it is more clear and consistent as a matter of practice and in its legal provisions.

In terms of how to implement these provisions in the Law, Saudi legislators may do so in two forms. The first is to amend the scope of Article 8 by including foreign public officials within its provisions. However, this may result in more confusion due to the issue of affirmative defense associated with the bribery of public officials. The second form is to implement a new section into the Anti-Bribery Law specifying the definition of a foreign public official, who is covered, specific offenses, and affirmative defenses, if adopted. As an initial step, the second form would also allow further steps and provides more flexibility for further amendments such as the accounting rules.

3.   Private-to-Private Bribery

Private-to-private bribery cannot be underestimated, especially when the role and the size of the private sector is taken into consideration. Though some countries adopt provisions criminalizing such bribery, a great number of others lack such provisions. Instead, they rely on

---

[1118] *Id*. at 22 ("[T]he U.K. Ministry of Justice has indicated publicly … that it is not inclined to prosecute bona fide promotional expenditures provided to foreign public officials.").

[1119] Michael Peterson, *Amending the Foreign Corrupt Practices Act: Should the Bribery Act 2010 be a Guideline?*, 12 Rich. J. Global L. & Bus. 417, 426 (2012).

other provisions to prosecute these offenses.[1120] Thus, sometimes bribery per se is not against the law unless it involves another offense.[1121]

In Saudi Arabia, the seriousness of the issue can be shown by the fact that, according to strategic management professor Abdulwahab Al-Gahtani, "bribes incurred in the Saudi private sector total $15 billion annually," which eventually harms society.[1122] This number is only likely to increase with the growing size of the private sector on the one hand and the national transformation program "Vision 2030" moving toward the privatization of services on the other.[1123]

In the previous chapter, the problem of the jurisdiction of the Anti-Bribery Law has been highlighted. As has been mentioned, in certain scenarios the Law's jurisdiction appears to have a short reach. Though the Law made an advance in including certain corporations within its jurisdiction, other potentially problematic issues have emerged, which can be summarized as follows: generally, a number of companies, as illustrated in the previous chapter, may not fall under the jurisdiction of the Law; specifically, the provisions of the Law only apply in cases where the recipient is within the scope of Article 8, rather than vice versa.

---

[1120] *See, e.g.*, Cheryl A. Krause & William Gibson, *Private Commercial Bribery: The Next Wave of Anti-Corruption Enforcement?*, 2 FIN. FRAUD L. REP. 710, 711-12 (2010) (Most U.S. states criminalize directly commercial for example, Texas Penal Code § 32.43. Commercial Bribery and Delaware Code Title 11. Crimes and Criminal Procedure § 881. Bribery. "China, for example, has prohibited commercial bribery since 1996 but has strongly stepped up enforcement in recent years. The PRC Anti-Unfair Competition Law prohibits the offering business counterparts money or property to induce them to purchase or sell products.").

[1121] SUSAN ROSE-ACKERMAN & BONNIE J. PALIFKA, CORRUPTION AND GOVERNMENT: CAUSES, CONSEQUENCES, AND REFORM 209 (2016).

[1122] "*Bribes Incurred in the Saudi Private Sector Total $15 Billion Annually*", ALAYAM NEWSPAPER, Jan. 24, 2013, http://www.alayam.com/online/Economy_online/213969/-الرشي-تكبد القطاع-الخاص-السعودي-15-مليار-دولار-سنوياً.html.

[1123] *See* SAUDI VISION 2030, (last visited Dec. 31, 2016), http://vision2030.gov.sa/en/node/6; *see, e.g.*, *Saudi Arabia to privatize 295 hospitals*, ALARABIYA, May. 15, 2016, http://english.alarabiya.net/en/business/economy/2016/05/15/Saudi-Arabia-to-privatize-295-hospitals.html

Though the Law represented an advance at the time of its enactment by partly including the private sector under its jurisdiction, this now appears insufficient due to the fact that a number of companies are neither joint-stock corporations nor performing a public service nor managing, running, or maintaining a public facility. Apparently, what was not taken into consideration is the social tendency toward forming family companies. "[A]ccording to the Saudi Arabian Monetary Agency (SAMA), … family companies constitute 95% of the total number of companies. While the majority of these companies are considered to be small and medium enterprises, 45 of the 100 largest companies are family business."[1124] This issue would be unimportant if these companies met the other conditions of Article 8, i.e., carrying out banking operations, performing a public service, or managing, running, or maintaining a public facility, yet in reality this is not always the case.

Even if a company meets the requirement of carrying out banking operations, performing a public service, or managing, running, or maintaining a public facility, this only provides a limited jurisdiction for the application of the Law on only the offenses committed within that scope.[1125] In other words, if a company had a contract to run a public facility, the jurisdiction of the Law would be limited to the offense of bribery committed within the scope of running a public facility. Thus, if an employee of such a company received a bribe in a matter not related to

---

[1124] Fahad A. Albloshi & Yehia S. Nawar, *Assessing the Impact of Leadership Styles on Organisational Performance: The Case of Saudi Private SME's*, 2 J. ORGANISATIONAL STUD. & INNOVATION, 66, 68 (2015); *see also Chamber of Commerce, 95% of the registered companies in Saudi Arabia are family companies*, ALARABIYA, Sept. 16, 2013, http://www.alarabiya.net/ar/aswaq/special-interviews/2013/09/16/غرفة-التجارة-95-من-الشركات-المسجلة-في-السعودية-عائلية.html

[1125] *See generally* Osama M. Alsulaimani, *Nitaq Tatbiq Nizam Mukafahat Alrrashwat Alssaeudi Ealaa Muazzafi Alqitae Alkhass* [The Jurisdiction of Saudi Anti-Bribery over Personnel of the Private Sector], 12 ALEXANDRIA U. J. LEGAL AND ECON. RES. 67 (1997).

the scope of the contract to run a public facility, then such an offense may not necessarily fall within the jurisdiction of the Law.[1126]

The issue is aggravated when the legal system is viewed as a whole. Unlike those countries opting to prosecute commercial bribery under provisions other than direct bribery provisions, the Saudi legal system may lack such an option because the number of codified offenses is significantly lower than the number of offenses existing in other countries. As shown in the previous chapter, two of the provisions under which commercial bribery can be prosecuted complicate the prosecution of such offenses.[1127] Such difficulties can be shown clearly by a comparison between the Saudi legal system and the U.S. Federal armory of laws.

Even if an offense can be successfully prosecuted under the previously highlighted provisions, namely Article 211(c) of the Law of Companies and Article 4 of the Competition Law, further issues appear to challenge the success of such a prosecution. Violation of the provision of the Competition Law may not result in the imprisonment of the offender; rather a monetary fine is imposed.[1128] With respect to the violation of Article 211(c) of the Companies Law, the liability is not extended to the legal person; rather, there is only an individual criminal liability.[1129] All of these provisions may fall into the trap of ineffective penalties, explained in the

---

[1126] *Id.*

[1127] Law of Companies, *supra* note 857, art. 211(c). Competition Law, *supra* note 1070, art. 4.

[1128] Competition Law, *supra* note 1070, art. 12 (providing that "[w]ithout prejudice to any harsher punishment under another law, each violation of the provisions of this Law shall be subject to a fine not exceeding five million Riyals [equivalent to $1.3 million], to be multiplied in case of repetition. Judgment shall be published at the expense of the violator.").

[1129] *See generally* Law of Companies, *supra* note 857, art. 211(imposing the punishment of maximum of five years imprisonment, or a monetary penalty not exceeding five million Riyals (equivalent to $1.3 million), or both.).

previous chapter, since they only impose a fixed monetary penalty, which may be insignificant when compared to the undue advantage gained by the bribery.[1130]

The potential solution, then, has to meet two requirements: (1) it needs to have direct provisions targeting private commercial bribery, and (2) it needs to establish the liability of legal persons, which can be achieved via a number of approaches. The semi-direct approach would be through amending the Companies Law to explicitly criminalize commercial bribery, both active bribery and passive bribery, and then establishing the criminal liability of legal persons within the provisions of the Companies Law, which would eventually kill two birds with one stone and serve the dual propose of criminalizing bribery offenses in the private sector and establishing criminal liability for legal persons, not only for bribery offenses, but also for other potential offenses. The second approach would be to amend the jurisdiction of Article 8 by omitting the conditions of carrying out banking operations, performing a public service, or managing, running, or maintaining a public facility for a company to be held liable.

Another approach that deserves mention was adopted by the Bribery Act of 2010, which, if adopted by Saudi legislators, would involve more complication and additional amendments to the elements of the bribery offenses and the structure of the Anti-Bribery Law. After defining offenses of bribing another person in section 1 and offenses relating to being bribed in section 2, the Act of 2010 specifies the area "within which bribery can take place."[1131] The Act defines the "'relevant function or activity' that can be improperly performed for the purposes of sections 1 and 2 [as]:

(a) any function of a public nature,

---

[1130] The maximum monetary penalty imposed by both laws is five million Riyals (equivalent to $1.3 million).
[1131] Joseph et al., *supra* note 1114, at 25.

(b) any activity connected with a business,

(c) any activity performed in the course of a person's employment, [or]

(d) any activity performed by or on behalf of a body of persons (whether corporate or unincorporate)."[1132]

In addition to the requirement of relevant function or activity, the person performing such function or activity must be expected to (A) perform it in good faith,[1133] (B) perform it impartially,[1134] or (C) be "in position of trust by virtue of performing it."[1135]

### D.  The Role of Criminal Law in Preventing Corruption

The importance of criminal law in anti-corruption policy is manifest in three objections that are related to each other. At the first level, criminal anti-corruption policies and provisions project externally that the issue of corruption is taken seriously, which by itself helps to build the external reputation of the country and give evidence of a serious commitment to fight corruption. Internally, the message delivered to the public is that such corrupt practices are not accepted. At the third stage, then, these policies and criminal provisions are ready to step in to be enforced against extreme and obvious corrupt practices cases.

This is reflected in the practices of a number of countries, among which are the United Kingdom and, more recently, China. The United Kingdom ratified the OECD's Convention on Combating Bribery of Foreign Public Officials in International Business Transactions in 1998, and since then U.K. anti-bribery laws have received a series of criticism by numerous OECD Working Groups.[1136] "Although the U.K. Government never conceded that its criminal laws fell

---

[1132] *Id* (*citing* The U.K. Anti-Bribery Act 2010 § 3(2)(a)–(d) (Eng.).
[1133] The U.K. Anti-Bribery Act 2010 § 3(3) (Eng.).
[1134] The U.K. Anti-Bribery Act 2010 § 3(4) (Eng.).
[1135] The U.K. Anti-Bribery Act 2010 § 3(5) (Eng.).
[1136] Joseph et al., *supra* note 1114, at 4-5.

short of its obligations under the Convention, it acknowledged that failure to implement legal reform could call into question the United Kingdom's commitment to it."[1137]

Mainly, the criticism was premised on "the United Kingdom's 'continued failure' to address its unsatisfactory anti-bribery and anticorruption laws,"[1138] and more specifically on the premise of its inadequate criminal provisions to fight corruption. To put it differently, the assessment of the commitment of the U.K. Government and its anti-corruption framework and policy have revolved primarily around the role of criminal law and provisions in fighting corruption.

China, on the other hand, ratified the UNCAC in 2006 and has followed a similar pattern to that of the U.K. Government. China has for a lengthy period of time been subject to many criticisms and much skepticism about its efforts to fight corruption. At the outset, the eighth amendment of the PRC Criminal Law in 2011 was enacted, which introduced the crime of bribery of foreign public officials.[1139] In 2015, wider coverage was introduced by the ninth amendment of the Anti-Bribery and Anti-Corruption (ABAC) Act.[1140]

---

[1137] *Id.* at 5 (Note that "[t]he Anti-Terrorism, Crime and Security Act of 2001 included provisions criminalizing the bribing or corruption of foreign officials by U.K. nationals or companies. [Yet] this reform ignored the actions of foreign nationals domiciled or habitually resident in the United Kingdom.").

[1138] *Id.*

[1139] *China criminalizes foreign bribery*, WALL ST J., May. 2, 2011, http://blogs.wsj.com/corruption-currents/2011/03/02/china-criminalizes-foreign-bribery/. (the eighth amendment expands the scope of Article 164 of PRC Criminal Law, which criminalizes the commercial bribery, to cover the bribery of foreign public officials.). *See* Squire P. Boggs, *China adopts amendment to the Criminal Law to outlaw bribery of foreign officials*, LEXOLOGY, Mar. 25, 2011, http://www.lexology.com/library/detail.aspx?g=2bd89e0b-c4ea-4a94-abb5-25a04136cbc2.

[1140] Sammy Fang et al., *A Signal of Further Reform: China Amends its Anti-Bribery Laws – Key Highlights*, DLA PIPER, Dec. 10, 2015, https://www.dlapiper.com/en/us/insights/publications/2015/12/the-global-anticorruption-perspective/a-signal-of-further-reform/.

The ninth amendment includes inter alia (1) criminalizing the bribery of "the immediate relatives" of current or former government workers or "individuals who have close relationship[s]" with government workers,[1141] (2) imposition of monetary penalties on individual bribers regardless of the circumstances,[1142] (3) raising the threshold of the exemption from the penalties,[1143] and (4) replacing the criteria of the punishments for embezzlement and accepting bribery offenses to general standards instead of fixed and specified monetary figures.[1144]

More precisely, China's anti-corruption campaign was fundamentally based on the criminal law approach, which can be grasped clearly in the strategy of targeting and pursuing "tigers and flies."[1145] Since the launch of the campaign around five years ago, more than 100,000

---

[1141] *Id*. Zhōnghuá Rénmín Gònghéguó Xíngfǎ (中华人民共和国刑法) [The Criminal Law of the People's Republic of China] (amended by the Standing Comm. Nat'l People's Cong., Aug. 29, 2015), arts. 390-1 & 393 (China).

[1142] *Id* ("Before the Amendment, monetary fines were usually imposed on entity offenders.  Individual offenders were only fined when they offered a large bribe or bribes, to a company employee, a foreign official performing official duties or an official of an international public organization."). Zhōnghuá Rénmín Gònghéguó Xíngfǎ (中华人民共和国刑法) [The Criminal Law of the People's Republic of China] (amended by the Standing Comm. Nat'l People's Cong., Aug. 29, 2015), art. 390-91 (China).

[1143] *Id* ("Under the Amendment, a bribe giver who self-reports before the commencement of a prosecution will only be eligible for an exemption of punishment under specific circumstances, such as if the offense is relatively minor, the accused has provided information to authorities leading to a 'successful investigation of a major case,' or the accused performs meritorious services assisting the authorities."). Zhōnghuá Rénmín Gònghéguó Xíngfǎ (中华人民共和国刑法) [The Criminal Law of the People's Republic of China] (amended by the Standing Comm. Nat'l People's Cong., Aug. 29, 2015), art. 390 (China) (note that this article applies to the bribe giver rather than to the recipient.).

[1144] *Id* ("The new standards are referred to as: (1) 'relatively large' amount or 'relatively serious' circumstances; (2) [a 'huge'] amount or 'serious' circumstances; and (3) [an 'especially huge'] amount or 'extremely serious' circumstances."). Zhōnghuá Rénmín Gònghéguó Xíngfǎ (中华人民共和国刑法) [The Criminal Law of the People's Republic of China] (amended by the Standing Comm. Nat'l People's Cong., Aug. 29, 2015), arts. 267(1) & 286-1 (China).

[1145] *Can Xi Jinping's Anti-Corruption Campaign Succeed?*, Center for Strategic and International Studies (last visited Dec. 31, 2016), http://chinapower.csis.org/can-xi-jinpings-anti-corruption-campaign-succeed/ (The tigers category includes "officials with the rank of vice minister or vice governor and above," while the flies category includes "mid and lower ranking officials".).

individuals have been prosecuted and indicted for various corruption offenses,[1146] among which are more than 120 high-ranking officials.[1147] Another indication of the heavy reliance of the government on criminal law comes from the amendment of the criminal law, which tightened its grip on these offenses. The ninth amendment, in addition to the raising the threshold of the exemption from the penalties mentioned above, not only imposes severe penalties that may include the imposition of death penalty, but also shows no leniency for individuals who commit serious corruption offenses.[1148]

Even at the international level, the reading of various international conventions suggests a heavy reliance on criminal law. In fact, a number of the criticisms of countries' anti-bribery policies and laws revolve around the lack of sufficient criminal provisions and failures to criminalize and prosecute corrupt practices and offenses, which can be seen in the case of the evaluation of the U.K.'s efforts to combat corruption for instance.[1149] Eventually, the pressure of

---

[1146] *Robber Barons, Beware: A Crackdown on Corruption Has Spread Anxiety Among China's Business Elite*, ECONOMIST, Oct. 24, 2015, http://www.economist.com/news/china/21676814-crackdown-corruption-has-spread-anxiety-among-chinas-business-elite-robber-barons-beware ("Of more than 100,000 people indicted for graft since Mr Xi became leader in 2012, most are politicians and officials—not private businessmen.").

[1147] See generally *Visualizing China's Anti-Corruption Campaign*, CHINA FILE, Jan. 21, 2016, https://www.chinafile.com/infographics/visualizing-chinas-anti-corruption-campaign. *See also Can Xi Jinping's anti-corruption campaign succeed*, *supra* note 1145 (according to Minxin Pei, Professor of Government & Director of the Keck Center for International and Strategic Studies, Claremont McKenna College, "In terms of tigers … as of today, the number is about 150 [that have been arrested, which is] double the number of officials arrested in any given year before the anti-corruption campaign.").

[1148] *See* Fang et al., *supra* note 1140 ("According to the Amendment, for an individual who is convicted of embezzlement or accepting bribes, is sentenced to the death penalty, and is then granted a reprieve, if the sentence is reduced to life imprisonment, the individual cannot then be paroled or afforded a further reduction of his/her term of imprisonment."); *see also* Zhōnghuá Rénmín Gònghéguó Xíngfǎ (中华人民共和国刑法) [The Criminal Law of the People's Republic of China] (amended by the Standing Comm. Nat'l People's Cong., Aug. 29, 2015), arts. 383 & 386 (China).

[1149] *See, e.g.*, OECD, UNITED KINGDOM: PHASE 2BIS REPORT ON THE APPLICATION OF THE CONVENTION ON COMBATING BRIBERY OF FOREIGN PUBLIC OFFICIALS IN INTERNATIONAL

the international community seems to abate when amendments to criminal law provisions takes place.

At the domestic level, the advantage of the criminal law stems from the direct and explicit intention of the prohibition. That is, the criminal law is ought to communicate an explicit message of intolerance of a corrupt behavior, which can be carried out because "[t]he criminal law defines, or should define, the outer boundaries of the tolerable, and enforces those boundaries by declaring those who transgress them as outlaws."[1150] Criminal process and law "serve unique functions in educating the public about basic standards of behavior, stigmatizing violators, and reinforcing the security, sense of justice, and automatic compliance of the law-abiding nearly as powerfully as criminal punishment."[1151] For a better or worse, countries tend to enact and enforce provisions of criminal law to deliver the message that "nobody dares to be corrupt," which is the notion that China, for example, seems to have adopted.[1152]

This by no means should be understood as underestimating the role of other laws, including civil laws and administrative regulation, in fighting corruption. Instead, the significance of criminal law stems from the existence and readiness of adequate provisions to be applied in cases of serious and obvious corrupt practices. Thus, anti-corruption policy may fail in its mission if the goal is completely weed out corruption, since this would eventually "impose rigid and cumbersome constraints that increase, rather than decrease, corrupt incentives."[1153]

---

BUSINESS TRANSACTIONS AND THE 1997 RECOMMENDATION ON COMBATING BRIBERY IN INTERNATIONAL BUSINESS TRANSACTIONS (2008).

[1150] Gerard E. Lynch, *The Role of Criminal Law in Policing Corporate Misconduct*, 60 L. & CONTEMPORARY PROBLEMS 23, 63 (1997).

[1151] *Id*. at 52.

[1152] *See, e.g.*, *Xi Calls for a China in 2016 Where "Nobody Dares to Be Corrupt*," Bloomberg, Jan. 12, 2016, http://www.bloomberg.com/news/articles/2016-01-13/xi-calls-for-a-china-in-2016-where-nobody-dares-to-be-corrupt-.

[1153] ROSE-ACKERMAN, *supra* note 21, at 68.

Due to the sensitivity of the role of criminal law interventions, certain points need to be highlighted. As mentioned in the previous chapter, to succeed, anti-corruption policy must adopt the "right mix of penalties, rewards, and undercover law enforcement."[1154] Further, the "right mix" should also mean the adoption of anti-corruption policies and mechanisms in which criminal law is not the sole device; instead, other provisions from various laws should be integrated into the criminal law.[1155] This leads to a warning against the imposition of criminal punishment "for technical regulatory violations, or in the absence of moral blameworthiness; [criminal punishment] should not be a device for collecting revenue in the form of corporate fines, expediting compensation of victims, or adjusting the marginal costs of corporate activities that regulators would like to discourage."[1156]

In the context of the indigenous forms of informal influence which include inter alia *guanxi* and *wasta*, the intervention of criminal law remains at the minimum level. The difficulty in drawing a line between the legitimate and illegitimate forms of these practices raises a challenge for the intervention of criminal law. Around the fine line between legality and illegality, individuals are moving and dancing and frequently they exceed it, yet the speed of their movements coupled with the vagueness of the line confuse the perception of those practices by the individuals themselves and the law. China, for instance, approaches the practice of *guanxi* from two different perspectives: the first is that of traditional criminal law provisions covering corrupt practices.[1157] The other approach is the "soft law," which is derived from ethical rules for

---

[1154] *Id.*

[1155] *See, e.g.*, Susan Rose-Ackerman, *Corruption and the Criminal Law*, 2 F. Crime & Soc'y. 3, 3-21 (2002).

[1156] Lynch, *supra* note 1150, at 64.

[1157] *See* Harding, *supra* note 1086, at 134-35 ("Chinese Criminal Law categorizes graft/embezzlement (*tanwu*), bribery (*shouhui*), and misappropriation (*nuoyong*) as economic

official behaviors published and enforced by the Chinese Communist Party (CCP).[1158] The former may not necessarily authorize criminal punishments; rather, it can be more disciplinary in nature.[1159]

In the Saudi context, bribery and other corrupt practices may not challenge the role of criminal law as much as the practice of *wasta*, which sends a signal of caution when approaching such a practice. Approaching *wasta* can be problematic due to the fact that the practice is not fully blameworthy, at least from the perspective of social norms. Though the Anti-Bribery Law targets *wasta*, at least partly, the problem with the *wasta* provision is not only its short reach, but also its failure to prevent the practice in the first place. That is, the Law stipulates the punishment, and defines the violation of the Law, in regard to the response and the action of a public official. That however cannot be understand as a call for punishing the mere act of offering or using *wasta*. Instead, such an act should be targeted indirectly and differently.

---

crimes that are included within Legal Corruption. China also has a crime of illicit enrichment, which punishes government officials for possessing assets clearly in excess of their earnings.").

[1158] *See* Hualing Fu, *The upward and downward spirals in China's anti-corruption enforcement*, *in* COMPARATIVE PERSPECTIVES ON CRIMINAL JUSTICE IN CHINA 390, 395-96 (Michael McConville & Eva Pils eds. 2013) ("A random survey of the CCP disciplinary rules reveals that there are, at the ground level, rules prohibiting lavish living, womanizing, visiting prostitutes, practicing superstition, being religious, privilege-seeking, or violating the one-child policy; at the next level, there are rules against housing irregularities, unauthorized business operation, profiteering, or nepotism aiming at self-enrichment; and at the next higher level, there are rules against smuggling, irregular banking loans, misappropriation of public funds, and other types of financial fraud; and finally there are rules which replicate the existing criminal laws.").

