2022 Country Reports on Human Rights Practices: Saudi Arabia - United States Department of State

An official website of the United States Government  Here's how you know

## U.S. DEPARTMENT *of* STATE

○

**Home** >  ...  > Saudi Arabia

# 2022 Country Reports on Human Rights Practices: Saudi Arabia

**IN THIS SECTION /
EXECUTIVE SUMMARY**

## EXECUTIVE SUMMARY

The Kingdom of Saudi Arabia is a monarchy ruled by King Salman bin Abdulaziz Al Saud who is head of state. Crown Prince Mohammed bin Salman Al Saud is prime minister and head of government. The 1992 Basic Law provides for the system of governance, rights of citizens, and powers and duties of the government, and it provides that the Quran and Sunna (the traditions of the Prophet Muhammad) serve as the country's constitution. It specifies that the rulers of the country shall be male descendants of the founder, King Abdulaziz (Ibn Saud).

The State Security Presidency, National Guard, and Ministries of Defense and Interior, all which report to the king, are responsible for law enforcement and maintenance of order. The State Security Presidency includes the General Directorate of Investigation (*mabahith*), Special Security Forces, and Special Emergency Forces; police are under the Ministry of Interior. Civilian authorities generally maintained effective control over the security forces. There were credible reports that members of the security forces committed numerous abuses.

Significant human rights issues included credible reports of: unlawful or arbitrary killings, including extrajudicial killings; enforced disappearances; torture and cruel, inhuman, or degrading treatment or punishment by government agents; harsh and life-threatening pris

conditions; arbitrary arrest and detention; political prisoners or detainees; transnational repression against individuals in another country; serious problems with the independence of the judiciary; arbitrary or unlawful interference with privacy; punishment of family members for alleged offenses by a relative; serious abuses in a conflict, including related to civilian casualties and damage to civilian infrastructure as a result of airstrikes in Yemen; serious restrictions on freedom of expression and media, including unjustified arrests or prosecutions against journalists and others, and censorship; serious restrictions on internet freedom; substantial interference with the freedom of peaceful assembly and freedom of association, including overly restrictive laws on the organization, funding, or operation of nongovernmental organizations and civil society organizations; particularly severe restrictions of religious freedom; restrictions on freedom of movement and residence within the territory of a state and on the right to leave the country; inability of citizens to choose their government peacefully through free and fair elections; serious and unreasonable restrictions on political participation; serious government restrictions on domestic and international human rights organizations; lack of investigation of and accountability for gender-based violence, including but not limited to domestic and intimate partner violence; criminalization of consensual same-sex sexual activity; and outlawing of independent trade unions or significant restrictions on workers' freedom of association.

In several cases the government did not investigate, prosecute, or punish officials accused of committing human rights abuses, contributing to an environment of impunity. The government prosecuted some officials for corruption, although there were allegations of a significant lack of respect for fair trial guarantees and other human rights abuses or violations, including allegations of torture, in these cases.

Houthi militant attacks from Yemen caused civilian casualties.

---

## Section 1.
# Respect for the Integrity of the Person

### A. ARBITRARY DEPRIVATION OF LIFE AND OTHER UNLAWFUL OR POLITICALLY MOTIVATED KILLINGS

There were several reports that the government or its agents committed arbitrary or unlawful killings. The Public Prosecutor's Office, which reports to the king, is responsible for investigating

whether security force actions were justifiable and pursuing prosecutions. Capital punishment may be imposed for a range of nonviolent offenses, including apostasy, sorcery, and adultery, although in practice death sentences for apostasy, sorcery, and adultery were rare and usually reduced on appeal. According to human rights organizations, members of the Shia minority and members of the al-Huwaitat tribe were disproportionately sentenced to death. On December 1, Amnesty International reported that Saudi Arabia executed 148 persons in the first 11 months of 2022 and that in March, the authorities executed 81 individuals in a day – the largest mass execution in years – including 41 individuals who were from the Saudi Shi'a minority.

According to NGO Mwatana for Human Rights, on May 12, bodies of Yemeni and Ethiopian migrants were discovered piled near an informal detention facility in southern Saudi Arabia. They reported that the migrants had reportedly crossed the border from Yemen into Saudi Arabia the previous day. A medical report on seven Yemeni victims showed two had gunshot wounds, and the remaining five had marks of torture.

On April 11, the Sanad and THE WINA human rights organizations reported that Abdullah bin Abdulrahman al-Kamli, age 29, died in prison with marks indicating that he died under torture. They added that al-Kamli was detained along with several family members seven years ago.

In January 2021 the Saudi government Human Rights Commission (HRC) announced that the government would institute a moratorium on the death penalty for drug-related offenses. Nonetheless, on November 10, the government resumed executions for drug-related crimes when it executed two Pakistani nationals for smuggling heroin, according to Amnesty International. By year's end, a total of 20 drug-related executions had been carried out despite the announced moratorium.

In January the European Saudi Organization for Human Rights (ESOHR) said it had documented 21 killings by government officials or others in prisons during the period from December 2010 to October 2021.

*Ta'zir* (discretionary) death penalty sentences for individuals who committed crimes as minors are forbidden, and minors' prison sentences are capped at 10 years under an April 2020 royal decree. (The 2018 Juvenile Law sets the legal age of adulthood at 18 based on the lunar Hijri calendar.) Individuals convicted of *qisas*, a category of crimes that includes various types of murder, or *hudud*, crimes that carry specific penalties under the country's interpretation of Islamic law, still

https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/saudi-arabia/

face the death penalty even if the crimes were committed as minors, and there were instances during the year when offenders were sentenced to be executed for actions taken as a minor.

On November 16, the European-Saudi Organization for Human Rights (ESOHR) said 54 persons were facing the possibility of capital punishment, including at least eight individuals accused of crimes committed as minors: Abdullah al-Huwaiti, Jalal al-Labbad, Yusuf al-Manasif, Abdullah al-Derazi, Mahdi Mohsen, Ali Hassan al-Subaiti, Jawad Qureiris, and Hasan Zaki al-Faraj. There are 27 Shia among the list of 33. On June 13, the Court of Appeal upheld the death sentence verdict against Abdullah al-Huwaiti, arrested at age 14 in 2017 and sentenced to death in 2019 on murder and armed robbery charges. The Tabuk criminal court sentenced al-Huwaiti to death on March 2 in a retrial after the Supreme Court overturned his death sentence in November 2021. On May 31, UN human rights experts called on the government to immediately release Abdullah al-Huwaiti and cancel the death sentence for crimes he allegedly committed as a child. Per information available, the execution had not occurred by year's end.

On July 25, the Specialized Criminal Court (SCC) postponed the trials of Ahmad al-Faraj, Ali al-Batti, Ali al-Faraj, Muhammed al-Nimr, and Mohammed Essam al-Faraj, who in 2017 were charged as minors for crimes related to free expression and protest. Prosecutors were seeking 10-year prison sentences, rather than the death penalty originally sought for them. On September 26, the SCC sentenced Mohamed Essam al-Faraj to 10 years in prison.

During the year UN officials also expressed concerns regarding due process in death penalty cases for adults. On January 22, UN special rapporteurs sent the government a letter calling for a halt to the executions of Bahraini citizens Jaafar Sultan and Sadiq Thamer, who had been charged on "terrorism" and protest-related grounds for participating in antigovernment protests in Bahrain. The UN special rapporteurs found that the lack of specificity in the charges made these executions arbitrary, and Amnesty reported that their convictions came after a deeply flawed trial based on torture-tainted confessions. Nevertheless, on April 6 the Supreme Court upheld the original verdicts. Per information available, the executions had not occurred by year's end.

On October 2, the SCC issued death sentences against three members of the al-Huwaitat tribe for resisting displacement, according to ALQST and Prisoners of Conscience. Shadli, Atallah, and Ibrahim al-Huwaiti were arrested in 2020 for opposing the eviction of their tribe for the Saudi government's construction of the NEOM city. Per information available, the executions had not occurred by year's end.

2022 Country Reports on Human Rights Practices: Saudi Arabia ...2022 Country Reports on Human Rights Practices: U.S. Department of State https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/saudi-arabia/

On March 12, the government executed 81 men, including seven Yemenis and one Syrian, in the largest known mass execution carried out in the kingdom's history. The men reportedly included 41 Saudi Shia, of whom 37 were found guilty in a single case for allegedly attempting to assassinate security officers and targeting police stations and convoys. On March 14, UN High Commissioner for Human Rights Michelle Bachelet said that some of their trials did not meet fair trial and due process guarantees, and that the crimes of which they were accused and convicted did not appear to meet the "most serious crimes" threshold for capital punishment, as required under international law. Bachelet voiced her concern over the extremely broad definition of "terrorism" in local law, which includes non-violent acts that supposedly "endanger national unity" or "undermine the State's reputation." On March 15, Human Rights Watch (HRW) echoed these concerns after analyzing court rulings for five of the Shia men who were executed: Aqeel al-Faraj, Mortada al-Musa, Yasin al-Brahim, Mohammed al-Shakhouri, and Asad al-Shibr. HRW alleged that their trials were marred with due process violations, including that all five had told the court they were tortured and suffered other ill-treatment during interrogations, and that their supposed confessions had been forcibly extracted through torture.

## B. DISAPPEARANCE

There were numerous credible reports of disappearances carried out by or on behalf of government authorities.

In May the UK-based rights organization Sanad, as well as Prisoners of Conscience, reported that authorities arrested and forcibly disappeared rapper and song writer Omar Shiboba in mid-March for unknown reasons without a charge. As of year's end, his whereabouts were unknown.

There were some updates during the year of previous disappearances. On June 10, the Twitter account of Prisoners of Conscience affirmed that authorities released writer and women's rights activist Souad al-Shammari after almost a year and a half in detention for unknown reasons.

On August 2, Amnesty International reported that in August 2021 Lebanese national Ali Maziad was abducted from his house in Riyadh by men in civilian clothes. The Lebanese embassy informed his family three months after his disappearance that he was being detained by Saudi State Security. On December 26, ESOHR reported that Maziad had been freed and was in Beirut.

On April 4, Amnesty International called on authorities to immediately release four Uyghurs being detained by Saudi authorities, instead of sending them back to China, where all four would be at grave risk of being taken to repressive internment camps. Buheliqiemu Abula and her daughter, age 13, were detained near Mecca on March 31 and told by police they faced deportation to China along with two Uyghur men, Nuermeiti Ruze and Aimidoula Waili, who have been detained without charge in Saudi Arabia since November 2020.

On July 29, Washington-based Democracy for the Arab World Now (DAWN) confirmed that authorities released Prince Faisal bin Abdullah Al Saud, former head of the Saudi Red Crescent Society, who had been detained by security forces since March 2020.

On January 6, authorities released Princess Basmah bint Saud — a daughter of the late King Saud, businesswoman, and human rights activist — and her daughter Suhoud al-Sharif, according to Princess Basmah's legal adviser, Henri Estramant. Authorities arrested Princess Basmah and her daughter in their home in Jeddah in 2019 and held them in a high-security prison for almost three years without being charged.

On August 2, DAWN confirmed that the General Court sentenced Prince Turki bin Abdullah, a son of the late King Abdullah and former governor of Riyadh Province, to 17 years in prison after he was held in pretrial detention for five years. Prince Turki had been arrested in a 2017 so-called anti-corruption campaign and reportedly was accused of taking advantage of his influence to award contracts to his own companies.

## C. TORTURE AND OTHER CRUEL, INHUMAN, OR DEGRADING TREATMENT OR PUNISHMENT, AND OTHER RELATED ABUSES

The law prohibits torture and makes officers responsible for criminal investigations liable for any abuse of authority.  Sharia law, as interpreted by officials and judges, prohibits judges from accepting confessions obtained under duress, and the law states that public investigators shall not subject accused persons to coercive measures to influence their testimony.  Nevertheless, there were numerous credible reports by human rights organizations, the United Nations, and independent third parties of torture and other cruel, inhuman, or degrading treatment or punishment by government officials and law enforcement officers, and of defendants' confessions being obtained through torture or other mistreatment.  On June 27, ESOHR claimed that official institutions used torture systematically during all stages of detention, from arrest to

after the issuance of the verdict.  Officials from the Ministry of Interior, Public Prosecutor's Office, and HRC, which is responsible for coordinating with other government entities to investigate and respond to alleged human rights violations (see section 5), claimed that rules prohibiting torture prevented such practices from occurring in the penal system.

On February 16, the UK-based rights organization ALQST reported that lawyer and activist Mut'ib bin Zafir al-Amri, who was sentenced to seven years in prison for posting on Twitter and human rights activism on charges of "inflaming public opinion" and "criticizing the symbols of the state," had been subjected to severe physical and psychological torture since 2018 by government officials in Dahban Prison, including beatings and electric shocks.

On July 5, Prisoners of Conscience reported that authorities arrested Malik al-Dowaish, son of detained cleric Sulaiman al-Dowaish, after he wrote an article accusing Saudi authorities of abducting, torturing, and forcibly disappearing his father, who has been detained since 2016. Malik was arrested before the article was published, after campaigning for years for the release of his father, then released on September 2 only to be rearrested on September 29.  As of year's end, he remains in detention without trial.

Courts continued to sentence individuals to corporal punishment.  In March 2021 the Supreme Court clarified that a 2020 royal decree that effectively had eliminated flogging in most cases could be applied retroactively to sentences predating the decree.  While flogging may no longer be used as a discretionary ta'zir sentence, it can still be used for three hudud crimes: drunkenness, sexual conduct between unmarried persons, and false accusations of adultery. There have been no reports of flogging since the 2020 decree.

On March 11, authorities released blogger Raif Badawi from prison after 10 years' imprisonment, according to an interior ministry official.  Badawi was sentenced to 1,000 lashes, 10 years in prison, and a 10-year travel ban in 2014 on charges including insulting Islam, in response to his human rights activism.  He was subjected to 50 lashes in 2015, but further floggings were delayed due to health concerns.  Badawi remains banned from speaking to any media and is subject to a travel ban for an additional 10 years after his release from prison.

Impunity for security forces was a serious problem.  Activists questioned the impartiality of procedures to investigate detainee complaints of torture and maltreatment.  HRC and the quasi-governmental National Society for Human Rights (NSHR) had offices at main prisons with which

Case 1:23-cv-00306-RBW   Document 31-6   Filed 08/16/24   Page 8 of 67

prisoners or their families could file complaints, but there were reports that prisoners could not submit complaints about mistreatment without the approval of prison officials, and there was no information that any official actions had been taken in response to prisoner complaints. The Ministry of Interior stated it had installed surveillance cameras to record suspects' interrogations in some criminal investigation offices, police stations, and prisons where such interrogations occur, but reports of abuses during interrogations continued during the year, and there were no reports of accountability for abuses because of such video monitoring. The government provided human rights training to security forces, but nongovernmental organizations (NGOs) continued to highlight concerns regarding widespread torture and other abuses as well as deplorable conditions in detention centers.

**Prison and Detention Center Conditions**

Prison and detention center conditions were unobserved, but reports indicated some did not meet international standards; reported problems included overcrowding, dangerous conditions, medical neglect, harassment, and denial of family visits.

**Abusive Physical Conditions:** On February 1, ALQST reported mounting evidence of a deliberate campaign by authorities to jeopardize the safety, health, and even lives of certain prisoners of conscience, through medical neglect and by failing to protect detainees from other prisoners. The organization also reported constant harassment of certain political detainees and denial of family visits.

Juveniles constituted less than 1 percent of detainees and were held in separate facilities from adults, according to available information.

