**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| TAREK ELKHOLY, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 23-306 (RBW) |
| ) | |
| ROYAL EMBASSY OF THE ) | |
| KINGDOM OF SAUDI ARABIA, et al., ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION**

The plaintiffs—Tarek Elkholy, Atef Tawfik Hanna, Iman Gariballa, Muhammad Bashir, and Abdalla Zamrawy—bring this civil action against the Royal Embassy of the Kingdom of Saudi Arabia (the "Embassy") and the Kingdom of Saudi Arabia (collectively, the "defendants"), alleging that they were unlawfully discriminated against based on their age and/or disability and terminated from their positions with the Embassy in violation of the Age Discrimination in Employment Act (the "ADEA"), 29 U.S.C. § 621 et seq.; the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101 et seq.; and the District of Columbia Human Rights Act (the "DCHRA"), D.C. Code § 2-1401 et seq.  See Complaint ("Compl.") ¶ 1, ECF No. 1.[1] Currently pending before the Court is the defendants' motion to dismiss the plaintiffs' Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), or, at a minimum, to strike

---

[1] On February 6, 2023, the plaintiffs filed an Errata and Updated Complaint because the paragraph numbers in the original Complaint did not proceed sequentially.  See generally Errata at 1, ECF No. 4; Errata, Exhibit ("Ex.") 1 (Updated Complaint), ECF No. 4-1.  However, because the plaintiffs did not file the updated Complaint as an Amended Complaint, and because the defendants refer to the original Complaint in their submissions, the Court will also refer only to the original Complaint for the sake of clarity.  Where there are ambiguities in the paragraph numberings, the Court will specify the paragraph referenced by either indicating the page number along with the paragraph number or, where paragraphs on the same page have the same number indicated, by using (1) or (2) to differentiate between paragraphs with the same number.

the plaintiffs' request for punitive damages.  See Defendants' (Appearing Specially) Motion to

Dismiss the Complaint and Motion to Strike Punitive Damages ("Defs.' Mot.") at 1, ECF No. 29.

Upon careful consideration of the parties' submissions,[2] the Court concludes for the following

reasons that it must grant the defendants' motion to dismiss and consequently deny the

defendants' motion to strike as moot.

**I.      BACKGROUND**

**A.      Factual Background**

The following allegations are derived from the plaintiffs' Complaint, unless otherwise

specified.  The plaintiffs were all formerly employed at the Embassy in Washington, D.C.  See

Compl. ¶¶ 2–6, 20.  All of the plaintiffs are United States citizens or dual citizens of the United

States and another country other than Saudi Arabia.  See id. ¶¶ 29, 79, 111, 148, 162.  Over the

course of their tenures as employees of the Embassy, the plaintiffs worked in various

administrative capacities or served as drivers for Saudi officials.  See id. ¶¶ 30, 80, 112(2),

113(2), 117, 149(2), 163, 165.  However, each of the plaintiffs alleges that they were either

terminated or forced to terminate their employment with the defendants at different times

between 2017 and 2021.  See id. ¶¶ 16–20.  Moreover, the plaintiffs allege that upon their

terminations, the defendants failed to provide them with the severance pay and other end-of-

service compensation they were entitled to receive pursuant to their contracts and the defendants'

employment policies and practices.  See id. ¶ 28.

---

[2] In addition to the filings already identified, the Court considered the following submissions in rendering its
decision: (1) the Defendants' (Appearing Specially) Memorandum in Support of Motion to Dismiss and to Strike
("Defs.' Mem."), ECF No. 29; (2) the Plaintiffs' Opposition to Defendants the Royal Embassy of the Kingdom of
Saudi Arabia and the Kingdom of Saudi Arabia's Motion to Dismiss Plaintiffs' Complaint and Motion to Strike
Plaintiffs' Punitive Damages Demand ("Pls.' Opp'n"), ECF No. 31; and (3) the Reply Brief in Further Support of
Defendants' (Appearing Specially) Motion to Dismiss and Motion to Strike ("Defs.' Reply"), ECF No. 32.

### 1.  Facts Specific to Plaintiff Tarek Elkholy

Plaintiff Elkholy is a dual United States-Egyptian citizen and was sixty-two years old at the time of the filing of the Complaint.  Id. ¶ 29.  In 1994, he began working as an Accounting Clerk at the Embassy, and eventually in May 2008, his job title was changed to Clerk, id. ¶ 30, and "he ultimately became the number two person with expanded accounting related responsibility in the Department of Finance at the Embassy[,]" id., before his termination on June 1, 2021, see id. ¶ 31.  Throughout his employment with the Embassy, plaintiff Elkholy's job duties as the Accounting Clerk purportedly included, but were not limited to, "preparing annual Embassy budgets and reports; compliance with external annual audits; supervising and monitoring the work of the accounting team; evaluating accounting team performance and training; payroll management; verifying local employee timesheets; bank account reconciliation and general ledger accounts; and paying local United States vendors' invoices."  Id. ¶ 33.  Additionally, he represents that he "oversaw [the d]efendants' commercial activity in the United States[] [by] monitoring commercial transactions in the United States."  Id.

When plaintiff Elkholy was first hired in 1994, he entered into an employment contract with the Embassy titled "Employment Contract for Employees of Saudi Embassies and Consular Office Overseas[.]"  Id. ¶ 34.  According to plaintiff Elkholy, "[a]s a local employee," he did not receive civil service benefits or any other benefits from the defendants, such as health insurance coverage.  Id. ¶ 35.  Indeed, plaintiff Elkholy alleges that his tenure with the defendants was marked by tensions between local employees of non-Saudi origin and their Saudi government supervisors regarding purported disparities in salaries, benefits, and working conditions, as compared to employees of Saudi origin.  See id. ¶¶ 36–52, 56–60, 62.  However, plaintiff Elkholy does not in fact bring a claim based on discrimination due to his national origin, see id.

3

¶ 1, and thus the Court will not recite in detail his allegations regarding the defendants' treatment of their employees based on their national origin.

Plaintiff Elkholy further alleges that, on at least one occasion in May 2019, he "reported financial abuse to the Embassy by his superiors for which he was subsequently penalized[,]" id. ¶ 53, and he alleges that "whistleblower retaliation was a contributing factor in his subsequent termination[,]" id., although he does not plead a retaliation claim in the Complaint, see id. ¶ 1. Instead, plaintiff Elkholy alleges that, in response to his report of financial abuse, his superiors "sought Elkholy's termination and in fact replaced him with a younger Saudi graduate student . . . ." Id. ¶ 54.

Specifically, plaintiff Elkholy alleges that, on October 20, 2020, this same superior reprimanded plaintiff Elkholy for "overstepping him" by delivering a letter to the Deputy Chief of Mission concerning the compensation and benefits of local employees of non-Saudi origin. Id. ¶ 61. In addition to criticizing plaintiff Elkholy, his superior purportedly "said that [plaintiff Elkholy] had already reached the age of 60, and should have been let go because of his advanced age." Id. Then, on December 15, 2020, plaintiff Elkholy was allegedly ordered to train a younger Saudi graduate student for over two months, see id. ¶ 63, and after doing so, on March 24, 2021, plaintiff Elkholy alleges that he received a termination letter from his manager, effective on June 1, 2021. Id. ¶ 67. The reason allegedly provided for the termination was expressed as being "for the public good[.]" Id. According to plaintiff Elkholy, the defendants replaced him with the younger Saudi graduate student whom he had trained. See id. ¶ 63. Moreover, he alleges that the defendants did not pay him any "end-of-service compensation" as required by his employment contract. Id. ¶ 74.

On April 14, 2021, plaintiff Elkholy "submitted a charge of discrimination to" the Equal Employment Opportunity Commission ("EEOC") "for retaliation, [as well as discrimination due to his] national origin[] and age[.]"  Id. ¶ 68.  On November 14, 2022, the EEOC issued to him a letter notifying him of his right to sue.  See id. ¶ 71.

### 2.  Facts Specific to Plaintiff Atef Tawfik Hanna

Plaintiff Hanna is a dual United States-Egyptian citizen and was sixty-three years old at the time the Complaint was filed and possessed a professional "specialty in Science and Education, with a Bachelor of Science from [the] University of Zagazig, Egypt[.]"  Id. ¶ 79. Plaintiff Hanna began his employment at the Embassy as a phone operator in 2006, and subsequently, in January 2007, transitioned to a position as a Consulate Processing Agent in the Embassy's consular section, where he remained for fourteen years until his termination on June 1, 2021.  See id. ¶ 80.  In his position as a Consulate Processing Agent, plaintiff Hanna was responsible for "incoming and outgoing Consulate mail and provided clerical services to individuals seeking employment in the Kingdom, business affairs, and visa forms to Saudi Arabia[,]" id. ¶ 82, as well as other tasks, such as "data entry to assist the Consul and the Deputy Consul in the processing of [certain] applications[,]" id.

When plaintiff Hanna was first hired as a phone operator in 2006, he signed an employment contract with the defendants, id. ¶¶ 83–84, which is substantially similar to that signed by plaintiff Elkholy.  As with plaintiff Elkholy, plaintiff Hanna alleges that his term of employment with the defendants was marked by the same tensions over purportedly unequal compensation, benefits, and treatment of local employees of non-Saudi origin and their Saudi counterparts.  See id. ¶¶ 87–95, 97–104.  And like plaintiff Elkholy, he has not pleaded a claim based on his national origin.  See id. ¶ 1.

On March 24, 2021, the defendants "tendered a termination letter to [plaintiff] Hanna through his manager, Bandar Al-Hazany," effective on June 1, 2021. Id. ¶ 106.   The reason given for his termination was allegedly for "the 'public good.'" Id.  According to plaintiff Hanna, prior to receiving the termination letter, he "was asked by diplomat Ahmad Fahad to have . . . a cafeteria worker[] shadow [him] as he performed his job[,]" id. ¶ 105, and after plaintiff Hanna's employment was officially terminated, he contends that his "position was filled with a younger employee of Saudi origin, Ibrahim El-Manee[,]" id.  According to plaintiff Hanna, the defendants did not pay him any "end-of-service compensation [or] related post-employment compensation[,]" as required by his employment contract. Id. ¶ 107.

Plaintiff Hanna filed his charge of discrimination with the EEOC on May 10, 2021, alleging claims for discrimination based on national origin and age, as well as retaliation for engaging in protected activity.  See id. ¶ 109.  However, he alleges that although "[t]he matter is now closed[,]" the EEOC never notified him of his right to sue, despite his request for such a letter. Id.