[1159] *Id*. at 396 ("The greatest utility of the CCP rules is to cover the field so as to exclude the intrusion of external rules, including the criminal law. While criminal offence and disciplinary offence are conceptually distinct, there is a large overlapping jurisdiction in which the CCP norms prevail and can marginalize legal norms. Once the CCP defines an act or omission as misconduct without expressly authorizing criminal punishment, then criminal law is regarded as being ousted. For example, CCP rules govern and punish CCP members who use official funding for overseas travel for leisure, and as a result the abuse in that particular matter can only be a disciplinary matter and is not capable of becoming a criminal offence; no matter how abusive a case may be the maximum penalty for this misconduct is dismissal from the CCP membership.").

Thus, to succeed, a criminal provision should establish the use of *wasta* with different elements. As an indirect and fair approach, the practice and the use of *wasta* can be illegalized in the context of the direct or indirect intervention of an unauthorized individual in the legal process and decision making process, knowing that such an intervention may affect the neutrality of the legal process and the decision-making process. However, the existence of such a provision is contingent on a well-established legal and institutional structure.

Another potential approach is to fight *wasta* through administrative disciplinary rules and actions, which may include, in addition to the civil penalties, removal from the office, reduction in grade, debarment from office for a certain period of time, suspension, or dismissal from office.[1160] Since individuals are more inclined to protect their power, administrative penalties that threaten their power may constitute an effective approach to fighting *wasta*.[1161]

CONCLUSION

In this chapter, a number of suggestions have been offered, taking into consideration the specific social and legal factors relevant to Saudi Arabia. Among the proposed solutions is the improvement and development of the existing e-government program in order to not only simplify the procedures, but also to detect corrupt practices. In addition, this chapter has suggested the use of nudges as a tool to fight *wasta* in particular and other corrupt practices in general.

Furthermore, out of the various weaknesses of the Saudi legal framework when it comes to fighting corruption, this chapter opted to discuss the problem of the limited jurisdiction of the Anti-Bribery Law. The selection of this particular issue was based on the realization that the

---

[1160] *See, e.g.*, 5 U.S.C. § 1215(a)(3).
[1161] *See* Guinote & Cai, *supra* note 581, at 12 ("Power gives advantages to individuals by increasing the availability of resources, and is a buffer against social competition and aggression. Therefore, individuals in power positions often have a desire to maintain power.").

reform of other weaknesses will be partly or completely built on the reform of the jurisdiction issues. Moreover, this problem—that of limited jurisdiction—is one of those that receive an emphasis when anti-corruption regulations are evaluated, especially when taking into consideration the movement of a number of countries toward criminalizing private-to-private bribery and the bribery of foreign public officials. Finally, due to the significant role of criminal law, this chapter has concluded by shedding light on the role of criminal law in fighting corruption.

CONCLUSION

Corruption is a concern around the globe, as it impacts the growth and the well-being of individuals and of nations. The study of corruption is complex, since every single aspect of it, whether cultural, economic, political, or legal, plays a role in its development and flourishing. It is not surprising, therefore, that diagnosing the root causes of corruption is a necessary antecedent to successfully combating it. An accurate diagnosis of its root causes will sketch the roadmap for fighting corruption and establish the priority of each step to be taken.

Influenced by recent studies and surveys highlighting the issues related to *wasta* and the demand for legal reforms, this dissertation has shed light on corruption in Saudi Arabia by exploring the social and legal factors behind corruption in the Saudi context. As Saudi Arabia is a country that has established its legal system on the foundation of Shari'a, it was necessary to examine the Islamic position on corruption. That examination showed that Islamic rules and principles clearly mandate against traditional corrupt practices, among which are *wasta* and bribery. There is no doubt about Shari'a's prohibition of bribery, nor about its prohibition of the contemporaneously practiced form of *wasta*, even if individuals in certain cases confused it with the concept of permissible *shafa'ah*, or intercession, to justify the practice.

*Wasta* is a social factor in corruption, since it is rooted in and influenced by the society itself, which creates difficulties in fighting it. The negative role of *wasta* has been underestimated when compared to that of bribery, yet such assessments do not take into consideration how widespread and divisive the practice of *wasta* is, and thus fail to grasp the total number of people affected and the holistic consequences of it.

Since it is rooted in and influenced by Saudi society, *wasta* also constitutes a challenge to the Saudi legal system. In essence, the limitations of each of the Saudi legal provisions that can

265

be applied to those practicing *wasta* create a grey area where it can be practiced legally. The lack of other provisions discouraging acts of favoritism and discrimination, which are the core of *wasta*, aggravates the challenge involved in fighting the practice. Saudi legal and institutional structures bear responsibility for the prevalence of *wasta*. The complexity of procedures and the weaknesses of the legal structures influence individuals' decisions to rely on *wasta* to overcome these challenges and find solutions to their problems.

This dissertation has sought to highlight a number of legal factors considered to be crucial in fighting corruption by examining the provisions of the Anti-Bribery Law specifically and related aspects within the Saudi legal system generally. Since the Saudi legal system lacks a comprehensive penal code, it was necessary to widen the scope of the study to cover the impact of other legal provisions beyond the Anti-Bribery Law.

Therefore, the dissertation evaluated six aspects which needed to be taken into account. This evaluation shed light on the advantages and disadvantages of each aspect. In addition to legal provisions directly related to *wasta*, the evaluation included the liability of legal persons; immunity; penalties and rewards; the protection of whistleblowers and witnesses; and the jurisdiction of the Anti-Bribery Law. No reforms were proposed, except with respect to the jurisdiction of the Anti-Bribery Law; instead, the disadvantages associated with each aspect were pointed out.

Basied on this analysis, it was argued that certain solutions can be suggested to decrease corrupt practices in general and *wasta* in particular. Since it is a socially influenced practice, *wasta* can be reduced by the implementation of nudges aimed at increasing the condemnation of *wasta* practices, which will eventually increase the cognitive dissonance of those involved in them, and that will, in turn, weaken the self-justification process related to them. This will

facilitate the passing of legal measures to outlaw *wasta*, on the one hand, and increase the social rejection of *wasta* and of other corrupt practices on the other.

This research further suggests that the improvement and simplification of government processes would discourage corrupt practices. Among the potential solutions, the improvement of e-government can be recommended in order to enhance the efficiency of procedures. Although a number of Saudi governmental agencies and organizations have taken steps in implementing e-government, certain aspects need to be further developed to serve the purpose of fighting corrupt practices.

As regards the Anti-Bribery Law, the reform of its jurisdiction is necessary in order to expand to the application of its provisions. Its limited jurisdiction, aimed at protecting the integrity of public office, is insufficient, especially when the role of the private sector is taken into consideration, to say nothing of its inconsistent position on corrupt practices in the public sector vs. corrupt practices in the private sector.

Finally, this study has argued that the role of criminal law is fundamental in building a strong mindset against corruption by sending a message internally and externally that corrupt practices will not be tolerated. The existence of such criminal provisions will also reflect the readiness to apply them to corrupt practices that pose serious harm to the health and wellbeing of the society in which they occur.

Chapter five places the practice of *wasta* under the microscope. The first section describes the practice of *wasta* and compares it with similar practices from other cultures that involve informal influence. The chapter then tracks the evolution and development of *wasta* in Saudi Arabia in light of the overview of historical and cultural background provided in chapter

four. The last section investigates how the public perceives *wasta* and the legal position of the practice.

The Anti-Bribery Law is the focus of chapter six. Before analyzing the Anti-Bribery Law, the first section reviews the Saudi anti-corruption legal system. The second section explores the definition of bribery as an offense under the Law, the elements of the offense, the scope of the Law's application, and the punishments, defenses, and rewards for reporting the offense under the Law. The third section further examines the corrupt practices included in the Law and their elements.

Based on chapter six, chapter seven examines the strength and weaknesses of the Anti-Bribery Law in regard to four aspects: the liability of legal persons; the *wasta* provision; immunity; penalties and rewards; the protection of whistleblower and witnesses; and the jurisdiction of the Anti-Bribery Law.

The last chapter suggests potential legal, structural, and behavioral solutions to fight corrupt practices generally and the practice of *wasta* specifically. The first section proposes improving institutional structures by the implementation and development of e-government. The second section suggests using the approach of nudges in order to discourage corrupt practices generally and *wasta* specifically. The third section then considers the possibility of expanding the jurisdiction of the Anti-Bribery Law. Finally, the dissertation concludes by addressing the role of criminal law in fighting corruption.

An official website of the United States Government Here's how you know

## U.S. DEPARTMENT *of* STATE

○

**Home** >  ...  > Saudi Arabia

# 2022 Country Reports on Human Rights Practices: Saudi Arabia

**IN THIS SECTION /**
**EXECUTIVE SUMMARY**

## EXECUTIVE SUMMARY

The Kingdom of Saudi Arabia is a monarchy ruled by King Salman bin Abdulaziz Al Saud who is head of state. Crown Prince Mohammed bin Salman Al Saud is prime minister and head of government. The 1992 Basic Law provides for the system of governance, rights of citizens, and powers and duties of the government, and it provides that the Quran and Sunna (the traditions of the Prophet Muhammad) serve as the country's constitution. It specifies that the rulers of the country shall be male descendants of the founder, King Abdulaziz (Ibn Saud).

The State Security Presidency, National Guard, and Ministries of Defense and Interior, all which report to the king, are responsible for law enforcement and maintenance of order. The State Security Presidency includes the General Directorate of Investigation (*mabahith*), Special Security Forces, and Special Emergency Forces; police are under the Ministry of Interior. Civilian authorities generally maintained effective control over the security forces. There were credible reports that members of the security forces committed numerous abuses.

Significant human rights issues included credible reports of: unlawful or arbitrary killings, including extrajudicial killings; enforced disappearances; torture and cruel, inhuman, or degrading treatment or punishment by government agents; harsh and life-threatening pris

conditions; arbitrary arrest and detention; political prisoners or detainees; transnational repression against individuals in another country; serious problems with the independence of the judiciary; arbitrary or unlawful interference with privacy; punishment of family members for alleged offenses by a relative; serious abuses in a conflict, including related to civilian casualties and damage to civilian infrastructure as a result of airstrikes in Yemen; serious restrictions on freedom of expression and media, including unjustified arrests or prosecutions against journalists and others, and censorship; serious restrictions on internet freedom; substantial interference with the freedom of peaceful assembly and freedom of association, including overly restrictive laws on the organization, funding, or operation of nongovernmental organizations and civil society organizations; particularly severe restrictions of religious freedom; restrictions on freedom of movement and residence within the territory of a state and on the right to leave the country; inability of citizens to choose their government peacefully through free and fair elections; serious and unreasonable restrictions on political participation; serious government restrictions on domestic and international human rights organizations; lack of investigation of and accountability for gender-based violence, including but not limited to domestic and intimate partner violence; criminalization of consensual same-sex sexual activity; and outlawing of independent trade unions or significant restrictions on workers' freedom of association.

In several cases the government did not investigate, prosecute, or punish officials accused of committing human rights abuses, contributing to an environment of impunity. The government prosecuted some officials for corruption, although there were allegations of a significant lack of respect for fair trial guarantees and other human rights abuses or violations, including allegations of torture, in these cases.

Houthi militant attacks from Yemen caused civilian casualties.

---

## Section 1.
# Respect for the Integrity of the Person

### A. ARBITRARY DEPRIVATION OF LIFE AND OTHER UNLAWFUL OR POLITICALLY MOTIVATED KILLINGS

There were several reports that the government or its agents committed arbitrary or unlawful killings. The Public Prosecutor's Office, which reports to the king, is responsible for investigating

whether security force actions were justifiable and pursuing prosecutions. Capital punishment may be imposed for a range of nonviolent offenses, including apostasy, sorcery, and adultery, although in practice death sentences for apostasy, sorcery, and adultery were rare and usually reduced on appeal. According to human rights organizations, members of the Shia minority and members of the al-Huwaitat tribe were disproportionately sentenced to death. On December 1, Amnesty International reported that Saudi Arabia executed 148 persons in the first 11 months of 2022 and that in March, the authorities executed 81 individuals in a day – the largest mass execution in years – including 41 individuals who were from the Saudi Shi'a minority.

According to NGO Mwatana for Human Rights, on May 12, bodies of Yemeni and Ethiopian migrants were discovered piled near an informal detention facility in southern Saudi Arabia. They reported that the migrants had reportedly crossed the border from Yemen into Saudi Arabia the previous day. A medical report on seven Yemeni victims showed two had gunshot wounds, and the remaining five had marks of torture.

On April 11, the Sanad and THE WINA human rights organizations reported that Abdullah bin Abdulrahman al-Kamli, age 29, died in prison with marks indicating that he died under torture. They added that al-Kamli was detained along with several family members seven years ago.

In January 2021 the Saudi government Human Rights Commission (HRC) announced that the government would institute a moratorium on the death penalty for drug-related offenses. Nonetheless, on November 10, the government resumed executions for drug-related crimes when it executed two Pakistani nationals for smuggling heroin, according to Amnesty International. By year's end, a total of 20 drug-related executions had been carried out despite the announced moratorium.

In January the European Saudi Organization for Human Rights (ESOHR) said it had documented 21 killings by government officials or others in prisons during the period from December 2010 to October 2021.

*Ta'zir* (discretionary) death penalty sentences for individuals who committed crimes as minors are forbidden, and minors' prison sentences are capped at 10 years under an April 2020 royal decree. (The 2018 Juvenile Law sets the legal age of adulthood at 18 based on the lunar Hijri calendar.) Individuals convicted of *qisas*, a category of crimes that includes various types of murder, or *hudud*, crimes that carry specific penalties under the country's interpretation of Islamic law, still

face the death penalty even if the crimes were committed as minors, and there were instances during the year when offenders were sentenced to be executed for actions taken as a minor.

On November 16, the European-Saudi Organization for Human Rights (ESOHR) said 54 persons were facing the possibility of capital punishment, including at least eight individuals accused of crimes committed as minors: Abdullah al-Huwaiti, Jalal al-Labbad, Yusuf al-Manasif, Abdullah al-Derazi, Mahdi Mohsen, Ali Hassan al-Subaiti, Jawad Qureiris, and Hasan Zaki al-Faraj. There are 27 Shia among the list of 33. On June 13, the Court of Appeal upheld the death sentence verdict against Abdullah al-Huwaiti, arrested at age 14 in 2017 and sentenced to death in 2019 on murder and armed robbery charges. The Tabuk criminal court sentenced al-Huwaiti to death on March 2 in a retrial after the Supreme Court overturned his death sentence in November 2021. On May 31, UN human rights experts called on the government to immediately release Abdullah al-Huwaiti and cancel the death sentence for crimes he allegedly committed as a child. Per information available, the execution had not occurred by year's end.

On July 25, the Specialized Criminal Court (SCC) postponed the trials of Ahmad al-Faraj, Ali al-Batti, Ali al-Faraj, Muhammed al-Nimr, and Mohammed Essam al-Faraj, who in 2017 were charged as minors for crimes related to free expression and protest. Prosecutors were seeking 10-year prison sentences, rather than the death penalty originally sought for them. On September 26, the SCC sentenced Mohamed Essam al-Faraj to 10 years in prison.

During the year UN officials also expressed concerns regarding due process in death penalty cases for adults. On January 22, UN special rapporteurs sent the government a letter calling for a halt to the executions of Bahraini citizens Jaafar Sultan and Sadiq Thamer, who had been charged on "terrorism" and protest-related grounds for participating in antigovernment protests in Bahrain. The UN special rapporteurs found that the lack of specificity in the charges made these executions arbitrary, and Amnesty reported that their convictions came after a deeply flawed trial based on torture-tainted confessions. Nevertheless, on April 6 the Supreme Court upheld the original verdicts. Per information available, the executions had not occurred by year's end.

On October 2, the SCC issued death sentences against three members of the al-Huwaitat tribe for resisting displacement, according to ALQST and Prisoners of Conscience. Shadli, Atallah, and Ibrahim al-Huwaiti were arrested in 2020 for opposing the eviction of their tribe for the Saudi government's construction of the NEOM city. Per information available, the executions had not occurred by year's end.

On March 12, the government executed 81 men, including seven Yemenis and one Syrian, in the largest known mass execution carried out in the kingdom's history. The men reportedly included 41 Saudi Shia, of whom 37 were found guilty in a single case for allegedly attempting to assassinate security officers and targeting police stations and convoys. On March 14, UN High Commissioner for Human Rights Michelle Bachelet said that some of their trials did not meet fair trial and due process guarantees, and that the crimes of which they were accused and convicted did not appear to meet the "most serious crimes" threshold for capital punishment, as required under international law. Bachelet voiced her concern over the extremely broad definition of "terrorism" in local law, which includes non-violent acts that supposedly "endanger national unity" or "undermine the State's reputation." On March 15, Human Rights Watch (HRW) echoed these concerns after analyzing court rulings for five of the Shia men who were executed: Aqeel al-Faraj, Mortada al-Musa, Yasin al-Brahim, Mohammed al-Shakhouri, and Asad al-Shibr. HRW alleged that their trials were marred with due process violations, including that all five had told the court they were tortured and suffered other ill-treatment during interrogations, and that their supposed confessions had been forcibly extracted through torture.

## B. DISAPPEARANCE

There were numerous credible reports of disappearances carried out by or on behalf of government authorities.

In May the UK-based rights organization Sanad, as well as Prisoners of Conscience, reported that authorities arrested and forcibly disappeared rapper and song writer Omar Shiboba in mid-March for unknown reasons without a charge. As of year's end, his whereabouts were unknown.

There were some updates during the year of previous disappearances. On June 10, the Twitter account of Prisoners of Conscience affirmed that authorities released writer and women's rights activist Souad al-Shammari after almost a year and a half in detention for unknown reasons.

On August 2, Amnesty International reported that in August 2021 Lebanese national Ali Maziad was abducted from his house in Riyadh by men in civilian clothes. The Lebanese embassy informed his family three months after his disappearance that he was being detained by Saudi State Security. On December 26, ESOHR reported that Maziad had been freed and was in Beirut.

Case 1:23-cv-00306-RBW Document 31-4 Filed 08/16/24 Page 288 of 374

On April 4, Amnesty International called on authorities to immediately release four Uyghurs being detained by Saudi authorities, instead of sending them back to China, where all four would be at grave risk of being taken to repressive internment camps. Buheliqiemu Abula and her daughter, age 13, were detained near Mecca on March 31 and told by police they faced deportation to China along with two Uyghur men, Nuermeiti Ruze and Aimidoula Waili, who have been detained without charge in Saudi Arabia since November 2020.

On July 29, Washington-based Democracy for the Arab World Now (DAWN) confirmed that authorities released Prince Faisal bin Abdullah Al Saud, former head of the Saudi Red Crescent Society, who had been detained by security forces since March 2020.

On January 6, authorities released Princess Basmah bint Saud — a daughter of the late King Saud, businesswoman, and human rights activist — and her daughter Suhoud al-Sharif, according to Princess Basmah's legal adviser, Henri Estramant. Authorities arrested Princess Basmah and her daughter in their home in Jeddah in 2019 and held them in a high-security prison for almost three years without being charged.

On August 2, DAWN confirmed that the General Court sentenced Prince Turki bin Abdullah, a son of the late King Abdullah and former governor of Riyadh Province, to 17 years in prison after he was held in pretrial detention for five years. Prince Turki had been arrested in a 2017 so-called anti-corruption campaign and reportedly was accused of taking advantage of his influence to award contracts to his own companies.

## C. TORTURE AND OTHER CRUEL, INHUMAN, OR DEGRADING TREATMENT OR PUNISHMENT, AND OTHER RELATED ABUSES

The law prohibits torture and makes officers responsible for criminal investigations liable for any abuse of authority. Sharia law, as interpreted by officials and judges, prohibits judges from accepting confessions obtained under duress, and the law states that public investigators shall not subject accused persons to coercive measures to influence their testimony. Nevertheless, there were numerous credible reports by human rights organizations, the United Nations, and independent third parties of torture and other cruel, inhuman, or degrading treatment or punishment by government officials and law enforcement officers, and of defendants' confessions being obtained through torture or other mistreatment. On June 27, ESOHR claimed that official institutions used torture systematically during all stages of detention, from arrest to

after the issuance of the verdict.  Officials from the Ministry of Interior, Public Prosecutor's Office, and HRC, which is responsible for coordinating with other government entities to investigate and respond to alleged human rights violations (see section 5), claimed that rules prohibiting torture prevented such practices from occurring in the penal system.

On February 16, the UK-based rights organization ALQST reported that lawyer and activist Mut'ib bin Zafir al-Amri, who was sentenced to seven years in prison for posting on Twitter and human rights activism on charges of "inflaming public opinion" and "criticizing the symbols of the state," had been subjected to severe physical and psychological torture since 2018 by government officials in Dahban Prison, including beatings and electric shocks.

On July 5, Prisoners of Conscience reported that authorities arrested Malik al-Dowaish, son of detained cleric Sulaiman al-Dowaish, after he wrote an article accusing Saudi authorities of abducting, torturing, and forcibly disappearing his father, who has been detained since 2016. Malik was arrested before the article was published, after campaigning for years for the release of his father, then released on September 2 only to be rearrested on September 29.  As of year's end, he remains in detention without trial.

Courts continued to sentence individuals to corporal punishment.  In March 2021 the Supreme Court clarified that a 2020 royal decree that effectively had eliminated flogging in most cases could be applied retroactively to sentences predating the decree.  While flogging may no longer be used as a discretionary ta'zir sentence, it can still be used for three hudud crimes: drunkenness, sexual conduct between unmarried persons, and false accusations of adultery. There have been no reports of flogging since the 2020 decree.

On March 11, authorities released blogger Raif Badawi from prison after 10 years' imprisonment, according to an interior ministry official.  Badawi was sentenced to 1,000 lashes, 10 years in prison, and a 10-year travel ban in 2014 on charges including insulting Islam, in response to his human rights activism.  He was subjected to 50 lashes in 2015, but further floggings were delayed due to health concerns.  Badawi remains banned from speaking to any media and is subject to a travel ban for an additional 10 years after his release from prison.

Impunity for security forces was a serious problem.  Activists questioned the impartiality of procedures to investigate detainee complaints of torture and maltreatment.  HRC and the quasi-governmental National Society for Human Rights (NSHR) had offices at main prisons with which

prisoners or their families could file complaints, but there were reports that prisoners could not submit complaints about mistreatment without the approval of prison officials, and there was no information that any official actions had been taken in response to prisoner complaints.  The Ministry of Interior stated it had installed surveillance cameras to record suspects' interrogations in some criminal investigation offices, police stations, and prisons where such interrogations occur, but reports of abuses during interrogations continued during the year, and there were no reports of accountability for abuses because of such video monitoring.  The government provided human rights training to security forces, but nongovernmental organizations (NGOs) continued to highlight concerns regarding widespread torture and other abuses as well as deplorable conditions in detention centers.

**Prison and Detention Center Conditions**

Prison and detention center conditions were unobserved, but reports indicated some did not meet international standards; reported problems included overcrowding, dangerous conditions, medical neglect, harassment, and denial of family visits.