Authorities held pretrial detainees together with convicted prisoners. They separated persons suspected or convicted of so-called terrorism offenses from the general population. Activists alleged that authorities sometimes detained individuals in the same cells as other individuals with mental disabilities as a form of punishment, and said Saudi authorities also mistreated persons with disabilities.

Authorities differentiated between violent and nonviolent prisoners, sometimes pardoning nonviolent prisoners other than those detained on political or freedom of expression grounds to

2022 Country Reports on Human Rights Practices: Saudi Arabia - United States Department of State, https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/saudi-arabia/

reduce the prison population.  In some cases, Shia inmates were held in separate wings of prisons and reportedly faced worse conditions than Sunni prisoners.

On May 27, Maha al-Qahtani, wife of imprisoned Saudi Civil and Political Rights Association member Mohamed al-Qahtani, said her husband was attacked by a prisoner suffering from mental illness, adding that prison authorities moved prisoners with mental illness to the same ward as prisoners of conscience as a means of punishing the latter.  According to ALQST reporting from February 1, Mohamed al-Qahtani previously had reported several incidents where his safety was compromised and his life was threatened, including a fire on his wing of the prison and prison administrators deliberately placing him alongside inmates infected with coronavirus. On May 31, ALQST echoed Maha al-Qahtani's complaints, saying reports suggested that the prison administration was deliberately housing prisoners of conscience, such as Mohammed al-Qahtani, as well as Essa al-Nukhaifi, Fawzan al-Harbi and Mohammed al-Hudaif, with prisoners with mental disorders, despite requests from the prisoners of conscience to be moved to another wing.  On November 4, Amnesty International said authorities have denied al-Qahtani contact with, and not disclosed his whereabouts to, his family since October 24.  It added that his family suspects that the authorities are not allowing him to contact them for previously complaining about being assaulted by another prisoner in his ward in October 2022.  On November 9, the Special Rapporteur on the situation of human rights defenders said she was increasingly concerned for the health and life of al-Qahtani, who is reportedly being held incommunicado after his family filed a complaint about attacks on him by inmates.  On November 24, 14 human rights NGOs, including Amnesty International, ESOHR, ALQST and DAWN, signed a joint letter calling on Saudi authorities to disclose al-Qahtani's whereabouts.  Al-Qahtani's 10-year prison sentence was due to expire on November 22, but he had not been released as of the end of the year and his whereabouts were unknown.

On November 16, ALQST reported that al-Nukhaifi remained on hunger strike that started on October 15 to protest his continued detention beyond the completion of his prison term, which should have concluded on October 14.

On October 11, ALQST reported that authorities prevented detained human rights activist Waleed Abu al-Khair from taking medication or visiting the hospital.

On July 29, ALQST said Yemeni prisoner Nabil Faisal Sulaiman Eidha started a hunger strike in protest of ill treatment, claiming he had been tortured, sexually harassed, and denied medical

https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/saudi-arabia/

treatment by prison authorities.

Family members of detained persons under investigation or in pretrial detention said family visits were typically not allowed, while others said visits or calls were extremely brief (less than five minutes).  Authorities at times reportedly denied some detainees their entitled weekly call for several months or years.  Some family members of prisoners complained authorities canceled scheduled family visits without justification.

**Administration:**  There were multiple legal authorities for prisons and detention centers.  The General Directorate of Prisons administered most detention centers, prisons, and jails, while the Mabahith administered some regional prisons and detention centers for so-called "security prisoners."

The law gives the Public Prosecutor's Office the authority to conduct official visits of prisons and detention facilities "within their jurisdictional areas to ensure that no person is unlawfully imprisoned or detained."  On February 15, Attorney General Saud al-Mu'jab said that Public Prosecutor's Office officials made nearly 50,000 inspection visits in 2021 to detention facilities to ensure inmates and detainees were receiving their legal rights.  The law provides that "any prisoner or detainee shall have the right to submit, at any time, a written or verbal complaint to the prison or detention center officer and request that he communicate it to a member of the [former] Bureau of Investigations and Public Prosecution [now the Public Prosecutor's Office]." Prisoners submitted complaints to the HRC, which had offices in several prisons, and to the NSHR for follow-up.  Inmates, however, required approval from prison authorities to submit complaints to an HRC office.  There was no information available on whether prisoners were able to submit allegations of mistreatment to prison or prosecutorial authorities without censorship or whether authorities responded or acted upon complaints.

Citizens and residents could also submit complaints regarding illegal detention or violations of detainee rights to the Public Prosecutor's office by using the Ma'akom system, or via the online platform *Absher*, a hotline telephone number, or in person.  The Ministry of Interior-run website *Nafetha* provided detainees and their relatives access to a database containing information regarding the legal status of the detainee, including any scheduled trial dates.  Authorities generally permitted relatives and friends to visit prisoners twice a week, although certain prisons limited visitation to once or twice a month, or in some cases, every 50 days.  Prisoners were typically granted at least one telephone call per week.  There were reports that prison, security, or

law enforcement officials denied this privilege in some instances, often during pretrial investigations.  The families of detainees could access the *Nafetha* website for applications for prison visits, temporary leave from prison (generally approved around post-Ramadan Eid holidays), and release on bail (for pretrial detainees).

Authorities generally permitted Muslim detainees and prisoners to perform Islamic religious observances, such as prayers.

**Independent Monitoring:**  Independent institutions were not permitted to conduct regular, unannounced visits to places of detention, according to the UN Committee against Torture.  In a limited number of cases, foreign diplomats were granted consular visits to individuals in detention, but the visits took place in a separate visitors' center where conditions may differ from those in the detention facilities holding the prisoners.  Prison conditions were therefore difficult to observe systemically.

The government permitted the HRC and quasi-governmental NSHR to monitor prison conditions.  The organizations stated they visited prisons throughout the country and reported on prison conditions.

**Improvements:**  On August 13, Attorney General al-Mu'jab launched procedural guidelines for the Public Prosecutor's Office for supervising prisons and detention centers.  The guide included procedures for supervising the execution of criminal judgments and monitoring and inspection of prisons and detention centers.

Some Covid-related restrictions relating to prisoners were lifted in 2022.  In May the Directorate General of Prisons launched "virtual visit" video calls for family members of prisoners.

## D. ARBITRARY ARREST OR DETENTION

The law provides that no entity may restrict a person's actions or imprison a person, except under the provisions of the law.  The criminal procedure prohibits authorities from detaining a person for more than 24 hours, but the Ministry of Interior and the State Security Presidency, to which most forces with arrest powers reported, nonetheless continued to arrest and detain persons indefinitely without judicial oversight, notification of charges, or effective access to legal counsel or family, according to human rights groups.

**Arrest Procedures and Treatment of Detainees**

The law gives the Public Prosecutor's Office "complete and independent powers" to identify major crimes that require detention, according to local media.

According to the law, "No person shall be arrested, searched, detained, or imprisoned except in cases provided by law, and any accused person shall have the right to seek the assistance of a lawyer or a representative to defend him during the investigation and trial stages." By law authorities may summon any person for investigation and may issue an arrest warrant based on evidence. In practice authorities frequently did not use warrants, which were not required under the law in all cases.

The law requires authorities to file charges within 72 hours of arrest and to hold a trial within six months, subject to exceptions specified by amendments to the law of criminal procedure and the counterterrorism law (see section 2.a.). Authorities may not legally detain a person under arrest for more than 24 hours except pursuant to a written order from a public investigator. Authorities reportedly often failed to observe these legal protections, and there was no requirement to advise suspects of their rights.

The law specifies procedures required for extending the detention period of an accused person beyond the initial five days. There is a functioning bail system for less serious criminal charges. Authorities may approve detentions more than six months in "exceptional circumstances," effectively allowing individuals to be held in pretrial detention indefinitely in cases involving "terrorism" or "violations of state security" charges. The Public Prosecutor's Office may order the detention of any person accused of a crime under the counterterrorism law for up to 30 days, renewable for up to 12 months or for up to 24 months in state security cases with a judge's approval.

By law defendants are entitled to hire a lawyer to defend them "within an adequate period of time to be decided by the investigatory body." The government provided lawyers to defendants who made a formal application to the Ministry of Justice to receive a court-appointed lawyer and proved their inability to pay for legal representation. In cases involving "terrorism" or "state security" charges, detainees generally were not permitted to be represented by a lawyer of their choice.

There were reports authorities did not always allow legal counsel access to detainees under investigation in pretrial detention.  Authorities indicated a suspect could be held up to 12 months in investigative detention without access to legal counsel if authorized by prosecutors.  Judicial proceedings begin after authorities complete a full investigation.

The king continued the tradition of commuting some judicial punishments.  Royal pardons could set aside a conviction or reduce or eliminate corporal punishment.  The remaining sentence could be added to a new sentence if the pardoned prisoner committed a crime subsequent to release.

Authorities commuted the sentences of some who had received prison terms.  The counterterrorism law allows the Public Prosecutor's Office to stop proceedings against an individual who cooperates with investigations or cooperates in thwarting a planned terrorist attack.  The law authorizes the State Security Presidency to release individuals already convicted in such cases.

**Arbitrary Arrest:**  Rights groups received reports from families claiming authorities held their relatives arbitrarily or without notification of charges.  During the year authorities detained without charge individuals exercising freedom of expression, including government critics, Shia religious leaders, individuals with links to human rights activists, persons accused of violating so-called religious standards, and so-called security suspects.

By law detainees are not entitled to challenge the lawfulness of their detention before a court.  In the case of wrongful detention, the law of criminal procedure, as well as provisions of the counterterrorism law, provide for the right to compensation if detainees are found to have been held unlawfully.  On September 4, the Public Prosecutor's Office urged individuals to report any illegal arrests, likely to highlight reporting mechanisms like other ministries.

On February 2, the UN Special Rapporteur on Human Rights Defenders said she had raised serious concerns about a pattern of widespread and systematic arbitrary arrests and detentions of human rights defenders, and had sent a communication to the government in November 2021 focused on the cases of six human rights defenders:  Asmaa Al-Subaie, Maha Al-Rafidi, Mohammed al-Qahtani, Fawzan al-Harbi, Issa al-Nukhaifi, and Khaled al-Omair (see section 1.c., Abusive Physical Conditions).

On July 13, Reporters Without Borders reported the government was arbitrarily detaining 28 journalists.

On August 12, ESOHR reported authorities released social media activist Musa al-Khunaizi after holding him for 50 days in detention for speaking out against hate speech.

On August 22, the Supreme Court overturned the acquittal of the former imam of the Holy Mosque in Mecca, Sheikh Saleh al-Talib, and sentenced him to 10 years in prison.  Al-Talib had been arrested in 2018, but there was no information available about the basis for his arrest or the charges brought against him (see section 1.e., Political Prisoners and Detainees, for additional cases of arbitrary or unlawful detention.)

**Pretrial Detention:**  Incommunicado detention occurred (see section 1.b.).  Authorities reportedly did not always respect a detainee's right to contact family members following detention, and the counterterrorism law allows the investigatory body to hold a defendant for up to 90 days in detention (or longer) without access to family members or legal counsel.  Security and other types of prisoners sometimes remained in prolonged solitary detention before family members or associates received information of their whereabouts, particularly for detainees in Mabahith-run facilities.

On March 5, Human Rights Foundation (HRF) reported that since October 2021, prisoner Abdulrahman al-Sadhan has been prevented from contacting his family, who remain unaware of his health or the location of his detention.  In April 2021 the SCC had sentenced al-Sadhan to 20 years' imprisonment, followed by a 20-year travel ban, on terrorism financing and facilitation charges.  However, according to HRF, the charges against him were in connection with tweets from a parody Twitter account that criticized the Saudi regime's repression.  After his arrest in 2018, al-Sadhan was detained incommunicado for two years before being allowed to speak with his family.  On October 22, the UN Working Group on Arbitrary Detention published a decision finding his detention arbitrary and calling on Saudi authorities to release him immediately and unconditionally.

In July family members of religious scholar Salman al-Odah claimed authorities had denied al-Odah contact with his family and his lawyers for more than a year and a half and repeatedly had postponed his trial hearings.

On August 9, the SCC Court of Appeals sentenced Salma al-Shehab, a Saudi national and Leeds University PhD student, to 34 years in prison followed by a 34-year travel ban after what Amnesty International called a "grossly" unfair trial. Al-Shehab was arrested in January 2021 and was initially sentenced to six years' imprisonment in mid-2022 for tweets in support of women's rights. According to Amnesty, she was held in solitary confinement for 285 days before being brought to trial and was denied access to legal representation throughout pretrial detention, including during interrogations. Al-Shehab told a court that she had been abused and harassed during her detention, including being subjected to interrogations after being given medications that exhausted her.

## E. DENIAL OF FAIR PUBLIC TRIAL

The law provides that judges are independent and not subject to any authority other than the provisions of sharia and the laws in force, but the judiciary reportedly was subject to influence, particularly in the case of legal decisions rendered by specialized judicial bodies like the SCC, which rarely acquitted suspects. The SCC and the Public Prosecutor's Office were not independent entities, as they reportedly were required to coordinate their decisions with government authorities, including the king and crown prince. Human rights activists claimed that SCC judges received implicit instructions to issue harsh sentences against human rights activists, reformers, journalists, and dissidents not engaged in violent activities. Activists also reported that judicial and prosecutorial authorities ignored due process-related complaints, including lack of access by lawyers to their clients at critical stages of the judicial process, particularly during the pretrial investigation phase.

Defendants and the prosecution can appeal convictions, acquittals, and sentences. The law requires a five-judge appellate court to affirm a death sentence, which a five-judge panel of the Supreme Court must then unanimously affirm. Appellate courts may recommend changes to a sentence, including increasing the severity of a lesser sentence (up to the death penalty), if the trial court convicted the defendant of a crime for which capital punishment is permitted. There were cases during 2022 when a prosecution appeal resulted in longer sentences than originally imposed, including cases involving Mohammed al-Rabea, Salma al-Shehab, and others.

Defendants possess the right to seek commutation of a death sentence for some crimes and may receive a royal pardon under specific circumstances (see section 1.d.). In some prescribed qisas

cases, the families of the deceased may accept compensation from the family of the person convicted in an unlawful death, sparing the convicted from execution.

On March 14, UN High Commissioner for Human Rights Michelle Bachelet said that the trials of some of the 81 individuals executed on March 12 did not meet fair trial and due process guarantees (see section 1.a.).

**Trial Procedures**

The judicial system traditionally lacked published case law on criminal matters, a uniform criminal code, the presumption of innocence, or a doctrine of stare decisis that binds judges to follow legal precedent.  In February 2021 the crown prince announced forthcoming legal reforms to the personal status law, civil transactions law, evidence law, and discretionary sentencing, stating a goal of increasing predictability and transparency in the legal system and expanding protections for women (see section 6, Women).  On December 28, 2021, the Council of Ministers enacted the evidence law.  The personal status law received final approval on March 8 and the civil transactions law was also approved in March.  While assessments of the effects of reforms are still preliminary, the evidence law has clarified the types of admissible evidence and created uniform application of evidence rules in all courts.  It also prohibited judges from discounting evidence given by women and non-Muslims.  The Personal Status law has improved trial procedures for women, giving them additional rights in family cases.  There are still reports of uneven application of the rights granted in the Personal Status law in some cases.  The Saudi Ministry of Justice Judicial Training Center holds training sessions on the legal reforms for judges.

In the absence of a formalized penal code that details all criminal offenses and punishments, judges in the courts determine many of these penalties through individualized interpretations of sharia, which varied according to the judge and the circumstances of the case.  Because judges have considerable discretion in decision making, rulings and sentences diverged widely from case to case.