### 3.  Facts Specific to Plaintiff Iman Gariballa

Plaintiff Gariballa is a dual United States-Sudanese citizen and was sixty-two years old at the time of the filing of the Complaint.  See id. ¶ 111(2).  Plaintiff Gariballa, who has "a bachelor's degree in [b]usiness [m]anagement with a specialty in accounting[,]" id., began her employment at the Embassy as an Administrative Assistant in the Information Office on January 6, 1997, and worked at the Embassy for twenty-one years, see id. ¶ 112(2).

As with the other plaintiffs, plaintiff Gariballa alleges that she "was not entitled to benefits afforded [to] civil servants[.]" Id. ¶ 114.  However, unlike the other plaintiffs, plaintiff Gariballa does not appear to have signed a written employment contract with the defendants.

She alleges that in 2001, she discovered that she was being paid less than her non-Saudi peers in the Information Office and that, in response to her concerns, the defendants adjusted her salary prospectively but never compensated her for the prior disparity and did not modify her compensation to account for the cost of health insurance.  See id. ¶ 115.

Plaintiff Gariballa alleges that, beginning in early 2002, she was directed to take on additional Accounting and Personnel responsibilities in the Information Office, and she continued to perform these duties until January 31, 2018, when she alleges "she was forced to terminate her employment[.]"  Id. ¶ 116.  The additional responsibilities plaintiff Gariballa was purportedly required to assume included "preparing annual office budgets and reports; verifying local employee timesheets; bank account reconciliation; and paying local United States vendors['] invoices."  Id. ¶ 118.  Despite these additional responsibilities, plaintiff Gariballa alleges that the defendants refused her repeated attempts to negotiate an increase in her salary. See id. ¶¶ 122–23.

In March 2010, plaintiff Gariballa alleges that she began to experience "deteriorating vision issues and was ultimately diagnos[ed with] macular degeneration[.]"  Id. ¶ 125.  In June 2012, plaintiff Gariballa provided her supervisor with a letter from a "low-vision specialist, who recommended conventional lenses and magnifying visual aids for her and her computer[,]" id. ¶ 126, along with a request from plaintiff Gariballa for "magnification tools and additional staffing" support "to mitigate eye strain[,]" id. ¶ 127.  However, according to plaintiff Gariballa, the defendants denied this request, as well as several follow up requests between 2012 and 2017. See id. ¶¶ 127, 130–36.

On December 13, 2017, plaintiff Gariballa "received a letter from the Commonwealth of Virginia's Department for the Blind and Vision Impaired, which certified that [plaintiff]

7

Gariballa was 'an individual with a documented disability.'" Id. ¶ 139.  However, plaintiff Gariballa alleges that her supervisors continued to refuse her requests for accommodations and "began a course of conduct designed by [the d]efendants to push [her] out of her job and terminate her employment[.]" Id. ¶ 140.  According to plaintiff Gariballa, these alleged actions ultimately resulted in her "formally depart[ing] her role at the Embassy" in February 2018.  Id. ¶ 141.

Plaintiff Gariballa further alleges that, after her departure from the Embassy, the defendants "promised [her] additional post employment compensation if she accepted an initial payment." Id. ¶ 142.  Specifically, she alleges that "[o]n October 23, 2018, the Embassy provided [her] with a partial severance payment of $25,385.60, indicating additional payments were coming." Id. ¶ 144.  She alleges that "[a]fter a [nine]-month period without income, [she] was struggling to pay bills and was at risk of losing her home[,]" and she alleges that, "[u]pon information and belief, the [defendants] used [her] dire circumstances to pressure her to accept a partial payment under duress[.]" Id.

Subsequently, on February 10, 2020, plaintiff Gariballa filed an intake questionnaire with the District of Columbia Office of Human Rights ("DCOHR"), alleging discrimination based on her national origin, see Defs.' Mot., Ex. G (Gariballa DCOHR Inquiry and Dismissal) at 2, ECF No. 29-7,[3] and on March 16, 2020, the DCOHR issued a response letter dismissing her claims "for administrative convenience[,]" id. at 1.

---

[3] The Court may take notice of the DCOHR's determination letter without converting the defendants' motion into a motion for summary judgment because plaintiff Gariballa incorporated it by reference in the Complaint and because agency charges of discrimination and related documents are "public document[s] of which a court may take judicial notice." Ndondji v. InterPark Inc., 768 F. Supp. 2d 263, 272 (D.D.C. 2011) (Walton, J.) (quoting Ahuja v. Detica Inc., 742 F. Supp. 2d 96, 101–02 (D.D.C. 2010)).

**4. Facts Specific to Plaintiff Muhammad Bashir**

Plaintiff Bashir is a dual United States-Pakistani citizen and was seventy-eight years old at the time of the filing of the Complaint. See id. ¶ 148(2). Plaintiff Bashir alleges that "[h]e worked for the Armed Forces of the Royal Embassy of Saudi Arabia in Washington[,] D.C.[,] from November []4, 1997 until August []1, 2017[,]" when his employment was terminated. Id. Plaintiff Bashir "was initially employed as an Embassy driver[,]" id. ¶ 149(2), and his duties included "picking up and delivering mail to and from the Armed Forces Office and the Embassy, the Saudi cultural office, and U.S. Department of State; picking up and dropping off official guests from local airports and transportation to hotels; and transporting guests during their local stay in the Washington, D.C.[,] area[,]" id. ¶ 150.

In January 2012, plaintiff Bashir was "transferred [ ] to an administrative job in the training section of the Air Force in the Embassy office dealing with [ ] American training centers, which trained Saudi students." Id. ¶ 151. In his administrative role, which he held until his employment was terminated, his duties included "clerical work[,] such as[] keeping and maintaining records of Air Force airmen/officers coming to the U[nited ]S[tates] for basic and advanced courses or any other special training courses at U.S. facilities, and assisting administratively Air Force training officers in connection with their training activities." Id. ¶ 152.

According to plaintiff Bashir, in April 2014, he was "diagnosed with Stage-V renal disease[,] which resulted from his job-related stress causing development of hypertension, depression, and high blood pressure." Id. ¶ 155. He started receiving "very painful and expensive" dialysis treatment three days per week in April 2016. Id. Despite his medical treatment, plaintiff Bashir alleges that he still reported to work every day. Id.

9

Nonetheless, he alleges that on August 1, 2017, the "[d]efendants forced [him] to end his employment[,]" id. ¶ 156, and offered him $10,666.57 in retirement compensation, which he rejected, believing that it was "inconsistent with the terms of his contract" and the defendants' policies regarding severance pay and end-of-service compensation, id. ¶ 158.

Subsequently, on February 10, 2020, plaintiff Bashir filed an intake questionnaire with the DCOHR, in which he alleged discrimination based on his national origin, see Defs.' Mot., Ex. H (Bashir DCOHR Inquiry and Dismissal) at 2, ECF No. 29-8, and on April 3, 2020, the DCOHR administratively dismissed his claims "for administrative convenience[,]" id. at 1.

### 5. Facts Specific to Plaintiff Abdalla Zamrawy

Plaintiff Zamrawy is "a dual American-Egyptian citizen" and was seventy-six years old at the time of the filing of the Complaint. Id. ¶ 162. After working as a private driver for several Saudi government officials, plaintiff Zamrawy began his employment with the defendants on July 1, 1992, as a driver for the Embassy, a position which he occupied until his employment was terminated. See id. ¶¶ 163–65. Plaintiff Zamrawy's employment with the defendants was governed by a written employment contract, which was modified and renewed several times during his employment. See id. ¶¶ 166–68. And, as with the other plaintiffs, the defendants did not provide plaintiff Zamrawy with health insurance or other benefits. See id. ¶ 170.

Plaintiff Zamrawy alleges that, during his employment with the defendants, he was asked by Embassy officials to drive them or their family members on personal trips, which he alleges was outside the scope of his employment with the defendants and contrary to the advice of his physician due to the ongoing back pain that he was experiencing. See id. ¶¶ 173–74. Plaintiff Zamrawy also alleges that, in addition to failing to provide accommodations for his back pain, on one occasion, an Embassy official deprived him of a chair he was using to pray at the Embassy's

10

mosque, "and when [he] tried to sit down[,] he fell to the floor, experiencing severe back pain[,]" but was told "not to call an ambulance." Id. ¶ 176.[4]

On June 1, 2019, plaintiff Zamrawy "received a termination letter with an end-of-service compensation of $10,666.66 and [a two-]month vacation payout of $8[,]000[.00,] totaling $18,666.66[,]" but he "rejected the end-of-service compensation [because he alleges that] it breached the terms of his contract and was inconsistent with" the defendants' severance and end-of-service compensation practices. Id. ¶ 178.

On January 10, 2020, plaintiff Zamrawy filed an intake questionnaire with the DCOHR, in which he alleged discrimination based on his national origin, age, and disability, see Defs.' Mot., Ex. I (Zamrawy DCOHR Inquiry and Dismissal) at 2, ECF No. 29-9, and on January 31, 2020, the DCOHR dismissed his claims "for administrative convenience[,]" id. at 1.

Then, "[o]n February 13, 2020, [plaintiff] Zamrawy protested in front of the Saudi Embassy." Id. ¶ 180. He alleges that, in response to his protest, the Deputy Chief of Mission "called [him] to offer an extra $10,000" in addition to the previously offered $18,000 severance offer, but that he refused to accept the offer. Id. He further alleges that, on October 13, 2020, he protested again in front of a hotel where the Saudi Foreign Minister was staying. See id. ¶ 181. According to plaintiff Zamrawy, he protested along with colleagues, including plaintiff Gariballa, in their attempt "for [the d]efendants to honor their employment contracts and provide adequate end-o[f]-service and severance package pay to local employees of non-Saudi origin." Id. Plaintiff Zamrawy contends that on both occasions, the "Saudi Embassy security office took pictures of [him,]" id. ¶ 182, and that "[u]pon information and belief, these photos were sent to"

---

[4] Plaintiff Zamrawy characterizes these incidents as creating "a hostile work environment in disregard of his disability[,]" id. ¶ 176, but he has not pleaded a hostile work environment claim in this case.

11

the Saudi government, and that "[t]he security office advised [him] not to travel to Saudi Arabia [because he] was [purportedly] put on a blacklist[,]" id.

**B.      Procedural Background**

On February 3, 2023, the plaintiffs filed their Complaint in this case. See Compl. at 1. Subsequently, on August 2, 2024, the defendants filed their motion to dismiss. See Defs.' Mot. at 1. On August 16, 2024, the plaintiffs filed their opposition to the defendants' motion to dismiss, see Pls.' Opp'n at 1, and on August 23, 2024, the defendants filed a reply in further support of their motion to dismiss, see Defs.' Reply at 1.