**Abusive Physical Conditions:**  On February 1, ALQST reported mounting evidence of a deliberate campaign by authorities to jeopardize the safety, health, and even lives of certain prisoners of conscience, through medical neglect and by failing to protect detainees from other prisoners.  The organization also reported constant harassment of certain political detainees and denial of family visits.

Juveniles constituted less than 1 percent of detainees and were held in separate facilities from adults, according to available information.

Authorities held pretrial detainees together with convicted prisoners.  They separated persons suspected or convicted of so-called terrorism offenses from the general population.  Activists alleged that authorities sometimes detained individuals in the same cells as other individuals with mental disabilities as a form of punishment, and said Saudi authorities also mistreated persons with disabilities.

Authorities differentiated between violent and nonviolent prisoners, sometimes pardoning nonviolent prisoners other than those detained on political or freedom of expression grounds to

reduce the prison population.  In some cases, Shia inmates were held in separate wings of prisons and reportedly faced worse conditions than Sunni prisoners.

On May 27, Maha al-Qahtani, wife of imprisoned Saudi Civil and Political Rights Association member Mohamed al-Qahtani, said her husband was attacked by a prisoner suffering from mental illness, adding that prison authorities moved prisoners with mental illness to the same ward as prisoners of conscience as a means of punishing the latter.  According to ALQST reporting from February 1, Mohamed al-Qahtani previously had reported several incidents where his safety was compromised and his life was threatened, including a fire on his wing of the prison and prison administrators deliberately placing him alongside inmates infected with coronavirus. On May 31, ALQST echoed Maha al-Qahtani's complaints, saying reports suggested that the prison administration was deliberately housing prisoners of conscience, such as Mohammed al-Qahtani, as well as Essa al-Nukhaifi, Fawzan al-Harbi and Mohammed al-Hudaif, with prisoners with mental disorders, despite requests from the prisoners of conscience to be moved to another wing.  On November 4, Amnesty International said authorities have denied al-Qahtani contact with, and not disclosed his whereabouts to, his family since October 24.  It added that his family suspects that the authorities are not allowing him to contact them for previously complaining about being assaulted by another prisoner in his ward in October 2022.  On November 9, the Special Rapporteur on the situation of human rights defenders said she was increasingly concerned for the health and life of al-Qahtani, who is reportedly being held incommunicado after his family filed a complaint about attacks on him by inmates.  On November 24, 14 human rights NGOs, including Amnesty International, ESOHR, ALQST and DAWN, signed a joint letter calling on Saudi authorities to disclose al-Qahtani's whereabouts.  Al-Qahtani's 10-year prison sentence was due to expire on November 22, but he had not been released as of the end of the year and his whereabouts were unknown.

On November 16, ALQST reported that al-Nukhaifi remained on hunger strike that started on October 15 to protest his continued detention beyond the completion of his prison term, which should have concluded on October 14.

On October 11, ALQST reported that authorities prevented detained human rights activist Waleed Abu al-Khair from taking medication or visiting the hospital.

On July 29, ALQST said Yemeni prisoner Nabil Faisal Sulaiman Eidha started a hunger strike in protest of ill treatment, claiming he had been tortured, sexually harassed, and denied medical

treatment by prison authorities.

Family members of detained persons under investigation or in pretrial detention said family visits were typically not allowed, while others said visits or calls were extremely brief (less than five minutes).  Authorities at times reportedly denied some detainees their entitled weekly call for several months or years.  Some family members of prisoners complained authorities canceled scheduled family visits without justification.

**Administration:**  There were multiple legal authorities for prisons and detention centers.  The General Directorate of Prisons administered most detention centers, prisons, and jails, while the Mabahith administered some regional prisons and detention centers for so-called "security prisoners."

The law gives the Public Prosecutor's Office the authority to conduct official visits of prisons and detention facilities "within their jurisdictional areas to ensure that no person is unlawfully imprisoned or detained."  On February 15, Attorney General Saud al-Mu'jab said that Public Prosecutor's Office officials made nearly 50,000 inspection visits in 2021 to detention facilities to ensure inmates and detainees were receiving their legal rights.  The law provides that "any prisoner or detainee shall have the right to submit, at any time, a written or verbal complaint to the prison or detention center officer and request that he communicate it to a member of the [former] Bureau of Investigations and Public Prosecution [now the Public Prosecutor's Office]." Prisoners submitted complaints to the HRC, which had offices in several prisons, and to the NSHR for follow-up.  Inmates, however, required approval from prison authorities to submit complaints to an HRC office.  There was no information available on whether prisoners were able to submit allegations of mistreatment to prison or prosecutorial authorities without censorship or whether authorities responded or acted upon complaints.

Citizens and residents could also submit complaints regarding illegal detention or violations of detainee rights to the Public Prosecutor's office by using the Ma'akom system, or via the online platform *Absher*, a hotline telephone number, or in person.  The Ministry of Interior-run website *Nafetha* provided detainees and their relatives access to a database containing information regarding the legal status of the detainee, including any scheduled trial dates.  Authorities generally permitted relatives and friends to visit prisoners twice a week, although certain prisons limited visitation to once or twice a month, or in some cases, every 50 days.  Prisoners were typically granted at least one telephone call per week.  There were reports that prison, security, or

law enforcement officials denied this privilege in some instances, often during pretrial investigations.  The families of detainees could access the *Nafetha* website for applications for prison visits, temporary leave from prison (generally approved around post-Ramadan Eid holidays), and release on bail (for pretrial detainees).

Authorities generally permitted Muslim detainees and prisoners to perform Islamic religious observances, such as prayers.

**Independent Monitoring:**  Independent institutions were not permitted to conduct regular, unannounced visits to places of detention, according to the UN Committee against Torture.  In a limited number of cases, foreign diplomats were granted consular visits to individuals in detention, but the visits took place in a separate visitors' center where conditions may differ from those in the detention facilities holding the prisoners.  Prison conditions were therefore difficult to observe systemically.

The government permitted the HRC and quasi-governmental NSHR to monitor prison conditions.  The organizations stated they visited prisons throughout the country and reported on prison conditions.

**Improvements:**  On August 13, Attorney General al-Mu'jab launched procedural guidelines for the Public Prosecutor's Office for supervising prisons and detention centers.  The guide included procedures for supervising the execution of criminal judgments and monitoring and inspection of prisons and detention centers.

Some Covid-related restrictions relating to prisoners were lifted in 2022.  In May the Directorate General of Prisons launched "virtual visit" video calls for family members of prisoners.

## D. ARBITRARY ARREST OR DETENTION

The law provides that no entity may restrict a person's actions or imprison a person, except under the provisions of the law.  The criminal procedure prohibits authorities from detaining a person for more than 24 hours, but the Ministry of Interior and the State Security Presidency, to which most forces with arrest powers reported, nonetheless continued to arrest and detain persons indefinitely without judicial oversight, notification of charges, or effective access to legal counsel or family, according to human rights groups.

## Arrest Procedures and Treatment of Detainees

The law gives the Public Prosecutor's Office "complete and independent powers" to identify major crimes that require detention, according to local media.

According to the law, "No person shall be arrested, searched, detained, or imprisoned except in cases provided by law, and any accused person shall have the right to seek the assistance of a lawyer or a representative to defend him during the investigation and trial stages." By law authorities may summon any person for investigation and may issue an arrest warrant based on evidence. In practice authorities frequently did not use warrants, which were not required under the law in all cases.

The law requires authorities to file charges within 72 hours of arrest and to hold a trial within six months, subject to exceptions specified by amendments to the law of criminal procedure and the counterterrorism law (see section 2.a.). Authorities may not legally detain a person under arrest for more than 24 hours except pursuant to a written order from a public investigator. Authorities reportedly often failed to observe these legal protections, and there was no requirement to advise suspects of their rights.

The law specifies procedures required for extending the detention period of an accused person beyond the initial five days. There is a functioning bail system for less serious criminal charges. Authorities may approve detentions more than six months in "exceptional circumstances," effectively allowing individuals to be held in pretrial detention indefinitely in cases involving "terrorism" or "violations of state security" charges. The Public Prosecutor's Office may order the detention of any person accused of a crime under the counterterrorism law for up to 30 days, renewable for up to 12 months or for up to 24 months in state security cases with a judge's approval.

By law defendants are entitled to hire a lawyer to defend them "within an adequate period of time to be decided by the investigatory body." The government provided lawyers to defendants who made a formal application to the Ministry of Justice to receive a court-appointed lawyer and proved their inability to pay for legal representation. In cases involving "terrorism" or "state security" charges, detainees generally were not permitted to be represented by a lawyer of their choice.

8/16/24, 10:31 AM      2022 Country Reports on Human Rights Practices: Saudi Arabia
Case 1:23-cv-00306-RBW Document 31-4 Filed 08/16/24 Page 295 of 374
United States Department of State | www.state.gov/reports/2022-country-reports-on-human-rights-practices/saudi-arabia/

There were reports authorities did not always allow legal counsel access to detainees under investigation in pretrial detention. Authorities indicated a suspect could be held up to 12 months in investigative detention without access to legal counsel if authorized by prosecutors. Judicial proceedings begin after authorities complete a full investigation.

The king continued the tradition of commuting some judicial punishments. Royal pardons could set aside a conviction or reduce or eliminate corporal punishment. The remaining sentence could be added to a new sentence if the pardoned prisoner committed a crime subsequent to release.

Authorities commuted the sentences of some who had received prison terms. The counterterrorism law allows the Public Prosecutor's Office to stop proceedings against an individual who cooperates with investigations or cooperates in thwarting a planned terrorist attack. The law authorizes the State Security Presidency to release individuals already convicted in such cases.

**Arbitrary Arrest:** Rights groups received reports from families claiming authorities held their relatives arbitrarily or without notification of charges. During the year authorities detained without charge individuals exercising freedom of expression, including government critics, Shia religious leaders, individuals with links to human rights activists, persons accused of violating so-called religious standards, and so-called security suspects.

By law detainees are not entitled to challenge the lawfulness of their detention before a court. In the case of wrongful detention, the law of criminal procedure, as well as provisions of the counterterrorism law, provide for the right to compensation if detainees are found to have been held unlawfully. On September 4, the Public Prosecutor's Office urged individuals to report any illegal arrests, likely to highlight reporting mechanisms like other ministries.

On February 2, the UN Special Rapporteur on Human Rights Defenders said she had raised serious concerns about a pattern of widespread and systematic arbitrary arrests and detentions of human rights defenders, and had sent a communication to the government in November 2021 focused on the cases of six human rights defenders: Asmaa Al-Subaie, Maha Al-Rafidi, Mohammed al-Qahtani, Fawzan al-Harbi, Issa al-Nukhaifi, and Khaled al-Omair (see section 1.c., Abusive Physical Conditions).

On July 13, Reporters Without Borders reported the government was arbitrarily detaining 28 journalists.

On August 12, ESOHR reported authorities released social media activist Musa al-Khunaizi after holding him for 50 days in detention for speaking out against hate speech.

On August 22, the Supreme Court overturned the acquittal of the former imam of the Holy Mosque in Mecca, Sheikh Saleh al-Talib, and sentenced him to 10 years in prison. Al-Talib had been arrested in 2018, but there was no information available about the basis for his arrest or the charges brought against him (see section 1.e., Political Prisoners and Detainees, for additional cases of arbitrary or unlawful detention.)

**Pretrial Detention:** Incommunicado detention occurred (see section 1.b.). Authorities reportedly did not always respect a detainee's right to contact family members following detention, and the counterterrorism law allows the investigatory body to hold a defendant for up to 90 days in detention (or longer) without access to family members or legal counsel. Security and other types of prisoners sometimes remained in prolonged solitary detention before family members or associates received information of their whereabouts, particularly for detainees in Mabahith-run facilities.

On March 5, Human Rights Foundation (HRF) reported that since October 2021, prisoner Abdulrahman al-Sadhan has been prevented from contacting his family, who remain unaware of his health or the location of his detention. In April 2021 the SCC had sentenced al-Sadhan to 20 years' imprisonment, followed by a 20-year travel ban, on terrorism financing and facilitation charges. However, according to HRF, the charges against him were in connection with tweets from a parody Twitter account that criticized the Saudi regime's repression. After his arrest in 2018, al-Sadhan was detained incommunicado for two years before being allowed to speak with his family. On October 22, the UN Working Group on Arbitrary Detention published a decision finding his detention arbitrary and calling on Saudi authorities to release him immediately and unconditionally.

In July family members of religious scholar Salman al-Odah claimed authorities had denied al-Odah contact with his family and his lawyers for more than a year and a half and repeatedly had postponed his trial hearings.

Case 1:23-cv-00306-RBW   Document 31-4   Filed 08/16/24   Page 297 of 374

On August 9, the SCC Court of Appeals sentenced Salma al-Shehab, a Saudi national and Leeds University PhD student, to 34 years in prison followed by a 34-year travel ban after what Amnesty International called a "grossly" unfair trial.  Al-Shehab was arrested in January 2021 and was initially sentenced to six years' imprisonment in mid-2022 for tweets in support of women's rights.  According to Amnesty, she was held in solitary confinement for 285 days before being brought to trial and was denied access to legal representation throughout pretrial detention, including during interrogations.  Al-Shehab told a court that she had been abused and harassed during her detention, including being subjected to interrogations after being given medications that exhausted her.

## E. DENIAL OF FAIR PUBLIC TRIAL

The law provides that judges are independent and not subject to any authority other than the provisions of sharia and the laws in force, but the judiciary reportedly was subject to influence, particularly in the case of legal decisions rendered by specialized judicial bodies like the SCC, which rarely acquitted suspects.  The SCC and the Public Prosecutor's Office were not independent entities, as they reportedly were required to coordinate their decisions with government authorities, including the king and crown prince.  Human rights activists claimed that SCC judges received implicit instructions to issue harsh sentences against human rights activists, reformers, journalists, and dissidents not engaged in violent activities.  Activists also reported that judicial and prosecutorial authorities ignored due process-related complaints, including lack of access by lawyers to their clients at critical stages of the judicial process, particularly during the pretrial investigation phase.

Defendants and the prosecution can appeal convictions, acquittals, and sentences.  The law requires a five-judge appellate court to affirm a death sentence, which a five-judge panel of the Supreme Court must then unanimously affirm.  Appellate courts may recommend changes to a sentence, including increasing the severity of a lesser sentence (up to the death penalty), if the trial court convicted the defendant of a crime for which capital punishment is permitted.  There were cases during 2022 when a prosecution appeal resulted in longer sentences than originally imposed, including cases involving Mohammed al-Rabea, Salma al-Shehab, and others.

Defendants possess the right to seek commutation of a death sentence for some crimes and may receive a royal pardon under specific circumstances (see section 1.d.).  In some prescribed qisas

cases, the families of the deceased may accept compensation from the family of the person convicted in an unlawful death, sparing the convicted from execution.

On March 14, UN High Commissioner for Human Rights Michelle Bachelet said that the trials of some of the 81 individuals executed on March 12 did not meet fair trial and due process guarantees (see section 1.a.).

**Trial Procedures**

The judicial system traditionally lacked published case law on criminal matters, a uniform criminal code, the presumption of innocence, or a doctrine of stare decisis that binds judges to follow legal precedent. In February 2021 the crown prince announced forthcoming legal reforms to the personal status law, civil transactions law, evidence law, and discretionary sentencing, stating a goal of increasing predictability and transparency in the legal system and expanding protections for women (see section 6, Women). On December 28, 2021, the Council of Ministers enacted the evidence law. The personal status law received final approval on March 8 and the civil transactions law was also approved in March. While assessments of the effects of reforms are still preliminary, the evidence law has clarified the types of admissible evidence and created uniform application of evidence rules in all courts. It also prohibited judges from discounting evidence given by women and non-Muslims. The Personal Status law has improved trial procedures for women, giving them additional rights in family cases. There are still reports of uneven application of the rights granted in the Personal Status law in some cases. The Saudi Ministry of Justice Judicial Training Center holds training sessions on the legal reforms for judges.

In the absence of a formalized penal code that details all criminal offenses and punishments, judges in the courts determine many of these penalties through individualized interpretations of sharia, which varied according to the judge and the circumstances of the case. Because judges have considerable discretion in decision making, rulings and sentences diverged widely from case to case.

Several laws provide sentencing requirements for crimes, including terrorism, cybercrimes, trafficking in persons, and domestic abuse.

The Justice Ministry continued a project started in 2007 to distribute model judicial decisions with the goal of ensuring more uniformity of legal application, and the ministry published judicial

8/16/24, 10:31 AM
Case 1:23-cv-00306-RBW Document 31-4 Filed 08/16/24 Page 299 of 374
2022 Country Reports on Human Rights Practices: Saudi Arabia | United States Department of State

decisions on its website. The law states that defendants should be treated equally in accordance with sharia. The Council of Senior Scholars, or the *ulema*, an autonomous advisory body, issues *fatwas* (religious opinions) that guide how judges are supposed to interpret sharia. In 2016 the Ministry of Justice issued a compilation of previous decisions that judges could reference in rulings and sentences.

Appeals courts cannot independently reverse lower-court judgments of innocence or guilt; they are limited to affirming judgments, modifying sentences, or returning them to a lower court for modification. Even when appeals judges did not affirm judgments, in some cases they remanded the judgment to the original trial judge, sometimes making it difficult for parties to receive a ruling that differed from the original judgment, given judges' hesitation to admit error. While judges may base their decisions on any of the four Sunni schools of jurisprudence, all of which were represented in the Council of Senior Scholars, the Hanbali School predominated and formed the basis for the country's law and legal interpretations of sharia. Shia citizens in the Eastern Province, where most Saudi Shia reside, use their legal traditions with Shia judges to adjudicate family law and inheritance cases between Shia parties in their own court system, although either party can decide to adjudicate a case in state courts, which apply Sunni legal traditions.

While the law states that court hearings shall be public, courts regularly were closed at the judge's discretion. According to the Ministry of Justice, authorities may close a trial depending on the sensitivity of the case to national security, the reputation of the defendant, or the safety of witnesses. HRC representatives sometimes attended SCC trials. Foreign diplomats regularly requested to attend non-consular trials of political prisoners and other high-profile detainees, but the Ministry of Foreign Affairs consistently refused to approve their attendance to court proceedings at the SCC, as well as at trials related to state security or human rights issues. Diplomatic personnel were generally allowed to attend consular proceedings for their own citizens. Some family members of prisoners complained that neither they nor the legal representatives of the accused were permitted access to trials or notified of the status of trial proceedings. In several cases, family members were given only 24 hours' notice before a trial hearing.

By law authorities must offer defendants a lawyer at government expense. In 2017 the Ministry of Justice stated that defendants "enjoy all judicial guarantees they are entitled to, including the right to seek the assistance of lawyers of their choosing to defend them, while the ministry pays

Case 1:23-cv-00306-RBW    Document 31-4    Filed 08/16/24    Page 300 of 374

the lawyer's fees when the accused is not able to settle them."  Activists alleged that many political prisoners were not able or allowed to retain an attorney or consult with their attorneys during critical stages of the investigatory and trial proceedings.  Detained human rights activists often indicated they did not trust the courts to appoint unbiased lawyers who would vigorously defend them.  The law provides defendants the right to be present at trial and to consult with an attorney during the trial.  The counterterrorism law, however, authorizes the attorney general to limit the right of a defendant accused of so-called terrorism charges to access legal representation while under investigation, "whenever the interests of the investigation so require." Defendants have no right to discovery, nor can defendants view their own case file or the minutes from their interrogation.  Defendants have the right to call and cross-examine witnesses, but activists reported that SCC judges regularly restricted this right in "the interests of the case." The law provides that a prosecutor-appointed investigator may question the witnesses called by the defendant during the investigation phase before the initiation of a trial.  The investigator also may elicit testimony from additional witnesses.  Authorities are prohibited from subjecting a defendant to coercive measures or compelling the taking of an oath, but there were regular credible reports of confessions elicited through torture and other mistreatment.  The court must inform convicted persons of their right to appeal rulings.

The law does not provide for a right against self-incrimination.

The law provides that "the court should seek the assistance of interpreters," but it does not obligate the court to do so from the moment the defendant is charged, nor does the law specify that the state will bear the costs of such services; in practice free interpretation services often were provided.

Sharia, as interpreted by the government, is applied to all citizens and noncitizens, but in practice the law discriminates against women, noncitizens, nonpracticing Sunni Muslims, Shia Muslims, and persons of other religions.  Sources reported judges sometimes completely disregarded or refused to hear testimony by Shia Muslims.

**Political Prisoners and Detainees**

NGOs and press sources reported that Saudi authorities regularly detained persons for peaceful activism, government criticism, or political opposition, including nonviolent religious figures, women's rights activists, human rights defenders, and those who the government claimed posted

or shared offensive or critical comments on social media. The government nonetheless claimed it held no political prisoners, including detainees who reportedly remained in prolonged detention without charge, while local activists and human rights organizations estimated that political prisoners numbered in the "hundreds" or "thousands."

During the year the SCC tried political and human rights activists for nonviolent actions unrelated to terrorism, violence, or espionage against the state, and authorities restricted attorneys' access to detainees on trial. In many cases it was impossible to determine the legal basis for incarceration and whether the detention complied with international norms and standards.

International NGOs, the United Nations, and others criticized the government for abusing its antiterrorism and cybercrime legal authorities to detain or arrest on security-related charges dissidents or critics of the government or royal family who had neither espoused nor committed violence. According to the NGOs Prisoners of Conscience and ESOHR, more than 100 persons remained in detention for peaceful activism, criticism of government leaders or policies, impugning Islam or religious leaders, or "offensive" internet postings, including prominent activists such as Mohammed al-Qahtani, Naimah Abdullah al-Matrod, Maha al-Rafidi, and Waleed Abu al-Khair; clerics including former grand mosque imam Salih al-Talib; and Sahwa movement figures Safar al-Hawali, Nasser al-Omar, and others.

On February 17, the Court of Appeals sentenced Sheikh Khalid al-Rashid to an additional eight years in prison. Al-Rashid was arrested in 2005 over a sermon condemning and calling for protests against Danish cartoons insulting Prophet Muhammad, according to Sanad. According to Prisoners of Conscience and the Alkarama rights group, al-Rashid was due to be released in 2020 after completing his 15-year prison sentence. On November 16, Prisoners of Conscience reported that the SCC Court of Appeals increased al-Rashid's prison sentence for the second time adding another 17 years, which means his prison term became 40 years in total.

On July 23, authorities released Shia human rights defender and writer Nadhir al-Majed, who had been detained since 2017 on charges related to his exercise of freedom of expression, according to ALQST and the Euro-Med Human Rights Monitor. He remained subject to a travel ban for seven years following his release. In August Prisoners of Conscience affirmed that authorities released writers Moqbel al-Saqar and Abdullah al-Dahilan, who were detained in 2019.

1.23.mv-00306rbw Document 31-4 Filed 08/16/24 - 2022 country-reports-on-human-rights-practices/saudi-arabia/

Several members of the al-Huwaitat tribe, who were reported to be forcibly displaced to make way for the NEOM megacity project in Tabuk province, were sentenced to lengthy prison terms for expressing opposition to government evictions and other actions.  In August the SCC sentenced activist Maha Sulaiman al-Huwaiti to 23 years in prison for tweeting about the increasing cost of living and about the enforced displacement of the al-Huwaitat tribe in northwestern Saudi Arabia, according to Sanad and THE WINA rights organizations.  In August the SCC Court of Appeals sentenced Abdulilah al-Huwaiti and his relative Abdullah Dukhail al-Huwaiti to 50 years in prison, followed by a 50-year travel ban.  According to ALQST and Prisoners of Conscience, the two men were sentenced over their protests against the project.  On October 26, Sanad and Prisoners of Conscience reported that the SCC issued prison sentences ranging from 20 years to 30 years against Ahmed Abdulnaser al-Huwaiti, Abdulnaser al-Huwaiti, and Mahmoud Ahmed al-Huwaiti because of their refusal to surrender their homes for demolition.