Several laws provide sentencing requirements for crimes, including terrorism, cybercrimes, trafficking in persons, and domestic abuse.

The Justice Ministry continued a project started in 2007 to distribute model judicial decisions with the goal of ensuring more uniformity of legal application, and the ministry published judicial

Case 1:23-cv-00306-RBW Document 31-6 Filed 08/16/24 Page 17 of 67

decisions on its website.  The law states that defendants should be treated equally in accordance with sharia.  The Council of Senior Scholars, or the *ulema*, an autonomous advisory body, issues *fatwas* (religious opinions) that guide how judges are supposed to interpret sharia.  In 2016 the Ministry of Justice issued a compilation of previous decisions that judges could reference in rulings and sentences.

Appeals courts cannot independently reverse lower-court judgments of innocence or guilt; they are limited to affirming judgments, modifying sentences, or returning them to a lower court for modification.  Even when appeals judges did not affirm judgments, in some cases they remanded the judgment to the original trial judge, sometimes making it difficult for parties to receive a ruling that differed from the original judgment, given judges' hesitation to admit error.  While judges may base their decisions on any of the four Sunni schools of jurisprudence, all of which were represented in the Council of Senior Scholars, the Hanbali School predominated and formed the basis for the country's law and legal interpretations of sharia.  Shia citizens in the Eastern Province, where most Saudi Shia reside, use their legal traditions with Shia judges to adjudicate family law and inheritance cases between Shia parties in their own court system, although either party can decide to adjudicate a case in state courts, which apply Sunni legal traditions.

While the law states that court hearings shall be public, courts regularly were closed at the judge's discretion.  According to the Ministry of Justice, authorities may close a trial depending on the sensitivity of the case to national security, the reputation of the defendant, or the safety of witnesses.  HRC representatives sometimes attended SCC trials.  Foreign diplomats regularly requested to attend non-consular trials of political prisoners and other high-profile detainees, but the Ministry of Foreign Affairs consistently refused to approve their attendance to court proceedings at the SCC, as well as at trials related to state security or human rights issues.  Diplomatic personnel were generally allowed to attend consular proceedings for their own citizens.  Some family members of prisoners complained that neither they nor the legal representatives of the accused were permitted access to trials or notified of the status of trial proceedings.  In several cases, family members were given only 24 hours' notice before a trial hearing.

By law authorities must offer defendants a lawyer at government expense.  In 2017 the Ministry of Justice stated that defendants "enjoy all judicial guarantees they are entitled to, including the right to seek the assistance of lawyers of their choosing to defend them, while the ministry pays

the lawyer's fees when the accused is not able to settle them." Activists alleged that many political prisoners were not able or allowed to retain an attorney or consult with their attorneys during critical stages of the investigatory and trial proceedings. Detained human rights activists often indicated they did not trust the courts to appoint unbiased lawyers who would vigorously defend them. The law provides defendants the right to be present at trial and to consult with an attorney during the trial. The counterterrorism law, however, authorizes the attorney general to limit the right of a defendant accused of so-called terrorism charges to access legal representation while under investigation, "whenever the interests of the investigation so require." Defendants have no right to discovery, nor can defendants view their own case file or the minutes from their interrogation. Defendants have the right to call and cross-examine witnesses, but activists reported that SCC judges regularly restricted this right in "the interests of the case." The law provides that a prosecutor-appointed investigator may question the witnesses called by the defendant during the investigation phase before the initiation of a trial. The investigator also may elicit testimony from additional witnesses. Authorities are prohibited from subjecting a defendant to coercive measures or compelling the taking of an oath, but there were regular credible reports of confessions elicited through torture and other mistreatment. The court must inform convicted persons of their right to appeal rulings.

The law does not provide for a right against self-incrimination.

The law provides that "the court should seek the assistance of interpreters," but it does not obligate the court to do so from the moment the defendant is charged, nor does the law specify that the state will bear the costs of such services; in practice free interpretation services often were provided.

Sharia, as interpreted by the government, is applied to all citizens and noncitizens, but in practice the law discriminates against women, noncitizens, nonpracticing Sunni Muslims, Shia Muslims, and persons of other religions. Sources reported judges sometimes completely disregarded or refused to hear testimony by Shia Muslims.

**Political Prisoners and Detainees**

NGOs and press sources reported that Saudi authorities regularly detained persons for peaceful activism, government criticism, or political opposition, including nonviolent religious figures, women's rights activists, human rights defenders, and those who the government claimed posted

or shared offensive or critical comments on social media. The government nonetheless claimed it held no political prisoners, including detainees who reportedly remained in prolonged detention without charge, while local activists and human rights organizations estimated that political prisoners numbered in the "hundreds" or "thousands."

During the year the SCC tried political and human rights activists for nonviolent actions unrelated to terrorism, violence, or espionage against the state, and authorities restricted attorneys' access to detainees on trial. In many cases it was impossible to determine the legal basis for incarceration and whether the detention complied with international norms and standards.

International NGOs, the United Nations, and others criticized the government for abusing its antiterrorism and cybercrime legal authorities to detain or arrest on security-related charges dissidents or critics of the government or royal family who had neither espoused nor committed violence. According to the NGOs Prisoners of Conscience and ESOHR, more than 100 persons remained in detention for peaceful activism, criticism of government leaders or policies, impugning Islam or religious leaders, or "offensive" internet postings, including prominent activists such as Mohammed al-Qahtani, Naimah Abdullah al-Matrod, Maha al-Rafidi, and Waleed Abu al-Khair; clerics including former grand mosque imam Salih al-Talib; and Sahwa movement figures Safar al-Hawali, Nasser al-Omar, and others.

On February 17, the Court of Appeals sentenced Sheikh Khalid al-Rashid to an additional eight years in prison. Al-Rashid was arrested in 2005 over a sermon condemning and calling for protests against Danish cartoons insulting Prophet Muhammad, according to Sanad. According to Prisoners of Conscience and the Alkarama rights group, al-Rashid was due to be released in 2020 after completing his 15-year prison sentence. On November 16, Prisoners of Conscience reported that the SCC Court of Appeals increased al-Rashid's prison sentence for the second time adding another 17 years, which means his prison term became 40 years in total.

On July 23, authorities released Shia human rights defender and writer Nadhir al-Majed, who had been detained since 2017 on charges related to his exercise of freedom of expression, according to ALQST and the Euro-Med Human Rights Monitor. He remained subject to a travel ban for seven years following his release. In August Prisoners of Conscience affirmed that authorities released writers Moqbel al-Saqar and Abdullah al-Dahilan, who were detained in 2019.

Several members of the al-Huwaitat tribe, who were reported to be forcibly displaced to make way for the NEOM megacity project in Tabuk province, were sentenced to lengthy prison terms for expressing opposition to government evictions and other actions. In August the SCC sentenced activist Maha Sulaiman al-Huwaiti to 23 years in prison for tweeting about the increasing cost of living and about the enforced displacement of the al-Huwaitat tribe in northwestern Saudi Arabia, according to Sanad and THE WINA rights organizations. In August the SCC Court of Appeals sentenced Abdulilah al-Huwaiti and his relative Abdullah Dukhail al-Huwaiti to 50 years in prison, followed by a 50-year travel ban. According to ALQST and Prisoners of Conscience, the two men were sentenced over their protests against the project. On October 26, Sanad and Prisoners of Conscience reported that the SCC issued prison sentences ranging from 20 years to 30 years against Ahmed Abdulnaser al-Huwaiti, Abdulnaser al-Huwaiti, and Mahmoud Ahmed al-Huwaiti because of their refusal to surrender their homes for demolition.

In August the SCC sentenced Prince Abdullah Bin Faisal, a graduate student at Boston's Northeastern University, to a 30-year prison term after he was arrested on a trip back to Saudi Arabia and accused of acting to destabilize the kingdom, disturbing social unity, and supporting the country's opponents.

On September 9, ALQST reported that writer, translator, and computer programmer Osama Khaled, detained since 2020, was sentenced to a prison term of 32 years — increased on appeal from an initial five-year sentence — following "allegations relating to the right of free speech."

On September 10, Prisoners of Conscience reported that the SCC Court of Appeals increased prison sentences issued against clerics Nasser al-Omar and Essam al-Owaid from 10 years, including four years suspended, and four years, with one year suspended, to 30 years and 27 years respectively. The court issued a 25-year prison sentence against cleric Abdulrahman al-Mahmoud.

On December 7, DAWN and the Freedom Initiative reported that the SCC Court of Appeals sentenced women's rights activist Mohammed al-Rabea to 17 years in prison after the Supreme Court accepted in September a request filed by the Public Prosecutor's Office to retry him despite the expiry of his prison term. Al-Rabea started a hunger strike in protest over his situation, according to ALQST. Detained in 2018 along with Loujain al-Hathloul and Aziza al-Yousef, al-Rabea's arrest was tied, inter alia, to his activism for women's right to drive and against the guardianship system.

Case 1:23-cv-00306-RBW Document 31-6 Filed 08/16/24 Page 21 of 67

In October media reported that U.S.-Saudi citizen Saad Almadi, age 72, was sentenced to 16 years in prison, plus a 16 year and 3-month long travel ban, for tweets he primarily posted while abroad, some of which were critical of the government.

**Transnational Repression**

Freedom House reports the government engages in transnational repression including "extensive use of spyware, proxy punishment, detentions, assaults, and renditions in nine countries spanning the Middle East, Europe, North America, and Asia," They state that women feature more prominently in the country's transnational repression campaign than in other countries that employ such practices.

The government also harassed and detained family members and associates of Saudi citizens living abroad who were outspoken critics of the government.

**Extraterritorial Killing, Kidnapping, Forced Returns, or Other Violence or Threats of Violence:** There were reports that authorities attempted to intimidate critics living abroad, pressured their relatives in country, and in certain instances abducted or pressured dissidents and repatriated them to the country. In February, the London-based dissident Alya al-Huwaiti said she received death threats from trolls she believed were sending messages from the Saudi government.

On July 15, AP News reported that former interior ministry official Salem al-Muzaini, who is the son-in-law of exiled former senior security official Saad al-Jabri, was abducted from a third country in 2017, forcibly returned to Saudi Arabia, tortured, and detained. On June 10, the UN Working Group on Arbitrary Detention adopted an opinion that al-Muzaini was being physically and psychologically tortured. He was reportedly beaten, lashed, and held incommunicado during this detention.

On August 19, a British judge ruled that dissident satirist, Ghanem al-Masarir, can proceed with his case accusing the government of ordering a physical assault against him in London in 2018, as well as the hacking of his phone.

On November 2, Freedom House told the Associated Press that Saudi Arabia had targeted critics in 14 countries, and that the government's aim was to spy on Saudis, intimidate them, or compel

them to return to the country.

**Threats, Harassment, Surveillance, and Coercion:**  According to Reporters without Borders (RSF), journalists live under heavy surveillance, even when abroad.  RSF states that "electronic brigades" active on social networks hunt and harass journalists, and the government uses high-tech espionage tools to monitor journalists in exile.

On August 9, a jury in a U.S. federal court convicted former Twitter employee and dual U.S.-Lebanese national Ahmad Abouammo of spying on Saudi dissidents using the social media platform and passing their personal information to the crown prince's aide, Bader al-Asaker.

On August 20, *The Telegraph* reported that the government uses the Kollona Amn (We Are All Security) app, which allows citizens to report others alleged to be critical online of the government, and to target female critics of the government.  The article said Salma al-Shehab (see section 1.d., Arbitrary Arrest or Detention) appears to have been prosecuted after some of her tweets were sent to authorities by a Kollona Amn user (See section 1.f. for efforts to punish family members for offenses allegedly committed by their relatives.)

**Misuse of International Law Enforcement Tools:**  NGOs have reported that the government attempted to misuse international law enforcement tools for politically motivated reprisals against individuals located outside the country.  According to Freedom House, there have been renditions of Saudi nationals critical of the government in recent years from three Gulf states of Kuwait, Qatar, and the United Arab Emirates (UAE).

**Efforts to Control Mobility:**  There were credible reports that the government attempted to control mobility as reprisal against citizens abroad, by denying them consular services or otherwise engaging in actions aimed at jeopardizing their legal status, restricting their movement, or provoking their detention in the country where they were located.

In May activist Abdullah al-Odah, son of detained cleric Salman al-Odah, told Amnesty International that he has been unable to renew his passport that expired in October 2017 because authorities repeatedly tried to lure him back to the country with the ultimate purpose of preventing him from leaving the country.

On September 15, U.S.-based activist Danah Almayouf tweeted that the Saudi Consulate in New York canceled her passport renewal application because her Saudi ID was expired.  Almayouf said

she had a valid family Saudi card (equivalent of an ID) issued just a year earlier, but the consulate told her the only way to renew her documents was to go back to Saudi Arabia.

**Bilateral Pressure:**  On June 9, Prisoners of Conscience reported authorities requested that Bulgaria deport Saudi political activist Abdulrahman al-Khalidi, who was under administrative detention in Bulgaria since October 2021, after his asylum application was rejected.  There were no updates available at year's end.

## Civil Judicial Procedures and Remedies

Complainants alleging human rights violations often sought assistance from the HRC or the NSHR, which sometimes advocated on their behalf or provided courts with opinions on their cases.  The HRC generally responded to complaints and can refer cases to the Public Prosecutor's Office; domestic violence cases were the most common.  Individuals or organizations may petition directly for damages or government action to end human rights violations before the Board of Grievances, except in compensation cases related to state security, where the SCC is mandated to determine if remediation is appropriate.  The counterterrorism law contains a provision allowing detainees in Mabahith-run prisons to request financial compensation from the Ministry of Interior, State Security Presidency, or both for wrongful detention beyond their prison terms.  In some cases the government did not carry out in a timely manner judicially-ordered compensation for unlawful detentions.

## F. ARBITRARY OR UNLAWFUL INTERFERENCE WITH PRIVACY, FAMILY, HOME, OR CORRESPONDENCE

The law prohibits unlawful intrusions into the privacy of persons, their homes, places of work, and vehicles.  Criminal investigation officers are required to maintain records of all searches conducted; these records should contain the name of the officer conducting the search, the text of the search warrant (or an explanation of the urgency that necessitated the search without a warrant), and the names and signatures of the persons who were present at the time of search.  While the law also provides for the privacy of all mail, telegrams, telephone conversations, and other means of communication, the government did not respect the privacy of correspondence or communications and used the considerable latitude provided by the law to monitor activities legally and intervene where it deemed necessary.  Authorities regularly targeted family members of activists and critics of the government with intrusions and searches.  For example, in October,

*Al–Hurra* reported that Nasser al-Qarni, son of detained cleric Awad al-Qarni, stated that security officers in plainclothes stormed and ransacked his father's house to arrest him without an arrest warrant.  He added that all electronic devices, including laptops and mobile devices, and some personal belongings were confiscated.  Similar allegations were made by activists Abdullah al-Odah and Areej al-Sadhan in relation to the arrests of their father and brother respectively.

In February *Reuters* reported that the Canadian privacy rights group Citizen Lab uncovered evidence that women's rights activist Loujain al-Hathloul's phone had been hacked using NSO Group's spyware.

In April lawyers for Yahya Assiri, founder of London-based human rights NGO ALQST, said their client's mobile phone had been hacked with Pegasus spyware between 2018 and 2020 while he was in the United Kingdom.

There were reports from human rights activists of governmental monitoring or blocking of mobile phone or internet usage. The government strictly monitored politically related activities and took punitive actions, including arrest and detention, against persons engaged in certain political activities, such as calling for a constitutional monarchy or publicly criticizing senior members of the royal family by name (see section 2.a.). Customs officials reportedly opened mail and shipments on a routine basis to search for contraband. Informants allegedly reported "seditious ideas," "antigovernment activity," or "behavior contrary to Islam" in their neighborhoods.