## II.      STANDARDS OF REVIEW

**A.      Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(1)**

"Federal [district] courts are courts of limited jurisdiction[,]" Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994), and therefore, "[a] motion for dismissal under [Federal Rule of Civil Procedure] 12(b)(1) 'presents a threshold challenge to the [C]ourt's jurisdiction[,]'" Morrow v. United States, 723 F. Supp. 2d 71, 75 (D.D.C. 2010) (Walton, J.) (quoting Haase v. Sessions, 835 F.2d 902, 906 (D.C. Cir. 1987)). Thus, the Court is obligated to dismiss a claim if it "lack[s] [ ] subject-matter jurisdiction[.]" Fed. R. Civ. P. 12(b)(1). And, because "[i]t is to be presumed that a cause lies outside [the Court's] limited jurisdiction," Kokkonen, 511 U.S. at 377, the plaintiff bears the burden of establishing by a preponderance of the evidence that a district court has subject matter jurisdiction, see Nurse v. Sec'y of Air Force, 231 F. Supp. 2d 323, 326 (D.D.C. 2002) (Walton, J.).

In deciding a motion to dismiss based upon lack of subject matter jurisdiction, the Court "need not limit itself to the allegations of the complaint." Grand Lodge of the Fraternal Ord. of Police v. Ashcroft, 185 F. Supp. 2d 9, 14 (D.D.C. 2001). Rather, the "[C]ourt may consider such

12

materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case." Scolaro v. D.C. Bd. of Elections & Ethics, 104 F. Supp. 2d 18, 22 (D.D.C. 2000); see also Jerome Stevens Pharms., Inc. v. Food & Drug Admin., 402 F.3d 1249, 1253 (D.C. Cir. 2005).  Additionally, the Court must "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting [the] plaintiff the benefit of all inferences that can be derived from the facts alleged[.]'" Am. Nat'l Ins. Co. v. Fed. Deposit Ins. Corp., 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting Thomas v. Principi, 394 F.3d 970, 972 (D.C. Cir. 2005)).  However, "the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." Grand Lodge, 185 F. Supp. 2d at 13–14 (alterations in original) (citation and internal quotation marks omitted).  And, the Court "need not accept bare legal conclusions nor unsupported inferences." Campaign Legal Ctr. v. Fed. Election Comm'n, No. 22-cv-3319 (CRC), 2024 WL 4263853, at *5 (D.D.C. Sept. 23, 2024) (citing Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002)).

**B.      Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)**

A motion to dismiss under Rule 12(b)(6) tests whether a complaint has properly "state[d] a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw [a] reasonable interference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).

In evaluating a motion to dismiss under Rule 12(b)(6), "the Court must construe the complaint in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged." Hettinga v. United States, 677 F.3d 471, 476 (D.C. Cir. 2012) (internal quotation marks omitted). While the Court must "assume [the] veracity" of any "well-pleaded factual allegations" in a complaint, conclusory allegations "are not entitled to the assumption of truth." Iqbal, 556 U.S. at 679. Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678 (citing Twombly, 550 U.S. at 555). Also, the Court need not "accept legal conclusions cast as factual allegations[,]" or "inferences drawn by [the] plaintiff if those inferences are not supported by the facts set out in the complaint[.]" Hettinga, 677 F.3d at 476. The Court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] and matters of which [the Court] may take judicial notice." Equal Emp. Opportunity Comm'n v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997).

## III.   ANALYSIS

The defendants first argue that the Court must dismiss the plaintiffs' claims for lack of subject matter jurisdiction because the plaintiffs should be considered civil servants of Saudi Arabia, and, accordingly, their claims are barred by the defendants' sovereign immunity under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 et seq. See Defs.' Mem. at 6. Separately, the defendants argue that the Court should dismiss the claims brought by Plaintiffs Elkholy, Hanna, Bashir, and Zamrawy on forum non conveniens grounds because the forum-selection clause in their employment contract mandates that their claims be brought in Saudi

Arabia.[5]  See id. at 10.  Finally, the defendants argue that most of the plaintiffs' claims fail to state a claim because: (1) their ADA and ADEA claims are untimely exhausted, released, or otherwise inadequately pleaded, see id. at 13–14; (2) their DCHRA age discrimination claims are untimely, see id. at 20; and (3) the breach of contract claims brought by plaintiffs Gariballa, Bashir, and Zamrawy are either time-barred or, in the case of plaintiff Gariballa, released pursuant to her severance payment agreement, see id. at 24–26.

The plaintiffs respond that neither the FSIA nor forum non conveniens bars their suit because: (1) the FSIA's commercial activity exception permits their employment claims, see Pls.' Opp'n at 13–14; and (2) the forum-selection clause in their employment contracts is drafted too narrowly to encompass at least some of their employment discrimination claims, see id. at 21, and that, even if applicable, the clause is unenforceable because of the difficulties the plaintiffs would face in seeking to pursue their claims in Saudi Arabia, see id. at 23.  In regards to the defendants' non-jurisdictional arguments for dismissal, the plaintiffs respond that their failure to timely exhaust their administrative remedies or bring their claims in federal court are entitled to equitable tolling of the applicable limitations periods, see id. at 15; their claims are all adequately pleaded, see id. at 19; and that plaintiff Gariballa did not release her claims against the defendants by signing her severance payment agreement, see id. at 19–20.

Although the Court must ordinarily first assure itself that it has subject matter jurisdiction over a case, "a federal court has leeway 'to choose among threshold grounds for denying audience to a case on the merits.'"  Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp., 549 U.S. 422, 431 (2007) (quoting Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 585 (1999)).  And because "[a] forum non conveniens dismissal 'den[ies] audience to a case on the merits[,]'"

---

[5] Because plaintiff Gariballa did not sign a written employment contract with the defendants, they do not seek to dismiss her claims on the basis of forum non conveniens.

id. at 432 (quoting Ruhrgas AG, 526 U.S. at 585), the Supreme Court has held that "[a] district court therefore may dispose of an action by a forum non conveniens dismissal, bypassing questions of subject-matter and personal jurisdiction, when considerations of convenience, fairness, and judicial economy so warrant[,]" id.

Here, the Court will first address the defendants' forum non conveniens argument before addressing their jurisdictional argument under the FSIA because, as the Court concludes below, the claims brought by plaintiffs Elkholy, Hanna, Bashir, and Zamrawy must be dismissed on forum non conveniens grounds, and thus, the Court need not address the defendants' alternative arguments for dismissal of these plaintiffs' claims.  Moreover, the Court ultimately concludes that plaintiff Gariballa's claims fall within the FSIA's commercial activity exception, and therefore, at least as to plaintiff Gariballa, the FSIA does not deprive the Court of subject matter jurisdiction.  And, because the Court concludes that the FSIA does not bar plaintiff Gariballa's ADA and breach of contract claims, the Court will then determine whether she has adequately pleaded her claims.[6]

**A.      Whether the Court Must Dismiss the Claims Brought by Plaintiffs Elkholy, Hanna, Bashir, and Zamrawy on Forum Non Conveniens Grounds**

"As the Supreme Court has instructed, 'the appropriate way to enforce a forum-selection clause pointing to a state or foreign forum is through the doctrine of forum non conveniens.'" D&S Consulting, Inc. v. Kingdom of Saudi Arabia, 961 F.3d 1209, 1212 (D.C. Cir. 2020) (quoting Atl. Marine Constr. Co. v. U.S. Dist. Court for W. Dist. of Texas, 571 U.S. 49, 60 (2013)).  In other words, "if [a] plaintiff has entered into a contract to litigate his [or her] claims

---

[6] Because the Court ultimately concludes that it must grant the defendants' motion to dismiss, it need not address the defendants' motion to strike the plaintiffs' request for punitive damages.

16

in a specific forum, the defendant[s] may enforce that agreement by moving to dismiss for <u>forum non conveniens</u>." <u>Azima v. RAK Inv. Auth.</u>, 926 F.3d 870, 874 (D.C. Cir. 2019).

And, although it is generally true that courts weigh private and public interests when faced with a motion for dismissal on <u>forum non conveniens</u> grounds, "[t]he calculus changes, however, when the parties' contract contains a valid forum-selection clause, which 'represents the parties' agreement as to the most proper forum.'" <u>Atl. Marine Constr. Co.</u>, 571 U.S. at 62–63 (quoting <u>Stewart Org., Inc. v. Ricoh Corp.</u>, 487 U.S. 22, 31 (1988)).  Thus, rather than balancing the relevant private and public interests, the Supreme Court has outlined a two-step analysis for determining whether to dismiss an action on <u>forum non conveniens</u> grounds consistent with a forum-selection clause.  First, the Court must determine whether the "forum-selection clause is applicable, mandatory, valid, and enforceable[.]" <u>D&S Consulting</u>, 961 F.3d at 1212–13 (quoting <u>Azima</u>, 926 F.3d at 874).  And, "when a court considering <u>forum non conveniens</u> dismissal is faced with an applicable and mandatory forum-selection clause, it should presume the clause to be legally valid and enforceable." <u>Dahman v. Embassy of Qatar</u>, 815 F. App'x 554, 558 (D.C. Cir. 2020) (citing <u>Azima</u>, 926 F.3d at 870).  The plaintiffs can only overcome that presumption by making a "strong showing" that, for example, enforcement of the clause "would be unreasonable and unjust, . . . would contravene a strong public policy of the present forum, or trial in the preselected forum would be so gravely difficult that the plaintiff[s] effectively would be deprived of [their] day in court." <u>Id.</u> (citing <u>Azima</u>, 926 F.3d at 874–75).  The District of Columbia Circuit has indicated that one such way plaintiffs can show that a valid and mandatory clause is nonetheless unenforceable is by a "strong showing" that the "preselected forum 'is substantially deficient—for instance, because it is effectively inaccessible or unable to afford the plaintiff[s] any relief.'" <u>Id.</u> (quoting <u>Azima</u>, 926 F.3d at 875).  Absent such a showing, an

17

applicable, mandatory, valid, and enforceable forum-selection clause should be "given controlling weight in all but the most exceptional cases." Atl. Marine Constr. Co., 571 U.S. at 63 (quoting Stewart Org., 487 U.S. at 33 (Kennedy, J., concurring)).

Thus, if the Court concludes that the clause is applicable, mandatory, valid, and enforceable, the plaintiffs bear "the burden of showing that public-interest factors overwhelmingly disfavor a transfer" to the preselected forum. Id. at 67. These factors include "administrative convenience, the interest in deciding local controversies at home, judicial economy, familiarity with applicable law, and the desire to avoid imposing jury duty on a community unconnected to the litigation." Azima, 926 F.3d at 875.

The Court will address these issues in turn.