In August the SCC sentenced Prince Abdullah Bin Faisal, a graduate student at Boston's Northeastern University, to a 30-year prison term after he was arrested on a trip back to Saudi Arabia and accused of acting to destabilize the kingdom, disturbing social unity, and supporting the country's opponents.

On September 9, ALQST reported that writer, translator, and computer programmer Osama Khaled, detained since 2020, was sentenced to a prison term of 32 years — increased on appeal from an initial five-year sentence — following "allegations relating to the right of free speech."

On September 10, Prisoners of Conscience reported that the SCC Court of Appeals increased prison sentences issued against clerics Nasser al-Omar and Essam al-Owaid from 10 years, including four years suspended, and four years, with one year suspended, to 30 years and 27 years respectively.  The court issued a 25-year prison sentence against cleric Abdulrahman al-Mahmoud.

On December 7, DAWN and the Freedom Initiative reported that the SCC Court of Appeals sentenced women's rights activist Mohammed al-Rabea to 17 years in prison after the Supreme Court accepted in September a request filed by the Public Prosecutor's Office to retry him despite the expiry of his prison term.  Al-Rabea started a hunger strike in protest over his situation, according to ALQST.  Detained in 2018 along with Loujain al-Hathloul and Aziza al-Yousef, al-Rabea's arrest was tied, inter alia, to his activism for women's right to drive and against the guardianship system.

In October media reported that U.S.-Saudi citizen Saad Almadi, age 72, was sentenced to 16 years in prison, plus a 16 year and 3-month long travel ban, for tweets he primarily posted while abroad, some of which were critical of the government.

**Transnational Repression**

Freedom House reports the government engages in transnational repression including "extensive use of spyware, proxy punishment, detentions, assaults, and renditions in nine countries spanning the Middle East, Europe, North America, and Asia," They state that women feature more prominently in the country's transnational repression campaign than in other countries that employ such practices.

The government also harassed and detained family members and associates of Saudi citizens living abroad who were outspoken critics of the government.

**Extraterritorial Killing, Kidnapping, Forced Returns, or Other Violence or Threats of Violence:** There were reports that authorities attempted to intimidate critics living abroad, pressured their relatives in country, and in certain instances abducted or pressured dissidents and repatriated them to the country. In February, the London-based dissident Alya al-Huwaiti said she received death threats from trolls she believed were sending messages from the Saudi government.

On July 15, AP News reported that former interior ministry official Salem al-Muzaini, who is the son-in-law of exiled former senior security official Saad al-Jabri, was abducted from a third country in 2017, forcibly returned to Saudi Arabia, tortured, and detained. On June 10, the UN Working Group on Arbitrary Detention adopted an opinion that al-Muzaini was being physically and psychologically tortured. He was reportedly beaten, lashed, and held incommunicado during this detention.

On August 19, a British judge ruled that dissident satirist, Ghanem al-Masarir, can proceed with his case accusing the government of ordering a physical assault against him in London in 2018, as well as the hacking of his phone.

On November 2, Freedom House told the Associated Press that Saudi Arabia had targeted critics in 14 countries, and that the government's aim was to spy on Saudis, intimidate them, or compel

them to return to the country.

**Threats, Harassment, Surveillance, and Coercion:**  According to Reporters without Borders (RSF), journalists live under heavy surveillance, even when abroad.  RSF states that "electronic brigades" active on social networks hunt and harass journalists, and the government uses high-tech espionage tools to monitor journalists in exile.

On August 9, a jury in a U.S. federal court convicted former Twitter employee and dual U.S.-Lebanese national Ahmad Abouammo of spying on Saudi dissidents using the social media platform and passing their personal information to the crown prince's aide, Bader al-Asaker.

On August 20, *The Telegraph* reported that the government uses the Kollona Amn (We Are All Security) app, which allows citizens to report others alleged to be critical online of the government, and to target female critics of the government.  The article said Salma al-Shehab (see section 1.d., Arbitrary Arrest or Detention) appears to have been prosecuted after some of her tweets were sent to authorities by a Kollona Amn user (See section 1.f. for efforts to punish family members for offenses allegedly committed by their relatives.)

**Misuse of International Law Enforcement Tools:**  NGOs have reported that the government attempted to misuse international law enforcement tools for politically motivated reprisals against individuals located outside the country.  According to Freedom House, there have been renditions of Saudi nationals critical of the government in recent years from three Gulf states of Kuwait, Qatar, and the United Arab Emirates (UAE).

**Efforts to Control Mobility:**  There were credible reports that the government attempted to control mobility as reprisal against citizens abroad, by denying them consular services or otherwise engaging in actions aimed at jeopardizing their legal status, restricting their movement, or provoking their detention in the country where they were located.

In May activist Abdullah al-Odah, son of detained cleric Salman al-Odah, told Amnesty International that he has been unable to renew his passport that expired in October 2017 because authorities repeatedly tried to lure him back to the country with the ultimate purpose of preventing him from leaving the country.

On September 15, U.S.-based activist Danah Almayouf tweeted that the Saudi Consulate in New York canceled her passport renewal application because her Saudi ID was expired.  Almayouf said

she had a valid family Saudi card (equivalent of an ID) issued just a year earlier, but the consulate told her the only way to renew her documents was to go back to Saudi Arabia.

**Bilateral Pressure:**  On June 9, Prisoners of Conscience reported authorities requested that Bulgaria deport Saudi political activist Abdulrahman al-Khalidi, who was under administrative detention in Bulgaria since October 2021, after his asylum application was rejected.  There were no updates available at year's end.

### Civil Judicial Procedures and Remedies

Complainants alleging human rights violations often sought assistance from the HRC or the NSHR, which sometimes advocated on their behalf or provided courts with opinions on their cases.  The HRC generally responded to complaints and can refer cases to the Public Prosecutor's Office; domestic violence cases were the most common.  Individuals or organizations may petition directly for damages or government action to end human rights violations before the Board of Grievances, except in compensation cases related to state security, where the SCC is mandated to determine if remediation is appropriate.  The counterterrorism law contains a provision allowing detainees in Mabahith-run prisons to request financial compensation from the Ministry of Interior, State Security Presidency, or both for wrongful detention beyond their prison terms.  In some cases the government did not carry out in a timely manner judicially-ordered compensation for unlawful detentions.

### F. ARBITRARY OR UNLAWFUL INTERFERENCE WITH PRIVACY, FAMILY, HOME, OR CORRESPONDENCE

The law prohibits unlawful intrusions into the privacy of persons, their homes, places of work, and vehicles.  Criminal investigation officers are required to maintain records of all searches conducted; these records should contain the name of the officer conducting the search, the text of the search warrant (or an explanation of the urgency that necessitated the search without a warrant), and the names and signatures of the persons who were present at the time of search.  While the law also provides for the privacy of all mail, telegrams, telephone conversations, and other means of communication, the government did not respect the privacy of correspondence or communications and used the considerable latitude provided by the law to monitor activities legally and intervene where it deemed necessary.  Authorities regularly targeted family members of activists and critics of the government with intrusions and searches.  For example, in October,

*Al–Hurra* reported that Nasser al-Qarni, son of detained cleric Awad al-Qarni, stated that security officers in plainclothes stormed and ransacked his father's house to arrest him without an arrest warrant.  He added that all electronic devices, including laptops and mobile devices, and some personal belongings were confiscated.  Similar allegations were made by activists Abdullah al-Odah and Areej al-Sadhan in relation to the arrests of their father and brother respectively.

In February *Reuters* reported that the Canadian privacy rights group Citizen Lab uncovered evidence that women's rights activist Loujain al-Hathloul's phone had been hacked using NSO Group's spyware.

In April lawyers for Yahya Assiri, founder of London-based human rights NGO ALQST, said their client's mobile phone had been hacked with Pegasus spyware between 2018 and 2020 while he was in the United Kingdom.

There were reports from human rights activists of governmental monitoring or blocking of mobile phone or internet usage. The government strictly monitored politically related activities and took punitive actions, including arrest and detention, against persons engaged in certain political activities, such as calling for a constitutional monarchy or publicly criticizing senior members of the royal family by name (see section 2.a.). Customs officials reportedly opened mail and shipments on a routine basis to search for contraband. Informants allegedly reported "seditious ideas," "antigovernment activity," or "behavior contrary to Islam" in their neighborhoods.

During the year the Public Prosecutor's Office reiterated that infringing on private life through the misuse of mobile phones equipped with a camera or the like is a cybercrime punishable by imprisonment for up to one year and a large fine, in addition to confiscation of devices and the means used in committing the crime.

The government banned the use of encrypted communications by private citizens, and authorities frequently attempted to identify and detain anonymous or pseudonymous users and writers who made critical or controversial remarks. Government authorities regularly surveilled websites, blogs, chat rooms, social media sites, emails, and text messages. Media outlets reported that authorities gained access to critics' and activists' Twitter and other social media accounts and in some cases questioned, detained, or prosecuted individuals for comments made online. (See section 1.e., Transnational Repression, for cases.)

The counterterrorism law allows the government to access a terrorism suspect's private communications and banking information in a manner inconsistent with the legal protections provided by the law of criminal procedure.

The Committee for the Promotion of Virtue and the Prevention of Vice (CPVPV) is charged with monitoring and regulating public interaction between members of the opposite sex, although in practice CPVPV authorities were greatly curtailed compared with past years.

## G. CONFLICT-RELATED ABUSES

During the year Saudi Arabia, as part of the Saudi-led Coalition, continued military operations in support of the internationally recognized Government of Yemen against the Houthi militants. A truce between the parties to the conflict that extended from April 2 until October 2 during the year saw no cross-border aerial attacks between Saudi and Houthi forces and improved access for humanitarian assistance providers. On January 21, a Saudi air strike against an alleged Houthi detention facility in Sa'ada killed 90 civilians and injured over 100.

The United Nations, NGOs, media outlets, as well as humanitarian and international organizations, reported what they characterized as abuses by all parties to the continuing conflict, including civilian casualties and damage to infrastructure from shelling and airstrikes. (For more information, please reference the 2022 Yemen Human Rights Report.) Prior to the end of its mandate in October 2021, the UN Group of Eminent International and Regional Experts expressed concerns in a September 2021 report regarding the Saudi-led coalition's efforts to investigate claims of civilian casualties and its prosecution efforts, saying the Joint Incident Assessment Team (JIAT) did not provide detailed case summary information or supporting evidence. JIAT has not announced any completed reviews of cases from 2022, including the January 21 Saudi strike on a Houthi detention center.

On numerous occasions prior to the April 2 ceasefire taking effect, Saudi civilians were injured and killed by missile, rocket, drone, artillery, and maritime cross-border attacks by Houthi militants in Yemen aimed at Saudi territory.

**Killings:** There were reports of killings of African and Yemeni migrants by Saudi security forces along the border with Yemen (see section 2.e.).

Case 1:23-cv-00306-RBW   Document 31-4   Filed 08/16/24   Page 308 of 374

See the Yemen, UAE, and Iran Human Rights Reports for additional information on abuses and violations related to the ongoing conflict in Yemen.

---

## Section 2.
# Respect for Civil Liberties

## A. FREEDOM OF EXPRESSION, INCLUDING FOR MEMBERS OF THE PRESS AND OTHER MEDIA

The law does not provide for or protect freedom of expression, including for members of the press and other media.  The law specifies, "Mass media and all other vehicles of expression shall employ civil and polite language, contribute towards the education of the nation, and strengthen unity.  Media are prohibited from committing acts that lead to disorder and division, affect the security of the state or its public relations, or undermine human dignity and rights."  Authorities regulate and determine what speech or expression is considered to "undermine internal security."  The government can ban or suspend media outlets if it concludes they violated the press and publications law, and it monitored and blocked hundreds of thousands of internet sites.  There were frequent reports of restrictions on free speech.

The counterterrorism law's definition of terrorism includes "any conduct...intended to disturb public order...or destabilize the state or endanger its national unity."  The law also penalizes "anyone who challenges, either directly or indirectly, the religion or justice of the king or crown prince...or anyone who establishes or uses a website or computer program...to commit any of the offenses set out in the law."  Local human rights activists, international human rights organizations, and the UN special rapporteur on the promotion and protection of human rights and fundamental freedoms while countering terrorism criticized the law for its overly broad and vague definitions of terrorism and criticized the government for using it to prosecute peaceful expression and dissent.

Saudi courts handed down several unprecedentedly long prison sentences to individuals for expressing dissent.  These included 34- and 45-year prison terms, respectively, for women's rights activists Salma al-Shehab and Nourah al-Qahtani for peaceful activity on Twitter, and 50-year sentences for Abdulilah al-Huwaiti and Abdullah Dukhail al-Huwaiti for opposing forcible eviction from their homes to make way for the government's NEOM megaproject.

In an August 19 statement, UN Human Rights Spokesperson Liz Throssell called the "extraordinarily lengthy sentence" given to Salma al-Shehab (see section 1.d., Arbitrary Arrest or Detention) for tweets and retweets on political and human rights issues an example of authorities weaponizing the country's counterterrorism and anti-cybercrime laws to target, intimidate, and retaliate against human rights defenders and those who voice dissent.

As of November, Amnesty International has documented the cases of 55 individuals who have been prosecuted for exercising their rights to freedom of expression, association, and assembly, including human rights defenders, peaceful political activists, journalists, poets, clerics, and others.

**Freedom of Expression:** The government monitored public expressions of opinion and used legal controls to impede the free expression of opinion and restrict individuals from engaging in public criticism of the government. The law forbids apostasy and blasphemy, which can carry the death penalty, although there were no recent instances of death sentences being carried out for these crimes (see section 1.a.). Statements that authorities construed as constituting defamation of the king, monarchy, governing system, or Al Saud family (including advocating for government reform) resulted in criminal charges. The government prohibits public employees from directly or indirectly engaging in dialogue with local or foreign media or participating in any meetings intended to oppose state policies.

The government detained many individuals for crimes related to their exercise of free speech during the year.

On February 16, the SCC Court of Appeals sentenced lawyer and activist Mut'ib bin Zafir al-Amri to seven years in prison for his peaceful media work and human rights activism, including critical tweets calling for reform, according to ALQST and Prisoners of Conscience. According to ALQST, al-Amri, who has been detained since 2018, was subjected to severe physical and psychological torture, including beatings and electric shocks.

In August the SCC Court of Appeals sentenced Nourah bint Saeed al-Qahtani to 45 years in prison for social media posts, according to DAWN. Arrested in July 2021, she was initially sentenced to 13 years' imprisonment, but the court lengthened it to 45 years after a prosecutor complained during her appeal that the original sentence was too lenient.

On January 17, the SCC Court of Appeals upheld an earlier two-year prison sentence against U.S.-Saudi citizens Salah al-Haidar and Bader al-Ibrahim for peacefully expressing their views, according to U.S.-based rights group The Freedom Initiative. The two were arrested in 2019 and sentenced in October 2021 to time served and a two-year travel ban. They remain under travel bans as of the year's end.

On October 17, Prisoners of Conscience and Sanad reported the SCC Court of Appeals overturned the acquittal of Yemeni journalist Marwan al-Muraisy and sentenced him to five years in prison. Al-Muraisy was held incommunicado since his arrest in early June 2018 until May 2019, when he was able to contact his family.

**Violence and Harassment:** Authorities subjected journalists, writers, and bloggers to violence, harassment, and intimidation during the year (see section 1.c., Prison and Detention Center Conditions). NGOs, academics, and the press claimed the government targeted journalists, writers, and bloggers using automated social media accounts to ensure that progovernment messages dominated social media trend lists and effectively silenced dissenting voices, accompanied by online harassment by progovernment accounts in some instances.

According to a November 2 Euro-Med Human Rights Monitor report, journalists within the country, as well as Saudi journalists who live and work outside of it, are subject to strict control over their work as they are unable to issue press or media reports or express views critical of government policies without facing prosecution and repression.

**Censorship or Content Restrictions for Members of the Press and Other Media, Including Online Media:** The law restricts printed materials; printing presses; bookstores; the import, rental, and sale of films; television and radio; foreign media offices and their correspondents; and online newspapers and journals. Media fall under the jurisdiction of the Ministry of Media. The ministry may permanently close "whenever necessary" any means of communication – defined as any means of expressing a viewpoint that is meant for circulation – that it deems is engaged in a prohibited activity, as set forth in the law.

Government policy guidance instructs journalists in the country to uphold Islam, oppose atheism, promote Arab interests, and preserve cultural heritage. The press law requires all online newspapers and bloggers to obtain a license from the ministry. The law bans publishing anything "contradicting sharia, inciting disruption, serving foreign interests that contradict national

Case 1:23-cv-00306-RBW   Document 31-4   Filed 08/16/24   Page 311 of 374

interests, and damaging the reputation of the grand mufti, members of the Council of Senior Religious Scholars, or senior government officials." On August 23, local media reported that the Council of Minsters approved a new tourism law that criminalizes any criticism of the country's tourism industry.

The law states that violators can face substantial fines for each violation of the law, which doubles if the violation is repeated. Other penalties include banning individuals from publishing any writing. While the Violations Considerations Committee in the Ministry of Media has formal responsibility for implementing the law, the Ministry of Interior, the CPVPV, and judges considered these issues regularly and exercised wide discretion in interpreting the law. It was unclear which of these institutional processes accords with the law.

Although unlicensed satellite dishes were illegal, there was no reporting of the government enforcing restrictions on them, and their use was widespread. Many foreign satellite stations broadcast a wide range of programs into the country in Arabic and other languages, including foreign news channels. Access to foreign sources of information, including via satellite dishes and the internet, was common. Foreign media and some privately owned satellite networks headquartered outside the country maintained local offices; they were subject to licensing requirements from the Ministry of Media and could not operate freely.

The government reportedly penalized those who published items counter to government guidelines and directly or indirectly censored media by licensing domestic media and by controlling importation of foreign printed material.

All newspapers, blogs, and websites in the country must be government licensed. The Ministry of Media must approve the appointment of all senior editors and has authority to remove them. The government provided guidelines to newspapers regarding controversial issues. The Saudi Press Agency reported official government news. The government owned most print and broadcast media and book publication facilities in the country, and members of the royal family owned or influenced privately owned and nominally independent operations, including various media outlets and widely circulated pan-Arab newspapers published outside the country. Authorities prevented or delayed the distribution of foreign print media covering issues considered sensitive, effectively censoring these publications.

The government censored published online and print material it considered blasphemous, extremist, racist, offensive, or inciting chaos, violence, sectarianism, or harm to the public order, as well as criticism of the royal family or its allies among the Gulf Arab states.

On July 25, Riyadh police arrested Egyptian TikToker Tala Safwan, according to the BBC and Al Jazeera.  In a statement, the police said they had arrested an Egyptian resident "who appeared in a broadcast on a social media site talking to another woman with sexual content and suggestiveness that could have a negative impact on public morality."

On October 8, authorities arrested Egyptian publisher Ahmed Diouf, who was taking part in the Riyadh International Book Fair.  His whereabouts remained unknown to his family and friends, according to *Middle East Eye*.

Online self-censorship was pervasive, as social media users were extremely cautious regarding what they posted, shared, or "liked," due to the threat of harassment or prosecution under broadly worded antiterrorism and other laws.  The government closely monitored and often targeted users who expressed support for minority rights or political reform, in addition to those who exposed human rights violations.  Social media users reportedly were reluctant to express support for outspoken activists who were detained or received prison sentences.  Questioning religious doctrine was strictly taboo, particularly content related to the Prophet Muhammad.

**Libel/Slander Laws:**  The cybercrimes law provides for a maximum penalty of one year's imprisonment for "defamation and infliction of damage upon others through the use of various information technology devices," including social media and social networks.  The government acted on this law.  Individuals charged were usually also charged with other provisions of the cybercrime law.

**National Security:**  Authorities abused the cybercrimes law and the counterterrorism law to restrict freedom of expression, including by prosecuting numerous individuals under these laws on charges related to statements made on social media and other exercises of freedom of expression.

On August 16, multiple media outlets reported that Salma al-Shehab, was sentenced to 34 years in prison by the SCC Court of Appeals, using the internet to "cause public unrest and destabilize civil and national security" (see section 1.d., Arbitrary Arrest or Detention).

## Internet Freedom

The Ministry of Media or its agencies must authorize all websites registered and hosted in the country.  The General Commission for Audiovisual Media has responsibility for regulating all audio and video content in the country, including satellite channels, film, music, internet, and mobile applications, independent from the Ministry of Commerce and Industry.  Internet access was widely available.

The press and publications law implicitly covers electronic media, since it extends to any means of expression of a viewpoint meant for circulation, ranging from words to cartoons, photographs, and sounds.  Laws, including the cybercrimes law, criminalize many internet-related activities, including defamation, hacking, unauthorized access to government websites, and stealing information related to national security as well as the creation or dissemination of a website for a terrorist organization.  Security authorities actively monitored internet activity, both to enforce laws, regulations, and societal norms and to monitor recruitment efforts by extremist organizations such as ISIS.  The government prosecuted individuals who used the internet to criticize government officials or religious authorities, or express support for terrorism, blasphemy, and apostasy.

The government reportedly collected information concerning the identity of persons peacefully expressing political, religious, or ideological opinions or beliefs online.  According to Freedom House, authorities regularly monitored nonviolent political, social, and religious activists and journalists in the name of national security and maintaining social order.

Between May and August, rights organizations reported that authorities arrested several prominent social media personalities, including Mansour al-Raqeeba, his father Ali al-Raqeeba, and Abu Bejad al-Harif for unknown reasons.  Ali al-Raqeeba was released in August.  No information was available on the charges against them or on the current status of the others arrested.

Access to the internet is legally available only through government-authorized internet service providers (ISPs).  The government required ISPs to monitor customers and required internet cafes to install hidden cameras and provide identity records of customers.  Although authorities blocked websites offering proxies, persistent internet users accessed the unfiltered internet via other means.

On many occasions, government officials and senior clerics publicly warned against inaccurate reports on the internet and reminded the public that criticism of the government and its officials should be done through private channels, including official complaint processes.

On January 17, the Public Prosecutor's Office issued a warning that "spreading rumors and lies about matters related to public order" is a serious crime, punishable by up to five years in prison, fines up to 3,000,000 Saudi riyals ($798,000), and confiscation of the devices and tools used.  It added that individuals in the kingdom who had participated in spreading rumors had been "summoned" and criminal charges were brought against them under the Anti-Cybercrimes Law and the Law of Criminal Procedures.  This announcement came after a cancelled concert in Riyadh led to online claims that young women were sexually harassed on their way home.  There was no information available regarding whether complaints were filed or whether, if filed, the allegations of sexual harassment were investigated or prosecuted.

The law criminalizes the publication or downloading of "offensive" websites, and authorities routinely blocked sites containing material perceived as harmful, illegal, offensive, or anti-Islamic. The governmental Communications and Information Technology Commission (CITC) filtered and blocked access to websites it deemed offensive, including sexual content, as well as pages calling for domestic political, social, or economic reforms or supporting human rights, including websites of expatriate Saudi dissidents.