During the year the Public Prosecutor's Office reiterated that infringing on private life through the misuse of mobile phones equipped with a camera or the like is a cybercrime punishable by imprisonment for up to one year and a large fine, in addition to confiscation of devices and the means used in committing the crime.

The government banned the use of encrypted communications by private citizens, and authorities frequently attempted to identify and detain anonymous or pseudonymous users and writers who made critical or controversial remarks. Government authorities regularly surveilled websites, blogs, chat rooms, social media sites, emails, and text messages. Media outlets reported that authorities gained access to critics' and activists' Twitter and other social media accounts and in some cases questioned, detained, or prosecuted individuals for comments made online. (See section 1.e., Transnational Repression, for cases.)

The counterterrorism law allows the government to access a terrorism suspect's private communications and banking information in a manner inconsistent with the legal protections provided by the law of criminal procedure.

The Committee for the Promotion of Virtue and the Prevention of Vice (CPVPV) is charged with monitoring and regulating public interaction between members of the opposite sex, although in practice CPVPV authorities were greatly curtailed compared with past years.

## G. CONFLICT-RELATED ABUSES

During the year Saudi Arabia, as part of the Saudi-led Coalition, continued military operations in support of the internationally recognized Government of Yemen against the Houthi militants. A truce between the parties to the conflict that extended from April 2 until October 2 during the year saw no cross-border aerial attacks between Saudi and Houthi forces and improved access for humanitarian assistance providers. On January 21, a Saudi air strike against an alleged Houthi detention facility in Sa'ada killed 90 civilians and injured over 100.

The United Nations, NGOs, media outlets, as well as humanitarian and international organizations, reported what they characterized as abuses by all parties to the continuing conflict, including civilian casualties and damage to infrastructure from shelling and airstrikes. (For more information, please reference the 2022 Yemen Human Rights Report.) Prior to the end of its mandate in October 2021, the UN Group of Eminent International and Regional Experts expressed concerns in a September 2021 report regarding the Saudi-led coalition's efforts to investigate claims of civilian casualties and its prosecution efforts, saying the Joint Incident Assessment Team (JIAT) did not provide detailed case summary information or supporting evidence. JIAT has not announced any completed reviews of cases from 2022, including the January 21 Saudi strike on a Houthi detention center.

On numerous occasions prior to the April 2 ceasefire taking effect, Saudi civilians were injured and killed by missile, rocket, drone, artillery, and maritime cross-border attacks by Houthi militants in Yemen aimed at Saudi territory.

**Killings:** There were reports of killings of African and Yemeni migrants by Saudi security forces along the border with Yemen (see section 2.e.).

See the Yemen, UAE, and Iran Human Rights Reports for additional information on abuses and violations related to the ongoing conflict in Yemen.

Section 2.
# Respect for Civil Liberties

## A. FREEDOM OF EXPRESSION, INCLUDING FOR MEMBERS OF THE PRESS AND OTHER MEDIA

The law does not provide for or protect freedom of expression, including for members of the press and other media.  The law specifies, "Mass media and all other vehicles of expression shall employ civil and polite language, contribute towards the education of the nation, and strengthen unity.  Media are prohibited from committing acts that lead to disorder and division, affect the security of the state or its public relations, or undermine human dignity and rights."  Authorities regulate and determine what speech or expression is considered to "undermine internal security."  The government can ban or suspend media outlets if it concludes they violated the press and publications law, and it monitored and blocked hundreds of thousands of internet sites.  There were frequent reports of restrictions on free speech.

The counterterrorism law's definition of terrorism includes "any conduct...intended to disturb public order...or destabilize the state or endanger its national unity."  The law also penalizes "anyone who challenges, either directly or indirectly, the religion or justice of the king or crown prince...or anyone who establishes or uses a website or computer program...to commit any of the offenses set out in the law."  Local human rights activists, international human rights organizations, and the UN special rapporteur on the promotion and protection of human rights and fundamental freedoms while countering terrorism criticized the law for its overly broad and vague definitions of terrorism and criticized the government for using it to prosecute peaceful expression and dissent.

Saudi courts handed down several unprecedentedly long prison sentences to individuals for expressing dissent.  These included 34- and 45-year prison terms, respectively, for women's rights activists Salma al-Shehab and Nourah al-Qahtani for peaceful activity on Twitter, and 50-year sentences for Abdulilah al-Huwaiti and Abdullah Dukhail al-Huwaiti for opposing forcible eviction from their homes to make way for the government's NEOM megaproject.

In an August 19 statement, UN Human Rights Spokesperson Liz Throssell called the "extraordinarily lengthy sentence" given to Salma al-Shehab (see section 1.d., Arbitrary Arrest or Detention) for tweets and retweets on political and human rights issues an example of authorities weaponizing the country's counterterrorism and anti-cybercrime laws to target, intimidate, and retaliate against human rights defenders and those who voice dissent.

As of November, Amnesty International has documented the cases of 55 individuals who have been prosecuted for exercising their rights to freedom of expression, association, and assembly, including human rights defenders, peaceful political activists, journalists, poets, clerics, and others.

**Freedom of Expression:**  The government monitored public expressions of opinion and used legal controls to impede the free expression of opinion and restrict individuals from engaging in public criticism of the government.  The law forbids apostasy and blasphemy, which can carry the death penalty, although there were no recent instances of death sentences being carried out for these crimes (see section 1.a.).  Statements that authorities construed as constituting defamation of the king, monarchy, governing system, or Al Saud family (including advocating for government reform) resulted in criminal charges.  The government prohibits public employees from directly or indirectly engaging in dialogue with local or foreign media or participating in any meetings intended to oppose state policies.

The government detained many individuals for crimes related to their exercise of free speech during the year.

On February 16, the SCC Court of Appeals sentenced lawyer and activist Mut'ib bin Zafir al-Amri to seven years in prison for his peaceful media work and human rights activism, including critical tweets calling for reform, according to ALQST and Prisoners of Conscience.  According to ALQST, al-Amri, who has been detained since 2018, was subjected to severe physical and psychological torture, including beatings and electric shocks.

In August the SCC Court of Appeals sentenced Nourah bint Saeed al-Qahtani to 45 years in prison for social media posts, according to DAWN.  Arrested in July 2021, she was initially sentenced to 13 years' imprisonment, but the court lengthened it to 45 years after a prosecutor complained during her appeal that the original sentence was too lenient.

Case 1:23-cv-00306-RBW    Document 31-6    Filed 08/16/24    Page 28 of 67

On January 17, the SCC Court of Appeals upheld an earlier two-year prison sentence against U.S.-Saudi citizens Salah al-Haidar and Bader al-Ibrahim for peacefully expressing their views, according to U.S.-based rights group The Freedom Initiative.  The two were arrested in 2019 and sentenced in October 2021 to time served and a two-year travel ban.  They remain under travel bans as of the year's end.

On October 17, Prisoners of Conscience and Sanad reported the SCC Court of Appeals overturned the acquittal of Yemeni journalist Marwan al-Muraisy and sentenced him to five years in prison.  Al-Muraisy was held incommunicado since his arrest in early June 2018 until May 2019, when he was able to contact his family.

**Violence and Harassment:**  Authorities subjected journalists, writers, and bloggers to violence, harassment, and intimidation during the year (see section 1.c., Prison and Detention Center Conditions).  NGOs, academics, and the press claimed the government targeted journalists, writers, and bloggers using automated social media accounts to ensure that progovernment messages dominated social media trend lists and effectively silenced dissenting voices, accompanied by online harassment by progovernment accounts in some instances.

According to a November 2 Euro-Med Human Rights Monitor report, journalists within the country, as well as Saudi journalists who live and work outside of it, are subject to strict control over their work as they are unable to issue press or media reports or express views critical of government policies without facing prosecution and repression.

**Censorship or Content Restrictions for Members of the Press and Other Media, Including Online Media:**  The law restricts printed materials; printing presses; bookstores; the import, rental, and sale of films; television and radio; foreign media offices and their correspondents; and online newspapers and journals.  Media fall under the jurisdiction of the Ministry of Media.  The ministry may permanently close "whenever necessary" any means of communication – defined as any means of expressing a viewpoint that is meant for circulation – that it deems is engaged in a prohibited activity, as set forth in the law.

Government policy guidance instructs journalists in the country to uphold Islam, oppose atheism, promote Arab interests, and preserve cultural heritage.  The press law requires all online newspapers and bloggers to obtain a license from the ministry.  The law bans publishing anything "contradicting sharia, inciting disruption, serving foreign interests that contradict national

2022 Country Reports on Human Rights Practices: Saudi Arabia | United States Department of State

interests, and damaging the reputation of the grand mufti, members of the Council of Senior Religious Scholars, or senior government officials." On August 23, local media reported that the Council of Minsters approved a new tourism law that criminalizes any criticism of the country's tourism industry.

The law states that violators can face substantial fines for each violation of the law, which doubles if the violation is repeated. Other penalties include banning individuals from publishing any writing. While the Violations Considerations Committee in the Ministry of Media has formal responsibility for implementing the law, the Ministry of Interior, the CPVPV, and judges considered these issues regularly and exercised wide discretion in interpreting the law. It was unclear which of these institutional processes accords with the law.

Although unlicensed satellite dishes were illegal, there was no reporting of the government enforcing restrictions on them, and their use was widespread. Many foreign satellite stations broadcast a wide range of programs into the country in Arabic and other languages, including foreign news channels. Access to foreign sources of information, including via satellite dishes and the internet, was common. Foreign media and some privately owned satellite networks headquartered outside the country maintained local offices; they were subject to licensing requirements from the Ministry of Media and could not operate freely.

The government reportedly penalized those who published items counter to government guidelines and directly or indirectly censored media by licensing domestic media and by controlling importation of foreign printed material.

All newspapers, blogs, and websites in the country must be government licensed. The Ministry of Media must approve the appointment of all senior editors and has authority to remove them. The government provided guidelines to newspapers regarding controversial issues. The Saudi Press Agency reported official government news. The government owned most print and broadcast media and book publication facilities in the country, and members of the royal family owned or influenced privately owned and nominally independent operations, including various media outlets and widely circulated pan-Arab newspapers published outside the country. Authorities prevented or delayed the distribution of foreign print media covering issues considered sensitive, effectively censoring these publications.

The government censored published online and print material it considered blasphemous, extremist, racist, offensive, or inciting chaos, violence, sectarianism, or harm to the public order, as well as criticism of the royal family or its allies among the Gulf Arab states.

On July 25, Riyadh police arrested Egyptian TikToker Tala Safwan, according to the BBC and Al Jazeera.  In a statement, the police said they had arrested an Egyptian resident "who appeared in a broadcast on a social media site talking to another woman with sexual content and suggestiveness that could have a negative impact on public morality."

On October 8, authorities arrested Egyptian publisher Ahmed Diouf, who was taking part in the Riyadh International Book Fair.  His whereabouts remained unknown to his family and friends, according to *Middle East Eye*.

Online self-censorship was pervasive, as social media users were extremely cautious regarding what they posted, shared, or "liked," due to the threat of harassment or prosecution under broadly worded antiterrorism and other laws.  The government closely monitored and often targeted users who expressed support for minority rights or political reform, in addition to those who exposed human rights violations.  Social media users reportedly were reluctant to express support for outspoken activists who were detained or received prison sentences.  Questioning religious doctrine was strictly taboo, particularly content related to the Prophet Muhammad.

**Libel/Slander Laws:**  The cybercrimes law provides for a maximum penalty of one year's imprisonment for "defamation and infliction of damage upon others through the use of various information technology devices," including social media and social networks.  The government acted on this law.  Individuals charged were usually also charged with other provisions of the cybercrime law.

**National Security:**  Authorities abused the cybercrimes law and the counterterrorism law to restrict freedom of expression, including by prosecuting numerous individuals under these laws on charges related to statements made on social media and other exercises of freedom of expression.

On August 16, multiple media outlets reported that Salma al-Shehab, was sentenced to 34 years in prison by the SCC Court of Appeals, using the internet to "cause public unrest and destabilize civil and national security" (see section 1.d., Arbitrary Arrest or Detention).

Case 1:23-cv-00306-RBW    Document 31-6    Filed 08/16/24    Page 31 of 67

**Internet Freedom**

The Ministry of Media or its agencies must authorize all websites registered and hosted in the country.  The General Commission for Audiovisual Media has responsibility for regulating all audio and video content in the country, including satellite channels, film, music, internet, and mobile applications, independent from the Ministry of Commerce and Industry.  Internet access was widely available.

The press and publications law implicitly covers electronic media, since it extends to any means of expression of a viewpoint meant for circulation, ranging from words to cartoons, photographs, and sounds.  Laws, including the cybercrimes law, criminalize many internet-related activities, including defamation, hacking, unauthorized access to government websites, and stealing information related to national security as well as the creation or dissemination of a website for a terrorist organization.  Security authorities actively monitored internet activity, both to enforce laws, regulations, and societal norms and to monitor recruitment efforts by extremist organizations such as ISIS.  The government prosecuted individuals who used the internet to criticize government officials or religious authorities, or express support for terrorism, blasphemy, and apostasy.

The government reportedly collected information concerning the identity of persons peacefully expressing political, religious, or ideological opinions or beliefs online.  According to Freedom House, authorities regularly monitored nonviolent political, social, and religious activists and journalists in the name of national security and maintaining social order.

Between May and August, rights organizations reported that authorities arrested several prominent social media personalities, including Mansour al-Raqeeba, his father Ali al-Raqeeba, and Abu Bejad al-Harif for unknown reasons.  Ali al-Raqeeba was released in August.  No information was available on the charges against them or on the current status of the others arrested.

Access to the internet is legally available only through government-authorized internet service providers (ISPs).  The government required ISPs to monitor customers and required internet cafes to install hidden cameras and provide identity records of customers.  Although authorities blocked websites offering proxies, persistent internet users accessed the unfiltered internet via other means.

Saudi Arabia - United States Department of State
https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/saudi-arabia/

On many occasions, government officials and senior clerics publicly warned against inaccurate reports on the internet and reminded the public that criticism of the government and its officials should be done through private channels, including official complaint processes.

On January 17, the Public Prosecutor's Office issued a warning that "spreading rumors and lies about matters related to public order" is a serious crime, punishable by up to five years in prison, fines up to 3,000,000 Saudi riyals ($798,000), and confiscation of the devices and tools used.  It added that individuals in the kingdom who had participated in spreading rumors had been "summoned" and criminal charges were brought against them under the Anti-Cybercrimes Law and the Law of Criminal Procedures.  This announcement came after a cancelled concert in Riyadh led to online claims that young women were sexually harassed on their way home.  There was no information available regarding whether complaints were filed or whether, if filed, the allegations of sexual harassment were investigated or prosecuted.

The law criminalizes the publication or downloading of "offensive" websites, and authorities routinely blocked sites containing material perceived as harmful, illegal, offensive, or anti-Islamic.  The governmental Communications and Information Technology Commission (CITC) filtered and blocked access to websites it deemed offensive, including sexual content, as well as pages calling for domestic political, social, or economic reforms or supporting human rights, including websites of expatriate Saudi dissidents.

In November 2021 the CITC proposed the Digital Content Platform Regulations.  The framework includes requirements for online content platforms to comply with content removal requests, local data protection legislation, and to obtain registration certificates from the CITC.

According to the Saudi Gazette, an English-language daily newspaper published in Jeddah, in July the government asked YouTube to remove ads the government called "inappropriate" because they were said to "contradict Islamic values and principles and violate media content regulations in the Kingdom."  There was no action taken as of November.