1. **Whether the Forum-Selection Clauses Are Applicable, Mandatory, Valid, and Enforceable as to Plaintiffs Elkholy, Hanna, Bashir, and Zamrawy**

In opposing the defendants' motion to dismiss, Plaintiffs Elkholy, Hanna, Bashir, and Zamrawy do not argue that the forum-selection clauses in their contracts are not valid or mandatory, but instead argue that (1) the clauses are inapplicable at least to some of their claims, see Pls.' Opp'n at 21; and (2) the clauses are unenforceable because "Saudi Arabia is truly an unavailable forum as [to] these [p]laintiffs[,]" and requiring them to pursue their claims in Saudi Arabia would "deprive[ them] of their day in court" and force them to "risk their lives or imprisonment merely for bringing claims against the Kingdom for its bad acts[,]" id. at 23.

As previously indicated, plaintiffs Elkholy, Hanna, Bashir, and Zamrawy each signed a written employment contract with the defendants. Each of these contracts contains provisions governing the terms of their employment, including the renewal of the contract, leave provisions, compensation, termination of employment, and severance and other termination-related

18

compensation.  See generally Compl., Exhibit ("Ex.") 1 (Translated Employment Contract for

Tarek Abdelhafez Elkholy ("Elkholy Contract")), ECF No. 1-4; id., Ex. 2 (Translated

Employment Contract for Atef Tawfik Hanna) ("Hanna Contract")), ECF No. 1-5; id., Ex. 10

(Translated Employment Contract for Muhammad Bashir Noor Din) ("Bashir Contract")), ECF

No. 1-13; id., Ex. 11 (Translated Employment Contract for Abdalla Ali Mohamed Zamrawy

("Zamrawy Contract")), ECF No. 1-14.[7]  The forum-selection clauses included in the

employment agreements signed by plaintiffs Elkholy, Hanna, and Zamrawy contain identical

language:

> The Arabic version of this contract is the original version. And <u>any complain[t] or claim that may arise over any [of] the provisions of this contract</u> shall be submitted to <u>the Board of Grievances of the Kingdom of Saudi Arabia</u> for settlement. In accordance [with] the rules and regulations of the board and its procedural rules.  The ruling of the board shall be binding and final.

Elkholy Contract at 8 (emphasis added); <u>see also</u> Hanna Contract at 8; Zamrawy Contract at 8.[8]

The language in the forum-selection clause contained in plaintiff Bashir's contract reads as

follows:

> The Arabic version of this contract shall be considered an original and <u>any dispute between the two parties over any of the provisions of this contract</u> shall be referred to <u>the Civil Service Bureau in the Kingdom of Saudi Arabia</u> for settlement.  The ruling of the Bureau shall be binding [and] final.

Bashir Contract at 7 (emphasis added).

Plaintiffs Elkholy, Hanna, Bashir, and Zamrawy do not respond to the defendants'

argument that the language of these forum-selection clauses applies to the ADA claims pursued

---

[7] The plaintiffs and defendants appear to agree that the English translations of the plaintiffs' employment contracts are correct, and therefore, the Court relies on the translations included as exhibits to the plaintiffs' Complaint.

[8] The agreements signed by these plaintiffs contained language identical to the contract signed by plaintiff Bashir, <u>see</u> Elkholy Contract at 6; Hanna Contract at 6; Zamrawy Contract at 6, but their agreements indicate that the forum-selection clause was amended and replaced with the provision set forth above, <u>see</u> Elkholy Contract at 8; Hanna Contract at 8; Zamrawy Contract at 8.

by plaintiffs Bashir and Zamrawy and to the breach of contract claims brought by each of these four plaintiffs. See Pls.' Opp'n at 20–24. Indeed, although these plaintiffs argue that the clause in their employment contracts is drafted too narrowly to encompass their age discrimination claims brought under the ADEA and DCHRA, see id. at 21, they expressly acknowledge that it was drafted "to apply to specific specified disputes over the terms, interpretation, and termination of the contract itself[,]" id., which clearly includes these plaintiffs' breach of contract claims, see, e.g., Samirah v. District Smiles, PLLC, No. 20-cv-3076 (APM), 2021 WL 918082, at *1, *3 (D.D.C. Mar. 10, 2021) (concluding that a plaintiff's breach of contract claim fell within the scope of a forum-selection clause that stated that it applied to "[a]ny suit involving any dispute or matter arising under" the employment agreement because "[a]fter all, the allegedly breached contract—his employment agreement—contains the forum-selection clause"). Therefore, the Court treats these arguments as conceded and concludes that the forum-selection clauses are applicable to the ADA claims pursued by plaintiffs Bashir and Zamrawy and to the breach of contract claims brought by each of these four plaintiffs.

Second, although the parties disagree about the precise scope of the forum-selection clause in these plaintiffs' employment contracts, the Court need not determine the outer bounds of that clause because, assuming arguendo that not all of these plaintiffs' claims are covered by the forum-selection clause, "a successful motion under forum non conveniens requires dismissal of the case[,]" Atl. Marine Constr. Co., 571 U.S. at 66 n.8, not the piecemeal dismissal of certain claims. Thus, as other members of this Court have concluded, because at least the breach of contract claims brought by plaintiffs Elkholy, Hanna, Bashir, and Zamrawy are covered by the forum-selection clause, the Court must transfer all of these plaintiffs' claims pursuant to forum non conveniens, if such transfer is warranted. See Samirah, 2021 WL 918082, at *3 (concluding

20

that, although the plaintiff brought claims alleging, <u>inter alia</u>, breach of contract and discriminatory termination based on his race, sex, and religion, because his "breach of contract claim merits transfer per the forum-selection clause, the court must transfer the entire action, including claims for which the clause might not apply"); <u>Edebri v. N. Highland Co.</u>, No. 20-cv-758 (TNM), 2020 WL 5411303, at *2 (D.D.C. Sept. 9, 2020) (noting its "doubts that plaintiffs should be able to elide forum[-]selection clauses simply by piling on additional claims that are not strictly covered by the clause"); <u>Revis v. Tustin Constr. Servs., LLC</u>, 322 F. Supp. 3d 58, 62 (D.D.C. 2018) (transferring all of the plaintiff's claims, even those unrelated to the enforcement of a provision of the non-disclosure agreement, because "it would be inefficient and wasteful to bifurcate [the p]laintiff's claims, transfer only some, and have this dispute be litigated in two separate forums"). Thus, the Court concludes that it is most efficient for one forum to adjudicate all of these plaintiffs' claims and will therefore proceed to determine whether the forum-selection clauses are enforceable.

As previously indicated, when faced with a mandatory and valid forum-selection clause, the Court begins with the presumption that the clause is enforceable, and it is these plaintiffs' heavy burden to show otherwise. <u>See</u> <u>Dahman</u>, 815 F. App'x at 558. Plaintiffs Elkholy, Hanna, Bashir, and Zamrawy argue that they have made the required "strong showing" that the clauses are unenforceable because "Saudi Arabia is truly an unavailable forum" for them. Pls.' Opp'n at 23. Specifically, they argue that if they are required to pursue their claims in Saudi Arabia, "their claims cannot be adjudicated and they will be deprived of their day in court[,]" <u>id.</u>, and that the "stark reporting on country conditions[]" in Saudi Arabia underscores that they would be "risk[ing] their lives or imprisonment merely for bringing claims against the Kingdom for its bad acts[,]" <u>id.</u>; <u>see also</u> <u>id.</u> at 11 (arguing that, in Saudi Arabia, they "would not, <u>inter alia</u>: have an

opportunity for their claims to be adjudicated based on U.S. law; be represented by counsel which is forbidden; be afforded due process; have in country security; be granted access to the country to avail themselves of that forum[]; [and] be safe[,]" and instead would "be subject to incarceration and punishment as a consequence of bring[ing] the claims").

In support of their positions, the plaintiffs provided a declaration from Jafar Jafari, which represents that Mr. Jafari is an expert in "Middle East affairs" and Saudi Arabia's "employment practices, institutions[,] and political environment[.]"  Pls.' Opp'n, Ex. 2 (Declaration of Jafar Jafari ("Jafari Decl.")) ¶ 2, ECF No. 31-4.  Mr. Jafari represents that he worked in Saudi Arabia between 1997 and 1998 "as an internet engineer" and is "credentialed with the U.S. State Department Foreign Press Center . . . in [his] capacity as a news producer" for a Lebanon-based television network.  Id. ¶¶ 3–4.  According to the Jafari Declaration, "[i]t is not possible for these [p]laintiffs to adjudicate their claims . . . in Saudi Arabia for political, security, and institutional reasons[,]" id. ¶ 9, including purported safety risks to "similarly situated person[s]" and false imprisonment of "people of non-Saudi nationality with claims against the Kingdom[,]" id. ¶ 11; Saudi Arabia's "significant human rights issues[,]" id. ¶ 12; and criticism of Saudi Arabia's judicial system on the grounds that it "is neither transparent nor independent, and that the system discriminates against foreign parties, non-Saudi nationals especially, and follows deficient substantive and procedural rules[,]" id. ¶ 13.  At bottom, the Jafari Declaration contends that Saudi Arabia is effectively unavailable to the plaintiffs as a forum because "there is a remarkably high likelihood [that pursuing their claims in Saudi Arabia] could cost the [p]laintiffs their lives[,]" id. ¶ 22, and because "Saudi Arabia does not manifest the same high standard of social justice as the United States judiciary [due to the fact that it is] arbitrary and capricious in its administration of justice[,]" id. ¶ 23.  These plaintiffs also cite to a response letter from plaintiff

22

Elkholy to an EEOC investigator regarding his personal financial circumstances and similar fears regarding the security conditions in Saudi Arabia. See generally Pls.' Opp'n, Ex. 3 (Letter from Tarek Elkholy to Natnael Worku, Investigator, U.S. Equal Employment Opportunity Commission (Nov. 29, 2021) ("Elkholy EEOC Letter")), ECF No. 31-5.

Despite the claims in the Jafari Declaration, for the following reasons, the Court concludes that these plaintiffs have failed to make the "strong showing" that enforcement of the forum-selection clauses in their employment contracts "would be unreasonable and unjust, . . . would contravene a strong public policy of the present forum, or trial in the preselected forum would be so gravely difficult that the plaintiff[s] effectively would be deprived of [their] day in court." Dahman, 815 F. App'x at 558 (citing Azima, 926 F.3d at 874–75).