In November 2021 the CITC proposed the Digital Content Platform Regulations.  The framework includes requirements for online content platforms to comply with content removal requests, local data protection legislation, and to obtain registration certificates from the CITC.

According to the Saudi Gazette, an English-language daily newspaper published in Jeddah, in July the government asked YouTube to remove ads the government called "inappropriate" because they were said to "contradict Islamic values and principles and violate media content regulations in the Kingdom."  There was no action taken as of November.

Several Voice over Internet Protocol call services, such as WhatsApp, remained blocked and only accessible using a virtual private network.  On April 17, Minister of Communications and Information Technology Abdullah al-Swaha said the government would continue blocking call facilities on apps that do not comply with regulatory and safety protocols in the country. Progovernment trolls reportedly took to "hashtag poisoning," a method of spamming a popular

Case 1:23-cv-00306-RBW    Document 31-4    Filed 08/16/24    Page 315 of 374

hashtag to disrupt criticism or other unwanted conversations through a flood of unrelated or opposing tweets.  Bots frequently shared identical messages.

The government published its first Personal Data Protection Law in September 2021.  The law, which regulates the collection, processing, storing, and transfer of data, states that the unlawful transfer of personal data outside the country can result in "criminal conviction and imprisonment."

The government continued to block some Qatari websites, such as *Bein Sports*.  The government also blocked access to the website of the Turkish public broadcaster TRT's Arabic edition.  Writing for blocked websites, providing them with materials to publish, or promoting alternative addresses to access them are crimes under the cybercrimes law.

### Restrictions on Academic Freedom and Cultural Events

The government restricted some public artistic expression but increasingly relaxed restrictions on cultural events dedicated to film, comics, music, and dance.

Academics reportedly practiced self-censorship, and authorities prohibited professors and administrators at public universities from hosting meetings at their universities with foreign academics or diplomats without prior government permission (see section 2.b., Freedom of Association).

On September 6, Sanad and Prisoners of Conscience reported that the SCC sentenced academics Mohammed al-Hazmi and Ali al-Alma'i to 23 years in prison for attending a gathering hosted by now-detained Sahwa cleric Awadh al-Qarni.  The two were arrested in a series of raids in Abha in July 2021, which targeted several academics.

## B. FREEDOMS OF PEACEFUL ASSEMBLY AND ASSOCIATION

The law provides for limited freedom of assembly and association, but the government did not respect these rights.

### Freedom of Peaceful Assembly

The law requires a government permit for an organized public assembly of any type. The government categorically forbids participation in political protests or unauthorized public assemblies, and security forces reportedly arrested and detained demonstrators. Security forces at times allowed a small number of unauthorized demonstrations throughout the country.

On August 31, online videos purportedly showing security forces attacking and beating girls protesting at an orphanage in Khamis Mushait went viral. In response, the governor of Asir province Prince Turki bin Talal bin Abdulaziz ordered the formation of a committee to investigate "all parties" of the incident and "refer the case to the competent authority." According to Prisoners of Conscience and DAWN, security forces intervened after the girls staged a sit-in demanding improvements to their conditions at the orphanage.

On August 31, Amnesty International called upon authorities to immediately release and drop all charges against 10 Egyptian men detained without charge after attempting to organize a remembrance event marking the 1973 Arab-Israeli war. On October 11, Amnesty International reported that Saudi Arabia's SCC sentenced the men to between 10 and 18 years in prison for organizing a peaceful remembrance event.

### Freedom of Association

The law provides for limited freedom of association, but the government strictly restricted this right. The law provides a comprehensive legal framework to govern and restrict the establishment, operation, and supervision of associations and foundations. The government prohibited the establishment of political parties. All associations must be licensed by the Ministry of Human Resources and Social Development and comply with its regulations. Groups that advocated changing elements of the social or political order reported their licensing requests went unanswered for years, despite repeated inquiries. The ministry reportedly used arbitrary means such as requiring unreasonable types and quantities of information to delay and effectively deny licenses to associations. Government-chartered associations limited membership only to citizens.

## C. FREEDOM OF RELIGION

See the Department of State's *International Religious Freedom Report* at **https://www.state.gov/international-religious-freedom-reports/**.

## D. FREEDOM OF MOVEMENT AND THE RIGHT TO LEAVE THE COUNTRY

The law does not prohibit internal movement, emigration, or repatriation of male citizens. The government imposed some restrictions on foreign travel.

**In-country Movement:** The government generally did not restrict the free movement of male citizens within the country. The guardianship system no longer requires a woman to have the permission of her male guardian (normally a father, husband, son, brother, grandfather, uncle, or other male relative) to move freely within the country (see section 6, Women). Following a 2020 court ruling in favor of women's right to live independently, judicial authorities amended the *taghayyub* (absenteeism) law to allow all unmarried, divorced, or widowed women to live alone without the consent of a male guardian. Previously, the law granted guardians the right to report the "unapproved absence" of anyone under their guardianship (see section 6, Women). Parents can still file disobedience cases against their children, male or female, including adult children. In parental disobedience cases, no evidence is required, and the case is referred to the court after a complaint is filed. Such cases can result in arrest and forcible return to the parent's home or imprisonment, even of adult women.

On July 5, ALQST and MENA Rights Group reported that Shaimaa al-Baqmi, a woman age 24, had been missing since April after her family filed a complaint against her for running away from the family home to live independently. Sources reportedly close to al-Baqmi claimed she was a victim of domestic violence and death threats. ALQST alleged authorities arrested her because her father reported that she had run away from home and accused her of unspecified matters affecting state security.

Authorities respected the right of citizens to change residence or workplace, provided they held a national identification card.

**Foreign Travel:** The government regularly restricts foreign travel, especially for human rights defenders, women's rights activists, and those perceived as critical of the government, as well as their families. In addition, travel documents allowing international travel are unavailable to the kingdom's tens of thousands of stateless residents.

The government reportedly confiscated passports for political reasons and revoked the rights of some citizens to travel, often without providing them notification or opportunity to contest the restriction. Courts regularly imposed travel bans as part of criminal sentencing, restricting an

individual's ability to leave the country after being released from prison. Travel bans reportedly were imposed against individuals being prosecuted for charges related to state security, corruption, labor, financial, or real estate disputes, in addition to other crimes.

Activists, media, and rights groups alleged the government used travel bans as part of a broader effort to suppress dissent. Activists estimated thousands of citizens were under travel restrictions, including released activists, relatives of citizens detained in the government's anticorruption campaign, and relatives of detained clerics and human rights activists. On February 26, Sanad reported that the number of citizens banned from traveling abroad exceeds 70,000, including entire families of detainees, activists, and opponents, in addition to members from the royal family and those close to them. On September 26, Amnesty International reported 40 documented cases of activists and human rights defenders sentenced after unfair trials with travel bans from five to 35 years. The group also noted 39 unofficial travel bans that affected their relatives.

On February 10, Amnesty International urged the government to lift the travel ban imposed on women's rights activist Loujain al-Hathloul and her parents, which the organization called arbitrary.

According to Amnesty, detained cleric Salman al-Odah, who is at risk of the death penalty, has had 19 of his family members subject to travel bans.

Citizens of both genders younger than 21 require a guardian's consent to travel abroad.

In March 2021 the government implemented reforms allowing most private-sector expatriate workers to obtain exit or reentry visas at the end of their work contract without their employer's permission. Expatriate domestic workers, however, still require employer approval to travel or depart the country. Foreign citizen workers under sponsorship require the sponsor's consent to travel abroad unless they resign and depart the country for good.

## E. PROTECTION OF REFUGEES

**Access to Asylum:** The government cooperated with the Office of the UN High Commissioner for Refugees (UNHCR) and other humanitarian organizations in providing protection and assistance to refugees, returning refugees, or asylum seekers, as well as other persons of concern. The law

provides that the "state will grant political asylum if public interest so dictates." Generally, there is not a codified asylum system for those fleeing persecution, and the country is not a party to the 1951 Refugee Convention. The government permitted refugees recognized by UNHCR to stay in the country temporarily, pending identification of a durable solution, including third-country resettlement or voluntary repatriation. The government generally did not grant asylum or accept refugees for resettlement from third countries, however. Government policy is to refuse refugee status to persons in the country illegally, including those who overstayed a pilgrimage visa. The government strongly encouraged persons without residency to leave, and it threatened or imposed deportation. Access to naturalization was difficult for refugees.

The government did not recognize the right of citizens to petition for access to asylum or refugee status in foreign countries. The law penalizes citizens who seek asylum in foreign countries.

**Refoulement:** Multiple media sources claimed the government had increased activities to arrest and deport undocumented migrants.

In a March 30 statement, International Organization for Migration (IOM) said that around 900 Ethiopians arrived back in Addis Ababa, the first contingent of some 100,000 nationals to be repatriated from Saudi Arabia following an agreement between the Governments of Ethiopia and Saudi Arabia. UNHCR has expressed concerns about their safety after being returned to Ethiopia.

In March *NBC News* reported that Saudi Arabia had increasingly cooperated with the Chinese government's requests to return Chinese Uyghurs. A 2022 Wilson Center report found that authorities deported at least six Uyghurs to China in the last four years who were either making pilgrimage to Mecca or living in the country legally. (See Section 1.b., Disappearance, for details regarding a case of four detained Uyghurs facing deportation.)

On September 23, the *Middle East Eye* reported that authorities arrested and handed over to the Egyptian government Egyptian dissident Ayman Shohoum, 61, after an Egyptian court issued a life sentence in absentia against him and an Interpol arrest notice was issued. According to his son, authorities deported Shohoum to Egypt on September 20, after nearly four months in prison in Saudi Arabia.

**Abuse of Migrants and Refugees:** In a March 30 statement, IOM estimated that approximately 750,000 Ethiopians were residing in Saudi Arabia with as many as 450,000 likely to have travelled

to the country through irregular means. IOM reported these individuals need help to return home. On May 6, the *Middle East Eye* reported that Ethiopian migrants held in deportation centers around the country were subject to being beaten, extorted, and left in unsanitary, overcrowded rooms. The reports added that migrants were not provided beds or sufficient food and were denied medical care.

Migrants attempting to reach Saudi Arabia via Yemen reportedly faced significant dangers, including from the ongoing conflict. A letter from the UN Office of the High Commissioner for Human Rights (OHCHR), addressed to the Saudi Government and released to the public in December 2022, listed allegations of migrant abuse perpetrated by Saudi security forces, including killings, torture, arbitrary detention, and sexual abuse.

The letter cited reports suggesting that Saudi forces may be "pursuing a policy of excessive use of firearm force to stop and deter migrants from crossing the Saudi-Yemeni border."

The letter referred to information suggesting that Saudi security forces killed approximately 430 migrants and injured 650 others in cross-border shelling and shooting between January and April 30, 2022. The UN letter listed 16 incidents where Saudi security forces were alleged to have fired artillery at migrants en route in the Ar Raqw area and the mountains of al-Ghar in Monabbih district, and Thabit, Qatabir district in Yemen, and the border area of the Red Valley, Saudi Arabia, the two main crossing points from Yemen into Saudi Arabia.

The letter also cited accounts of sexual abuse, including reports that girls as young as 13 were raped by Saudi security forces and pushed back across the border into Yemen without their clothes.

OHCHR invited the Saudi government to respond to the allegations, but as of the end of 2022, it had not done so. OHCHR sent a similar letter to the Houthi leadership in Yemen, which also had not responded by year's end.

NGO Mwatana for Human Rights also documented allegations of security force involvement in injuring and killing migrants, mainly Yemenis and Ethiopians, including eyewitness allegations of migrant bodies abandoned at the border and accounts from survivors of arbitrary detention and torture. Mwatana reported that on May 12, bodies of Yemeni and Ethiopian migrants were discovered piled near an informal detention facility in southern Saudi Arabia (see Section 1.a.,

8/16/24, 10:31 AM
Case 1:23-cv-00306-RBW Document 31-4 Filed 08/16/24 Page 321 of 374
Saudi Arabia - United States Department of State 2022 Country Reports on Human Rights Practices/saudi-arabia/

Extrajudicial Killings). It was unclear in these reports which organizations or units were responsible for the reported attacks and abuse.

As of the end of the year, the Saudi government was restricting access to the Saudi side of the border, limiting the UN and NGOs' ability to investigate the reports.

On December 16, Amnesty International said in a statement that since 2017, Saudi authorities have forcibly returned hundreds of thousands of Ethiopian migrants crossing the border from Yemen or residing in Saudi Arabia to Ethiopia after arbitrarily detaining them for up to 18 months in inhuman and cruel conditions, denying them adequate medical care and subjecting them to torture and other ill-treatment leading to deaths in custody. It called upon authorities to urgently investigate cases of torture and deaths.

**Employment:** Refugees and asylum seekers were generally unable to work legally, although Syrian and Yemeni citizens who possessed a temporary visa could obtain a visitor card from the Ministry of Interior, which reportedly allows them to work. The renewable permits are valid for up to six months and tied to the validity period of their temporary visas; men between the ages of 18 and 60 were eligible to apply.

Most of the Rohingya refugees in the country lack proper documentation. They are unable to get residency permits, a requirement to work legally in the kingdom.

**Access to Basic Services:** The government provides preferential access to education, health care, public housing, and other social services to citizens and certain legal residents. The UNHCR office in Riyadh provided a subsistence allowance covering basic services to a limited number of vulnerable families, based on a needs assessment. Authorities worked with the local UNHCR office to provide medical treatment, also following a needs assessment. The government provided COVID-19 vaccines at no cost to all citizens and residents, regardless of legal status.

## F. STATUS AND TREATMENT OF INTERNALLY DISPLACED PERSONS

Not applicable.

## G. STATELESS PERSONS

8/16/24, 10:31 AM
Case 1:23-cv-00306-RBW Document 31-4 Filed 08/16/24 Page 322 of 374
Saudi Arabia - United States Department of State / 2022 Country Reports on Human Rights Practices/saudi-arabia/

The country has several groups of habitual residents who were legally stateless, but data on the stateless population was incomplete and scarce.

Citizenship is generally derived only from the father. The law approves acquisition of the original nationality by way of descent through the mother, as an exception, when the mother is a Saudi at the time of birth of the baby and the baby's father is of unknown nationality or no nationality. Children born to an unmarried citizen mother who is not legally affiliated with the citizen father may be considered stateless, even if the father recognized the child as his. If the government did not authorize the marriage of a citizen father and a noncitizen mother prior to birth of the children, they may also be considered stateless.

The nationality laws do not allow Saudi women married to foreign citizens to pass their nationality to their children, except in certain circumstances as noted above. Children of Saudi women married to foreign spouses receive permanent residency, but their residency status is revocable in the event of the death of the Saudi mother. Sons of citizen mothers and noncitizen fathers may apply for citizenship once they turn 18 (if not already granted citizenship at birth under certain circumstances); daughters in such cases can obtain citizenship only through marriage to a Saudi man. A child may lose legal identification and accompanying rights if authorities withdraw identification documents from a parent (possible when a naturalized parent denaturalizes voluntarily or loses citizenship through other acts). The personal status law does not cover the rights of Saudi women to marry foreigners; in this and other cases not specifically covered by the law, judges make decisions regarding family matters based on their own interpretations of Islamic law.

Foreign male spouses of female citizens can obtain permanent residency in the country without needing a sponsor, and they can receive free government education and medical benefits, although in general they cannot apply for citizenship based on their marriage and residence. These spouses are also included in the quota of Saudis employed in private companies under the labor quota system, which improves their employment prospects.

Female citizens must be between the ages of 30 and 50 to marry a non-Saudi man. Male citizens must be between the ages of 40 and 65 to marry a non-Saudi woman. The extent to which those laws were enforced was unclear.

8/16/24, 10:31 AM    Saudi Arabia - United States Department of State / 2022 Country Reports on Human Rights Practices / saudi-arabia/

Case 1:23-cv-00306-RBW   Document 31-4   Filed 08/16/24   Page 323 of 374

In past years the United Nations unofficially estimated there were 70,000 stateless persons in the country, almost all of whom were native-born residents known as *Bidoon* (an Arabic word that means "without" [citizenship]). Updated information on stateless persons was not available. Bidoon are persons whose ancestors failed to obtain nationality during the reign of the country's founder, King Abdulaziz, such as descendants of nomadic tribes not counted among the native tribes, descendants of foreign-born fathers who arrived before there were laws regulating citizenship, and rural migrants whose parents failed to register their births. As noncitizens, Bidoon are unable to obtain passports. The government sometimes denied them employment and educational opportunities, and their marginalized status made them among the poorest residents of the country. In recent years the Ministry of Education encouraged Bidoon children to attend school. The government issues Bidoon five-year residency permits to facilitate their social integration in government-provided health care and other services, putting them on similar footing with sponsored foreign workers. The Jawazat (General Directorate of Passports) issued special identification cards to Bidoon like residency permits issued to foreigners in the country, but with features entitling their holders to additional government services similar to those available to citizens.

Some Baloch, West African, and Rohingya Muslims resident in Saudi Arabia were stateless. Some Rohingya had expired passports that Burma or other countries refused to renew. Others had entered the country with fraudulent travel documents and some of them were subsequently detained for years. UNHCR estimated there were 280,000 Rohingya in the country. Some of these individuals benefited from a prior program to correct their residency status; in 2014 the government issued nearly 200,000 four-year residency permits to Rohingya who entered the country prior to 2008. Rohingya who arrived in the country after 2008 were not eligible for residency permits, although NGOs reported that Rohingya, including those without legal residency, were generally not subject to deportation. In February, the Jawazat announced that Burmese residents could renew their residency permits through the online service portal *Absher*.

There were also between 300,000 and 400,000 Palestinians living in the country who were not registered as refugees.

---

Section 3.
# Freedom to Participate in the Political Process

Case 1:23-cv-00306-RBW Document 31-4 Filed 08/16/24 Page 324 of 374
2022 Country Reports on Human Rights Practices: Saudi Arabia | United States Department of State

The law does not provide citizens the ability to choose their national government in free and fair periodic elections held by secret ballot and based on universal and equal suffrage; it establishes an absolute monarchy led by the Al Saud family as the political system. The Allegiance Council, composed of up to 34 senior princes appointed by the king, is formally responsible for selecting a king and crown prince upon the death or incapacitation of either. Only select members of the ruling family have a voice in the choice of leaders, the composition of the government, or changes to the political system.

The law provides citizens the right to communicate with public authorities on any matter and establishes the government on the principle of *shura* (consultation). The king and senior officials, including ministers and regional governors, are required to be available through *majlis*, open-door meetings where any male citizen or noncitizen may express an opinion or a grievance without an appointment. Senior leaders were typically unavailable to the public, but their representatives or lower-level officials continued this traditional practice. Officials may also be reached through written petitions, such as an appeal of decisions from the legal system.

## ELECTIONS AND POLITICAL PARTICIPATION

**Recent Elections:** In 2015 elections were held for two-thirds of the 3,159 seats on 284 municipal councils; the government appointed the remaining third. Council members serve until the next election – nominally for four-year terms – but there was no public announcement of conducting municipal elections during the year. Women were allowed to vote and run as candidates for the first time in 2015. The voting age was also lowered to 18. The Ministry of Municipal and Rural Affairs actively encouraged women's participation in the municipal elections. Election regulations prohibited candidates from contesting under party affiliation. Twenty-one women won seats, and 17 were appointed to seats, totaling approximately 1 percent of all available seats.

**Political Parties and Political Participation:** There were no political parties or similar associations. The law does not protect the right of individuals to organize politically and specifically bans several organizations with political wings, including the Muslim Brotherhood, as terrorist groups. The government continued to regard human rights organizations, such as the Saudi Civil and Political Rights Association, as illegal political movements and treated them accordingly.

**Participation of Women and Members of Minority Groups:** The law permits women and men to engage in political activities on an equally limited basis. Women may vote and run for office in municipal elections and serve on the Shura council. Women served in a small number of senior positions within government ministries. There was no specific law that prevented lesbian, gay, bisexual, transgender, queer, or intersex (LGBTQI+) persons from voting or running for office but no openly LGBTQI+ individual has run for office.

On January 30, Dr. Leila bint Hamad al-Kassem became the first female undersecretary in the Ministry of Islamic Affairs, Dawah, and Guidance.  On February 9, Fatima al-Tuwaijri was appointed as assistant to the general president for women's affairs at the Prophet's Mosque in Medina, and on July 31, the General Presidency for the Affairs of the Grand Mosque and the Prophet's Mosque appointed three women as female undersecretaries and assistant undersecretaries for the first time.  In July local media reported the appointment of two women to senior positions in government:  Shihana Alazzaz became the first female deputy secretary general of the cabinet and Princess Haifa bint Mohammed Al Saud was appointed deputy minister of tourism.  On March 25, the Ministry of Interior opened admission and registration for females to join the Border Guards at the rank of private.  On September 23, Dr. Hala al-Tuwaijri was appointed as the first woman head of the Human Rights Commission, with the rank of minister.

In September local media reported that the Ministry of Education appointed three female directors to lead the education offices that supervise boys' and girls' schools in Riyadh province. There were no women on the High Court or Supreme Judicial Council and only one female judge. There are no women public prosecutors.

No laws prevent male citizens from minority groups from participating in political life on the same basis as other male citizens. Societal discrimination, however, marginalized the Shia Saudi population, and tribal factors and long-standing traditions continued to dictate many individual appointments to positions. Government authorities were unlikely to appoint a Bedouin tribesman to a high-ranking ministerial-level position or the senior-most positions in the armed forces.

While the religious affiliation of Shura Council members was not known publicly, the council included an estimated seven or eight Shia members out of 150 members. In January a royal order relieved the only Shia member of the Council of Ministers, Mohammad bin Faisal Abu Saq, of his

8/16/24, 10:31 AM
Case 1:23-cv-00306-RBW Document 31-4 Filed 08/16/24 Page 326 of 874
2022 Country Reports on Human Rights Practices: Saudi Arabia | United States Department of State

position and appointed him as a Royal Court Advisor. Multiple municipal councils in the Eastern Province, where most Shia Saudis resided, had large proportions of Shia Saudis as members to reflect the local population, including a majority in Qatif and 50 percent in al-Hassa.

---

Section 4.
# Corruption and Lack of Transparency in Government

The law provides criminal penalties for official corruption, and the government generally implemented the law effectively. Nazaha (the National Control and Anticorruption Commission) has sole authority to investigate and prosecute reports of corruption involving government employees. Nazaha's ministerial-level director reports directly to the king. Human rights organizations criticized the government for using anticorruption campaigns as a pretext to target political opponents and for arbitrarily detaining and abusing individuals targeted in the crackdown (see sections 1.c.; 1.d., Pretrial Detention; and 1.e., Threats, Harassment, Surveillance, and Coercion).

**Corruption:** Nazaha conducted countercorruption campaigns throughout the year. It published monthly (based on the lunar Hijri calendar) reports of its activities, providing the overall number of investigations and arrests during the prior month and a list of the government ministries or agencies involved. It periodically published limited details concerning convictions in cases that involved either senior-level officials or large sums of money; however, the press releases did not identify the officials by name or provide enough details to allow identification.

Throughout the year Nazaha provided periodic updates on arrests of individuals on corruption related charges, including bribery, abuse of power, and forgery. For example, on December 26, Nazaha stated that it arrested 170 persons accused of bribery, forgery, abuse of authority, and money laundering, and investigated 437 for crimes between November 25 and December 24, noting that many of the 170 detainees were released on bail.