Several Voice over Internet Protocol call services, such as WhatsApp, remained blocked and only accessible using a virtual private network.  On April 17, Minister of Communications and Information Technology Abdullah al-Swaha said the government would continue blocking call facilities on apps that do not comply with regulatory and safety protocols in the country. Progovernment trolls reportedly took to "hashtag poisoning," a method of spamming a popular

Saudi Arabia - United States Department of State
https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/saudi-arabia/

hashtag to disrupt criticism or other unwanted conversations through a flood of unrelated or opposing tweets.  Bots frequently shared identical messages.

The government published its first Personal Data Protection Law in September 2021.  The law, which regulates the collection, processing, storing, and transfer of data, states that the unlawful transfer of personal data outside the country can result in "criminal conviction and imprisonment."

The government continued to block some Qatari websites, such as *Bein Sports*.  The government also blocked access to the website of the Turkish public broadcaster TRT's Arabic edition.  Writing for blocked websites, providing them with materials to publish, or promoting alternative addresses to access them are crimes under the cybercrimes law.

### Restrictions on Academic Freedom and Cultural Events

The government restricted some public artistic expression but increasingly relaxed restrictions on cultural events dedicated to film, comics, music, and dance.

Academics reportedly practiced self-censorship, and authorities prohibited professors and administrators at public universities from hosting meetings at their universities with foreign academics or diplomats without prior government permission (see section 2.b., Freedom of Association).

On September 6, Sanad and Prisoners of Conscience reported that the SCC sentenced academics Mohammed al-Hazmi and Ali al-Alma'i to 23 years in prison for attending a gathering hosted by now-detained Sahwa cleric Awadh al-Qarni.  The two were arrested in a series of raids in Abha in July 2021, which targeted several academics.

## B. FREEDOMS OF PEACEFUL ASSEMBLY AND ASSOCIATION

The law provides for limited freedom of assembly and association, but the government did not respect these rights.

### Freedom of Peaceful Assembly

2022 Country Reports on Human Rights Practices: Saudi Arabia | United States Department of State

The law requires a government permit for an organized public assembly of any type. The government categorically forbids participation in political protests or unauthorized public assemblies, and security forces reportedly arrested and detained demonstrators. Security forces at times allowed a small number of unauthorized demonstrations throughout the country.

On August 31, online videos purportedly showing security forces attacking and beating girls protesting at an orphanage in Khamis Mushait went viral. In response, the governor of Asir province Prince Turki bin Talal bin Abdulaziz ordered the formation of a committee to investigate "all parties" of the incident and "refer the case to the competent authority." According to Prisoners of Conscience and DAWN, security forces intervened after the girls staged a sit-in demanding improvements to their conditions at the orphanage.

On August 31, Amnesty International called upon authorities to immediately release and drop all charges against 10 Egyptian men detained without charge after attempting to organize a remembrance event marking the 1973 Arab-Israeli war. On October 11, Amnesty International reported that Saudi Arabia's SCC sentenced the men to between 10 and 18 years in prison for organizing a peaceful remembrance event.

**Freedom of Association**

The law provides for limited freedom of association, but the government strictly restricted this right. The law provides a comprehensive legal framework to govern and restrict the establishment, operation, and supervision of associations and foundations. The government prohibited the establishment of political parties. All associations must be licensed by the Ministry of Human Resources and Social Development and comply with its regulations. Groups that advocated changing elements of the social or political order reported their licensing requests went unanswered for years, despite repeated inquiries. The ministry reportedly used arbitrary means such as requiring unreasonable types and quantities of information to delay and effectively deny licenses to associations. Government-chartered associations limited membership only to citizens.

## C. FREEDOM OF RELIGION

See the Department of State's *International Religious Freedom Report* at
**https://www.state.gov/international-religious-freedom-reports/**.

## D. FREEDOM OF MOVEMENT AND THE RIGHT TO LEAVE THE COUNTRY

The law does not prohibit internal movement, emigration, or repatriation of male citizens. The government imposed some restrictions on foreign travel.

**In-country Movement:** The government generally did not restrict the free movement of male citizens within the country. The guardianship system no longer requires a woman to have the permission of her male guardian (normally a father, husband, son, brother, grandfather, uncle, or other male relative) to move freely within the country (see section 6, Women). Following a 2020 court ruling in favor of women's right to live independently, judicial authorities amended the *taghayyub* (absenteeism) law to allow all unmarried, divorced, or widowed women to live alone without the consent of a male guardian. Previously, the law granted guardians the right to report the "unapproved absence" of anyone under their guardianship (see section 6, Women). Parents can still file disobedience cases against their children, male or female, including adult children. In parental disobedience cases, no evidence is required, and the case is referred to the court after a complaint is filed. Such cases can result in arrest and forcible return to the parent's home or imprisonment, even of adult women.

On July 5, ALQST and MENA Rights Group reported that Shaimaa al-Baqmi, a woman age 24, had been missing since April after her family filed a complaint against her for running away from the family home to live independently. Sources reportedly close to al-Baqmi claimed she was a victim of domestic violence and death threats. ALQST alleged authorities arrested her because her father reported that she had run away from home and accused her of unspecified matters affecting state security.

Authorities respected the right of citizens to change residence or workplace, provided they held a national identification card.

**Foreign Travel:** The government regularly restricts foreign travel, especially for human rights defenders, women's rights activists, and those perceived as critical of the government, as well as their families. In addition, travel documents allowing international travel are unavailable to the kingdom's tens of thousands of stateless residents.

The government reportedly confiscated passports for political reasons and revoked the rights of some citizens to travel, often without providing them notification or opportunity to contest the restriction. Courts regularly imposed travel bans as part of criminal sentencing, restricting an

Saudi Arabia - United States Department of State https://www.state.gov/reports/2022-country-reports-human-rights-practices/saudi-arabia/

individual's ability to leave the country after being released from prison. Travel bans reportedly were imposed against individuals being prosecuted for charges related to state security, corruption, labor, financial, or real estate disputes, in addition to other crimes.

Activists, media, and rights groups alleged the government used travel bans as part of a broader effort to suppress dissent. Activists estimated thousands of citizens were under travel restrictions, including released activists, relatives of citizens detained in the government's anticorruption campaign, and relatives of detained clerics and human rights activists. On February 26, Sanad reported that the number of citizens banned from traveling abroad exceeds 70,000, including entire families of detainees, activists, and opponents, in addition to members from the royal family and those close to them. On September 26, Amnesty International reported 40 documented cases of activists and human rights defenders sentenced after unfair trials with travel bans from five to 35 years. The group also noted 39 unofficial travel bans that affected their relatives.

On February 10, Amnesty International urged the government to lift the travel ban imposed on women's rights activist Loujain al-Hathloul and her parents, which the organization called arbitrary.

According to Amnesty, detained cleric Salman al-Odah, who is at risk of the death penalty, has had 19 of his family members subject to travel bans.

Citizens of both genders younger than 21 require a guardian's consent to travel abroad.

In March 2021 the government implemented reforms allowing most private-sector expatriate workers to obtain exit or reentry visas at the end of their work contract without their employer's permission. Expatriate domestic workers, however, still require employer approval to travel or depart the country. Foreign citizen workers under sponsorship require the sponsor's consent to travel abroad unless they resign and depart the country for good.

## E. PROTECTION OF REFUGEES

**Access to Asylum:** The government cooperated with the Office of the UN High Commissioner for Refugees (UNHCR) and other humanitarian organizations in providing protection and assistance to refugees, returning refugees, or asylum seekers, as well as other persons of concern. The law

provides that the "state will grant political asylum if public interest so dictates." Generally, there is not a codified asylum system for those fleeing persecution, and the country is not a party to the 1951 Refugee Convention. The government permitted refugees recognized by UNHCR to stay in the country temporarily, pending identification of a durable solution, including third-country resettlement or voluntary repatriation. The government generally did not grant asylum or accept refugees for resettlement from third countries, however. Government policy is to refuse refugee status to persons in the country illegally, including those who overstayed a pilgrimage visa. The government strongly encouraged persons without residency to leave, and it threatened or imposed deportation. Access to naturalization was difficult for refugees.

The government did not recognize the right of citizens to petition for access to asylum or refugee status in foreign countries. The law penalizes citizens who seek asylum in foreign countries.

**Refoulement:** Multiple media sources claimed the government had increased activities to arrest and deport undocumented migrants.

In a March 30 statement, International Organization for Migration (IOM) said that around 900 Ethiopians arrived back in Addis Ababa, the first contingent of some 100,000 nationals to be repatriated from Saudi Arabia following an agreement between the Governments of Ethiopia and Saudi Arabia. UNHCR has expressed concerns about their safety after being returned to Ethiopia.

In March *NBC News* reported that Saudi Arabia had increasingly cooperated with the Chinese government's requests to return Chinese Uyghurs. A 2022 Wilson Center report found that authorities deported at least six Uyghurs to China in the last four years who were either making pilgrimage to Mecca or living in the country legally. (See Section 1.b., Disappearance, for details regarding a case of four detained Uyghurs facing deportation.)

On September 23, the *Middle East Eye* reported that authorities arrested and handed over to the Egyptian government Egyptian dissident Ayman Shohoum, 61, after an Egyptian court issued a life sentence in absentia against him and an Interpol arrest notice was issued. According to his son, authorities deported Shohoum to Egypt on September 20, after nearly four months in prison in Saudi Arabia.

**Abuse of Migrants and Refugees:** In a March 30 statement, IOM estimated that approximately 750,000 Ethiopians were residing in Saudi Arabia with as many as 450,000 likely to have travelled

to the country through irregular means. IOM reported these individuals need help to return home. On May 6, the *Middle East Eye* reported that Ethiopian migrants held in deportation centers around the country were subject to being beaten, extorted, and left in unsanitary, overcrowded rooms. The reports added that migrants were not provided beds or sufficient food and were denied medical care.

Migrants attempting to reach Saudi Arabia via Yemen reportedly faced significant dangers, including from the ongoing conflict. A letter from the UN Office of the High Commissioner for Human Rights (OHCHR), addressed to the Saudi Government and released to the public in December 2022, listed allegations of migrant abuse perpetrated by Saudi security forces, including killings, torture, arbitrary detention, and sexual abuse.

The letter cited reports suggesting that Saudi forces may be "pursuing a policy of excessive use of firearm force to stop and deter migrants from crossing the Saudi-Yemeni border."

The letter referred to information suggesting that Saudi security forces killed approximately 430 migrants and injured 650 others in cross-border shelling and shooting between January and April 30, 2022. The UN letter listed 16 incidents where Saudi security forces were alleged to have fired artillery at migrants en route in the Ar Raqw area and the mountains of al-Ghar in Monabbih district, and Thabit, Qatabir district in Yemen, and the border area of the Red Valley, Saudi Arabia, the two main crossing points from Yemen into Saudi Arabia.

The letter also cited accounts of sexual abuse, including reports that girls as young as 13 were raped by Saudi security forces and pushed back across the border into Yemen without their clothes.

OHCHR invited the Saudi government to respond to the allegations, but as of the end of 2022, it had not done so. OHCHR sent a similar letter to the Houthi leadership in Yemen, which also had not responded by year's end.

NGO Mwatana for Human Rights also documented allegations of security force involvement in injuring and killing migrants, mainly Yemenis and Ethiopians, including eyewitness allegations of migrant bodies abandoned at the border and accounts from survivors of arbitrary detention and torture. Mwatana reported that on May 12, bodies of Yemeni and Ethiopian migrants were discovered piled near an informal detention facility in southern Saudi Arabia (see Section 1.a.,

Extrajudicial Killings). It was unclear in these reports which organizations or units were responsible for the reported attacks and abuse.

As of the end of the year, the Saudi government was restricting access to the Saudi side of the border, limiting the UN and NGOs' ability to investigate the reports.

On December 16, Amnesty International said in a statement that since 2017, Saudi authorities have forcibly returned hundreds of thousands of Ethiopian migrants crossing the border from Yemen or residing in Saudi Arabia to Ethiopia after arbitrarily detaining them for up to 18 months in inhuman and cruel conditions, denying them adequate medical care and subjecting them to torture and other ill-treatment leading to deaths in custody. It called upon authorities to urgently investigate cases of torture and deaths.

**Employment:** Refugees and asylum seekers were generally unable to work legally, although Syrian and Yemeni citizens who possessed a temporary visa could obtain a visitor card from the Ministry of Interior, which reportedly allows them to work. The renewable permits are valid for up to six months and tied to the validity period of their temporary visas; men between the ages of 18 and 60 were eligible to apply.

Most of the Rohingya refugees in the country lack proper documentation. They are unable to get residency permits, a requirement to work legally in the kingdom.

**Access to Basic Services:** The government provides preferential access to education, health care, public housing, and other social services to citizens and certain legal residents. The UNHCR office in Riyadh provided a subsistence allowance covering basic services to a limited number of vulnerable families, based on a needs assessment. Authorities worked with the local UNHCR office to provide medical treatment, also following a needs assessment. The government provided COVID-19 vaccines at no cost to all citizens and residents, regardless of legal status.

## F. STATUS AND TREATMENT OF INTERNALLY DISPLACED PERSONS

Not applicable.

## G. STATELESS PERSONS

Case 1:23-cv-00306-RBW    Document 31-6    Filed 08/16/24    Page 40 of 67

The country has several groups of habitual residents who were legally stateless, but data on the stateless population was incomplete and scarce.

Citizenship is generally derived only from the father. The law approves acquisition of the original nationality by way of descent through the mother, as an exception, when the mother is a Saudi at the time of birth of the baby and the baby's father is of unknown nationality or no nationality. Children born to an unmarried citizen mother who is not legally affiliated with the citizen father may be considered stateless, even if the father recognized the child as his. If the government did not authorize the marriage of a citizen father and a noncitizen mother prior to birth of the children, they may also be considered stateless.

The nationality laws do not allow Saudi women married to foreign citizens to pass their nationality to their children, except in certain circumstances as noted above. Children of Saudi women married to foreign spouses receive permanent residency, but their residency status is revocable in the event of the death of the Saudi mother. Sons of citizen mothers and noncitizen fathers may apply for citizenship once they turn 18 (if not already granted citizenship at birth under certain circumstances); daughters in such cases can obtain citizenship only through marriage to a Saudi man. A child may lose legal identification and accompanying rights if authorities withdraw identification documents from a parent (possible when a naturalized parent denaturalizes voluntarily or loses citizenship through other acts). The personal status law does not cover the rights of Saudi women to marry foreigners; in this and other cases not specifically covered by the law, judges make decisions regarding family matters based on their own interpretations of Islamic law.

Foreign male spouses of female citizens can obtain permanent residency in the country without needing a sponsor, and they can receive free government education and medical benefits, although in general they cannot apply for citizenship based on their marriage and residence. These spouses are also included in the quota of Saudis employed in private companies under the labor quota system, which improves their employment prospects.

Female citizens must be between the ages of 30 and 50 to marry a non-Saudi man. Male citizens must be between the ages of 40 and 65 to marry a non-Saudi woman. The extent to which those laws were enforced was unclear.