First, although the defendants do not expressly challenge Mr. Jafari's qualifications as an expert on "Saudi Arabia's employment practices, institutions[,] and political environment[,]" Jafari Decl. ¶ 2, the Court notes that it has serious doubts, based on the current record before it, that Mr. Jafari's proposed expert testimony—regarding Saudi Arabia's employment practices, legal institutions and due process protections, and security conditions—is reliable, see Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592 n.10 (1993) (noting that the proponent of expert testimony must demonstrate by a preponderance of the evidence that such testimony is admissible); see also Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 147 (1999) (noting that expert testimony must be relevant and reliable to be admitted under Federal Rule of Evidence 702).[9]  For example, the Jafari Declaration contains no information regarding under what circumstances he "ha[s] been designated an expert[,]" and by whom, Jafari Decl. ¶ 2; no

---

[9] Under Rule 702, proposed expert testimony is reliable if: (1) it is "based upon sufficient facts or data;" (2) it is "the product of reliable principles and methods;" and (3) "the witness has applied the principles and methods reliably to the facts of the case."  Fed. R. Evid. 702.

information regarding his academic or other qualification, such as a graduate degree or publications on the topics for which the plaintiffs seek to have the Court rely on his testimony; and no other information upon which the Court can determine that he possesses "a reliable basis in the knowledge and experience of [the relevant] discipline[,]" Daubert, 509 U.S. at 592. Instead, the Jafari Declaration indicates only that Mr. Jafari worked in Saudi Arabia as an internet engineer for two years over twenty-five years ago, see Jafari Decl. ¶ 3 (noting that he worked in Saudi Arabia between 1997 and 1998), and that he is now a news producer for a Lebanon-based television network, see id. ¶ 4, neither of which relate to the plaintiffs' claims regarding Saudi Arabia's processes for adjudicating employment claims brought by non-Saudi individuals.  Further, the Jafari Declaration relies entirely on publications by other organizations and individuals and cites to no professional experience Mr. Jafari has regarding the topics of these sources.  See generally Jafari Decl.  Thus, although the plaintiffs' burden is only establishing that it is "more likely than not that" Mr. Jafari is qualified to provide expert testimony, Fed. R. Evid. 702, the Court has serious doubts that it could conclude that Mr. Jafari is qualified to provide expert testimony on these matters.

In any event, even assuming arguendo that Mr. Jafari is qualified to provide expert testimony and thus the Court could credit his representations regarding Saudi Arabia, the Jafari Declaration merely recites the same arguments that the District of Columbia Circuit and other courts have rejected regarding Saudi Arabia and the adequacy of Saudi Arabian dispute resolution forums in the forum non conveniens context.  In D&S Consulting, the District of Columbia Circuit rejected arguments "that Saudi Arabia is an unsafe place to travel, that the judicial system there is neither transparent nor independent, and that the system discriminates against foreign parties and follows deficient substantive procedural rules."  961 F.3d at 1214.

That is because, by agreeing to the employment contract and the forum-selection clause, the Court "'can assume that the[se plaintiffs] selected' a forum 'adequate to litigate their claims and to protect their private interests.'" Id. (quoting Azima, 926 F.3d at 875).

To be sure, this Circuit noted that the plaintiff in D&S Consulting had traveled to Saudi Arabia to execute the contract and performed work in Saudi Arabia pursuant to the contract, id., but other courts have also concluded that generalized concerns regarding fairness—whether in regards to Saudi Arabia or other foreign nations—are insufficient to overcome a mandatory forum-selection clause in similar employment disputes, see Alayan v. Permanent Mission of Saudi Arabia to the U.N., No. 18-CV-10068 (ALC), 2021 WL 1964078, at *2–3 (S.D.N.Y. May 17, 2021) (concluding that the plaintiffs' claims for severance payments could be properly brought in Saudi Arabia, consistent with the parties' forum-selection clause); CDM Smith Inc. v. Atasi, 594 F. Supp. 3d 246, 263 (D. Mass. 2022) (same); Kamel v. Hill-Rom Co., 108 F.3d 799, 803 (7th Cir. 1997) (noting that the plaintiff could bring his breach of contract action in Saudi Arabia); see also El-Fadl v. Cent. Bank of Jordan, 75 F.3d 668, 678 (D.C. Cir. 1996), abrogated on other grounds by Samantar v. Yousuf, 560 U.S. 305 (2010) (explaining that "[a] foreign forum is not inadequate merely because it has less favorable substantive law, because it employs different adjudicative procedures, or because of general allegations of corruption in the judicial system") (internal citations omitted).  Indeed, "[c]ourts must be cautious before finding incompetence or corruption by other nation's judicial systems." Alayan, 2021 WL 1964078, at *2.

Similarly, although courts have considered safety conditions in a foreign nation to determine whether it would be unjust to require plaintiffs to pursue their claims in that forum, the plaintiffs—with one exception—rely solely on the same generalized concerns about safety

25

conditions that courts have rejected as grounds for overcoming an otherwise valid forum-selection clause.  See id. at *2–3 (rejecting the plaintiffs' arguments that they could not proceed in Saudi Arabia based on "allegations of human rights scandals, the detention of women's' rights activists, and the murder of a Saudi [j]ournalist"); Atasi, 594 F. Supp. 3d at 256–57 (declining to conclude that it would be unjust to require the plaintiff to proceed in Saudi Arabia based only on general conclusions contained in the United States Department of State Human Rights Report regarding Saudi Arabia's criminal justice system).

On the other hand, plaintiff Zamrawy alleges that an unnamed member of the Saudi Embassy security office "advised [him] not to travel to Saudi Arabia [because he] was [purportedly] put on a blacklist[,]" due to his protests.  Compl. ¶ 182.  To be sure, courts have denied dismissal on forum non conveniens grounds based on evidence of safety concerns specific to the plaintiffs and witnesses.  See, e.g., HSBC USA, Inc. v. Prosegur Paraguay, S.A., No. 03 Civ. 3336(LAP), 2004 WL 2210283, at *3 (S.D.N.Y. Sept. 30, 2004) (noting that the "[p]laintiff has presented ample evidence that litigating in Paraguay could endanger the safety of [the] plaintiff's agents and potential witnesses" based on a declaration representing that "violence [ ] ha[d] already been directed at individual witnesses[,]" including the murder or suspicious deaths of individuals connected with a related investigation).  But courts have also declined to invalidate a forum-selection clause based on mere anecdotal allegations, coupled with generalized concerns over security, including in regards to Saudi Arabia.  See, e.g., Alayan, 2021 WL 1964078, at *2 (concluding that allegations that the plaintiffs' process server "was turned away under the threat of arrest" and "was in fear of his life" were insufficient).  Without more information regarding the veracity of plaintiff Zamrawy's allegation, the Court cannot

determine whether the security officer's warning was merely an empty threat or if plaintiff Zamrawy would be precluded from traveling to Saudi Arabia.

Plaintiffs Elkholy, Hanna, Bashir, and Zamrawy have not provided the Court with any particularized allegations as to why the selected forums in Saudi Arabia would "be so gravely difficult that the[se] plaintiff[s] effectively would be deprived of [their] day in court[,]" Dahman, 815 Fed. App'x at 558, such as uncontested expert testimony regarding "discriminatory evidentiary rules" that would "ha[ve] direct bearing on" their case, Peterson v. Boeing Co., 108 F. Supp. 3d 726, 731 (D. Ariz. 2015); a complete inability to travel to Saudi Arabia, based on, for example, their unforeseeable inability to bear such financial costs or due to their health,[10] see, e.g., Spradlin v. Lear Siegler Mgmt. Servs. Co., 926 F.2d 865, 869 (9th Cir. 1991); or, as previously discussed, specific threats against them in retaliation for seeking to pursue claims in Saudi Arabia, see, e.g., HSBC USA, Inc., 2004 WL 2210283, at *3.

Nor do these plaintiffs meaningfully argue that enforcement of the forum-selection clause would contravene public policy, apart from their concerns regarding Saudi Arabia's procedures and safety conditions. See Pls.' Opp'n at 23. To the extent it is addressed at all, the Jafari Declaration represents generally that "Saudi Arabia does not manifest the same high standard of social justice as the United States judiciary[,]" Jafari Decl. ¶ 23, and appears to offer contradictory representations regarding whether Saudi Arabia lacks anti-discrimination laws,

---

[10] Although plaintiff Elkholy represented in his November 2021 EEOC letter that his "financial situation also makes it difficult to travel[,]" Elkholy EEOC Letter at 3, because at that time he was "struggling to find a stable job to be able to provide for [his] family[,]" id., he did not submit an affidavit in this case attesting to his current financial circumstances that would allow the Court to determine whether the extent of the inconvenience he would suffer by proceeding in Saudi Arabia "was clearly foreseeable at the time of contracting[,]" Atl. Marine Constr. Co., 571 U.S. at 64 (quoting Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 17–18 (1972)), or instead would effectively preclude him from seeking to vindicate his claims.

Similarly, although the Complaint notes that plaintiff Bashir "was diagnosed with Stage-V renal disease" in April 2014, for which he subsequently began dialysis, Compl. ¶ 155, he does not contend that his current health circumstances would preclude him from pursuing his rights in Saudi Arabia, see generally Pls.' Opp'n.

27

including laws protecting the rights of non-citizens and older individuals, contrast id. ¶ 20 (representing that "Saudi Arabia is void of regulations prohibiting discrimination based on" various protected characteristics), with id. ¶ 21 (representing that "[t]he antidiscrimination law only applies to [Saudi] citizens . . . ."). These general statements are nearly identical to those the District of Columbia Circuit rejected in Dahman regarding the enforceability of a forum-selection clause directing that the plaintiff arbitrate in Qatar, because they "d[id] not establish that Qatar will leave [the plaintiff] entirely without a remedy, especially when it is conceivable that the arbitral panel dictated by the employment agreement could apply U.S. law to the present dispute." 815 Fed. App'x at 558.

It is not the Court's intent to minimize these plaintiffs' concerns regarding being required to pursue their claims in Saudi Arabia. From a personal perspective, the Court is troubled by the apparently standard inclusion of these forum-selection clauses in employment contracts with local staff of non-Saudi origin, given the relative imbalance of bargaining power between the parties and the inconvenience of former employees being required to proceed in a forum far afield from the plaintiff's home forum and the locus of the employee's relationship with the foreign nation. However, these plaintiffs have failed to provide the Court with any particularized and well-grounded information regarding the unavailability or unfairness of the agreed-upon Saudi forums, and without more, the Court is left to speculate about the nature and fairness of these forums, which it is precluded from doing under District of Columbia Circuit precedent. Thus, despite its concerns, the Court is compelled to conclude that, under binding legal authority, the forum-selection clauses in the employment contracts signed by plaintiffs Elkholy, Hanna, Bashir, and Zamrawy are applicable, mandatory, valid, and enforceable.