On December 27, Prisoners of Conscience reported that a court issued a 25-year prison sentence against the former Director of Public Security Lieutenant General Khaled bin Qarar al-Harbi on

charges of corruption and abuse of power.  On September 7, 2021, a royal decree removed al-Harbi from his position and referred him for investigation by Nazaha over corruption charges.

---

## Section 5.
# Governmental Posture Towards International and Nongovernmental Investigation of Alleged Abuses of Human Rights

The law provides that "the State shall protect human rights in accordance with Islamic sharia."  Nevertheless, the government restricted the activities of domestic and international human rights organizations.

The government often cooperated with and sometimes accepted recommendations of the quasi-governmental NSHR, the sole government-licensed domestic human rights civil society organization.  The NSHR accepted requests for assistance and complaints regarding government actions affecting human rights.  The government blocked websites of unlicensed local human rights groups and charged their founders with founding and operating unlicensed organizations (see 2.b., Freedom of Association).

The government did not allow international human rights NGOs to be based in the country and restricted their access to the country for visits; there were no transparent standards governing visits by international NGO representatives.  International human rights and humanitarian NGOs reported the government was at times unresponsive to requests for information and did not establish a clear mechanism for communication with NGOs on both domestic human rights issues and issues relating to the conflict in Yemen.

**The United Nations or Other International Bodies:**  The Human Rights Council (UNHRC) included the country in a report published on September 14, 2022, as one of several countries under allegation of subjecting persons who cooperate with the United Nations and its mechanisms in the field of human rights to intimidation and reprisal.  The report cited the case of Loujain al-Hathloul, who engaged with the United Nations Committee on the Elimination of Discrimination against Women in March 2018 before being sentenced in 2020 on national security-related charges.  Although al-Hathloul was released from prison in February 2021, the

Case 1:23-cv-00306-RBW Document 31-4 Filed 08/16/24 Page 328 of 874

UNHRC cited reports that al-Hathloul was under close surveillance and that she and her family were under a travel ban.

**Government Human Rights Bodies:**  The government had mechanisms mandated to investigate and punish human rights abuses, but their effectiveness was limited.  The HRC is part of the government and requires permission from the Ministry of Foreign Affairs before meeting with diplomats, academics, or researchers with international human rights organizations.  The HRC president has ministerial status and reports to the king.  The HRC worked directly with the Royal Court and the Council of Ministers, with a committee composed of representatives of the Shura Council and the Ministries of Labor and Social Development and Interior, and with the Shura Council committees for the judiciary, Islamic affairs, and human rights.

During the year the HRC and NSHR were sometimes outspoken in areas deemed less politically sensitive, including combatting child abuse, child marriage, and trafficking in persons.  While they avoided topics such as protests or cases of political activists that would require directly confronting government authorities, they inquired into complaints of mistreatment by some high-profile political prisoners.  The 18 full-time members of the HRC board included eight women and at least two Shia members; they received and responded to individual complaints, including those related to persons with disabilities, religious freedom, and women's rights.

The Shura Council's Human Rights Committee also actively followed cases and included women and Shia among its members.

The HRC and NSHR maintained records of complaints and outcomes, but privacy laws protect information concerning individual cases, and information was not publicly available.

The Board of Grievances, a high-level administrative judicial body that hears cases against government entities and reports directly to the king, is the primary mechanism to seek redress for claims of abuse.  During the year the Board of Grievances held hearings and adjudicated claims of wrongdoing, but there were no reported prosecutions of security force members for human rights violations.  Military and security courts investigated an unknown number of abuses of authority and security force killings.  The HRC, in cooperation with the Ministry of Education, provided materials and training to police, other security forces, the Ministry of Defense, and the CPVPV on protecting human rights.

Citizens may report abuses by security forces at any police station or to the HRC or NSHR. Citizens and residents could also submit complaints regarding illegal detention or violations of detainee to the Public Prosecutor's office by using the Ma'akom system, or via the online platform *Absher*, a hotline telephone number, or in person.  (See Administration in section 1.c., Prison and Detention Center Conditions).

## Section 6.
# Discrimination and Societal Abuses

## WOMEN

**Rape and Domestic Violence:** Rape is a criminal offense under sharia with a wide range of penalties, from flogging to execution. The law does not recognize spousal rape as a crime. The government enforced the law based on its interpretation of sharia, and in some cases, courts punished victims as well as perpetrators for illegal "mixing of genders," even when there was no conviction for rape. Survivors must prove that a rape was committed, and a woman's testimony in court was not always accepted.

Due to these legal and social obstacles, authorities brought few cases to trial. Statistics on incidents of, and prosecutions, convictions, or punishments for rape were not available. Most rape cases were likely unreported because survivors faced societal and familial reprisal, including diminished marriage opportunities, criminal sanctions including imprisonment, or accusations of adultery or sexual relations outside of marriage, which are punishable under sharia. There were reports that domestic abuse in the form of incest occurred but was seldom reported to authorities due to fears of societal repercussions, according to local sources.

The law against domestic violence defines domestic abuse broadly and criminalizes domestic abuse with penalties of one month to one year of imprisonment or a fine unless a court provides a harsher sentence.

Researchers stated it was difficult to gauge the magnitude of domestic abuse, which they believed to be widespread. Recent studies varied widely, finding the rate of domestic abuse among women to be anywhere between 15 to 60 percent. On November 27, the HRC tweeted that one in three women in Saudi Arabia have experienced physical or sexual violence. The

Case 1:23-cv-00306-RBW   Document 31-4   Filed 08/16/24   Page 330 of 374

National Family Safety Program, a quasi-governmental organization under the Ministry of National Guard, is charged with spreading awareness of and combatting domestic violence, including child abuse, and continued to report abuse cases.

Officials stated the government did not clearly define domestic violence and procedures concerning cases, including thresholds for investigation or prosecution, and thus enforcement varied from one government body to another. Some women's rights advocates were critical of investigations of domestic violence, claiming investigators were hesitant to enter a home without permission from the male head of household, who may also be the perpetrator of violence. Activists reported the situation had improved in recent years, with greater awareness of resources for domestic violence survivors, such as the domestic violence hotline managed by the Ministry of Human Resources and Social Development. They also noted a continued increase in authorities' willingness to investigate and prosecute domestic violence perpetrators, but they expressed concern that some police departments continued to neglect domestic violence cases.

In April police arrested two men, one in Jeddah and the other in Riyadh, for physically abusing their wives and children, according to media. No further information was available on the case as of year's end.

The government made some efforts to reduce domestic violence. The Ministry of Human Resources and Social Development administered government-supported family protection shelters, although women reported that remaining in the shelters was not always voluntary.

**Female Genital Mutilation/Cutting (FGM/C):** The official government interpretation of sharia prohibits the practice; however, some studies indicated up to 18 percent of women reported having undergone some type of FGM/C.

**Sexual Harassment:** The extent of sexual harassment was difficult to measure, with little media reporting and no official government data. No statistics were available on the incidence of sexual harassment due to reluctance to report violations.

In January 2021 the Council of Ministers approved an amendment to the anti-harassment law that allows for the public release of names of those convicted for harassment, as a deterrent and to prevent offenders' employment in certain jobs. The law criminalizing sexual harassment carries a maximum penalty of five years in prison and a substantial fine. The HRC stated that a

legal punishment against sexual harassment is irreversible, even if the victim renounced his or her own rights or did not file a legal complaint.

On January 9, according to local media, the Criminal Court in Medina sentenced a man convicted of sexual harassment to his identity being publicly revealed, in addition to an eight-month prison term and a fine of 5000 Saudi riyals ($1,330), for harassing a woman using obscene remarks.

Local media reported several incidents of harassment during the year. On January 9, Mecca police arrested a man seen in a video deliberately driving his car into another car driven by a woman. The accused was referred to the Public Prosecutor's Office, but no further information was available on the case at year's end.

In April 2021 the HRC launched a specialized group for confidential support of victims of sexual harassment and their families with psychological counseling and educational, social, and legal guidance.

On December 17, *Middle East Eye* reported that the MDL Beast Soundstorm music festival in Riyadh saw many incidents of harassment of women, who took to social media to voice their stories and complaints.

**Reproductive Rights:** There were no reports of coerced abortion or involuntary sterilization on the part of government authorities.

Premarital sex is illegal under sharia law, and hospitals and health centers may report extramarital pregnancies to police, including pregnancies that result from rape. Access to most contraceptives required a prescription, but condoms were available at pharmacies and supermarkets for over-the-counter purchase. Emergency contraceptives reportedly were available.

Almost all women had access to skilled health attendants during pregnancy and childbirth. The most recent UN Population Fund estimates reported that skilled health personnel attended 99 percent of births between 2004 and 2020. While some women in rural areas had to travel to the closest medical facility to receive treatment, others received health services from Ministry of Health-sponsored mobile health clinics. According to the government, women are entitled to medical assistance during pregnancy and delivery; the right to decide the details of their deliveries; and obtain maternity care in a language she understands and is appropriate to her

cultural and religious beliefs. Adult women, including unmarried women, also have the right to consent to any medical procedures.

Governmental and quasi-governmental agencies provided medical care to sexual violence survivors as well as psychological and social support. The Ministry of Human Resources and Social Development's Center for Protection Against Abuse runs a 24-hour hotline and shelters across the country with access to medical care for victims of sexual violence, while the quasi-governmental National Family Safety Program agency provided medical support to sexual abuse victims. There were some reports that domestic workers in areas outside of the major cities had more limited access due to language barriers. There were reportedly emergency contraceptives and Post-Exposure Prophylaxis available for survivors, but information was not available on whether they could easily be obtained. (See sections 2.g. and 6, Children, for issues related to legal status for children born outside of marriage.)

**Discrimination:** Women continued to face discrimination under law and custom. A series of regulations issued from 2019 through year's end, however, granted women many of the same rights as men pertaining to travel abroad, civil status, and employment.

Most restrictions under the guardianship system, which had required women to have permission from close male relatives to conduct certain actions, were eliminated. There were reports, however, that government and nongovernment entities, primarily in rural areas, continued to require women to obtain guardian permission prior to providing services.

Women older than 18 have the right to perform several actions pertaining to civil status that were previously limited to men. These included registering the birth of a child; registering the death of a spouse or close relative; registering a marriage or divorce (whether initiated by the husband or wife); and being designated "head of household," thereby allowing women to serve as the guardian of their minor children. Women can also obtain from the Civil Status Administration a "family registry," which is official documentation of a family's vital records that verifies the relationship between parents and children. This reform allows mothers to perform administrative transactions for their children, such as registering them for school or obtaining services at a hospital.

In June 2021 judicial authorities amended the absenteeism law, or *taghayyub*, to allow all unmarried, divorced, or widowed women to live alone without the consent of a male guardian.

Under the previous absenteeism law, guardians could report the unauthorized absence of anyone under their guardianship, which could lead to the arrest, detention, or forcible return of the individual.

In July 2021 authorities ended the male guardian requirement for women to participate in the annual pilgrimage.

Adult women may legally own property and are entitled to financial support from their husbands or ex-husbands. They can make their own determinations concerning hospital care and no longer need a male guardian's permission to start a business.

By law women have equal rights to employment. In January 2021 the Ministry of Human Resources and Social Development banned employee discrimination based on race, color, gender, age, or disability, citing reforms to human resources laws.

In August the Ministry of Education allowed women to teach boys in the fourth grade in the private and foreign education sector for the first time, starting from the academic year of 2022-2023 in the Jeddah governorate, only on an experimental basis. In 2019, the ministry allowed women to teach boys up to the third grade in public schools for the first time.

According to the General Authority for Statistics' labor market survey, Saudi women's employment-to-population ratio rose to 29.4 percent in the third quarter of the year. The Ministry of Human Resources and Social Development said the percentage of women in senior and middle management positions rose to 45 percent by the third quarter. As of September, women were 37 percent of the workforce, according to the General Authority for Statistics. On September 17, the Shura Council called on the ministry to ensure equal opportunities in employing females and males.

Women no longer require a guardian's permission to exit prisons after completing their terms.

The law permits women to transmit citizenship to their children under certain circumstances (see section 2.g. and section 6, Children). The country's interpretation of sharia prohibits Muslim women from marrying non-Muslims, but Muslim men may marry non-Muslim women. Women require government permission to marry noncitizens; men must obtain government permission if they intend to marry citizens from countries other than Gulf Cooperation Council-member states (Saudi Arabia, Bahrain, Kuwait, Oman, Qatar, and the United Arab Emirates). Regulations

2022 Country Reports on Human Rights Practices: Saudi Arabia | U.S. Department of State https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/saudi-arabia/

prohibit men from marrying women from Bangladesh, Burma, Chad, and Pakistan. The government additionally requires men wishing to marry a second wife who is a foreigner to submit documentation attesting to the fact that his first wife was disabled, had a chronic disease, or was sterile.

Cultural norms selectively enforced by managers of state institutions continue to require women to wear an abaya (a loose-fitting, full-length cloak) in public. Female foreigners, like all males, were only required to dress "modestly."

Women have begun practicing law, but almost all judges are male. In divorce proceedings, women must demonstrate legally specified grounds for divorce, but men may divorce without giving cause, citing "irreconcilable differences." In doing so, men must pay immediately an amount of money agreed at the time of the marriage that serves as a one-time alimony payment. Men may be forced, however, to make subsequent alimony payments by court order. The government began implementing an identification system based on fingerprints, designed to provide women more access to courts, even if they chose to cover their faces with the *niqab* (facial veil) covering.

In 2020 the Justice Ministry ended the so-called secret divorce, whereby men could divorce their wives without the woman's consent or knowledge. The ministry also canceled an article in the marriage law that gave a husband the right to force his wife to return to her home against her will.

A woman still needs a male guardian's permission to marry or must seek a court order in the case of *adhl* (male guardians refusing to approve the marriage of women under their charge). In such cases the judge assumes the role of the guardian and may approve the marriage. During the year, courts regularly executed marriage contracts for women whose male guardians refused to approve their marriage, according to informed judicial sources quoted by local media.

On March 8, the Council of Ministers passed the Personal Status Law, which took effect in June. On March 10, Minister of Justice Walid al-Samaani stated the law consolidates the rights of women, especially the right to custody of children. In the announcement of the new law, the crown prince said the law controls the discretionary power of the judge to limit the discrepancy of judicial rulings in this regard. Nonetheless, an Amnesty International statement on December 9 said the law codifies problematic practices inherent in the male guardianship system including

the requirement of the guardian's permission to marry and granting the legal guardianship of minor children (separate from the physical custody of the children) to the man in the event of divorce.

Courts routinely awarded custody of children when they attain a specified age (seven years for boys and nine years for girls) to the divorced husband or the deceased husband's family in cases when the couple was divorced or the father died. In some cases former husbands reportedly prevented divorced noncitizen women from visiting their children. Under the new Personal Status Law, divorced women can travel with their children if they have a custody deed, according to the Jawazat. Minister of Justice Walid al-Samaani said there is a provision in the new law that unequivocally emphasizes a right of the mother for the custody of children, while in the past this provision was not legally binding.

In April U.S. citizen Carly Morris posted tweets stating that her Saudi ex-husband was using the guardianship system to block the daughter's ability to return home to the United States even when Morris was the custodial parent. In September prosecutors opened an investigation that could lead to formal criminal charges against Morris for "disrupting the public order." According to Human Rights Watch, Morris believed the charges were related to her tweets. According to multiple media reports, Morris was detained by Saudi authorities on November 6 and released on November 8.

Sharia-based inheritance laws discriminate against women, giving daughters one-half the inheritance awarded to their brothers.

According to recent surveys, women constituted 52 percent of public education and higher education students. Segregated education through the university level was standard. Some private universities, such as Faisal University, offered partially segregated classes with students receiving instruction from the same teacher and able to participate together in class discussion, but with the women and men physically separated by dividers. A few other government universities offered coeducation in selected programs, largely in the sciences. Private international and national schools may offer coeducation at any grade; most private international schools are coeducational, while most private national schools are segregated. Primary public schools offered mixed-gender education up to the third grade.

## SYSTEMIC RACIAL OR ETHNIC VIOLENCE AND DISCRIMINATION

Case 1:23-cv-00306-RBW   Document 31-4   Filed 08/16/24   Page 336 of 374

Although racial discrimination is illegal, societal discrimination against members of national, racial, and ethnic minorities was a problem. Descendants of former slaves in the country, who have African lineage, faced discrimination in both employment and society. There was formal and informal discrimination, especially racial discrimination, against foreign workers from Africa and Asia. There were also reports of discrimination based on tribal or nontribal lineage. The Personal Status Law abolished the custom of forbidding marriage between Saudis that were members of tribes and Saudis that were not tribal members. A tolerance campaign by the King Abdulaziz Center for National Dialogue sought to address discrimination, and it provided training during the year to combat discrimination against national, racial, or ethnic groups.

## CHILDREN

**Birth Registration:** Citizenship generally derives from the father, and both the father and mother may register a birth. There were cases of authorities denying public services to children of citizen parents, including education and health care, because the government failed to register the birth entirely or had not registered it immediately, sometimes because the father failed to report the birth or did not receive authorization to marry a foreigner. Children of women who were married to foreign spouses receive permanent residency, but their residency status is revocable in the event of the death of the Saudi mother (see section 2.g., Stateless Persons). In June 2021 the social security administration announced children from foreign fathers and Saudi mothers will be allowed to benefit from their mother's pension, if she is widowed or divorced. The Saudi Citizenship Law issued in 1954 and amended in 1960 states that individuals born inside or outside the kingdom from a Saudi father, or Saudi mother and unknown father, or born inside the kingdom from unknown parents are considered Saudis.

**Child Abuse:** Child abuse is a crime punishable by one year's imprisonment, a maximum fine of 50,000 Saudi riyals ($13,300), or both. The National Family Safety Program operated a helpline dedicated to assisting children in matters ranging from bullying to abuse, providing counseling, tracking, and referrals to social services. On March 30, the HRC reported the Saudi Child Helpline received over 8,000 calls in 2021. The Ministry of Human Resources and Social Development had 17 social protection units across the country providing social protection to children younger than 18, as well as other vulnerable populations suffering domestic violence and abuse.

On May 5, Najran police said a girl was abused by a family member and reported that legal action was taken against the perpetrator and the girl was referred to competent authorities.

8/16/24, 10:31 AM
Case 1:23-cv-00306-RBW Document 31-4 Filed 08/16/24 Page 337 of 874
2022 Country Reports on Human Rights Practices: Saudi Arabia | United States Department of State

**Child, Early, and Forced Marriage:** Article (9) of the Personal Status Law states that the minimum age for marriage is 18; those younger than that age may marry only with court approval. According to local media, the court ensures several conditions are met before approving a marriage contract for a bride or groom younger than 18, including assessing their psychosocial development and hearing statements from the potential bride, groom, and guardians to determine consent. The HRC and NSHR monitored cases of child marriages, which they reported were rare or at least rarely reported, and took steps to prevent consummation of such marriages. The application for a marriage license must record the bride's age, and registration of the marriage is a legal prerequisite for consummation.

**Sexual Exploitation of Children:** The cybercrimes law stipulates that punishment for such crimes, including the preparation, publication, and promotion of material for pornographic sites, may be no less than two and one-half years' imprisonment or a substantial fine if the crime includes the exploitation of minors. The law does not define a minimum age for consensual sex.

On June 26, Riyadh police announced they arrested and referred to the Public Prosecutor's Office a man who appeared in an online video sexually abusing an infant. The statement said the video impinged on public morals and personal privacy and abused children's rights.

## ANTISEMITISM

There were no known data on Jewish citizens and no statistics available concerning the religious denominations of foreigners.

Cases of government-employed imams using antisemitic language in their sermons were generally rare but occurred more frequently during periods of conflict between Palestinians and Israelis. During the year, the Ministry of Islamic Affairs issued periodic circulars to clerics and imams in mosques directing them to include messages on the principles of justice, equality, and tolerance, and to encourage rejection of bigotry and all forms of racial discrimination in their sermons.

In its annual report on education in the country published in June, the Institute for Monitoring Peace and Cultural Tolerance in School Education noted that the government continued to make progress in removing antisemitic content from textbooks, though it noted that some problematic

content remained. According to the report, Israel was still omitted from maps in textbooks, and Zionism is still described as "racist."

In May the government funded Muslim World League convened the first-ever Forum on Common Values among Religious Followers in Riyadh, which was attended by Muslim, Christian, Jewish, Hindu, and Buddhist religious leaders. According to Arab News, the founding of the forum was based on Islamic teachings that call for dialogue and working together and the common values that help to ensure peaceful coexistence in a diverse world.

On July 8, Sheikh Muhammad al-Issa, Secretary General of the Muslim World League, delivered the Arafat sermon, a major sermon delivered at the climax of the Hajj pilgrimage and viewed by millions around the world, which led to social media backlash against him. Under a trending hashtag #Descend Al-Issa from the Pulpit, critics – mostly from outside of the kingdom – attacked al-Issa for his opinions on the integration of Muslim immigrants in the West and his interfaith outreach, with a focus on his engagements with Jewish leaders and his 2020 visit to Auschwitz. Critics also condemned al-Issa as a traitor, and "the beloved of the Hindus, the Jews, and the Christians."

## TRAFFICKING IN PERSONS

See the Department of State's *Trafficking in Persons Report* at **https://www.state.gov/trafficking-in-persons-report/**.

## ACTS OF VIOLENCE, CRIMINALIZATION, AND OTHER ABUSES BASED ON SEXUAL ORIENTATION, GENDER IDENTITY OR EXPRESSION, OR SEX CHARACTERISTICS

**Criminalization:** Under sharia, as interpreted in the country, consensual same-sex sexual conduct is punishable by death or flogging, depending on the perceived seriousness of the case. There were no known prosecutions for same-sex relations during the year. It is illegal for men "to behave like women" or to wear women's clothes, and vice versa. The government did not actively enforce these laws, except when individuals posted photos of so-called cross-dressing on social media. There were no known prosecutions under these laws during the year. Publicly advocating for LGBTQI+ rights is illegal and advocates face arrest and imprisonment.

On June 14, state TV al-Ekhbariya reported Commerce Ministry officials in Riyadh seized rainbow-colored toys and children's clothing from shops in Riyadh and claimed that the items "contradict the Islamic faith and public morals and promote homosexual colors targeting the younger generation." The ministry tweeted that its teams were confiscating "products that contain symbols and signs calling for deviation and contradicting common sense." It added that shops found to be selling them would face legal penalties.

France24 News reported on October 25 that gay social media personality Suhail al-Jameel had been released from prison after being detained in October 2019 on public decency charges for posting a picture of himself on Twitter shirtless and wearing swim shorts.

**Violence against LGBTQI+ Persons:** There were reports of physical violence and harassment based on sexual orientation or gender identity. There were no known cases during the year of police or other government agents inciting, perpetrating, condoning, or tolerating violence against LGBTQI+ individuals or those reporting such abuse.

**Discrimination:** The law does not prohibit discrimination by state and nonstate actors based on sexual orientation, gender identity or expression, or sex characteristics and does not recognize LGBTQI+ individuals, couples, and their families. There were reports of official and societal discrimination based on sexual orientation or gender identity in employment, housing, access to education, and health care. Clerics condemned homosexuality during government-approved Friday sermons at some mosques.

During the year, local newspapers featured opinion pieces condemning homosexuality and calling on authorities to punish harshly individuals engaging in same-sex relations.

**Availability of Legal Gender Recognition:** The country does not permit individuals to change gender identity markers.

**Involuntary or Coercive Medical or Psychological Practices Specifically Targeting LGBTQI+ Individuals:** There was anecdotal reporting of the existence of so-called conversion therapy, but further information was not available.