8/16/24, 10:31 AM
Case 1:23-cv-00306-RBW Document 31-6 Filed 08/16/24 Page 41 of 67
Saudi Arabia - United States Department of State 2022 Country Reports on Human Rights Practices/saudi-arabia/

In past years the United Nations unofficially estimated there were 70,000 stateless persons in the country, almost all of whom were native-born residents known as *Bidoon* (an Arabic word that means "without" [citizenship]). Updated information on stateless persons was not available. Bidoon are persons whose ancestors failed to obtain nationality during the reign of the country's founder, King Abdulaziz, such as descendants of nomadic tribes not counted among the native tribes, descendants of foreign-born fathers who arrived before there were laws regulating citizenship, and rural migrants whose parents failed to register their births. As noncitizens, Bidoon are unable to obtain passports. The government sometimes denied them employment and educational opportunities, and their marginalized status made them among the poorest residents of the country. In recent years the Ministry of Education encouraged Bidoon children to attend school. The government issues Bidoon five-year residency permits to facilitate their social integration in government-provided health care and other services, putting them on similar footing with sponsored foreign workers. The Jawazat (General Directorate of Passports) issued special identification cards to Bidoon like residency permits issued to foreigners in the country, but with features entitling their holders to additional government services similar to those available to citizens.

Some Baloch, West African, and Rohingya Muslims resident in Saudi Arabia were stateless. Some Rohingya had expired passports that Burma or other countries refused to renew. Others had entered the country with fraudulent travel documents and some of them were subsequently detained for years. UNHCR estimated there were 280,000 Rohingya in the country. Some of these individuals benefited from a prior program to correct their residency status; in 2014 the government issued nearly 200,000 four-year residency permits to Rohingya who entered the country prior to 2008. Rohingya who arrived in the country after 2008 were not eligible for residency permits, although NGOs reported that Rohingya, including those without legal residency, were generally not subject to deportation. In February, the Jawazat announced that Burmese residents could renew their residency permits through the online service portal *Absher*.

There were also between 300,000 and 400,000 Palestinians living in the country who were not registered as refugees.

---

## Section 3.
# Freedom to Participate in the Political Process

The law does not provide citizens the ability to choose their national government in free and fair periodic elections held by secret ballot and based on universal and equal suffrage; it establishes an absolute monarchy led by the Al Saud family as the political system. The Allegiance Council, composed of up to 34 senior princes appointed by the king, is formally responsible for selecting a king and crown prince upon the death or incapacitation of either. Only select members of the ruling family have a voice in the choice of leaders, the composition of the government, or changes to the political system.

The law provides citizens the right to communicate with public authorities on any matter and establishes the government on the principle of *shura* (consultation). The king and senior officials, including ministers and regional governors, are required to be available through *majlis*, open-door meetings where any male citizen or noncitizen may express an opinion or a grievance without an appointment. Senior leaders were typically unavailable to the public, but their representatives or lower-level officials continued this traditional practice. Officials may also be reached through written petitions, such as an appeal of decisions from the legal system.

## ELECTIONS AND POLITICAL PARTICIPATION

**Recent Elections:** In 2015 elections were held for two-thirds of the 3,159 seats on 284 municipal councils; the government appointed the remaining third. Council members serve until the next election – nominally for four-year terms – but there was no public announcement of conducting municipal elections during the year. Women were allowed to vote and run as candidates for the first time in 2015. The voting age was also lowered to 18. The Ministry of Municipal and Rural Affairs actively encouraged women's participation in the municipal elections. Election regulations prohibited candidates from contesting under party affiliation. Twenty-one women won seats, and 17 were appointed to seats, totaling approximately 1 percent of all available seats.

**Political Parties and Political Participation:** There were no political parties or similar associations. The law does not protect the right of individuals to organize politically and specifically bans several organizations with political wings, including the Muslim Brotherhood, as terrorist groups. The government continued to regard human rights organizations, such as the Saudi Civil and Political Rights Association, as illegal political movements and treated them accordingly.

2022 Country Reports on Human Rights Practices: Saudi Arabia

**Participation of Women and Members of Minority Groups:** The law permits women and men to engage in political activities on an equally limited basis. Women may vote and run for office in municipal elections and serve on the Shura council. Women served in a small number of senior positions within government ministries. There was no specific law that prevented lesbian, gay, bisexual, transgender, queer, or intersex (LGBTQI+) persons from voting or running for office but no openly LGBTQI+ individual has run for office.

On January 30, Dr. Leila bint Hamad al-Kassem became the first female undersecretary in the Ministry of Islamic Affairs, Dawah, and Guidance.  On February 9, Fatima al-Tuwaijri was appointed as assistant to the general president for women's affairs at the Prophet's Mosque in Medina, and on July 31, the General Presidency for the Affairs of the Grand Mosque and the Prophet's Mosque appointed three women as female undersecretaries and assistant undersecretaries for the first time.  In July local media reported the appointment of two women to senior positions in government:  Shihana Alazzaz became the first female deputy secretary general of the cabinet and Princess Haifa bint Mohammed Al Saud was appointed deputy minister of tourism.  On March 25, the Ministry of Interior opened admission and registration for females to join the Border Guards at the rank of private.  On September 23, Dr. Hala al-Tuwaijri was appointed as the first woman head of the Human Rights Commission, with the rank of minister.

In September local media reported that the Ministry of Education appointed three female directors to lead the education offices that supervise boys' and girls' schools in Riyadh province. There were no women on the High Court or Supreme Judicial Council and only one female judge. There are no women public prosecutors.

No laws prevent male citizens from minority groups from participating in political life on the same basis as other male citizens. Societal discrimination, however, marginalized the Shia Saudi population, and tribal factors and long-standing traditions continued to dictate many individual appointments to positions. Government authorities were unlikely to appoint a Bedouin tribesman to a high-ranking ministerial-level position or the senior-most positions in the armed forces.

While the religious affiliation of Shura Council members was not known publicly, the council included an estimated seven or eight Shia members out of 150 members. In January a royal order relieved the only Shia member of the Council of Ministers, Mohammad bin Faisal Abu Saq, of his

position and appointed him as a Royal Court Advisor. Multiple municipal councils in the Eastern Province, where most Shia Saudis resided, had large proportions of Shia Saudis as members to reflect the local population, including a majority in Qatif and 50 percent in al-Hassa.

---

## Section 4.
# Corruption and Lack of Transparency in Government

The law provides criminal penalties for official corruption, and the government generally implemented the law effectively.  Nazaha (the National Control and Anticorruption Commission) has sole authority to investigate and prosecute reports of corruption involving government employees.  Nazaha's ministerial-level director reports directly to the king.  Human rights organizations criticized the government for using anticorruption campaigns as a pretext to target political opponents and for arbitrarily detaining and abusing individuals targeted in the crackdown (see sections 1.c.; 1.d., Pretrial Detention; and 1.e., Threats, Harassment, Surveillance, and Coercion).

**Corruption:**  Nazaha conducted countercorruption campaigns throughout the year.  It published monthly (based on the lunar Hijri calendar) reports of its activities, providing the overall number of investigations and arrests during the prior month and a list of the government ministries or agencies involved.  It periodically published limited details concerning convictions in cases that involved either senior-level officials or large sums of money; however, the press releases did not identify the officials by name or provide enough details to allow identification.

Throughout the year Nazaha provided periodic updates on arrests of individuals on corruption related charges, including bribery, abuse of power, and forgery.  For example, on December 26, Nazaha stated that it arrested 170 persons accused of bribery, forgery, abuse of authority, and money laundering, and investigated 437 for crimes between November 25 and December 24, noting that many of the 170 detainees were released on bail.

On December 27, Prisoners of Conscience reported that a court issued a 25-year prison sentence against the former Director of Public Security Lieutenant General Khaled bin Qarar al-Harbi on

charges of corruption and abuse of power.  On September 7, 2021, a royal decree removed al-Harbi from his position and referred him for investigation by Nazaha over corruption charges.

---

## Section 5.
# Governmental Posture Towards International and Nongovernmental Investigation of Alleged Abuses of Human Rights

The law provides that "the State shall protect human rights in accordance with Islamic sharia." Nevertheless, the government restricted the activities of domestic and international human rights organizations.

The government often cooperated with and sometimes accepted recommendations of the quasi-governmental NSHR, the sole government-licensed domestic human rights civil society organization.  The NSHR accepted requests for assistance and complaints regarding government actions affecting human rights.  The government blocked websites of unlicensed local human rights groups and charged their founders with founding and operating unlicensed organizations (see 2.b., Freedom of Association).

The government did not allow international human rights NGOs to be based in the country and restricted their access to the country for visits; there were no transparent standards governing visits by international NGO representatives.  International human rights and humanitarian NGOs reported the government was at times unresponsive to requests for information and did not establish a clear mechanism for communication with NGOs on both domestic human rights issues and issues relating to the conflict in Yemen.

**The United Nations or Other International Bodies:**  The Human Rights Council (UNHRC) included the country in a report published on September 14, 2022, as one of several countries under allegation of subjecting persons who cooperate with the United Nations and its mechanisms in the field of human rights to intimidation and reprisal.  The report cited the case of Loujain al-Hathloul, who engaged with the United Nations Committee on the Elimination of Discrimination against Women in March 2018 before being sentenced in 2020 on national security-related charges.  Although al-Hathloul was released from prison in February 2021, the

UNHRC cited reports that al-Hathloul was under close surveillance and that she and her family were under a travel ban.

**Government Human Rights Bodies:**  The government had mechanisms mandated to investigate and punish human rights abuses, but their effectiveness was limited.  The HRC is part of the government and requires permission from the Ministry of Foreign Affairs before meeting with diplomats, academics, or researchers with international human rights organizations.  The HRC president has ministerial status and reports to the king.  The HRC worked directly with the Royal Court and the Council of Ministers, with a committee composed of representatives of the Shura Council and the Ministries of Labor and Social Development and Interior, and with the Shura Council committees for the judiciary, Islamic affairs, and human rights.

During the year the HRC and NSHR were sometimes outspoken in areas deemed less politically sensitive, including combatting child abuse, child marriage, and trafficking in persons.  While they avoided topics such as protests or cases of political activists that would require directly confronting government authorities, they inquired into complaints of mistreatment by some high-profile political prisoners.  The 18 full-time members of the HRC board included eight women and at least two Shia members; they received and responded to individual complaints, including those related to persons with disabilities, religious freedom, and women's rights.

The Shura Council's Human Rights Committee also actively followed cases and included women and Shia among its members.

The HRC and NSHR maintained records of complaints and outcomes, but privacy laws protect information concerning individual cases, and information was not publicly available.

The Board of Grievances, a high-level administrative judicial body that hears cases against government entities and reports directly to the king, is the primary mechanism to seek redress for claims of abuse.  During the year the Board of Grievances held hearings and adjudicated claims of wrongdoing, but there were no reported prosecutions of security force members for human rights violations.  Military and security courts investigated an unknown number of abuses of authority and security force killings.  The HRC, in cooperation with the Ministry of Education, provided materials and training to police, other security forces, the Ministry of Defense, and the CPVPV on protecting human rights.

Citizens may report abuses by security forces at any police station or to the HRC or NSHR. Citizens and residents could also submit complaints regarding illegal detention or violations of detainee to the Public Prosecutor's office by using the Ma'akom system, or via the online platform *Absher*, a hotline telephone number, or in person. (See Administration in section 1.c., Prison and Detention Center Conditions).

## Section 6.
# Discrimination and Societal Abuses

### WOMEN

**Rape and Domestic Violence:** Rape is a criminal offense under sharia with a wide range of penalties, from flogging to execution. The law does not recognize spousal rape as a crime. The government enforced the law based on its interpretation of sharia, and in some cases, courts punished victims as well as perpetrators for illegal "mixing of genders," even when there was no conviction for rape. Survivors must prove that a rape was committed, and a woman's testimony in court was not always accepted.

Due to these legal and social obstacles, authorities brought few cases to trial. Statistics on incidents of, and prosecutions, convictions, or punishments for rape were not available. Most rape cases were likely unreported because survivors faced societal and familial reprisal, including diminished marriage opportunities, criminal sanctions including imprisonment, or accusations of adultery or sexual relations outside of marriage, which are punishable under sharia. There were reports that domestic abuse in the form of incest occurred but was seldom reported to authorities due to fears of societal repercussions, according to local sources.

The law against domestic violence defines domestic abuse broadly and criminalizes domestic abuse with penalties of one month to one year of imprisonment or a fine unless a court provides a harsher sentence.

Researchers stated it was difficult to gauge the magnitude of domestic abuse, which they believed to be widespread. Recent studies varied widely, finding the rate of domestic abuse among women to be anywhere between 15 to 60 percent. On November 27, the HRC tweeted that one in three women in Saudi Arabia have experienced physical or sexual violence. The

National Family Safety Program, a quasi-governmental organization under the Ministry of National Guard, is charged with spreading awareness of and combatting domestic violence, including child abuse, and continued to report abuse cases.

Officials stated the government did not clearly define domestic violence and procedures concerning cases, including thresholds for investigation or prosecution, and thus enforcement varied from one government body to another. Some women's rights advocates were critical of investigations of domestic violence, claiming investigators were hesitant to enter a home without permission from the male head of household, who may also be the perpetrator of violence. Activists reported the situation had improved in recent years, with greater awareness of resources for domestic violence survivors, such as the domestic violence hotline managed by the Ministry of Human Resources and Social Development. They also noted a continued increase in authorities' willingness to investigate and prosecute domestic violence perpetrators, but they expressed concern that some police departments continued to neglect domestic violence cases.

In April police arrested two men, one in Jeddah and the other in Riyadh, for physically abusing their wives and children, according to media. No further information was available on the case as of year's end.

The government made some efforts to reduce domestic violence. The Ministry of Human Resources and Social Development administered government-supported family protection shelters, although women reported that remaining in the shelters was not always voluntary.

**Female Genital Mutilation/Cutting (FGM/C):** The official government interpretation of sharia prohibits the practice; however, some studies indicated up to 18 percent of women reported having undergone some type of FGM/C.

**Sexual Harassment:** The extent of sexual harassment was difficult to measure, with little media reporting and no official government data. No statistics were available on the incidence of sexual harassment due to reluctance to report violations.

In January 2021 the Council of Ministers approved an amendment to the anti-harassment law that allows for the public release of names of those convicted for harassment, as a deterrent and to prevent offenders' employment in certain jobs. The law criminalizing sexual harassment carries a maximum penalty of five years in prison and a substantial fine. The HRC stated that a

legal punishment against sexual harassment is irreversible, even if the victim renounced his or her own rights or did not file a legal complaint.

On January 9, according to local media, the Criminal Court in Medina sentenced a man convicted of sexual harassment to his identity being publicly revealed, in addition to an eight-month prison term and a fine of 5000 Saudi riyals ($1,330), for harassing a woman using obscene remarks.

Local media reported several incidents of harassment during the year. On January 9, Mecca police arrested a man seen in a video deliberately driving his car into another car driven by a woman. The accused was referred to the Public Prosecutor's Office, but no further information was available on the case at year's end.

In April 2021 the HRC launched a specialized group for confidential support of victims of sexual harassment and their families with psychological counseling and educational, social, and legal guidance.

On December 17, *Middle East Eye* reported that the MDL Beast Soundstorm music festival in Riyadh saw many incidents of harassment of women, who took to social media to voice their stories and complaints.

**Reproductive Rights:** There were no reports of coerced abortion or involuntary sterilization on the part of government authorities.

Premarital sex is illegal under sharia law, and hospitals and health centers may report extramarital pregnancies to police, including pregnancies that result from rape. Access to most contraceptives required a prescription, but condoms were available at pharmacies and supermarkets for over-the-counter purchase. Emergency contraceptives reportedly were available.