28

**2.  Whether the Public Interest Factors Nonetheless "Overwhelmingly Disfavor" Dismissal of the Claims Brought by Plaintiffs Elkholy, Hanna, Bashir, and Zamrawy**

The Court must now determine whether, notwithstanding the forum-selection clauses in their contracts, plaintiffs Elkholy, Hanna, Zamrawy, and Bashir have shown that the "public-interest factors overwhelmingly disfavor" dismissal pursuant to forum non conveniens. Atl. Marine, 571 U.S. at 67.  Although these plaintiffs have only addressed these concerns in passing other than the arguments the Court has now rejected regarding the enforceability of the forum-selection clauses, to the extent that they address the public interest factors, they seemingly argue that their claims are "precisely and narrowly governed by U.S. law and only [capable of being adjudicated] in U.S. courts."  Pls.' Opp'n at 24 (citing Scherk v. Alberto-Culver Co., 417 U.S. 506, 519 (1974)).  However, although the District of Columbia has "a legitimate interest" in "keeping localized controversies that turn on the District's law in the District Courts[,]" Dahman, 815 F. App'x at 559, the District of Columbia Circuit has held that the District's interest in adjudicating claims of employment discrimination under the ADEA and DCHRA "is not enough on its own to tip the scales[ against dismissal,]" id. (affirming dismissal of the plaintiff's claims of age discrimination arising out of his termination by the Embassy of Qatar on forum non conveniens grounds).

Despite their cursory attempts to distinguish Dahman, plaintiffs Elkholy, Hanna, Zamrawy, and Bashir have not provided any particularized and well-supported factual information indicating that the agreed-upon forums in Saudi Arabia are incapable of applying United States law in resolving their dispute, and without more, the Court is compelled to conclude that these plaintiffs' failure to meaningfully address the public interest factors is "patently insufficient" to carry their burden of showing that the public interest factors "overwhelmingly disfavor" dismissal on forum non conveniens grounds, Billard v. Angrick, 220

29

F. Supp. 3d 132, 143 (D.D.C. 2016), especially considering the applicable District of Columbia Circuit legal authority.  Accordingly, the Court concludes that it must dismiss all claims brought by plaintiffs Elkholy, Hanna, Bashir, and Zamrawy on the basis of forum non conveniens, consistent with the forum-selection clauses in their employment contracts.

**B.      Whether Plaintiff Gariballa's Suit Is Barred by the Foreign Sovereign Immunities Act**

Having concluded that it must dismiss the claims brought by plaintiffs Elkholy, Hanna, Bashir, and Zamrawy, the Court now must determine whether it may exercise jurisdiction over plaintiff Gariballa's claims or whether they are barred by the FSIA.

The FSIA provides the "sole basis for obtaining jurisdiction over a foreign state in [United States] courts." Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434 (1989).  A "foreign state" is defined to include "a political subdivision of a foreign state or an agency or instrumentality of a foreign state[,]" 28 U.S.C. § 1603(a), such as an embassy, see, e.g., Howe v. Embassy of Italy, 68 F. Supp. 3d 26, 32–33 (D.D.C. 2014) (collecting cases). Under the FSIA, "a foreign state is presumptively immune from the jurisdiction of United States courts[.]" Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993).  However, the FSIA contains certain exceptions that "strip foreign states of this immunity." Reed v. Islamic Republic of Iran, 845 F. Supp. 2d 204, 210 (D.D.C. 2012) (citing 28 U.S.C. §§ 1605–1607).

Relevant here, the FSIA contains a commercial-activity exception, which directs that "[a] foreign state shall not be immune from the jurisdiction of courts . . . in any case . . . in which the action is based upon commercial activity carried on in the United States by the foreign state."  28 U.S.C. § 1605(a)(2).  The FSIA further defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act[]" and "shall be determined

by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). The Supreme Court has explained that "the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the <u>type</u> of actions by which a private party engages in trade and traffic or commerce." <u>Republic of Arg. v. Weltover, Inc.</u>, 504 U.S. 607, 614 (1992) (internal quotation marks and citation omitted); <u>see</u> <u>Nelson</u>, 507 U.S. at 360 (stating that a foreign state engages in commercial activity "where it exercises only those powers that can also be exercised by private citizens, as distinct from those powers peculiar to sovereigns") (internal quotation marks and citation omitted).

This Circuit has adopted a three-part test to determine whether the commercial-activity exception applies in an employment dispute involving a foreign state. First, a court must determine whether the plaintiff's claims are "based upon" his or her employment relationship, i.e., whether the employment relationship is an "element[] of a claim that, if proven, would entitle [the] plaintiff to relief under [her] theory of the case." <u>El-Hadad v. United Arab Emirates</u>, 496 F.3d 658, 663 (D.C. Cir. 2007) (quoting <u>Nelson</u>, 507 U.S. at 357). If it is, the Court then must determine the nature of the plaintiff's employment relationship, i.e., whether he or she was employed in a "[p]ublic or governmental" capacity or merely in a "commercial" capacity, such as a "laborer[,] clerical staff, or public relations or marketing agent[.]" <u>Id.</u> (quoting H.R. Rep. No. 94-1487, at 16 (1976)). In many cases, the critical question is whether the plaintiff was employed as a civil servant or merely as a "commercial employee[.]" <u>Id.</u> at 664 n.2. Because "some countries might lack the notion of a 'civil service' altogether, and others might define the notion in a way far afield of [the] FSIA's purpose[,]" the District of Columbia Circuit has instructed courts to employ a "flexible and inclusive approach to determin[e] whether a foreign

31

government's employee is a civil servant[]" when assessing employment cases.  Id. at 665.

Thus, in assessing whether a plaintiff is a civil servant, the Court should use several "generally

relevant considerations" as a guide, including: (1) whether the plaintiff's job title and duties fall

within the foreign state's definition of a civil servant; (2) whether the plaintiff had a "true

contractual arrangement" or relied instead on the foreign state's civil service laws; and (3)

whether the plaintiff's duties were clerical in nature or instead involved some form of

governmental decisionmaking.[11]  Id. at 665.

Finally, if the Court concludes that plaintiff Gariballa was not employed as a civil

servant, it must then determine whether the plaintiff's duties "involved the exercise of 'powers

that can also be exercised by private citizens, as distinct from those powers peculiar to

sovereigns.'"  Id. at 667 (quoting Nelson, 507 U.S. at 360).  In making this assessment, the Court

"look[s] only to the resemblance between 'the outward form' of [the plaintiff's] conduct and

powers and those of private citizens[,]" id. at 668, rather than the purpose of the plaintiff's work,

see id. at 667–68.  At bottom, the Court must determine whether the plaintiff's work included

"discretionary involvement with sovereign law or policy[,]" id. at 668, or instead only related to

duties "easily found in commercial enterprise[,]" such as ministerial work or "standard

accounting work[,]" id.  If the Court is satisfied that the plaintiff's work is commercial in nature,

the plaintiff's claims based upon her employment are authorized under the FSIA's commercial

activity exception.

---

[11] Because plaintiff Gariballa had no employment relationship with the defendants prior to her employment at the Embassy in Washington, D.C., the third El-Hadad factor—i.e., the relationship between the plaintiff's employment relationship when she worked in the foreign nation and current employment relationship with that nation, see El-Hadad, 496 F.3d at 665—is inapplicable here.  Similarly, the plaintiff's nationality is "all but irrelevant[,]" id. at 667, due to the fact that she is not a Saudi national and there is no allegation as to whether Saudi Arabia "rarely if ever hires non-citizens for its civil service[,]" id.  Thus, the Court does not address these two El-Hadad factors.

Here, for the following reasons, the Court concludes that plaintiff Gariballa's claims are authorized under the FSIA's commercial activity exception.  First, plaintiff Gariballa's claims that the defendants unlawfully terminated her employment and breached her employment contract by failing to pay her the full severance amount she alleges she was entitled to receive are clearly "based upon" her employment relationship with the defendants, id. at 663, and the defendants do not argue otherwise, see Defs.' Mem. at 6–10.

Proceeding to the next El-Hadad step, the Court concludes that plaintiff Gariballa has established that she was not employed as a civil servant of Saudi Arabia.  The defendants acknowledge that "courts in this jurisdiction have found employees working for other governments in similar roles to be outside of the civil service[,]" but nonetheless argue that Saudi Arabia "maintains a broad view of which workers may fall within the country's civil service[,]" id. at 8, and thus, although plaintiff Gariballa was only employed in accounting and as a personnel manager, Saudi Arabia's expansives definition of civil service "compels" this Court to conclude that plaintiff Gariballa was employed as a civil servant, id. at 9.  The Court is not persuaded.

To adopt the defendants' position based on Saudi Arabia's definition of civil service would run afoul of the District of Columbia Circuit's admonition that courts are to take a "flexible and inclusive approach to determin[e] whether a foreign government's employee is a civil servant[]" when assessing employment cases because some countries "might define the notion in a way far afield of [the] FSIA's purpose[,]" El-Hadad, 496 F.3d at 665.  Indeed, even crediting the defendants' representations regarding the scope of Saudi Arabia's definition of civil

33

servants,[12] it is hard to reconcile that definition with the legislative history of the FSIA, which expressly indicates that a foreign state's "employment or engagement of laborers, clerical staff or public relations or marketing agents" constitutes commercial activity and not public or governmental employment.  H.R. Rep. No. 94–1487, at 16.

Moreover, the balance of the other El-Hadad factors strongly indicates that plaintiff Gariballa's employment was commercial in nature.  First, although there appears to be no written contract governing her employment, plaintiff Gariballa has provided letters from the Embassy's Information Office certifying her employment and describing her compensation and lack of health insurance coverage, none of which indicate that she was employed as a civil servant or that her employment was based on civil service laws and not a contractual agreement, written or otherwise.  See generally Compl., Ex. 3 (Letter from Jamal I. Nasif, Deputy Director, Royal Embassy of Saudi Arabia Information Office (Jan. 12, 1997)), ECF No. 1-6; id., Ex. 5 (Letter from Nail A. Al-Jubeir, Director, Royal Embassy of Saudi Arabia Information Office (Sept. 10, 2007)), ECF No. 1-8; id., Ex. 6 (Letter from Nail A. Al-Jubeir, Director, Royal Embassy of Saudi Arabia Information Office (Oct. 31, 2012)), ECF No. 1-9.  Further, plaintiff Gariballa expressly alleged that she was not entitled to the same benefits or compensation as local staff of Saudi origin.  See Compl. ¶ 114; see also El-Hadad, 496 F.3d at 666 (holding that "the fact that [the plaintiff] lacked benefits common to other [ ] governmental employees is sufficient for [the plaintiff] to prevail" on this first factor).