**Restrictions of Freedom of Expression, Association, or Peaceful Assembly:** LGBTQI+ organizations and advocacy regarding LGBTQI+ issues were illegal. No organizations operated openly, nor were there LGBTQI+ rights advocacy events of any kind.

The government did not allow two movies, the Marvel movie *Doctor Strange and the Multiverse of Madness* and the Pixar movie *Lightyear*, to be aired in the country, because Disney refused requests to cut same-sex references.

## PERSONS WITH DISABILITIES

The law mandates the state to "protect human rights in accordance with Islamic law," which the Authority for Persons with Disabilities notes includes "justice, equity, and antidiscrimination on any grounds, including disability." In January 2021 the Ministry of Human Resources and Social Development banned workplace discrimination, including based on disability (see section 6, Women). In April 2021 the ministry announced that all private and government institutions were obliged to meet certain accessibility requirements within six months; accommodations were implemented at government buildings, retail establishments, and sidewalks. Local media reported that the ministry had formed expert committees to oversee the implementation of accessibility requirements that would follow the building code and accessibility standards developed by the King Salman Center for Disability Research. Newer commercial buildings often included such access, as did some newer government buildings.

The Ministry of Human Resources and Social Development (MHRSD) is responsible for protecting the rights of persons with disabilities. Children with disabilities could attend government-supported schools. In April the MHRSD issued two digital cards for persons with autism and other disabilities to benefit from its digital services. The "Digital Autism" card will help identify the beneficiaries and facilitate their movement in public places. It will also provide them access to priority services when visiting hospitals, healthcare centers and other public facilities. The "Digital Erkab" card for persons with disabilities will make them and their escorts eligible for concessions in ticket fares and travel fees while using public transportation.

MHRSD issues a Mowaamah certificate, which is an accreditation by MHRSD designed for organizations who wish to enhance their work environments to be comprehensive and more supportive of persons with disabilities. On June 15, local media reported that the percentage of workers with disabilities rose from 11 percent to more than 12 percent by the end of 2021, according to the Deputy President of the HRC Abdulaziz Bin Abdullah al-Khayal.

Persons with disabilities were elected and appointed to municipal councils in 2015, and two individuals with disabilities served on the consultative Shura Council.

Case 1:23-cv-00306-RBW   Document 31-4   Filed 08/16/24   Page 341 of 374

## OTHER SOCIETAL VIOLENCE OR DISCRIMINATION

Social, legal, economic, and political discrimination against the country's Shia minority continued. See the Department of State's *International Religious Freedom Report* at **https://www.state.gov/international-religious-freedom-reports/**. Human Rights Watch claimed that some state clerics and institutions "incited hatred and discrimination against religious minorities, including the country's Shia Muslim minority." Reporting indicated that Shia faced discrimination in employment, especially when trying to get jobs in the Ministry of Defense, Ministry of Interior, and National Guard, and particularly for positions where they would be permitted to hold a firearm.

To address the problem, the Ministries of Defense and Interior and the National Guard included antidiscrimination training in courses offered by the King Abdulaziz Center for National Dialogue for police and other law enforcement officers.

## Section 7.
# Worker Rights

## A. FREEDOM OF ASSOCIATION AND THE RIGHT TO COLLECTIVE BARGAINING

The law does not provide for the right of workers to form and join independent unions; however, trade unions and labor committees existed. The law does not provide for the right to collective bargaining or the right to conduct legal strikes. Workers faced potential dismissal, imprisonment, or, in the case of migrant workers, deportation for unsanctioned union activities.

The government allowed citizen-only labor committees in workplaces with more than 100 employees, was heavily involved in their formation and placed undue limitations on freedom of association and activities of these committees. For example, MHRSD approves the committee members and authorizes ministry and employer representatives to attend committee meetings. Committee members must submit meeting minutes to management and then transmit them to the minister; the ministry can dissolve committees if they violate regulations or are deemed to threaten public security. Committees' recommendations to company management are limited to improvements to working conditions, health and safety, productivity, and training programs.

The law does not prohibit antiunion discrimination or require reinstatement of workers fired for union activity. There was little information on government efforts to enforce applicable laws.

Media and activists reported that on April 16, fishermen in Qatif protested against new loading charges and other business costs imposed by the city's central local market. They demanded the government drop the additional fees that would force them to charge higher prices. During an April 26 meeting, the fishermen and authorities agreed to maintain fees at the previous levels, pending further talks to identify appropriate levels for new fees.

## B. PROHIBITION OF FORCED OR COMPULSORY LABOR

The law does not prohibit or criminalize all forms of forced or compulsory labor and the government did not effectively enforce the law. Forced labor occurred among migrant workers, notably domestic workers. Conditions indicative of forced labor experienced by foreign workers reportedly included passport confiscation, nonpayment of wages, restrictions on movement, and verbal, physical and sexual abuse. The government improved enforcement of some areas of the law, including electronic systems to monitor and ensure compliance. In March 2021 the government announced the Labor Reform Initiative, which eliminated the need for many private-sector workers to obtain their employer's permission to obtain an exit and re-entry visa, obtain a final exit visa, or change employers at the conclusion of their contract or after one year. This provided increased freedom of movement and lessened the risks of forced labor for seven million private-sector workers. According to MHRSD, as of March, more than 65,000 workers had successfully benefited from the initiative. Employers may, however, require a trainee to work for them upon completion of training for a period not to exceed twice the duration of the training or one year, whichever is longer.

Many migrant workers, particularly female domestic workers, who are not covered under the Labor Reform Initiative, were unable to exercise the right to terminate their employment contract, change employers, or leave the country due of a lack of knowledge of their rights and, in some cases, coercive situations. A ministerial decree issued in June allows domestic workers to either leave their employer or the country after they complete a full two-year contract or break their contract and switch employers without the consent of their current employer if the employer engages in a prohibited practice, for example, salary withholding or the assignment of dangerous or potentially hazardous tasks.

The government expanded the implementation of the Wage Protection System to all private-sector companies, which requires employers to pay foreign workers by electronic transfer through a Saudi bank. The government also implemented a mandatory e-contract system that includes type of work, salary, duration of contract, working hours, and annual leave. Contracts were verified by both the employer and employee. MHRSD reported it used the Mudad payroll platform to track Wage Protection System and e-contract compliance in real-time and imposed penalties for any firm that failed to maintain at least 80 percent compliance monthly.

Also see the Department of State's *Trafficking in Persons Report* at **https://www.state.gov/trafficking-in-persons-report/**.

## C. PROHIBITION OF CHILD LABOR AND MINIMUM AGE FOR EMPLOYMENT

The law prohibits the employment of any child in the worst forms of child labor defined in the relevant international conventions. The National Policy to Prevent Child Labor and a corresponding National Action Plan provides that no person younger than 15 may legally work unless that person is the sole source of support for the family. Children between the ages of 13 to 15 may conduct light work if it does not interfere with their schooling. Children younger than 18 may not work shifts exceeding six hours a day. There is no minimum age for workers employed in family-owned businesses or other areas considered extensions of the household, such as farming, herding, and domestic service. The policy includes creating a database to track child labor with the support of the ILO, while also adopting a list of the types of work prohibited for those under the age of 18, including any work that is likely to be dangerous, impede education or that is harmful to a child's health or physical, mental, moral, or social development.

There was little data on government efforts to effectively enforce the applicable laws and whether penalties were commensurate with or less than those for analogous serious crimes when applied against violators. There is also no available data reporting whether child labor occurred.

## D. DISCRIMINATION WITH RESPECT TO EMPLOYMENT AND OCCUPATION

The labor law in general prohibits discrimination in the terms of recruitment as well as during employment. The law mandates that employers treat all workers equally and barred discrimination based on gender, disability, age, or any other forms of discrimination, whether in

employment or advertising a vacancy. No regulations prohibit discrimination based on religion, political opinion, national origin or citizenship, sexual orientation or gender identity, language, or HIV-positive status. Gender-based violence and harassment occurred in the workplace (see section 6, Women). Discrimination with respect to employment and occupation occurred in all these categories. Women may work without their guardian's permission, but some employers required applicants to submit proof of it, even though the law prohibits the practice. A 2019 decree expanded previous regulations barring employers from firing female workers on maternity leave and includes protection from dismissal for pregnancy-related illness if the absence is less than 180 days per year. Employers who violate the antidiscrimination law can be fined. The antidiscrimination law only applies to citizens and does not protect the rights of expatriates. There was widespread societal discrimination against African and Asian expatriate workers.

In recent years women's labor participation increased significantly, including in sectors traditionally dominated by men (see section 6, Women). Prohibitions on employment of women in some hazardous jobs and night shifts were lifted. MHRSD explicitly approved and encouraged employment of women in specific sectors, particularly in government and retail. On May 21, Flyadeal Airline completed the first flight with an all-female crew. In medical settings and the energy industry, women and men worked together, and in some instances, women supervised male employees. Women, however, continued to face societal discrimination and gender segregation continued in the workplace. There were almost no women working as judges or as members of the Council of Senior Religious Scholars.

The third-quarter labor market survey found the labor force participation rate of the Saudi female working-age population was 37 percent. Most non-Saudi women were employed as domestic workers.

No regulation requires equal pay for equal work. In the private sector, the average monthly wage of Saudi women workers was 64 percent of the average monthly wage of Saudi men. Labor dispute settlement bodies did not register any cases of discrimination against women.

The law grants women the right to obtain business licenses without the approval of their guardians, and women frequently obtained licenses in fields that might require them to supervise foreign workers, interact with male clients, or deal with government officials. Women who work in establishments with 50 or more female employees have the right to maternity leave

Case 1:23-cv-00306-RBW   Document 31-4   Filed 08/16/24   Page 345 of 374

and childcare. On March 25, the Ministry of Interior opened admission for females to join the Border Guards at the rank of private. On April 10, the Ministry of Defense announced the opening of admission and unified recruitment for military jobs for Saudi men and women from the rank of soldier to sergeant. On July 23, the Ministry of Interior allowed women to join the General Directorate of Public Security, General Traffic Department, with the rank of soldier. In April 2021, local media reported that 113 female officers were deployed in the Holy Mosques in Mecca and Medina to assist pilgrims and worshippers as part of Special Security Forces' homeland security unit.

Discrimination with respect to religious beliefs occurred in the workplace. Members of the Shia community complained of discrimination based on their religion and had difficulty securing or being promoted in government positions. They were significantly underrepresented in national security-related positions, including the Ministries of Defense and Interior and the National Guard. In predominantly Shia areas, Shia representation was higher in the ranks of traffic police and employees of municipalities and public schools. A small number of Shia occupied high-level positions in government-owned companies and government agencies. Shia were also underrepresented in employment in primary, secondary, and higher education.

## E. ACCEPTABLE CONDITIONS OF WORK

**Wage and Hour Laws:** The monthly minimum wage for public-sector employees was above the estimated poverty income level. There was no private-sector minimum wage for foreign workers.

By law a standard workday is eight hours. A standard workweek is 48 hours but can extend to 60 hours subject to payment of overtime, which is 50 percent more than the basic wage. The law requires employers to provide paid holidays on Eid al-Fitr, Eid al-Adha, and Saudi National Day, with the exception of domestic workers sponsored by individuals rather than companies.

An estimated 10.2 million foreign workers, including approximately 1.4 million women, made up approximately 75 percent of the labor force, according to the first quarter labor market survey. Legal workers generally negotiated and agreed to terms of employment prior to their arrival in accordance with the contract requirements contained in the law.

The law provides penalties for bringing foreigners into the country to work in any service, including domestic service, without following the required procedures and obtaining a permit.

Case 1:23-cv-00306-RBW Document 31-4 Filed 08/16/24 Page 346 of 374

**Occupational Safety and Health:** The government issued occupational safety and health standards that were up-to-date and appropriate for the main industries. The law provides for regular safety inspections and enables ministry-appointed inspectors to make unannounced inspections, initiate sanctions, examine materials used or handled in industrial and other operations, and submit samples of suspected hazardous materials or substances to government laboratories. There was a ban on outside work from 12 p.m. to 3 p.m. during the summer months. There was little information on government efforts to enforce applicable laws and whether penalties imposed were commensurate with those for other comparable laws.

**Wage, Hour, and OSH Enforcement:** The Ministry of Health's Occupational Health Service Directorate and the Ministry of Human Resources and Social Development worked together on health and safety matters. Responsibility for identifying unsafe situations remains with occupational safety and health experts and not the worker. By law, employers are obligated to safeguard safety and health requirements in the workplace to protect employees from harm and disease. Regulations require employers to protect some categories of workers from job-related hazards and disease, although violations occurred. Punishment for labor violations involved a range of fines and the possible temporary or permanent closure of a business. The law does not provide workers the right to remove themselves from a hazardous workplace without jeopardizing their employment.

**Informal Sector:** According to the law, a citizen or business must sponsor foreign workers for them to obtain legal work and residency status, although the requirement exempts Syrian and Yemeni citizens who overstayed their visas. MHRSD implemented measures allowing noncitizen workers to switch their employer to a new employer or company that employed a sufficient quota of Saudi citizens. Some workers were unaware of the new regulations and were forced to remain with their sponsor until completion of their contract or seek the assistance of their embassy to return home. There were also instances in which sponsors bringing foreign workers into the country failed to provide them with a residency permit, which undermined workers' ability to access government services or navigate the court system in the event of grievances. Sponsors with commercial or labor disputes with foreign employees could ask authorities to prohibit employees from departing the country until the dispute was resolved. Authorities, however, would not jail or forcibly return fleeing workers who sought to exit the country within a 72-hour period or coordinate with their embassy for repatriation, provided the employees did not have criminal charges or outstanding fines pending against them.

Case 1:23-cv-00306-RBW Document 31-4 Filed 08/16/24 Page 347 of 374
2022 Country Reports on Human Rights Practices: Saudi Arabia - United States Department of State

Bilateral labor agreements set conditions on foreign workers' minimum wage, housing, and other benefits, including leave and medical care. Those provisions were not drafted in line with international standards and varied depending on the bargaining power of the foreign workers' country. There were reports that some migrant workers were employed on terms to which they had not agreed and experienced problems, such as delays in the payment of wages, inability to change employers, or changes in working hours and conditions. There were reports that migrant workers, especially domestic workers, were vulnerable to abuse, exploitation, and conditions contravening labor laws, including nonpayment of wages, working for periods in excess of the 48-hour workweek, working for periods longer than the prescribed eight-hour workday without due compensation, and restrictions on movement due to passport confiscation. There were also reports of physical, psychological, sexual, and verbal abuse. Domestic workers were unable to remove themselves from dangerous situations.

Some employers physically prevented workers from leaving or threatened them with nonpayment of wages if they left. Sponsoring employers, who controlled foreign workers' ability to remain employed in the country, usually held foreign workers' passports, a practice prohibited by law. In some contract disputes, to prevent the employee from leaving the country until resolution of the dispute, sponsors asked authorities to coerce the employee into accepting a disadvantageous settlement in lieu of risking deportation without any settlement.

While some foreign workers were able to contact the labor offices of their embassies for assistance, domestic workers faced challenges when attempting to gain access to their embassies, including restrictions on their freedom of movement and telephone access, confiscation of their passports, and being subjected to threats and verbal and physical abuse. During the year several dozen (primarily) female domestic workers sought shelter at their embassies' safehouses to escape physical and sexual abuse by their employers. Those workers usually sought legal assistance from their embassies and government agencies to obtain end-of-service benefits and exit visas. In addition to their embassies, some domestic servants could contact the NSHR, HRC, Interministerial General Secretariat to Combat Human Trafficking, and the Migrant Workers' Welfare Department, which provided services to safeguard migrant workers' rights and protect them from abuse. Some were able to apply to the offices of regional governors and lodge an appeal with the Board of Grievances against decisions by those authorities.

Occupational safety and health regulations do not cover farmers, herdsmen, domestic servants, or workers in family-operated businesses. Although the Ministry of Human Resources and Social Development employed nearly 1,000 labor inspectors, foreign workers privately reported frequent failures to enforce health and safety standards.

---

**TAGS**

[Bureau of Democracy, Human Rights, and Labor]     [Bureau of Near Eastern Affairs]

[Saudi Arabia]

---

White House

USA.gov

Office of the Inspector General

Archives

Contact Us

---



---

Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

# Rights groups claim Saudi Arabia holding relatives of U.S. citizen as 'retaliation'

**i24news.tv**/en/news/middle-east/the-gulf/1690964355-rights-groups-claim-saudi-arabia-holding-relatives-of-u-s-citizen-as-retaliation

August 02, 2023 at 04:19 AM   ■   latest revision August 02, 2023 at 06:05 AM

DAWN, Freedom Initiative, and ALQST release statement, following an alleged retaliatory detainment of Saudi nationals for a lawsuit against MBS and other royals



The flag of Saudi Arabia in Washington, the United States.AP Photo/Cliff Owen, File

Relatives of a U.S. citizen were allegedly detained in Saudi Arabia as retaliation for a commercial lawsuit against royals, including Crown Prince Mohammed bin Salman (MBS), according to three human rights groups on Wednesday.

A lawsuit in the state of Pennsylvania, filed on behalf of 15-year-old U.S. citizen Rakan Nader Aldossari by his father in June 2020, accused the Saudis of failure to honor a contract related to a refinery project on the Caribbean island of Saint Lucia.

Rakan's five relatives reportedly appeared before a Specialized Criminal Court in Riyadh, established in 2008 to try terrorism cases, according to the Washington-based Freedom Initiative's Saudi director, Abdullah Alaoudh. He added that their names were read out by a judge, but their charges were not disclosed, nor were they given a date for the next hearing.

The Freedom Initiative further denounced the proceedings, saying that "turning a private, commercial dispute into a basis for unjust detention" amounted to "a gross abuse of authority."



New Saudi Crown Prince Mohammed bin Salman (L) talks with his cousin Muhammed bin Nayef, whom he has replaced as heir to the Kingdom.FAYEZ NURELDINE (AFP/File)

The lawsuit was originally against former Crown Prince Muhammed bin Nayef (MBN), but later amended to include MBS, after the previous Saudi heir was placed under house arrest and had his assets seized.

U.S. courts eventually dismissed the suit, but, according to a statement released by the Freedom Initiative, Democracy for the Arab World Now (DAWN) and ALQST for Human Rights, the Saudi Arabian authorities detained Rakan's relatives earlier as apparent "retaliation."

"The three organisations call on the Biden administration to demand the release of the Aldossari family members and end their persecution," the statement said.

In response to a letter from Rakan to U.S. President Joe Biden, a State Department official said Washington would "encourage the Saudi government to be clear and transparent about the charges your relatives face and the grounds for those charges."

"We have raised concerns about suspected acts of transnational repression with the Saudi government repeatedly and will raise your case with our Saudi interlocutors as appropriate," the response added, according to *AFP*.

This article received 0 comments

## Comments



☰ |

**DONATE NOW**

July 25, 2021 12:00AM EDT

Available In   English   العربية

# Saudi Arabia: Collective Punishment for Ex-Official's Children
**Arbitrary Travel Bans, Incommunicado Detention, Secret Appeal Hearing**

  

  

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Accept          **Other options**

8/16/24, 10:35 AM
Case 1:23-cv-00306-RBW Document 31-4 Filed 08/16/24 Page 356 of 374
Saudi Arabia: Collective Punishment for Ex-Official's Children | Human Rights Watch

Sarah al-Jabri and Omar al-Jabri © Private

(Beirut) – Saudi authorities should immediately release the imprisoned children of a former Saudi official following an unfair trial that took place in an apparent effort to coerce him to return to Saudi Arabia, Human Rights Watch said today. Omar Al-Jabri, 23, and Sarah Al-Jabri, 21, the children of Saad Al-Jabri, a former top Saudi intelligence official, were arrested in March 2020 and held incommunicado until January 2021.

Saudi authorities brought charges against the siblings in September 2020, a month after their father sued Crown Prince Mohammed bin Salman in US Federal Court under the Torture Victim Protection Act, alleging that the crown prince had sent a hit squad to murder him in Canada in 2018. Following their arrests and during their trial Saudi authorities held the siblings incommunicado, preventing them from meeting with their lawyer or speaking with family members. The authorities have also detained up to 40 other Al-Jabri family members and associates, who remain in detention, informed sources said.

"The treatment of Omar and Sarah Al-Jabri demonstrates the lengths to which Saudi Arabia is willing to go to pressure people who refuse to fall in line," said Michael Page, deputy Middle East director at Human Rights Watch. "Detaining, imposing arbitrary travel bans, and railroading at trial two young people solely to create leverage against their father is collective punishment that demands accountability and justice."

A Saudi court in November 2020 sentenced Omar and Sarah Al-Jabri in an unfair trial to nine and six and a half years in prison respectively, for "money laundering" and "attempting to escape" Saudi Arabia. In December 2020, an appeals court upheld their sentences in a secret hearing at which they were not present. Neither they nor their lawyer or other family members have been formally presented with the final court verdict detailing the reasons behind the initial judgment or the appeal decision.

Human Rights Watch reviewed a series of court documents, text messages, and other items related to Saudi authorities' targeting of al-Jabri and his children and interviewed another family member by phone in June.

The family member said that the siblings had been targeted by Saudi authorities since 2017, when Sarah was 17 and Omar 18, to coerce their father to return to Saudi Arabia from exile. Saad Al-Jabri was formerly an intelligence official in the Saudi Interior Ministry and a top adviser to Mohammed bin

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Case 1:23-cv-00306-RBW   Document 31-4   Filed 08/16/24   Page 357 of 374

reasons." They had been about to travel to the US to continue their schooling. They were never formally notified of the reasons behind the travel ban.

In late 2017, Saudi authorities froze their bank accounts and financial assets, and interrogated them separately about their father's whereabouts and activities. The family member said that during the interrogation the authorities attempted to convince the siblings that their father and other family members living abroad should return to Saudi Arabia.

Following an expedited trial of four hearings over a few weeks, the court convicted the siblings based solely on their alleged confessions, but the judgment was only signed by two of three judges on the panel. While the family appealed the conviction, the authorities carried out a secret appeal session without notifying or the presence of the siblings, their lawyer or the family. The family only discovered the secret appeals ruling by a reference to it in a court filing by a lawyer representing Mohammed bin Salman in a US Federal Court requesting dismissal of the Al-Jabri lawsuit.

Given the trial irregularities and due process violations, Saudi authorities should immediately vacate the prison sentence, release the Al-Jabri siblings, and allow them to travel abroad to reunite with their family. The Saudi authorities should immediately cancel the arbitrary detentions and travel bans imposed on Al-Jabri family members and their associates since 2017.

Human Rights Watch has long documented due process violations under Saudi Arabia's criminal justice system. In early 2020, the authorities announced significant reforms curbing some of the worst outcomes for child offenders and promised to develop a written penal code. However, these changes did not go far enough to comply fully with international law standards, and whether some of the provisions have been carried out remains unclear.

"The treatment of the Al-Jabri siblings puts Saudi's criminal justice reform announcements to shame," Page said. "There remains a long way to go before the Saudi justice system can credibly carry its own name."

**Arbitrary Travel Bans**

Sarah and Omar Al-Jabri faced reprisals from Saudi authorities as early as mid-2017, when they were teenagers. On June 21, 2017, shortly after bin Nayef was deposed, Riyadh airport officers stopped Sarah

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Based on text message records publicly available in US court filings and reviewed by Human Rights Watch, Saad Al-Jabri texted Crown Prince Mohammed bin Salman on June 21 to request lifting the travel ban on his children. Mohammed bin Salman did not acknowledge receipt of Al-Jabri's messages.