Almost all women had access to skilled health attendants during pregnancy and childbirth. The most recent UN Population Fund estimates reported that skilled health personnel attended 99 percent of births between 2004 and 2020. While some women in rural areas had to travel to the closest medical facility to receive treatment, others received health services from Ministry of Health-sponsored mobile health clinics. According to the government, women are entitled to medical assistance during pregnancy and delivery; the right to decide the details of their deliveries; and obtain maternity care in a language she understands and is appropriate to her

Case 1:23-cv-00306-RBW   Document 31-6   Filed 08/16/24   Page 50 of 67

cultural and religious beliefs. Adult women, including unmarried women, also have the right to consent to any medical procedures.

Governmental and quasi-governmental agencies provided medical care to sexual violence survivors as well as psychological and social support. The Ministry of Human Resources and Social Development's Center for Protection Against Abuse runs a 24-hour hotline and shelters across the country with access to medical care for victims of sexual violence, while the quasi-governmental National Family Safety Program agency provided medical support to sexual abuse victims. There were some reports that domestic workers in areas outside of the major cities had more limited access due to language barriers. There were reportedly emergency contraceptives and Post-Exposure Prophylaxis available for survivors, but information was not available on whether they could easily be obtained. (See sections 2.g. and 6, Children, for issues related to legal status for children born outside of marriage.)

**Discrimination:** Women continued to face discrimination under law and custom. A series of regulations issued from 2019 through year's end, however, granted women many of the same rights as men pertaining to travel abroad, civil status, and employment.

Most restrictions under the guardianship system, which had required women to have permission from close male relatives to conduct certain actions, were eliminated. There were reports, however, that government and nongovernment entities, primarily in rural areas, continued to require women to obtain guardian permission prior to providing services.

Women older than 18 have the right to perform several actions pertaining to civil status that were previously limited to men. These included registering the birth of a child; registering the death of a spouse or close relative; registering a marriage or divorce (whether initiated by the husband or wife); and being designated "head of household," thereby allowing women to serve as the guardian of their minor children. Women can also obtain from the Civil Status Administration a "family registry," which is official documentation of a family's vital records that verifies the relationship between parents and children. This reform allows mothers to perform administrative transactions for their children, such as registering them for school or obtaining services at a hospital.

In June 2021 judicial authorities amended the absenteeism law, or *taghayyub*, to allow all unmarried, divorced, or widowed women to live alone without the consent of a male guardian.

Under the previous absenteeism law, guardians could report the unauthorized absence of anyone under their guardianship, which could lead to the arrest, detention, or forcible return of the individual.

In July 2021 authorities ended the male guardian requirement for women to participate in the annual pilgrimage.

Adult women may legally own property and are entitled to financial support from their husbands or ex-husbands. They can make their own determinations concerning hospital care and no longer need a male guardian's permission to start a business.

By law women have equal rights to employment. In January 2021 the Ministry of Human Resources and Social Development banned employee discrimination based on race, color, gender, age, or disability, citing reforms to human resources laws.

In August the Ministry of Education allowed women to teach boys in the fourth grade in the private and foreign education sector for the first time, starting from the academic year of 2022-2023 in the Jeddah governorate, only on an experimental basis. In 2019, the ministry allowed women to teach boys up to the third grade in public schools for the first time.

According to the General Authority for Statistics' labor market survey, Saudi women's employment-to-population ratio rose to 29.4 percent in the third quarter of the year. The Ministry of Human Resources and Social Development said the percentage of women in senior and middle management positions rose to 45 percent by the third quarter. As of September, women were 37 percent of the workforce, according to the General Authority for Statistics. On September 17, the Shura Council called on the ministry to ensure equal opportunities in employing females and males.

Women no longer require a guardian's permission to exit prisons after completing their terms.

The law permits women to transmit citizenship to their children under certain circumstances (see section 2.g. and section 6, Children). The country's interpretation of sharia prohibits Muslim women from marrying non-Muslims, but Muslim men may marry non-Muslim women. Women require government permission to marry noncitizens; men must obtain government permission if they intend to marry citizens from countries other than Gulf Cooperation Council-member states (Saudi Arabia, Bahrain, Kuwait, Oman, Qatar, and the United Arab Emirates). Regulations

prohibit men from marrying women from Bangladesh, Burma, Chad, and Pakistan. The government additionally requires men wishing to marry a second wife who is a foreigner to submit documentation attesting to the fact that his first wife was disabled, had a chronic disease, or was sterile.

Cultural norms selectively enforced by managers of state institutions continue to require women to wear an abaya (a loose-fitting, full-length cloak) in public. Female foreigners, like all males, were only required to dress "modestly."

Women have begun practicing law, but almost all judges are male. In divorce proceedings, women must demonstrate legally specified grounds for divorce, but men may divorce without giving cause, citing "irreconcilable differences." In doing so, men must pay immediately an amount of money agreed at the time of the marriage that serves as a one-time alimony payment. Men may be forced, however, to make subsequent alimony payments by court order. The government began implementing an identification system based on fingerprints, designed to provide women more access to courts, even if they chose to cover their faces with the *niqab* (facial veil) covering.

In 2020 the Justice Ministry ended the so-called secret divorce, whereby men could divorce their wives without the woman's consent or knowledge. The ministry also canceled an article in the marriage law that gave a husband the right to force his wife to return to her home against her will.

A woman still needs a male guardian's permission to marry or must seek a court order in the case of *adhl* (male guardians refusing to approve the marriage of women under their charge). In such cases the judge assumes the role of the guardian and may approve the marriage. During the year, courts regularly executed marriage contracts for women whose male guardians refused to approve their marriage, according to informed judicial sources quoted by local media.

On March 8, the Council of Ministers passed the Personal Status Law, which took effect in June. On March 10, Minister of Justice Walid al-Samaani stated the law consolidates the rights of women, especially the right to custody of children. In the announcement of the new law, the crown prince said the law controls the discretionary power of the judge to limit the discrepancy of judicial rulings in this regard. Nonetheless, an Amnesty International statement on December 9 said the law codifies problematic practices inherent in the male guardianship system including

the requirement of the guardian's permission to marry and granting the legal guardianship of minor children (separate from the physical custody of the children) to the man in the event of divorce.

Courts routinely awarded custody of children when they attain a specified age (seven years for boys and nine years for girls) to the divorced husband or the deceased husband's family in cases when the couple was divorced or the father died. In some cases former husbands reportedly prevented divorced noncitizen women from visiting their children. Under the new Personal Status Law, divorced women can travel with their children if they have a custody deed, according to the Jawazat. Minister of Justice Walid al-Samaani said there is a provision in the new law that unequivocally emphasizes a right of the mother for the custody of children, while in the past this provision was not legally binding.

In April U.S. citizen Carly Morris posted tweets stating that her Saudi ex-husband was using the guardianship system to block the daughter's ability to return home to the United States even when Morris was the custodial parent. In September prosecutors opened an investigation that could lead to formal criminal charges against Morris for "disrupting the public order." According to Human Rights Watch, Morris believed the charges were related to her tweets. According to multiple media reports, Morris was detained by Saudi authorities on November 6 and released on November 8.

Sharia-based inheritance laws discriminate against women, giving daughters one-half the inheritance awarded to their brothers.

According to recent surveys, women constituted 52 percent of public education and higher education students. Segregated education through the university level was standard. Some private universities, such as Faisal University, offered partially segregated classes with students receiving instruction from the same teacher and able to participate together in class discussion, but with the women and men physically separated by dividers. A few other government universities offered coeducation in selected programs, largely in the sciences. Private international and national schools may offer coeducation at any grade; most private international schools are coeducational, while most private national schools are segregated. Primary public schools offered mixed-gender education up to the third grade.

## SYSTEMIC RACIAL OR ETHNIC VIOLENCE AND DISCRIMINATION

Case 1:23-cv-00306-RBW   Document 31-6   Filed 08/16/24   Page 54 of 67

Although racial discrimination is illegal, societal discrimination against members of national, racial, and ethnic minorities was a problem. Descendants of former slaves in the country, who have African lineage, faced discrimination in both employment and society. There was formal and informal discrimination, especially racial discrimination, against foreign workers from Africa and Asia. There were also reports of discrimination based on tribal or nontribal lineage. The Personal Status Law abolished the custom of forbidding marriage between Saudis that were members of tribes and Saudis that were not tribal members. A tolerance campaign by the King Abdulaziz Center for National Dialogue sought to address discrimination, and it provided training during the year to combat discrimination against national, racial, or ethnic groups.

## CHILDREN

**Birth Registration:** Citizenship generally derives from the father, and both the father and mother may register a birth. There were cases of authorities denying public services to children of citizen parents, including education and health care, because the government failed to register the birth entirely or had not registered it immediately, sometimes because the father failed to report the birth or did not receive authorization to marry a foreigner. Children of women who were married to foreign spouses receive permanent residency, but their residency status is revocable in the event of the death of the Saudi mother (see section 2.g., Stateless Persons). In June 2021 the social security administration announced children from foreign fathers and Saudi mothers will be allowed to benefit from their mother's pension, if she is widowed or divorced. The Saudi Citizenship Law issued in 1954 and amended in 1960 states that individuals born inside or outside the kingdom from a Saudi father, or Saudi mother and unknown father, or born inside the kingdom from unknown parents are considered Saudis.

**Child Abuse:** Child abuse is a crime punishable by one year's imprisonment, a maximum fine of 50,000 Saudi riyals ($13,300), or both. The National Family Safety Program operated a helpline dedicated to assisting children in matters ranging from bullying to abuse, providing counseling, tracking, and referrals to social services. On March 30, the HRC reported the Saudi Child Helpline received over 8,000 calls in 2021. The Ministry of Human Resources and Social Development had 17 social protection units across the country providing social protection to children younger than 18, as well as other vulnerable populations suffering domestic violence and abuse.

On May 5, Najran police said a girl was abused by a family member and reported that legal action was taken against the perpetrator and the girl was referred to competent authorities.

**Child, Early, and Forced Marriage:** Article (9) of the Personal Status Law states that the minimum age for marriage is 18; those younger than that age may marry only with court approval. According to local media, the court ensures several conditions are met before approving a marriage contract for a bride or groom younger than 18, including assessing their psychosocial development and hearing statements from the potential bride, groom, and guardians to determine consent. The HRC and NSHR monitored cases of child marriages, which they reported were rare or at least rarely reported, and took steps to prevent consummation of such marriages. The application for a marriage license must record the bride's age, and registration of the marriage is a legal prerequisite for consummation.

**Sexual Exploitation of Children:** The cybercrimes law stipulates that punishment for such crimes, including the preparation, publication, and promotion of material for pornographic sites, may be no less than two and one-half years' imprisonment or a substantial fine if the crime includes the exploitation of minors. The law does not define a minimum age for consensual sex.

On June 26, Riyadh police announced they arrested and referred to the Public Prosecutor's Office a man who appeared in an online video sexually abusing an infant. The statement said the video impinged on public morals and personal privacy and abused children's rights.

## ANTISEMITISM

There were no known data on Jewish citizens and no statistics available concerning the religious denominations of foreigners.

Cases of government-employed imams using antisemitic language in their sermons were generally rare but occurred more frequently during periods of conflict between Palestinians and Israelis. During the year, the Ministry of Islamic Affairs issued periodic circulars to clerics and imams in mosques directing them to include messages on the principles of justice, equality, and tolerance, and to encourage rejection of bigotry and all forms of racial discrimination in their sermons.

In its annual report on education in the country published in June, the Institute for Monitoring Peace and Cultural Tolerance in School Education noted that the government continued to make progress in removing antisemitic content from textbooks, though it noted that some problematic

Case 1:23-cv-00306-RBW   Document 31-6   Filed 08/16/24   Page 56 of 67

content remained. According to the report, Israel was still omitted from maps in textbooks, and Zionism is still described as "racist."

In May the government funded Muslim World League convened the first-ever Forum on Common Values among Religious Followers in Riyadh, which was attended by Muslim, Christian, Jewish, Hindu, and Buddhist religious leaders. According to Arab News, the founding of the forum was based on Islamic teachings that call for dialogue and working together and the common values that help to ensure peaceful coexistence in a diverse world.

On July 8, Sheikh Muhammad al-Issa, Secretary General of the Muslim World League, delivered the Arafat sermon, a major sermon delivered at the climax of the Hajj pilgrimage and viewed by millions around the world, which led to social media backlash against him. Under a trending hashtag #Descend Al-Issa from the Pulpit, critics – mostly from outside of the kingdom – attacked al-Issa for his opinions on the integration of Muslim immigrants in the West and his interfaith outreach, with a focus on his engagements with Jewish leaders and his 2020 visit to Auschwitz. Critics also condemned al-Issa as a traitor, and "the beloved of the Hindus, the Jews, and the Christians."

## TRAFFICKING IN PERSONS

See the Department of State's *Trafficking in Persons Report* at **https://www.state.gov/trafficking-in-persons-report/**.

## ACTS OF VIOLENCE, CRIMINALIZATION, AND OTHER ABUSES BASED ON SEXUAL ORIENTATION, GENDER IDENTITY OR EXPRESSION, OR SEX CHARACTERISTICS

**Criminalization:** Under sharia, as interpreted in the country, consensual same-sex sexual conduct is punishable by death or flogging, depending on the perceived seriousness of the case. There were no known prosecutions for same-sex relations during the year. It is illegal for men "to behave like women" or to wear women's clothes, and vice versa. The government did not actively enforce these laws, except when individuals posted photos of so-called cross-dressing on social media. There were no known prosecutions under these laws during the year. Publicly advocating for LGBTQI+ rights is illegal and advocates face arrest and imprisonment.

2022 Country Reports on Human Rights Practices: Saudi Arabia - United States Department of State    https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/saudi-arabia/

On June 14, state TV al-Ekhbariya reported Commerce Ministry officials in Riyadh seized rainbow-colored toys and children's clothing from shops in Riyadh and claimed that the items "contradict the Islamic faith and public morals and promote homosexual colors targeting the younger generation." The ministry tweeted that its teams were confiscating "products that contain symbols and signs calling for deviation and contradicting common sense." It added that shops found to be selling them would face legal penalties.

France24 News reported on October 25 that gay social media personality Suhail al-Jameel had been released from prison after being detained in October 2019 on public decency charges for posting a picture of himself on Twitter shirtless and wearing swim shorts.

**Violence against LGBTQI+ Persons:** There were reports of physical violence and harassment based on sexual orientation or gender identity. There were no known cases during the year of police or other government agents inciting, perpetrating, condoning, or tolerating violence against LGBTQI+ individuals or those reporting such abuse.

**Discrimination:** The law does not prohibit discrimination by state and nonstate actors based on sexual orientation, gender identity or expression, or sex characteristics and does not recognize LGBTQI+ individuals, couples, and their families. There were reports of official and societal discrimination based on sexual orientation or gender identity in employment, housing, access to education, and health care. Clerics condemned homosexuality during government-approved Friday sermons at some mosques.

During the year, local newspapers featured opinion pieces condemning homosexuality and calling on authorities to punish harshly individuals engaging in same-sex relations.

**Availability of Legal Gender Recognition:** The country does not permit individuals to change gender identity markers.

**Involuntary or Coercive Medical or Psychological Practices Specifically Targeting LGBTQI+ Individuals:** There was anecdotal reporting of the existence of so-called conversion therapy, but further information was not available.

**Restrictions of Freedom of Expression, Association, or Peaceful Assembly:** LGBTQI+ organizations and advocacy regarding LGBTQI+ issues were illegal. No organizations operated openly, nor were there LGBTQI+ rights advocacy events of any kind.

The government did not allow two movies, the Marvel movie *Doctor Strange and the Multiverse of Madness* and the Pixar movie *Lightyear*, to be aired in the country, because Disney refused requests to cut same-sex references.