---

[12] The plaintiffs argue that the Court may not take judicial notice of the definition of civil service contained in Saudi Arabia's Implementing Regulation for Human Resources in the Civil Service because Saudi Arabia's "governmental agency website does not have unquestionable accuracy[,]" Pls.' Opp'n at 12, as is required for judicial notice to be taken.  However, this argument is unavailing, because that regulation is published on the website for Saudi Arabia's Ministry of Civil Service and plaintiff Gariballa has put forth no compelling argument as to why the accuracy of Saudi Arabia's public regulations could be reasonably questioned.  See Fed. R. Evid. 201(b)(2); see also United States v. All Assets Held in Account Number XXXXXXXX, No. 13-cv-1832 (JDB), 2014 WL 12810522, at *3 n.3 (D.D.C. July 3, 2014) (taking judicial notice of the Nigerian Federal Ministry of Justice website).

Second, plaintiff Gariballa's administrative role falls squarely within what Congress has characterized as commercial employment—i.e., her role was similar to that of "laborers, clerical staff[,] or public relations or marketing agents[,]" as opposed to being a civil servant. El-Hadad, 496 F.3d at 665. Far from exercising policymaking or deliberative powers, see id. at 666–67, plaintiff Gariballa either provided administrative or clerical services to the Embassy, see Compl. ¶¶ 116, 118 (noting that plaintiff Gariballa was responsible for accounting tasks and verifying employee timesheets). As other members of this Court have concluded, administrative roles are clearly "ministerial, not discretionary," lacking any "authority to determine or articulate policy." Youssef v. Embassy of the United Arab Emirates, No. 17-cv-2638 (KBJ), 2021 WL 3722742, at *8 (D.D.C. Aug. 23, 2021); see Ashraf-Hassan v. Embassy of Fr., 40 F. Supp. 3d 94, 102 (D.D.C. 2014) (administrative assistant duties supported a finding that the plaintiff's work was commercial).

Having concluded that the first two factors support a finding that plaintiff Gariballa was not employed by the defendants as a civil servant, the Court must next determine whether plaintiff Gariballa's work involved the exercise of "powers that can also be exercised by private citizens, as distinct from those powers peculiar to sovereigns." El-Hadad, 496 F.3d at 667 (quoting Nelson, 507 U.S. at 360). As indicated above, plaintiff Gariballa performed administrative or clerical tasks which fall squarely within what other courts have concluded are commercial in nature. See Youssef, 2021 WL 3722742, at *8; Ashraf-Hassan, 40 F. Supp. 3d at 102.

Accordingly, having concluded that each of the applicable El-Hadad factors indicate that plaintiff Gariballa's claims arise out of Saudi Arabia's commercial activity and not matters that

35

are governmental in nature, the Court concludes that the FSIA's commercial activity exception applies and it therefore may exercise jurisdiction over her claims.

## C.      Whether Plaintiff Gariballa Has Adequately Pleaded Her ADA and Breach of Contract Claims

Having concluded that it has jurisdiction to consider plaintiff Gariballa's claims, the Court now proceeds to determine whether her two claims, i.e., her ADA claim (Count III) and her breach of contract claim (Count IV), state claims for which relief may be granted.  The defendants argue, inter alia, that plaintiff Gariballa's ADA claim is untimely because, assuming arguendo that her DCOHR intake questionnaire constitutes a formal charge of discrimination, she failed to file her intake questionnaire within the applicable 300-day limitations period, see Defs.' Mem. at 17, and her breach of contract claim is untimely because she failed to file this action within three years of when her breach of contract cause of action accrued, see id. at 24–25.[13]  Plaintiff Gariballa appears to argue that her claims are not barred because she is entitled to equitable tolling of the applicable statutes of limitations, either because of the defendant's actions or other external circumstances that prevented the timely filing of her claims.  See Pls.' Opp'n at 16 (discussing the circumstances of her ADA claim); id. at 19 (discussing her breach of contract claim).

### 1.  Whether Plaintiff Gariballa's ADA Claim Is Time-Barred

As indicated above, the defendants argue that plaintiff Gariballa's ADA claim is untimely because, assuming arguendo that her DCOHR intake questionnaire constitutes a formal charge of discrimination, she failed to file her intake questionnaire within the applicable 300-day statutory

---

[13] Because the Court ultimately concludes that plaintiff Gariballa's ADA and breach of contract claims must be dismissed because they were not timely filed pursuant to the applicable limitations periods, the Court need not address the defendants' alternative arguments for dismissal of these claims.

limitations period.  See Defs.' Mem. at 17.  In response, plaintiff Gariballa does not appear to address the defendants' argument directly, but instead seemingly argues that she is entitled to equitable tolling because "[n]o counsel could be found or retained during COVID despite attempts[ to do so]."  Pls.' Opp'n at 16.

"The ADA incorporates the 'powers, remedies, and procedures' of Title VII, including the limitations period set forth in 42 U.S.C. § 2000e–5."  Dahlman v. Am. Ass'n of Retired Persons (AARP), 791 F. Supp. 2d 68, 74 (D.D.C. 2011) (quoting 42 U.S.C. § 12117(a)).  Thus, consistent with Title VII's limitations period, a plaintiff in the District of Columbia may only pursue an ADA claim in court if she has filed her charge of discrimination within 300 days of the date of the allegedly discriminatory act.  See Craig v. District of Columbia, 74 F. Supp. 3d 349, 361 (D.D.C. 2014) ("Ordinarily, . . . a plaintiff alleging a violation of Title VII must file an EEOC charge within 180 days of the date that the allegedly discriminatory act occurred[; however,] [i]n the District of Columbia . . . a 'worksharing agreement' between the EEOC and the [District's Office of Human Rights ('DCOHR')] results in the automatic cross-filing of an EEOC complaint with the [DCOHR], thereby extending the filing deadline for plaintiffs in the District to 300 days." (citations omitted)).

However, as with Title VII, the ADA's limitations period is not jurisdictional and is subject to equitable tolling, though "only in extraordinary and carefully circumscribed instances."  Smith-Haynie v. District of Columbia, 155 F.2d 575, 579–80 (D.C. Cir. 1998) (quoting Mondy v. Sec'y of Army, 845 F.3d 1051, 1057 (D.C. Cir. 1988)).  Relevant here, "a litigant is entitled to equitable tolling of a statute of limitations only if the litigant establishes two elements: (1) that [s]he has been pursuing h[er] rights diligently, and (2) that some extraordinary circumstance stood in h[er] way and prevented timely filing."  Menominee Indian Tribe of Wisc.

v. United States, 577 U.S. 250, 255 (2016) (internal quotation marks omitted).  Therefore, "the principles of equitable tolling . . . do not extend to what is at best a garden variety claim of excusable neglect."  Irwin v. Dep't of Veterans Affs., 498 U.S. 89, 96 (1990).  And, the plaintiff bears the burden of demonstrating a basis for applying equitable tolling.  See McAlister v. Potter, 733 F. Supp. 2d 134, 143–44 (D.D.C. 2010) (finding that equitable considerations were not applicable because the plaintiff failed to explain or raise an excuse for her late filing).

Here, plaintiff Gariballa acknowledges that she "formally departed from her role at the Embassy" in February 2018, Compl. ¶ 141, and she does not dispute that she only commenced proceedings with the DCOHR on February 10, 2020, when she filed her DCOHR intake questionnaire, see Pls.' Opp'n at 8 (citing Defs.' Mot., Ex. G (Gariballa DCOHR Inquiry and Dismissal) at 1).  Thus, assuming arguendo that her filing of the DCOHR intake questionnaire constituted the filing of a formal charge of discrimination, her filing of the intake questionnaire—approximately two years after she ended her employment with the defendants— is well outside the ADA's 300-day limitations period for plaintiffs in the District of Columbia.  Accordingly, the Court must dismiss plaintiff Gariballa's ADA claim as untimely filed unless she can show she is entitled to equitable tolling.

For the following reasons, the Court concludes that plaintiff Gariballa has not established that she is entitled to equitable tolling of her ADA claim.  As indicated previously, plaintiff Gariballa does not expressly respond to the defendants' arguments regarding the 300-day limitations period, but she appears to indicate, inter alia, that her ADA claim is entitled to equitable tolling of the applicable limitations period because: (1) the "[d]efendants continued to engage in protracted negotiation, promises of additional compensation as to final end of service and severance compensation until [they] ultimately abandoned those negotiations[ and] breached

38

their contract[,]" Pls.' Opp'n at 16; and (2) "[n]o counsel could be found or retained during COVID despite [her] attempts[ to do so,]" id.[14]  However, as an initial matter, although plaintiff Gariballa appears to argue that she could not obtain counsel "during COVID despite [her] attempts[ to do so,]" id., she makes no indication that she could not obtain counsel during the relevant 300-day limitations period following February 2018 before the pandemic commenced in 2020.  And, in any event, this Court and others have regularly concluded that a plaintiff's "inability to retain an attorney is not an extraordinary circumstance," as she could have filed her submissions pro se or otherwise "attempt[ed] to preserve her rights within the limitations period."  Miller v. Downtown Bid Servs. Corp., 281 F. Supp. 3d 15, 20–21 (D.D.C. 2017) (Walton, J.); see Martin v. Piedmont Airlines, 916 F. Supp. 2d 11, 14 (D.D.C. 2013) (declining to invoke equitable tolling where the pro se litigant "attribute[d] his delay to his inability to obtain legal advice . . . or to retain legal counsel").

Second, to the extent that plaintiff Gariballa argues that the defendants' engagement in negotiations and promises of further compensation amounted to "affirmative misconduct on the part of [the] defendant[s] [that] lulled the plaintiff into inaction," Pls.' Opp'n at 15, the Court is not persuaded.  Indeed, this Court has previously concluded that "mere participation in settlement negotiations" is insufficient to invoke equitable tolling or equitable estoppel, Cristwell v. Veneman, 224 F. Supp. 2d 54, 61 (D.D.C. 2002) (Walton, J.); see also Dudley v. SEED Sch. of Wash. D.C., No. 24-cv-1300 (SLS), 2025 WL 2097571, at *4 (D.D.C. July 25, 2025) (noting that engaging in mediation discussions do not justify invoking equitable tolling).  Moreover,

---

[14] Plaintiff Gariballa also argues that the language contained in the DCOHR's letter dismissing her intake questionnaire did not explicitly indicate mandatory next steps.  See id.  However, any purported ambiguity created by the dismissal letter as to what steps plaintiff Gariballa could pursue upon the dismissal of her claims by the DCOHR is not relevant to the Court's determination as to whether she timely filed her intake questionnaire with the DCOHR.

"vague and unsupported assertion[s] that the defendant[s] participated in the settlement discussions in bad faith" are also insufficient to warrant the exercise of the Court's equitable powers, Cristwell, 224 F. Supp. 2d at 61; see also Ruff v. Ascension Health Servs., No. 24-cv-2562 (JDB), 2025 WL 1950855, at *5 (D.D.C. July 16, 2025) ("Settlement discussions . . . are not an extraordinary circumstance—especially because [the plaintiff] does not allege that the discussions prevented her from timely filing an EEOC charge."); Johnson v. District of Columbia, 572 F. Supp. 2d 94, 103 (D.D.C. 2008) (declining to apply equitable estoppel based on similar arguments).