On September 7, 2017, Al-Jabri texted Mohammed bin Salman again, saying that the travel ban impeded the siblings' ability to begin their schooling. The crown prince replied: "I want to resolve this problem of your son and daughter, but there is a very sensitive file here that is related to [Mohammed bin Nayef]." He demanded that Al-Jabri should return to Saudi Arabia the following day to discuss the matter in person, and threatened him with an Interpol filing if he didn't.

Al-Jabri did not return, and in December 2017 Saudi Arabia filed the complaint with Interpol, the International Crime Police Organization, to have him extradited on corruption charges. Al-Jabri's wife and other relatives were barred from flying from Turkey to Canada that same month, apparently due to the Interpol complaint. The New York Times reported that Saudi authorities initially filed the complaint as a diffusion, a "less formal" way for Interpol members to request help from other members. A formal red notice was issued by Interpol in January 2018.

According to Interpol documents that Human Rights Watch reviewed, Interpol dismissed the case in July 2018 on the basis that pursuing Al-Jabri was a misuse of its resources and a violation of its bylaws. The commission reviewing the case noted the "collateral restrictive measures" taken against multiple members of the Al-Jabri family by Saudi authorities and also considered Saad Al-Jabri's "relationship with [Mohammed bin Salman's] formal rival for power, [Mohammed bin Nayef]," as part of the political motivations for the case.

**Arrest and Incommunicado Detention**

In March 2020 a high-level official in the Presidency of State Security summoned Omar and Sarah Al-Jabri to his office, where he pressured them to convince their family to return to Saudi Arabia, the family member said. A week later, a group of Saudi security forces, led by the same official, arrested the siblings at their home in Riyadh and held them incommunicado for about 10 months.

Under UN guidelines, prolonged incommunicado detention is a form of cruel, inhuman and degrading punishment or treatment. The United Nations Convention Against Torture, which Saudi Arabia acceded to in 1997, prohibits torture and other ill-treatment.

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

reveal that the family also asked directly about the children's conditions, though the official did not respond to these questions.

In May 2020, armed security officers arrested Saad Al-Jabri's brother in a home raid without explanation. He remains in detention. In June 2020 Al-Jabri's nephew was summoned to the official's office, then allegedly arrested and interrogated about the media coverage regarding the circumstances of Omar and Sarah Al-Jabri's detention. In August 2020, Al-Jabri's son-in-law was also detained after being summoned for a meeting. A family member estimates 40 Al-Jabri family members or close associates are currently in detention.

In early January 2021, Saudi prison authorities transferred the siblings from an undisclosed detention center to separate prisons in Riyadh and permitted them to make phone calls to their family in Saudi Arabia for the first time. The family member said that Omar is in Al-Ha'ir prison, and Sarah in Al-Malaz prison. The siblings are prohibited from having visitors or making direct calls to their parents abroad.

Disrupting family life by making visiting impossible or extremely difficult constitutes a violation of prisoners' rights. International standards also require that "communication of the detained or imprisoned person with the outside world, and in particular his family or counsel, shall not be denied for more than a matter of days."

**Sentencing and Unfair Appeals Process**

The family member said that the charges brought against Omar and Sarah Al-Jabri by the Riyadh Saudi Criminal Court in September 2020 are based "entirely" on purported confessions by the siblings. Human Rights Watch reviewed a copy of the court's descriptions of the siblings' alleged confessions as evidence for the case.

According to the charge sheet, which Human Rights Watch also reviewed, both siblings were charged with "money laundering" in violation of the Anti-Money Laundering Law, and attempting to "escape" the kingdom in an "irregular" manner. The charge of "irregular escape" apparently refers to their attempt to fly to the United States in 2017 for school, and the case files do not clarify how or why such travel would be considered "irregular." The charge sheet does not include the name of the main prosecutor, which is unusual for court proceedings. The court judgment also identifies only two out of three judges on the panel who signed it, also an irregularity.

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

The family member said that neither Omar and Sarah Al-Jabri, nor anyone else in the family or the lawyer were notified that the appeal was taking place. By carrying out the appeal in secret, the court left the family unable to appeal to the Supreme Court within the required 30 days.

Most of the siblings' alleged crimes took place when the siblings were under age 18, according to the family member and the appeal sheet, meaning that Saudi authorities disregarded multiple provisions of the 2018 Juvenile Law, including reduced sentences for alleged child offenders.

The anti-money laundering law, issued by Decree No. 20 of 2017, defines money laundering as including "concealing or falsifying the true origin of funds acquired." On the September 2020 charge sheet, the Criminal Court claims the siblings received 200,000 Riyal (approximately US$53,000). In another document, the court says that Omar received this money via "one of the accused [Saad Al-Jabri]," implying that the court was aware of who had sent him the money.

The court also claims Omar that withdrew one million Riyal (approximately $267,000) from one of his father's bank accounts after his father left the kingdom in 2017, shortly before the bank account was frozen. The family's appeal document denies this claim, saying that it was impossible for Omar, who never held any authority over his father's bank account, to withdraw money from it. The authorities also accused Sarah Al-Jabri of violating the law by using an ATM card belonging to a family associate who wanted to assist in covering the siblings' living costs.

The family contends that the money in the siblings' bank accounts originated from members of the Al-Jabri family or trusted friends' bank accounts. The money was intended for the sole purpose of providing the siblings with spending money to cover living expenses and obtain their education, given that Saudi authorities froze the family's other bank accounts in 2017.

Additionally, Al-Jabri's legal counsel and his family experienced a series of reprisals by Saudi authorities. According to the family member, in January 2021 the Saudi Presidency of State Security office summoned the Al-Jabri siblings' lawyer, the lawyer's brother, and the lawyer's sister for a meeting. During this meeting, State Security officials denied an appeal had taken place.

The lawyer allegedly admitted during the meeting that he had contacted members of the Al-Jabri family who were outside of the kingdom. Shortly thereafter, the lawyer and the lawyer's relatives found out that authorities had banned them all from travel and frozen their financial assets.

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Case 1:23-cv-00306-RBW   Document 31-4   Filed 08/16/24   Page 361 of 374

Your tax deductible gift can help stop human rights violations and save lives around the world.

| | | |
|---|---|---|
| **$50** | **$100** | **$250** |
| **$500** | **$1000** | **Other** |

**DONATE NOW**

**Region / Country**   Middle East/North Africa, Saudi Arabia

**MORE READING**

---



July 11, 2021  |  News Release

### Saudi Arabia: New Details of Alleged Torture Leaked



May 23, 2021  |  News Release

### Saudi Arabia: Repression Rages on Despite Releases

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our **privacy policy** to find out what cookies are used for and how to change your settings.



July 17, 2024 | Report

## "I Can't Erase All the Blood from My Mind"

**Palestinian Armed Groups' October 7 Assault on Israel**



June 10, 2024 | Report

## "No Way Out"

**Debt Imprisonment in Tunisia**

## MOST VIEWED

1  August 15, 2024 | Dispatches

### Doctor's Rape, Murder in India Sparks Protests



2  December 7, 2011 | Report

### "How Come You Allow Little Girls to Get Married?"



3  July 17, 2024 | News Release

### October 7 Crimes Against Humanity, War Crimes by Hamas-led Groups



4  August 14, 2024 | Report

### India: Hate Speech Fueled Modi's Election Campaign



5  June 9, 2015 | News Release

### Bangladesh: Girls Damaged by Child Marriage

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

**DONATE NOW**



## Get Updates On Rights Issues Worldwide

Enter an email address     Sign Up

## Connect With Us

Contact Us | Corrections | Privacy Policy | Permissions | Site Map | Child Safeguarding | Text Version

© 2024 Human Rights Watch

**Human Rights Watch** | 350 Fifth Avenue, 34th Floor | New York, NY 10118-3299 USA | **t** 1.212.290.4700

**Human Rights Watch** is a 501(C)(3) nonprofit registered in the US under EIN: 13-2875808

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our **privacy policy** to find out what cookies are used for and how to change your settings.

 

**DONATE NOW**

May 6, 2018 12:00AM EDT

Available In   English   العربية   简体中文   Français   Bahasa Indonesia

# Saudi Arabia: Thousands Held Arbitrarily
## Dramatic Increase in Detention Without Trial

(Beirut) – Saudi Arabia is detaining thousands of people for more than six months, in some cases for over a decade, without referring them to courts for criminal proceedings. Saudi Arabia's attorney general should promptly charge or release all criminal defendants and stop holding people arbitrarily.

Human Rights Watch analyzed data from a public online Interior Ministry database, which revealed that authorities have detained 2,305 people who are under investigation for more than six months without referring them to a judge. The number held for excessively long periods has apparently increased dramatically in recent years. A similar Human Rights Watch analysis in May 2014 revealed that only 293 people had been held under investigation for that period.



Then-Deputy Crown Prince Mohammed bin Salman attends a graduation ceremony at King Faisal Air College in Riyadh, Saudi Arabia, January 25, 2017. © 2017 Reuters

"If Saudi authorities can hold a detainee for months on end with no charges, it's clear that the Saudi criminal justice system remains broken and unjust, and it only seems to be getting worse," said Sarah Leah Whitson, Middle East director at Human Rights Watch. "It seems that MBS's 'Vision2030' plan

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Accept     **Other options**

to take place outside of any recognizable legal framework, with detainees forced to trade financial and business assets for their freedom.

Saudi Arabia's Law of Criminal Procedure provides that a person may be detained without charge for a maximum of five days, renewable up to six months by an order of the Bureau of Investigation and Prosecution (now Public Prosecution). After six months, the law requires that a detainee "be directly transferred to the competent court, or be released."

The Interior Ministry created the "Communication Window" online database in 2013. It does not identify detainees by name but includes their initials, nationality, type of identification, the last five digits of their foreign passport or Saudi identification numbers, the date they were detained, and their case status.

Later that year the Saudi Embassy in London sent Human Rights Watch a letter in which it said: "[by] establishing this website the Government of Saudi Arabia is clearly demonstrating its intention to be transparent in its treatment of detainees. This treatment is in accordance with the laws and regulations and ensures justice and fairness for all."

The portal offers six possible case statuses: "under investigation," "case file with the Bureau of Investigation and Prosecution," "case file under judicial review," "in the process of completing procedures to refer to the prosecution to enforce directives in the case," "convicted," and "convicted subject to appeal." Of these, all but "convicted" and "convicted subject to appeal" could indicate pretrial detention.

Human Rights Watch analyzed the data on April 2, which was updated through March 31. Of the 5,314 people in the database, 3,380 had been held for over six months without a conviction or their "case file under judicial review," including 2,949 for more than a year and 770 for over three years. The database indicated Saudi authorities were holding 2,305 people "under investigation" for more than six months, 1,875 for more than a year, and 251 for over three years.

Saudi authorities have held one Saudi citizen without a conviction since September 2003 and another "under investigation" since December 2006. Of the 251 held "under investigation" for over three years, 233 are Saudis.

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our **privacy policy** to find out what cookies are used for and how to change your settings.

Case 1:23-cv-00306-RBW   Document 31-4   Filed 08/16/24   Page 366 of 374

The database does not provide information on whether the authorities have allowed detainees to seek release on bail or a similar system. Nor did it disclose whether authorities had charged formally with a crime those detainees whose cases had been referred to the office of Public Prosecution or brought them before a judge.

Human Rights Watch wrote to Sheikh Saud Al-Mojeb, the Saudi attorney general, on February 1 seeking his explanation for the high number of cases of apparent arbitrary detention, but received no response.

Human Rights Watch has documented arbitrary detention by Saudi authorities for years. The 2014 review revealed much lower numbers indicative of arbitrary detention. The data showed 2,766 total people in detention, including 293 apparently held for over six months without the cases being referred to the judiciary, 16 of them apparently for over two years, and one for over 10 years.

The United Nations Working Group on Arbitrary Detention has determined that detention is arbitrary when the detaining authority fails to observe, wholly or in part, the norms related to the right to due process, including for a prompt hearing before a judge following the initial detention. Principle 11 of the UN Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment states that a detainee must be "given an effective opportunity to be heard promptly by a judicial or other authority," and that a judicial or other authority should be empowered to review the decision to continue detention.

The Arab Charter on Human Rights, which Saudi Arabia ratified in 2009, also guarantees the right of anyone arrested or detained on a criminal charge to be brought promptly before a judge or other officer of the law, and to have a trial within a reasonable time or be released. The charter says that, "Pre-trial detention shall in no case be the general rule."

Extended detention without charge or trial or without an appearance before a judge is arbitrary, and violates both Saudi law and international human rights standards.

"Mohammad bin Salman's promises to modernize and strengthen the rule of law mean very little when the authorities can lock away thousands of people for years and throw away the key," Whitson said.

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our **privacy policy** to find out what cookies are used for and how to change your settings.

Your tax deductible gift can help stop human rights violations and save lives around the world.

| $50 | $100 | **$250** |
|---|---|---|
| $500 | $1000 | Other |

DONATE NOW

Region / Country  Middle East/North Africa, Saudi Arabia

MORE READING



April 25, 2018  |  News Release

Saudi Arabia: Executions for Drug Crimes



April 5, 2018  |  News Release

Saudi Arabia: Activist Marks 2 Years Behind Bars

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our **privacy policy** to find out what cookies are used for and how to change your settings.



July 17, 2024  |  Report

## "I Can't Erase All the Blood from My Mind"

**Palestinian Armed Groups' October 7 Assault on Israel**



June 10, 2024  |  Report

## "No Way Out"

**Debt Imprisonment in Tunisia**

## MOST VIEWED

**1**    August 15, 2024  |  Dispatches

### Doctor's Rape, Murder in India Sparks Protests



**2**    December 7, 2011  |  Report

### "How Come You Allow Little Girls to Get Married?"



**3**    July 17, 2024  |  News Release

### October 7 Crimes Against Humanity, War Crimes by Hamas-led Groups



**4**    August 14, 2024  |  Report

### India: Hate Speech Fueled Modi's Election Campaign



**5**    June 9, 2015  |  News Release

### Bangladesh: Girls Damaged by Child Marriage

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our **privacy policy** to find out what cookies are used for and how to change your settings.

**DONATE NOW**



## Get Updates On Rights Issues Worldwide

Enter an email address        Sign Up

## Connect With Us

Contact Us | Corrections | Privacy Policy | Permissions | Site Map | Child Safeguarding | Text Version

© 2024 Human Rights Watch

**Human Rights Watch** | 350 Fifth Avenue, 34th Floor | New York, NY 10118-3299 USA | **t** 1.212.290.4700

**Human Rights Watch** is a 501(C)(3) nonprofit registered in the US under EIN: 13-2875808

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

# Human rights in Saudi Arabia Amnesty International

amnesty.org/en/location/middle-east-and-north-africa/middle-east/saudi-arabia/report-saudi-arabia/



## Saudi Arabia

Amnesty International takes no position on issues of sovereignty or territorial disputes. Borders on this map are based on UN Geospatial data. © Amnesty International

Back to Saudi Arabia

## Saudi Arabia 2023

The authorities targeted individuals for peacefully exercising their rights to freedom of expression or association, and some were sentenced to lengthy prison terms or death following grossly unfair trials. Human rights defenders continued to be arbitrarily detained or subject to travel bans following their conditional release from prison. Courts handed down death sentences following grossly unfair trials, including in cases of individuals who were children at the time of their alleged crimes, and people were executed for a wide range of crimes. Migrants were subjected to serious human rights abuses, including killings at the border with Yemen and treatment that may amount to human trafficking for the purpose of

labour exploitation. Thousands of people were involuntarily returned to their home country as part of a nationwide crackdown on undocumented migrants. Women continued to face discrimination in law and practice.

## Background

Saudi Arabia and the EU held their third human rights dialogue in Brussels, Belgium on 28 November. The EU raised concerns regarding Saudi Arabia's continued application of the death penalty, including for drug-related offences and non-lethal crimes, as well as lengthy prison terms imposed for social media activity.

The Saudi Arabia-led coalition in the long-running armed conflict in Yemen continued to be implicated in war crimes and other serious violations of international law (see Yemen entry).

## Freedom of expression

The Specialized Criminal Court (SCC), established to try terrorism-related crimes, convicted and sentenced individuals to lengthy prison terms following grossly unfair trials solely for exercising their rights to freedom of association and expression, including online on X (formerly Twitter).

### Unfair trials

The authorities continued to arbitrarily detain individuals without giving them any opportunity to challenge the lawfulness of their detention, and in many cases sentenced them to lengthy prison terms or death on vague, "catch-all" charges that criminalize peaceful opposition as "terrorism" in violation of their fair trial rights.

In January, the SCC resentenced Salma al-Shehab, a PhD student at Leeds University in the UK and mother of two, to 27 years in prison followed by a 27-year travel ban after the Supreme Court in the capital, Riyadh, referred her 34-year prison term back to the SCC's appeals chamber. The SCC upheld her convictions for terrorism-related offences, including "supporting those who seek to disrupt public order, destabiliz[ing] security and the stability of the state" and publishing tweets that "disturb public order, destabilize the security of society and the stability of the state." The charges arose from posts she published on X in support of women's rights.[1]

In May, the Supreme Court upheld the 10-year prison sentence of Egyptian physician Sabry Shalaby.[2] The SCC convicted him in August 2022 following a grossly unfair trial for supporting and joining the Muslim Brotherhood, which is classified as a terrorist organization in Saudi Arabia. He was held in solitary confinement for the first 10 months of his detention, which included three months in incommunicado detention. Throughout his detention, he

repeatedly asked to see a neurologist about health complications arising from spinal cord surgery, but his requests were denied. In addition, he received inadequate care for asthma and cataracts arising from underlying health conditions.

The trial of religious cleric Salman Alodah continued before the SCC into its fifth year. He faced 37 charges, including affiliation with the Muslim Brotherhood and others related to his calls for government reforms and "regime change" in the Arab region.

### Human rights defenders

Human rights defenders continued to be arbitrarily detained, including following the expiry of their prison terms, and subjected to judicially imposed travel bans.

Mohammed al-Qahtani, founding member of the Saudi Civil and Political Rights Association, remained forcibly disappeared; his prison term expired in November 2022.[3]

Prominent woman human rights defender Loujain al-Hathloul, who was released in February 2021 after serving two and a half years in prison, continued to be subjected to a travel ban.

## Death penalty

Courts handed down and upheld death sentences imposed for a wide range of crimes, including in cases of individuals who were under the age of 18 at the time of the crime. The authorities carried out executions for a wide range of crimes throughout the year.

On 12 March, Hussein Abo al-Kheir, a Jordanian father of eight, was executed. He had been sentenced to death for drug smuggling following a grossly unfair trial. During his pretrial detention, he was held incommunicado, denied access to legal representation and tortured to make a "confession". The authorities failed to return his body to his family following the execution.[4]

In May, the Saudi Human Rights Commission confirmed in a letter to Amnesty International that: "the application of the death penalty on juveniles for *ta'zir* crimes has been completely abolished". *Ta'zir* crimes are those for which the death penalty is not mandated under Islamic law. Contrary to such assurances, at least seven child offenders remained at imminent risk of execution, including Abdullah al-Derazi and Jalal Labbad. The Supreme Court upheld the death sentences against them in 2023 without informing their families or lawyers.[5]

In July, the SCC sentenced to death 54-year-old retired teacher Mohammad bin Nasser al-Ghamdi solely for his peaceful online activity on Twitter (now known as X) and YouTube.[6] He was convicted under articles 30, 34, 43 and 44 of Saudi Arabia's counterterrorism law for offences that included: "renouncing allegiance to the guardians of the state"; "supporting a terrorist ideology and a terrorist entity [the Muslim Brotherhood]"; "using his accounts on Twitter and YouTube to follow and promote individuals who seek to destabilize public order";

and "sympathizing with individuals detained on terrorism-related charges." Mohammad al-Ghamdi's charge sheet cited several tweets that were used to convict him, including posts in which he criticized Saudi Arabia's king and crown prince and its foreign policy, called for the release of detained religious clerics, and protested against increased prices. He was not accused of any violent crime.

## Migrants' rights

The authorities continued their crackdown on individuals accused of violating residency, border and labour regulations, including through arbitrary arrests and deportations of foreign nationals solely due to their irregular immigration status.

According to the Ministry of Interior, between January and December, at least 468,000 foreign nationals were returned to their home country out of over 777,000 arrested for "violating labour, residency and border security" regulations. In the same period, over 40,000 foreign nationals, most of them Ethiopian and Yemeni nationals, were arrested for crossing the border irregularly from Yemen into Saudi Arabia.

Dozens of Nepali migrant workers contracted to work in Amazon warehouses were subjected to serious human rights abuses, including treatment that may amount to human trafficking for the purposes of labour exploitation. The workers were deceived by recruitment agencies in Saudi Arabia about the nature of their employer and the terms and conditions of their jobs before leaving their home country. Additionally, they had their wages withheld by third-party contractors and were housed in wholly inadequate accommodation. Some were verbally or physically abused or threatened with such abuse, particularly when they raised complaints about their living and working conditions. Once these workers were terminated from deployment with Amazon, third-party contractors often failed to find them alternative jobs and stopped paying them their contractual wage when they were rendered "jobless". Contractors also provided these workers with limited or no support and failed to give them the required documents to allow them to change jobs or leave the country, thereby restricting their freedom of movement and job mobility.[7]

During the year, Saudi border guards killed Ethiopian migrants and asylum seekers who tried to enter Saudi Arabia across the border with Yemen. Human Rights Watch documented how the guards used explosive weapons against the migrants and shot some at close range, including children, killing at least hundreds between March 2022 and June 2023.

## Women's and girls' rights

Women continued to face discrimination in law and practice, including in matters of marriage, divorce, child custody and inheritance. Under the country's Personal Status Law, fathers are default guardians of their children. While the mother is automatically granted custody in the

event of separation, the father is designated as the child's legal guardian without due consideration of the best interests of the child.

In February, an appeals court overturned an earlier verdict that had granted US citizen Carly Morris custody of her daughter. The ruling was based on Article 128 of the Personal Status Law, which states that a custodian loses their custody if they move to reside in another place where the interests of the child is not taken into consideration. Carly Morris was not notified about the court sessions, which took place in her absence, and her former husband has since not allowed her communication with her daughter.

In May, Saudi fitness instructor Manahel al-Otaibi was charged with "defaming the kingdom at home and abroad, calling for rebellion against public order and society's traditions and customs, and challenging the judiciary and its justice" for challenging the customs and traditions of Saudi Arabia on social media, including by advocating for liberal clothing for women, appearing in what the authorities said was indecent clothing on social media and calling for the abolition of male guardianship laws.

## Right to a healthy environment

Saudi Arabia, a major fossil fuel producer, also remained one of the world's top 10 $CO_2$ emitters per capita.

In July, the Financial Times newspaper reported that Saudi Arabia had blocked a G20 initiative to cut back on the use of fossil fuels.

In 2023, the state-owned Saudi Aramco produced on average more than 12 million barrels of oil a day. It aims to increase its output by about 1 million barrels per day by 2027 and increase its production of natural gas by 50% by 2030. The oil and gas produced by Aramco have been estimated to be responsible for more than 4% of global greenhouse gas emissions since 1965 and, according to a study, accounted for about 4.8% of all global greenhouse gas emissions in 2018 – the largest of any oil and gas company.

## GET THE AMNESTY INTERNATIONAL REPORT 2023/24

Download