## PERSONS WITH DISABILITIES

The law mandates the state to "protect human rights in accordance with Islamic law," which the Authority for Persons with Disabilities notes includes "justice, equity, and antidiscrimination on any grounds, including disability." In January 2021 the Ministry of Human Resources and Social Development banned workplace discrimination, including based on disability (see section 6, Women). In April 2021 the ministry announced that all private and government institutions were obliged to meet certain accessibility requirements within six months; accommodations were implemented at government buildings, retail establishments, and sidewalks. Local media reported that the ministry had formed expert committees to oversee the implementation of accessibility requirements that would follow the building code and accessibility standards developed by the King Salman Center for Disability Research. Newer commercial buildings often included such access, as did some newer government buildings.

The Ministry of Human Resources and Social Development (MHRSD) is responsible for protecting the rights of persons with disabilities. Children with disabilities could attend government-supported schools. In April the MHRSD issued two digital cards for persons with autism and other disabilities to benefit from its digital services. The "Digital Autism" card will help identify the beneficiaries and facilitate their movement in public places. It will also provide them access to priority services when visiting hospitals, healthcare centers and other public facilities. The "Digital Erkab" card for persons with disabilities will make them and their escorts eligible for concessions in ticket fares and travel fees while using public transportation.

MHRSD issues a Mowaamah certificate, which is an accreditation by MHRSD designed for organizations who wish to enhance their work environments to be comprehensive and more supportive of persons with disabilities. On June 15, local media reported that the percentage of workers with disabilities rose from 11 percent to more than 12 percent by the end of 2021, according to the Deputy President of the HRC Abdulaziz Bin Abdullah al-Khayal.

Persons with disabilities were elected and appointed to municipal councils in 2015, and two individuals with disabilities served on the consultative Shura Council.

## OTHER SOCIETAL VIOLENCE OR DISCRIMINATION

Social, legal, economic, and political discrimination against the country's Shia minority continued. See the Department of State's *International Religious Freedom Report* at **https://www.state.gov/international-religious-freedom-reports/**. Human Rights Watch claimed that some state clerics and institutions "incited hatred and discrimination against religious minorities, including the country's Shia Muslim minority." Reporting indicated that Shia faced discrimination in employment, especially when trying to get jobs in the Ministry of Defense, Ministry of Interior, and National Guard, and particularly for positions where they would be permitted to hold a firearm.

To address the problem, the Ministries of Defense and Interior and the National Guard included antidiscrimination training in courses offered by the King Abdulaziz Center for National Dialogue for police and other law enforcement officers.

## Section 7.
# Worker Rights

## A. FREEDOM OF ASSOCIATION AND THE RIGHT TO COLLECTIVE BARGAINING

The law does not provide for the right of workers to form and join independent unions; however, trade unions and labor committees existed. The law does not provide for the right to collective bargaining or the right to conduct legal strikes. Workers faced potential dismissal, imprisonment, or, in the case of migrant workers, deportation for unsanctioned union activities.

The government allowed citizen-only labor committees in workplaces with more than 100 employees, was heavily involved in their formation and placed undue limitations on freedom of association and activities of these committees. For example, MHRSD approves the committee members and authorizes ministry and employer representatives to attend committee meetings. Committee members must submit meeting minutes to management and then transmit them to the minister; the ministry can dissolve committees if they violate regulations or are deemed to threaten public security. Committees' recommendations to company management are limited to improvements to working conditions, health and safety, productivity, and training programs.

The law does not prohibit antiunion discrimination or require reinstatement of workers fired for union activity. There was little information on government efforts to enforce applicable laws.

Media and activists reported that on April 16, fishermen in Qatif protested against new loading charges and other business costs imposed by the city's central local market. They demanded the government drop the additional fees that would force them to charge higher prices. During an April 26 meeting, the fishermen and authorities agreed to maintain fees at the previous levels, pending further talks to identify appropriate levels for new fees.

## B. PROHIBITION OF FORCED OR COMPULSORY LABOR

The law does not prohibit or criminalize all forms of forced or compulsory labor and the government did not effectively enforce the law. Forced labor occurred among migrant workers, notably domestic workers. Conditions indicative of forced labor experienced by foreign workers reportedly included passport confiscation, nonpayment of wages, restrictions on movement, and verbal, physical and sexual abuse. The government improved enforcement of some areas of the law, including electronic systems to monitor and ensure compliance. In March 2021 the government announced the Labor Reform Initiative, which eliminated the need for many private-sector workers to obtain their employer's permission to obtain an exit and re-entry visa, obtain a final exit visa, or change employers at the conclusion of their contract or after one year. This provided increased freedom of movement and lessened the risks of forced labor for seven million private-sector workers. According to MHRSD, as of March, more than 65,000 workers had successfully benefited from the initiative. Employers may, however, require a trainee to work for them upon completion of training for a period not to exceed twice the duration of the training or one year, whichever is longer.

Many migrant workers, particularly female domestic workers, who are not covered under the Labor Reform Initiative, were unable to exercise the right to terminate their employment contract, change employers, or leave the country due of a lack of knowledge of their rights and, in some cases, coercive situations. A ministerial decree issued in June allows domestic workers to either leave their employer or the country after they complete a full two-year contract or break their contract and switch employers without the consent of their current employer if the employer engages in a prohibited practice, for example, salary withholding or the assignment of dangerous or potentially hazardous tasks.

The government expanded the implementation of the Wage Protection System to all private-sector companies, which requires employers to pay foreign workers by electronic transfer through a Saudi bank. The government also implemented a mandatory e-contract system that includes type of work, salary, duration of contract, working hours, and annual leave. Contracts were verified by both the employer and employee. MHRSD reported it used the Mudad payroll platform to track Wage Protection System and e-contract compliance in real-time and imposed penalties for any firm that failed to maintain at least 80 percent compliance monthly.

Also see the Department of State's *Trafficking in Persons Report* at **https://www.state.gov/trafficking-in-persons-report/**.

## C. PROHIBITION OF CHILD LABOR AND MINIMUM AGE FOR EMPLOYMENT

The law prohibits the employment of any child in the worst forms of child labor defined in the relevant international conventions. The National Policy to Prevent Child Labor and a corresponding National Action Plan provides that no person younger than 15 may legally work unless that person is the sole source of support for the family. Children between the ages of 13 to 15 may conduct light work if it does not interfere with their schooling. Children younger than 18 may not work shifts exceeding six hours a day. There is no minimum age for workers employed in family-owned businesses or other areas considered extensions of the household, such as farming, herding, and domestic service. The policy includes creating a database to track child labor with the support of the ILO, while also adopting a list of the types of work prohibited for those under the age of 18, including any work that is likely to be dangerous, impede education or that is harmful to a child's health or physical, mental, moral, or social development.

There was little data on government efforts to effectively enforce the applicable laws and whether penalties were commensurate with or less than those for analogous serious crimes when applied against violators. There is also no available data reporting whether child labor occurred.

## D. DISCRIMINATION WITH RESPECT TO EMPLOYMENT AND OCCUPATION

The labor law in general prohibits discrimination in the terms of recruitment as well as during employment. The law mandates that employers treat all workers equally and barred discrimination based on gender, disability, age, or any other forms of discrimination, whether in

employment or advertising a vacancy. No regulations prohibit discrimination based on religion, political opinion, national origin or citizenship, sexual orientation or gender identity, language, or HIV-positive status. Gender-based violence and harassment occurred in the workplace (see section 6, Women). Discrimination with respect to employment and occupation occurred in all these categories. Women may work without their guardian's permission, but some employers required applicants to submit proof of it, even though the law prohibits the practice. A 2019 decree expanded previous regulations barring employers from firing female workers on maternity leave and includes protection from dismissal for pregnancy-related illness if the absence is less than 180 days per year. Employers who violate the antidiscrimination law can be fined. The antidiscrimination law only applies to citizens and does not protect the rights of expatriates. There was widespread societal discrimination against African and Asian expatriate workers.

In recent years women's labor participation increased significantly, including in sectors traditionally dominated by men (see section 6, Women). Prohibitions on employment of women in some hazardous jobs and night shifts were lifted. MHRSD explicitly approved and encouraged employment of women in specific sectors, particularly in government and retail. On May 21, Flyadeal Airline completed the first flight with an all-female crew. In medical settings and the energy industry, women and men worked together, and in some instances, women supervised male employees. Women, however, continued to face societal discrimination and gender segregation continued in the workplace. There were almost no women working as judges or as members of the Council of Senior Religious Scholars.

The third-quarter labor market survey found the labor force participation rate of the Saudi female working-age population was 37 percent. Most non-Saudi women were employed as domestic workers.

No regulation requires equal pay for equal work. In the private sector, the average monthly wage of Saudi women workers was 64 percent of the average monthly wage of Saudi men. Labor dispute settlement bodies did not register any cases of discrimination against women.

The law grants women the right to obtain business licenses without the approval of their guardians, and women frequently obtained licenses in fields that might require them to supervise foreign workers, interact with male clients, or deal with government officials. Women who work in establishments with 50 or more female employees have the right to maternity leave

Saudi Arabia - United States Department of State https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/saudi-arabia/

and childcare. On March 25, the Ministry of Interior opened admission for females to join the Border Guards at the rank of private. On April 10, the Ministry of Defense announced the opening of admission and unified recruitment for military jobs for Saudi men and women from the rank of soldier to sergeant. On July 23, the Ministry of Interior allowed women to join the General Directorate of Public Security, General Traffic Department, with the rank of soldier. In April 2021, local media reported that 113 female officers were deployed in the Holy Mosques in Mecca and Medina to assist pilgrims and worshippers as part of Special Security Forces' homeland security unit.

Discrimination with respect to religious beliefs occurred in the workplace. Members of the Shia community complained of discrimination based on their religion and had difficulty securing or being promoted in government positions. They were significantly underrepresented in national security-related positions, including the Ministries of Defense and Interior and the National Guard. In predominantly Shia areas, Shia representation was higher in the ranks of traffic police and employees of municipalities and public schools. A small number of Shia occupied high-level positions in government-owned companies and government agencies. Shia were also underrepresented in employment in primary, secondary, and higher education.

## E. ACCEPTABLE CONDITIONS OF WORK

**Wage and Hour Laws:** The monthly minimum wage for public-sector employees was above the estimated poverty income level. There was no private-sector minimum wage for foreign workers.

By law a standard workday is eight hours. A standard workweek is 48 hours but can extend to 60 hours subject to payment of overtime, which is 50 percent more than the basic wage. The law requires employers to provide paid holidays on Eid al-Fitr, Eid al-Adha, and Saudi National Day, with the exception of domestic workers sponsored by individuals rather than companies.

An estimated 10.2 million foreign workers, including approximately 1.4 million women, made up approximately 75 percent of the labor force, according to the first quarter labor market survey. Legal workers generally negotiated and agreed to terms of employment prior to their arrival in accordance with the contract requirements contained in the law.

The law provides penalties for bringing foreigners into the country to work in any service, including domestic service, without following the required procedures and obtaining a permit.

**Occupational Safety and Health:** The government issued occupational safety and health standards that were up-to-date and appropriate for the main industries. The law provides for regular safety inspections and enables ministry-appointed inspectors to make unannounced inspections, initiate sanctions, examine materials used or handled in industrial and other operations, and submit samples of suspected hazardous materials or substances to government laboratories. There was a ban on outside work from 12 p.m. to 3 p.m. during the summer months. There was little information on government efforts to enforce applicable laws and whether penalties imposed were commensurate with those for other comparable laws.

**Wage, Hour, and OSH Enforcement:** The Ministry of Health's Occupational Health Service Directorate and the Ministry of Human Resources and Social Development worked together on health and safety matters. Responsibility for identifying unsafe situations remains with occupational safety and health experts and not the worker. By law, employers are obligated to safeguard safety and health requirements in the workplace to protect employees from harm and disease. Regulations require employers to protect some categories of workers from job-related hazards and disease, although violations occurred. Punishment for labor violations involved a range of fines and the possible temporary or permanent closure of a business. The law does not provide workers the right to remove themselves from a hazardous workplace without jeopardizing their employment.

**Informal Sector:** According to the law, a citizen or business must sponsor foreign workers for them to obtain legal work and residency status, although the requirement exempts Syrian and Yemeni citizens who overstayed their visas. MHRSD implemented measures allowing noncitizen workers to switch their employer to a new employer or company that employed a sufficient quota of Saudi citizens. Some workers were unaware of the new regulations and were forced to remain with their sponsor until completion of their contract or seek the assistance of their embassy to return home. There were also instances in which sponsors bringing foreign workers into the country failed to provide them with a residency permit, which undermined workers' ability to access government services or navigate the court system in the event of grievances. Sponsors with commercial or labor disputes with foreign employees could ask authorities to prohibit employees from departing the country until the dispute was resolved. Authorities, however, would not jail or forcibly return fleeing workers who sought to exit the country within a 72-hour period or coordinate with their embassy for repatriation, provided the employees did not have criminal charges or outstanding fines pending against them.

Bilateral labor agreements set conditions on foreign workers' minimum wage, housing, and other benefits, including leave and medical care. Those provisions were not drafted in line with international standards and varied depending on the bargaining power of the foreign workers' country. There were reports that some migrant workers were employed on terms to which they had not agreed and experienced problems, such as delays in the payment of wages, inability to change employers, or changes in working hours and conditions. There were reports that migrant workers, especially domestic workers, were vulnerable to abuse, exploitation, and conditions contravening labor laws, including nonpayment of wages, working for periods in excess of the 48-hour workweek, working for periods longer than the prescribed eight-hour workday without due compensation, and restrictions on movement due to passport confiscation. There were also reports of physical, psychological, sexual, and verbal abuse. Domestic workers were unable to remove themselves from dangerous situations.

Some employers physically prevented workers from leaving or threatened them with nonpayment of wages if they left. Sponsoring employers, who controlled foreign workers' ability to remain employed in the country, usually held foreign workers' passports, a practice prohibited by law. In some contract disputes, to prevent the employee from leaving the country until resolution of the dispute, sponsors asked authorities to coerce the employee into accepting a disadvantageous settlement in lieu of risking deportation without any settlement.

While some foreign workers were able to contact the labor offices of their embassies for assistance, domestic workers faced challenges when attempting to gain access to their embassies, including restrictions on their freedom of movement and telephone access, confiscation of their passports, and being subjected to threats and verbal and physical abuse. During the year several dozen (primarily) female domestic workers sought shelter at their embassies' safehouses to escape physical and sexual abuse by their employers. Those workers usually sought legal assistance from their embassies and government agencies to obtain end-of-service benefits and exit visas. In addition to their embassies, some domestic servants could contact the NSHR, HRC, Interministerial General Secretariat to Combat Human Trafficking, and the Migrant Workers' Welfare Department, which provided services to safeguard migrant workers' rights and protect them from abuse. Some were able to apply to the offices of regional governors and lodge an appeal with the Board of Grievances against decisions by those authorities.

Case 1:23-cv-00306-RBW    Document 31-6    Filed 08/16/24    Page 66 of 67

Occupational safety and health regulations do not cover farmers, herdsmen, domestic servants, or workers in family-operated businesses. Although the Ministry of Human Resources and Social Development employed nearly 1,000 labor inspectors, foreign workers privately reported frequent failures to enforce health and safety standards.

---

**TAGS**

Bureau of Democracy, Human Rights, and Labor      Bureau of Near Eastern Affairs

Saudi Arabia

---

White House

USA.gov

Office of the Inspector General

Archives

Contact Us



Privacy Policy

Accessibility Statement

Case 1:23-cv-00306-RBW   Document 31-6   Filed 08/16/24   Page 67 of 67

Copyright Information

FOIA

No FEAR Act