Therefore, the Court concludes that plaintiff Gariballa has failed to show that she is entitled to the "extraordinary and carefully circumscribed" exercise of equitable tolling, Smith-Haynie, 155 F.2d at 580 (quoting Mondy, 845 F.3d at 1057), and thus, she did not timely file her charge of discrimination, even assuming arguendo that her DCOHR intake questionnaire constituted such a charge. Accordingly, the Court must dismiss plaintiff Gariballa's ADA claim for failure to state a claim because it is time-barred.

### 2. Whether Plaintiff Gariballa's Breach of Contract Claim Is Time-Barred

Finally, the Court turns to plaintiff Gariballa's breach of contract claim, which the defendants argue was not filed within the applicable statute of limitations. See Defs.' Mem. at 24–25. As she argued in regards to her ADA claim, plaintiff Gariballa appears to argue that she is entitled to equitable relief—under either equitable tolling of the applicable statute of limitations or equitable estoppel of the defendant's timeliness argument—because the "[d]efendants engaged in protracted negotiation, promises of additional compensation pursuant to her oral employment contract as to, inter alia, final end of service and severance compensation[,] until [the d]efendants ultimately abandoned those negotiations and promises, [and] breached their contract with Gariballa[,]" Pls.' Opp'n at 19, and that after this alleged

40

breach, she "immediately" submitted her DCOHR questionnaire on February 10, 2020, id.

Additionally, she appears to argue that she "understandably would be reluctant to file a

complaint with the EEOC for fear [she] would jeopardize [her] chances to gain relief [ ]

voluntarily[,]" based on the defendants' promises.  Id. at 18.

Under District of Columbia law, a plaintiff must generally bring a breach of contract

claim within three years of when the cause of action accrued.  D.C. Code § 12-301(a)(7).  A

cause of action for breach of contract generally "accrues . . . at the time of the breach," i.e., when

a party to the contract "fail[s] to perform all or any part of what is promised in a contract."

Medhin v. Hailu, 26 A.3d 307, 310 (D.C. 2011).  And, while the District of Columbia Court of

Appeals has noted that it adheres to a "generally strict application of statutes of limitations[,]"

East v. Graphic Arts Indus. Joint Pension Tr., 718 A.2d 153, 156 (D.C. 1998), it has recognized

"at least two limited exceptions" to that rule, id.

First, "[u]nder the lulling doctrine, a defendant cannot assert the bar of the statute of

limitations, if it appears [that the defendant] has done anything that would tend to lull the

plaintiff into inaction, and thereby permit the limitation prescribed by the statute to run . . . ."  Id.

at 156–57 (quoting Bond v. Serano, 566 A.2d 47, 50 (D.C. 1989) (Farrell, J., concurring)

(internal quotation marks omitted)); see also Z-Modular, LLC v. MCN Build, Inc., 729 F. Supp.

3d 1, 16 (D.D.C. 2024) (noting that the lulling doctrine is "a theory of equitable estoppel").  The

District of Columbia Court of Appeals has cautioned that it "has construed the lulling doctrine

narrowly[,]" id. (citing Bond, 566 A.2d at 50 (Farrell, J., concurring)), and that application of the

doctrine "requires some affirmative action on the defendant[s'] part that goes beyond failure to

post notice of the law[,]" id., such as a defendant's "acknowledgment of indebtedness, [in

addition to] a promise to pay[ the plaintiff,]" Bailey v. Greenberg, 516 A.2d 934, 937 (D.C.

1986) (quoting <u>Hornblower v. Geo. Wash. Univ.</u>, 31 App. D.C. 64, 73 (D.C. 1908)).  Second, pursuant to the "discovery rule," courts have sometimes tolled a cause of action "until the plaintiff knows or reasonably should have known of the injury[,]" <u>Wright v. Howard Univ.</u>, 60 A.3d 749, 751 n.1 (D.C. 2013), such as when the plaintiff knows or reasonably should have known that she was "receiving something substantially less or different from that for which [s]he bargained[,]" <u>Fowler v. A & A Co.</u>, 262 A.2d 344, 347 (D.C. 1970) (internal quotation marks omitted).[15]

For the following reasons, the Court concludes that plaintiff Gariballa's breach of contract claim is untimely, even if the Court applied either of these two limited exceptions and tolled the statute of limitations for a period of time immediately following the termination of her employment.  Plaintiff Gariballa's own allegations in the Complaint make clear that on October 23, 2018, she signed an agreement with the defendants accepting a partial severance payment of $25,385.60.  Compl. ¶ 144.  She alleges that the defendants "indicat[ed] additional payments were forthcoming[,]" and also that the defendants "used [her] dire [economic] circumstances to pressure her to accept a partial payment under duress[.]"  <u>Id.</u>

The agreement plaintiff Gariballa signed is titled "Acknowledgment of Receipt of Severance Payment and Full Release of Claims."  <u>See</u> Defs.' Mot., Ex. F (Acknowledgment of Receipt of Severance Payment and Full Release of Claims) at 1, ECF No. 29-6.[16]  And that

---

[15] Other members of this Court have noted that "the discovery rule is not so much a doctrine of 'equitable tolling,'" <u>Z-Modular</u>, 729 F. Supp. 3d at 17, but instead is "a rule that governs when a claim accrues[,]" <u>id.</u> (citing <u>Doe v. Exxon Mobil Corp.</u>, No. 01-cv-1357 (RCL), 2022 WL 3043219, at *11 (D.D.C. Aug. 2, 2022)).  In any event, the Court's ultimate conclusion that the discovery rule does not save plaintiff Gariballa's untimely breach of contract claim does not depend on the formulation of the discovery rule theory.

[16] Because plaintiff Gariballa does not dispute the authenticity of the severance release document, and because she refers to it in the Complaint and the document is "integral" to her breach of contract claim, the Court concludes she has incorporated it by reference and thus the Court may consider it without converting the defendants' motion to

(continued . . .)

42

agreement clearly indicates, contrary to plaintiff Gariballa's assertions otherwise, that she "acknowledge[d] that this amount represents [the] full payment of the severance pay and that no part of it has been withheld by the Embassy for Federal, State, or Local tax purposes." Id.  The agreement further states that plaintiff Gariballa "agree[d] that this amount represents a final payment by the Embassy and that [she] do[es] not claim, nor does the Embassy owe [her] additional compensation[,]" and that she "agree[d] to absolutely and unconditionally release, discharge, indemnify[,] and hold harmless the Embassy from any and all claims." Id.  Thus, by her own account, plaintiff Gariballa knew or should have known at least as of October 23, 2018, when she signed the agreement, that she was "receiving something substantially less or different from that for which [s]he bargained[,]" Fowler, 262 A.3d at 347 (internal quotation marks omitted), and was on notice of the defendants' position that they had paid her all she was entitled to receive at that time, see Daramy-Andrews v. Liberty Ins. Co., No. 22-cv-1694 (TJK), 2025 WL 294957, at *4 (D.D.C. Jan. 24, 2025) (declining to apply the lulling doctrine where the plaintiff was "'on notice' that [the d]efendant's estimated payments would come up short of what she had hoped for[,]" but she did not file her suit in a timely fashion) (quoting Martinez v. Hartford Cas. Ins. Co., 429 F. Supp. 2d 52, 60–61 (D.D.C. 2006)).[17]

Similarly, plaintiff Gariballa has failed to allege any affirmative actions by the defendants to delay the filing of her breach of contract claim.  To the contrary, the language contained in the

_____

(. . . continued)
dismiss into a motion for summary judgment.  Banneker Ventures, 798 F.3d at 1133 (quoting Kaempe v. Myers, 376 F.3d 958, 965 (D.C. Cir. 2004)).

[17] In opposition to the defendants' motion to dismiss, plaintiff Gariballa argues for the first time that "[a]t no time did [the d]efendants state to [her] that the 'Receipt' was a final payment or settlement, [and] therefore, she was duped into signing it with [the d]efendants taking advantage of her lack of vision."  Pls.' Opp'n at 19.  However, the assertions made in her opposition directly contradict her allegations in the Complaint that she signed the partial severance payment agreement due to her dire economic circumstances, see Compl. ¶ 144, and she has not alleged any other facts that indicate that she was unaware of the nature of the agreement—despite its clear title and text— until a later date.

October 23, 2018, agreement makes clear that the defendants did not intend to pay plaintiff Gariballa any additional compensation for her claims, which contradicts any conclusory assertion that the defendants promised her some future payment in order to delay the filing of her claim. Thus, assuming arguendo that the applicable statute of limitations was tolled under either exception following her final date of employment in February 2018, her breach of contract claim accrued no later than October 23, 2018, when she signed the agreement for partial severance payment. Thus, plaintiff Gariballa had three years from that date to file her breach of contract claim, i.e., until October 25, 2021.[18] And, because plaintiff Gariballa did not file her Complaint in this case until February 3, 2023, the Court must dismiss her breach of contract claim as having been untimely filed.

### IV.    CONCLUSION

For the foregoing reasons, the Court concludes that it must grant the defendants' motion to dismiss and deny the defendants' motion to strike as moot.[19]

**SO ORDERED** this 28th day of July, 2026.[20]

REGGIE B. WALTON
United States District Judge

---

[18] Because D.C. Code § 12-301(a)(7) does not specify a method of computing the statute of limitations period, and because the final day of the applicable statute of limitations, i.e., October 23, 2021, fell on a Saturday, the Court assumes that, pursuant to the applicable rules of the Superior Court of the District of Columbia, the period continued to run until the following Monday. See D.C. Super. Ct. R. Civ. P. 6(a)(1)(C) (directing that "if the last day [of the period] is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday or legal holiday"); see also Crockett v. District of Columbia, No. 16-cv-1357 (RDM), 2020 WL 1821121, at *10 (D.D.C. Apr. 10, 2020) (concluding the same regarding the statute of limitations for a defamation claim brought under D.C. Code § 12-301).

[19] The plaintiffs also request that the Court grant them leave to amend their complaint under Federal Rule of Civil Procedure 15(a)(2), if the Court determines it must grant the defendants' motion to dismiss. See Pls.' Opp'n at 25. However, "a bare request in an opposition to a motion to dismiss—without any indication of the particular grounds on which amendment is sought—does not constitute a motion within the contemplation of Rule 15(a)." Rollins v. Wackenhut Servs., Inc., 703 F.3d 122, 130 (D.C. Cir. 2012). The Court must therefore deny this request.

[20] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.